1  Joseph N. Kravec, Jr.
   SPECTER SPECTER EVANS
2    & MANOGUE, P.C.
   The 26th Floor Koppers Building
3  Pittsburgh, Pennsylvania 15219
   Tel:    (412) 642-2300
4  Fax:    (412) 642-2309
   E-mail: jnk@ssem.com
5
   Michael D. Braun (167416)
6  BRAUN LAW GROUP, P.C.
   12304 Santa Monica Blvd., Suite 109
7  Los Angeles, CA 90025
   Tel:    (310) 442-7755
8  Fax:    (310) 442-7756
   E-mail: service@braunlawgroup.com
9
10 Ira Spiro (67641)                      Janet Lindner Spielberg (221926)
   SPIRO MOSS BARNESS, LLP                LAW OFFICES OF JANET
11 11377 West Olympic Blvd., Fifth Floor  LINDNER SPIELBERG
   Los Angeles, CA 90064-1683             12400 Wilshire Blvd., Suite 400
   Tel:    (310) 235-2468                 Los Angeles, CA 90025
12 Fax:    (310) 235-2456                 Tel:    (310) 392-8801
                                          Fax:    (310) 278-5938
13                                        E-mail: jlspielberg@jlslp.com

14 *Attorneys for Plaintiffs*

15              **UNITED STATES DISTRICT COURT**

16              **NORTHERN DISTRICT OF CALIFORNIA**

17                   **SAN JOSE DIVISION**

18

19 FELTON A. SPEARS, JR. and SIDNEY      )   CASE NO.:
   SCHOLL, on behalf of themselves and all )
20 others similarly situated,             )   **CLASS ACTION**
                                          )
21              Plaintiffs,               )   **COMPLAINT FOR DAMAGES,**
                                          )   **EQUITABLE, DECLARATORY**
22              v.                        )   **AND INJUNCTIVE RELIEF**
                                          )
23 WASHINGTON MUTUAL, INC.,               )   **DEMAND FOR JURY TRIAL**
   a Washington corporation;             )
24 FIRST AMERICAN EAPPRAISEIT,            )
   a Delaware corporation; and           )
25 LENDER'S SERVICE, INC.,                )
                                          )
26              Defendants.               )
                                          )
27 _____ )

28              **FILE BY FAX**

COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF
CASE NO.:

1      Plaintiffs, by their attorneys, bring this class action against Defendants Washington Mutual,

2  Inc. ("WaMu"), First American eAppraiseIT ("EA"), and Lender's Service Inc., ("LSI")

3  (collectively "Defendants") on their own behalf and on behalf of all others similarly situated, and

4  allege as follows based upon the investigation of their counsel:

5                     **OVERVIEW**

6      1.    This is a class action against Defendants seeking relief on behalf of Plaintiffs and a

7  class of all consumers in California and throughout the United States who, on or after June 1, 2006,

8  received home loans from WaMu, in connection with appraisals that were obtained through either

9  EA or LSI. Plaintiffs and the Class were ultimately responsible for paying for these appraisals,

10  which, as described throughout this Complaint, were not performed in an independent, objective,

11  impartial and unbiased manner, in violation of applicable law and the contractual requirements for

12  the appraisal.

13      2.    The vast majority of home purchasers in the United States finance their home

14  purchase through a third party lender. The loan has traditionally been secured by the lender, who

15  retains a security interest in the property until the loan is repaid in full. In the event of default, the

16  lender will be entitled to sell off the security interest (i.e., the property) and recoup the loan amount.

17  Thus, it traditionally has been critical for the lender to make sure the fair market value of the

18  property equals or exceeds the value of the loan.[1] To do so, lenders require that, prior to the loan,

19  the property be professionally appraised to determine its fair market value.

20      3.    A real estate appraisal is supposed to be an independent, objective, impartial,

21  unbiased, credible professional estimate of the fair market value of a particular property. It typically

22  consists of a visual inspection of the interior and exterior of a property; inspection of the

23  neighborhood; and a comparison of selling prices of comparable properties on the street or adjacent

24  areas, among other indicia. The lender (in this case, WaMu) typically undertakes to procure the

---

[1] Fair market value is the price at which a willing buyer would purchase a property and a willing seller would sell the same property, when neither party is under any compulsion to buy or sell, and each party has full knowledge of all pertinent facts relating to the sale."

1

1 | appraisal on behalf of itself and the borrower with the cost of the appraiser's services ultimately
2 | borne by the borrower.

3 |       4.      If an appraisal is properly done, the appraisers perform the appraisal, and appraisal
4 | reviewers review the appraisal report, for accuracy and compliance with applicable standards to
5 | create what legal and professional standards term a "credible appraisal". Appraisers and appraisal
6 | reviewers follow federally accepted standards, the Uniform Standards of Professional Appraisal
7 | Practice ("USPAP"), which govern the ethical and legal aspects of the appraisal undertaking,
8 | assessment, reporting and review process, and establish the minimum standards for performing a
9 | "credible appraisal". These USPAP standards are also adopted by most, if not all, states, including
10 | California. Also they are part of the contractual undertakings expressly stated in the Uniform
11 | Residential Appraisal Report, which is the standard form that appraisers use for their appraisal
12 | reports and which were used for the WaMu loans that are the subject of this Complaint. These
13 | appraisal reports also expressly provide that they are to be provided to borrowers and acknowledge
14 | that borrowers are permitted to rely on the appraisals as part of any mortgage finance transaction
15 | between borrowers and WaMu.

16 |       5.      The USPAP requirements provide that to promote and preserve the public trust
17 | inherent in professional appraisal practice, an appraiser and an appraisal reviewer must observe the
18 | highest standards of professional ethics to perform and ensure a "credible appraisal". An appraiser
19 | and an appraisal reviewer must perform assignments ethically and competently, in accordance with
20 | USPAP and any supplemental standards agreed to by the appraiser in accepting the assignment.
21 | Under USPAP, an appraiser and an appraisal reviewer must perform assignments with impartiality,
22 | objectivity, and independence, and without bias or accommodation of personal interests. In
23 | appraisal practice under USPAP, an appraiser and an appraisal reviewer must not perform as an
24 | advocate for any party or issue, must not accept an assignment that includes the reporting of
25 | predetermined opinions and conclusions or favors the cause of any client, must not communicate
26 | assignment results or write a report in a misleading or fraudulent manner, and must not permit an
27 | employee or other person to communicate a misleading or fraudulent report.

28

1       6.      In or about June 2006, WaMu entered an agreement, conspiracy or scheme with EA

2   and LSI, two purportedly independent appraisal companies, to handle all of WaMu's home loan

3   appraisals.  As part of this arrangement, EA and LSI received appraisal requests from WaMu,

4   procured local appraisers to perform the appraisals, reviewed the appraisal reports, and requested at

5   the behest of WaMu that the appraisers make changes before finalizing the reports and providing

6   them to WaMu to transmit to the borrowers.  In reality, WaMu, with the full, unfettered cooperation

7   of EA and LSI, controlled the process by which individual appraisers were selected, how home

8   appraisals were performed and ultimately the values at which properties were appraised.  EA and

9   LSI consulted directly with WaMu and its loan officers to establish the property values they desired

10  before EA and LSI (and its appraisers) finalized the appraisal reports.  This conspiratorial conduct

11  allowed WaMu to direct appraisers to artificially inflate home values and thus provide false

12  appraisals in order to qualify more people for higher value loans.  WaMu would then aggregate and

13  package these home loans and sell them in the financial markets for a substantial profit.  Ultimately,

14  the higher the volume and value of these loans, the higher WaMu's profits.  In 2006, WaMu made

15  over $760 million in revenue from sales and servicing of home mortgage loans.

16      7.      As part of the scheme, EA and LSI each received millions of dollars in appraisal fees

17  from unsuspecting WaMu borrowers who, despite paying for what should have been credible

18  appraisals (i.e., done in compliance with applicable legal and professional standards so as to provide

19  an independent, unbiased, and objective appraisal of the fair market value of their property), they

20  instead unwittingly received biased appraisals that were neither independent, objective or in

21  compliance with legal and professional standards.  Each borrower was charged for a credible, lawful

22  appraisal, but as a result of the arrangement between WaMu, EA and LSI, no credible, lawful

23  appraisal was performed.  WaMu borrowers (i.e., Plaintiffs and the Class) were damaged thereby.

24      8.      EA has its principal place of business in Poway, California and operates, manages

25  and directs its nationwide appraisal services and business operations from its offices in California.

26  Likewise, LSI has two of its three nationwide operation centers in California, from which LSI

27  operates and directs the majority, or at least a substantial proportion, of its nationwide appraisal

28  services and business operations.  A majority of WaMu's home loan portfolio are loans made in

3

1 | California, according to its 2006 Annual Report. It is therefore believed and averred that the
2 | agreements, conspiracy and misconduct at issue in this Complaint occurred, was conducted and/or
3 | was directed primarily from, or at least a substantial proportion emanated from, California,
4 | including, but not limited to: a) the designation and assignment of appraisers for WaMu home loans;
5 | b) the review, approval and revision of appraisals for WaMu home loans to meet WaMu's
6 | expectations; and c) the management and supervision of appraisal services for WaMu home loans to
7 | Plaintiffs and the Class.

8 |       9.      Defendants' conduct violates the Real Estate Settlement Procedures Act, 12 U.S.C.
9 | section 2607, the unlawful, unfair and fraudulent prongs of California's Business and Professions
10 | Code section 17200, *et seq.* (the "UCL") as well as the Consumer Legal Remedies Act ("CLRA").
11 | Defendants' conduct also constitutes an unlawful civil conspiracy. Defendants' conduct also
12 | breaches their contracts with Plaintiffs and the Class, either directly or because Plaintiffs and Class
13 | members are intended beneficiaries of the contracts, or Defendants' services, or is grounds for
14 | restitution on a quasi-contract/unjust enrichment basis.

15 | **PARTIES**

16 |       10.     Plaintiff, Sidney Scholl, is an individual who is a citizen of the State of California,
17 | residing in Sonoma County, California. In October, 2006, Ms. Scholl entered a mortgage loan
18 | through WaMu's offices in Sonoma, California to purchase a property located at 194 Terrace,
19 | Edmond, Oklahoma. In connection with this loan, WaMu procured for itself and Ms. Scholl an
20 | appraisal on the subject property from EA and/or LSI that was performed pursuant to the scheme
21 | alleged in this Complaint. Ms. Scholl was charged for this appraisal.

22 |       11.     Plaintiff, Felton A. Spears, Jr., is an individual who is a citizen of the State of
23 | California, residing in San Jose, California. In March, 2007, Mr. Spears entered a mortgage loan
24 | with WaMu on a property located in San Jose, California. In connection with this loan, WaMu
25 | procured for itself and Mr. Spears an appraisal of the subject property from EA and/or LSI that was
26 | performed pursuant to the scheme alleged in this Complaint. Mr. Spears was charged for this
27 | appraisal.

28 |

4

12.     Defendant Washington Mutual, Inc. ("WaMu") operates as a consumer and small business banking company in the United States with assets totaling $346 billion. WaMu operates in four segments: Retail Banking, Card Services, Commercial, and Home Loans. The Home Loans segment originates and services home loans, manages capital market operations, fulfills and services a portfolio of home equity loans and lines of credit, originates and purchases mortgage loans to higher risk borrowers, provides financing and other banking services to mortgage bankers for the origination of mortgage loans, and offers insurance-related products and reinsurance services. This segment offers various real estate secured residential loan products and services primarily consisting of fixed-rate home loans, adjustable-rate home loans, hybrid home loans, option ARM loans, and mortgage loans to higher risk borrowers. As of December 31, 2006, the company operated 2,225 retail banking stores and 472 lending stores and centers in 36 states, including California. According to the company's 2006 Annual Report, the majority of WaMu's home loan portfolio are loans made in California.

13.     Defendant First American eAppraiseIT ("EA") is a Delaware corporation with its principal place of business at 12395 First American Way, Poway, California. EA is a subsidiary of The First American Corporation and is a California corporation with its principal place of business at 1 First American Way, Santa Ana, California.

14.     Defendant Lender's Service Inc. is one of the country's largest providers of property valuation, title and closing services to the first mortgage, home equity, and subprime markets, as well as to mortgage servicers and investors. LSI is a subsidiary of Fidelity National Information Services, a corporation incorporated in Georgia and headquartered in Jacksonville, Florida. LSI maintains three operation centers, two of which, Santa Ana and Sacramento, are located in California.

## JURISDICTION AND VENUE

15.     Jurisdiction of this Court is proper under 28 U.S.C. § 1331(federal question jurisdiction) and §1367(supplemental jurisdiction). Plaintiffs assert a federal claim under RESPA, 12 U.S.C. §2607, and supplemental state law claims.

