Stephen M. Rummage, *pro hac vice*
Jonathan M. Lloyd, *pro hac vice*
Martin Fineman (Cal. Bar No. 104413)
Sam N. Dawood (Cal. Bar No. 178862)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111-6533
Telephone: (415) 276-6500
Facsimile: (415) 276-6599
Email: martinfineman@dwt.com
        samdawood@dwt.com

Attorneys for Defendant Washington Mutual Bank

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

| | |
|---|---|
| SIDNEY SCHOLL and FELTON A. SPEARS, JR., on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> WASHINGTON MUTUAL, INC., a Washington corporation; WASHINGTON MUTUAL BANK, FA (aka WASHINGTON MUTUAL BANK); FIRST AMERICAN EAPPRAISEIT, a Delaware corporation; and LENDER'S SERVICE, INC., <br><br> Defendants. | Case No. 5:08-cv-00868 (HRL) <br><br> CLASS ACTION <br><br> **DECLARATION OF STEPHEN M. RUMMAGE IN SUPPORT OF DEFENDANT WASHINGTON MUTUAL BANK'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** <br><br> (Fed. R. Civ. P. 12(b)(1) and 12(b)(6)) <br><br> Date: Tuesday, July 15, 2008 <br> Time: 10:00 a.m. <br> Department: SJ, Courtroom 2, 5th Floor |

I, STEPHEN M. RUMMAGE, declare as follows:

1.  I am an attorney duly licensed to practice in the State of Washington and a partner with Davis Wright Tremaine LLP, counsel of record for defendant Washington Mutual Bank ("WMB") in this action. I make this declaration in support of WMB's Motion to Dismiss Plaintiffs' First Amended Complaint for Damages, Equitable, Declaratory and Injunctive Relief. I have personal knowledge of the matters stated in this declaration and could competently testify to them if called as a witness.

1

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.    Attached hereto as Exhibit A is a true and correct copy of the final HUD-1 Settlement Statement for WMB's mortgage loan to plaintiff Sidney Scholl described in paragraph 58 of Plaintiffs' Amended Complaint.

3.    Attached hereto as Exhibit B is a true and correct copy of the appraisal report that WMB obtained in connection with its mortgage loan to plaintiff Sidney Scholl described in paragraph 58 of Plaintiffs' Amended Complaint.

4.    Attached hereto as Exhibit C is a true and correct copy of the promissory note executed in connection with WMB's mortgage loan to plaintiff Sidney Scholl described in paragraph 58 of Plaintiffs' Amended Complaint.

5.    Attached hereto as Exhibit D is a true and correct copy of the mortgage executed in connection with WMB's mortgage loan to plaintiff Sidney Scholl described in paragraph 58 of Plaintiffs' Amended Complaint.

6.    Attached hereto as Exhibit E is a true and correct copy of the purchase and sale agreement for the property securing WMB's mortgage loan to plaintiff Sidney Scholl described in paragraph 58 of Plaintiffs' Amended Complaint.

7.    Attached hereto as Exhibit F is a true and correct copy of the final HUD-1 Settlement Statement for WMB's mortgage loan to plaintiff Felton A. Spears, Jr., described in paragraph 63 of Plaintiffs' Amended Complaint.

8.    Attached hereto as Exhibit G is a true and correct copy of the appraisal report that WMB obtained in connection with its mortgage loan to plaintiff Felton A. Spears, Jr., described in paragraph 63 of Plaintiffs' Amended Complaint.

9.    Attached hereto as Exhibit H is a true and correct copy of the promissory note executed in connection with WMB's mortgage loan to plaintiff Felton A. Spears, Jr., described in paragraph 63 of Plaintiffs' Amended Complaint.

10.    Attached hereto as Exhibit I is a true and correct copy of the deed of trust executed in connection with WMB's mortgage loan to plaintiff Felton A. Spears, Jr. described in paragraph 63 of Plaintiffs' Amended Complaint.

11.    Attached hereto as Exhibit J is a true and correct copy of OTS Letter P-99-3, dated March 10, 1999.

12.    Attached hereto as Exhibit K is a true and correct copy of OTS Letter P-2006-2, dated March 10, 1999.

13.    Attached hereto as Exhibit L is a true and correct copy of Interagency Statement, *Independent Appraisal and Evaluation Functions*, dated October 28, 2003.

14.    Attached hereto as Exhibit M is a true and correct copy of the Interagency publication *Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions*, dated March 22, 2005.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of May, 2008, at Seattle, Washington.

*/s/ Stephen M. Rummage*
Stephen M. Rummage

DAVIS WRIGHT TREMAINE LLP

# EXHIBIT A

10/4/06 4:08 PM

| A. U.S. Department of Housing and Urban Development | OMB No. 2502-0265 |
|---|---|

| A. U.S. Department of Housing and Urban Development

FINAL

Settlement Statement | B. Type of Loan |
|---|---|
| | 1. [ ] FHA    2. [ ] FMHA    3. [ ] Conv. Unins. |
| | 4. [ ] VA    5. [X] Conv. Ins. |
| | 6. File Number    7. Loan Number |
| | 6090335    0047468970 |
| | 8. Mortgage Ins. Case No. |

Note:    This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked ("POC") were paid outside the closing; they are shown here for information purposes and are not included in the totals.

| D. Name of Borrower: | Sidney Scholl | |
|---|---|---|
| E. Name of Seller: | Savannah Builders LLC | TIN: |
| F. Name of Lender: | Washington Mutual Bank, F.A., 3050 Highland Parkway, 6th Floor, Downers Grove, IL 60515 | |
| G. Property Location: | Lot 2, Block 3, STONEBRIAR 1 | |
| | 817 Northwest 194 Terrace, Edmond, OK 73003 | |
| H. Settlement Agent: | Stewart Abstract & Title of Oklahoma (405) 232-6764 | TIN:   73-1063494 |
| Place of Settlement: | 4401 W. Memorial Road, Suite #106, Oklahoma City, OK 73134 | |
| I. Settlement Date: | 10/4/2006 | Proration Date:    10/4/2006 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100.    Gross amount due from borrower: | | 400.    Gross amount due to seller: | |
| 101.    Contract sales price | 289,000.00 | 401.    Contract sales price | |
| 102.    Personal property | | 402.    Personal property | |
| 103.    Settlement charges to borrower (line 1400) | 6,132.18 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance: | | Adjustments for items paid by seller in advance: | |
| 106.    City/town taxes | | 406.    City/town taxes | |
| 107.    County taxes | | 407.    County taxes | |
| 108.    Assessments | | 408.    Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120.    Gross amount due from borrower: | 295,132.18 | 420.    Gross amount due to seller: | |
| 200.    Amounts paid by or in behalf of the borrower: | | 500.    Reduction in amount due to seller: | |
| 201.    Deposit or earnest money | 5,000.00 | 501.    Excess deposit (see instructions) | |
| 202.    Principal amount of new loan(s) | 231,200.00 | 502.    Settlement charges to seller (line 1400) | |
| 203.    Existing loan(s) taken subject to | | 503.    Existing loan(s) taken subject to | |
| 204. | | 504.    Payoff of first mortgage loan Kirkpatrick Bank | |
| 205. | | 505.    Payoff of second mortgage loan | |
| 206. | | 506.    Deposit or earnest money | |
| 207.    Seller paid closing cost for buyer | 2,312.00 | 507.    Seller paid closing cost for buyer | |
| 208. | | 508.    Federal Express | |
| 209. | | 509.    Release | |
| Adjustments for items unpaid by seller: | | Adjustments for items unpaid by seller: | |
| 210.    City/town taxes | | 510.    City/town taxes | |
| 211.    County taxes | | 511.    County taxes | |
| 212.    Assessments | | 512.    Assessments | |
| 213. | | 513. | |
| 214. | | 514.    2006 HOA Dues    10/4/2006    to 1/1/2007 | |
| 215.    October Rent    10/4/2006 to 10/31/2006 | 1,841.56 | 515.    October Rent    10/4/2006    to 10/31/2006 | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220.    Total paid by/for borrower: | 240,353.56 | 520.    Total reduction in amount due seller: | |
| 300.    Cash at settlement from/to borrower: | | 600.    Cash at settlement to/from seller: | |
| 301.    Gross amount due from borrower (line 120) | 295,132.18 | 601.    Gross amount due to seller (line 420) | |
| 302.    Less amount paid by/for borrower (line 220) | 240,353.56 | 602.    Less total reduction in amount due seller(line 520) | |
| 303.    CASH (X)FROM ()TO BORROWER | 54,778.62 | 603.    CASH ()FROM (X)TO SELLER | |

SUBSTITUTE FORM 1099 SELLER STATEMENT - The information contained in Blocks E, G, H and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

SELLER INSTRUCTION - If this real estate was your principle residence, file form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of form 4797, Form 8252 and/or Schedule D (Form 1040).

You are required by law to provide Stewart Abstract & Title of Oklahoma (405) 232-6764 with your correct taxpayer identification number.
If you do not provide Stewart Abstract & Title of Oklahoma (405) 232-6764 with your correct taxpayer identification number, you may be subject to civil or criminal penalties.

Savannah Builders LLC

| L. Settlement Charges | 10/4/06 4:06 PM | | File Number: 6090335 | |
|---|---|---|---|---|
| 700. | Total sales/broker commission | based on : = $16,092.00 | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
| | Division of commission (line 700) as follows: | | | |
| 701. | | | | |
| 702. | $16,092.00 | to   ReMax Associates, Realtors | | |
| 703. | Commission paid at settlement $16,092.00 | | | |
| 704. | | | | |
| 705. | Transaction/Closing Coordinator Fee | | | |
| 706. | Transaction/Closing Coordinator Fee | | | |
| 800. | Items payable in connection with loan | | | |
| 801. | Loan origination fee | to   Washington Mutual Bank, F. ( 1%) | 2,312.00 | |
| 802. | Loan discount | to   Washington Mutual Bank, F. | 1,098.20 | |
| 803. | Appraisal fee | to   Washington Mutual Bank, F.A. | 255.00 | |
| 804. | Credit report | | | |
| 805. | Lender's inspection fee | | | |
| 806. | Mortgage insurance application fee | | | |
| 807. | Assumption fee | | | |
| 808. | Underwriting fee | | | |
| 809. | Tax Service Fee | | | |
| 810. | Flood Certification Fee | to   LERETA Corp | 8.00 | |
| 811. | Document Preparation Fee | | | |
| 812. | Tax Research Fee | to   Washington Mutual Bank, F.A. | 31.00 | |
| 813. | Tax Procurement Fee | to   LERETA Corp | 50.00 | |
| 814. | Yield Spread Premium | | | |
| 815. | Loan Review Fee | to   Washington Mutual Bank, F.A. | 380.00 | |
| 816. | | | | |
| 900. | Items required by lender to be paid in advance | | | |
| 901. | Interest from     10/4/2006 to 11/1/2006     at $41.0100/day  for 28 days. | | 1,148.28 | |
| 902. | Mortgage insurance premium for | | | |
| 903. | Hazard insurance premium for     1 yrs.     to State Farm | | | |
| 904. | | | | |
| 905. | | | | |
| 1000. | Reserves deposited with lender | | | |
| 1001. | Hazard insurance | | | |
| 1002. | Mortgage insurance | | | |
| 1003. | City property taxes | | | |
| 1004. | County property taxes | | | |
| 1005. | Annual assessments (maint.) | | | |
| 1006. | | | | |
| 1007. | | | | |
| 1008. | | | | |
| 1009. | Aggregate Adjustment | | | |
| 1100. | Title charges | | | |
| 1101. | Settlement or closing fee | to   Stewart Abstract & Title of Oklahoma | 37.50 | |
| 1102. | Abstract or title search | | | |
| 1103. | Title examination Waived | | | |
| 1104. | Title insurance binder | | | |
| 1105. | Document preparation | | | |
| 1106. | Notary fees | | | |
| 1107. | Attorney's fees to | | | |
| | includes above items no.: | | | |
| 1108. | Title insurance | to   Stewart Abstract & Title of Oklahoma | 380.00 | |
| | includes above items no.:   Discounted | | | |
| 1109. | Lender's coverage | $231,200.00           $50.00 | | |
| 1110. | Owner's coverage | $289,000.00           $710.00 | | |
| 1111. | Interim Title Report | to   Stewart Abstract & Title of Oklahoma | 50.00 | |
| 1112. | Courier Fee | to   Stewart Abstract & Title of Oklahoma | 35.00 | |
| 1113. | File Quit Claim Deed | to   Oklahoma County Clerk | | |
| 1114. | | | | |
| 1115. | | | | |
| 1116. | | | | |
| 1200. | Government recording and transfer charges | | | |
| 1201. | Recording fees: | Deed $21.00  Mortgage $55.00 | 76.00 | |
| 1202. | City/county tax/stamps: | | | |
| 1203. | State tax/stamps: | Deed $433.50 | | |
| 1204. | Mortgage Tax | Mortgage $231.20 | 231.20 | |
| 1205. | Mortgage Certification | to   County Treasurer | 5.00 | |
| 1206. | Assignment | | | |
| 1300. | Additional settlement charges | | | |
| 1301. | Survey 0606226 | to   Miller Survey | 55.00 | |
| 1302. | Pest Inspection Pretreat/Soil Cert | | | |
| 1303. | Home Inspection Fee | | | |
| 1304. | Repairs | | | |
| 1305. | Hms Warr. to be done @ end of Lease | | | |
| 1306. | HOA Verification Fee | to   Neighborhood Services | | |
| 1307. | | | | |
| 1400. | Total settlement charges (entered on lines 103, section J and 502, section K) | | 6,132.18 | |

CERTIFICATION: I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipt and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

_____          _____
Sidney Scholl                                      Savannah Builders LLC

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed for the undersigned as part of the settlement of this transaction.

_____          Date  10/6/06
Stewart Abstract & Title of Oklahoma

SELLER'S AND/OR PURCHASER'S STATEMENT Seller's and Purchaser's signature hereon acknowledges his/their approval of tax prorations and signifies their understanding that prorations were based on taxes for the preceding year, or estimates for the current year, and in the event of any change for the current year, all necessary adjustments must be made between Seller and Purchaser; likewise any default in delinquent taxes will be reimbursed to Title Company by the Seller.

Title Company, in its capacity as Escrow Agent, is and has been authorized to deposit all funds it receives in this transaction in any financial institution, whether affiliated or not. Such financial institution may provide Title Company computer accounting and audit services directly or through a separate entity which, if affiliated with Title Company, may charge the financial institution reasonable and proper compensation therefore and retain any profits therefrom. Any escrow fees paid by any party involved in this transaction shall only be for checkwriting and input to the computers, but not for afterward accounting and audit services. Title Company shall not be liable for any interest or other charges on the earnest money and shall be under no duty to invest or reinvest funds held by it at any time. Sellers and Purchasers hereby acknowledge and consent to the deposit of the escrow money in financial institutions with which Title Company has or may have other banking relationships and further consent to the retention by Title Company and/or its affiliates of any and all benefits (including advantageous interest rates on loans) Title Company and/or its affiliates may receive from such financial institutions by reason of their maintenance of said escrow accounts.

The parties have read the above sentences, understand that the recitations herein are material, agree to same, and recognize Title Company is relying on the same.

Purchaser/Borrower                                 Sellers

_____          _____
Sidney Scholl                                      Savannah Builders LLC

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar forms. Penalties upon conviction can include a fine and imprisonment. For details see; Title 18; U.S. Code Section 1001 and Section 1010.

Date: 10/03/2006

Loan Number: 0047468970

Borrower(s): Sidney Scholl


Property Address: 817 NorthWest 194th Terrace

City, State, and Zip Code: Edmond, OK 73003

# Addendum to HUD-1

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

| Borrower Sidney Scholl | 10/3/06 Date | Seller | 10-4-06 Date |
|---|---|---|---|
| Borrower | Date | Seller | Date |
| Borrower | Date | Seller | Date |
| Borrower | Date | Seller | Date |

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Settlement Agent                    10/4/06
                                    Date

**WARNING:** It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

Return to:
Washington Mutual Bank, FA
9451 Corbin Ave.
Northridge, CA 91324

ACCURACY CERTIFICATION - ADDENDUM TO HUD-1
AA000761 (2011).01

# EXHIBIT B



 

APPRAISAL

# Washington Mutual    Collateral Valuation Report

| | | | |
|---|---|---|---|
| Originating Office: | CORTE MADERA HLC | Originating Phone: | |
| Consultant/Acct. Mgr.: | SUE BEAVERS | Consultant/Acct. Mgr. Phone: | 707-939-2210 |
| Coordinator/Team: | SUE BEAVERS | Coordinator/Team Phone: | 707-939-2210 |
| LFC Name: | DOWNERS GROVE RETAIL LFC | LFC Phone: | 800-995-5015 |
| ARC: | N.WEST ARC | ARC Phone: | 800-758-9945 |
| ARC Address: | 75 N FAIRWAY DRIVE VERNON HILLS, IL 60061 | ARC FAX: | 925-560-6624 |
| Service Provider: | NORTHWEST EAppraiseIt(R) | Service Provider Phone: | 866-690-1140 |

* Refer to Underwriter: No
Loan Number: 03-2783-004746897-0
Job Number: NW-060914-0860-3
Borrower: SIDNEY SCHOLL
Property Address: 817 NW 194TH TER, EDMOND, OKLAHOMA County, OK 73003
Property Type: SINGLE FAMILY
Service Type: 2055 EXTERIOR
Date of Service: 17-Sep-2006 00:00:00
Valuation Report Date: 27-Sep-2006 09:56:49
Date of Signature and Report: 20-Sep-2006 00:00:00
Year Built: 2006
Assessor's Parcel #: 20-637-1460
Foundation Walls: n/a
Exterior Walls: Brick
Non Owner Occupied: No
Occupancy: n/a

| Unit | BR | Rent |
|---|---|---|
| | 4 | n/a |

This Appraisal is Made:
AS-IS

Required repairs, required inspections, or additional reviewer comments:

All required repairs/conditions/inspections must be completed in a workmanlike manner and in conformance with Bank policy.

Appraised Value: Appraiser Value $289,000.00

## Billing

| | | Fee | Cost Center |
|---|---|---|---|
| Impacted By: | NORTHWEST EAppraiseIt(R) | $255.00 | 0002783 |

We have charged the appropriate cost center for the Out above charges. Please reconcile the GL account at closing.

27-Sep-2006 09:57:18



File No. 2958756 Page #2



# APPRAISAL OF REAL PROPERTY

**LOCATED AT:**
817 NW 184th Ter
Lot 2 Block 3 Stonebriar Sec 1
Edmond, OK  73003

**FOR:**
Washington Mutual/eAppraiseit
75 N Fairway Dr
Vernon Hills, Il  60061

**AS OF:**
09/17/06

**BY:**
Elizabeth J Angelo

Form GA3 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.

Angelo Appraisal Service, Inc.    (405) 340-1656

File No. 2908756  Page #3

**Summary Appraisal Report**

03-2783-004746897-0

## Exterior-Only Inspection Residential Appraisal Report    File # 2908756

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| Property Address | 817 NW 194th Ter | City | Edmond | State | OK | Zip Code | 73003 |
|---|---|---|---|---|---|---|---|

| Borrower | Sidney Scholl | Owner of Public Record | OKGeoBuilders LLC | County | Oklahoma |
|---|---|---|---|---|---|

Legal Description  Lot 2 Block 3 Stonebriar Sec 1

| Assessor's Parcel # | 20-637-1460 | Tax Year | 2008 | R.E. Taxes $ | 0 |
|---|---|---|---|---|---|

| Neighborhood Name | Stonebriar | Map Reference | 38420 | Census Tract | 40109-1082.12 |
|---|---|---|---|---|---|

| Occupant ☐ Owner ☐ Tenant ☒ Vacant | Special Assessments $ None | ☐ PUD | HOA $ N/A | ☐ per year ☐ per month |
|---|---|---|---|---|

Property Rights Appraised  ☒ Fee Simple  ☐ Leasehold  ☐ Other (describe)

Assignment Type  ☒ Purchase Transaction  ☐ Refinance Transaction  ☐ Other (describe)

Lender/Client  Washington MutualeAppraiseIt    Address  75 N Fairway Dr, Vernon Hills, Il 60061

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?  ☐ Yes  ☒ No

Report data source(s) used, offering price(s), and date(s).  Oklahoma City MLS Listing Service

I ☐ did ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.  No contract was provided. Sales price was provided by lender.

| Contract Price $ | 289,000 | Date of Contract | Unknown | Is the property seller the owner of public record? ☒ Yes ☐ No | Data Source(s) | Per Lender |
|---|---|---|---|---|---|---|

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower?  ☐ Yes  ☐ No

If Yes, report the total dollar amount and describe the items to be paid.  Unknown    To appraisers knowledge there are no financing concessions.

**Note: Race and the racial composition of the neighborhood are not appraisal factors.**

| Neighborhood Characteristics | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % |
|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☐ Increasing ☒ Stable ☐ Declining | | PRICE $ (000) | AGE (yrs) | One-Unit | 80 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | | 2-4 Unit | % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | 122 Low  new | Multi-Family | % |
| | | | 460 High  10 | Commercial | % |
| | | | 200 Pred.  3 | Other | 10 % |

Neighborhood Boundaries  Bounded Coveil Rd on the north Santa Fe Ave on the east Danforth Rd on the south and Western Ave on the west.

Neighborhood Description  There are no apparent adverse factors which should affect the subject's marketability. Appeal to the market is average. The improvements conform well with the surrounding area. The subject has access to necessary supporting facilities including schools, shopping, recreation and employment.

Market Conditions (including support for the above conclusions)  Property values in the subject area are considered to be stable with demand and supply being in balance. Primary financing in this market is Conventional, FHA and VA with little seller participation. 1 to 3 point typical.

| Dimensions 70 x 120 | Area 8,400 Sq.Ft. +/- | Shape Rectangular | View Avg/Interior |
|---|---|---|---|

Specific Zoning Classification A Single Family    Zoning Description Single Family Residence

Zoning Compliance ☒ Legal  ☐ Legal Nonconforming (Grandfathered Use)  ☐ No Zoning  ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use?  ☒ Yes  ☐ No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street  Concrete | ☒ | ☐ |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley | ☐ | ☐ |

| FEMA Special Flood Hazard Area ☐ Yes ☒ No | FEMA Flood Zone X | FEMA Map # 40109C0066G | FEMA Map Date 7/2/2002 |
|---|---|---|---|

Are the utilities and off-site improvements typical for the market area?  ☒ Yes  ☐ No  If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)?  ☐ Yes  ☒ No  If Yes, describe

| Source(s) Used for Physical Characteristics of Property ☐ Appraisal Files ☐ MLS ☒ Assessment and Tax Records ☐ Prior Inspection ☐ Property Owner |
|---|
| ☒ Other (describe) MDC Appraisal Source, Assessor    Data Source for Gross Living Area MDC Appraisal Source |

| General Description | | General Description | | | | | |
|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☒ Concrete Slab ☐ Crawl Space | ☒ FWA ☐ HWBB | ☒ Fireplace(s) # 1 | None | | |
| # of Stories  1 | ☐ Full Basement ☐ Finished | ☐ Radiant | ☐ Woodstove(s) # | ☐ Driveway  # of Cars 3 | |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | ☐ Partial Basement ☐ Finished | ☐ Other | ☐ Fuel  gas | ☐ Patio/Deck | Driveway Surface |
| ☒ Existing ☐ Proposed ☐ Under Const. | Exterior Walls  Brick | ☐ Central Air Conditioning | ☒ Porch Cov | ☒ Garage  # of Cars 3 | |
| Design (Style)  Traditional | Roof Surface  Composition | ☐ Individual | ☐ Pool | ☐ Carport  # of Cars | |
| Year Built  2008 | Gutters & Downspouts Galvanized | ☐ Fence | ☐ Other | ☒ Att. | Detached |
| Effective Age (Yrs) N/A | Window Type  Thermal | ☐ Other | ☐ Other (describe) | ☐ Built-in | |

| Appliances ☐ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☐ Washer/Dryer | ☐ Other (describe) |
|---|---|

| Finished area above grade contains:  8 Rooms  4 Bedrooms  3 Bath(s)  2,546 Square Feet of Gross Living Area Above Grade |
|---|

Additional features (special energy efficient items, etc.)  Three bedrooms and a study or four bedrooms.

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.) Overall condition is good and no repairs are required. Good quality construction and functional utility. Subject is in an area of similar new construction homes.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property?  ☐ Yes  ☒ No
If Yes, describe.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)?  ☒ Yes  ☐ No  If No, describe.

| Freddie Mac Form 2055 March 2005 | Page 1 of 6 | Fannie Mae Form 2055 March 2005 |
|---|---|---|

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Compiled on behalf of eAppraiseIT.