5

16.     Jurisdiction of this Court is alternatively proper under 28 U.S.C. §1332(d)(2). Plaintiffs are citizens of the State of California and reside in Sonoma and San Jose, California. Defendant WaMu is incorporated in the State of Washington and has its corporate headquarters in Seattle, Washington.  Defendant EA is incorporated in the State of Delaware and has its principal place of business in Poway, California.  Defendant LSI has two of its three main operation centers located in Santa Ana, California and Sacramento, California.  A substantial portion of the conduct at issue in this lawsuit took place in one or more of Defendants' California offices.

17.     The amount in controversy exceeds $5,000,000 for Plaintiffs and Class members collectively, exclusive of interest and costs, by virtue of the combined cost of appraisals performed by EA and LSI for WaMu, and the revenue and profit reaped by Defendants from their transactions with Plaintiffs and the Class, as a direct and proximate result of the wrongful conduct alleged herein, and by virtue of the statutory, exemplary and/or punitive damages alleged herein.

18.     Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b), (c) and (d).  Defendant EA has agents, transacts business and is otherwise found within this judicial district. Defendant LSI has agents, transacts business, and is otherwise found within this judicial district. Defendant WaMu has agents, transacts business and is otherwise found within this judicial district. A substantial portion of the transactions and events complained of herein, including Plaintiffs', occurred in this judicial district, a substantial portion of the affected persons and entities are in this judicial district, and Defendants have received substantial compensation from such transactions and business activity in this judicial district, including the transaction Plaintiffs entered with Defendant. Finally, Defendants inhabit and/or may be found in this judicial district, and the interstate trade and commerce described herein is and has been carried out in part within this judicial district.

## BASIC FACTUAL ALLEGATIONS

### The Real Estate Mortgage Industry
### Provides Incentives for High Appraisals

19.     WaMu is the country's largest savings and loan with assets totaling $346 billion. During the first three quarters of 2007 alone, WaMu originated $116 billion in residential mortgage loans.  WaMu procures more appraisals from EA and LSI than any other single entity.

6

1      20.    Traditionally, a lender such as WaMu would have an interest in ensuring that a

2 borrower is able to repay a home loan, and that the loan is adequately collateralized in case the

3 borrower defaults.  Likewise, a consumer borrowing money for a home loan places their trust in the

4 lender to procure a credible appraisal (i.e., one done in compliance with applicable legal and

5 professional standards so as to provide an independent, objective and unbiased appraisal of their

6 home's value) and to lend them money on terms appropriate to that independent, objective and

7 unbiased assessment of that home's fair market value.  Traditionally, the borrower and lender share

8 a common interest in having a property independently and objectively appraised to ensure both that

9 the borrower is not paying too much, and that the property value can support repayment of the loan

10 in the event of a default.

11      21.    Because traditionally banks retained ownership of the loan and mortgage for the life

12 of the loan, their primary interest was to make sure that the buyer paid off the principal and interest

13 without delay or default.  Whenever a buyer defaulted on a loan it would have a direct financial

14 impact on the lender, i.e. loss or threatened loss of principal and interest on the loan.  If the loan was

15 properly based on the actual fair market value of the property, however, the lender would be able to

16 sell the loan and recoup the outstanding principal.  Accordingly, it was critical that the market value

17 of the property was properly appraised and that the loan amount reflected that value.

18      22.    In recent years the traditional model, whereby banks held a mortgage loan until it was

19 paid off, has changed.  Banks such as WaMu no longer hold all, or even most of their mortgage

20 loans, but instead sell them to investment banks or government sponsored enterprises such as the

21 Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage

22 Corporation ("Freddie Mac").  These loans are then pooled together, securitized, and sold to the

23 general public as mortgage backed securities, allowing lenders such as WaMu to profit from the

24 volume and value of loans it has procured.  The larger the aggregate value of the loans, the more

25 profit for the lender.

26      23.    The paradigm shift away from retaining a portfolio of loans towards the sale of

27 mortgage backed securities fundamentally altered a lender's incentive to issue quality loans.  By

28 selling the vast majority of their mortgage loan portfolio to other companies, banks no longer

<div align="center">7</div>

1  assumed the risk of a bad loan. The risk of default was passed on to other companies and eventually

2  the investors who bought mortgage backed securities. More importantly, now bank profit directly

3  correlated to the volume and value of loans generated, not the likelihood that a loan would be

4  repaid. Banks were thus incentivized to offer as many loans at the highest dollar amounts that could

5  be offered with little regard to whether the loan could be paid back.

6       24.     In this environment, there remained little incentive for lenders to obtain a credible

7  appraisal of a property's real market value and every incentive to offer the highest loan possible and

8  to support it with biased, artificially inflated, false appraisals.

9                **Federal and State Laws Require Appraisal Independence**

10      25.     Despite the new economic paradigm fueling the mortgage lending industry, state and

11  federal regulations require that appraisals be "credible" by being  independent, objective, unbiased

12  and performed in compliance with the minimum standards set forth in the Uniform Standards of

13  Professional Appraisal Practice ("USPAP"). These USPAP standards are incorporated into federal

14  law, *see* 12 C.F.R. § 34.44, are incorporated into many, if not all, state laws, including California,

15  *see* California Business and Professions Code §11319, and are part of the contractual undertakings

16  expressly stated in the Uniform Residential Appraisal Report, which is the standard form that

17  appraisers use for their appraisal reports and which were used for the WaMu loans that are the

18  subject of this Complaint. These appraisal reports also expressly contemplated that they would be

19  provided to borrowers and acknowledged that borrowers may rely on the appraisals as part of any

20  mortgage finance transaction between borrowers and WaMu.

21      26.     USPAP requires appraisers to conduct their appraisals independently: "An appraiser

22  must perform assignments with impartiality, objectivity, and independence, and without

23  accommodation of personal interests. In appraisal practice, an appraiser must not perform as an

24  advocate for any party or issue. An appraiser must not accept an assignment that includes the

25  reporting of predetermined opinions and conclusions." USPAP Ethics Rules (Conduct).

26      27.     USPAP requires appraisers to communicate their appraisals honestly: "An appraiser

27  must not communicate assignment results in a misleading or fraudulent manner. An appraiser must

28

8

1   not use or communicate a misleading or fraudulent report or knowingly permit an employee or other

2   person to communicate a misleading or fraudulent report." USPAP Ethics Rules (Conduct).

3       28.    USPAP requires that "[i]n developing a real property appraisal, an appraiser must:

4   (a) be aware of, understand, and correctly employ those recognized methods and techniques that are

5   necessary to produce a credible appraisal..." USPAP Standards Rule 1-1.

6       29.    USPAP also requires that "[e]ach written real property appraisal report must contain

7   a signed certification that is similar in content to the following form:

8       I certify that, to the best of my knowledge and belief:

9       -    the statements of fact contained in this report are true and correct.

10      -    the reported analyses, opinions, and conclusions are limited only by the reported
            assumptions and limiting conditions and are my personal, impartial, and unbiased
11           professional analyses, opinions, and conclusions.

12      -    I have no (or the specified) present or prospective interest in the property that is the
            subject of this report and no (or the specified) personal interest with respect to the
13           parties involved.

14      -    I have no bias with respect to the property that is the subject of this report or to the
            parties involved with this assignment.

15

16      -    my engagement in this assignment was not contingent upon developing or reporting
            predetermined results.

17
        -    my compensation for completing this assignment is not contingent upon the
18           development or reporting of a predetermined value or direction in value that favors
            the cause of the client, the amount of the value opinion, the attainment of a stipulated
19           result, or the occurrence of a subsequent event directly related to the intended use of
            this appraisal.
20
        -    my analyses, opinions, and conclusions were developed, and this report has been
21           prepared, in conformity with the *Uniform Standards of Professional Appraisal
            Practice*."
22

23  The appraisal reports for the WaMu loans that are the subject of this Complaint contained this or a

24  materially identical certification.

25      30.    The same or similar USPAP ethics rules, standards and certifications are required for

26  appraisal reviewers (i.e., appraisers who perform a quality review of another appraiser's report).

27  Such appraisal reviews were performed by EA and LSI appraisal reviewers on the appraisal reports

28  for the WaMu loans that are the subject of this Complaint.

9

1    31.    Federal law mandates that appraisers involved in federally-regulated transactions

2  operate independently. *See* 12 U.S.C. §§ 3331 *et seq.*  The Federal Regulations provide that for

3  independent contractors or "fee" appraisers, the appraiser shall "have no direct or indirect interest,

4  financial or otherwise, in the property or the transaction." 12 C.F.R. 34.45.

5    32.    In 2005, federal regulators, including the Office of Thrift Supervision ("OTS"),

6  published "Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement

7  on Independent Appraisal and Evaluation Functions."  With regard to appraisal independence, the

8  statement provides:

9      3.      Who should be considered the loan production staff for
10             purpose of achieving appraisal independence?  Could loan
               production staff select an appraiser?

11     Answer:  The loan production staff consists of those responsible for
12              generating loan volume or approving loans, as well as their
                subordinates.  This would include any employee whose
13              compensation is based on loan volume.  Employees
                responsible for credit administration function or credit risk
14              management are not considered loan production staff.  **Loan
                production staff should not select appraisers.**

15     5.      When selecting residential appraiser, may loan production staff
16             use a revolving pre-approved appraiser list, provided the list is
               not under their control?

17     Answer:  Yes, loan production staff may use a revolving board-approved
18              list to select a residential appraiser, provided the development
                and maintenance of the list is not under their control.  **Staff
19              responsible for the development and maintenance of the
                list should be independent of the loan production process.
20              Further, there should be periodic interval review of the
                appraiser selection process to ensure that appropriate
21              procedures are being followed and that controls exist to
                ensure independence.**  (Emphasis added).

22

23              **LSI and EA
24      Conspired With WaMu to Provide Artificial Appraisals**

25     33.    In 2006, responding to these federal regulations, as well as threats of strict federal

26  enforcement of appraiser independence in the mortgage lending industry, WaMu attempted to

27  insulate itself from criticism and federal oversight by entering into an agreement with two

28  purportedly independent Appraisal Management Companies ("AMCs"), First American eAppraiseIT

<center>10</center>

1  and Lender's Services, Inc., whereby WaMu would procure appraisals from these two AMCs on

2  behalf of borrowers for all or nearly all WaMu residential loans nationwide and the cost of the

3  appraisals would be charged to the borrowers at the time of closing. These two AMCs were engaged

4  to oversee the appraisal process and provide a barrier of independence between WaMu (the lender)

5  and those hired to appraise properties on which it would provide mortgage loans. In theory, these

6  AMCs were to select appraisers independent of WaMu, serve as the sole contact with the appraiser,

7  review the appraiser's report, and communicate the unbiased results and report to WaMu. WaMu

8  would in turn communicate the appraisal results and reports to WaMu borrowers so both the

9  borrower and lender could rely on them in entering the mortgage loans. Under this arrangement,

10  WaMu would theoretically not be able to improperly influence the appraiser or the ultimate value

11  placed on a property.

12       34.    Both EA and LSI tout themselves as unbiased appraisers who abide by USPAP

13  requirements. As reported on its website, EA assures consumers that it uses "only the services of

14  appraisers licensed or certified by the state in which a subject property is located" and "customers

15  can be assured that Uniform Standards of Professional Appraisal Practice and Financial Institutions

16  Reform Recovery and Enforcement Act ("FIRREA") guidelines are followed and that each appraisal

17  is audited for compliance." Likewise, LSI assures consumers that its appraisals "conform to USPAP

18  requirements."

19       35.    In or about June 2006, WaMu retained EA and LSI to administer WaMu's appraisal

20  program. Since this time, EA and LSI have performed nearly all of WaMu's appraisals. WaMu

21  borrowers quickly became both EA's and LSI's largest source of revenue. Since June 2006, EA

22  alone has received over $50 million in fees from borrowers who received loans through WaMu.

23       36.    Prior to being retained by WaMu, EA and LSI used a combination of internal staff

24  and third party appraisers to service clients. Although the independence of the appraiser is critical to

25  the appraisal process, soon after retaining EA and LSI to administer WaMu appraisal program,

26  WaMu identified certain appraisers ("Preferred Appraisers") that WaMu requested conduct

27  residential property appraisals for its loans. At first these preferred appraisers were simply added to

28  the list of possible appraisers to conduct appraisals for WaMu loans, but eventually WaMu

1   demanded that all of its appraisals be done by the Preferred Appraisers.  Despite USPAP and

2   FIRREA requirements that appraisers be independent, EA and LSI acquiesced to WaMu's demand

3   to staff appraisals with Preferred Appraisers.

4          37.     Additionally, WaMu encouraged EA and LSI to hire former WaMu employees as

5   staff appraisers and appraisal business managers, the latter of which had authority to override and/or

6   revise the values reached by third party appraisers.  Both LSI and EA agreed to WaMu's request and

7   took on new employees who formerly worked for WaMu as its appraisers and regional managers.

8          38.     Moreover, pursuant to contractual agreements between WaMu and the AMCs, WaMu

9   had the right to challenge an appraiser's conclusions by requesting a "reconsideration of value" (also

10  known as a "ROV" or "rebuttal") when WaMu did not like the appraised value of a home.  This

11  rebuttal system gave WaMu a direct way to request that EA or LSI reconsider an appraiser's report

12  and to raise the value assigned to a given home.  WaMu frequently used this "reconsideration of

13  value" technique to get EA and LSI to provide higher appraisal values on a home to enable its loan

14  origination staff to close a loan.