[File No. 2968756] Page #4

03-2783-004746897-0

## Exterior-Only Inspection Residential Appraisal Report   File # 2968756

| | | |
|---|---|---|
| There are | 24 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 179,900 | to $ 454,000 |
| There are | 51 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 122,500 | to $ 296,000 |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 817 NW 194th Ter | 821 NW 194th | | 19417 Crest Ridge Drive | | 1609 Redland | |
| | Edmond, OK 73003 | Edmond, OK 73003 | | Edmond, OK 73003 | | Edmond, OK 73003 | |
| Proximity to Subject | | 0.05 miles E | | 0.06 miles E | | 2.43 miles NE | |
| Sale Price | $ 289,000 | | $ 283,000 | | $ 282,321 | | $ 296,000 |
| Sale Price/Gross Liv. Area | $ 113.51 sq.ft. | $ 114.11 sq.ft. | | $ 116.71 sq.ft. | | $ 104.59 sq.ft. | |
| Data Source(s) | | Assessor | | Assessor | | Assessor | |
| Verification Source(s) | | MLS #243754 | | MLS #251725 | | MLS #237324 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | Cov/Fix | | Cov/Fix | | Cov/Fix | |
| Concessions | | None | | None | | None | |
| Date of Sale/Time | | 06/08/2006 | | 07/10/2006 | | 05/12/2006 | |
| Location | Stonebriar | Stonebriar | | Stonebriar | | CheyenneCross | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 8,400 Sq.Ft. +/- | 11,500 SF +/- | | 12000 SF +/- | | 18000 SF +/- | |
| View | Avg/Interior | Avg/Interior | | Avg/Interior | | Avg/Interior | |
| Design (Style) | Traditional | Traditional | | Traditional | | Traditional | |
| Quality of Construction | 1.5 Brk Comp/A | 1 Brk Comp/A | | 1 Brk Comp/A | | 1.5 Brk Comp/A | |
| Actual Age | New | New | | New | | New | |
| Condition | VeryGood | VeryGood | | VeryGood | | VeryGood | |
| Above Grade | Total / Bdrms. / Baths | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | |
| Room Count | 8 / 4 / 3 | 8 / 3 / 2 | +2,000 | 7 / 3 / 1.2 | 0 | 9 / 4 / 3.1 | -1,000 |
| Gross Living Area | 2,546 sq.ft. | 2,480 sq.ft. | +3,630 | 2,419 sq.ft. | +6,985 | 2,830 sq.ft. | -15,620 |
| Basement & Finished | N/A | N/A | | N/A | | N/A | |
| Rooms Below Grade | N/A | N/A | | N/A | | N/A | |
| Functional Utility | Good | Good | | Good | | Good | |
| Heating/Cooling | Central/Central | Central/Central | | Central/Central | | Central/Central | |
| Energy Efficient Items | Therm Winds | Therm Winds | | Therm Winds | | Therm Winds | |
| Garage/Carport | 3 Car Attached | 3 Car Attached | | 3 Car Attached | | 3 Car Attached | |
| Porch/Patio/Deck | Cov Por | Cov Por | | Cov Por | | Cov Por | |
| | | | | | | | |
| Net Adjustment (Total) | | ☒ + ☐ - $ | 5,630 | ☒ + ☐ - $ | 6,985 | ☐ + ☒ - $ | -16,620 |
| Adjusted Sale Price | | Net 2.0 % | | Net 2.5 % | | Net 5.6 % | |
| of Comparables | | Gross 2.0 % $ | 288,630 | Gross 2.5 % $ | 289,306 | Gross 5.6 % $ | 279,380 |

☐ did ☒ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data Source(s)  Oklahoma County Assessor

My research ☒ did ☐ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.

Data Source(s)  Oklahoma County Assessor

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 11/30/2005 | 12/12/2005 | 11/30/2005 | 07/07/2006 |
| Price of Prior Sale/Transfer | 36,000 | 36,000 | 35,000 | 64,000 |
| Data Source(s) | OK County Assessor | OK County Assessor | OK County Assessor | OK County Assessor |
| Effective Date of Data Source(s) | Approx 30 days | Approx 30 days | Approx 30 days | Approx 30 days |

Analysis of prior sale or transfer history of the subject property and comparable sales   All previous sales were land sales. Subject and comparables are all new construction.

Summary of Sales Comparison Approach   All sales were within net and gross adjustment guidelines. The comparable sales selected were the most recent and pertinent sales relative to the subject property. One and two story homes appear to market equally. All sales were located in the subject's market area, but outside normal distance perimeters due to scarcity of similar sales in subject's area. Sales are located in areas considered to possess very similar homes targeted to the same potential purchasers.

Indicated Value by Sales Comparison Approach $ 289,000

Indicated Value by: Sales Comparison Approach $ 289,000   Cost Approach (if developed) $ N/A   Income Approach (if developed) $ N/A

This is an exterior only. Insufficient data for the cost approach and income approach.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: No requirements. Appraisal is made for the intended user listed above.

Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 289,000 , as of 09/17/08 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 2055 March 2005                    Page 2 of 6                    Fannie Mae Form 2055 March 2005

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.

File No. 2968756 Page #9

## Exterior-Only Inspection Residential Appraisal Report

03-2783-004746897-0
File # 2968756

***The intended user for this appraisal report is the Lender/Client, noted in this appraisal report. The intended use is to evaluate the property that is the subject of this appraisal for a mortgage finance transaction, subject to the stated Scope of Work, purpose of the appraisal, reporting requirements of this appraisal report form, and Definition of Market Value. No additional Intended Uses or Users are identified by the appraiser.

Extraordinary Assumption: Due to the confidential nature of the comparable sales data; this report contains the extraordinary assumption that the county records are correct and accurate as reported and shown. The impact on value will be related to any significant changes determined later if it is found that the sale data is incorrect as relates to price, concessions, etc.

Hypothetical Conditions assume conditions contrary to known facts about legal, physical or economic characteristics of the subject, but is considered for the purpose of the analysis.
***The Oklahoma wildfires had no affect on the subject. Subject is in marketable condition and no repairs are needed and no other detrimental conditions were found.

Scope of Work for this assignment was typical for that of a residential assignment in which a exterior appraisal was performed. An order was received from the client. The assignment was to find an opinion of market valuation. After analyzing data via the internet on Assessor, MLS, PV Plus & MDC, an appraisal data base, a sufficient amount of data was found to complete this assignment. All sales were arms length transactions. I did a exterior inspection of the subject property, from the street, taking interior photos. After gathering data and exterior inspecting the subject property, the analyzed the data further and started preparing the appraisal summary report. The Uniform Standards of Professional Appraisal Practice of July 2006 was utilized throughout this process.

### COST APPROACH TO VALUE

Provide adequate information for the lender/client to replicate the below cost figures and calculations.
Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)    Estimated land value may or may not be based on actual land sales depending on age of the area and availability of information.

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | =$ | 36,000 |
| --- | --- | --- | --- |
| Source of cost data | DWELLING 2,546 Sq.Ft. @ $ | =$ | |
| Quality rating from cost service    Effective date of cost data | Sq.Ft. @ $ | =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | Sq.Ft. @ $ | =$ | |
| Insufficient information available for a cost approach with an exterior only. | Garage/Carport Sq.Ft. @ $ | =$ | |
| | Total Estimate of Cost-New | =$ | |
| | Less    Physical    Functional    External | | |
| | Depreciation | =$( | ) |
| | Depreciated Cost of Improvements | =$ | |
| | "As-is" Value of Site Improvements | =$ | |
| Estimated Remaining Economic Life (HUD and VA only)    60 Years | INDICATED VALUE BY COST APPROACH | =$ | |

### INCOME APPROACH TO VALUE

| Estimated Monthly Market Rent $ N/A X Gross Rent Multiplier N/A = $ N/A | Indicated Value by Income Approach N/A |
| --- | --- |
| Summary of Income Approach (including support for market rent and GRM) | |

### PROJECT INFORMATION FOR PUDs

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No    Unit type(s) ☐ Detached ☐ Attached
Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.
Legal Name of Project
Total number of phases ___ Total number of units ___ Total number of units sold ___
Total number of units rented ___ Total number of units for sale ___ Data source(s) ___
Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No If Yes, date of conversion.
Does the project contain any multi-dwelling units? ☐ Yes ☐ No Data Source(s)
Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.

File No. 2968756 Page #8

03-2783-004746897-0
## Exterior-Only Inspection Residential Appraisal Report    File # 2968756

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.

File No. 2968756 Page #7

03-2763-004746897-0
### Exterior-Only Inspection Residential Appraisal Report   File # 2968756

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.

File No. 2968758 Page #8

03-2783-004746897-0

**Exterior-Only Inspection Residential Appraisal Report** File # 2968758

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature _Elizabeth J Angelo_ | Signature _____ |
| Name _Elizabeth J Angelo_ | Name _____ |
| Company Name _Angelo Appraisal Service, Inc._ | Company Name _____ |
| Company Address _1217 Salem Ave, Edmond, OK 73003_ | Company Address _____ |
| Telephone Number _(405) 340-1558_ | Telephone Number _____ |
| Email Address _angeloappraisalservice@cox.net_ | Email Address _____ |
| Date of Signature and Report _09/20/2006_ | Date of Signature _____ |
| Effective Date of Appraisal _09/17/06_ | State Certification # _____ |
| State Certification # _11243CRA_ | or State License # _____ |
| or State License # _____ | State _____ |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License _____ |
| State _OK_ | |
| Expiration Date of Certification or License _3/31/2009_ | **SUBJECT PROPERTY** |
| **ADDRESS OF PROPERTY APPRAISED** | ☐ Did not inspect subject property |
| _817 NW 194th Ter_ | ☐ Did inspect exterior of subject property from street |
| _Edmond, OK 73003_ | Date of Inspection _____ |
| APPRAISED VALUE OF SUBJECT PROPERTY $ _289,000_ | |
| LENDER/CLIENT | **COMPARABLE SALES** |
| Name _____ | ☐ Did not inspect exterior of comparable sales from street |
| Company Name _Washington Mutual/eAppraiseit_ | ☐ Did inspect exterior of comparable sales from street |
| Company Address _75 N Fairway Dr, Vernon Hills, Il 60061_ | Date of Inspection _____ |
| Email Address _lsistatus@lenderservice.com_ | |

Freddie Mac Form 2055 March 2005                 Page 6 of 6                 Fannie Mae Form 2055 March 2005

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.

File No. P5587591 Page #3

## Subject Photos

| Borrower/Client | Sidney Scholl | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 817 NW 194th Ter | | | | | |
| City | Edmond | County | Oklahoma | State | OK | Zip Code 73003 |
| Lender | Washington Mutual/eAppraiseIt | | | | | |

### Subject Front

817 NW 194th Ter

| | |
|---|---|
| Sales Price | 289,000 |
| Gross Living Area | 2,546 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3 |
| Location | Stonebriar |
| View | Avg/Interior |
| Site | 8,400 Sq.Ft. +/- |
| Quality | 1.5 Brk Comp/A |
| Age | New |



### Subject Rear

### Subject Street



Form PICPIXSR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.

File No. 29887561 Page #10

## Comparable Photos ##

| | | | | |
|---|---|---|---|---|
| Borrower/Client | Sidney Scholl | | | |
| Property Address | 817 NW 194th Ter | | | |
| City | Edmond | County Oklahoma | State OK | Zip Code 73003 |
| Lender | Washington Mutual/eAppraiseIt | | | |

### Comparable 1



821 NW 1994th
| | |
|---|---|
| Prox. to Subject | 0.05 miles E |
| Sales Price | 283,000 |
| Gross Living Area | 2,480 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | Stonebriar |
| View | Avg/Interior |
| Site | 11,500 SF +/- |
| Quality | 1 Brk Comp/A |
| Age | New |

### Comparable 2



19417 Crest Ridge Drive
| | |
|---|---|
| Prox. to Subject | 0.06 miles E |
| Sales Price | 282,321 |
| Gross Living Area | 2,419 |
| Total Rooms | 7 |
| Total Bedrooms | 3 |
| Total Bathrooms | 1.2 |
| Location | Stonebriar |
| View | Avg/Interior |
| Site | 12000 SF +/- |
| Quality | 1 Brk Comp/A |
| Age | New |

### Comparable 3



1609 Redland
| | |
|---|---|
| Prox. to Subject | 2.43 miles NE |
| Sales Price | 298,000 |
| Gross Living Area | 2,830 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.1 |
| Location | CheyenneCross |
| View | Avg/Interior |
| Site | 16000 SF +/- |
| Quality | 1.5 Brk Comp/A |
| Age | New |

Completed on behalf of eAppraiseIT.



File No. 2968756 Page #12

# ELIZABETH J. ANGELO
1217 Salem Ave
Edmond, OK 73003
(405) 340-1556  Fax (405) 340-7355
AngeloAppraisalService@cox.net

| | |
|---|---|
| **EDUCATION:** | BBA Finance |
| | University of Central Oklahoma, OK  1992 |
| | AAS Banking, Real Estate & Insurance |
| | Hudson Valley Community College, NY 1972 |
| | Charles Barnes School of RE Appraisal, OK 1992 |
| | |
| _1990-1992_ | Real Estate Law |
| | Real Estate Principles |
| | Real Estate Practices |
| | |
| _1996-1999_ | FHA Appraisals |
| | Technology & Modern Appraiser |
| | New Construction |
| | Home Inspection-Common Defects |
| | Introduction to Income Property |
| | |
| _2000-2002_ | Residential Analysis for Small Income Property |
| | Financial Analysis of Income Property |
| | Dissection of a Residential Appraisal Report |
| | Computing GLA using Ansi Standards |
| | Is a Comparable A Comparable? |
| | Documenting & Supporting Appraisal Reports |
| | Mobile & Manufacturing Homes |
| _2003-2005_ | Market Abstraction |
| | Reviewing Residential Appraisals |
| | Narrative Report Writing |
| | Building Material Characteristics |
| | New Fannie Mae Forms Review |
| | USPAP Update |
| | |
| **EXPERIENCE:** | Full Time Residential Appraiser. October 1994 Present. |
| | Seven years experience in a RE Construction & Mgmt Office. |
| | |
| **CREDENTIALS:** | OK Certified Residential Appraisal License.  #11243CRA |
| | FHA Approved              Choms          #4237 |
| | |
| **PROFESSIONAL** | |
| **MEMBERSHIPS:** | Oklahoma Metropolitan Board of Realtors |
| | National Association of Independent Fee Appraisers |

Completed on behalf of eAppraiseIT.



**Location Map**

File No. 2085759  Page #18

| Borrower/Client | Sidney Scholl | | | |
|---|---|---|---|---|
| Property Address | 817 NW 194th Ter. | | | |
| City | Edmond | County  Oklahoma | State  OK | Zip Code  73003 |
| Lender | Washington Mutual/eAppraiseit | | | |

Form MAP.LOC — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.

# EXHIBIT C



# FIXED/ADJUSTABLE RATE NOTE
### (One-Year Treasury Index - Rate Caps)

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

I DO HEREBY CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF THE ORIGINAL DOCUMENT

BY: _____
STEWART ABSTRACT & TITLE CO.

**October 3, 2006**           **Edmond**
[Date]                        [City]                        [State]

817 Northwest 194th Terrace
Edmond, OK 73003
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 231,200.00        (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **Washington Mutual Bank, FA**


I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        **6.475** %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on        **December 1, 2006**        .

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on **November 1, 2036**   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **9451 Corbin Ave., Northridge, California 91324**

or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ **1,457.54**        . This amount may change.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **November, 2011**        , and the adjustable interest rate I will pay may change on that day every 12th month thereafter.

MULTISTATE FIXED/ADJUSTABLE RATE NOTE - ONE-YEAR TREASURY INDEX - Single Family

P843N (0208)
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 5                    Initials: SS

The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Two and one quarter** percentage points ( **2.250** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **11.475** % or less than **2.250** %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **11.475** %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5.    BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6.    LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.   **BORROWER'S FAILURE TO PAY AS REQUIRED**
     **(A) Late Charges for Overdue Payments**
     If the Note Holder has not received the full amount of any monthly payment by the end of        **15**     calendar days
after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        **5.000** %
of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.
     **(B) Default**
     If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.
     **(C) Notice of Default**
     If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a
certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the
interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or
delivered by other means.
     **(D) No Waiver By Note Holder**
     Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described
above, the Note Holder will still have the right to do so if I am in default at a later time.
     **(E) Payment of Note Holder's Costs and Expenses**
     If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to
be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.
Those expenses include, for example, reasonable attorneys' fees.

8.   **GIVING OF NOTICES**
     Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by
delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note
Holder a notice of my different address.
     Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note
will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different
address if I am given a notice of that different address.

9.   **OBLIGATIONS OF PERSONS UNDER THIS NOTE**
     If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in
this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is
also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety
or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its
rights under this Note against each person individually or against all of us together. This means that any one of us may be
required to pay all of the amounts owed under this Note.

10.  **WAIVERS**
     I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor.
"Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the
right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11.  **UNIFORM SECURED NOTE**
     This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the
Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as
this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note.
That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all
amounts I owe under this Note. Some of those conditions read as follows:

     (A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above,
Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Sidney Scholl                   -Borrower                                        -Borrower


_____ (Seal)          _____ (Seal)
                                -Borrower                                        -Borrower


_____ (Seal)          _____ (Seal)
                                -Borrower                                        -Borrower


_____ (Seal)          _____ (Seal)
                                -Borrower                                        -Borrower


*[Sign Original Only]*

P843N (0105)                     Page 5 of 5                     Form 3822 1/01

## ADDENDUM TO ADJUSTABLE RATE NOTE

This Addendum to Adjustable Rate Note is made this 3rd       day of October      ,2006      and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Note (the "Note") of the same date given by the undersigned (the "Borrower") and made payable to the order of **Washington Mutual Bank, FA**
("Lender").

Paragraph 3 of the Note is hereby restated in its entirety as follows:

### 3.  PAYMENTS

**(A) Time and Place of Payments**
I will make my monthly payments on the first day of each month beginning on **December 1, 2006**
Until the     **1st**     day of December     , **2011**     I will pay only the interest on the unpaid principal balance of this Note.  Thereafter, I will pay principal and interest by making payments every month as provided below.

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on **November 1, 2036**          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make monthly payments at **9451 Corbin Avenue, Northridge, CA   91324**
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**
Each of my initial monthly payments will be in the amount of U.S. $ **1,247.52**      . This amount may change.

**(C) Monthly Payment Changes**
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay.  The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.  Notwithstanding any other provision herein, the interest only payment identified above shall be based upon the unpaid principal balance after any partial prepayment is made.

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.**

_____ (Seal)          _____ (Seal)
Sidney   Scholl                  -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                          -Borrower

ADDENDUM TO ADJUSTABLE RATE NOTE
AA10350 (0101)

# EXHIBIT D



ORIGINAL DEED

Doc # 2006151729
Bk 10269
Pg 543-566
DATE 10/10/06 11:59:21
Filing Fee $59.00
Documentary Tax $0.00
State of Oklahoma
County of Oklahoma
Oklahoma County Clerk
Carolynn Caudill

47468970

Return To:
Washington Mutual
2210 Enterprise Drive
Attn: Doc Ops FSCE 440
Florence, SC 29501

Prepared By:
Tiffany Hopf
3050 Highland Pkwy.
Downers Grove, IL 60515

STEWART ABSTRACT & TITLE CO.
701 N. Broadway, Ste. 300
Oklahoma City, OK 73102
(405) 232-6764

———————————— [Space Above This Line For Recording Data] ————————————

# MORTGAGE

006

TREASURER'S ENDORSEMENT 231.80
I hereby certify that I received $_____ & based rue No.
Therefore in payment of mortgage tax on the within mortgage.
Dated this 10TH day of OCTOBER , 2006.
FORREST "BUTCH" FREEMAN, County Treasurer

By PAULA WELLS _____ Deputy

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated     October 3, 2006     , together with all Riders to this document.
(B) "Borrower" is Sidney Scholl ,A SINGLE PERSON and CERILLO Cruz and Emelda Ventura , HUSBAND & WIFE

Borrower is the mortgagor under this Security Instrument.

0047468970

OKLAHOMA-Single Family-UNIFORM INSTRUMENT

P6(OK) (0212)

Page 1 of 15     Initials: SS/CSC/EV

VMP Mortgage Solutions, Inc. (800)521-7291

6090335Q     FF: 59.00     MTG TAX: 231.20     MTG CERT: 5.00     24/59

24/59

(C) "Lender" is **Washington Mutual Bank, FA**

Lender is a **Bank**
organized and existing under the laws of **the United States of America**
Lender's address is **9451 Corbin Ave., Northridge, CA 91324**

Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated       **October 3, 2006**
The Note states that Borrower owes Lender **Two Hundred Thirty One Thousand Two Hundred
and 00/100--------------------------------------------------------------------------** Dollars
(U.S. $ **231,200.00**          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than       **November 1, 2036**
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "*Community Association Dues, Fees, and Assessments*" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

0047468970

PS(OK) (0312)                         Page 2 of 16                 Initials: SS
                                                                   CSC
                                                                   EV

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, with power of sale, the following described property located in the County of Oklahoma :

[Type of Recording Jurisdiction]                          [Name of Recording Jurisdiction]

**Legal description attached hereto and made a part hereof.**

Parcel ID Number: 206371460                which currently has the address of
817 Northwest 194th Terrace                                            [Street]
                        Edmond           [City], Oklahoma    73003    [Zip Code]

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

0047468970

Initials: SS
CSC
EV

PS(OK) (0312)                          Page 3 of 15

File No.: 6090335

# EXHIBIT "A"

~Lot Two (2) of Block Three (3) in STONEBRIAR ADDITION SECTION ONE, an Addition to the City of Oklahoma City, Oklahoma County, Oklahoma, according to the recorded plat thereof.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues,

0047468970

PG(OK) (0512)                    Page 4 of 16                    Initials: SS
                                                                          CSC
                                                                          ED

Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith

0047462276

P6(OK) (0312)                    Page 5 of 13

by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law

0047468970

Initials: SS
CSC
EV

requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or

0047468970

PA(OK) (0312)                    Page 7 of 16                    Initials: SS
                                                                         CRO
                                                                         BN

regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that

0047468970

Initials: SS
QSC
EV

an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of

0047468970



Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Except as otherwise required by Applicable Law, any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security

0047468970

Initials: SS
ago
EV

Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to

0047468970

PS(OK) (0312)                     Page 11 of 16

Initials: SS
cgc
EV

Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

0047668970

P6(OK) (0312)          Page 12 of 16



**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower as required by Applicable Law prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 35 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property; and (e) any other information required by Applicable Law. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all costs and expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give notice in the manner required by Applicable Law to Borrower and any other persons prescribed by Applicable Law. Lender shall also publish the notice of sale, and the Property shall be sold, as prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the manner prescribed by Applicable Law.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs unless Applicable Law provides otherwise. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable law.

**24. Waiver of Appraisement.** Appraisement of the Property is waived or not waived at Lender's option, which shall be exercised before or at the time judgment is entered in any foreclosure.