15         39.     In addition to WaMu's contractual ability to request a re-appraisal of property

16  valuation, the AMCs' Appraisal Business Managers, hired at the request of WaMu, were given

17  unfettered authority to override the values prescribed by third party appraisers.  According to a

18  complaint filed by the New York Attorney General ("NYAG") against EA, a WaMu executive

19  defined the role of EA's Appraisal Business Managers in terms of value disputes in the following

20  way:

21         ... the four appraisers/reviewers would be directly involved in escalations dealing
           with: ROVs, Valuation issues where the purchase price and appraised value differ
22         with no reconciliations/justifications by the appraiser, Value cuts which we continue
           to receive from your third party reviewers (Wholesale), **proactively making a
23         decision to override and correct the third party appraiser's value or reviewer's
           value cut**, when considered appropriate and supported...

24

25  Through these Appraisal Business Managers, WaMu sought to, and did, ensure that home valuations

26  would be sufficient to support the loan WaMu wanted to provide.

27

28

                                    12

**Guaranteed High Appraisals Were Facilitated Through
Instituting WaMu's Preferred Appraiser List**

40.     Soon after entering its arrangement with EA and LSI, WaMu's loan origination staff began complaining about the appraisals performed by these AMCs having property values too low for the proposed loans.  WaMu's origination staff received commissions based on the value and volume of loans generated.  Their dissatisfaction was based on desire to close loans at amounts higher than the appraisals justified.

41.     For example, according to the NYAG's complaint, as early as August 9, 2006, WaMu's internal staff admonished EA for not providing appraisals at the values they wanted.  In response to this acknowledged, improper pressure coming from WaMu's loan origination staff who desired the higher appraisals, EA's Executive Vice President capitulated to WaMu's demands by giving its Appraisal Business Managers discretion to raise the value of homes up to $50,000.

42.     In order to guarantee WaMu would get the high appraisals it wanted, without having to go through the delay of the rebuttal system, by the winter of 2007, WaMu insisted that EA and LSI use WaMu's "Preferred Appraisers" for all of WaMu's home loan appraisals.  These appraisers were individuals whom WaMu was confident would appraise properties at a high inflated value to ensure WaMu could quickly close the loan at a desired amount, and get as much value from the transaction as possible.

43.     According to the NYAG's complaint, both EA and LSI were complicit with WaMu's demands to exclusively use Preferred Appraisers.  In an email dated February 22, 2007, EA's President explained to senior executives at EA's parent corporation, First American, that:

> We had a joint call with Wamu and LSI today.  The attached document outlines the new appraiser assigning process.  In short, we will now assign all WaMu's work to WaMu's "Proven Appraisers" ... We will pay their appraisers whatever they demand. **Performance ratings to retain position as a Wamu Proven Appraiser will be based on how many come in on value, negating a need for an ROV.** (Emphasis added).

///
///
///

13

1

**WaMu's "Preferred Appraiser List" Included Only Appraisers
Selected and Controlled by WaMu's Loan Origination Staff**

2

3          44.     The individuals on the "Preferred Appraiser List" were hand selected by WaMu's

4    loan origination staff. Requests sent to WaMu's AMCs for the addition of specific appraisers to the

5    approved list were often sent by WaMu's loan origination staff themselves. WaMu's Vice President

6    of "Appraisal Oversight" – the division of WaMu that is supposed to be responsible for ensuring that

7    no undue influence is exerted by WaMu's loan origination staff on appraisers – stated in an email to

8    EA regarding one ROV for a "low value," that "[t]his is an example of the issue that has caused

9    sales pushing for a 'proven appraiser' process."

10          45.     In an email dated March 5, 2007, WaMu confirmed the role of its loan origination

11    staff in choosing specific appraisers for WaMu's "Proven Appraiser List:"

12          Proven Appraiser List is being created. This will replace the WaMu preferred list.
          **The initial list of names will be provided by lending** with a minimum of two
13          appraisers per area/county. The list will then be reviewed and approved by the
          Appraisal Business Oversight Team and will be checked against our most recent
14          ineligible list. Final list will be provided to VMC's [vendor management
          companies]. Majority of work must be assigned to the appraisers on the Proven
15          Appraiser List on a Priority Basis. (Emphasis added).

16          46.     Any review and approval by WaMu's Appraisal Business Oversight Team was a

17    facade. If an AMC went to WaMu's Appraisal Business Oversight team to discuss the pressure

18    being put on it by WaMu's loan origination staff to provide higher home appraisal values, WaMu

19    responded by telling the AMC to work the issue out directly with the lending staff. WaMu insisted

20    that its loan origination staff have direct contact with appraisers so they could get the appraisals at

21    the value they wanted. Both EA and LSI permitted this direct involvement to occur.

22          47.     Appraisers were also aware that the Proven Appraisers were being selected by

23    WaMu's loan origination staff, and that the only way for an appraiser to get onto the list was by

24    giving WaMu's origination staff the appraisals they sought. According to the NYAG's complaint, in

25    an email sent on April 17, 2007 to EA's staff appraisers to explain why staff appraisers were

26    removed from WaMu's Proven Appraiser List, EA's manager acknowledged WaMu's loan

27    origination staff's involvement in the selection of appraisers to perform WaMu's appraisals:

28

14

1    I thought I [sic] pass on my thoughts regarding the recent message that we all
     received for [sic] Peter last weekend.  I will be glad to tell you what I know.  I have
2    been told that the lending folks at Wamu and [sic] were unhappy with the AMC's and
     felt they were not receiving a good level of appraisal work.  They therefore decided to
3    construct their own appraisal panel, now known as the wamu proven panel, and
     instructed the AMC's to utilize appraisers from this panel whenever possible.  The
4    end result is that if you are not on this proven panel it is very unlikely you will
     receive wamu work.
5

6       48.     The involvement of WaMu's loan origination staff in selecting appraisers to perform

7    WaMu's home loan appraisals was readily apparent to all parties involved and evidenced by emails

8    sent by WaMu's origination staff to EA and LSI requesting the addition of specific appraisers to the

9    Proven Appraiser List.  In an email identified in the NYAG's complaint, EA's Executive Vice

10   President informed EA's President that "currently WAMU is controlling the appraisal panel.  They

11   are selecting appraisers and calling them 'proven' appraisers.  These appraisers are being chosen by

12   their sales force.  First American eAppraiseIT (FA eAppraiseIT) is obligated to use these

13   appraisers."  The stated reason WaMu insisted on only using its 'proven' appraisers was because

14   EA's appraisers provided WaMu with "low values."

15      49.     In addition to selecting which appraisers were on the Proven Appraiser List, WaMu's

16   loan origination staff was responsible for removing appraisers from the list who did not comply with

17   staff expectations or requests for high appraisals, or who performed desk evaluations of other

18   appraisals and reduced another appraiser's valuation of one of WaMu's customer's properties.

19                          **WaMu's Proven Appraiser List is Illegal**

20      50.     The Code of Federal Regulations provides that for independent contractors or "fee"

21   appraisers, the appraiser shall "have no direct or indirect interest, financial or otherwise, in the

22   property or the transaction."  12 C.F.R. 34.45.  In addition, the Uniform Standards of Professional

23   Appraisal Practice ("USPAP") are incorporated into federal law, *see* 12 C.F.R. § 34.44, are

24   incorporated into many, if not all, states' laws, including California, and are expressly incorporated

25   as part of the Uniform Residential Appraisal Report used as the standard form for the appraisal

26   reports for the WaMu loans that are the subject of this Complaint.  USPAP requires appraisers and

27   appraisal reviewers to provide and ensure "credible" appraisals by complying with USPAP and other

28   applicable legal and professional requirements, which include, among other things, the requirement

                                          15

1    that appraisals and appraisal reviews be conducted independently and without bias: "An appraiser

2    must perform assignments with impartiality, objectivity, and independence, and without

3    accommodation of personal interests. In appraisal practice, an appraiser must not perform as an

4    advocate for any party or issue." USPAP Ethics Rules (Conduct).

5        51.    Despite the requirement that appraisers be unbiased, independent, and have no direct

6    or indirect interest in the home mortgage transaction, the agreements between WaMu and EA and

7    LSI establishing WaMu's Proven Appraiser List put in place an appraisal system that was anything

8    but unbiased and independent. Those appraisers willing to provide WaMu with its desired high

9    appraisals for home mortgage transactions were paid an additional 20% WaMu preferred appraisal

10   fee each appraisal. Those appraisers unwilling to bend to WaMu's, EA's and LSI's desire to provide

11   WaMu with high appraisals were removed from the Proven Appraiser List by WaMu's loan

12   origination staff, and were thereafter prohibited from providing appraisals for WaMu by EA or LSI.

13   Appraisers, therefore, had a stake in each and every appraisal they performed for WaMu. They were

14   rewarded financially for providing high home appraisal values through the 20% premium for each

15   WaMu appraisal performed, and were rewarded by staying on WaMu's "Proven Appraiser List" for

16   future WaMu appraisals.

17       52.    EA and LSI likewise had a financial incentive to provide WaMu with the specific

18   appraisers WaMu wanted. If either EA or LSI did not agree to provide WaMu with appraisers from

19   WaMu's Proven Appraiser List, they faced losing millions of dollars of business on WaMu's loans.

20       53.    EA recognized that WaMu's Proven Appraiser List was unlawful, but chose to go

21   along with WaMu and continued providing illegal appraisal services in order to reap millions of

22   dollars from unsuspecting borrowers. According to the NYAG's complaint, in an email from EA's

23   president to senior executives of First American dated April 17, 2007, EA described the relationship

24   with WaMu as follows: "In short, the issuers are using their designated appraisers as mandated by

25   the WaMu production force at 20% gross margin and bypassing our panel. **We view this as a**

26   **violation of the OCC, OTS, FDIC and USPAP influencing regulation.**" (Emphasis added). In

27   support of EA's conclusion that its agreement with WaMu was illegal, EA's Executive Vice

28

16

1    President prepared a summary of the guidelines regarding appraiser independence and, compared to

2    WaMu's Proven Appraiser List, concluded the following:

3         Based on our conversations we have had with the WAMU oversight as well as the
          questions and answers initiated by our competitor LSI, **it is our interpretation that**
4         **the loan production staff has a great deal to do with selecting appraisers.  The**
          **PAL [Proven Appraiser List] has been selected by the loan production staff and**
5         **the continued use of these appraisers is being monitored by the loan production**
          **staff.**  For example, on the LSI question #1 "Does WAMU want to be updated
6         transactionally on every order we can not assign to a PAL?", WAMU's answer is
          "Yes, we need a short sentence in the message log so that we can monitor, – AND
7         most important – lending can see why you didn't assign to a PAL service provider.
          Not using a PAL appraiser will be an issue so we need to ensure we've covered our
8         bases as to why they're not utilized."  **This appears to be directly in contradiction**
          **to the interagency guidelines unless you have a different interpretation.**
9         (Emphasis added).

10        54.    Both EA and LSI knew that what WaMu was doing, by having its loan origination

11   staff personally select appraisers, was illegal, and that by agreeing to provide WaMu with its

12   "Proven Appraisers" EA and LSI were acting as co-conspirators.  According to the NYAG's

13   complaint, in an email dated April 17, 2007, EA's Executive Vice President wrote to EA's President

14   and Chief Operating Officer regarding EA's liability on this:

15        OTS and OCC only control lenders.  However, there is the legal concern about
          collusion.  For example, let's say it is discovered that a lender (loan officer at a
16        lender) is being collusive with an appraiser that is on OUR (WAMU) panel.  That is,
          our reps and warrants apply.  Then we are liable I would say because we have gone
17        along with it....  In addition, I think it will tarnish our reputation in the appraisal
          community because we are allowing WAMU to pick appraisers based on their loan
18        officers.  It makes us look complicit.  So [it] may not be actionable
          legally but would hurt our reputation.  So those are two bad things off the
19        cuff.  There may be more if we think about it and use creative paranoia.

20        55.    Despite increasing regulatory scrutiny, rather than abandon the Proven Appraiser List,

21   WaMu sought to obfuscate its misfeasance by changing the name of its Proven Appraiser List to the

22   "WaMu Select" panel.  WaMu stated that the, "Name change from 'proven appraiser' and/or use of

23   the moniker "PAL" list is discontinued, under direction of the WaMu legal department.  We are

24   utilizing a more generic term acceptable w/in regulatory guidelines and industry standards."

25        56.    As a result of WaMu's, EA's and LSI's arrangement, conspiracy and scheme,

26   thousands of WaMu borrowers who collectively paid millions of dollars for "independent, unbiased,

27   and credible" appraisals, failed to receive what they paid for and were damaged thereby.