**25. Assumption Fee.** If there is an assumption of this loan, Lender may charge an assumption fee of U.S. $900.00.

**26. Notice of Power of Sale. A power of sale has been granted in this Security Instrument. A power of sale may allow the Lender to take the Property and sell it without going to court in a foreclosure action upon default by Borrower under this Security Instrument.**

0047468970

Initials: SS
CSC
BV

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____                        _____ (Seal)
                                                        Sidney Scholl              -Borrower

_____                        _____ (Seal)
                                                        Carlito Cruz               -Borrower

_____ (Seal)                             _____ (Seal)
                      -Borrower          Emelda Ventura                    -Borrower

_____ (Seal)                             _____ (Seal)
                      -Borrower                                            -Borrower

_____ (Seal)                             _____ (Seal)
                      -Borrower                                            -Borrower

0047468970

PS(OK) (0212)                          Page 14 of 15

STATE OF ~~OKLAHOMA~~ / CALIFORNIA                                County ss: SONOMA

The foregoing instrument was acknowledged before me this 3ʳᵈ day of October  by

Susan Beavers, Notary Public

Witness my hand and seal on this date.
My Commission Expires: March 3, 2008

_Susan Beau_
Notary Public



0047468970

# FIXED/ADJUSTABLE RATE RIDER
(One-Year Treasury Index - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this   3rd  day of   October, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to **Washington Mutual Bank, FA**

("Lender") of the same date and covering the property described in the Security Instrument and located at:

817 NorthWest 194th Terrace
Edmond, OK 73003
[Property Address]

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of        6.875 %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **November 1, 2011**           , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

MULTISTATE FIXED/ADJUSTABLE RATE RIDER
ONE-YEAR TREASURY INDEX- Single Family
Page 1 of 4
P843R (0405)              VMP Mortgage Solutions, Inc. (800)521-7291

Initials: SS
         CBC
         EV

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and three quarters                                        percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.475    % or less than                        2.750 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than                11.475 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Initials: SS
C&C
EV

P843R (0405)                     Page 2 of 4

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

P843R (0405)                    Page 3 of 4                    Initials: _SS_
                                                              CSC
                                                              EV

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)    _____ (Seal)
Sidney Scholl             -Borrower                           -Borrower

_____ (Seal)    _____ (Seal)
Carlito Cruz              -Borrower                           -Borrower

_____ (Seal)    _____ (Seal)
Emelda Ventura            -Borrower                           -Borrower

_____ (Seal)    _____ (Seal)
                          -Borrower                           -Borrower

P843R (0405)                         Page 4 of 4

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this **3rd** day of **October, 2006**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **Washington Mutual Bank, FA**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**817 Northwest 196th Terrace**
**Edmond, OK 73003**
[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

0047468970

MULTISTATE 1-4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Initials: SS /esc /av

Page 1 of 4

Form 3170 1/01

P57R (0106)

VMP MORTGAGE FORMS - (800)521-7291

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii)

0047465970

Initials: SS/CSC/EU

P57R (0108)                           Page 2 of 4                           Form 3170 1/01

Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

0047468970

PS7R (0108)                                   Page 3 of 4

Initials: _SS/ase/EU_

Form 3170 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)          _____ (Seal)
Sidney Scholl            -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
Carlitos Cruz            -Borrower                                -Borrower
      CSC

_____ (Seal)          _____ (Seal)
Emelda Ventura           -Borrower                                -Borrower
      EV

_____ (Seal)          _____ (Seal)
                         -Borrower                                -Borrower

0047465970

P57R (0108)                      Page 4 of 4                      Form 3170 1/01

FORREST "BUTCH" FREEMAN          MORTGAGE TAX RECEIPT          ALL OF THIS TAX
    OKLAHOMA COUNTY                                                                IS PAID TO
        TREASURER                                                              PUBLIC SCHOOLS

    DATE RECEIVED  10/10/2006 00:00:0                          RECEIPT 101020060006
      RECEIVED OF  STEWART ABSTRACT                    THE SUM OF $236.20

     MORTGAGOR  SIDNEY SHOLL

     MORTGAGEE  WASHINGTON MUTUAL FINANCE

DESC OF PROPERTY  STONEBRIAR 1                              LOT   2          BLOCK 3

LEGAL DESCRIPTION                                                ACCOUNT NUMBER

    MORTGAGE DATE  10/10/2006                                                200

TERMS OF MORTGAGE  FIVE (5) YEARS OR MORE

  MORTGAGE AMOUNT        $231,200.00

ATE OF TAX PER $100 OR MAJOR FRACTION THEREOF  0.1        Amount of tax due other county
   AMOUNT OF TAX  $231.20    FEE AMOUNT      $5.00    0

     REMARKS  Charge

                       FORREST "BUTCH" FREEMAN OKLAHOMA COUNTY TREASURER

                            By TRPAUWEL

                         **CUSTOMER COPY**



# EXHIBIT E

®

**REAL ESTATE PURCHASE CONTRACT FOR NEW HOME**
This is a legally binding contract if not understood seek legal advice.

_____ 20 __

1. PROPERTY: The Undersigned Buyer(s) ("Buyer") hereby agrees to purchase from the undersigned Builder/Seller(s) ("Seller") the following real property, to-wit: Lot ___ Block ___, Addition to the _____, County, Oklahoma, which City/Town _____ 917 SW 29th Terrace Edmond OK 73003

2. TOTAL: Buyer shall pay for the Property the sum of **Two Hundred Eighty Nine Thousand Dollars Only** ($289,000.00)

(a) The sum of $_____

3. CONSTRUCTION:

(a) Improvements on the Property are [Check one]
☐ Complete   ☐ Incomplete   ☐ To be Custom Built

☑ Plans and Specifications   ☐ Allowances   ☐ Other _____

4. CONDITION OF PROPERTY:

Buyer's Initials _SS_ _____   Page 1 of _7_   Seller's Initials _____ _____

FORM RPC1NY                                                              Rev. ____

06-13-2006  09:24am  From-Washington Mutual Sonoma        707-339-2224      T-281  P.003/021  F-443

**REAL ESTATE PURCHASE CONTRACT FOR NEW HOME**
This is a legally binding contract. If not understood seek legal advice.

Property Address: 817 NW 150th Terrace, Edmond, OK 73003

Page 5 of 7

FORM (NFCW)

Nov 7/98

e9SEP. 13, 2006@11:23AM4667@REMAX ASSOC (EDMOND)    NO. 0073    P. 3    04/22

09-13-2006  09:24am  From-Washington Mutual Sonoma       707-836-2234       T-281  P.004/021  F-443

## MEMORANDUM OF AGREEMENT

Property Location: **917 NW 164th Terrace OKC, OK 73012**

Purchaser ("Buyer"): **Sidney Segal, Carlin S. Cruz and Brenda B. Ventura**

*(body text illegible)*

### IMPORTANT NOTICE

### CLOSURE ACKNOWLEDGEMENT AND RELEASE

1. Inspection.

2. Termite Certificate.

3. Waiver and Release.

4. Binding Effect.

06-13-2008  09:25am  From-Washington Mutual Sonoma          707-935-2224      T-281  P.008/021  F-442

REAL ESTATE PURCHASE CONTRACT FOR NEW HOME
This is a legally binding agreement if not understood seek legal advice.
417 NW 184th Terrace Edmond, OK 73003

Property Address: _____

☐ Abstract of Title. The Seller at Seller's expense, shall provide an abstract of title certified to a date subsequent to the date of this Contract including a current Uniform Commercial Code Search showing title in Seller's name, within a reasonable time. This Abstract, if required by the Lender(s), and a Mortgage Inspection Certificate (a current survey of the location of the Property and the improvements thereof), unless otherwise specified in paragraph 5 above, along with one of the following (Check one):

☐ Owner's Title Policy including a Title Examination by an attorney acceptable to the buyer.

OR

☑ Attorney's Opinion of Title

(a) When an abstract or a Mortgage Inspection Certificate, whichever is applicable, satisfactory to the title insurer is furnished showing the condition of the title to be insured acceptable, Buyer may file the insurance policies and provide such endorsements and coverage, to be paid by the survey or Mortgage Inspection Certificate disclose any encroachments under boundary boundary disputes, such defects shall be cured at the undersigned's coverage with a commitment for such coverage as disclosed by such survey or Mortgage Inspection Certificate, which commitment shall be subject to acceptance by buyer in writing.

(b) Seller shall make saving the evidence from abstract of title or Owner's Title Insurance Policy available in the escrow closing agent within a reasonable time after the date of acceptance of this Contract.

(c) Upon delivery to buyer of the kind of the current Commitment for Owner's Title Insurance Policy, the certified abstract or the certified survey or Mortgage Inspection Certificate, whichever are to be provided under this Contract, Buyer shall have a reasonable time, not to exceed ___15___ days, to examine same and return same to Seller with a written report specifying any objections or defects in the title or such rights as shall be deemed waived. Seller shall have ___30___ days after receipt of such report to correct such objections and thereafter if not cured the matter may then be submitted to Buyer. If Seller is unable or unwilling to cure any objections or any exception made by him, then unless Buyer waives such objections and accepts it in writing, this Contract will terminate as provided in Paragraph 12(a) below.

(d) The title to the Property shall be conveyed to Buyer by General Warranty Deed in acceptable form unless otherwise specified in Paragraph 5 above. Upon Closing, the existing shall of title, if secured by Seller, shall become the property of Buyer.

10. TAXES, ASSESSMENTS AND PRORATIONS:

(a) Unless otherwise specified in the Supplemental Financing Agreement, Seller shall pay at expense prior to the date of Closing. Including, but not limited to, and assessment of all taxes and other special assessments. Homeowner's Association dues, if any, insurance, all utility bills, and any other expenses related to the Property. If the amount of taxes cannot be ascertained, such proration shall be on the basis of the taxes paid for the preceding year. All other expenses shall be prorated on the basis of thirty days to the month or such expense paid for the previous month.

(b) In the event that Seller agrees in the Supplemental Financing Agreement or otherwise to pay the Buyer's prepaid expenses, and Seller's escrow, input portion of insurance such as points of delivery taxes on Property(s) in the total prepaid expenses on the undersigned's statement, then such taxes and insurance may be paid by Buyer as provided in paragraph 9(b) above.

(c) Items, if any, shall be prorated on the basis of thirty days to the month. Rents delinquent more than thirty days shall be collected by the Seller and shall not be prorated.

(d) Any and all taxes in effect shall be assigned, and security deposits and prepaid rents, if any, shall be paid to Buyer by Seller at the Closing unless otherwise provided herein.

11. CLOSING/POSSESSION: This transaction must be closed on or before _____October 5th 2006_____

_6:00_ P___m.___ _October 5th_ ___, 20 06 ___. the "Closing"), unless Closing is
        (time)          (date)              (year)
extended as may be required by Paragraph 5 above, or by written agreement of Seller and Buyer with legal possession delivered to Buyer at the time of Closing and actual and complete possession of Property to be given on or before

_6:00_ P___m.___ _October 5th_ ___, 20 06 ___.
        (time)          (date)              (year)

12. DEFAULT:

(a) If Buyer wrongfully refuses to close, Seller and Buyer agree that since it is impractical and extremely difficult to fix the actual damages sustained, the Earnest Money shall be retained as liquidated damages to Seller and one half of the balance thereof shall be retained by the Broker(s) to apply on professional services in lawful forfeiture of the Earnest Money. Seller may, at Seller's option, seek specific performance.

(b) If (I) Seller's title defects cannot be corrected as herein provided, (II) Buyer's objections cannot be cured, or (III) Seller wrongfully refuses to close, Buyer's Earnest Money shall be returned and Seller shall be liable for the forfeiture, commissions and any other expenses incurred by Buyer in reliance of this Contract, in lieu of acceptance of return of the Earnest Money, Buyer may, at Buyer's option, seek specific performance.

(c) In the event a suit for specific performance is instituted, the prevailing party shall have the right to recover all of such party's documented and costs incurred by reason of such litigation including, but not limited to, attorney's fees, court costs and costs of such preparation.

13. MEDIATION: Any dispute arising under, out of, in connection with, or in relation to this Contract, or the making or validity thereof, or its interpretation or any breach thereof, shall be submitted to mediation in accordance with the rules and procedures of the Dispute Resolution System of the _____ CRDA_____ of REALTORS, and provided, however if the earnest deposit or those which Lessor ONLY the Earnest Money, the interpleader action may be commenced and maintained shall be required. The party which submits information that has been tendered, tried and completed the Dispute Resolution System and agree to submit disputes as disclosed above to mediation in accordance with the Dispute Resolution System.

Buyer's Initials: _SS_ _CK/SW_        Page 3 of 7        Seller's Initials: _____ _____

FORM REPCNH                                                            Rev. 2006

09-13-2006  09:26am  From-Washington Mutual Sonoma    707-939-2224    T-231  P.005/021  F-443

**REAL ESTATE PURCHASE CONTRACT FOR NEW HOME**
This is a legally binding contract if not understood seek legal advice.
717 NW 194th Terrace, Edmond, OK 73026

Property Address:

14. *(text illegible)*

15. ACCEPTANCE TIME *(text illegible)*

16. TIME IS OF THE ESSENCE.

17. NOTICES *(text illegible)*

| | |
|---|---|
| **BUYER**/(Purchaser) | **SELLER**/Ideal Built Builders, LLC |
| 1900 SE 19th, Ste. 201 | P.O. Box 7423 |
| Edmond, OK 73013 | Edmond, OK 73083 |
| Telephone: (405) ___ 830-8700 | Telephone: (___) ___ 330-8072 |
| Facsimile: (405) ___ 359-8728 | Facsimile: (___) ___ |

*(text illegible)*

18. DISCLAIMER AND REPRESENTATION *(text illegible)*

19. BUYER'S ESTIMATED EXPENSES *(text illegible)*

20. CONFIRMATION OF BROKERAGE RELATIONSHIP *(text illegible)*

21. BUYER'S AND SELLER'S CONSENT *(text illegible)*

| | |
|---|---|
| Sidney Sohal | (Signature) Buyer |
| (Print Buyer's name exactly as title will be taken) | |
| SS# 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 | |
| | |
| Carlito S. Cruz | Carlito S. Cruz (Signature) Buyer |
| (Print Buyer's name exactly as title will be taken) | |
| SS# 552 61 1656 | |

Emelda B. Ventura    Emelda B. Ventura (Signature)

SS# 5??-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

Page 6 of 7

09-13-2006  09:26am  From-Washington Mutual Sonoma          707-996-2224      T-281  P.007/021  F-443

**REAL ESTATE PURCHASE CONTRACT FOR NEW HOME**
This is a legally binding contract; if not understood seek legal advice.
617 NW 142th Terrace  Edmond, OK 73003

Property Address: _____

**22. SELLER'S ACCEPTANCE:** Seller accepts the foregoing offer and agrees to sell the above described Property on the terms and conditions herein stated and shall pay the Listing Broker for services rendered, commission agreed upon in the Listing Agreement or other agreement of employment between Seller, which shall survive the Contract, for previously agreed services rendered and to be rendered in this transaction. Seller further acknowledges receipt of Seller's estimate of expenses to be incurred in this transaction.

Accepted this _____ day of _____ September _____, 20 06 .

Savannah Builders, LLC
(Print Seller's Name as in title)                              (Print Seller's Name as in title)

_____                              _____
(title)                                                    (title)

_____ Seller                       _____ Seller
(Signature)                                               (Signature)

**EARNEST MONEY RECEIPT:** Received the sum of $ __5,000.00__   [check] (EMR) as Earnest Money, to be held and applied in accordance with the terms and conditions of the foregoing sales.

(title)                                                    (title)

Joe Pryor                                                 Mike Grissom
Listing Broker/Sales Associate                            Listing Broker/Sales Associate
_____ (Signature)                     _____ (Signature)

RMX501                  (405) 366-6700  Phone           Broker's MLS ID      (405) 414-7896  Phone
Broker's MLS ID

REMAX Associates                                          Savannah Builders, LLC
Company Name                                              Company Name

JOEPRYOR
MLS Public ID Name

Non-MLS Member, use License #

Page 6 of  7

FORM REPC501                                                                   Rev. 7/05

09-13-2008   09:27am   From-Washington Mutual Sonoma                707-838-2224          T-281   P.008/021   F-443

CONFIRMATION OF DISCLOSURE OF BROKER RELATIONSHIP AND, IF APPLICABLE, CONSENT

As required by state law, both Buyer and Seller must confirm certain disclosures pertaining to the brokerage relationship and, if applicable, consent to Single-Party Broker to Transaction Broker, and attach this confirmation to the contract to purchase, lease, option or exchange real estate. This Confirmation is attached to that certain Real Estate Purchase Contract

between the undersigned Buyer and the undersigned Seller dated _____ September 5th _____ , 20 __ US __ , relating to the

real estate described therein, the street address of which is ____ 811 NEW YEAR LANE(S)  Edmond, CA /2523 ____

1.  The undersigned Buyer confirms that: (check one)

☐  (a)   The Selling Broker is providing services to Buyer as a Transaction Broker...

☐  (b)   The Selling Broker is providing services to Buyer as a Transaction Broker with a written brokerage agreement...

☐  (c)   The Selling Broker is providing services to Buyer in this transaction as a Transaction Broker where the Broker has previously entered into a written brokerage agreement...

☒  (d)   The Selling Broker is providing services to Buyer as a Single-Party Broker with a written brokerage agreement in which the Broker's relationship to Buyer was described and disclosed, and the Broker disclosed that the Buyer may be vicariously liable for the acts or omissions of the Broker as a Single-Party Broker.

Executed by Buyer this  9th  day of ____ September ____ , 20 __ 05 __

Buyer [Print]  _____ Aubrey Noren _____          Buyer [Signature]  _____ (signature) _____

Buyer [Print]  _____ Carlos S. Cruz _____         Buyer [Signature]  _____ Carlito S Cruz _____

Buyer [Print]  _____ Emelda B. Ventura _____      Buyer [Signature]  _____ Emelda B. Ventura _____

2.  The undersigned Seller confirms that: (check one)

☐  (a)   The Listing Broker is providing services to Seller as a Transaction Broker with a written brokerage agreement...

☐  (b)   The Listing Broker is providing services to Seller in this transaction as a Transaction Broker where the Broker has previously entered into a written brokerage agreement...

☐  (c)   The Listing Broker is providing services to Seller as a Single-Party Broker with a written brokerage agreement...

☒  (d)   The Broker is providing services to Seller as a Transaction Broker with a written brokerage agreement...

Executed by Seller this ____ day of ____ November ____ , 20 __ 05 __

Seller [Print]  _____ NEW YEAR HOMES, LLC _____      Seller [Signature]  _____ (signature) _____

Seller [Print]  _____          Seller [Signature]  _____ (signature) _____

Page 6 of 7

Form C Oura                                          Rev. 7/02

09-13-2006    09:27am    From-Washington Mutual Sonoma                707-939-2224              T-291   P.009/021   F-443

SUPPLEMENTAL FINANCING AGREEMENT TO THE REAL ESTATE PURCHASE CONTRACT
OR THE CONDOMINIUM ADDENDUM OR REAL ESTATE PURCHASE CONTRACT FOR NEW HOME

**A. CONVENTIONAL LOAN**

**5. SPECIAL PROVISIONS**
At Closing, Seller shall credit $ 3012 toward the Buyer's Closing Costs

Buyer's Initials  SS  AL/BH

**B. CASH DEAL**

Page 1 of 2

From Washington Mutual Sonoma          707-339-2224          T-201   P.011/021   F-443

Page 3
SINGLE-PARTY BROKER DISCLOSURE AND CONSENT
(CONFIRM TO SIGNATURE AGREEMENT)

[Sign either Subparagraph (d) or (e)(paragraph (e) below]

(d) Consent. The undersigned hereby consents to the Change by the Broker in the brokerage relationship from single-party Broker to Transaction Broker to assist transaction, where Broker is compensated by both parties respectively and had been the brokerage provider and such compensation and understand that the broker be obligated than authority in such a particular service to all parties to make a Transaction as a Transaction Broker.

_____        _____

(e) Non-Consent. The undersigned does not consent to the change by the Broker from a Single-Party Broker to a Transaction Broker in this sale transaction and understand that Broker neither party gives consent, the Broker shall withdraw from providing services to all Parties party to such a transaction.

_____        Carlito S Cruz
Signature                       Signature
                                Irmelda B. Ventura

E.  Matters That Cannot Be Disclosed or Explain. The following Information is considered confidential, and matter without disclosure:
    (i)  that a party is willing to pay more or accept less than what is being offered
    (ii)  that a party is willing to agree to changing terms that are offered from those already had
    (iii)  motivating factors of a party purchasing, selling, leasing, exploring or exchanging the Property.
    Unless:
    •  consent is granted by the party disclosing the information
    •  the disclosure is required by law; or
    •  the Information is made public or becomes public to the public of actions from a source other than Broker.

F.  Confirmation. The foregoing disclosures and any consent must be confirmed by making in a separate provision, incorporated by or attached to the covered in purchase Home, option or exchange and sales.

Agreed and accepted this _____ day of ____September____ , 20 __08__.

_____        _____
Sidney Schal                   (Signature)
(Print Name)

_____        Carlito S Cruz
Carlito S Cruz                 (Signature)
(Print Name)

emelda B. Ventura              Irmelda B. Ventura
                               (Signature)
Received by Broker this _____ day of ____September____ , 20 __08__.

RE/MAX Acceptance
Broker (Company)               Broker or Associate (Signature)

09-13-2006  08:28am  From-Washington Mutual Sonoma          707-838-2284      T-251  P.012/021  F-443



**ADDENDUM**

In reference to Real Estate Purchase Contract between Sidney Schull, Cecilia S. Cruz & Kynthia R. Venters Buyer(s) and Savannah Builders, LLC. Seller(s) Dated September 9th, 2006 covering the real property commonly known as 817 NW 194th Terrace Edmond, OK 73003, the undersigned Buyer(s) and Seller(s) hereby agree to the following:

The property shall be covered by a One Year Limited Warranty.  The Old Republic Service Agreement shall be paid 24 months after closing on the property, by Savannah Builders, LLC at cost not to exceed $400 with a deductible $100.

The herein agreement, upon its execution by both parties, is herewith made an integral part of the aforementioned Real Estate Purchase Contract.  All other terms and conditions to prevail.

9/14/06
Date

9/15/06
Date

7-11-06
Date

_____
Date

Buyer: Sidney Schull

Buyer: Cecilia S. Cruz

Buyer: Kynthia R. Venters

Seller: Savannah Builders, LLC.

Re/Max Associates
1900 SE 15th Bldg 500
Edmond OK 73013
405-359-8700 Office
405-359-8729 Fax

SEP. 13. 2006 11:28AM  #674 REMAX ASSOC (EDMOND)

09-13-2006  09:29am  From-Washington Mutual Sonoma          787-899-2224        T-201  P.013/021  F-449

## COMPENSATION AGREEMENT

September 8 _____ , 2006

Edmond _____ , Oklahoma

1. I, or we, the undersigned Seller of the following real property, to-wit: Lots 22 _____ ,
Block 53 _____ , Sanders1 _____ , Addition to _____ ,
817 NW 18th Terrace, OKC, OK73008 _____ , do hereby agree to
compensate the undersigned Broker $ _____ , of the gross sales price
for professional services rendered and to be rendered in connection with the sale of the
above described real property pursuant to the Real Estate Contract dated August 30, 2006 _____ ,
submitted by Baker Saied, Katie Carl and Enmis D. Vargas _____ , as Buyer(s).

2. Such compensation shall be paid to the undersigned Broker at the time of closing of the
transaction only if (a) such Real Estate Purchase Contract is entered into between the Buyer(s)
and undersigned Seller(s), and (b) the closing of the sale of the above described real property
is consummated pursuant to the terms of such Real Estate Purchase Contract.

3. The right of the undersigned Broker to receive compensation is conditioned upon the actual
closing of the transaction. However, in the event the Buyer(s) forfeits the Earnest Money, then
the undersigned Seller(s) shall divide the Earnest Money equally with the undersigned Broker
as compensation for services rendered provided that the Broker's portion shall in no event
exceed the agreed compensation.

4. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto,
their respective heirs, personal representatives, successors and assigns.

Savannah Builders, LLC _____ Seller                    _____ Seller
(Print or Type Name)

_____ Seller                    _____ Seller
(Print or Type Name)

Joe Pham _____ BROKER
(Print or Type Name)

By _____
(Principal of Broker or Salaried Licensee)

@SEP. 13, 2006 11:28AM  RE/MAX ASSOC (EDMOND)                    NO. 0023  P. 13  14/22

09-13-2006  09:29am  From-Washington Mutual Sonoma          707-820-2224    T-281  P.014/021  F-443

MODEL HOME
LEASEBACK AGREEMENT

This Agreement, made this 9th day of September 2006 by and between, Sidney Schell, Curtis S. Cruz and Zenaida B. Ventura, hereinafter referred to as "Landlord", and Savannah Builders, LLC., hereinafter referred to as "Tenant."

WHEREAS, Tenant agrees to lease from Landlord and Landlord agrees to lease to Tenant the Leased Premises under and upon the terms and conditions of this Agreement.

LEASE OF PROPERTY

1. **Lease.** The Landlord leases to Tenant and Tenant leases from Landlord the Property located at: 817 NW 154th Terrace Edmond, OK 73013

2. **Term.** The term of this lease shall be 24' months, commencing on the date of closing of the property. The Tenant reserves the option to extend the lease for a third year, if so desired at the end to the original term.

3. **Rent.** Tenant shall pay Landlord the rent for the leased premises as described herewith. The rent for the leased premises will be $2030 (Two Thousand Thirty Nine Dollars Only) per month and shall be payable on or before the first day of each month of the Lease Term at the office of the Landlord or such other place as the Landlord shall designate. Such monthly payments shall be made without demand and shall not be subject to any set-off or deduction. In the event that the Lease Term shall commence on a day other than the first day of the month, Tenant shall pay on the Closing Date a proration of one monthly installment of Adjusted Rent equal to the number of days in that month. Tenant shall be liable for and shall be responsible to Landlord for payment of the rent during the period of this Agreement. Rental payments received after the tenth (10) of the month will be assessed a fifteen (15) percent late charge. In the Event the Tenant desires to extend the lease agreement beyond the original term, any increase in the rental amount will be negotiate and agreed in writing before the actual end of the original term.