28

17

**PLAINTIFF SIDNEY SCHOLL**

1
2      57.     Plaintiff, Sidney Scholl, is an individual who is a citizen of the State of California,
3  residing in Sonoma County, California.
4      58.     In October, 2006, Ms. Scholl entered a mortgage loan through WaMu's offices in
5  Sonoma, California to purchase a property located at 194 Terrace, Edmond, Oklahoma.  See Exhibit
6  1 (Settlement Statement).
7      59.     In connection with this loan, WaMu procured for itself and Ms. Scholl an appraisal
8  on the subject property from EA and/or LSI.  See Exhibit 2 (appraisal report).  The appraisal report,
9  utilizing the Uniform Residential Appraisal form, certifies that it was completed in compliance with
10 the USPAP standards, including being performed in an independent, objective and unbiased manner.
11 *Id.*  It also acknowledges that the appraisal was performed for WaMu and EA and provided to them
12 and LSI, and was contemplated to be disclosed to and could be relied upon by the borrower, Ms.
13 Scholl, in her mortgage loan transaction with WaMu.  *Id.*  Ms. Scholl was charged $255.00 for this
14 appraisal.
15     60.     Ms. Scholl understood she was purchasing a credible, lawful appraisal and had no
16 reason to doubt the certification in the appraisal report and therefore believed that the appraisal done
17 on her property was performed independently, objectively, without undue influence or bias to affect
18 the value of the home, and was otherwise a credible, lawful appraisal done in compliance with
19 applicable law.  It was upon this appraisal that Ms. Scholl and WaMu entered her loan.
20     61.     Contrary to Ms. Scholl's belief and unbeknownst to her until shortly before filing this
21 Complaint, the appraisal for the property that was the subject of her WaMu loan was created
22 pursuant to the scheme described in this Complaint and therefore Ms. Scholl did not receive the
23 independent, objective, unbiased and credible appraisal done in compliance with applicable law for
24 which she paid, since no such appraisal was performed by WaMu, EA, LSI or their agents.  Ms.
25 Scholl has been damaged thereby.

**PLAINTIFF FELTON A. SPEARS, JR.**

26
27     62.     Plaintiff, Felton A. Spears, Jr., is an individual who is a citizen of the State of
28 California, residing in San Jose, California.

18

1       63.    In March, 2007, Mr. Spears entered a mortgage loan with WaMu on a property

2  located in San Jose, California.  See Exhibit 3 (Closing Statement).

3       64.    In connection with this loan, WaMu procured for itself and Mr. Spears an appraisal

4  on the subject property from EA and/or LSI.  It is believed that the appraisal report, utilizing the

5  Uniform Residential Appraisal form, certifies that it was completed in compliance with the USPAP

6  standards, including being performed in an independent, objective and unbiased manner.  *Id.*  It is

7  also believed that the appraisal report acknowledges that the appraisal was performed for WaMu and

8  EA and provided to them and LSI, and was contemplated to be disclosed to and could be relied upon

9  by the borrower, Mr. Spears, in his mortgage loan transaction with WaMu.  *Id.*  Mr. Spears was

10  charged approximately $361.00 for this appraisal.

11       65.    Mr. Spears understood he was purchasing a credible, lawful appraisal and had no

12  reason to doubt the certification in the appraisal report and therefore believed that the appraisal done

13  on his property was performed independently, objectively, without undue influence or bias to affect

14  the value of the home, and was otherwise a credible, lawful appraisal done in compliance with

15  applicable law.

16       66.    Contrary to Mr. Spears' belief and unbeknownst to him until shortly before filing this

17  Complaint, the appraisal for the property that was the subject of his WaMu loan was created

18  pursuant to the scheme described in this Complaint and therefore Mr. Spears did not receive the

19  independent, objective, unbiased and credible appraisal done in compliance with applicable law for

20  which he paid, since no such appraisal was performed by WaMu, EA, LSI or their agents.  Mr.

21  Spears has been damaged thereby.

22               **DEFENDANTS' CONCEALMENT OF ITS SCHEME**

23       67.    WaMu's, EA's and LSI's scheme to conduct and charge Plaintiffs and the Class for

24  appraisals for WaMu home loans that were neither independent, objective, impartial, unbiased,

25  credible or in compliance with USPAP and applicable law was never disclosed to Plaintiffs or any

26  Class member by Defendants.

27       68.    Nor did Defendants give Plaintiffs or the Class any reason to suspect that there was

28  any problem with their appraisal.  Indeed, EA and LSI were recognized, experienced appraisal

<div align="center">19</div>

1 companies who retained certified appraisers who prepared reports that on the surface appeared to

2 have all of the earmarks of a legitimate, independent, objective, unbiased, credible and lawful

3 appraisal. The appraisal reports even included the appraiser's certification that the report was done

4 independently, objectively, impartially and in compliance with USPAP standards and applicable

5 law.

6   69. Moreover, it was traditional that lenders, like WaMu, would obtain appraisals of

7 properties in connection with a home loan and would provide the appraisal report to borrowers and

8 would charge them for it. In other words, without disclosure of Defendants' arrangement, Plaintiffs

9 and the Class could not have reasonably suspected that there was anything wrong with the appraisal

10 for which they were charged.

11   70. The first time Defendants' scheme was publically revealed was in the Fall of 2007

12 when the New York Attorney General announced its investigation and complaint against EA for

13 conspiring with WaMu to create false appraisals for WaMu home loans. It was only upon and after

14 the New York Attorney General's announcement in the Fall of 2007 that Plaintiffs became aware of

15 Defendants' scheme, and that Class members could have become aware of Defendants' scheme.

16         **CLASS ACTION ALLEGATIONS**

17   71. Plaintiffs bring this action on behalf of themselves and on behalf of all other

18 members of the Class ("Class"), defined as all persons in the United States who received a home

19 loan with WaMu and received an appraisal performed by EA or LSI. Excluded from the Class are

20 WaMu's, EA's, and LSI's officers, directors and managerial employees, and any of WaMu's, EA's,

21 or LSI's subsidiary or affiliated entities and any of the judges of the Court before which this case is

22 pending.

23   72. There are thousands of class members who are geographically dispersed throughout

24 the United States, including California. Therefore, individual joinder of all members of the Class

25 would be impracticable.

26   73. Common questions of law or fact exist as to all members of the Class. These

27 questions predominate over the questions affecting only individual class members. These common

28 legal or factual questions include:

<div align="center">20</div>

1    —    Whether WaMu entered into an agreement with EA and/or LSI to procure appraisal services that were not performed by independent, unbiased appraisers as required by
2         law;

3    —    Whether Defendants had and have policies, practices, or procedures that undermine the possibility that Plaintiffs and the Class received credible appraisals done in
4         compliance with USPAP and applicable law;

5    —    Whether WaMu, through its agreement with EA and/or LSI, was able to control the appraisal process, by its loan origination personnel or otherwise, by having either EA
6         or LSI provide higher appraised values for homes than EA's or LSI's appraiser had initially concluded or than was the actual fair market value of the home;
7
     —    Whether EA and/or LSI agreed with WaMu to provide WaMu with appraisers who
8         were selected by WaMu to be on WaMu's Proven Appraiser List (or the WaMu Select panel);
9
     —    Whether WaMu controlled and/or manipulated the pool of appraisers on WaMu's
10        Proven Appraiser List;

11   —    Whether the agreements between WaMu, EA and LSI constitutes a civil conspiracy;

12   —    Whether Defendants' actions described herein violate California's Business and Professions Code, sections 17200 et seq.;
13
     —    Whether Defendants' actions violate California's Consumer Legal Remedies Act,
14        California Civil Code sections 1750 et seq.;

15   —    The appropriate measure of damages and/or restitution; and

16   —    Whether Defendants breached their contracts with Plaintiffs and the Class.

17        74.    Plaintiffs' claims are typical of the claims of the Class, in that Plaintiffs took out

18   home mortgage loans with Defendant WaMu and their home appraisals were procured for them by

19   WaMu through EA and/or LSI. Plaintiffs, therefore, are no different in any relevant respect from

20   any other Class member, and the relief sought is common to the Class.

21        75.    Plaintiffs are adequate representatives of the Class because their interests do not

22   conflict with the interests of the class members they seek to represent, and they have retained

23   counsel competent and experienced in conducting complex class action litigation. Plaintiffs and

24   their counsel will adequately protect the interests of the Class.

25        76.    A class action is superior to other available means for the fair and efficient

26   adjudication of this dispute. The damages suffered by each individual class member likely will be

27   relatively small, especially given the burden and expense of individual prosecution of the complex

28   litigation necessitated by Defendants' conduct. Thus, it would be virtually impossible for the class

21

1  members individually to effectively redress the wrongs done to them. Moreover, even if the class

2  members could afford individual actions, it would still not be preferable to class wide litigation.

3  Individualized actions present the potential for inconsistent or contradictory judgments. By contrast,

4  a class action presents far fewer management difficulties and provides the benefits of single

5  adjudication, economies of scale, and comprehensive supervision by a single court.

6        77.    In the alternative, the Class may be certified because Defendants have acted or

7  refused to act on grounds generally applicable to the Class, thereby making appropriate preliminary

8  and final equitable relief with respect to the Class as a whole.

9  <div align="center">**FIRST CLAIM FOR RELIEF**</div>

10  <div align="center">**(Against Defendants' for Violation of RESPA, 12 U.S.C. § 2607)**</div>

11        78. . . .Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate

12  them as if they were fully written herein.

13        79.    Under 12 U.S.C. § 2607(b) of RESPA, "[n]o person shall give and no person shall

14  accept any portion, split, or percentage of any charge made or received for the rendering of a real

15  estate service in connection with a transaction involving a federally related mortgage loan other than

16  for services actually performed."

17        80.    Plaintiffs and the Class entered federally related mortgage loans with WaMu on or

18  after June 1, 2006.

19        81.    In connection with these WaMu loans, Plaintiffs and the Class were charged for

20  appraisals WaMu procured for them through EA and LSI that were certified in the appraisal report to

21  be credible, independent, objective, unbiased, and performed in compliance with USPAP and

22  applicable law. As described throughout this Complaint, no such appraisals were performed by

23  Defendants and the appraisals for which Plaintiffs and the Class were charged by Defendants were

24  neither independent, objective, unbiased or performed in compliance with USPAP or applicable law,

25  in violation of 12 U.S.C. § 2607(b) of RESPA. As such, the appraisals Plaintiffs and the Class

26  received from WaMu, EA and LSI were not appraisals at all in that they could not be relied upon at

27  all since they had not been performed in compliance with the applicable legal and professional

28

<div align="center">22</div>

1  standards. In other words, the appraisals Plaintiffs and the Class received were not worth the paper

2  on which they were printed and were otherwise valueless.

3      82.    Plaintiffs and the Class never received the appraisal service for which they were

4  charged by Defendants and have been damaged thereby.

5      . 83.   Under 12 U.S.C. § 2607(a) of RESPA, "[n]o person shall give and no person shall

6  accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or

7  otherwise, that business incident to or part of a real estate settlement service involving a federally

8  related mortgage loan shall be referred to any person."

9      84.    As described throughout this Complaint, WaMu entered into an agreement or

10  understanding with EA and LSI that in exchange for WaMu steering to EA and LSI all, or most,

11  appraisal work for WaMu home loans that EA and LSI would cooperate with WaMu to ensure that

12  the appraisals established property values sufficient to support WaMu home loan amounts,

13  regardless of the true market value of the property that was the subject of the WaMu home loan.

14      85.    To facilitate WaMu's, EA's and LSI's agreement or understanding, EA and LSI

15  agreed to use (for WaMu home loans) appraisers that WaMu's loan origination staff selected to be

16  on its Proven Appraiser List based on these individuals providing WaMu with sufficiently high

17  appraisals to financially benefit both WaMu and its loan origination staff. In return, WaMu

18  demanded that EA and LSI pay appraisers on its Proven Appraiser List a 20% premium over what

19  EA's and LSI's staff or third party appraisers were paid. Those appraisers who did not provide

20  WaMu with the desired high appraisal values were removed from WaMu's Proven Appraiser List by

21  WaMu's loan origination staff, and were thereafter prohibited from providing appraisals for WaMu,

22  and could not get the 20% appraisal premium. Appraisers on WaMu's Proven Appraiser List have a

23  financial interest in each and every WaMu home loan mortgage transaction that they perform

24  appraisal services for, both for the immediate 20% additional fee, as well as future appraisals for

25  WaMu at the additional 20% fee.

26      86.    WaMu benefitted from this arrangement by securing more high value home

27  mortgages that it could bundle and securitize for substantial profits, and EA and LSI benefitted from

28  this arrangement by securing a steady stream of appraisal work on WaMu home loans. Appraisers

1   on WaMu's Proven Appraiser List who were retained by EA and LSI to perform appraisals for

2   WaMu home loans benefitted from this arrangement by receiving a 20% premium in return for their

3   participation in this unlawful arrangement with WaMu, EA and LSI.

4         87.    Plaintiffs and the Class were damaged by Defendants' arrangement in that they never

5   received the appraisal service for which they were charged by Defendants and instead unwittingly

6   received unreliable, biased appraisals that were the basis of the mortgage transactions they entered

7   with WaMu.