4. **Additional Clauses.** Tenant shall pay the following charges in addition to rent:

   a. During the lease term, Tenant shall pay, for hazard, fire and extended coverage insurance policy premiums. Tenant shall further pay for liability insurance on the Property. Tenant, at no cost to Landlord, shall name Landlord and any mortgagee of Landlord as additional insured or loss payee, as appropriate, under such policies or insurance described above. Tenant shall provide Certificates of Insurance showing Landlord and mortgagees as co-insured. Tenant agrees to provide proof of premium payment on the policies at the time Landlord should request such information. Tenant also agrees to pay, as additional charges, real estate taxes, homeowners association or condominium dues and assessments, taxes, and any other charges and expenses incurred by Landlord with

1

SEP. 13. 2006 11:29AM REMAX ASSOC (EDMOND)                    NO.7494  P.15/22

09-13-2006  09:30am  From-Washington Virtual Sonoma          707-839-2224          T-281  P.016/021  F-448

respect to the Leased Premises.  Furthermore, the Tenant will provide the Landlord proof of payment of all property taxes and assessments prior to their being delinquent.  In the event charges for water and sewer service to the Leased Premises become a lien upon the real Property, then Tenant shall pay such charges in the same manner as real estate taxes and other Additional charges listed herein.  In the event any Additional Charges attributable to the Leased Premises during the term of the Lease are billed or become due after the termination of this Agreement, Tenant agrees to promptly make payment of such charges or to reimburse Landlord for any payment made, upon written demand from Landlord.

b.  During the Lease Term, the Tenant shall at its sole cost and expense, maintain the Leased Premises in good condition, repair and order, ordinary wear and tear as a model home excepted, both inside and outside, structural and non-structural, and the yard areas, railings, fences, sidewalks, roads, and curbs thereon or adjoining or in front of the Leased Premises and all connection with the street, water, electric, gas mains and sewer, air conditioning and heating apparatus, all appliances, personal Property and other fixtures used in connection with the Leased Premises, including any replacements made by the Tenant.  The Tenant shall be responsible for, and shall, at its sole cost and expense, promptly repair any damage to the leased Premises, specifically including without limitation damage from acts of vandalism.  Tenant shall indemnify and save the Landlord harmless from and against any and all costs, expenses, claims, losses, damages, fines, or penalties because of or due to Tenant's failure to comply with the foregoing and the Tenant shall not call upon the Landlord for any money in connection therewith whatsoever, and Tenant hereby expressly releases and forever discharges the Landlord in and from liability or responsibility whatsoever on connection therewith.

c.  The Landlord shall not be required to furnish any service to the Leased Premises, including heat, water, sewer service, air conditioning, gas or electric power, and shall not be liable for any failure of water, gas or electric current or of any service by any utility, nor for injury or death to any person or damage to Property caused by or resulting from steam, gas, electricity, water, rain, snow or sewage which may flow or leak from any part of the Leased Premises or from any pipes, appliances or plumbing works or the same or from the street or subsurface or from any other place, or from interference with light or other incorporeal hereditaments or easements, however caused, except if due to the affirmative acts of the Landlord.  The Tenant agrees to pay all the charges (including any required deposits) for gas, electricity, water, sewer, light, heat, power trash removal or other services used by or supplied to the Leased Premises, and Tenant shall indemnify and save Landlord harmless from and against any and all liability on such account.  All such utility accounts shall be maintained in the name of the Tenant.  Landlord shall not be required to furnish any services or facilities or to make any repairs or alterations in or to the Leased Premises.  Tenant hereby assumed the full and sole responsibility for the condition, operation, repair, replacement, maintenance and management of the Leased Premises.

2

SEP. 13, 2006 11:17AM    WASHINGTON MUTUAL 4057...

08-13-2008    08:30am    From-Washington Mutual Sonoma          707-838-2224          T-281  P.016/021  F-443

**Quiet Enjoyment.** Upon Tenant's payment of the Fixed Rent and Additional Charges and performance of all the terms, covenants and conditions in this Agreement, Tenant shall and may peaceably and quietly have, hold and enjoy the Leased Premises for the Lease Term, subject to the terms of the Agreement.

5. **Use of Leased Premises.** The Tenant shall have the right to use and covenants that it will use the Leased Premises only for the purpose of model home and sales office in connection with the sale of homes to the public.

6. **Signs.** The Tenant shall have the privilege of placing on the Leased Premises such signs as are necessary and proper to use the Leased Premises as a model home and sales office, provided the Tenant pays all permit and license fees and all other costs which may be required to be paid for the erection and maintenance of any and all such signs, and provided such signs are legally permitted to be installed. All such signs shall be removed by Tenant prior to the termination or expiration of this Agreement.

7. **Alterations by Tenant.** Tenant shall have the right, upon five (5) days prior written notice to Landlord, at its own expense, from time to time during the Lease Term, to make such alterations, additions and changes, structural or otherwise, in and to the Leased Premises, as are necessary or convenient to the use of the Leased Premises as model homes; provided, however, Tenant agrees to restore the Leased Premises to their original condition, upon the termination of this Lease, should Landlord so request. Tenant agrees to complete driveway and landscaping and to restore the leased premises to their original condition, including the conversion of the sales office back to the garage, upon the termination of the lease. Tenant also agrees to obtain a occupancy permit prior to the termination of the lease.

8. **Compliance with Laws and Regulations.** The Tenant covenants and agrees to comply with any and all laws, statutes, ordinances and regulations, whether federal, state, county or municipal, now or hereafter in force, applicable to the Leased Premises during the tenancy, relating to use or occupancy thereof or to the making of repair, changes, alterations, or improvements therein, ordinary or extraordinary structural or otherwise. The Tenant shall pay all costs, expenses, claims, fines, penalties, and damages that may in any manner arise out of or be imposed because of the failure of Tenant to comply with its obligations under this section, and in any event, agrees to indemnify the Landlord from all liability with respect to the same. The Landlord and Tenant shall each promptly give notice to the other of any notice of violation received by the Tenant or Landlord, respectively, concerning the Leased Premises.

9. **Indemnification.** The Tenant shall, and hereby does, indemnify and hold the Landlord harmless from and against any and all claims, damages, suits or causes of action for damages arising during the Lease Term and resulting from any injury to person or Property or from loss of life sustained in or about the Leased Premises and the buildings and improvements thereon, or in or upon the sidewalks or streets appurtenant thereto by any person or persons whatsoever, except in connection with Landlord's action. Landlord shall not be liable for the

5

SEP. 13, 2006 11:29AM  RE/MAX ASSOC (EDMOND)          NO. 0073    P. 17    17/22

08-12-2008  09:31am  From-Washington Mutual Sonova          707-930-2224      T-281  P.017/021  F-443

death or personal injury to the Tenant or its officers, agents and employees, visitors, invitees, trespassers or to any other persons or to any occupants of any part of the Leased Premises or for any injury or damage to goods, wares, merchandise or property of the Tenant or of any occupant, visitor, invitee or trespasser or any part of the said Leased Premises, irrespective of how the same may be caused, whether from action of the elements or act of negligence of the Owner or occupants of the adjacent properties. The Tenant shall, and hereby does, indemnify and save harmless the Landlord from any and all claims and judgments, including legal expenses in connection with defense against any action, suit or claim arising from injury to person or damage to property of any and every nature and for any matter or thing growing out of the occupancy of the Leased Premises or by the agents, or employees, respectively, or which may be occasioned by any person or thing whatsoever. Notwithstanding anything contained herein to the contrary, the obligation of Tenant to indemnify Landlord as set out herein shall survive the termination of this Lease.

10. **Landlord Obligations.** If the Landlord shall fail to pay within twenty (20) days after due, any installment of principal or interest on any mortgage paramount to this Agreement, and such failure should jeopardize Tenant's right to possession as hereby granted, the Tenant may make such payment. If the Tenant shall make any payment or advance or incur any expense for the account of the Landlord pursuant to this Agreement, the Tenant shall be entitled to reimbursement thereof from the Landlord, together with interest at fifteen (15) percent per annum computed from the date of such advance.

11. **Liability, Fire and Extended Coverage Insurance.**

    a. The Tenant shall carry $2,000,000 public liability insurance.

    b. The Tenant shall be responsible for providing hazard, fire and extended coverage insurance for the Leased Premises in an amount equal to 100% of the full replacement cost of the improvements located upon the Property, said replacement cost being determined in accordance with concurrence policies existing and in general use in the insurance industry on the Closing Date. Except as specifically hereinafter provided, Tenant shall be entitled to claim or receive any proceeds of such insurance. In the event of any damages to the Leased Premises covered by such insurance policy, Tenant shall be responsible for payment of any deductible amount.

    c. Ten (10) days prior to the commencement of the Lease Term, Tenant shall provide Landlord with a copy of such insurance policy with evidence of payment of the premium due thereon. Such insurance policies shall name Landlord and Mortgagee as co-insured.

    d. If the Leased Premises are damaged or destroyed, the same shall be promptly repaired, replaced or rebuilt at the sole cost of the Tenant. Any insurance proceeds payable to the Tenant as a result of any damage to or destruction of the Leased Premises (less any costs, fees or expenses incurred by Landlord) shall be paid to Tenant to reimburse Tenant for

4

09-13-2006  09:31am  From-Washington Mutual Sonoma                707-030-2224          T-201  P.018/021  F-443

costs of repair, replacement or rebuilding of the Leased Premises as hereinafter set forth. After completion of the repair work, Tenant agrees to the following:

    i. Allow a representative of Landlord to inspect the Leased Premises to determine whether the Leased Premises have been repaired, replaced or rebuilt in accordance with the original plans

    ii. Provide an endorsement to the title insurance policy on the Leased Premises insuring against mechanics and materialmen's liens for work performed and materials provided in connection with the repair, replacement or rebuilding of the Leased Premises.

  e. In the event that cost of repair for any damage to or destruction of the Leased Premises exceeds insurance proceeds received by the Tenant, then the Tenant shall be responsible for and bear the cost of any unreimbursed expenses.

  f. Notwithstanding any provisions of this Agreement to the contrary, Tenant shall be solely responsible for insuring any and all of tenant's personal property located on or about the Leased Premises.

**12. Default.** The following shall be considered events of default under this Agreement:

  a. If Tenant shall fail to pay the Fixed Rent or Additional Charges payable under this Lease on the date the same shall become due and payable, and such failure to pay shall continue for a period of fifteen (15) days after written notice thereof; or

  b. If Tenant shall fail in the performance of or compliance with any other obligation under this Agreement and such non-monetary default shall continue for a period of thirty (30) days after the date of mailing written notice thereof from Landlord to Tenant, or in the case of a non-monetary default or a contingency which cannot, with due diligence, be cured within such period of thirty (30) days, Tenant fails to proceed promptly to cure the same except that where a non-monetary default cannot be cured with due diligence within thirty (30) days that the time of Tenant within which to cure the same shall be extended for such period as may be necessary to complete the same with all due diligence; or

  c. If Tenant shall in any way encumber the Leased Premises.

  d. If Tenant shall cease to use the Leased Premises for model home and sales office purposes.

**13. Landlord Remedies.** Upon default, Landlord shall have the right to the following:

5

@SEP. 13, 2006 11:30AM XEROX ASSOC (FORMUN)                          NO. 9911  P. 19  19/22

09-13-2006  08:32am  From-Washington Mutual Sonoma            707-935-2224         T-281  P.010/021  F-443

a. Terminate Tenant's right to possession with respect to the Leased Premises by giving ten (10) days written notice to Tenant. Any notice given shall specify the date upon which right to possession shall be terminated and expire. Tenant shall remain liable for all Fixed Rent and reasonable Additional Charges (including late charges) and shall be liable for all costs and expenses incurred by Landlord, including attorney's fees, to collect any sums due and to regain possession of the Leased Premises.

b. Notwithstanding any other provisions of this Agreement to the contrary, in the event Tenant fails for any reason whatsoever to pay Landlord the Fixed Rent or Additional Charges within ten (10) days of the date such payment is due, Tenant shall pay a late charge amount, equal to four (4) percent of the amount of the overdue payment which shall be considered an Additional Charge.

c. The rights and remedies given to the Landlord in this Lease are distinct, separate and cumulative remedies and no one of them whether or not exercised by the Landlord, shall be deemed to be in exclusion of any of the others herein or by law or equity provided.

d. The receipt of rent by the Landlord, with knowledge of any breach of this lease by the Tenant or of any default on the part of the Tenant in the observance or performance of any of the terms, covenants or conditions of this Lease, shall not be deemed to be a waiver of any provisions of this Lease.

14. **Surrender of Leased Premises.** Tenant agrees to take care of the premises and to return the same to the possession of the landlord in the same condition as at the time of purchase except for reasonable wear and tear.  Before lease expires Savannah Builders, LLC. will do the following:

   a. Complete any repairs required by a home inspection report from any home inspector hired by Landlord, if the Landlord so desires.

   b. Clean all flooring throughout the house and do all repairs at Landlord's discretion.

   c. Convert garage, sidewalks and any other structural changes so that the house is reconverted to a home according to original design and not a sales office/model.

   d. Verify sprinkler system installed and operational.

   e. Insure that the landscaping is alive and in good condition.

15. **Miscellaneous.**

   a. The covenants, terms, conditions, warranties and undertakings contained in this Agreement shall extend and inure to the benefit of and bind the parties hereto, and each of their respective heirs, administrators, successors and assigns, as permitted.

6

SEP. 13. 2006 11:30AM  RE/MAX ASSOC (EDMUND)                                No. 0021  P. 11

09-13-2006   09:02am   From-Washington Mutual Sonoma          707-838-2224      T-281  P.020/021  F-443

**LANDLORD**

BY: Sidney Scholl                    TITLE: Landlord

BY: Carlito S. Cruz                  TITLE: Landlord

BY: Imelda B. Ventura                TITLE: Landlord

STATE OF _California_          COUNTY OF _Sonoma_

I, the undersigned, a notary public in and for the State and County aforesaid, do certify that Sidney Scholl, Carlito S. Cruz, Imelda B. Ventura is the signatory of the writing foregoing and hereto annexed, bearing date of the 9th day of September, 2006 personally appeared before me in my said State and County aforesaid and acknowledge said writing to be his act and deed.

Given under my hand this 9 day of September, 2006.



Notary Public

My commission expires _June 12, 2007_

OFFICIAL SEAL
KIMBERLYA. MUSH.
NOTARY PUBLIC - CALIF.
COUNTY OF SONOMA
My Comm. Exp. June 12, 2007

10

08-13-2008   09:32am   From-Washington Mutual Sonoma          707-939-2224      T-291  P.021/021  F-443

## SELLER/TENANT

BY: Savannah Builders, LLC.                    TITLE: Tenant

STATE OF _____ COUNTY OF _____

I, the undersigned, a notary public in and for the State and County aforesaid, do certify that _____ is the signatory of the voting foregoing and hereto annexed, bearing date of the _____ day of _____, 2006 personally appeared before me in my said State and County aforesaid and acknowledge said voting to be his act and deed.

Given under my hand this _____ day of _____, 2006.

_____
Notary Public

My commission expires _____

10

# EXHIBIT F

A. U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

SETTLEMENT STATEMENT

Alliance Title Company
901 Campisi Way, Suite 100
Campbell, CA 95008

**FINAL**

| B. TYPE OF LOAN | | OMB No. 2502-0265 |
|---|---|---|
| 1. ☐ FHA | 2. ☐ FMHA | 3. ☑ CONV. UNINS. |
| 4. ☐ VA | 5. ☐ CONV. INS. | |

6. ESCROW FILE NUMBER: 11517558-001 JLT
7. LOAN NUMBER: 3012935742
8. MORTGAGE INSURANCE CASE NUMBER:

NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(P.O.C.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

NAME OF BORROWER: Felton A. Spears and Toni Spears

ADDRESS OF BORROWER: 10161 Roehampton Avenue
San Jose, CA 95127

E. NAME OF SELLER: Felton A. Spears

ADDRESS OF SELLER: 10161 Roehampton Avenue
San Jose, CA 95127

F. NAME OF LENDER: Washington Mutual Bank
ADDRESS OF LENDER: 3050 Highland Parkway. 6th Flr,
Downers Grove, IL 60515

G. PROPERTY LOCATION: 10161 Roehampton Avenue
San Jose, CA 95127
Santa Clara 601-37-010

H. SETTLEMENT AGENT: Alliance Title Company
PLACE OF SETTLEMENT: 901 Campisi Way, Suite 100, Campbell, CA 95008
I. SETTLEMENT DATE: 03/12/2007    PRORATION DATE:    FUNDING DATE:

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100. Gross Amount Due From Borrower: | | 400. Gross Amount Due To Seller: | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to Borrower (line 1400) | 2,688.54 | 403. | |
| 104. Payoff to World Savings | 155,385.68 | 404. | |
| 105. | | 405. | |
| Adjustments For Items Paid By Seller In Advance: | | Adjustments For Items Paid By Seller In Advance: | |
| 106. City/Town Taxes | | 406. City/Town Taxes | |
| 107. County Taxes | | 407. County Taxes | |
| 108. Assessments | | 408. Assessments | |
| | | 409. | |
| | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 120. Gross Amount Due from borrower: | 158,072.22 | 420. Gross Amount Due to Seller | 0.00 |
| 200. Amounts Paid by or in behalf of Borrower: | | 500. Reductions In Amount Due To Seller: | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 176,000.00 | 502. Settlement charges to Seller (line 1400) | 0.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments For Items Unpaid By Seller: | | Adjustments For Items Unpaid By Seller: | |
| 210. City/Town Taxes | | 510. City/Town Taxes | |
| 211. County Taxes | | 511. County Taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower | 176,000.00 | 520. Total Reductions In Amount Due Seller | 0.00 |
| 300. Cash at Settlement from/to Borrower: | | 600. Cash at Settlement from/to Seller: | |
| 301. Gross amount due from Borrower (line 120) | 158,072.22 | 601. Gross amount due to Seller (line 420) | 0.00 |
| 302. Less amount paid by/for Borrower (line 220) | 176,000.00 | 602. Less reductions in amount due Seller (line 52 | 0.00 |
| Cash TO Borrower: | 19,927.78 | 603. Cash TO/FROM Seller: | 0.00 |



ALLIANCE TITLE COMPANY
hereby certifies this is a true
and correct copy of the original.

Authorized Signature

ESCROW FILE NUMBER:     11517558-001  JLT

OMB No. 2502-0265

**L. SETTLEMENT CHARGES:**

| | | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|
| **700. Total Sales/Broker's Commission:** | | | |
| Based on Price $ | | | |
| Division of Commission (line 700) follows: | | | |
| 701. $ | | | |
| $ | | | |
| 703. Commission paid at settlement | | | |
| 704. | | | |
| **800. Items Payable In Connection With Loan:** | | | |
| 801. Loan Origination Fee | | | |
| 802. Loan Discount Fee | | | |
| 803. Appraisal Fee to  Southwest Eapprsl | | 361.00 | |
| 804. Credit Report | | | |
| 805. Lenders Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | | |
| 807. Assumption Fee | | | |
| 808. Tax Service to Washington Mutual Bank | | 81.00 | |
| 809. Flood Determination to  LandAmerica Tax & Flood | | 8.00 | |
| 810. Funding & Review Fee to Washington Mutual Bank | | 480.00 | |
| 811. Wire Transfer Fee to Washington Mutual Bank | | 35.00 | |
| 812. Payment Processing to Washington Mutual Bank | | 200.00 | |
| 813. Credit-Customer Retent to Washington Mutual Bank | | 980.00- | |
| **900. Items Required By Lender To Be Paid In Advance:** | | | |
| 901. Interest from 03/09/07 to 04/01/07 @$31.09/day (23 days) | | 715.07 | |
| 902. Mortgage Insurance Premium | | | |
| 903. Hazard Insurance Premium | | | |
| 904. | | | |
| 905. | | | |
| **1000. Reserves Deposited With Lender:** | | | |
| 1001. Hazard Insurance 3 months @$74.00 per month | | 222.00 | |
| 1002. Mortgage Insurance | | | |
| 1003. City Property Taxes | | | |
| 1004. County Property Taxes 3 months @$166.49 per month | | 499.47 | |
| 1005. Annual Assessments | | | |
| 1006. | | | |
| Aggregate Adjustment   months @$ | | 0.00 | |
| **1100. Title Charges:** | | | |
| 1101. Settlement or closing fee to Alliance Title Company | | 250.00 | |
| 1102. Abstract or title search | | | |
| 1103. Title examination | | | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation | | | |
| 1106. Notary Fees | | | |
| 1107. Attorney's Fees | | | |
| (includes above item numbers: ) | | | |
| 1108. Title Insurance | | | |
| (included above item numbers: ) | | | |
| 1109. Lender's coverage $    176,000.00 to Alliance Title Company | | 584.00 | |
| 1110. Owner's Coverage | | | |
| 1111. | | | |
| 1112. Delivery/Courier Deliveries to Alliance Title Company | | 65.00 | |
| 1113. Notary to Alliance Title Company | | 75.00 | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Recording Fees: Deed$     13.00 Mortgage $     60.00 Release $ | | 73.00 | |
| 1202. City/County tax/stamps | | | |
| 1203. State tax/stamps | | | |
| 1204. City Transfer Tax | | | |
| 1205. County Transfer Tax | | | |
| 1206. Record Release to Alliance Title Company | | 18.00 | |
| 1207. | | | |
| **1300. Additional Settlement Charges:** | | | |
| 1301. Survey | | | |
| 1302. Pest Inspection | | | |
| | | | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| 1400. Total Settlement Charges (Enter on line 103,Section J -and- line 502, Section K) | | 2,886.54 | |

Hudc.rpt (11/04/2005)

Printed by Jennifer Trujillo on 03/09/2007 at 09:14:03 PM

ESCROW FILE NUMBER:    11517558-001 JLT

OMB No. 2502-0265

**BREAKDOWN OF NEW LOANS**

| Description | Buyer Amount | Seller Amount |
|---|---|---|
| Washington Mutual Bank, 3050 Highland Parkway. 6th Flr, Downers Grove, IL 60515, Loan# 30 | 178,000.00 | |
| Total of New Loans. | 178,000.00 | |

# EXHIBIT G

 **Washington Mutual**    Collateral Valuation Report

| | | | |
|---|---|---|---|
| **Originating Office:** | SAN JOSE HLC | **Originating Phone:** | 408-223-4100 |
| **Consultant/Acct. Mgr.:** | JULENE RAMIREZ | **Consultant/Acct. Mgr. Phone:** | 408-223-4108 |
| **Coordinator/Team:** | KAREN SMILEY | **Coordinator/Team Phone:** | 630-437-7358 |
| **LFC Name:** | Coast to Coast Fulfillment | **LFC Phone:** | |
| **Service Provider:** | SOUTHWEST EAppraiseIt(R) | **Service Provider Phone:** | 866-690-1140 |

**\* Refer to Underwriter:** No
**Loan Number:** 03-2371-301266496-1
**Job Number:** SW-070116-0831-2
**Borrower:** FELTON SPEARS
**Property Address:** 10161 ROEHAMPTON AVE, SAN JOSE, SANTA CLARA
County, CA 95127
**Property Type:** SINGLE FAMILY
**Service Type:** 1004 W/ NO COST APPROACH
**Date of Service:** 19-Jan-2007 00:00:00
**Valuation Report Date:** 22-Jan-2007 21:53:43
**Date of Signature and Report:** 21-Jan-2007 00:00:00
**Year Built:** n/a
**Assessor's Parcel #:** 601-37-010
**Foundation Walls:** Concrete/Average
**Exterior Walls:** Stucco/Wood/Avg
**Non Owner Occupied:** No
**Occupancy:** n/a

| Unit | BR | Rent |
|---|---|---|
| | 3 | |

**This Appraisal is Made:**
AS-IS

Zoning compliance field is marked as LEGALNONCONFORMING.

**Required repairs, required inspections, or additional reviewer comments:**
The estimate of value assumes a three month exposure period.

All required repairs/conditions/inspections must be completed in a workmanlike manner and in conformance with Bank policy.