8                             **SECOND CLAIM FOR RELIEF**

9          **(Against Defendants for Unfair Business Practices in Violation of**
                    **Business & Professions Code §§ 17200, *et seq.*)**

10

11         88.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate

12   them as if they were fully written herein.

13         89.    The UCL defines unfair business competition to include any "unlawful, unfair or

14   fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200.

15         90.    A business practice is "unlawful" under the Unfair Competition Law if it is forbidden

16   by law, including state or federal laws or regulations.

17         91.    The Code of Federal Regulations provides that for independent contractors or "fee"

18   appraisers, the appraiser shall "have no direct or indirect interest, financial or otherwise, in the

19   property or the transaction." 12 C.F.R. 34.45. In addition, the Uniform Standards of Professional

20   Appraisal Practice ("USPAP"), which are incorporated into federal law by 12 C.F.R. § 34.44, and

21   into the state law of many, if not all states, including California (*see* California Business and

22   Professions Code §11319) requires appraisers to perform a credible appraisal done in compliance

23   with USPAP standards, which includes requiring that their appraisals be conducted independently:

24   "An appraiser must perform assignments with impartiality, objectivity, and independence, and

25   without accommodation of personal interests. In appraisal practice, an appraiser must not perform

26   as an advocate for any party or issue." USPAP Ethics Rules (Conduct).

27         92.    USPAP also requires that "[e]ach written real property appraisal report must contain

28   a signed certification that is similar in content to the following form:

<div align="center">24</div>

1    I certify that, to the best of my knowledge and belief:

2    -    the statements of fact contained in this report are true and correct.

3    -    the reported analyses, opinions, and conclusions are limited only by the reported
          assumptions and limiting conditions and are my personal, impartial, and unbiased
4         professional analyses, opinions, and conclusions.

5    -    I have no (or the specified) present or prospective interest in the property that is the
          subject of this report and no (or the specified) personal interest with respect to the
6         parties involved.

7    -    I have no bias with respect to the property that is the subject of this report or to the
          parties involved with this assignment.
8
     -    my engagement in this assignment was not contingent upon developing or reporting
9         predetermined results.

10   -    my compensation for completing this assignment is not contingent upon the
          development or reporting of a predetermined value or direction in value that favors
11        the cause of the client, the amount of the value opinion, the attainment of a stipulated
          result, or the occurrence of a subsequent event directly related to the intended use of
12        this appraisal.

13   -    my analyses, opinions, and conclusions were developed, and this report has been
          prepared, in conformity with the *Uniform Standards of Professional Appraisal*
14        *Practice*."

15   The appraisal reports for the WaMu loans that are the subject of this Complaint contained this or a

16   materially identical certification.

17        93.    The same or similar USPAP ethics rules, standards and certifications are required for

18   appraisal reviewers (i.e., appraisers who perform a quality review of another appraiser's report).

19   Such appraisal reviews were performed by EA and LSI appraisal reviewers on the appraisal reports

20   for the WaMu loans that are the subject of this Complaint.

21        94.    WaMu, EA, and LSI have and continue to violate the "unlawful" prong of the UCL

22   through the creation and use of WaMu's Proven Appraiser List because appraisers on this list clearly

23   have an interest in each WaMu home appraisal transaction, and are not unbiased and independent.

24   WaMu's loan origination staff selects appraisers to be on its Proven Appraiser List based on these

25   individuals providing WaMu with sufficiently high appraisals to financially benefit both WaMu and

26   its loan origination staff. In return, WaMu demands that EA and LSI pay appraisers on its Proven

27   Appraiser List a 20% premium over what EA's and LSI's staff or third party appraisers are paid.

28

25

**COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF
CASE NO.:**

1   Those appraisers who do not provide WaMu with the desired high appraisal values are removed

2   from WaMu's Proven Appraiser List by WaMu's loan origination staff, and are thereafter prohibited

3   from providing appraisals for WaMu, and can not get the 20% appraisal premium. Appraisers on

4   WaMu's Proven Appraiser List clearly have a financial interest in each and every WaMu home loan

5   mortgage transaction that they perform appraisal services for, both for the immediate 20% additional

6   fee, as well as future appraisals for WaMu at the additional 20% fee.

7         95.     WaMu, EA and LSI conspired to allow WaMu's loan origination staff to select

8   individuals to be on WaMu's Proven Appraiser List even though federal and state law prohibits loan

9   producers from having a direct influence on appraisers. *See* Office of Thrift Supervision ("OTS"),

10  published "Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement

11  on Independent Appraisal and Evaluation Functions." WaMu, EA, and LSI also agreed that

12  WaMu's loan origination staff would have control over deciding which individuals would stay on

13  the list in violation of federal laws which prohibit loan producers from having a direct influence on

14  appraisers.

15        96.     Through these agreements, the appraisers on WaMu's Proven Appraiser List retained

16  by EA and LSI for WaMu home loans are not acting independently, objectively and in compliance

17  with USPAP standards as federal and state law mandates. Rather, WaMu, EA and LSI permit and

18  have agreed to permit WaMu's loan origination staff direct contact with appraisers to influence their

19  ultimate appraisal decision, instead of allowing them to act in an unbiased, independent fashion.

20  Moreover, the appraisal reports that these appraisers create for WaMu home loans, which are

21  approved by EA and LSI in their review process, are not independent, objective, unbiased, credible

22  or performed in compliance with USPAP standards as required by federal and state law.

23        97.     Because of Defendants' unlawful acts and practices, Defendants injured Plaintiffs and

24  members of the Class and obtained, and continue to unfairly obtain, money and property from

25  Plaintiffs and members of the Class. Thus, Plaintiffs request that this Court cause Defendants to

26  restore this money to Plaintiffs and all Class members, and to enjoin Defendants from continuing to

27  violate the Unfair Competition Law as discussed herein. Otherwise, the Class may be irreparably

28  harmed and/or denied an effective and complete remedy if such an order is not granted.

<center>26</center>

## THIRD CLAIM FOR RELIEF

**(Against Defendants for Unfair Business Practices in Violation of
Business & Professions Code §§ 17200, *et seq.*)**

98.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

99.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice.  Cal. Bus. & Prof. Code § 17200.

100.    A business act or practice is "unfair" under the Unfair Competition Law if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

101.    Defendants have violated, and continue to violate, the "unfair" prong of the UCL in the following ways:

–    Agreeing to allow and allowing WaMu to create its Proven Appraiser List which is constituted of appraisers WaMu hand selected as being ones that would provide WaMu with high home appraisal values;

–    Agreeing to allow and allowing WaMu to limit its Proven Appraiser List to only those appraisers WaMu knew would provide it with high home appraisal values;

–    Agreeing to allow and allowing all of WaMu's home appraisals to be performed by only appraisers on WaMu's Proven Appraiser List;

–    Agreeing to allow and allowing WaMu control over the Proven Appraiser List by allowing WaMu, or members of WaMu's loan origination staff, to choose appraisers to be added to the list, or to choose appraiser to be taken off the list;

–    Agreeing to allow and allowing WaMu to dictate a financial incentive for appraisers on WaMu's Proven Appraiser List to inflate appraisals;

–    Agreeing to provide and providing appraisers on WaMu's Proven Appraiser List a financial interest in each appraisal performed for WaMu;

–    Agreeing to provide and providing appraisers on WaMu's Proven Appraiser List a financial interest in remaining on WaMu's Proven Appraiser List by paying these appraisers a higher per-appraisal fee, and by informing them that if they did not provide appraisals at a high enough value for WaMu, they would be removed from the Proven Appraiser List;

–    Agreeing to allow and allowing WaMu the ability to overrule home appraisal values WaMu believed to be too low through the "rebuttal" or "Reconsideration of Value" system;

27

1         —     Agreeing to allow and allowing WaMu's loan origination staff to have direct contact
with LSI, EA, and their appraisers, with regard to appraisals performed for home
2                loans for WaMu; and,

3         —     Failing to provide home loan borrowers with unbiased, independent and credible
home appraisals performed in compliance with USPAP standards.
4

5      102.    The gravity of the harm to members of the Class resulting from such unfair acts and

6 practices outweighs any conceivable reasons, justifications and/or motives of Defendants for

7 engaging in such deceptive acts and practices. By committing the acts and practices alleged above,

8 Defendants have engaged, and continue to be engaged, in unfair business practices within the

9 meaning of California Business and Professions Code §§ 17200 *et seq.*

10      103.    Through their unfair acts and practices, Defendants have obtained, and continue to

11 unfairly obtain, money from members of the Class. As such, Plaintiffs request that this Court cause

12 Defendants to restore this money to Plaintiffs and all Class members, and to enjoin Defendants from

13 continuing to violate the Unfair Competition Law as discussed herein. Otherwise, the Class may be

14 irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

15                                **FOURTH CLAIM FOR RELIEF**

16             **(Against Defendants for Unfair Business Practices in Violation of**
**Business & Professions Code §§ 17200, *et seq.*)**
17

18      104.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate

19 them as if they were fully written herein.

20      105.    The UCL defines unfair business competition to include any "unlawful, unfair or

21 fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200.

22      106.    A business act or practice is "fraudulent" under the Unfair Competition Law if it

23 actually deceives or is likely to deceive members of the consuming public.

24      107.    Defendants' acts and practices as described herein have deceived and/or are likely to

25 deceive members of the consuming public, including Plaintiffs and the Class. Specifically,

26 Defendants offered to provide Plaintiffs and members of the Class with independent, unbiased and

27 credible home appraisals performed in compliance with USPAP standards, and, in fact, certified

28 such in the appraisal reports prepared for and disseminated to Plaintiffs and the Class by Defendants.

1    Yet, despite this offer and promise, Defendants' failed to provide independent, unbiased and

2    credible home appraisals in the following ways:

3        –       Agreeing to allow and allowing WaMu to create its Proven Appraiser List which is
                 constituted of appraisers WaMu hand selected as being ones that would provide
4                WaMu with high home appraisal values;

5        –       Agreeing to allow and allowing WaMu to limit its Proven Appraiser List to only
                 those appraisers WaMu knew would provide it with high home appraisal values;
6

7        –       Agreeing to allow and allowing all of WaMu's home appraisals to be performed by
                 only appraisers on WaMu's Proven Appraiser List;

8        –       Agreeing to allow and allowing WaMu control over the Proven Appraiser List by
                 allowing WaMu, or members of WaMu's loan origination staff, to choose appraisers
9                to be added to the list, or to choose appraiser to be taken off of the list;

10       –       Agreeing to allow and allowing WaMu to dictate a financial incentive for appraisers
                 on WaMu's Proven Appraiser List;
11

12       –       Agreeing to provide and providing appraisers on WaMu's Proven Appraiser List a
                 financial interest in each appraisal performed for WaMu;

13       –       Agreeing to provide and providing appraisers on WaMu's Proven Appraiser List a
                 financial interest in remaining on WaMu's Proven Appraiser List by paying these
14               appraisers a higher per-appraisal fee, and by informing them that if they did not
                 provide appraisals at a high enough value for WaMu, they would be removed from
15               the Proven Appraiser List;

16       –       Agreeing to allow and allowing WaMu the ability to overrule home appraisal values
                 WaMu believed to be too low through the "rebuttal" or "Reconsideration of Value"
17               system;

18       –       Agreeing to allow and allowing WaMu's loan origination staff to have direct contact
                 with LSI, EA, and/or their appraisers, regarding appraisals performed for WaMu
19               home loans; and,

20       –       Failing to provide home loan borrowers with unbiased, independent and credible
                 home appraisals performed in compliance with USPAP standards.
21

22       108.   As a result of the conduct described above, Defendants have been, and will continue

23   to be, unjustly enriched at the expense of Plaintiffs and members of the proposed Class.

24   Specifically, Defendants have been unjustly enriched by the profits and revenue it has obtained from

25   Plaintiffs and the Class from the home appraisals charged to them when taking out WaMu loans.

26       109.   Because of Defendants' unlawful acts and practices, Defendants injured Plaintiffs and

27   members of the class and obtained, and continue to unfairly obtain, money and property from

28   Plaintiffs and  members of the Class.  Thus, Plaintiffs request that this Court cause Defendants to

                                                29

1   restore this money to Plaintiffs and all Class members, and to enjoin Defendants from continuing to

2   violate the Unfair Competition Law as discussed herein.  Otherwise, the Class may be irreparably

3   harmed and/or denied an effective and complete remedy if such an order is not granted.

4   **FIFTH CLAIM FOR RELIEF**

5   **(Against Defendants for Violation of the Consumers Legal Remedies Act,
     California Civil Code § 1750, *et seq.*)**

6

7   110.   Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate

8   them as if they were fully written herein.

9   111.   This claim for relief is brought pursuant to the Consumers Legal Remedies Act,

10  California Civil Code § 1750, *et seq.* (the "CLRA").

11  112.   Plaintiffs and each member of the proposed Class who took out WaMu home loans,

12  and had appraisals performed by EA and/or LSI are "consumers" within the meaning of *Civil Code* §

13  1761(d).