**Appraised Value:** Appraiser Value $525,000.00

### Billing

| | | Fee | Cost Center |
|---|---|---|---|
| **Inspected By:** | SOUTHWEST EAppraiseIt(R) | $361.00 | 0002371 |

We have charged the appropriate cost center for the above charges. Please reconcile the GL account at closing.

23-Feb-2007 15:46:59

## Uniform Residential Appraisal Report

File #

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| Property Address | | | City | | State CA | Zip Code |
| Borrower | | Owner of Public Record | | County | |

Legal Description

| Assessor's Parcel # | | | Tax Year | | R.E. Taxes $ |
| Neighborhood Name | | Map Reference | | Census Tract |

Occupant ☒ Owner ☐ Tenant ☐ Vacant    Special Assessments $    ☐ PUD  HOA $    ☐ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☒ Refinance Transaction ☐ Other (describe)

Lender/Client    Washington Mutual    Address

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☒ No

Report data source(s) used, offering price(s), and date(s).

The subject is not currently listed and has not been listed within 12 months of the appraisal.

I ☐ did ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $    Date of Contract    Is the property seller the owner of public record? ☐ Yes ☐ No  Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No

If Yes, report the total dollar amount and describe the items to be paid.

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | PRICE | AGE | Present Land Use % |
| Location ☐ Urban ☒ Suburban ☐ Rural | | Property Values ☐ Increasing ☒ Stable ☐ Declining | | | PRICE $(000) | AGE (yrs) | One-Unit % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | Low | | 2-4 Unit % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | | Marketing Time ☒ Under 3 mths ☐ 3-6 mths ☐ Over 6 mths | | | High | | Multi-Family % |
| Neighborhood Boundaries | | | | | Pred. | | Commercial % |
| | | | | | | | Other % |

Neighborhood Description
SEE ADDITIONAL FIELD TEXT ADDENDUM

Market Conditions (including support for the above conclusions)
SEE ADDITIONAL FIELD TEXT ADDENDUM

| Dimensions | | Area | | Shape | | View |
| Specific Zoning Classification | | Zoning Description | | | |
| Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe) | | | | | |

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No  If No, describe.

| Utilities | Public | Other (describe) | | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
| Electricity | ☒ | ☐ | | Water | ☒ | ☐ | Street | | ☐ ☐ |
| Gas | ☒ | ☐ | | Sanitary Sewer | ☒ | ☐ | Alley | | ☐ ☐ |

FEMA Special Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone    FEMA Map #    FEMA Map Date

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No  If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No  If Yes, describe.

| General Description | | Foundation | | | Exterior Description | materials/condition | Interior | materials/condition |
| Units ☒ One ☐ One with Accessory Unit | | ☐ Concrete Slab ☒ Crawl Space | | | Foundation Walls | | Floors | |
| # of Stories  One | | ☐ Full Basement ☐ Partial Basement | | | Exterior Walls | | Walls | |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | | Basement Area    sq. ft. | | | Roof Surface | | Trim/Finish | |
| Design (Style) | | Basement Finish    % | | | Gutters & Downspouts | | Bath Floor | |
| ☒ Existing ☐ Proposed ☐ Under Const. | | ☐ Outside Entry/Exit ☐ Sump Pump | | | Window Type | | Bath Wainscot | |
| Year Built | | Evidence of ☐ Infestation | | | Storm Sash/Insulated | | Car Storage ☐ None | |
| Effective Age (Yrs) | | ☐ Dampness ☐ Settlement | | | Screens | | ☐ Driveway  # of Cars | |
| Attic ☐ None | | Heating ☒ FWA ☐ HWBB ☐ Radiant | | | Amenities ☐ WoodStove(s) # | | Driveway Surface | |
| ☐ Drop Stair ☐ Stairs | | ☐ Other | | | ☐ Fireplace(s) # ☐ Fence | | ☐ Garage  # of Cars | |
| ☐ Floor ☒ Scuttle | | Cooling ☐ Central Air Conditioning | | | ☒ Patio/Deck ☐ Porch | | ☐ Carport  # of Cars | |
| ☐ Finished ☐ Heated | | ☐ Individual ☐ Other | | | ☐ Pool ☐ Other (describe) | | ☐ Att. ☐ Det. ☐ Built-in | |

Appliances ☐ Refrigerator ☒ Range/Oven ☐ Dishwasher ☐ Disposal ☐ Microwave ☐ Washer/Dryer ☐ Other (describe)

Finished area above grade contains:    Rooms    Bedrooms    Bath(s)    Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.).

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No  If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No  If No, describe

| Freddie Mac Form 70  March 2005 | Page 1 of 6 | Fannie Mae Form 1004  March 2005 |

## Uniform Residential Appraisal Report

File #

There are ___ comparable properties currently offered for sale in the subject neighborhood ranging in price from $ _____ to $ _____
There are ___ comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ _____ to $ _____

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Address | | | | |
| Proximity to Subject | | | | |
| Sale Price | $ | $ | $ | $ |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ sq.ft. | $ sq.ft. | $ sq.ft. |
| Data Source(s) | | | | |
| Verification Source(s) | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION +(-) $ Adjustment | DESCRIPTION +(-) $ Adjustment | DESCRIPTION +(-) $ Adjustment |
| Sale or Financing Concessions | | | | |
| Date of Sale/Time | | | | |
| Location | | | | |
| Leasehold/Fee Simple | | | | |
| Site | | | | |
| View | | | | |
| Design (Style) | | | | |
| Quality of Construction | | | | |
| Actual Age | | | | |
| Condition | | | | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | Total Bdrms. Baths | Total Bdrms. Baths |
| Room Count | | | | |
| Gross Living Area | sq.ft. | sq.ft. | sq.ft. | sq.ft. |
| Basement & Finished Rooms Below Grade | | | | |
| Functional Utility | | | | |
| Heating/Cooling | | | | |
| Energy Efficient Items | | | | |
| Garage/Carport | | | | |
| Porch/Patio/Deck | | | | |
| | | | | |
| | | | | |
| Net Adjustment (Total) | | ☐ + ☐ − $ | ☐ + ☐ − $ | ☐ + ☐ − $ |
| Adjusted Sale Price of Comparables | | Net Adj. % Gross Adj. % $ | Net Adj. % Gross Adj. % $ | Net Adj. % Gross Adj. % $ |

☐ I did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s)
My research ☐ did ☐ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s)
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | | | | |
| Effective Date of Data Source(s) | | | | |

Analysis of prior sale or transfer history of the subject property and comparable sales

Summary of Sales Comparison Approach

Indicated Value by Sales Comparison Approach $

Indicated Value by: Sales Comparison Approach $ _____ Cost Approach (if developed) $ _____ Income Approach (if developed) $ _____

This appraisal is made ☒ "as is," ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ _____ , as of 01/19/2007 , which is the date of inspection and the effective date of this appraisal.



## Uniform Residential Appraisal Report

File #

Provide adequate information for the lender/client to replicate the below cost figures and calculations.
Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW          OPINION OF SITE VALUE ...........................................  =$

Source of cost data ....................................................   Dwelling ............ Sq. Ft. @ $ .......... =$

Quality rating from cost service ........ Effective date of cost data .........   .................. Sq. Ft. @ $ .......... =$

Comments on Cost Approach (gross living area calculations, depreciation, etc.)   .......................................... =$

                                                                                 Garage/Carport ...... Sq. Ft. @ $ ........ =$

                                                                                 Total Estimate of Cost-New .............. =$

                                                                                 Less    Physical    Functional    External
                                                                                 Depreciation ........ =$ ( ........... )
                                                                                 Depreciated Cost of Improvements ....... =$
                                                                                 "As-is" Value of Site Improvements ..... =$

Estimated Remaining Economic Life (HUD and VA only) .......... Years    Indicated Value by Cost Approach ........... =$

Estimated Monthly Market Rent $ ........... X Gross Rent Multiplier ........... = $ ........ Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM)

Is the developer/builder in control of the Homeowners' Association (HOA)?     ☐ Yes ☐ No     Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

Total number of phases ........... Total number of units ........... Total number of units sold ...........

Total number of units rented ........... Total number of units for sale ........... Data source(s) ...........

Was the project created by the conversion of existing building(s) into a PUD?   ☐ Yes ☐ No  If Yes, date of conversion

Does the project contain any multi-dwelling units?   ☐ Yes ☐ No  Data source(s)

Are the units, common elements, and recreation facilities complete?   ☐ Yes ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?   ☐ Yes ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities

Freddie Mac Form 70   March 2005                       Page 3 of 6                        Fannie Mae Form 1004   March 2005

**Uniform Residential Appraisal Report**    File #

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

## Uniform Residential Appraisal Report

**APPRAISER'S CERTIFICATION: The Appraiser certifies and agrees that:**

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

**Uniform Residential Appraisal Report**    File # [illegible]

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

**APPRAISER**

Signature    *Kathryn A. Kumamoto*
Name  Kathryn A. Kumamoto
Company Name  [illegible]
Company Address  [illegible]

Telephone Number  [illegible]
Email Address  [illegible]
Date of Signature and Report  [illegible]
Effective Date of Appraisal  [illegible]
State Certification #  [illegible]
or State License #  [illegible]
or Other (describe)  [illegible]  State #  [illegible]
State  [illegible]
Expiration Date of Certification or License  [illegible]

ADDRESS OF PROPERTY APPRAISED
[illegible]
[illegible]  CA  [illegible]
APPRAISED VALUE OF SUBJECT PROPERTY $  [illegible]
LENDER/CLIENT
Name  [illegible]
Company Name  [illegible]
Company Address  [illegible]
[illegible]
Email Address  [illegible]

**SUPERVISORY APPRAISER (ONLY IF REQUIRED)**

Signature  [illegible]
Name  Deborah L. Garrett
Company Name  [illegible]
Company Address  [illegible]
[illegible]

Telephone Number  [illegible]
Email Address  [illegible]
Date of Signature  [illegible]
State Certification #  [illegible]
or State License #  [illegible]
State  [illegible]
Expiration Date of Certification or License  [illegible]

SUBJECT PROPERTY
☒ Did not inspect subject property
☐ Did inspect exterior of subject property from street
    Date of Inspection  [illegible]
☐ Did inspect interior and exterior of subject property
    Date of Inspection  [illegible]

COMPARABLE SALES
☒ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
    Date of Inspection  [illegible]

**ADDITIONAL FIELD TEXT**

File No. ▓▓▓▓▓▓▓▓

| Borrower/Client | Speer ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| Property Address | 10191 Rosehampton Avenue ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| City San Jose ▓▓▓▓▓▓▓▓▓▓ | County Santa Clara ▓▓▓▓ State CA ▓▓ Zip Code 95127 ▓▓ |
| Lender Washington Mutual ▓▓ Appraisal ▓▓▓▓▓▓ Washington Mutual ▓▓▓▓▓▓▓▓▓▓▓▓▓ |

**ANALYSIS CURRENT AGREE COMPS 1-3**
The subject has not closed escrow within 36 months of the effective date of this appraisal. Comparables One, Two, and Three have not closed escrow within 12 months of their last sale date.

**ADDITIONAL FEATURES**
Hardwood flooring throughout; wall to wall carpet in living room; vinyl flooring in kitchen and bathroom. Floor-to-ceiling brick-hearth fireplace in living room. Covered concrete patio in side yard. Rear perimeter fencing.

**CONDITION IMPROVEMENTS**
Normal physical depreciation, no functional, or external inadequacies noted. No repairs or modernizations needed. The subject appears to have had little updating with the exception of new thermal pane windows throughout. It is considered to be of average construction quality in overall average condition. There was evidence of cosmetic deferred maintenance such as peeling exterior paint and no paint on the new stucco surrounding the newly installed thermal pane windows. This was reflected in the subject's effective age/condition.

**COMMENT SALES COMPARE COMPS 1-3**
None of the sales used for comparison were directly comparable to the subject residence, however, all shared similar appeal to the same segment of the housing market as the subject property. It was necessary to expand the search perimeter beyond the typical 1 mile radius to bracket the subject's effective age/condition. These sales provided a reasonably well-supported indication of the subject's market value. All sales when adjusted were given equal weight in determining the final value estimate. See Addendum for additional comments.

**FINAL RECONCILIATION**
The sales comparison approach was considered the most relevant approach to value, though there were no directly comparable sales, due to the age of the subject residence and the availability of market data. The estimate of value assumes a three month exposure period.

**MARKET CONDITIONS**
Prices remain stable with maybe some slight price adjustments from one neighborhood to another and between market segments. Typical marketing times require a market exposure period of 90 days or less with no unusual contingencies or conditions. Conventional financing is the norm.

**NEIGHBORHOOD BOUNDARIES**
General neighborhood boundaries are Fleming Road north; Marten Road south; Babb Creek east; 680 west.

**APPARENT CONDITION DESCRIPTION**
No adverse easements, encroachments, or other adverse conditions noted. The subject property backs up to the National Hispanic University and is one block from commercial properties along Storey Road. This has no adverse effect on market value. The subject was built prior to current zoning regulations and can be rebuilt if destroyed.

**NEIGHBORHOOD DESCRIPTION**
The subject is located in a neighborhood of primarily older and rebuilt, average quality and condition homes in the city of San Jose. San Jose neighborhoods are typically heterogeneous but that is acceptable to the market. The neighborhood is close to shopping, schools, and community services and has good access to the Highways 680 and 101. Employment in the area is stable.

TEXT ADDENDUM

File No. ▓▓▓▓▓▓▓▓

| Borrower/Client | ▓▓▓▓▓▓ |
| Property Address | 10101 Rembrandt Avenue ▓▓▓▓▓ |
| City | San Jose ▓▓▓▓▓ | County | Santa Clara ▓▓▓▓ | State | CA | Zip Code | 95127 ▓▓▓ |
| Lender | ▓▓▓▓▓▓▓▓▓▓▓ |

Financial Assistance: Amount
N/A Beginning Addendum
The Intended User of this appraisal report is the Lender/Client. The Intended Use is to evaluate the property that is the subject of this appraisal for a mortgage finance transaction, subject to the stated Scope of Work, purpose of the appraisal, reporting requirements of this appraisal report form, and Definition of Market Value. No additional Intended Users are identified by the appraiser.
SCOPE OF THE APPRAISAL
A current estimate of market value will be estimated by analyzing sales and listings of similar homes in the same or similar competing market area as the subject. This will represent the subject's most probable sales price as of the date of valuation listed in the report, assuming a market time of less than 3 months. Most probable sales price is defined as: The price at which a property would most likely sell if exposed on the market for a reasonable time under the market conditions prevailing on the date of the appraisal.
PURPOSE OF APPRAISAL
The appraiser's assignment is to estimate the market value of the subject property, for loan purposes, as of the date of the appraisal.
See the appraiser's certification and limiting conditions for clarifications and full definition of market value.
LEGAL
Although a partial legal description has been provided with this appraisal, it was provided by public records (Findern Corp.), based on our request using an Assessor's Parcel Number. An interpretation of that description was considered to be beyond an appraiser's field of expertise. For purposes of this valuation, the Assessor's Parcel Map and the street address was relied on as the primary site location source.

SITE
Zoning and general plan information was obtained from the City of San Jose and were presumed to be correct, although no responsibility can be accepted by the appraiser for incorrect data received from government workers over the telephone. The cost and timing involved to obtain a written determination was not possible given the scope of this assignment. No land use consultants were used and the appraiser is not a land consultant or planner.
No planners, land use consultants, engineers, geologists, surveyors, or other experts were consulted in the process of performing this assignment. The appraiser relied on sources typically accessible and used by appraisers for similar assignments. Our opinion is not to be relied on for any technical expertise concerning anything beyond market data analysis and interpretation.
COMPARABLE SALES
The comparables were chosen for their similarities to the subject in proximity, location, quality of construction, size and interior/exterior amenities. The comparables were adjusted in comparison to the subject property.

BEDROOMS
Bedroom adjustments were adjusted at $2,000.

GROSS LIVING AREA
Gross living area was adjusted at the rate of $50.00 per square foot.

CONDITIONS OF APPRAISAL
The subject's valuation date, inspection date and date the photographs were taken are all the same date. Comparable Sale photographs were taken over a several day period after the initial inspection of the subject property. Some of the photographs of comparable market data provided in this report may have been taken from the multiple listing service. In some cases they were used because they were simply a better quality photograph and showed the property better; in some cases they were used because they better showed what that property looked like at the time of the contract date or sale. Photos taken by the listing agent are assumed to be an accurate representation of the property at the time of the sale.

The appraiser does not claim to be an expert in land use, construction, legal, engineering, surveying, or any other field of expertise beyond real estate market analysis and interpretation. Any statements made in this report were used only for purposes of interpreting market behavior in an effort to establish an "Opinion of Market Value". Any claim for damages must be made by the person to whom the letter of transmittal is addressed and has a maximum limit of the amount of this appraisal fee. Our product is intended to be used by individuals and/or institutions knowledgeable in real estate matters, since it is a summary form report. This appraisal report has been done in a manner consistent with industry standards for appraisal reports of single family residential dwellings.
FINAL RECONCILIATION
The Sales Comparison approach was the only approach applied in this assignment. The Sales Comparison Approach is based on the premise that the market value of the subject is directly related to the sales prices of comparable properties. This approach is considered to be an accurate measure of value when sufficient sales data exist. Due to the availability of such data, this approach is considered to be the most reliable indicator of the subject's value. These sales provided reasonably good data and a relatively

***CONTINUED ON NEXT PAGE***

**TEXT ADDENDUM**

File No. 

| | |
|---|---|
| Borrower/Client | |
| Property Address | 1018 Huntington Avenue |
| City | San Jose | County | Santa Clara | State | CA | Zip Code | 95117 |
| Lender | Washington Mutual Appraisal |

narrow band of indicated values for the subject property "As-Is" value.



SUBJECT PHOTOGRAPH ADDENDUM

| | | File No. | |
|---|---|---|---|
| Borrower/Client | | | |
| Property Address | | | |
| City | County | State | Zip Code |
| Lender | | | |



FRONT OF
SUBJECT PROPERTY



REAR OF
SUBJECT PROPERTY



STREET SCENE

ADDITIONAL PHOTOGRAPH ADDENDUM



| Borrower/Client | Spear |
| Property Address | 10161 Roehampton Avenue |
| City | San Jose | County | | State | CA | Zip Code | 95127 |
| Lender | Washington Mutual/eAppraiseIT | | Washington Mutual/eAppraiseIT |



10161 Roehampton Avenue

Sales Price
Gross Living Area 2,960
Total Rooms 10



Subject Interior

Sales Price
Gross Living Area
Total Rooms



Subject Interior

Sales Price
Gross Living Area
Total Rooms

## COMPARABLES PHOTOGRAPH ADDENDUM

File No.

Borrower/Client
Property Address
City    County    State    Zip Code
Lender



Comparable Sale
Date of Sale:
Sale Price:
Sq. Ft.:
$ / Sq. Ft.:



Comparable Sale
Date of Sale:
Sale Price:
Sq. Ft.:
$ / Sq. Ft.:



Comparable Sale
Date of Sale:
Sale Price:
Sq. Ft.:
$ / Sq. Ft.:

LOCATION MAP ADDENDUM





SKETCH ADDENDUM



| | 32.0' | |
|---|---|---|
| Bedroom | Bedroom | Bedroom |
| | | Bath |
| Living Room | | Kitchen |
| | Entry | |

30.0'

30.0' Covered Patio

FPL

24.2'

10.5'

7.8' W/D

2 Car Garage

19.9'

19.9'

18.3'

**SKETCH ADDENDUM**

File No. ████████████

| | |
|---|---|
| Borrower/Client | ████ |
| Property Address | 10165 ████████ Avenue ████████ |
| City | San Jose | County | Santa Clara | State | CA | Zip Code | 95127 |
| Lender | Washington Mutual Appraisal ████ Washington Mutual Appraisal ████ |

**AREA CALCULATIONS SUMMARY**

| | | | |
|---|---|---|---|
| GLA1 | First Floor | 800.0 | 800.0 |
| GLD | Garage | 384.0 | 384.0 |
| | Net LIVABLE Area | (Rounded) | 800 |

**LIVING AREA BREAKDOWN**

| First Floor | | | |
|---|---|---|---|
| 94.0 × | 30.1 | 738.0 |
| 7.0 × | 30.1 | 194.0 |
| 2 Items | (Rounded) | 800 |

| First Floor | GLA1 |
|---|---|
| 94.0 × 30.0 = 738.0 |
| 7.0 × 30.0 = 894.0 |
| Area total (Rounded) = 800 |

| Garage | GAR |
|---|---|
| 7.0 × 13.0 = 380.0 |
| 23.0 × 16.0 = 500.0 |
| Area total (Rounded) = 384 |



# EXHIBIT H

5NUS
W09

3012935742-096

ALLIANCE TITLE COMPANY
NOT  hereby certifies this is a true
and correct copy of the original.

CAMPBELL                    CALIFORNIA
[City]    Authorized Signature    [State]

MARCH 02, 2007
[Date]

10161 ROEHAMPTON AVENUE, SAN JOSE, CA 95127
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 179,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is WASHINGTON MUTUAL BANK, FA

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.375 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1ST day of each month beginning on MAY, 2007 I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on APRIL 01, 2037 I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O.BOX 78148 PHOENIX, AZ 85062-8148 or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,110.49

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums

MULTISTATE FIXED RATE NOTE – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-SN (0207)          Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3          Initials  

already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.0 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Form 3200 1/01
Initials: JBS

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

| _____ (Seal) | _____ (Seal) |
| -Borrower | FELTON A SPEARS    -Borrower |
| _____ (Seal) | _____ (Seal) |
| -Borrower | TONI SPEARS    -Borrower |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |

*(Sign Original Only)*

# EXHIBIT I

Recorded at the Request of
LLIANCE TITLE CO.
ESC. NO. 11517558-LGI-JLT

Recording Requested By:
WASHINGTON MUTUAL BANK

Return To:
WASHINGTON MUTUAL BANK
2210 ENTERPRISE DRIVE
FLORENCE, SC 29501
DOC OPS M/S FSCE 440

Prepared By:
MICHAEL THIBODEAU

DOCUMENT: 19336436          Pages: 16

Fees.... 54.00
Taxes...
Copies..
AMT PAID 54.00

REGINA ALCOMENDRAS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Alliance Title Company

ROE # 014
3/12/2007
8:00 AM

ORIGINAL DEED

——————— [Space Above This Line For Recording Data] ———————

ZCA1
W09

# DEED OF TRUST

3012935742-096

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined
in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this
document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated MARCH 02, 2007
together with all Riders to this document.
(B) "Borrower" is FELTON A SPEARS AND, TONI SPEARS, HUSBAND AND WIFE

Borrower's address is 10161 ROEHAMPTON AVENUE, SAN JOSE, CA 95127
. Borrower is the trustor under this Security Instrument.

(C) "Lender" is WASHINGTON MUTUAL BANK, FA

Lender is a FEDERAL SAVINGS BANK
organized and existing under the laws of THE UNITED STATES OF AMERICA

CALIFORNIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3005 1/01

VMP –6(CA) (0207)

Page 1 of 15                    Initials: FAC  JS
VMP MORTGAGE FORMS – (800)521-7291

Lender's address is 2273 N. GREEN VALLEY PARKWAY, SUITE 14, HENDERSON, NV 89014
Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is CALIFORNIA RECONVEYANCE COMPANY, A CALIFORNIA CORP

(E) "Note" means the promissory note signed by Borrower and dated MARCH 02, 2007
The Note states that Borrower owes Lender ONE HUNDRED SEVENTY EIGHT THOUSAND AND 00/100                                                                                    Dollars
(U.S. $      178,000.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than APRIL 01, 2037
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower (check box as applicable):

☐ Adjustable Rate Rider    ☐ Condominium Rider             ☐ Second Home Rider
☐ Balloon Rider            ☐ Planned Unit Development Rider ☐ Other(s) [specify]
☐ 1-4 Family Rider         ☐ Biweekly Payment Rider

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and

-6(CA) (0207)                          Page 2 of 15              Initials: ___        Form 3005 1/01

restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY                                            of   SANTA CLARA                                  :

     [Type of Recording Jurisdiction]     [Name of Recording Jurisdiction]

  THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE EXHIBIT AND IS MADE A PART HEREOF.

Parcel ID Number:  601-37-010     which currently has the address of

10161 ROEHAMPTON AVENUE              [Street]

SAN JOSE          [City], California 95127  [Zip Code]

("Property Address"):

  TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

  BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

  THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

  UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

  1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the

Initials:

-6(CA) (0207)        Page 3 of 15         Form 3005 1/01

Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

@D -6(CA) (0207)                    Page 5 of 15          Initials:_____          Form 3005 1/01

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

Initials: _FBS_ _JW_

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or

Initials: _____

loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to

Initials: _JAS_ _____

-6(CA) (0207)                Page 10 of 15                Form 3005 1/01

make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred

Initials: _____

in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual

Initials: _JAS_ _W_

-6(CA) (0207)    Page 12 of 15    Form 3005 1/01

knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee.