14  113.   The home appraisals sold by Defendants to Plaintiffs and Class members are

15  "services" within the meaning of *Civil Code* § 1761(b).

16  114.   Defendants have violated, and continue to violate, the CLRA in at least the following

17  respects:

18      —      in violation of *Civil Code* § 1770(a)(7), Defendants represented their home appraisal
               services to be of a particular standard or quality, (i.e., being credible, independent,
19             unbiased and performed in compliance with USPAP standards), which they were not.

20  115.   Plaintiffs and the members of the Class request that this Court enjoin Defendants

21  from continuing to engage in the unlawful and deceptive methods, acts and practices alleged above,

22  pursuant to *California Civil Code* § 1780(a)(2). Unless Defendants are permanently enjoined from

23  continuing to engage in such violations of the CLRA, future consumers taking out WaMu home

24  loans will be damaged by their acts and practices in the same way as have Plaintiffs and the

25  members of the proposed Class.

26  ///

27  ///

28  ///

30

1    116.    Pursuant to *Civil Code* § 1782, in conjunction with the filing of this action, Plaintiffs

2    notified Defendants in writing of the particular violations of *Civil Code* § 1770 and demanded that

3    Defendants rectify the problems associated with its illegal behavior detailed above, which actions

4    are in violation of *Civil Code* § 1770.

5    117.    If Defendants fail to adequately respond to Plaintiffs' demand within 30 days of

6    Plaintiffs' notice, pursuant to *Civil Code* § 1782(b), Plaintiffs will amend their complaint to seek the

7    following damages as provided for in *Civil Code* § 1780 actual damages in excess of the

8    jurisdictional limits of this Court.

9    ### SIXTH CLAIM FOR RELIEF

10   **(Against Defendants for Breach of Contract)**

11   118.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate

12   them as if they were fully written herein.

13   119.    Plaintiffs and the other Class members on or after June 1, 2006 took out a WaMu

14   home loan with WaMu.  In connection with these WaMu home loans, WaMu, on behalf of and for

15   Plaintiffs and the Class, undertook and agreed to procure and did procure appraisals from EA and/or

16   LSI for the homes that were the subject of Plaintiffs' and Class members' WaMu loans.  EA and/or

17   LSI undertook and agreed to provide and provided Plaintiffs and the Class with these appraisals

18   directly and/or by delivery to them through WaMu.  Plaintiffs and Class members were charged for

19   these appraisals as reflected in their Settlement Statements (HUD-1) or other loan documents.

20   120.    As evidenced by the loan documents that accompanied the home loan transaction, the

21   contracts between Plaintiffs and the Class and Defendants show that the Defendants were to provide

22   a home appraisal which, pursuant to applicable laws and standards as certified in the appraisal

23   reports, would be performed by an independent, objective and unbiased appraiser, and the appraisal

24   reports would be credible, objective, unbiased and independent home appraisal done in compliance

25   with USPAP standards.  Moreover, the appraisal reports Plaintiffs and the Class received from

26   Defendants specifically acknowledge that borrowers (i.e., Plaintiffs and the Class) would receive the

27   appraisal report and may rely upon them in their mortgage financing transaction with the lender (i.e.,

28   WaMu).

31

1    121.    Plaintiffs and the Class performed all conditions of the contracts to be performed by

2    them, except to the extent they were lawfully excused from such performance. Defendants breached

3    these contracts with Plaintiffs and each Class member by not providing a home appraisal which was

4    performed by an independent, objective and unbiased appraiser, and by not providing appraisal

5    reports that were credible, objective, unbiased, independent, and done in compliance with USPAP

6    standards and applicable law. In other words, Plaintiffs and the Class were charged for a lawful

7    appraisal which was never performed by Defendants.

8    122.    As a direct and proximate result of the foregoing conduct, Plaintiffs and the Class

9    members have suffered damages, including economic losses, warranting compensatory damages as

10   well as injunctive relief, declaratory relief and other equitable relief deemed just and proper by the

11   Court.

12                           **SEVENTH CLAIM FOR RELIEF**

13              **(Against Defendants for Quasi-Contract/Unjust Enrichment)**

14   123.    Plaintiffs hereby incorporate by reference each and every allegation contained in the

15   preceding paragraphs of this Complaint as if fully rewritten herein. Plaintiffs plead this Count in the

16   alternative.

17   124.    Defendants' engaged in unlawful conduct by representing to Plaintiffs and the

18   members of the Class that their home appraisals provided for the purpose of obtaining a home loan

19   would be performed by an independent and unbiased appraiser and that the appraisal report would be

20   credible, objective and done in compliance with USPAP standards, but actually providing home

21   appraisals performed by a biased, non-independent appraiser and providing appraisal reports that

22   were not credible, objective or done in compliance with USPAP standards as described throughout

23   this Complaint, is unlawful

24   125.    Defendants took monies from Plaintiffs and Class members in exchange for what

25   were supposed to be independent, objective, unbiased, credible appraisals and appraisal reports done

26   in compliance with USPAP standards, but did not provide such appraisals and appraisal reports.

27   Defendants have been unjustly enriched at the expense of Plaintiffs and the Class members as a

28

32

1  result of their unlawful conduct alleged herein, thereby creating a quasi-contractual obligation on

2  Defendants to restore these ill-gotten gains to Plaintiffs and the Class.

3        126. As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and

4  Class members are entitled to restitution in an amount to be proved at trial.

5  <center>**PRAYER**</center>

6        WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the other members of the

7  Class, request an award and relief as follows:

8        A. An order certifying that this action is properly brought and may be maintained as a

9  class action, that Plaintiffs be appointed Class Representative and Plaintiffs' counsel be appointed

10  Class Counsel.

11        B. Compensatory damages, except as to Count Five.

12        C. Treble damages as to Count One.

13        D. Restitution in such amount that Plaintiffs and all Class members paid for their home

14  appraisals, or the profits, charges and fees Defendants obtained for them.

15        E. An order enjoining Defendants from maintaining and utilizing WaMu's Proven

16  Appraiser List, or any other mechanism by which WaMu has control over the appraiser selected to

17  perform WaMu's home appraisals or value the appraiser sets for the subject property.

18        F. An order awarding Plaintiffs their costs of suit, including pre and post-judgment

19  interest.

20        G. An order awarding Plaintiffs' counsel's attorneys' fees.

21        H. An order requiring an accounting for, and imposition of a constructive trust upon, all

22  monies received by Defendants as a result of the unfair, fraudulent and unlawful conduct alleged

23  herein.

24        I. Such other and further relief as may be deemed necessary or appropriate.

25

26  ///

27  ///

28  ///

<center>33</center>

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all causes of action and issues so triable.

Dated: February 7, 2008

Michael D. Braun
BRAUN LAW GROUP, P.C.

By: _____

Michael D. Braun
12304 Santa Monica Blvd., Suite 109
Los Angeles, CA 90025
Tel:    (310) 442-7755
Fax:    (310) 442-7756

Joseph N. Kravec, Jr.
SPECTER SPECTER EVANS
   & MANOGUE, P.C.
The 26th Floor Koppers Building
Pittsburgh, Pennsylvania 15219
Tel:    (412) 642-2300
Fax:    (412) 642-2309

Ira Spiro
SPIRO MOSS BARNESS & BARGE, LLP
11377 West Olympic Blvd., Fifth Floor
Los Angeles, CA 90064-1683
Tel:    (310) 235-2468
Fax:    (310) 235-2456

Janet Lindner Spielberg
LAW OFFICES OF JANET LINDNER SPIELBERG
12400 Wilshire Blvd., Suite 400
Los Angeles, CA 90025
Tel:    (310) 392-8801
Fax:    (310) 278-5938

*Attorneys for Plaintiffs*

34

COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF
CASE NO.:

# EXHIBIT 1

10/4/06 4:08 PM

OMB No. 2502-0265

| A. U.S. Department of Housing and Urban Development | | B. Type of Loan | | |
|---|---|---|---|---|
| | | 1.[ ] FHA | 2. [ ] FMHA | 3. [ ] Conv. Unins. |
| | | 4.[ ] VA | 5. [X] Conv. Ins. | |
| **FINAL** | | 6. File Number | | 7. Loan Number |
| | | 6090335 | | 0047466970 |
| **Settlement Statement** | | 8. Mortgage Ins. Case No. | | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside the closing; they are shown here for information purposes and are not included in the totals.

D. Name of Borrower: Sidney Scholl

E. Name of Seller: Savannah Builders LLC                                         TIN:

F. Name of Lender: Washington Mutual Bank, F.A., 3050 Highland Parkway, 6th Floor, Downers Grove, IL 60515

G. Property Location: Lot 2, Block 3, STONEBRIAR 1

817 Northwest 194 Terrace, Edmond, OK 73003

H. Settlement Agent: Stewart Abstract & Title of Oklahoma (405) 232-6784
   Place of Settlement: 4401 W. Memorial Road, Suite #105, Oklahoma City, OK 73134          TIN: 73-1093464

I. Settlement Date: 10/4/2006                          Proration Date:     10/4/2006

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross amount due from borrower:** | | **400. Gross amount due to seller:** | |
| 101. Contract sales price | 289,000.00 | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 6,132.16 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross amount due from borrower:** | 295,132.16 | **420. Gross amount due to seller:** | |
| **200. Amounts paid by or in behalf of borrower:** | | **500. Reductions in amount due to seller:** | |
| 201. Deposit or earnest money | 5,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 231,200.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan Kirkpatrick Bank | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. Deposit or earnest money | |
| 207. Seller paid closing cost for buyer | 2,312.00 | 507. Seller paid closing cost for buyer | |
| 208. | | 508. Federal Express | |
| 209. | | 509. Release | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. 2006 HOA Dues    10/4/2006   to 1/1/2007 | |
| 215. October Rent   10/4/2006 to 10/31/2006 | 1,841.59 | 515. October Rent    10/4/2006    to 10/31/2006 | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total paid by/for borrower:** | 240,353.59 | **520. Total reduction in amount due seller:** | |
| **300. Cash at settlement from/to borrower:** | | **600. Cash at settlement to/from seller:** | |
| 301. Gross amount due from borrower (line 120) | 295,132.16 | 601. Gross amount due to seller (line 420) | |
| 302. Less amount paid by/for borrower (line 220) | 240,353.59 | 602. Less total reduction in amount due seller(line 520) | |
| 303. **CASH (X)FROM ( )TO BORROWER** | 54,778.62 | 603. **CASH ( )FROM (X)TO SELLER** | |

SUBSTITUTE FORM 1099 SELLER STATEMENT - The information contained in Blocks E, G, H and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

SELLER INSTRUCTION - If this real estate was your principle residence, file form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide Stewart Abstract & Title of Oklahoma (405) 232-6784 with your correct taxpayer identification number. If you do not provide Stewart Abstract & Title of Oklahoma (405) 232-6784 with your correct taxpayer identification number, you may be subject to civil or criminal penalties.