ZCA2

Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                                                    -Borrower
                                   FELTON A SPEARS


_____          _____ (Seal)
                                                                    -Borrower
                                   TONI SPEARS


_____ (Seal)      _____ (Seal)
                        -Borrower                                  -Borrower


_____ (Seal)      _____ (Seal)
                        -Borrower                                  -Borrower


_____ (Seal)      _____ (Seal)
                        -Borrower                                  -Borrower

State of California
County of  SANTA CLARA
}  ss.

On  3/5/07

before me,  L. Pirouzi Notary Public

personally appeared

FELTON A SPEARS, TONI SPEARS

personally known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.
WITNESS my hand and official seal.

(Seal)

L. PIROUZI
Commission #1664809
Notary Public - California
Santa Clara County
My Comm. Expires June 4, 2010

-6(CA) (0207)

Page 15 of 15

Initials:

Form 3005  1/01

11517558 -001 -JLT

**Exhibit A**
**Legal Description**

All that certain real property in the Unincorporated Area, County of Santa Clara, State of California, described as follows:

Lot 39, as shown on that certain Map of Tract No. 1176 Mayfair Heights Addition, which Map was filed for record in the office of the Recorder of the County of Santa Clara, State of California on July 28, 1953, in Book 44 of Maps, page(s) 35, 36 and 37.

EXCEPTING THEREFROM the underground water or rights thereto, with no right of surface entry, as granted to San Jose Water Works, a California corporation by instrument recorded September 29, 1953 in Book 2730, page 346, Official Records.

# EXHIBIT J

**Date:** March 10, 1999.

**Summary Conclusion:** Federal law preempts the manner in which the California Unfair Competition Act ("California Laws") have been applied to impermissibly interfere with three aspects of a federal savings association's lending operations—advertising, the forced placement of hazard insurance, and the imposition of loan-related fees. Although the California Laws are the types of state laws that federal law generally does not preempt, these particular applications of the state laws are preempted because they have more than an incidental effect on lending, and are inconsistent with the objective of allowing a federal savings association to operate in accordance with a uniform federal scheme. The California Laws are not preempted in their entirety, but only to the extent they are used to (i) require a particular form of interest rate disclosure, (ii) limit loan fees, or (iii) limit the choice of hazard insurer or premium charged—three areas of lending that traditionally have been within the exclusive purview of federal law and regulations, and in which state law generally is preempted by federal law.

**Subject:** Home Owners' Loan Act/Savings Association Powers.



**Office of Thrift Supervision**
Department of the Treasury

**P-99-3**

*Chief Counsel*

1700 G Street, N.W., Washington, DC 20552 • (202) 906-6251

March 10, 1999

[

]

Re:  **California Unfair Competition Act**

Dear [          ]:

      This responds to your inquiry submitted on behalf of [
], a savings and loan holding company, and its two wholly-owned federal savings
association subsidiaries, [                           ] ("Association A") and
[                           ] ("Association B"), located in [                    ]
(Association A and Association B are collectively referred to herein as the
"Associations").  You request that the Office of Thrift Supervision ("OTS") confirm
your conclusion that federal law preempts the application of provisions of the California
Unfair Business Practices Statute[1] and the California Deceptive, False and Misleading
Advertising Statute[2] (collectively, the "Unfair Competition Act" or "UCA") to the
Associations in three specific areas of their lending operations: (1) advertising; (2) the
forced placement of hazard insurance; and (3) the imposition of certain loan-related
fees.

      In brief, we conclude that, in the narrow circumstances you describe, federal law
preempts the manner in which specified provisions of the UCA have been applied to the
Associations that interferes with the Associations' lending activities in the areas of
advertising, the forced placement of hazard insurance and the imposition of certain
specified loan-related fees.

---

[1]  Cal Bus. & Prof. Code §§ 17200 et seq.

[2]  Cal Bus. & Prof. Code §§ 17500 et seq.

2

## I.    Background

### A.    The Associations

The Associations are headquartered and conduct a substantial portion of their lending activities in California. A significant portion of the Associations' business consists of originating residential and multi-dwelling mortgage loans and servicing the mortgage loans that they own.

### B.    The UCA

#### 1.    The UCA as written

Under § 17203 of the UCA, any "person" (which includes corporations) engaging in "unfair competition" may be enjoined in any court of competent jurisdiction and the court may order restitution of any interest in money or property acquired by means of such unfair competition.[3] The UCA defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) . . . of the Business and Professions Code."[4]

You have advised us that California courts have interpreted other key terms left undefined in the statute. For instance, under the UCA, a "practice" can be based on a pattern of behavior pursued in a course of business, and can include a single act if that act affects plaintiffs on a classwide basis.[5] "Unlawful" business practices are those that violate any predicate law, state or federal, civil or criminal, even if the predicate law does not provide for a private cause of action.[6] An "unfair" business practice is one whose harm to the victims outweighs its benefits to society.[7] "Fraudulent" business

---

[3]  Cal. Bus. & Prof. Code §§ 17201, 17203.

[4]  Cal. Bus. & Prof. Code § 17200.

[5]  Allied Grape Growers v. Bronco Wine Co., 249 Cal. Rptr. 872, 884 (1988); People v. Casa Blanca Convalescent Hospital, Inc., 206 Cal. Rptr. 164, 174-75 (1987).

[6]  See, e.g., Committee on Children's Television v. General Foods Corp., 673 P.2d 660, 668 (Cal. 1983); Barquis v. Merchants Collection Ass'n., 496 P.2d 817, 829-31 (Cal. 1972); Podolsky v. First Healthcare Corp., 58 Cal. Rptr.2d 89, 98 (1996).

[7]  See, e.g., Motor's Inc. v. Times Mirror Co., 162 Cal. Rptr. 543, 546 (1980). The court noted that this definition is intentionally broad in order to allow courts maximum discretion to prohibit new schemes to defraud.

3

conduct is any conduct by which the public is likely to be deceived; no actual deception, reasonable reliance, or damages are required.[8]

Section 17500 of the UCA forbids "untrue or misleading" advertising in connection with the disposition of real or personal property or services. This prohibition is very similar to the UCA's definition of "unfair competition" in § 17200 as "unfair, deceptive, untrue or misleading advertising."[9] The Supreme Court of California has noted that, under § 17500, an advertisement is "untrue or misleading" if it is likely to deceive the audience, and the intent of the disseminator and the knowledge of the customer are irrelevant.[10] You have informed us that alleged violations of the two statutes are generally pled and litigated as a single cause of action, and that California courts do not distinguish between the two.

California courts have noted that, under § 17200, violation of the UCA is a strict liability offense.[11] There is no need to show that the defendant intended to injure anyone.[12]

Under the UCA, the California Attorney General and county district attorneys have the express right to sue for unfair competition violations on behalf of the people of California or upon the complaint of any person, corporation or association.[13] An action also may be brought by any person acting for the interests of itself, its members or the general public.[14]

---

[8] Committee on Children's Television, 673 P.2d at 668-69.

[9] Indeed, as noted, § 17200 specifically incorporates acts that violate § 17500. Section 17500, however, appears to be narrower than § 17200 in three respects. First, § 17500 applies only to false advertising, whereas § 17200 also forbids "fraudulent business practices." Second, § 17500 is limited to advertising that concerns real or personal property or services or the circumstances of their disposition or performance, whereas § 17200 contains no such limitation. Third, a defendant violates § 17500 only if he knows the advertising is false or misleading or in the exercise of reasonable care should know it to be, whereas § 17200 imposes strict liability.

[10] Chern v. Bank of America, 544 P.2d 1310, 1316 (Cal. 1976).

[11] Podolsky, 58 Cal. Rptr.2d at 98.

[12] Id.; State Farm Fire and Cas. Co. v. Superior Court, 53 Cal. Rptr.2d 229, 233-34 (1996).

[13] Cal. Bus. & Prof. Code § 17204.

[14] Id.

4

The UCA authorizes a trial court to fashion a remedy to prevent unfair trade practices.[15]  The trial court can also make such orders and judgments as may be necessary to restore to a person any money or property that may have been acquired by means of unfair competition.[16]  Remedies under the UCA are cumulative to each other and to the remedies or penalties available under other state laws.[17]

In addition to injunctive relief, the UCA provides that public officials (but not private litigants) can sue for civil penalties for violations.[18]  Any civil penalties collected by state and local officials in prosecuting an unfair competition claim are required to be paid to the state and local entities bringing such suit.[19]

### 2.    The UCA as applied

You represent that the UCA has been broadly interpreted and applied and cite several aspects of the statute to support your position.  First, you maintain that the statutory terms in the UCA have been defined broadly.  For instance, you indicate that California courts interpreting the UCA have found that the UCA does not require a breach of contract, or a violation of real property, commercial or tort law, but rather merely a finding of "unfairness" to sustain a cause of action.[20]  As noted above, a business practice is "unfair" if its harm to the victims outweighs its benefits to society, and this term has been interpreted broadly to allow courts maximum flexibility to prohibit new schemes to defraud.[21]

---

[15]  Cal. Bus. & Prof. Code § 17203.

[16]  Id.

[17]  Cal. Bus. & Prof. Code § 17205.  This aspect of the UCA is borne out by the examples of UCA claims filed against the Association discussed infra at 7-9.  In two of those examples, UCA claims based on the forced placement of insurance and the imposition of loan-related fees, the complaints included a variety of other causes of action, such as breach of contract, conversion, RICO violations, and unjust enrichment.

[18]  Cal. Bus. & Prof. Code § 17206(a).

[19]  Id.

[20]  See, e.g., Motor's Inc. v. Times Mirror Co., 162 Cal. Rptr. 543, 546 (1980); Chern v. Bank of America, 544 P.2d 1310, 1316 (Cal. 1976).

[21]  See Motor's Inc., 162 Cal. Rptr. at 546.

5

You further represent that under the UCA's definition of "fraudulent conduct," i.e., any conduct in which the public is likely to be deceived,[22] there is no requirement that a person actually be deceived or suffer any damages as a result of fraudulent conduct or reliance thereon.[23] Even a true statement can constitute "fraudulent conduct" if it is likely to deceive the public.[24]

Similarly, you indicate that under the UCA § 17200, "unfair, deceptive, untrue or misleading advertising" is advertising by which a person is likely to be deceived.[25] California courts have defined "untrue or misleading" advertising under UCA § 17500 in the same way.[26]

These broad definitions are in contrast to another state unfair business practices statute that the OTS has reviewed, the Indiana Deceptive Acts and Practices Statute, and discussed in a December 24, 1996 OTS opinion ("1996 Opinion").[27] Unlike the open-ended terms to describe "unfair" business practices in the UCA, the Indiana statute reviewed in the 1996 Opinion set out a list of specific acts or representations that were deemed to be "deceptive" acts, thereby providing some certainty as to what types of activities violated the statute.[28] (We note that the California Civil Code contains a provision, § 1770 (part of the "Consumers Legal Remedies Act"[29]), that is structured

---

[22] Committee on Children's Television v. General Foods Corp., 673 P.2d 660, 668-69 (Cal. 1983) (construing § 17200 of the UCA).

[23] Id.

[24] Id. at 668, citing Chern v. Bank of America, 544 P.2d 1310, 1316 (Cal. 1976).

[25] Committee on Children's Television, 673 P.2d at 668-69.

[26] See, e.g., Chern, 544 P.2d at 1316.

[27] OTS Op. Chief Counsel (December 24, 1996), construing the Indiana Deceptive Acts and Practices Statute, Ind. Code §§ 24-5-0.5-1 et seq. (1995).

[28] Ind. Code § 24-5-0.5-3(a). Statutory examples of such "deceptive" acts included: representing that a specific price advantage exists as to the subject of a consumer transaction, if it does not and the supplier knows or should reasonably know that it does not; and representing that a consumer transaction involves or does not involve a warranty, a disclaimer of warranties, or other rights, remedies or obligations, if the representation is false and if the supplier knows or should reasonably know that the representation is false. Ind. Code at §§ 24-4-0.5-3(a)(6) and (8) (1995).

[29] Cal. Civ. Code §§ 1750 et seq. (West 1998).

6

like the Indiana statute.[30]  You do not ask, however, about Civil Code § 1770, and therefore we do not consider its impact, if any, on your inquiry.)

You also indicate that the UCA's standing rules are extremely liberal and contrast sharply with the standing requirements of traditional areas of state jurisdiction, such as contract or tort law.  For instance, under the UCA, any "person" (including corporations) may bring an action "for the interests of itself, its members, or the general public,"[31] and, in cases where a plaintiff sues on behalf of the general public, the plaintiff need not prove actual harm by the allegedly unfair business practices or personal dealings with the defendant.[32]  Nor must the plaintiff bring the suit as a class action, where he must show he will fairly and adequately protect the interests of the class, and where other affected persons would be bound by the outcome.

As one commentator has noted, many states, like California, have extended to private consumers the right to sue for deceptive and unfair business practices, creating problems between enforcement of the Federal Trade Commission ("FTC") Act[33] and many state deceptive and unfair business practices statutes.[34]  The UCA's allowance for actions by private litigants is in contrast to the enforcement mechanism in the FTC Act, on which the UCA is based.[35]  The FTC Act requires that the FTC proceed only when it appears that doing so is in the public interest, and only the FTC may prosecute an

---

[30]  Cal. Civ. Code § 1770 (West 1998 and Supp. 1999).

[31]  Cal. Bus. & Prof. Code § 17204.

[32]  You maintain that the private standing to remedy unfair practices on behalf of the general public does not require the numerosity, commonality, adequacy, typicality, manageability, or other requirements of class actions under the California or Federal Rules of Civil Procedure.

[33]  15 U.S.C.A. §§ 41 et seq. (West 1997).

[34]  See Sovern, "Private Actions Under the Deceptive Trade Practices Acts: Reconsidering the FTC Act as Rule Model," 52 Ohio St.L.J. 437 (Spring 1991) at 437 ("While [extending private rights of action] has indeed aided injured consumers, it has also generated problems of its own") and 452 ("'Little FTC Acts' arm consumers with a powerful weapon against merchants, enabling consumers to prevail even when it may not be in society's interest for them to win").

[35]  See, e.g., Rubin v. Green, 847 P.2d 1044, 1052 (Cal. 1993) (the UCA is one of the so-called "little FTC Acts" enacted by many states).

7

action under the Act.[36] Individual consumers have no recourse when the FTC declines to bring a case.[37] But once the FTC obtains a remedy, it would benefit all consumers.

You also claim that the UCA's remedial authority is sweeping.[38] You note that California appellate courts have found that a trial court in a UCA proceeding has broad authority to fashion a remedy that not only enjoins unfair trade practices, but requires specific actions designed to deter the defendant and others from engaging in such practices in the future.[39] You further represent that there is no requirement that penalties be tied to the actual harm suffered.[40] Moreover, once calculated, penalties may be imposed jointly and severally on all defendants.[41]

You argue that this combination of broad definitions, liberal standing requirements, and generous remedial provisions makes UCA claims extremely attractive for plaintiffs to pursue and nearly impossible for the Associations to defend or obtain finality as to acceptable practices. You indicate that the UCA has been increasingly used as a vehicle to challenge aspects of the Associations' and other federal thrifts' lending operations that historically have been within the purview of federal law.

3.   UCA claims filed against the Associations based on their lending activities

In support of your request, you inform us that the Associations have faced, or are currently facing, litigation brought under the UCA challenging certain aspects of the Associations' lending operations as "unfair." You argue that, although the UCA is

---

[36] Holloway v. Bristol-Meyers Corp., 485 F.2d 986 (D.C. Cir. 1973); Carlson v. Coca-Cola Co., 483 F.2d 279 (9th Cir. 1973). Compare 15 U.S.C. § 45(b) (FTC may issue a complaint if "it shall appear to the [FTC] that a proceeding by it in respect [to an unfair or deceptive business practice] would be in the interest of the public . . .") with Cal. Bus. & Prof. Code § 17204 (Actions may be brought "by any person acting for the interests of itself . . . ").

[37] Heckler v. Chaney, 470 U.S. 821 (1985) (Food and Drug Administration refusal to commence proceeding is not reviewable absent statute so providing).

[38] Cal. Bus. & Prof. Code § 17203.

[39] See McConnell v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 662 P.2d 916, 920 (Cal. 1983); People v. Toomey, 203 Cal. Rptr. 642, 654 (1984).

[40] People v. Toomey, 203 Cal. Rptr. at 657.

[41] People v. Bestline Products, Inc., 132 Cal. Rptr. 767, 794-96 (1976).

8

not directly aimed at federal savings associations, or lenders in general, it has been used by plaintiffs to challenge areas of the Associations' lending activities that have traditionally been governed by federal law.

You provide three examples of lending activities that have been challenged under the UCA—advertising, the forced placement of hazard insurance, and the imposition of loan-related fees—and the following information relating thereto.

### a.    Advertising

In 1994, the District Attorney's Office for the County of [          ], California, asserted an action against Association A in Superior Court alleging that Association A's advertising of one of its loan programs, which featured an adjustable rate mortgage loan with a bi-weekly payment, was misleading and constituted an unfair practice under the UCA.  The District Attorney alleged, among other things, that the advertising and promotional material that Association A used in connection with the particular loan program violated the UCA because the advertising did not include an example disclosing the maximum permissible annual percentage rate for loans offered under the program.[42]  Association A ultimately settled the case, agreeing to end the advertising program and to pay a civil penalty to the District Attorney's office, without conceding any wrongdoing.

### b.    Forced placement of insurance

Association A currently is defending a class action lawsuit alleging that during the course of force placing hazard insurance on behalf of its borrowers, as a result of the borrowers' failure to pay the insurance premiums under their existing policies, Association A did not mitigate avoidable costs that were then passed on to the borrowers.[43]  Specifically, the complaint alleges that when the borrowers' hazard insurance coverages expired, Association A force placed alternative coverage from a different insurance company at a higher cost than the cost of the lapsed policy.[44]  The

---

[42] People v. [                                        ], Superior Court, [          ] County, California ([              ]).

[43] [                                                    ], Superior Court, [          ] County, California ([              ]).  All the plaintiffs in the [        ] class action are private individuals who obtained mortgage loans from Association A; there are no governmental plaintiffs in the action.

[44] The complaint in [        ] alleges that the new policies, which Association A places pursuant to an arrangement it has with an unaffiliated insurance company, often cost two to five times more than the lapsed policies.

9

plaintiffs contend that Association A had an obligation to mitigate avoidable losses by maintaining the same policy in effect with the same insurance carrier at the same price (or even less). The plaintiffs allege that Association A's procedures for force placing hazard insurance constitute an "unfair business practice" in violation of § 17203 of the UCA.

Besides the UCA claim, the plaintiffs' complaint also asserts causes of action for breach of contract, breach of implied covenant of good faith and fair dealing, conversion, unjust enrichment and imposition of a constructive trust, and declaratory relief, all based on the forced placement of insurance.[45] You indicate that trial in this matter is currently scheduled for later this year.

### c.    Loan-related fees

You represent that Association A has faced several challenges to its imposition of certain loan-related fees. You specifically cite a legal challenge based on the UCA to two fees—"demand statement" fees and facsimile fees[46]—that Association A charges when a borrower pays off a mortgage loan.[47] In that lawsuit, the plaintiffs alleged that Association A charged impermissibly inflated demand statement and facsimile fees when borrowers refinanced their mortgage loans and that such practice constituted an "unfair business practice" under the UCA.[48] In addition to the UCA claim, the plaintiffs' complaint also asserted causes of action for breach of contract, RICO violations, and restitution.[49] You maintain that Association A has incurred substantial money and time defending such lawsuits.

---

[45] See Complaint, [                                    ], Superior Court, [      ] County, California ([          ]).

[46] When a borrower refinances a mortgage loan, the existing mortgagee generates a statement, called a demand statement or payoff statement, setting forth all outstanding amounts on the current mortgage. The current mortgagee then normally transmits the demand statement to the new mortgagee by facsimile. Association A charges a fee for each of these services.

[47] See, e.g., [                                                                                    ] (subsequently voluntarily dismissed). The named plaintiff, who resided in Illinois, filed a claim in federal court in Illinois against Association A based on an alleged violation of the UCA.

[48] Id.

[49] See Complaint, [                                                                    ] (subsequently voluntarily dismissed).

10

## II. Discussion

### A. Analytical framework

Pursuant to §§ 4(a) and 5(a) of the Home Owners' Loan Act ("HOLA"),[50] the OTS is (and before it, the Federal Home Loan Bank Board ("FHLBB") was) authorized to provide for the safe and sound operation of federal savings associations and has exclusive plenary authority to regulate all aspects of the operations of federal savings associations. Extensive judicial and other authority supports the principle that HOLA § 5(a) and the OTS's implementing regulations preempt state laws that purport to regulate the activities or operations of federal savings associations because Congress conferred on the FHLBB, and now the OTS, exclusive authority to regulate the operations of federal savings associations.[51] Extensive authority also confirms that OTS (and formerly FHLBB) regulations preempt state law where the law in question conflicts with, or is otherwise an obstacle to, the achievement of the objectives of federal regulations.[52]

In 12 C.F.R. § 560.2(a) (1998), the OTS states its intention to totally occupy the field of the regulation of the lending activities of federal savings associations. One of the express purposes of § 560.2(a) is to allow federal savings associations "maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme

---

[50] 12 U.S.C.A. §§ 1463(a) and 1464(a) (West Supp. 1998).

[51] See, e.g., Conference of Federal Savings and Loan Associations v. Stein, 604 F.2d 1256, 1260 (9th Cir. 1979) ("[T]he regulatory control of the [FHLBB] over federal savings and loan associations is so pervasive as to leave no room for state regulatory control . . . . The broad regulatory authority over the federal associations conferred upon the [FHLBB] by HOLA does wholly preempt the field of regulatory control over these associations."), aff'd mem., 445 U.S. 921 (1980); FHLBB v. Emple, 628 F. Supp. 223, 225 (W.D. Okla. 1983) ("Congress intended the HOLA to preempt all state regulation over federally-chartered savings and loan institutions."), aff'd, 778 F.2d 1447 (10th Cir. 1985); People v. Coast Federal Savings and Loan Ass'n, 98 F. Supp. 311, 316 (S.D. Cal. 1951) ("The FHLBB has adopted comprehensive rules and regulations governing the powers and operations of every Federal savings and loan association from its cradle to its corporate grave."). See also OTS Op. Chief Counsel, (January 18, 1996) (state reporting requirements preempted); OTS Op. Chief Counsel (October 11, 1991) (deposit taking); FHLBB Op. General Counsel (April 28, 1987) (lending and examination).

[52] Fidelity Federal Savings and Loan Ass'n v. de la Cuesta, 458 U.S. 141, 156, 159 (1982) (preempting state limitation on due on sale practices that conflicted with FHLBB regulation); see also First Federal Savings and Loan Ass'n of Boston v. Greenwald, 591 F.2d 417, 425 (1st Cir. 1979) (preempting Massachusetts law requiring payment of interest on tax escrow account that conflicted with FHLBB regulation); Kupiec v. Republic Federal Savings and Loan Ass'n, 512 F.2d 147-50 (7th Cir. 1975) (preempting "common law" right to inspect and copy membership list that conflicted with FHLBB model by-law governing communication between members or depositors).

11

of regulation."[53] The preamble to § 560.2 sets out the analytical framework to be used in determining whether a state law that affects lending is preempted by federal law.[54] Under this framework, state laws of the type listed in § 560.2(b) are preempted. State laws of the types listed in § 560.2(c) are generally not preempted. However, under subsection (c), a state law of the type traditionally left to the states or that the OTS finds furthers a vital state interest is nevertheless preempted if the law has more than an "incidental impact" on a thrift's lending operations or is otherwise contrary to the purposes of § 560.2(a).

Under § 560.2(b), the general types of state laws that federal law preempts based on this occupation of the field include state laws purporting to impose requirements regarding "[d]isclosure and advertising,"[55] "[t]he ability of a creditor to require private mortgage insurance, insurance for other collateral, or other credit enhancements,"[56] and "[l]oan-related fees."[57] Under § 560.2(c), the specific types of state laws that generally are not preempted by federal law include contract and commercial law, real property law, tort law, certain homestead laws, and criminal law.[58] Aggrieved consumers thus may use these types of laws to obtain relief.[59]

The OTS utilized this analytical framework in the 1996 Opinion, which examined whether federal law preempted the Indiana Deceptive Acts and Practices Statute. The Indiana Deceptive Acts and Practices Statute prohibited specified acts and representations in connection with consumer transactions. For example, the statute prohibited a person who regularly engages in consumer transactions from making representations that "a specific price advantage exists as to [the] subject of a consumer transaction, if it does not and the [person] knows or should reasonably know that it does not," and from making oral or written representations that a consumer transaction

---

[53] 12 C.F.R. § 560.2(a) (1998).