Savannah Builders LLC

35

| | ...ment Charges | 10/4/06 4:06 PM | File Number: 60003... |
|---|---|---|---|
| | Sales/broker commission | based on : = $16,092.00 | | |
| | Division of commission (line 700) as follows: | | Paid From | Paid From |
| | | | Borrower's | Seller's |
| .2. | $16,092.00 | to ReMax Associates, Realtors | Funds at | Funds at |
| .93. | Commission paid at settlement $16,092.00 | | Settlement | Settlement |
| 704. | | | | |
| 705. | Transaction/Closing Coordinator Fee | | | |
| 706. | Transaction/Closing Coordinator Fee | | | |
| 800. | Items payable in connection with loan | | | |
| 801. | Loan origination fee | to Washington Mutual Bank, F. ( 1%) | | |
| 802. | Loan discount | to Washington Mutual Bank, F. | 2,312.00 | |
| 803. | Appraisal fee | to Washington Mutual Bank, F.A. | 1,098.20 | |
| 804. | Credit report | to Washington Mutual Bank, F.A. | 265.00 | |
| 805. | Lender's Inspection fee | | | |
| 806. | Mortgage Insurance application fee | | | |
| 807. | Assumption fee | | | |
| 808. | Underwriting Fee | | | |
| 809. | Tax Service Fee | | | |
| 810. | Flood Certification Fee | to LERETA Corp | | |
| 811. | Document Preparation Fee | | 8.00 | |
| 812. | Tax Research Fee | to Washington Mutual Bank, F.A. | | |
| 813. | Tax Procurement Fee | to LERETA Corp | 31.00 | |
| 814. | Yield Spread Premium | | 50.00 | |
| 815. | Loan Review Fee | | | |
| 816. | | to Washington Mutual Bank, F.A. | 360.00 | |
| 900. | Items required by lender to be paid in advance | | | |
| 901. | Interest from 10/4/2006 to 11/1/2006 at $41.0100/day for 28 days | | 1,148.28 | |
| 902. | Mortgage Insurance premium for | | | |
| 903. | Hazard Insurance premium for 1 yrs. | to State Farm | | |
| 904. | | | | |
| 905. | | | | |
| 1000. | Reserves deposited with lender | | | |
| 1001. | Hazard Insurance | | | |
| 1002. | Mortgage Insurance | | | |
| 1003. | City property taxes | | | |
| 1004. | County property taxes | | | |
| 1005. | Annual assessments (maint.) | | | |
| 1006. | | | | |
| 1007. | | | | |
| 1008. | | | | |
| 1009. | Aggregate Adjustment | | | |
| 1100. | Title charges | | | |
| 1101. | Settlement or closing fee | to Stewart Abstract & Title of Oklahoma | | |
| 1102. | Abstract or title search | | 37.50 | |
| 1103. | Title examination Waived | | | |
| 1104. | Title Insurance binder | | | |
| 1105. | Document preparation | | | |
| 1106. | Notary fees | | | |
| 1107. | Attorney's fees to | | | |
| | includes above items no.: | | | |
| 1108. | Title Insurance | to Stewart Abstract & Title of Oklahoma | | |
| | includes above items no.: | Discounted | 380.00 | |
| 1109. | Lender's coverage | $231,200.00 $50.00 | | |
| 1110. | Owner's coverage | $266,000.00 $710.00 | | |
| 1111. | Interim Title Report | to Stewart Abstract & Title of Oklahoma | | |
| 1112. | Courier Fee | to Stewart Abstract & Title of Oklahoma | 50.00 | |
| 1113. | File Quit Claim Deed | to Oklahoma County Clerk | 35.00 | |
| 1114. | | | | |
| 1115. | | | | |
| 1116. | | | | |
| 1200. | Government recording and transfer charges | | | |
| 1201. | Recording fees: | Deed $21.00 Mortgage $55.00 | | |
| 1202. | City/county tax/stamps: | | 76.00 | |
| 1203. | State tax/stamps: | Deed $433.60 | | |
| 1204. | Mortgage Tax | Mortgage $231.20 | | |
| 1205. | Mortgage Certification | to County Treasurer | 231.20 | |
| 1206. | Assignment | | 5.00 | |
| 1300. | Additional settlement charges | | | |
| 1301. | Survey 0606226 | to Miller Survey | | |
| 1302. | Pest Inspection Pretreat/Soil Cert | | 65.00 | |
| 1303. | Home Inspection Fee | | | |
| 1304. | Repairs | | | |
| 1305. | Hme Warr. to be done @ end of Lease | | | |
| 1306. | HOA Verification Fee | to Neighborhood Services | | |
| 1307. | | | | |
| 1400. | Total settlement charges (entered on lines 103, section J and 502, section K) | | 6,132.18 | |

36

CERTIFICATION: I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

Sidney Scholl                                Savannah Builders LLC

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Stewart Abstract & Title of Oklahoma                                   Date    10/6/06

SELLER'S AND/OR PURCHASER'S STATEMENT Seller's and Purchaser's signature hereon acknowledges his/their approval of tax prorations and signifies their understanding that prorations were based on taxes for the preceding year, or estimates for the current year, and in the event of any change for the current year, all necessary adjustments must be made between Seller and Purchaser; likewise any default in delinquent taxes will be reimbursed to Title Company by the Seller.

Title Company, in its capacity as Escrow Agent, is and has been authorized to deposit all funds it receives in this transaction in any financial institution, whether affiliated or not. Such financial institution may provide Title Company computer accounting and audit services directly or through a separate entity which, if affiliated with Title Company, may charge the financial institution reasonable and proper compensation therefore and retain any profits therefore. Any escrow fees paid by any party involved in this transaction shall only be for checking/and input to the computers, but not for allomatic accounting and audit services. Title Company shall not be liable for any interest or other charges on the escrow money and shall be under no duty to invest or reinvest funds held by it at any time. Sellers and Purchasers hereby acknowledge and consent to the deposit of the escrow money in financial institutions with which Title Company has or may have other banking relationships and further consent to the retention by Title Company and/or its affiliates of any and all benefits (including advantageous interest rates on loans) Title Company and/or its affiliates may receive from such financial institutions by reason of their maintenance of said escrow accounts.

The parties have read the above sentences, acknowledge that the recitations herein are material, agree to same, and recognize Title Company is relying on the same.

Purchaser/Borrower                                             Seller

Sidney Scholl                                Savannah Builders LLC

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18; U.S. Code Section 1001 and Section 1010.

37

# EXHIBIT 2

File No. 2668764 Page #2



## APPRAISAL OF REAL PROPERTY

**LOCATED AT:**
817 NW 194th Ter
Lot 2 Block 3 Stonebrier Sec 1
Edmond, OK 73003

**FOR:**
Washington Mutual/eAppraiseIt
75 N Fairway Dr
Vernon Hills, II 60061

**AS OF:**
09/17/06

**BY:**
Elizabeth J Angelo

Form GA1 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.

38

Angelo Appraisal Service, Inc.   (405) 340-1556

File No. 2968756   Page #3

**Summary Appraisal Report**

03-2763-004746897-0

## Exterior-Only Inspection Residential Appraisal Report
File # 2968756

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | |
|---|---|
| Property Address 817 NW 194th Ter | City Edmond | State OK | Zip Code 73003 |
| Borrower Sidney Scholl | Owner of Public Record OKGeoBuilders LLC | County Oklahoma |
| Legal Description Lot 2 Block 3 Stonebriar Sec 1 | | |
| Assessor's Parcel # 20-437-1490 | Tax Year 2006 | R.E. Taxes $ 0 |
| Neighborhood Name Stonebriar | Map Reference 38420 | Census Tract 40109-1082.12 |
| Occupant ☐ Owner ☐ Tenant ☒ Vacant | Special Assessments $ None | ☐ PUD  HOA $ N/A  ☐ per year ☐ per month |
| Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe) | | |
| Assignment Type ☒ Purchase Transaction ☐ Refinance Transaction ☐ Other (describe) | | |
| Lender/Client Washington Mutual/eAppraiseIt   Address 75 N Fairway Dr. Vernon Hills, Il 60061 | | |

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?  ☐ Yes  ☒ No
Report data source(s) used, offering price(s), and date(s).  Oklahoma City MLS Listing Service

I ☐ did ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.  No contract was provided. Sales price was provided by lender.
Appraiser is unable to verify property owner without a contract.

Contract Price $ 269,000   Date of Contract Unknown   Is the property seller the owner of public record?  ☒ Yes ☐ No  Data Source(s) Per Lender
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc) to be paid by any party on behalf of the borrower?  ☐ Yes ☐ No
If Yes, report the total dollar amount and describe the items to be paid.  Unknown   To appraisers knowledge there are no financing concessions.

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| | | | | | |
|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☐ Increasing ☒ Stable ☐ Declining | PRICE $ (000) | AGE (yrs) | One-Unit 90 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | Low 480 | 3-4 Jan 10 | 2-4 Unit  % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | High 122 | Low 10 | Multi-Family  % |
| Neighborhood Boundaries Bounded Covell Rd on the north Santa Fa Ave on the east Danforth Rd on the south and Western Ave on the west. | | Pred. 200 | 3 | Commercial  % |
| | | | | Other 10 % |

Neighborhood Description  There are no apparent adverse factors which should affect the subject's marketability. Appeal to the market is average. The improvements conform well with the surrounding area. The subject has access to necessary supporting facilities including schools, shopping, recreation and employment.

Market Conditions (including support for the above conclusions)  Property values in the subject area are considered to be stable with demand and supply being in balance. Primary financing in this market is Conventional, FHA and VA with little seller participation. 1 to 3 point typical.

| | | | |
|---|---|---|---|
| Dimensions 70 x 120 | Area 8,400 Sq.Ft. +/- | Shape Rectangular | View Avg/Exterior |
| Specific Zoning Classification A Single Family | Zoning Description Single Family Residence | | |
| Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe) | | | |

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use?  ☒ Yes ☐ No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Concrete | ☒ | ☐ |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley | ☐ | ☐ |

FEMA Special Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone X   FEMA Map # 40109C0066G   FEMA Map Date 7/2/2002
Are the utilities and off-site improvements typical for the market area?  ☒ Yes ☐ No  If No, describe
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)?  ☐ Yes ☒ No  If Yes, describe

Source(s) Used for Physical Characteristics of Property ☐ Appraisal Files ☐ MLS ☒ Assessment and Tax Records ☐ Prior Inspection ☐ Property Owner
☒ Other (describe) MDC Appraisal Source, Assessor   Data Source for Gross Living Area MDC Appraisal Source

| | | | |
|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☒ Concrete Slab ☐ Crawl Space | ☒ FWA ☐ HWBB ☐ Radiant | ☒ Fireplace(s) # 1 ☒ None |
| # of Stories 1 | ☐ Full Basement ☐ Partial Basement | | ☐ Woodstove(s) # | Driveway # of Cars 3 |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | Sq ft Finished | ☐ Other | ☐ Patio/Deck | Driveway Surface |
| ☒ Existing ☐ Proposed ☐ Under Const. | Exterior Walls Brick | Fuel gas | ☐ Porch Cov | Garage # of Cars 3 |
| Design (Style) Traditional | Roof Surface Composition | ☒ Central Air Conditioning | ☐ Pool | ☐ Carport # of Cars |
| Year Built 2006 | Gutters & Downspouts Galvanized | ☐ Individual | ☐ Fence | ☒ Attached ☐ Detached |
| Effective Age (Yrs) N/A | Window Type Thermal | ☐ Other | ☐ Other | ☐ Built-In |
| Appliances ☐ Refrigerator ☒ Range/Oven | ☐ Dishwasher ☒ Disposal ☒ Microwave | ☐ Washer/Dryer | ☐ Other (describe) | |

Finished area above grade contains:  8 Rooms   4 Bedrooms   3 Bath(s)   2,646 Square Feet of Gross Living Area Above Grade
Additional features (special energy efficient items, etc.)  Three bedrooms and a study or four bedrooms.

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc) Overall condition is good and no repairs are required. Good quality construction and functional utility. Subject is in an area of similar new construction homes.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property?  ☐ Yes ☒ No
If Yes, describe.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)?  ☒ Yes ☐ No  If No, describe.

Freddie Mac Form 2055 March 2005                    Page 1 of 6                    Fannie Mae Form 2055 March 2005

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT

39

File No. 2936756/ Page #4

03-2763-004746867-0
File # 2936756

## Exterior-Only Inspection Residential Appraisal Report

There are 24 comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 179,800 to $ 454,000 .
There are 61 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 122,500 to $ 296,000 .

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 817 NW 194th Ter Edmond, OK 73003 | 821 NW 199th Edmond, OK 73003 | | 19417 Crest Ridge Drive Edmond, OK 73003 | | 1605 Redland Edmond, OK 73003 | |
| Proximity to Subject | | 0.05 miles E | | 0.06 miles E | | 2.43 miles NE | |
| Sale Price | $ 289,000 | $ 283,000 | | $ 282,321 | | $ 296,000 | |
| Sale Price/Gross Liv. Area | $ 113.51 sq.ft | $ 114.11 sq.ft | | $ 116.71 sq.ft | | $ 104.59 sq.ft | |
| Data Source(s) | | Assessor | | Assessor | | Assessor | |
| Verification Source(s) | | MLS #243754 | | MLS #251725 | | MLS #237324 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | Con/Fix None | | Con/Fix None | | Con/Fix None | |
| Date of Sale/Time | | 06/09/2006 | | 07/10/2006 | | 05/12/2006 | |
| Location | Stonebriar | Stonebriar | | Stonebriar | | CheyenneCross | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 8,400 Sq.Ft. +/- | 11,500 SF +/- | | 12000 SF +/- | | 16000 SF +/- | |
| View | Avg/Interior | Avg/Interior | | Avg/Interior | | Avg/Interior | |
| Design (Style) | Traditional | Traditional | | Traditional | | Traditional | |
| Quality of Construction | 1.5 Brk Comp/A | 1 Brk Comp/A | | 1 Brk Comp/A | | 1.5 Brk Comp/A | |
| Actual Age | New | New | | New | | New | |
| Condition | VeryGood | VeryGood | | VeryGood | | VeryGood | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 8   4   3 | 6   3   2 | +2,000 | 7   3   1.2 | 0 | 9   4   3 | -1,000 |
| Gross Living Area | 2,546 sq.ft. | 2,480 sq.ft. | +3,630 | 2,419 sq.ft. | +6,985 | 2,835 sq.ft. | -15,620 |
| Basement & Finished | N/A | N/A | | N/A | | N/A | |
| Rooms Below Grade | N/A | N/A | | N/A | | N/A | |
| Functional Utility | Good | Good | | Good | | Good | |
| Heating/Cooling | Central/Central | Central/Central | | Central/Central | | Central/Central | |
| Energy Efficient Items | Therm Winds | Therm Winds | | Therm Winds | | Therm Winds | |
| Garage/Carport | 3 Car Attached | 3 Car Attached | | 3 Car Attached | | 3 Car Attached | |
| Porch/Patio/Deck | Cov Por | Cov Por | | Cov Por | | Cov Por | |
| Net Adjustment (Total) | | ☒ + ☐ - $ | 5,630 | ☒ + ☐ - $ | 6,985 | ☐ + ☒ - $ | -16,620 |
| Adjusted Sale Price of Comparables | | Net 2.0 % Gross 2.0 % $ | 288,630 | Net 2.5 % Gross 2.5 % $ | 289,306 | Net 5.6 % Gross 5.6 % $ | 279,380 |

☐ ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)   Oklahoma County Assessor
My research ☒ did ☐ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)   Oklahoma County Assessor
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 11/30/2005 | 12/22/2005 | 11/30/2005 | 07/07/2005 |
| Price of Prior Sale/Transfer | 36,000 | 36,000 | 35,000 | 64,000 |
| Data Source(s) | OK County Assessor | OK County Assessor | OK County Assessor | OK County Assessor |
| Effective Date of Data Source(s) | Approx 30 days | Approx 30 days | Approx 30 days | Approx 30 days |

Analysis of prior sale or transfer history of the subject property and comparable sales    All previous sales were land sales. Subject and comparables are all new
construction.