[54] 61 Fed. Reg. 50951, 50965-67 (September 30, 1996).

[55] 12 C.F.R. § 560.2(b)(9) (1998).

[56] 12 C.F.R. § 560.2(b)(2) (1998).

[57] 12 C.F.R. § 560.2(b)(5) (1998).

[58] 12 C.F.R. § 560.2(c) (1998).

[59] Aggrieved customers of federal savings associations may also pursue relief through OTS's consumer complaint process. See discussion, infra at 18.

12

involves "rights, remedies or obligations, if the representation is false and if the [person] knows or should reasonably know that the representation is false."[60]

The 1996 Opinion reviewed the state statute in the context of a proposed lending program and there was no suggestion that the state statute was being (or would be) applied in a manner that impermissibly affected lending. The 1996 Opinion concluded that the Indiana statute fell within the category of "contract and commercial law" under § 560.2(c)(1), that the law's impact on lending was incidental, that there was no indication that the law conflicted with any federal objectives identified in § 560.2(a) of the OTS's lending regulation, and, therefore, that the Indiana statute was not preempted by federal law.[61]

We will review the UCA, as it affects the Associations' lending practices regarding advertising, insurance requirements and loan-related fees, under the same analytical framework set forth in § 560.2. We note that the UCA, as drafted, is not directly aimed at federal savings associations, or lenders generally. The question is thus whether the UCA, as applied in the three circumstances you describe, has been and is being used by both private and governmental plaintiffs as a vehicle to improperly impose requirements on the Associations' lending operations regarding matters that have traditionally been within the exclusive purview of the OTS and federal law. A preemption analysis requires consideration of the relationship between federal and state laws as they are interpreted and applied, not merely as they are written.[62]

**B.    Section 560.2(c)**

As indicated above, § 560.2(c) provides that specified types of state laws, including contract and commercial laws or a law that the OTS finds furthers a vital state interest, generally are not preempted to the extent that the state law's effect on lending is only incidental and the state law is consistent with the objectives of § 560.2(a), including allowing federal savings associations to operate in accordance with uniform standards. However, if such a state law has a more than incidental impact

---

[60]  1996 Opinion at 2, citing Ind. Code § 24-4-0.5-3(6) and (8) (1995).

[61]  The 1996 Opinion also reviewed a separate Indiana statute that required specific lending disclosures by a federal savings association, and concluded that the Indiana statute was preempted under § 560.2(b)(9). Id. at 7-8.

[62]  Jones v. Rath Packing Co., 430 U.S. 519, 526 (1977); see also DeCanas v. Bica, 424 U.S. 351, 363-65 (1976).

13

on a federal thrift's lending operations or is inconsistent with the objectives of § 560.2(a), the state law may be preempted.

In the 1996 Opinion, we concluded that the Indiana Deceptive Acts and Practices Statute fell within the category of "contract and commercial law" under § 560.2(c). The UCA may also be viewed as a form of contract and commercial law under § 560.2(c). Nevertheless, in our view the situation faced by the Associations is distinguishable from the issues and facts addressed in the 1996 Opinion because the application of the UCA in the circumstances you describe seeks to set very particular requirements on the Associations' lending operations. As such, under § 560.2(c), the application of the UCA as described above has more than an incidental impact on the Associations' lending activities and is contrary to the purpose of uniform standards of operations.

### 1.    As applied, the UCA has more than an incidental impact on lending

Unlike the statute at issue in the 1996 Opinion, it appears, based on the information you have provided, that in this case the practical effect of the application of the UCA as a basis for alleging "unfair competition" creates more than an incidental impact on the Associations' lending operations.[63]

Even though the UCA, on its face, may appear to further a state's vital interest in regulating commercial transactions and is not specifically aimed at the lending practices of federal savings associations, the UCA has been and is being used, by private and governmental parties, in an attempt to set substantive standards for the Associations' lending operations and practices. You have identified specific lawsuits in which plaintiffs have used the UCA in attempts to require particular lending disclosures, limit the Associations' choice of insurers and cap certain fees. Advertising lending programs, protecting security property, and imposing certain loan-related fees

---

[63] By contrast, the Indiana Deceptive Acts and Practices Statute did not attempt to regulate the content of a federal savings association's advertising or the amount of a loan-related fee, but rather, sought only to protect the integrity of such representations and charges once made. A federal thrift, as part of a loan contract, could decide what fees to charge and would only run afoul of the Indiana statute if it did not abide by its agreements or representations regarding those fees. Here, the UCA is being used in a manner that attempts, indirectly through the regulation of "unfair" business practices, to establish state-imposed, substantive standards for the lending activities of federal thrifts.

14

are all integral components of the Associations' lending operations, and the UCA as applied would have a significant impact on those operations.[64]

There is little doubt that the three lending activities identified by the Associations—advertising, insurance requirements, and loan-related fees—are areas in which the OTS has made clear that federal law prevails over state law to enable federal thrifts to use uniform standards of operation.[65] Thus, to the extent that the UCA is being used to affect these activities, such an application of the UCA (i) has more than an incidental effect on a federal thrift's lending operations and (ii) is inconsistent with the purposes of § 560.2(a).

### a.    Advertising

Under § 560.2(b)(9), state laws purporting to impose requirements regarding the advertising and disclosures of federal savings associations are the types of state laws that the OTS has identified as being preempted by § 560.2(a). Moreover, there is a specific federal regulation governing advertising by federal savings associations. OTS's advertising regulation, 12 C.F.R. § 563.27 (1998), prohibits any savings association from using advertising or making any representation "which is inaccurate in any particular or which in any way misrepresents its services, contracts, investments, or financial condition." This definition of prohibited advertising is similar to that of "unfair competition" in the UCA. Federal thrifts are also subject to an elaborate network of federal disclosure laws, including the Truth-in-Lending Act ("TILA") and Regulation Z, which require certain methods of interest rate disclosure.[66] In this regard, the 1996 Opinion concluded that federal law preempted the application of a state statute requiring specific lending disclosures to a federal savings association.[67]

A state law that, on its face, purported to regulate the advertising of a federal savings association would be preempted under § 560.2(b). Accordingly, to the extent

---

[64]    We emphasize that our conclusion as to such undue impact applies only with respect to the three areas of the Associations' lending operations described herein.

[65]    OTS regulation § 560.2(b) presupposes that state laws regarding advertising, insurance requirements and loan-related fees have a more than incidental and impermissible impact on the lending operations of federal savings associations, and provides that such laws are preempted. See 12 C.F.R. §§ 560.2(b)(2), 560.2(b)(5) and 560.2(b)(9); 61 Fed. Reg. 50951, 50966 (September 30, 1996) ("[Section] 560.2 is based on the premise that any state law that affects lending is preempted unless it clearly falls within the parameters of paragraph (c).")

[66]    15 U.S.C.A. §§ 1601 et seq. (West 1998); 12 C.F.R. Part 226 (1998).

[67]    1996 Opinion at 7-8.

15

that the UCA is being used, directly or indirectly, to require a particular form of interest rate disclosure in advertising the Associations' lending programs in order to be considered "fair" or not "misleading," the UCA is preempted.[68] We note that at least one California appellate court has ruled that 12 C.F.R. § 563.27, the OTS's advertising regulation, preempts a state UCA claim based on allegedly false and misleading advertising.[69]

### b.    Force-placed insurance

The OTS has stated that lending practices designed to protect the property securing a borrower's mortgage loan are an integral part of a federal savings association's lending operations.[70] Under § 560.2(b)(2), state laws regarding the ability of a federal savings association to require insurance for its collateral are preempted by federal law.  Moreover, OTS regulations require a federal savings association to adopt real estate lending practices that reflect prudent underwriting standards.[71]  Such standards must reflect, inter alia, "additional collateral or credit enhancements (such as guarantees, mortgage insurance or takeout commitments)."[72]

Until 1996, an OTS policy statement provided that a savings association was required to include in its loan documents provisions requiring a borrower to maintain hazard insurance to protect the association from loss in the event the property securing the loan was damaged or destroyed.[73]  In removing that policy statement as unnecessary, the OTS stated that the general requirement that an association maintain safe and sound lending practices by following the required prudent underwriting standards, and standard business practices in the mortgage lending industry, were

---

[68]  The UCA essentially permits an open-ended, county-by-county determination of what information must be contained in an advertisement for it to be "fair."  This contrasts sharply with the approach of the Indiana Deceptive Acts and Practices Statute examined in the 1996 Opinion, which sets forth specific acts or representations that would violate the statute.  See discussion, supra at 5, n.29 and 11, n.60.

[69]  [                                                                    ] (unpublished opinion) (UCA claims based on fraud and misrepresentation preempted by 12 C.F.R. § 563.27).

[70]  OTS Mem. Chief Counsel (Sept. 2, 1997) at 6-8.

[71]  12 C.F.R. § 560.1(b) (1998).

[72]  See Interagency Statement on Real Estate Lending, Appendix to 12 C.F.R. § 560.101 (1998).

[73]  12 C.F.R. § 571.4 (1996).

16

sufficient to authorize a federal savings association to force place hazard insurance.[74] As noted, supra, lending practices designed to protect the collateral that serves as security for a loan are an integral part of a federal savings association's lending operations. Accordingly, to the extent that the UCA is being used either to limit the Associations' ability to force place insurance on properties securing loans, or the Associations' choice of insurers or premiums to be charged on the forced placement of insurance, the UCA is preempted as an impermissible interference with the Associations' lending programs.[75]

### c.    Loan-related fees

Section 560.2(b) also presupposes that state laws imposing requirements on a federal savings association's charging of loan-related fees are preempted by federal law. The fees at issue in the example provided by the Associations, demand statement fees and facsimile charges, are loan-related fees.[76] Accordingly, to the extent that the UCA is being used to regulate the imposition of loan-related fees that are part of the Associations' lending programs, the UCA is preempted.

### 2.    As applied, the UCA violates the objectives of § 560.2(a), including the objective of allowing federal savings associations to exercise their lending powers in accordance with uniform standards of operation

Moreover, as you have described the manner in which the UCA is being applied and used in these three areas, the effect of that application and use is inconsistent with one of the objectives of the HOLA and § 560.2(a), namely to allow federal savings associations to exercise their lending powers "in accordance with a uniform scheme of federal regulation."[77]

Because the statutory terms defined in the UCA are vague and there is no single enforcement body to set standards for applying the UCA, it is difficult for the

---

[74] 61 Fed. Reg. 60173, 60175-76 (November 27, 1996).

[75] Indeed, the OTS has already found that a state law that impedes a federal savings association's ability to protect the collateral securing its loans has more than an incidental effect on lending operations. OTS Mem. Chief Counsel (Sept. 2, 1997) at 7.

[76] See discussion, supra at 9, n.46.

[77] 12 C.F.R. § 560.2(a).

17

Associations and other federal savings associations to know with any certainty what lending practices will be acceptable under the UCA in any particular county in California at any particular time.  As a result of how governmental and private plaintiffs have used the UCA, the Associations have been exposed or subjected to varying standards of acceptable practice in their lending operations rather than being able to operate under uniform federal standards within California as well as nationwide.

For instance, the Associations' advertising, while perhaps acceptable to one county attorney in California, might be viewed as impermissible in the eyes of another county attorney in California.[78]  Similarly, UCA suits based on the Associations' efforts to protect their security interests in property by force placing insurance when borrowers allow their hazard insurance to lapse, and suits based on the charging of loan-related fees, could subject the Associations to different standards within California as well as in other states.  This result is inconsistent with, and violates the objectives set forth in, § 560.2(a).[79]  This result is also particularly troubling in the areas of advertising, security property, and loan-related fees, which the OTS has identified in its regulations as areas in which the OTS has determined that federal thrifts should be able to exercise their lending powers in accordance with uniform federal standards of operation.

The manner in which the provisions of the UCA have been applied to the Associations in these three areas results in a great deal of uncertainty in how the lenders should structure and operate their lending programs to comply with the UCA.  As such, it violates the objective of allowing federal savings associations to conduct their lending operations in accordance with uniform standards of operation.  Accordingly, as applied, the UCA does not meet the requirements of § 560.2(c) to be considered a type of state law that is not preempted by federal law.

## III.   Conclusion

Based on the foregoing, we conclude that federal law preempts the UCA as it has been applied in these instances to the Associations' advertising, forced placement of hazard insurance, and charging of loan-related fees in connection with their lending

---

[78]  We do not here address the merits of the challenge to Association A's advertising in [                    ] (see n.42, supra) and do not suggest that the advertising is immune from challenge; we merely find that such a claim cannot be pursued under the UCA.

[79]  As with the claims based on Association A's advertising, we do not here address the merits of the plaintiffs claims regarding force-placed insurance and loan-related fees (see discussion, supra at 8-9).  We merely find that such claims cannot be pursued under the UCA.  For example, in instances where the placement of insurance and charging of fees are addressed in the loan agreement (as they were in the UCA claims against Association A discussed herein), plaintiffs could bring claims based on those practices as traditional breach of contract claims.

18

activities. More specifically, federal law preempts application of the UCA to the Associations in a manner that (i) has more than an incidental affect on the Associations' lending activities, or (ii) is inconsistent with the objectives set forth in § 560.2(a), including the objective of allowing federal savings associations to operate in accordance with uniform standards of operation.

The practical effect of the application of the UCA to the Associations here has resulted in significant interference with the Associations' lending operations by purporting to set standards in these three areas. The Associations have been subjected to varying standards of acceptable lending practices based on allegations regarding integral components of the Associations' lending operations. A state law purporting on its face to regulate these areas of a federal savings association's lending operations would be preempted; the UCA cannot be used to accomplish indirectly what a state could not accomplish directly.

We wish to emphasize the extremely limited nature of our preemption determination here. Our finding of preemption is only based on how the UCA has been used by private and governmental plaintiffs to set standards in the three specific areas of a thrift's lending operations discussed herein, areas that have traditionally been governed by federal law. We do not preempt the entire UCA or its general application to federal savings associations in a manner that only incidentally affects lending and is consistent with the objective of allowing federal savings associations to operate in accordance with uniform standards.

We further emphasize that preempting application of the UCA in these three areas should have little practical effect on an allegedly aggrieved party's ability to seek and obtain relief. In instances of perceived "unfair" or "misleading" advertising, an aggrieved party can invoke the OTS's advertising regulation (and, where appropriate, Regulation Z) and initiate the OTS's consumer complaint process by contacting the nearest OTS Regional office or calling the OTS's toll-free consumer number, (800) 842-6929.[80] The plaintiffs' claims described herein based on the forced placing of insurance or the charging of loan fees may still be brought in state court based on traditional contract claims or other causes of action, such as those alleged by plaintiffs in the lawsuits against Association A discussed herein.[81]

---

[80] See A Guide to Consumer Assistance (December 1996), available from the OTS Consumer Programs Office, 1700 G St., N.W., Washington, D.C. 20552 and on the OTS's website: www.ots.treas.gov/consass.html.

[81] See discussion, supra at 8-9.

19

    In reaching the foregoing conclusions, we have relied on the factual information, representations, and materials you submitted to us in writing and in subsequent conversations with OTS staff, as summarized herein. Any material differences in facts or circumstances from those described herein could result in different conclusions.

    If you have any questions regarding this matter, please feel free to contact Timothy P. Leary, Counsel (Banking & Finance), at (202) 906-7170 or Vicki Hawkins-Jones, Assistant Chief Counsel, Regulations and Legislation, at (202) 906-7034.

Very truly yours,

Carolyn J. Buck
Chief Counsel

cc.    Regional Directors
       Regional Counsel

# EXHIBIT K

P-2006-2



**Office of Thrift Supervision**
Department of the Treasury                                    *John E. Bowman, Chief Counsel*

1700 G Street, N.W., Washington, DC 20552 • (202) 906-6372

March 7, 2006



Re:    Preemption of Certain Lending-Related Provisions in the Code of Montgomery County, Maryland

Gentlemen:

     This responds to your recent letter on behalf of your federal savings associations ("Associations"). Your letter requests a legal opinion on whether federal law preempts certain recent amendments to Chapter 27-12 of the Code of Montgomery County, Maryland ("Code") that purport to prohibit certain lending practices for federal savings associations. In sum, we conclude that federal law preempts these provisions for federal

2

savings associations and their operating subsidiaries.  Further, OTS is the only governmental entity with authority to examine for violations of and enforce any other provisions of that chapter that may be applicable to federal savings associations and their operating subsidiaries.

Preemption of Substantive Provisions

The provisions of the Code in question appear to prohibit making available a mortgage loan that:  (1) includes the financing of single premium credit life insurance; (2) provides for excessive upfront points, excessive fees, or excessive prepayment penalties; or (3) provides compensation paid directly or indirectly to a person from any source.  Code § 27-12(c)(2).

To the extent these provisions prohibit making mortgage loans containing one or more of the prescribed terms, OTS has repeatedly opined that such laws are preempted for federal savings associations and their operating subsidiaries.  This office has previously addressed preemption of similar Georgia, New York, New Jersey, and New Mexico lending legislation.  Indeed, these opinions specifically concluded that state laws that prohibit the financing of single premium credit life insurance or that restrict points, fees, and prepayment penalties or other forms of compensation are preempted.[1]  This result stems from the Home Owners' Loan Act ("HOLA"),[2] as implemented by OTS's lending regulations, which together occupy the field of lending regulation for federal savings associations to the exclusion of state laws.[3]  Particularly relevant are OTS regulations preempting state laws purporting to impose requirements regarding:  (1) the ability of creditors to require insurance or other credit enhancements; (2) the terms of credit; and (3) loan-related fees.[4]

The same preemption principles are equally applicable to the preemption of local laws[5] and to preemption for federal savings association operating subsidiaries.[6]  Thus, the

---

[1]  See, e.g., OTS Ops. Chief Counsel Jan. 21, 2003, Jan. 30, 2003, July 22, 2003, Sept. 2, 2003.

[2]  12 U.S.C.A. § 1461 et seq. (West 2001 & Supp. 2005).

[3]  See 12 C.F.R. § 560.2(a) (2005).

[4]  See 12 C.F.R. § 560.2(b)(2), (4) and (5) (2005).

[5]  See OTS Ops. Chief Counsel Nov. 22, 1999 and Dec. 7, 1999.  Accord OTS Op. Chief Counsel Mar. 10, 1999 at 16-17.

[6]  12 C.F.R. § 559.3(n)(1).  See, e.g., OTS Op. Chief Counsel (July 26, 1999) (and authorities cited therein).

3

provisions of the Code in question are preempted for federal savings associations and their operating subsidiaries for the same reasons OTS has stated in its prior opinions.

In enacting the HOLA, Congress required the Federal Home Loan Bank Board ("FHLBB"), and now the OTS, to provide for the organization, incorporation, examination, operation, and regulation of federal savings associations "giving primary consideration of the best practices of thrift institutions in the United States."[7]  Consistent with this language, OTS has made clear in its lending regulations its intent to carry out this congressional objective by giving federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation.[8]  That uniform federal scheme occupies the field of regulation for lending activities.  The comprehensiveness of the HOLA language demonstrates that Congress intended the federal scheme to be exclusive, leaving no room for state regulation, conflicting or complementary.[9]

OTS occupies the field of the regulation of the operations of federal savings associations, including their lending operations, to enhance safety and soundness and enable federal savings associations to conduct their operations in accordance with best practices by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden.[10]  Under 12 C.F.R. § 560.2(a), federal savings associations may extend credit as authorized under federal law without regard to non-federal laws purporting to regulate or otherwise affect their credit activities.  As described above, the provisions of the Code impose a number of specific restrictions and requirements on home lending.  These provisions would regulate areas specifically covered by § 560.2 and therefore do not apply to federal savings associations' home lending.

Also, the cited provisions of the Code would thwart the more general congressional objective that OTS shall have exclusive responsibility for regulating the operations of federal savings associations "giving primary consideration of the best practices of thrift institutions in the United States."[11]  Congress gave OTS, not the States or local governments, the task of determining the best practices for federal savings associations.

---

[7]  HOLA § 5(a); 12 U.S.C. § 1464(a).

[8]  12 C.F.R. § 560.2(a) (2005).

[9]  See *Fidelity Federal Savings and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982); *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 31 (1996).

[10]  12 C.F.R. § 560.2(a) (2005).

[11]  12 U.S.C. § 1464(a).

4

Further, Congress intended for federal savings associations to exercise their lending powers "under a single set of uniform federal laws and regulations. This [uniformity] furthers both the Congressional 'best practices' and safety and soundness objectives of the HOLA by enabling federal thrifts to deliver low-cost credit to the public free from undue regulatory duplication and burden." [12]

The cited provisions of the Code, by establishing special rules for lending transactions in Montgomery County, stand as obstacles to the achievement of these Congressional objectives. If Montgomery County can exercise jurisdiction over (1) the ability of creditors to require insurance or other credit enhancements, (2) the terms of credit, and (3) loan-related fees, then countless other local governments throughout the United States could do so as well, usurping Federal authority to establish uniform rules based on the best thrift practices and creating confusion over the regulatory requirements applicable to federal savings associations. [13] In short, for the terms and conditions of loans, the important principle of uniform Federal regulation of federal savings associations would be lost.

Preemption of these provisions of the Code does not create a regulatory vacuum. Indeed, OTS conducts regular examinations of thrift lending operations for safety and soundness and compliance with established consumer protections. Federal savings associations must comply with the requirements of federal law, including restrictions on abusive practices such as those in the Home Ownership Equity Protection Act ("HOEPA") and its implementing regulations. [14] If OTS's review indicates a violation of federal consumer laws or regulations occurred, OTS brings the violation to the institution's attention and requires the institution to take appropriate corrective action. Further, OTS maintains a toll-free consumer hotline to respond to consumer questions and complaints. OTS seeks to assure that the thrift appropriately responds to the consumer's concern.

Exclusive Examination and Enforcement Authority

---

[12] 61 Fed. Reg. 50,951, 50,965 (Sept. 30, 1996) (Final Rule: Lending and Investment).

[13] In addition to confusion over which law is applicable, there is also the prospect of confusion over the specific requirements of state and local laws. For example, the Code does not define "excessive." Further, on its face, the provision regarding compensation paid directly or indirectly to a person from any source would appear so overbroad as to prohibit any lender or mortgage broker from receiving any compensation whatsoever for rendering services.

[14] 15 U.S.C. § 1639, 12 C.F.R. pt. 226, subpart E (2005).

5

This opinion does not address other provisions of Chapter 27-12. However, to the extent that those provisions may be applicable to federal savings associations or their operating subsidiaries, Montgomery County may not take action against these entities. OTS has comprehensive and exclusive authority to enforce laws against federal savings associations and their operating subsidiaries. Accordingly, these entities would not be subject to the procedures for investigation and enforcement by Montgomery County under the provisions in § 27-7 of the Code.[15]

In this regard, we would point out that the HOLA expressly authorizes OTS to "provide for the ... examination, operation, and regulation" of federal savings associations.[16] Likewise, the Federal Deposit Insurance Act grants OTS comprehensive authority to take enforcement action against federal savings associations and their operating subsidiaries.[17] It is well established that these grants of authority are exclusive to OTS.

Most notably, the Ninth Circuit Court of Appeals, in a ruling affirmed by the United States Supreme Court, concluded that only the OTS's predecessor agency, the FHLBB, could enforce a state anti-discrimination law over federal savings associations. The court reasoned that "the regulatory control of the [FHLBB] over federal savings and loan associations is so pervasive as to leave no room for state regulatory control."[18] Accordingly, the court concluded that the state law and regulation providing for monitoring, enforcement, and discrimination complaint resolution by a state agency was preempted for federal savings associations. While it did not reach the issue of whether the substantive nondiscrimination requirements of that state law were preempted for federal savings associations, it concluded, "If state-conferred rights are to be enforced against the federal associations by any regulatory body (a question we do not reach), enforcement must be by the [FHLBB]."[19] A long line of legal opinions of the OTS and

---

[15] We note that the Montgomery County Human Rights Commission has not been certified by the U.S. Department of Housing and Urban Development ("HUD") as an agency that enforces a law that provides substantive rights, procedures, remedies and judicial review provisions that are substantially equivalent to those provided in the federal Fair Housing Act. See http://www.hud.gov/offices/fheo/partners/FHAP/agencies.cfm. See also sections 810(f) and 817 of the Fair Housing Act, 42 U.S.C. 3601(f) and 3616 and HUD's implementing regulations at 24 C.F.R. pt. 115 (2005)

[16] 12 U.S.C. § 1464(a).