Summary of Sales Comparison Approach   All sales were within net and gross adjustment guidelines. The comparable sales selected were the most
recent and pertinent sales available to the subject property. One and two story homes appear to market equally. All sales were located in the
subject's market area, but outside normal distance perimeters due to scarcity of similar sales in subject's area. Sales are located in areas
considered to possess very similar homes targeted to the same potential purchasers.

Indicated Value by Sales Comparison Approach $ 289,000

Indicated Value by: Sales Comparison Approach $ 289,000   Cost Approach (if developed) $ N/A   Income Approach (if developed) $ N/A

This is an exterior only. Insufficient data for the cost approach and income approach.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been
completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the
following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: No requirements. Appraisal is
made for the intended user listed above.
Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting
conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$ 289,000 , as of   09/17/06 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 2055 March 2005                    Page 2 of 6                    Fannie Mae Form 2055 March 2005

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.

40

File No. 2668756 Page #4

03-2783-004748897-0
File # 2668756

## Exterior-Only Inspection Residential Appraisal Report

***The intended user for this appraisal report is the Lender/Client, noted in this appraisal report. The intended use is to evaluate the property that is the subject of this appraisal for a mortgage finance transaction, subject to the stated Scope of Work, purpose of the appraisal, reporting requirements of this appraisal report form, and Definition of Market Value. No additional Intended Uses or Users are identified by the appraiser.

Extraordinary Assumption: Due to the confidential nature of the comparable sales data; this report contains the extraordinary assumption that the county records are correct and accurate as reported and shown.  The impact on value will be related to any significant changes determined later if it is found that the sale data is incorrect as relates to price, concessions, etc.

Hypothetical Conditions assume conditions contrary to known facts about legal, physical or economic characteristics of the subject, but is considered for the purpose of the analysis.
***The Oklahoma wildfires had no affect on the subject. Subject is in marketable condition and no repairs are needed and no other detrimental conditions were found.

Scope of Work for this assignment was typical for that of a residential assignment in which a exterior appraisal was performed. An order was received from the client. The assignment was to find an opinion of market valuation. After analyzing data via the internet on Assessor, MLS, PV Plus & MDC, an appraisal data base, a sufficient amount of data was found to complete this assignment. All sales were arms length transactions. I did a exterior inspection of the subject property, from the street, taking exterior photos. After gathering data and exterior inspecting the subject property, the analyzed the data further and started preparing the appraisal summary report. The Uniform Standards of Professional Appraisal Practice of July 2005 was utilized throughout this process.

Provide adequate information for the lender/client to replicate the below cost figures and calculations.
Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)     Estimated land value may or may not be based on actual land sales depending on age of the area and availability of information.

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | =$ | 38,000 |
|---|---|---|---|---|
| Source of cost data | DWELLING | 2,548 Sq.Ft. @ $ | =$ | |
| Quality rating from cost service  Effective date of cost data | | Sq.Ft. @ $ | =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | Garage/Carport | Sq.Ft. @ $ | =$ | |
| Insufficient information available for a cost approach  with an exterior only. | Total Estimate of Cost-New | | =$ | |
| | Less  Physical  Functional  External | | | |
| | Depreciation | | =$( | ) |
| | Depreciated Cost of Improvements | | =$ | |
| | "As-is" Value of Site Improvements | | =$ | |
| Estimated Remaining Economic Life (HUD and VA only)  60 Years | INDICATED VALUE BY COST APPROACH | | =$ | |

| Estimated Monthly Market Rent $ | N/A | X Gross Rent Multiplier | N/A | = $ | N/A | Indicated Value by Income Approach |
|---|---|---|---|---|---|---|

Summary of Income Approach (including support for market rent and GRM)

| Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No  Unit type(s) ☐ Detached ☐ Attached | | |
|---|---|---|
| Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit. | | |
| Legal Name of Project | | |
| Total number of phases | Total number of units | Total number of units sold |
| Total number of units rented | Total number of units for sale | Data source(s) |
| Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No  If Yes, date of conversion | | |
| Does the project contain any multi-dwelling units? ☐ Yes ☐ No  Data Source(s) | | |
| Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No  If No, describe the status of completion. | | |

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No  If Yes, describe the rental terms and options.
Describe common elements and recreational facilities.

Freddie Mac Form 2055 March 2005                    Page 3 of 6                    Fannie Mae Form 2055 March 2005

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.



File No. 2366768 Page #8

03-2763-004746897-0
File # 2366758

## Exterior-Only Inspection Residential Appraisal Report

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.



**Exterior-Only Inspection Residential Appraisal Report**  03-2783-004746897-0  File # 2958756

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.

243

File No. 2968756 Page #48

03-2783-004746897-0

## Exterior-Only Inspection Residential Appraisal Report   File # 2968756

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable, and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  Elizabeth J Angelo | Name |
| Company Name  Angelo Appraisal Service, Inc. | Company Name |
| Company Address  1217 Salem Ave, Edmond, OK 73003 | Company Address |
| Telephone Number  (405) 340-1558 | Telephone Number |
| Email Address  angeloappraisalservice@cox.net | Email Address |
| Date of Signature and Report  09/20/2006 | Date of Signature |
| Effective Date of Appraisal  09/17/06 | State Certification # |
| State Certification #  11243CRA | or State License # |
| or State License # | State |
| or Other (describe)  State # | Expiration Date of Certification or License |
| State  OK | |
| Expiration Date of Certification or License  3/31/2009 | SUBJECT PROPERTY |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did not inspect subject property |
| 817 NW 194th Ter | ☐ Did inspect exterior of subject property from street |
| Edmond, OK 73003 | Date of Inspection |
| APPRAISED VALUE OF SUBJECT PROPERTY $   289,000 | |
| LENDER/CLIENT | COMPARABLE SALES |
| Name | ☐ Did not inspect exterior of comparable sales from street |
| Company Name  Washington Mutual/eAppraiseit | ☐ Did inspect exterior of comparable sales from street |
| Company Address  75 N Fairway Dr, Vernon Hills, Il 60061 | Date of Inspection |
| Email Address  istartup@landamservice.com | |

Freddie Mac Form 2055 March 2005          Page 6 of 6          Fannie Mae Form 2055 March 2005

Completed on behalf of eAppraiseIT.

## Subject Photos

| Borrower/Client | Sidney School | | | | |
|---|---|---|---|---|---|
| Property Address | 817 NW 194th Ter | | | | |
| City | Edmond | County | Oklahoma | State OK | Zip Code 73003 |
| Lender | Washington Mutual/eAppraiseIt | | | | |



**Subject Front**

817 NW 194th Ter

| | |
|---|---|
| Sales Price | 289,000 |
| Gross Living Area | 2,546 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3 |
| Location | Stonebriar |
| View | Avg/Interior |
| Site | 8,400 Sq.Ft. +/- |
| Quality | 1.5 Brk Comp/A |
| Age | New |

**Subject Rear**

**Subject Street**



Completed on behalf of eAppraiseIT



## Comparable Photos ##

| | | | | | |
|---|---|---|---|---|---|
| Borrower/Client | Sidney Scholl | | | | |
| Property Address | 817 NW 194th Ter | | | | |
| City | Edmond | County | Oklahoma | State OK | Zip Code 73003 |
| Lender | Washington Mutual/eAppraiseIt | | | | |



### Comparable 1
621 NW 1994th
| | |
|---|---|
| Prox. to Subject | 0.05 miles E |
| Sales Price | 283,000 |
| Gross Living Area | 2,480 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | Stonebriar |
| View | Avg/Interior |
| Site | 11,600 SF +/- |
| Quality | 1 Brk Comp/A |
| Age | New |



### Comparable 2
19417 Crest Ridge Drive
| | |
|---|---|
| Prox. to Subject | 0.06 miles E |
| Sales Price | 282,321 |
| Gross Living Area | 2,419 |
| Total Rooms | 7 |
| Total Bedrooms | 3 |
| Total Bathrooms | 1.2 |
| Location | Stonebriar |
| View | Avg/Interior |
| Site | 12000 SF +/- |
| Quality | 1 Brk Comp/A |
| Age | New |



### Comparable 3
1609 Redland
| | |
|---|---|
| Prox. to Subject | 2.43 miles NE |
| Sales Price | 296,000 |
| Gross Living Area | 2,830 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.1 |
| Location | CheyenneCross |
| View | Avg/Interior |
| Site | 16000 SF +/- |
| Quality | 1.5 Brk Comp/A |
| Age | New |

File No. 2866756 Page #11



State of Oklahoma

Oklahoma Real Estate Appraiser Board

**Elizabeth J. Angelo**

**ELIZABETH J. ANGELO**

EDUCATION

EXPERIENCE

**Location Map**

| Borrower/Client | Sidney Scholl | | | | |
|---|---|---|---|---|---|
| Property Address | 817 NW 194th Ter | | | | |
| City | Edmond | County | Oklahoma | State OK | Zip Code 73003 |
| Lender | Washington Mutual/eAppraiselT | | | | |



Form MAP.LOC — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.

49

# EXHIBIT 3



# ALLIANCE TITLE COMPANY

901 Campisi Way, Suite 101, Campbell, CA 95008
Phone: (408) 559-3424     Fax: (408) 377-0284

## BUYERS/BORROWERS CLOSING STATEMENT
### Estimated

| | | |
|---|---|---|
| Buyer/Borrower: | Felten A. Spears | Escrow No: 11517558-801 JLT |
| | Toni Spears | Close Date: |
| | | Proration Date: |
| | | Date Prepared: 03/03/2007 |

Property:
San Jose, CA 95127

| Description | Debit | Credit |
|---|---|---|
| **NEW AND EXISTING ENCUMBRANCES:** | | |
| Refinance from Washington Mutual Bank | | $178,000.00 |
| **NEW LOAN CHARGES:** | | |
| Appraisal Fee to Washington Mutual Bank | 361.00 | |
| Tax Service to Washington Mutual Bank | 81.00 | |
| Flood Determination to LandAmerica Tax & Flood | 8.00 | |
| Funding & Review Fee to Washington Mutual Bank | 480.00 | |
| Wire Transfer Fee to Washington Mutual Bank | 35.00 | |
| Payment Processing to Washington Mutual Bank | 200.00 | |
| Credit-Customer Retent to Washington Mutual Bank | (980.00) | |
| Prepaid Interest to Washington Mutual Bank | 621.80 | |
| @ $31.09 per day     From 03/12/07 To 04/01/07 | | |
| Hazard Insurance to Washington Mutual Bank | 222.00 | |
| 3 mos. @ $74.00/month | | |
| County Property Taxes to Washington Mutual Bank | 499.47 | |
| 3 mos. @ $166.49/month | | |
| **RECORDING FEES:** | | |
| Recording Fees to Alliance Title Company | 73.00 | |
| Record Release to Alliance Title Company | 18.00 | |
| **ADDITIONAL CHARGES:** | | |
| Homeowners Insurance Premium to Please Advise (If Needed) | 600.00 | |
| **PAYOFFS:** | | |
| Payoff to World Savings | | $155,423.11 |
| $154,165.58    Principal Balance | | |
| $561.75    Interest From 03/01/2007 to 03/16/2007 | | |
| $561.78    Interest 2/15/07-3/01/07 | | |
| $54.00    Reconveyance Fee | | |
| $80.00    Statement Fee | | |

**ESCROW AND TITLE CHARGES:**

| | | |
|---|---:|---:|
| Lenders Policy $178,000.00 to Alliance Title Company | 584.00 | |
| Delivery/Courier Deliveries to Alliance Title Company | 65.00 | |
| Escrow Fee to Alliance Title Company | 250.00 | |
| Notary Fee to Alliance Title Company | 75.00 | |
| | | |
| Sub Totals | 158,616.38 | 178,000.00 |
| Refund Due Buyer/Borrower | 19,383.62 | |
| Totals | $178,000.00 | $178,000.00 |

Felton A. Spears

Toni Spears

51