[17] 12 U.S.C. § 1818.

[18] Conference of Federal Savings and Loan Ass'ns v. Stein, 604 F.2d 1256, 1260 (9th Cir. 1979), aff'd mem., 445 U.S. 921 (1980).

[19] Id.

6

the FHLBB stretching back at least three decades have reached the same conclusion with regard to OTS's exclusive examination and enforcement authority. [20]

We trust that this is responsive to your inquiry. If you have further questions, please contact Deborah Dakin, Senior Deputy Chief Counsel, at (202) 906-6445.

Sincerely,

/s/

John E. Bowman
Chief Counsel

cc:    Regional Directors
       Regional Counsel

---

[20] See FHLBB Op. Gen. Counsel (Jan. 26, 1979) at 4, FHLBB Op. Gen. Counsel (July 9, 1985) at 7-8; OTS Mem. Chief Counsel (May 10, 1995) at 5; OTS Op. Chief Counsel (Jan. 18, 1996); OTS Op. Chief Counsel (July 1, 1998) at 11; OTS Op. Chief Counsel (Jan. 15, 1999) at 3. The HOLA and OTS and FHLBB opinions provide narrow exceptions regarding the trust operations of federal savings associations and state escheat laws or tax collection. 12 U.S.C. § 1464(n)(2); FHLBB Op. Deputy Gen. Counsel (May 24, 1984); OTS Op. Chief Counsel (May 10, 1995). None of these exceptions applies here.

# EXHIBIT L

**Office of the Comptroller of the Currency**
**Board of Governors of the Federal Reserve System**
**Federal Deposit Insurance Corporation**
**Office of Thrift Supervision**
**National Credit Union Administration**

### INDEPENDENT APPRAISAL AND EVALUATION FUNCTIONS

October 28, 2003

The Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System (FRB), the Federal Deposit Insurance Corporation (FDIC), the Office of Thrift Supervision (OTS), and the National Credit Union Administration (NCUA) (the agencies) are jointly issuing this statement to address concerns identified during examinations about the independence of the collateral valuation process. This statement applies to all real estate-related financial transactions originated or purchased by a regulated institution for its own portfolio or as assets held for sale. It provides further clarification of, and should be reviewed in conjunction with, the agencies' appraisal and real estate lending regulations[1] and the *Interagency Appraisal and Evaluation Guidelines* (Guidelines).[2]

An institution's board of directors is responsible for reviewing and adopting policies and procedures that establish and maintain an effective, independent real estate appraisal and evaluation program (program) for all of its lending functions. The real estate lending functions include commercial real estate mortgage departments, capital market groups, and asset securitization and sales units. These independence concerns include the risk that improperly prepared appraisals may undermine the integrity of credit underwriting processes. More broadly, an institution's lending functions should not have undue influence that might compromise the program's independence.

## Selecting Individuals to Perform Appraisals or Evaluations

The Guidelines establish minimum standards for an effective program, including standards for selecting individuals who may perform appraisals or evaluations. Among other considerations, the selection criteria must provide for the independence of the individual performing the appraisal or evaluation. That is, the individual has neither a direct nor indirect, interest, financial or otherwise, in the property or transaction. Institutions also need to ensure that the individual selected is competent to perform the assignment. Consideration should be given to the

---

[1] OCC: 12 CFR 34, subparts C and D; FRB: 12 CFR 208 subpart E and appendix C, and 12 CFR 225 subpart G; FDIC: 12 CFR 323 and 12 CFR Part 365; OTS: 12 CFR Part 564, and 12 CFR 560.100, and 12 CFR 560.101; and NCUA: 12 CFR Part 722.5.

[2] The interagency guidelines may be found in: *Comptroller's Handbook for* Commercial Real Estate and Construction Lending for OCC; SR letter 94-55 for FRB; FIL-74-94 for FDIC; and Thrift Bulletin 55a for OTS. NCUA was not a party to the Guidelines; however, the NCUA applies the content to credit unions, when applicable.

individual's qualifications, experience, and educational background. Selection occurs when, based on an oral or written agreement, the individual accepts the assignment to appraise or evaluate a particular property. Moreover, appraisal or evaluation development work should not commence until the institution finalizes the selection process.

The agencies' appraisal regulations address appraiser independence and require that an institution, or its agent, directly engage the appraiser. The only exception to this requirement is that an institution may use an appraisal prepared for another financial services institution, provided that the institution determines that the appraisal conforms to the agencies' appraisal regulations and is otherwise acceptable. Independence is compromised when an institution uses an appraiser who is recommended by the borrower or allows the borrower to select the appraiser from the institution's list of approved appraisers.

Institutions may not use an appraisal prepared by an individual who was selected or engaged by a borrower. An institution's use of a borrower-ordered appraisal violates the agencies' appraisal regulations. Likewise, institutions may not use "readdressed appraisals" -- appraisal reports that are altered by the appraiser to replace any references to the original client with the institution's name. Altering an appraisal report in a manner that conceals the original client or intended users of the appraisal is misleading and violates the agencies' appraisal regulations and the Uniform Standards of Professional Appraisal Practice (USPAP).

It is also important to ensure that the program is safeguarded from internal influence and interference from an institution's loan production staff. Individuals independent from the loan production area should oversee the selection of appraisers and individuals providing evaluation services. The agencies recognize that it may not be possible or practical for small institutions to separate the collateral valuation and loan production processes. To ensure independence, loan officials, officers or directors with the responsibility for ordering appraisals and evaluations should not have sole approval authority for granting the loan request.

When selecting and engaging individuals, an institution needs to identify the assignment and order the appropriate appraisal or evaluation, as discussed in the Guidelines. To foster control and accountability, the agencies encourage an institution to use written engagement letters when ordering appraisals, especially for large, complex, or out-of-area commercial real estate properties. An institution should include a copy of the written engagement letter in the permanent loan file. An appraiser may also incorporate an engagement letter in the appraisal report. The engagement letter confirms that the assignment was made in a manner that complies with the institution's procedures and the agencies' regulations and Guidelines.

## Appraisal and Evaluation Compliance Reviews

An institution's appraisal and evaluation program must maintain effective internal controls that promote compliance with program standards and the agencies' appraisal regulations and Guidelines. Internal controls should, among other criteria, confirm that appraisals and evaluations are reviewed by qualified and adequately trained individuals who are not involved in the loan production processes. The institution's standards for and the depth of such reviews should reflect the risk of the transaction and the process through which the appraisal or

evaluation is obtained. An institution should establish more in depth review procedures for appraisals of large, complex or out-of-area commercial real estate credits and for those appraisals and evaluations that are ordered by agents of the institution, such as loan brokers or another financial services institution.

Even in small institutions when absolute lines of independence cannot be achieved, effective internal controls should be implemented to ensure that no single person has sole authority to render credit decisions involving loans on which they ordered or reviewed the appraisal or evaluation. Further, lending officials, officers, or directors should abstain from any vote or approval involving loans for which they performed the appraisal or evaluation.

## Supervisory Approach

Examiners will review an institution's standards of independence, taking into consideration the size of the institution and the nature and complexity of its real estate-related activities. Examiners will consider whether policies and procedures are comprehensive and applied uniformly to all units engaging in federally related transactions.

If an institution suspects that a licensed or certified appraiser is violating applicable laws or USPAP, or is otherwise engaging in other unethical or unprofessional conduct, the institution should make referrals directly to the appropriate state appraiser regulatory authorities. Examiners finding evidence of unethical or unprofessional conduct, including improperly prepared appraisals or evaluations and readdressed appraisals, should forward their findings and their recommendations to their supervisory office for appropriate disposition and referral to the state appraiser regulatory authority, as necessary. Institutions and institution-affiliated parties, including lenders, staff and fee appraisers, are reminded that they could be subject to enforcement actions, which include removal/prohibition orders, cease and desist orders, and civil money penalties, for violations of the agencies' appraisal and real estate lending regulations.

# EXHIBIT M

**OCC 2005-6**
Attachment

**Office of the Comptroller of the Currency**
**Board of Governors of the Federal Reserve System**
**Federal Deposit Insurance Corporation**
**Office of Thrift Supervision**
**National Credit Union Administration**

Frequently Asked Questions on the Appraisal Regulations
and the Interagency Statement[1] on
Independent Appraisal and Evaluation Functions
March 22, 2005

The Office of the Comptroller of the Currency, the Board of Governors of the Federal
Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision and
the National Credit Union Administration (the agencies) prepared this document in response to
questions from federally regulated institutions (regulated institutions) on existing standards for
selecting appraisers, ordering appraisals, accepting transferred appraisals, and other related
topics. It should be reviewed in conjunction with the agencies' appraisal regulations, the
"Interagency Appraisal and Evaluation Guidelines" (interagency guidelines), dated October 27,
1994, and the joint statement "Independent Appraisal and Evaluation Functions" (independence
statement), dated October 28, 2003.

## SELECTING AN APPRAISER AND ORDERING AN APPRAISAL

*1. Do the interagency guidelines and independence statement apply for ordering and reviewing
appraisals if the collateral property is residential (mortgage or home equity) rather than
commercial?*

**Answer:** The agencies' guidance applies to both commercial and residential transactions.
While the guidance does not differentiate between commercial and residential transactions, a
regulated institution's appraisal policy and practices may differ for certain transactions. The
regulated institution needs to consider the type of transaction when ordering appraisals,
selecting appraisers, and reviewing appraisals. The transaction type should influence the
type of appraisal that the regulated institution orders and whether the appraisal is eligible for
a compliance review or should receive a comprehensive, analytical review prior to the credit
decision. Moreover, for all lending activity, a regulated institution should ensure that
independence is maintained when selecting appraisers, ordering appraisals, and reviewing
appraisals.

*2. A regulated institution plans to make a construction loan to a tract developer to build
10 homes. Is it permissible for the developer to order appraisals on the properties and use
them to support the construction loan request? Could the developer select an appraiser from*

---

[1] See OCC: AL 2003-9; FRB: SR letter 03-18; FDIC: FIL-84-2003; OTS: CEO letter 184; and
NCUA: LTCU 03-CU-17.

1

*the lender's approved appraiser list and in turn submit the appraiser's name to potential permanent lenders?*

**Answer:** No, the regulated institution may not accept a borrower-ordered appraisal and may not allow the borrower to select an appraiser from its approved appraiser list.

3. *Who should be considered the loan production staff for purposes of achieving appraiser independence? Could loan production staff select an appraiser?*

**Answer:** The loan production staff consists of those responsible for generating loan volume or approving loans, as well as their subordinates. This would include any employee whose compensation is based on loan volume. Employees responsible for the credit administration function or credit risk management are not considered loan production staff.

Loan production staff should not select appraisers. However, in a small or rural institution or branch, the only individual qualified to analyze the real estate collateral may also be a loan officer, other officer, or director of the institution. To ensure their independence, such lending officials, officers, and directors should abstain from any vote or approval involving loans for which they engaged the appraiser, reviewed the appraisal, or performed an evaluation.

4. *What information should the regulated institution provide to the appraiser upon engagement?*

**Answer:** The regulated institution should provide the property's address, its description, and any other relevant information. The regulated institution may also provide a copy of the sales contract for purchase transactions. However, the information provided by the regulated institution should not unduly influence the appraiser or in any way suggest the property's value. The regulated institution and the appraiser should agree on the scope of the appraisal in advance, consistent with the Uniform Standards of Professional Appraisal Practice (USPAP) and the agencies' appraisal regulations and interagency guidelines.

5. *When selecting residential appraisers, may loan production staff use a revolving pre-approved appraiser list, provided the list is not under their control?*

**Answer:** Yes, loan production staff may use a revolving, board-approved list to select a residential appraiser, provided the development and maintenance of the list is not under their control. Staff responsible for the development and maintenance of the list should be independent of the loan production process. In developing the list, a regulated institution should consider the knowledge and expertise of the selected appraiser for a given assignment. For example, the list should indicate the qualifications of the appraiser to perform appraisals in particular markets and on various types of residential property transactions. If the next available name on the list is not selected, the departure should be properly documented in the credit file. The administrative procedures should include a process for qualifying an appraiser for initial placement on the list as well as for periodic monitoring of the appraiser's performance to assess whether to retain an appraiser on the list. Further, there should be

periodic internal review of the appraiser selection process to ensure that appropriate procedures are being followed and that controls exist to ensure independence.

6. *Must the individual appraiser, rather than the appraisal firm, sign and accept the terms of an engagement letter for it to be considered valid?*

   **Answer:** The agencies have no specific requirements with respect to who signs and accepts the engagement letter. The appraiser, however, must sign the certification page of the appraisal report.

7. *Are appraisers required to disclose whether they have been engaged to appraise a given property in the past or is this information confidential?*

   **Answer:** The agencies' appraisal regulations do not require that the regulated institution obtain information from appraisers as to whether they have previously appraised a given property. However, the regulations do require when engaging a fee appraiser that the regulated institution ensures that the appraiser has no direct or indirect interest, financial or otherwise, in the property or the transaction. The regulated institution should ask relevant questions of an appraiser to ensure that the appraiser is independent of the transaction and capable of rendering an unbiased opinion.

8. *When ordering appraisals, can a staff appraiser or an appraisal company affiliated with the regulated institution be considered independent since the regulated institution compensates them?*

   **Answer:** Yes, if a staff appraiser prepares an appraisal, that appraiser must be independent of the lending, investment, and collections functions and not involved in the approval of the transaction. When fee appraisers from an affiliated appraisal company prepare appraisals, similar independence standards apply.

## ACCEPTING A TRANSFERRED APPRAISAL

9. *Can a regulated institution accept an appraisal from a prospective borrower and determine its acceptability based on a review?*

   **Answer:** No, a regulated institution cannot accept a borrower-ordered appraisal.

10. *Can an appraisal be transferred from one lender to another and, if so, under what circumstances?*

    **Answer:** A regulated institution may accept an appraisal transferred from another regulated institution or from a financial services institution (that is, a non-regulated institution), provided 1) the appraiser is engaged directly by the institution transferring the appraisal, 2) the appraiser has no direct or indirect interest in the property or transaction, 3) the existing appraisal or evaluation remains valid, and 4) the regulated institution determines that the appraisal conforms to the agencies' appraisal requirements and interagency guidelines and is

3

otherwise appropriate. (A financial services institution describes entities that provide services in connection with real estate lending transactions on an ongoing basis.)

Regulated institutions are expected to perform a more thorough review when accepting an appraisal from another financial services institution to confirm that the appraisal complies with the regulation and has sufficient information to support the lending decision. Moreover, the regulated institution accepting the appraisal should determine whether appropriate documentation is available to confirm that the financial services institution (not the borrower) ordered the appraisal.

11. *Can a regulated institution accept an appraisal prepared by an appraiser who was engaged by a loan broker?*

**Answer:** The agencies' appraisal regulations allow a regulated institution to accept an appraisal prepared by an appraiser engaged by another financial services institution, including a loan broker. This is allowed as long as the regulated institution has appropriate controls in place to ensure that the appraiser is acting on behalf of the financial services institution, the appraisal conforms to the requirements of the regulation and is otherwise acceptable, and the appraiser is independent from the borrower. Regulated institutions should review broker-ordered appraisals thoroughly to ensure that the appraisal complies with the regulation and meets the quality standards required by the institution's appraisal policies.

12. *May an appraisal be readdressed to a regulated institution from the borrower or another institution?*

**Answer:** A regulated institution cannot accept an appraisal that has been readdressed or altered by the appraiser with the intent to conceal that the original client was the borrower. Readdressing appraisals to conceal the original client, whether the client is a borrower or another financial services institution, is misleading and violates the agencies' regulations and USPAP.

13. *May an appraisal be routed from one lender to a regulated institution via the borrower?*

**Answer:** A regulated institution cannot accept an appraisal from the borrower unless the regulated institution can confirm that the appraisal was in fact ordered by another regulated institution or financial services institution. In accepting the appraisal, the regulated institution must also confirm that the appraiser is independent of the transaction and that the appraisal conforms to the agencies' appraisal regulations and is otherwise acceptable.

14. *Can a borrower pay the appraiser directly for an appraisal that is ordered by the lender?*

**Answer:** Since the regulated institution has engaged the appraiser for its services, the regulated institution should be the party to remit payment to the appraiser. The regulated institution may seek reimbursement from the borrower for the cost of the appraisal. However, the borrower may not recommend an appraiser to the institution or select the appraiser.

*15. Can an appraiser deliver an appraisal report to more than one lender assuming the appraisal has been ordered by one of the lenders?*

**Answer:** The agencies' appraisal regulations do not address whether an appraiser can deliver an appraisal report to more than one lender. The case may depend upon the provisions of the engagement letter. For example, the lender may specify in the engagement letter that the appraisal may be provided to another financial institution if the lender decides not to go forward on the loan. In the case of a syndicated loan, a lead lender is usually responsible for engaging the appraiser and providing copies of the appraisal to the other participating financial institutions. With regard to standards of confidentiality, USPAP directs an appraiser to be aware of, and comply with, all confidentiality and privacy laws and regulations applicable in an assignment.

*16. Can the regulated institution accept an appraisal prepared by an appraiser who is a family member of the loan broker who engaged him/her?*

**Answer:** The agencies' appraisal regulations do not address family relationships between the appraiser and the person who engages the appraiser. However, the agencies' appraisal regulations do not permit a regulated institution to accept an appraisal in which the appraiser has a direct or indirect interest, financial or otherwise, in the property or the transaction. Therefore, the regulated institution should review appraisals where a potential conflict of independence may exist and should accept the appraisal only if it can determine that the appraiser is independent of the transaction.

*17. Can the regulated institution accept an appraisal prepared by an appraiser who is engaged by a financial services institution with whom the appraiser has an affiliated business relationship?*

**Answer:** The business relationship between the financial services institution and the appraiser may not necessarily violate the independence requirement of the agencies' appraisal regulations. However, the agencies' appraisal regulations do not permit a regulated institution to accept an appraisal in which the appraiser has a direct or indirect interest, financial or otherwise, in the property or the transaction. The regulated institution should evaluate the financial services institution's controls to ensure independence and that there is appropriate separation of responsibilities and reporting lines between the appraiser and the financial services institution's lending function.

*18. How can a regulated institution ensure appraiser independence when accepting an appraisal prepared for a financial services institution?*

**Answer:** Documentation (that is, an engagement letter) should be available to indicate that the financial services institution (not the borrower) ordered the appraisal and that the appraiser has no direct or indirect interest, financial or otherwise, in the property or the transaction. The original lender's engagement letter to the appraiser should be made part of the appraisal report to provide additional information on the identity of the client in order to ensure independence in the appraisal process.

### REVIEWING APPRAISALS

*19. Should all appraisals undergo a compliance review?*

**Answer:** Yes, prior to a final credit decision, regulated institutions should perform a compliance review on all appraisals to confirm that they comply with the minimum appraisal standards as outlined in the agencies' appraisal regulations, the interagency guidelines, and the independence statement. Loan administration files should document this compliance review, which may be in checklist or narrative format. In addition, certain appraisals should be reviewed more comprehensively to assess the technical quality of the appraiser's analysis prior to making a final credit decision. The regulated institution should establish guidelines for a more detailed, technical review based on transaction risk, transaction size, or other criteria. (See "Program Compliance" in the interagency guidelines.)

*20. Can a regulated institution approve a loan subject to receipt and review of an appraisal, or must the appraisal be obtained and reviewed prior to making the final decision?*

**Answer:** A regulated institution may grant conditional approvals to prospective borrowers before obtaining an appraisal. However, a final credit decision or action should only occur after the regulated institution receives, reviews, and accepts the appraisal.

*21. What qualifications would constitute a "qualified and adequately trained individual" for the purpose of conducting appraisal reviews?*

**Answer:** Individuals who review appraisals as part of a regulated institution's internal compliance function should be independent of the transaction and possess the requisite education, expertise, and competence to perform the review commensurate with the complexity of the transaction.

### EVALUATION AND OTHER APPRAISAL TOPICS

*22. Can an otherwise qualified individual prepare an evaluation of a property securing a loan that will be approved by his/her direct supervisor? Can one officer perform an evaluation for another if they are both members of a loan committee, provided the evaluating officer abstains from voting? Could the lending officer or branch manager in a small, regulated institution perform the evaluation if he/she abstains from the final loan approval?*

**Answer:** To maintain independence, the individual preparing an evaluation should not directly report to someone involved in loan production. In a small, regulated institution where absolute lines of independence cannot be achieved, one officer may perform an evaluation for another as long as the evaluating officer abstains from the lending decision.

*23. Do the interagency guidelines apply only to loans in excess of $250,000? Is the $250,000 threshold the loan amount or the property value?*

**Answer:** The interagency guidelines apply to all real-estate-related financial transactions regardless of size or whether loans are for a regulated institution's own portfolio, held for sale, or held in asset-backed conduits. However, the agencies' appraisal regulations allow regulated institutions to use an appropriate evaluation of the real estate in lieu of an appraisal for transactions with a value of $250,000 or less, business loans $1 million or less, or subsequent transactions (transactions involving an existing extension of credit at the lending institution). The regulations define transaction value as the amount of the loan or extension of credit, not the value of the property. The interagency guidelines contain minimum standards for evaluation content and address the qualifications of individuals performing evaluations.

[Note: NCUA's business loan evaluation threshold is $250,000 or less. (12 CFR Part 722.3(b)(2)]

24. *Should a regulated institution comply with the independence requirements if an appraisal is not required by the agencies' appraisal regulations?*

*Answer:* A regulated institution should ensure independence in the ordering process for an appraisal even if the appraisal was not required under the agencies' appraisal regulations. Regulated institutions should also maintain independence for evaluations.

25. *Does a tax-assessment value from the local taxing authority constitute an evaluation? Can a loan officer who approves and/or recommends a loan conduct an evaluation if the market value that the officer develops in the evaluation does not exceed the tax-assessment value?*

**Answer:** A value from the taxing authority alone is insufficient to be considered an evaluation. An evaluation report should include calculations, supporting assumptions, and, if utilized, a discussion of comparable sales. If tax assessment information is used as part of an evaluation, the regulated institution should document the facts and analysis used to demonstrate that there is a valid correlation between the assessed values of the taxing authority and the property's market value. In addition, an evaluation should describe the real estate collateral, its condition, and its current and projected use.

A regulated institution should ensure that an individual who performs an evaluation is independent of the loan production function. Simply restricting the size of a transaction to less than the tax-assessed value alone does not comply with the agencies' appraisal regulations or the interagency guidelines, which address standards of independence. (See "Independence of the Appraisal and Evaluation Function" in the interagency guidelines.)

26. *The work-out plan on a $5 million problem loan calls for a regulated institution to receive an assignment of a $2 million note from the borrower's relative secured by a deed of trust on a different property. Is this financial transaction considered real-estate-related and is an appraisal required on the collateral property?*

**Answer:** Yes, this is considered a real-estate-related financial transaction. The agencies' appraisal regulations and interagency guidelines allow for an evaluation in lieu of an appraisal on new real estate collateral in certain loan workout situations depending on loan

7

OCC 2005-6
Attachment

quality, collateral quality, and validity of an existing appraisal or evaluation. (See "Renewals, Refinancings and Other Subsequent Transactions" in the interagency guidelines.)

27. *What is the useful life of an appraisal?*

**Answer:** The useful life of an appraisal varies with market conditions and property type. The agencies allow a regulated institution to use an existing appraisal to support a subsequent transaction if the institution documents that the existing value estimate remains valid. Factors which could impact the value include the passage of time; the volatility of the local market; the availability of financing; the inventory of competing properties; improvements to, or lack of maintenance of, the subject property or competing surrounding properties; changes in zoning; or environmental contamination. (See "Valid Appraisals and Evaluations" in the interagency guidelines.)

28. *Can a regulated institution advance new funds without a new appraisal if the value of the total loan continues to be supported by an existing appraisal and is consistent with supervisory LTV limits? Does the age of the appraisal matter if the physical condition of the property and the market conditions have not changed?*

**Answer:** A regulated institution may use an existing appraisal or evaluation to support a subsequent transaction, as long as the credit file documents the facts and analysis that support the institution's conclusion that the appraisal or evaluation remains valid. Criteria for determining whether an existing appraisal or evaluation remains valid will vary depending upon the condition of the property and the marketplace and the nature of any subsequent transaction.

8