

Joseph N. Kravec, Jr.
SPECTER SPECTER EVANS
  &MANOGUE, P.C.
The 26th Floor Koppers Building
Pittsburgh, Pennsylvania 15219
Tel:   (412) 642-2300
Fax:  (412) 642-2309
E-mail: jnk@ssem.com

Michael D. Braun (167416)
BRAUN LAW GROUP, P.C.
12304 Santa Monica Blvd., Suite 109
Los Angeles, CA 90025
Tel:   (310) 442-7755
Fax:  (310) 442-7756
E-mail: service@braunlawgroup.com

Ira Spiro (67641)
SPIRO MOSS BARNESS, LLP
11377 West Olympic Blvd., Fifth Floor
Los Angeles, CA 90064-1683
Tel:   (310) 235-2468
Fax:  (310) 235-2456
E-mail: ira@spiromoss.com

Janet Lindner Spielberg (221926)
LAW OFFICES OF JANET
LINDNER SPIELBERG
12400 Wilshire Blvd., Suite 400
Los Angeles, CA 90025
Tel:   (310)3928801
Fax:  (310)278-5938
E-mail: jlspielberg@jlslp.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FELTON A. SPEARS, JR. and SIDNEY SCHOLL, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>v.<br><br>WASHINGTON MUTUAL, INC. a Washington corporation; FIRST AMERICAN EAPPRAISEIT, a Delaware corporation; and LENDER'S SERVICE, INC.,<br><br>               Defendants. | CASE NO.: 5:08-cv-00868 **(RMW)**<br><br><br>CLASS ACTION<br><br>**NOTICE OF MDL FILING**<br><br>DEMAND FOR JURY TRIAL |

1    PLEASE TAKE NOTICE that Plaintiffs, Felton A. Spears, Jr. and Sidney Scholl,

2  by and through their undersigned counsel, have filed a Motion for Transfer of Tag-

3  Along Action to MDL No. 1919 with the Judicial Panel on Multidistrict Litigation. The

4  purpose of this Motion is to ask the Judicial Panel to transfer the above-captioned action

5  to MDL No. 1919 for coordination and consolidation of pretrial proceedings under 28

6  U.S.C. §1407 before the Western District of Washington where all other related actions

7  have been centralized by the Judicial Panel.

8    Pursuant to the Rules of Procedure of the Judicial Panel on Multidistrict

9  Litigation, appended hereto are the following documents Plaintiffs filed before the

10  Judicial Panel: 1) Motion for Transfer of Tag-Along Action to MDL No. 1919; 2) Brief

11  in Support of Motion for Transfer of Tag-Along Action to MDL No. 1919; and 3)

12  Schedule of Actions.

13  Dated: June 19, 2008                    SPECTER SPECTER EVANS &
                                            MANOGUE, P.C.
14

15                                          By:  s/Joseph N. Kravec, Jr.
                                                 Joseph N. Kravec, Jr.
16
                                            The 26th Floor Koppers Building
17                                          Pittsburgh, Pennsylvania 15219
                                            Tel:  (412) 642-2300
18                                          Fax:  (412) 642-2309
                                            E-mail: jnk@ssem.com
19
                                            Michael D. Braun, Esquire
20                                          BRAUN LAW GROUP, P.C.
                                            12304 Santa Monica Blvd., Suite 109
21                                          Los Angeles, CA 90025
                                            Tel:  (310) 442-7755
22                                          Fax:  (310) 442-7756
                                            E-mail: service@braunlawgroup.com
23
                                            Ira Spiro (67641)
24                                          SPIRO MOSS BARNESS, LLP
                                            11377 West Olympic Blvd., Fifth Floor
25                                          Los Angeles, CA 90064-1683
                                            Tel:  (310) 235-2468
26                                          Fax:  (310) 235-2456
                                            E-mail: ira@spiromoss.com
27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Janet Lindner Spielberg (221926)
LAW OFFICES OF JANET
LINDNER SPIELBERG
12400 Wilshire Blvd., Suite 400
Los Angeles, CA 90025
Tel:   (310)3928801
Fax:   (310)278-5938
E-mail: jlspielberg@jlslp.com

***Attorneys for Plaintiffs***

1

## PROOF OF SERVICE

2    STATE OF PENNSYLVANIA          )
                                                      )  ss.:
3    COUNTY OF ALLEGHENY       )

4         I am employed in the County of Allegheny, State of Pennsylvania.  I am over the
     age of 18 and not a party to the within action.  My business address is The 26th Floor
5    Koppers Building, Pittsburgh, Pennsylvania 15219.

6         On June 19, 2008, using the Northern District of California's Electronic Case
     Filing System, with the ECF ID registered to Joseph N. Kravec, Jr., I filed and served
7    the document(s) described as:

8                            NOTICE OF MDL FILING

9         The ECF System is designed to automatically generate an e-mail message to all
     parties in the case, which constitutes service.  According to the ECF/PACER system, for
10   this case, the parties are served as follows:

11        Janet Lindner Spielberg, Esquire          jlspielberg@jlslp.com

12        Ira Spiro, Esquire                        ira@spiromoss.com

13        Robert Ira Spiro, Esquire                 ira@spiromoss.com

14        Michael D. Braun, Esquire                 service@braunlawgroup.com

15   **Attorneys for Plaintiffs**

16        Robert J. Pfister, Esquire                rpfister@stblaw.com

17        Martin L. Fineman, Esquire                martinfineman@dwt.com

18        Stephen Michael Rummage, Esquire          steverummage@dwt.com

19        Sam N. Dawood, Esquire                    samdawood@dwt.com

20        Jonathan M. Lloyd, Esquire                jonathanlloyd@dwt.com

21   **Attorney for Defendant Washington Mutual, Inc.**

22        Laura Jean Fowler, Esquire                lfowler@mhalaw.com

23   **Attorneys for Defendant eAppraiseIT**

24        Margaret Anne Keane, Esquire              mkeane@dl.com

25        Kris Hue Chau Man, Esquire                kman@dl.com

26        Angela M. Papalaskaris, Esquire           apapalas@dl.com

27        Christopher J. Clark, Esquire             cjclark@dl.com

28        Kevin C. Wallace, Esquire                 kwallace@dl.com

1     Jeffrey D. Rotenberg, Esquire            jrotenberg@tpw.com

2     Richard F. Hans, Esquire               rhans@tpw.com

3  **Attorneys for Defendant LSI Appraisal, LLC**

4

5      On June 19, 2008, I served the document(s) described as:

                    **NOTICE OF MDL FILING**

6

7  by placing a true copy(ies) thereof enclosed in a sealed envelope(s) addressed as follows:

8  Kerry Ford Cunningham, Esquire
Patrick J. Smith, Esquire

9  Thacher Proffitt & Wood LLP
Two World Financial Center

10  New York, New York 10281

11  **Attorneys for eAppraiseIT**

12  Kris H. Man, Esquire
Dewey and LeBoeuf LLP

13  One Embarcadero Center
Suite 400

14  San Francisco, CA 94111-3619

15  **Attorneys for LSI Appraisal, LLC**

16  I served the above document(s) as follows:

17      BY MAIL.  I am familiar with the firm's practice of collection and processing correspondence by mailing.  Under that practice it would be deposited with U.S. postal

18  service on that same day with postage thereon fully prepaid at Pittsburgh, Pennsylvania in the ordinary course of business.  I am aware that on motion of the party served,

19  service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in an affidavit.

20

21      I am employed in the office of an attorney who is admitted *pro hac vice* in this action at whose direction the service was made.

22      I declare under penalty of perjury under the laws of the United States that the

23  above is true and correct.

      Executed on June 19, 2008, at Pittsburgh, Pennsylvania.

24

25

26                         _S/MARCIA Z. CARNEY_
                          Marcia Z. Carney

27

28

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

———————————————————— )
                                            )
IN RE WASHINGTON MUTUAL, INC. )
SECURITIES, DERIVATIVE AND        )        MDL Docket No. 1919
"ERISA" LITIGATION                     )
                                            )
———————————————————— )

<u>**MOTION FOR TRANSFER OF TAG-ALONG ACTION TO MDL NO. 1919**</u>

Felton A. Spears, Jr. and Sidney Scholl, plaintiffs in the action styled *Spears, et al. v. Washington Mutual, Inc., et al.*, No. 5:08-cv-00868 (N.D.Cal.), hereby respectfully move the Panel for an Order transferring their action to the United States District Court for the Western District of Seattle for coordinated pretrial proceedings with the actions already centralized as part of MDL No. 1919 captioned *In re: Washington Mutual, Inc., Securities, Derivative & "ERISA" Litigation*. In support of their motion, Mr. Spears and Ms. Scholl state as follows:

1.    On February 21, 2008, the Panel centralized over twenty actions against Washington Mutual, Inc. ("WaMu") in the United States District Court for the Western District of Washington which "share factual questions arising from alleged misrepresentations or omissions concerning

WaMu's financial condition with respect to its subprime home loan portfolio." *See* Exhibit 1, Transfer Order, p. 1.

      2.      The underlying factual claims for nearly all of the securities, derivative, and ERISA actions centralized pursuant to the Transfer Order is WaMu's alleged conspiracy with two appraisal management companies for the purpose of WaMu obtaining fraudulently high home appraisals to artificially inflate the value of its home loan portfolio. The basis for the majority of the complaints centralized in MDL 1919 was the New York Attorney General's complaint against one of the two appraisal management companies, First American eAppraiseIT, and all of the transferred actions were filed subsequent to the Attorney General's action.

      3.      Plaintiffs Felton A. Spears, Jr. and Sidney Scholl filed their action against WaMu and the two appraisal management companies named in the New York Attorney General's complaint on February 8, 2008 ("*Spears*"). Plaintiffs in the *Spears* action allege the same factual basis underlying for their consumer claims as the centralized actions allege for their securities, derivative, and ERISA claims – that WaMu entered into an illegal conspiracy with the two appraisal management companies for the purpose of having the appraisal management companies provide inflated home appraisals so that WaMu could bundle the loans and sell them on the financial markets. *See* Exhibit 2, First Amended Complaint for the *Spears* action, ¶¶ 6-9, 33-56.

      4.      On February 15, 2008, less than a week before the Panel's Transfer Order came down, WaMu filed a Notice of Tag-along Action for *Spears* asserting that the *Spears* action was factually related to the other actions that were eventually centralized in MDL 1919, and that the *Spears* action should likewise be transferred to the Western District of Washington for coordinated pretrial proceedings for the convenience of the parties involved. *See* Exhibit 3, WaMu's Notice of Tag-

along Action, ¶¶ 15-17.

     5.     WaMu's Notice of Tag-along Action failed to detail how the *Spears* consumer claims had the exact same factual basis as the other actions. *Id.* However, WaMu argued that the exact same conspiracy underlying *Spears'* consumer claims was a reason the Panel should centralize the actions in MDL 1919 in the first place. *See* Exhibit 4, WaMu's Brief in Support of WaMu's Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407, p. 1 (WaMu stating that the claims against it stem from "an alleged conspiracy between [WaMu] and an appraisal vendor, eAppraiseIT, related to appraisal valuations on loans originated by [WaMu]"); pp. 6-8 (summarizing five complaints with allegations that WaMu published materially false and misleading statements "related to the alleged conspiracy"); p. 10 (stating that multiple complaints of actions eventually coordinated in MDL No. 1919 were based on "[t]he conspiracy to inflate appraisal values on residential-secured loans with the goal of artificially increasing loan-to-value ratios").

     6.     When the Panel centralized MDL 1919 and transferred the actions to the Western District of Washington, the *Spears* action was not mentioned or considered by the Panel in its Transfer Order. Exhibit 1. Instead, *Spears* was deemed administratively "unrelated' to MDL 1919 by the Clerk's office and no conditional transfer was issued. The Clerk's decision was made without explanation as to why *Spears* was deemed unrelated to MDL 1919.

     7.     Despite the Clerk's decision to deem *Spears* as "unrelated" to MDL 1919, the *Spears* action shares common questions of fact with the other actions already centralized in MDL 1919 regarding the alleged conspiracy between WaMu and its appraisal management companies. A recent Joint Preliminary Report filed by the parties in MDL 1919 confirms that the factual core underlying *Spears* is the same as many, if not all, of the actions already centralized in MDL 1919. *See* Exhibit

5, Joint Preliminary Order. Specifically, the Joint Preliminary Order shows that a central factual predicate of the claims alleged by the majority of the centralized parties is improper appraisal practices and the related conspiracy between WaMu and its appraisal management companies. These are the same factual claims underlying the consumer claims in *Spears*. Exhibit 2, First Amended Complaint, ¶¶ 6-9, 33-56.

8.    The *Spears* action also shares common questions of fact regarding WaMu's securitization practices of its mortgages. Plaintiffs in the *Spears* action allege that the reason WaMu entered into its conspiracy with the two appraisal management companies to inflate home values was to bundle the loans and sell them in the financial markets for substantial profits over what it would make if the homes were properly appraised. First Amended Complaint, ¶¶ 6, 22-24. While scienter is not an element of any of the causes of action in *Spears*, the plaintiffs there will need to show WaMu's motives for their punitive damage claims. *Id.*, ¶¶ 17, 118, and Prayer at D.

9.    As *Spears* shares the same common questions of fact as the actions already centralized in MDL 1919, there will duplicative discovery regarding both the alleged conspiracy and WaMu's securitizing its home mortgage loans. *See* Exhibit 5, Joint Status Report, § 7.B (identifying the "Discovery Topics" to include, "the actions of defendants First American and eAppraiesIT," "the appraisal of the properties underlying WaMu's loans," "the securitization of WaMu's loans," and "each defendant's involvement in the aforementioned activities"). Transfer of *Spears* to the Western District of Washington is therefore appropriate to avoid the duplicative discovery that is bound to be taken in *Spears*. *In re: Washington Mutual, Inc., Securities, Derivative & "ERISA" Litigation*, 536 F.Supp.2d 1377, 1378 (Jud.Pan.Mult.Lit. 2008)(centralizing pretrial proceedings multiple actions alleging claims based on the same underlying factual allegations as in *Spears* to "eliminate

duplicative discovery").

10.    As *Spears* shares the same common factual questions regarding WaMu's appraisal practices and its securitization of home loans as the actions centralized in MDL 1919, the just and efficient conduct of the litigation will be promoted by its transfer to the Western District of Washington for coordinated pretrial proceedings with MDL 1919, and transfer will promote judicial economy and conservation of the parties' resources. *Id.* (centralizing the actions in MDL 1919 to "prevent inconsistent pretrial rulings, especially with respect to class certification; and conserve the resources of the parties, their counsel and the judiciary"). Transfer of Spears to MDL 1919 will not only prevent the clearly duplicative discovery, but also ensure consistent pretrial rulings regarding issues about the alleged conspiracy between WaMu and its appraisal management companies, WaMu's securitization of its home mortgages, and class certification. *Id.*

WHEREFORE, pursuant to 28 U.S.C. § 1407, Felton A. Spears, Jr. and Sidney Scholl respectfully request that the Panel transfer the *Spears* action to the Honorable Marsha J. Pechman, United States District Judge for the Western District of Washington for centralized pretrial proceedings with the other similar actions in MDL 1919. A Brief in support of their motion is attached.

Dated: June 19, 2008

SPECTER SPECTER EVANS
& MANOGUE, P.C.

By: _____
Joseph N. Kravec, Jr.

The 26th Floor Koppers Building
Pittsburgh, Pennsylvania 15219
Telephone: (412) 642-2300
Facsimile: (412) 642-2309

Michael D. Braun
BRAUN LAW GROUP, P.C.
12304 Santa Monica Blvd., Suite 109
Los Angeles, CA 90025
Telephone: (310) 442-7755
Facsimile: (310) 442-7756

Ira Spiro
SPIRO MOSS BARNESS, LLP
11377 West Olympic Blvd., Fifth Floor
Los Angeles, CA 90064-1683
Telephone: (310) 235-2468
Facsimile: (310) 235-2456

Janet Lindner Spielberg
LAW OFFICES OF JANET LINDNER
  SPIELBERG
12400 Wilshire Blvd., Suite 400
Los Angeles, CA 90025
Telephone: (310) 392-8801
Facsimile: (310) 278-5938

*Attorneys for Plaintiffs in the Spears Action*

## PROOF OF SERVICE

The undersigned, Joseph N. Kravec, Jr., Esquire, hereby certifies that he served a true and correct copy of the **MOTION FOR TRANSFER OF TAG-ALONG ACTION TO MDL NO. 1919** on counsel for Defendant by U.S. First Class Mail, on the 19th day of June, 2008 as follows:

Robert J. Pfister, Esquire
SIMPSON THACHER & BARTLETT LLP
1999 Avenue of the Stars, 29th Floor
Los Angeles, CA 90067

Stephen M. Rummage, Esquire
Jonathan M. Lloyd, Esquire
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045

Martin L. Fineman, Esquire
Sam N. Dawood, Esquire
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111

Laura J. Fowler, Esquire
MCDONOUGH HOLLAND
& ALLEN PC
555 Capitol Mall, 9th Floor
Sacramento, CA 95814

Margaret Anne Keane, Esquire
Kris H. Man, Esquire
DEWEY AND LEBOEUF LLP
One Embarcadero Center
Suite 400
San Francisco, CA 94111-3619

Angela M. Papalaskaris, Esquire
Christopher J. Clark, Esquire
Kevin C. Wallace, Esquire
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019-6092

Richard F. Hans, Esquire
Kerry Ford Cunningham, Esquire
Jeffrey D. Rotenberg, Esquire
Patrick J. Smith, Esquire
THACHER PROFITT & WOOD LLP
Two World Financial Center
New York, New York 10281

**MDL NO. 1919 LIAISON COUNSEL:**

Dan Drachler, Esquire
ZWERLING SCHACHTER & ZWERLING LLP
1904 Third Avenue
Suite 1030
Seattle, WA 98101-1170

Roger M. Townsend, Esquire
BRESKIN JOHNSON & TOWNSEND PPLC
999 Third Avenue
Suite 4400
Seattle, WA 98104-4088

Joseph N. Kravec, Jr., Esquire

# EXHIBIT 1

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

Feb 21, 2008

FILED
CLERK'S OFFICE

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

IN RE: WASHINGTON MUTUAL, INC.,
SECURITIES, DERIVATIVE & "ERISA"
LITIGATION                                          MDL No. 1919

TRANSFER ORDER

      **Before the entire Panel:** Defendant Washington Mutual, Inc. (WaMu) has moved, pursuant to 28 U.S.C. § 1407, for coordinated or consolidated pretrial proceedings of this litigation in the Western District of Washington. Plaintiffs in the Western District of Washington actions and four Western District of Washington potentially related actions support this motion. Plaintiffs in the Southern District of New York actions and interested party plaintiff the Ontario Teachers' Pension Plan Board support centralization, but suggest the Southern District of New York as transferee district.

      This litigation currently consists of seven actions listed on Schedule A and pending in two districts, five actions in the Western District of Washington and two actions in the Southern District of New York.[1]

      On the basis of the papers filed and hearing session held, we find that these actions involve common questions of fact, and that centralization under Section 1407 in the Western District of Washington will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. These actions share factual questions arising from alleged misrepresentations or omissions concerning WaMu's financial condition with respect to its subprime home loan portfolio. Whether the actions are brought by securities holders seeking relief under the federal securities laws, shareholders suing derivatively on behalf of WaMu, or participants in retirement savings plans suing for violations of ERISA, all actions can be expected to focus on a significant number of common events, defendants, and/or witnesses. Centralization under Section 1407 will eliminate duplicative discovery; prevent inconsistent pretrial rulings, especially with respect to class certification; and conserve the resources of the parties, their counsel and the judiciary.

      We are persuaded that the Western District of Washington is an appropriate transferee forum for this litigation, because (1) most of the actions are already pending in that district, and (2) WaMu

---

[1] The Panel has been notified of twelve potentially related actions, eight actions in the Western District of Washington, two actions in the Southern District of New York, and one action each in the Eastern District of California and the Northern District of California. In light of the Panel's disposition of this docket, these actions will be treated as potential tag-along actions. *See* Rules 7.4 and 7.5, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001).

-2-

is headquartered in Seattle, Washington, and relevant documents and witnesses will likely be located there.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A and pending outside the Western District of Washington are transferred to the Western District of Washington and, with the consent of that court, assigned to the Honorable Marsha J. Pechman for coordinated or consolidated pretrial proceedings with the actions pending there and listed on Schedule A.

PANEL ON MULTIDISTRICT LITIGATION

John G. Heyburn II
Chairman

| | |
|---|---|
| D. Lowell Jensen | J. Frederick Motz |
| Robert L. Miller, Jr. | Kathryn H. Vratil |
| David R. Hansen | Anthony J. Scirica |

IN RE: WASHINGTON MUTUAL, INC.,
SECURITIES, DERIVATIVE & "ERISA"
LITIGATION                                    MDL No. 1919

## SCHEDULE A

### Southern District of New York

Dennis Koesterer v. Washington Mutual, Inc., et al., C.A. No. 1:07-9801
Joel Abrams, et al. v. Washington Mutual, Inc., et al., C.A. No. 1:07-9806

### Western District of Washington

Mark Nelson v. John F. Woods, et al., C.A. No. 2:07-1809
Tom Sneva, etc. v. Kerry K. Killinger, et al., C.A. No. 2:07-1826
Lynne Harrison, etc. v. Kerry K. Killinger, et al., C.A. No. 2:07-1827
Gregory Bushansky v. Washington Mutual, Inc., et al., C.A. No. 2:07-1874
Vincent Bussey v. Washington Mutual, Inc., et al., C.A. No. 2:07-1879

# EXHIBIT 2

1   Joseph N. Kravec, Jr.
    SPECTER SPECTER EVANS
2     & MANOGUE, P.C.
    The 26th Floor Koppers Building
3   Pittsburgh, Pennsylvania 15219
    Tel:   (412) 642-2300
4   Fax:   (412) 642-2309
    E-mail: jnk@ssem.com
5
    Michael D. Braun (167416)
6   BRAUN LAW GROUP, P.C.
    12304 Santa Monica Blvd., Suite 109
7   Los Angeles, CA 90025
    Tel:   (310) 442-7755
8   Fax:   (310) 442-7756
    E-mail: service@braunlawgroup.com
9
    Ira Spiro (67641)                          Janet Lindner Spielberg (221926)
10  SPIRO MOSS BARNESS, LLP                    LAW OFFICES OF JANET
    11377 West Olympic Blvd., Fifth Floor      LINDNER SPIELBERG
11  Los Angeles, CA 90064-1683                 12400 Wilshire Blvd., Suite 400
    Tel:   (310) 235-2468                       Los Angeles, CA 90025
12  Fax:   (310) 235-2456                      Tel:   (310)392-8801
    E-mail: ira@spiromoss.com                  Fax:   (310)278-5938
13                                             E-mail: jlspielberg@jlslp.com

14  *Attorneys for Plaintiffs*

15                UNITED STATES DISTRICT COURT

16      NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION

17

18  SIDNEY SCHOLL and FELTON A. )    CASE NO.: 5:08-cv-00868 (HRL)
    SPEARS, JR., on behalf of
19  themselves and all others similarly    **CLASS ACTION**
    situated,
20                                          **FIRST AMENDED COMPLAINT FOR**
                        Plaintiffs,         **DAMAGES, EQUITABLE,**
21                                          **DECLARATORY AND INJUNCTIVE**
                  v.                        **RELIEF**
22
    WASHINGTON MUTUAL, INC.               **DEMAND FOR JURY TRIAL**
23  a Washington corporation;
    WASHINGTON MUTUAL BANK,
24  FA (aka WASHINGTON MUTUAL
    BANK); FIRST AMERICAN
25  EAPPRAISEIT, a Delaware
    corporation; and LENDER'S
26  SERVICE, INC.,

27
                        Defendants.
28

---

**FIRST AMENDED COMPLAINT**

1       Plaintiffs, by their attorneys, bring this class action against Defendants

2 Washington Mutual, Inc., Washington Mutual Bank, FA (aka Washington Mutual

3 Bank)(herein after collectively referred to as "WaMu"), First American eAppraiseIT

4 ("EA"), and Lender's Service Inc., ("LSI") (collectively "Defendants") on their own

5 behalf and on behalf of all others similarly situated, and allege as follows based upon

6 the investigation of their counsel:

7                         **OVERVIEW**

8     1.    This is a class action against Defendants seeking relief on behalf of

9 Plaintiffs and a class of all consumers in California and throughout the United States

10 who, on or after June 1, 2006, received home loans from WaMu, in connection with

11 appraisals that were obtained through either EA or LSI. Plaintiffs and the Class were

12 ultimately responsible for paying for these appraisals, which, as described throughout

13 this Complaint, were not performed in an independent, objective, impartial and

14 unbiased manner, in violation of applicable law and the contractual requirements for

15 the appraisal.

16     2.    The vast majority of home purchasers in the United States finance their

17 home purchase through a third party lender. The loan has traditionally been secured

18 by the lender, who retains a security interest in the property until the loan is repaid in

19 full. In the event of default, the lender will be entitled to sell off the security interest

20 (i.e., the property) and recoup the loan amount. Thus, it traditionally has been

21 critical for the lender to make sure the fair market value of the property equals or

22 exceeds the value of the loan.[1] To do so, lenders require that, prior to the loan, the

23 property be professionally appraised to determine its fair market value.

24     3.    A real estate appraisal is supposed to be an independent, objective,

25 _____

26    [1] Fair market value is the price at which a willing buyer would purchase a
27 property and a willing seller would sell the same property, when neither party is
under any compulsion to buy or sell, and each party has full knowledge of all
28 pertinent facts relating to the sale."

1



1   impartial, unbiased, credible professional estimate of the fair market value of a
2   particular property.  It typically consists of a visual inspection of the interior and
3   exterior of a property; inspection of the neighborhood; and a comparison of selling
4   prices of comparable properties on the street or adjacent areas, among other indicia.
5   The lender (in this case, WaMu) typically undertakes to procure the appraisal on
6   behalf of itself and the borrower with the cost of the appraiser's services ultimately
7   borne by the borrower.

8       4.    If an appraisal is properly done, the appraisers perform the appraisal,
9   and appraisal reviewers review the appraisal report for accuracy and compliance with
10  applicable standards to create what legal and professional standards term a "credible
11  appraisal".  Appraisers and appraisal reviewers follow federally accepted standards,
12  the Uniform Standards of Professional Appraisal Practice ("USPAP"), which govern
13  the ethical and legal aspects of the appraisal undertaking, assessment, reporting and
14  review process, and establish the minimum standards for performing a "credible
15  appraisal".  These USPAP standards are also adopted by most, if not all, states,
16  including California.  Also they are part of the contractual undertakings expressly
17  stated in the Uniform Residential Appraisal Report, which is the standard form that
18  appraisers use for their appraisal reports and which were used for the WaMu loans
19  that are the subject of this Complaint.  These appraisal reports also expressly provide
20  that they are to be provided to borrowers and acknowledge that borrowers are
21  permitted to rely on the appraisals as part of any mortgage finance transaction
22  between borrowers and WaMu.

23      5.    The USPAP requirements provide that to promote and preserve the
24  public trust inherent in professional appraisal practice, an appraiser and an appraisal
25  reviewer must observe the highest standards of professional ethics to perform and
26  ensure a "credible appraisal".  An appraiser and an appraisal reviewer must perform
27  assignments ethically and competently, in accordance with USPAP and any
28  supplemental standards agreed to by the appraiser in accepting the assignment.

2

**FIRST AMENDED COMPLAINT**



1    Under USPAP, an appraiser and an appraisal reviewer must perform assignments

2    with impartiality, objectivity, and independence, and without bias or accommodation

3    of personal interests.  In appraisal practice under USPAP, an appraiser and an

4    appraisal reviewer must not perform as an advocate for any party or issue, must not

5    accept an assignment that includes the reporting of predetermined opinions and

6    conclusions or favors the cause of any client, must not communicate assignment

7    results or write a report in a misleading or fraudulent manner, and must not permit an

8    employee or other person to communicate a misleading or fraudulent report.

9        6.    In or about June 2006, WaMu entered an agreement, conspiracy or

10    scheme with EA and LSI, two purportedly independent appraisal companies, to

11    handle all of WaMu's home loan appraisals.  As part of this arrangement, EA and

12    LSI received appraisal requests from WaMu, procured local appraisers to perform the

13    appraisals, reviewed the appraisal reports, and requested, at the behest of WaMu, that

14    the appraisers make changes before finalizing the reports and providing them to

15    WaMu to transmit to the borrowers.  In reality, WaMu, with the full, unfettered

16    cooperation of EA and LSI, controlled the process by which individual appraisers

17    were selected, how home appraisals were performed and, ultimately, the values at

18    which properties were appraised.  EA and LSI consulted directly with WaMu and its

19    loan officers to establish the property values they desired before EA and LSI (and its

20    appraisers) finalized the appraisal reports.  This conspiratorial conduct allowed

21    WaMu to direct appraisers to artificially inflate home values and thus provide false

22    appraisals in order to qualify more people for higher value loans.  WaMu would then

23    aggregate and package these home loans and sell them in the financial markets for a

24    substantial profit.  Ultimately, the higher the volume and value of these loans, the

25    higher WaMu's profits.  In 2006, WaMu made over $760 million in revenue from

26    sales and servicing of home mortgage loans.

27        7.    As part of the scheme, EA and LSI each received millions of dollars in

28    appraisal fees from unsuspecting WaMu borrowers who, despite paying for what

3

**FIRST AMENDED COMPLAINT**



1   should have been credible appraisals (i.e., done in compliance with applicable legal

2   and professional standards so as to provide an independent, unbiased, and objective

3   appraisal of the fair market value of their property), instead unwittingly received

4   biased appraisals that were neither independent, objective or in compliance with

5   legal and professional standards.  Each borrower was charged for a credible, lawful

6   appraisal, but as a result of the arrangement between WaMu, EA and LSI, no

7   credible, lawful appraisal was performed.  WaMu borrowers (i.e., Plaintiffs and the

8   Class) were damaged thereby.

9        8.      EA has its principal place of business in Poway, California and operates,

10  manages and directs its nationwide appraisal services and business operations from

11  its offices in California.  Likewise, LSI has two of its three nationwide operation

12  centers in California, from which LSI operates and directs the majority, or at least a

13  substantial proportion, of its nationwide appraisal services and business operations.

14  A majority of WaMu's home loan portfolio are loans made in California, according

15  to its 2006 Annual Report.  It is therefore believed and averred that the agreements,

16  conspiracy and misconduct at issue in this Complaint occurred, was conducted

17  and/or was directed primarily from, or at least a substantial proportion emanated

18  from, California, including, but not limited to: a) the designation and assignment of

19  appraisers for WaMu home loans; b) the review, approval and revision of appraisals

20  for WaMu home loans to meet WaMu's expectations; and c) the management and

21  supervision of appraisal services for WaMu home loans to Plaintiffs and the Class.

22       9.      Defendants' conduct violates the Real Estate Settlement Procedures Act,

23  12 U.S.C. section 2607, the unlawful, unfair and fraudulent prongs of California's

24  Business and Professions Code section 17200, *et seq.* (the "UCL") as well as the

25  Consumer Legal Remedies Act ("CLRA").  Defendants' conduct also constitutes an

26  unlawful civil conspiracy.  Defendants' conduct also breaches their contracts with

27  Plaintiffs and the Class, either directly or because Plaintiffs and Class members are

28  intended beneficiaries of the contracts, or Defendants' services, or is grounds for

4

**FIRST AMENDED COMPLAINT**

1    restitution on a quasi-contract/unjust enrichment basis.

2                                    **PARTIES**

3         10.    Plaintiff, Sidney Scholl, is an individual who is a citizen of the State of

4    California, residing in Sonoma County, California. In October, 2006, Ms. Scholl

5    entered a mortgage loan through WaMu's offices in Sonoma, California to purchase

6    a property located at 194 Terrace, Edmond, Oklahoma. In connection with this loan,

7    WaMu procured for itself and Ms. Scholl an appraisal on the subject property from

8    EA and/or LSI that was performed pursuant to the scheme alleged in this Complaint.

9    Ms. Scholl was charged for this appraisal.

10        11.    Plaintiff, Felton A. Spears, Jr., is an individual who is a citizen of the

11   State of California, residing in San Jose, California. In March, 2007, Mr. Spears

12   entered a mortgage loan with WaMu on a property located in San Jose, California.

13   In connection with this loan, WaMu procured for itself and Mr. Spears an appraisal

14   of the subject property from EA and/or LSI that was performed pursuant to the

15   scheme alleged in this Complaint. Mr. Spears was charged for this appraisal.

16        12.    Defendants Washington Mutual, Inc. and Washington Mutual Bank, FA

17   (aka Washington Mutual Bank)(herein after collectively referred to as "WaMu")

18   collectively operate as a consumer and small business banking company in the

19   United States with assets totaling $346 billion. WaMu operates in four segments:

20   Retail Banking, Card Services, Commercial, and Home Loans. The Home Loans

21   segment originates and services home loans, manages capital market operations,

22   fulfills and services a portfolio of home equity loans and lines of credit, originates

23   and purchases mortgage loans to higher risk borrowers, provides financing and other

24   banking services to mortgage bankers for the origination of mortgage loans, and

25   offers insurance-related products and reinsurance services. This segment offers

26   various real estate secured residential loan products and services primarily consisting

27   of fixed-rate home loans, adjustable-rate home loans, hybrid home loans, option

28   ARM loans, and mortgage loans to higher risk borrowers. As of December 31, 2006,

**FIRST AMENDED COMPLAINT**

1    the company operated 2,225 retail banking stores and 472 lending stores and centers

2    in 36 states, including California.  According to the company's 2006 Annual Report,

3    the majority of WaMu's home loan portfolio are loans made in California.

4        13.    Defendant First American eAppraiesIT ("EA") is a Delaware

5    corporation with its principal place of business at 12395 First American Way,

6    Poway, California.  EA is a subsidiary of The First American Corporation and is a

7    California corporation with its principal place of business at 1 First American Way,

8    Santa Ana, California.

9        14.    Defendant Lender's Service Inc. is one of the country's largest providers

10   of property valuation, title and closing services to the first mortgage, home equity,

11   and subprime markets, as well as to mortgage servicers and investors.  LSI is a

12   subsidiary of Fidelity National Information Services, a corporation incorporated in

13   Georgia and headquartered in Jacksonville, Florida.  LSI maintains three operation

14   centers, two of which, Santa Ana and Sacramento, are located in California.

15                    **JURISDICTION AND VENUE**

16       15.    Jurisdiction of this Court is proper under 28 U.S.C. §1331(federal

17   question jurisdiction) and §1367(supplemental jurisdiction).  Plaintiffs assert a

18   federal claim under RESPA, 12 U.S.C. §2607, and supplemental state law claims.

19       16.    Jurisdiction of this Court is alternatively proper under 28 U.S.C.

20   §1332(d)(2).  Plaintiffs are citizens of the State of California and reside in Sonoma

21   and San Jose, California. Defendant WaMu is incorporated in the State of

22   Washington and has its corporate headquarters in Seattle, Washington.  Defendant

23   EA is incorporated in the State of Delaware and has its principal place of business in

24   Poway, California.  Defendant LSI has two of its three main operation centers

25   located in Santa Ana, California and Sacramento, California.  A substantial portion

26   of the conduct at issue in this lawsuit took place in one or more of Defendants'

27   California offices.

28       17.    The amount in controversy exceeds $5,000,000 for Plaintiffs and Class

6

**FIRST AMENDED COMPLAINT**

1    members collectively, exclusive of interest and costs, by virtue of the combined cost

2    of appraisals performed by EA and LSI for WaMu, and the revenue and profit reaped

3    by Defendants from their transactions with Plaintiffs and the Class, as a direct and

4    proximate result of the wrongful conduct alleged herein, and by virtue of the

5    statutory, exemplary and/or punitive damages alleged herein.

6         18.    Venue is proper within this judicial district pursuant to 28 U.S.C. §

7    1391(b), (c) and (d). Defendant EA has agents, transacts business and is otherwise

8    found within this judicial district. Defendant LSI has agents, transacts business, and

9    is otherwise found within this judicial district. Defendant WaMu has agents,

10   transacts business and is otherwise found within this judicial district. A substantial

11   portion of the transactions and events complained of herein, including Plaintiffs',

12   occurred in this judicial district, a substantial portion of the affected persons and

13   entities are in this judicial district, and Defendants have received substantial

14   compensation from such transactions and business activity in this judicial district,

15   including the transaction Plaintiffs entered with Defendant. Finally, Defendants

16   inhabit and/or may be found in this judicial district, and the interstate trade and

17   commerce described herein is and has been carried out in part within this judicial

18   district.

19                          **BASIC FACTUAL ALLEGATIONS**

20                          **The Real Estate Mortgage Industry**
                            **Provides Incentives for High Appraisals**
21

22        19.    WaMu is the country's largest savings and loan with assets totaling

23   $346 billion. During the first three quarters of 2007 alone, WaMu originated $116

24   billion in residential mortgage loans. WaMu procures more appraisals from EA and

25   LSI than any other single entity.

26        20.    Traditionally, a lender such as WaMu would have an interest in ensuring

27   that a borrower is able to repay a home loan, and that the loan is adequately

28   collateralized in case the borrower defaults. Likewise, a consumer borrowing money

                                            7
                          **FIRST AMENDED COMPLAINT**

1   for a home loan places their trust in the lender to procure a credible appraisal (i.e.,

2   one done in compliance with applicable legal and professional standards so as to

3   provide an independent, objective and unbiased appraisal of their home's value) and

4   to lend them money on terms appropriate to that independent, objective and unbiased

5   assessment of that home's fair market value.  Traditionally, the borrower and lender

6   shared a common interest in having a property independently and objectively

7   appraised to ensure both that the borrower was not paying too much, and that the

8   property value could support repayment of the loan in the event of a default.

9           21.    Because historically banks retained ownership of the loan and mortgage

10   for the life of the loan, the banks' primary interest was to make sure that the

11   borrower paid off the principal and interest without delay or default.  Whenever a

12   borrower defaulted on a loan it would have a direct financial impact on the lender,

13   i.e. loss or threatened loss of principal and interest on the loan.  If the loan was

14   properly based on the actual fair market value of the property, however, the lender

15   would be able to sell the loan and recoup the outstanding principal.  Accordingly, it

16   was critical that the market value of the property was properly appraised and that the

17   loan amount reflected that value.

18           22.    In recent years the traditional model, whereby banks held a mortgage

19   loan until it was paid off, has changed.  Banks such as WaMu no longer hold all, or

20   even most of their mortgage loans, but instead sell them to investment banks or

21   government sponsored enterprises such as the Federal National Mortgage

22   Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation

23   ("Freddie Mac").  These loans are then pooled together, securitized, and sold to the

24   general public as mortgage backed securities, allowing lenders such as WaMu to

25   profit from the volume and value of loans it has procured.  The larger the aggregate

26   value of the loans, the more profit for the lender.

27           23.    The paradigm shift away from retaining a portfolio of loans towards the

28   sale of mortgage backed securities fundamentally altered a lender's incentive to issue

8

**FIRST AMENDED COMPLAINT**

1 quality loans.  By selling the vast majority of their mortgage loan portfolio to other
2 companies, banks no longer assumed the risk of a bad loan.  The risk of default was
3 passed on to other companies and eventually the investors who bought mortgage
4 backed securities.  More importantly, now bank profit directly correlated to the
5 volume and value of loans generated, not the likelihood that a loan would be repaid.
6 Banks were thus incentivized to offer as many loans at the highest dollar amounts
7 that could be offered with little regard to whether the loan could be paid back.
8     24.    In this environment, there remains little incentive for Wamu to obtain a
9 credible appraisal of a property's real market value and every incentive to offer the
10 highest loan amounts possible, supporting the loans with biased, artificially inflated,
11 false appraisals.
12            **Federal and State Laws Require Appraisal Independence**
13     25.    Despite the new economic paradigm fueling the mortgage lending
14 industry, state and federal regulations require that appraisals be "credible" by being
15 independent, objective, unbiased and performed in compliance with the minimum
16 standards set forth in the Uniform Standards of Professional Appraisal Practice
17 ("USPAP").  These USPAP standards are incorporated into federal law, *see* 12
18 C.F.R. § 34.44, are incorporated into many, if not all, state laws, including
19 California, *see* California Business and Professions Code §11319, and are part of the
20 contractual undertakings expressly stated in the Uniform Residential Appraisal
21 Report, which is the standard form that appraisers use for their appraisal reports and
22 which were used for the WaMu loans that are the subject of this Complaint.  These
23 appraisal reports also expressly contemplated that they would be provided to
24 borrowers and acknowledged that borrowers may rely on the appraisals as part of any
25 mortgage finance transaction between borrowers and WaMu.
26     26.    *USPAP requires appraisers to conduct their appraisals independently:*
27 "An appraiser must perform assignments with impartiality, objectivity, and
28 independence, and without accommodation of personal interests.  In appraisal

9
**FIRST AMENDED COMPLAINT**

1 practice, an appraiser must not perform as an advocate for any party or issue. An

2 appraiser must not accept an assignment that includes the reporting of predetermined

3 opinions and conclusions." USPAP Ethics Rules (Conduct).

4     27.    USPAP requires appraisers to communicate their appraisals honestly:

5 "An appraiser must not communicate assignment results in a misleading or

6 fraudulent manner. An appraiser must not use or communicate a misleading or

7 fraudulent report or knowingly permit an employee or other person to communicate a

8 misleading or fraudulent report." USPAP Ethics Rules (Conduct).

9     28.    USPAP requires that "[i]n developing a real property appraisal, an

10 appraiser must: (a) be aware of, understand, and correctly employ those recognized

11 methods and techniques that are necessary to produce a credible appraisal..."

12 USPAP Standards Rule 1-1.

13     29.    USPAP also requires that "[e]ach written real property appraisal report

14 must contain a signed certification that is similar in content to the following form:

15     I certify that, to the best of my knowledge and belief:

16     -    the statements of fact contained in this report are true and correct.

17     -    the reported analyses, opinions, and conclusions are limited only by the
18         reported assumptions and limiting conditions and are my personal,
           impartial, and unbiased professional analyses, opinions, and
19         conclusions.

20     -    I have no (or the specified) present or prospective interest in the
           property that is the subject of this report and no (or the specified)
21         personal interest with respect to the parties involved.

22     -    I have no bias with respect to the property that is the subject of this
           report or to the parties involved with this assignment.

23     -    my engagement in this assignment was not contingent upon developing
24         or reporting predetermined results.

25     -    my compensation for completing this assignment is not contingent upon
           the development or reporting of a predetermined value or direction in
26         value that favors the cause of the client, the amount of the value
           opinion, the attainment of a stipulated result, or the occurrence of a
27         subsequent event directly related to the intended use of this appraisal.

28     -    my analyses, opinions, and conclusions were developed, and this report
           has been prepared, in conformity with the *Uniform Standards of*

10

FIRST AMENDED COMPLAINT

1         *Professional Appraisal Practice*."

2         The appraisal reports for the WaMu loans that are the subject of this

3 Complaint contained this or a materially identical certification.

4         30.    The same or similar USPAP ethics rules, standards and certifications are

5 required for appraisal reviewers (i.e., appraisers who perform a quality review of

6 another appraiser's report). Such appraisal reviews were performed by EA and LSI

7 appraisal reviewers on the appraisal reports for the WaMu loans that are the subject

8 of this Complaint.

9         31.    Federal law mandates that appraisers involved in federally-regulated

10 transactions operate independently. *See* 12 U.S.C. §§ 3331 *et seq.* The Federal

11 Regulations provide that for independent contractors or "fee" appraisers, the

12 appraiser shall "have no direct or indirect interest, financial or otherwise, in the

13 property or the transaction." 12 C.F.R. 34.45.

14         32.    In 2005, federal regulators, including the Office of Thrift Supervision

15 ("OTS"), published "Frequently Asked Questions on the Appraisal Regulations and

16 the Interagency Statement on Independent Appraisal and Evaluation Functions."

17 With regard to appraisal independence, the statement provides:

18         3.        Who should be considered the loan production staff

19                      for purpose of achieving appraisal independence?

20                      Could loan production staff select an appraiser?

21

22         Answer:    The loan production staff consists of those

23                      responsible for generating loan volume or approving

24                      loans, as well as their subordinates. This would

25                      include any employee whose compensation is based

26                      on loan volume. Employees responsible for credit

27                      administration function or credit risk management are

28                      not considered loan production staff. Loan

11

FIRST AMENDED COMPLAINT

1   production staff should not select appraisers.

2

3   5.          When selecting residential appraiser, may loan

4               production staff use a revolving pre-approved

5               appraiser list, provided the list is not under their

6               control?

7

8   Answer:     Yes, loan production staff may use a revolving board-

9               approved list to select a residential appraiser,

10              provided the development and maintenance of the list

11              is not under their control.  **Staff responsible for the**

12              **development and maintenance of the list should be**

13              **independent of the loan production process.**

14              **Further, there should be periodic interval review**

15              **of the appraiser selection process to ensure that**

16              **appropriate procedures are being followed and**

17              **that controls exist to ensure independence.**

18              (Emphasis added).

19

20                        **LSI and EA**

21      **Conspired With WaMu to Provide Artificial Appraisals**

22      33.    In 2006, responding to these federal regulations, as well as threats of

23   strict federal enforcement of appraiser independence in the mortgage lending

24   industry, WaMu attempted to insulate itself from criticism and federal oversight by

25   entering into an agreement with two purportedly independent Appraisal Management

26   Companies ("AMCs"), First American eAppraiseIT and Lender's Services, Inc.,

27   whereby WaMu would procure appraisals from these two AMCs on behalf of

28   borrowers for all or nearly all WaMu residential loans nationwide, with the cost of

                                    12
                        **FIRST AMENDED COMPLAINT**

1   the appraisals being charged to the borrowers at the time of the closing of their loans.

2   These two AMCs were engaged to oversee the appraisal process and provide a barrier

3   of independence between WaMu (the lender) and those hired to appraise properties

4   on which it would provide mortgage loans.  In theory, these AMCs were to select

5   appraisers independent of WaMu, serve as the sole contact with the appraiser, review

6   the appraiser's report, and communicate the unbiased results and report to WaMu.

7   WaMu would in turn communicate the appraisal results and reports to WaMu

8   borrowers so both the borrower and lender could rely on them in entering the

9   mortgage loans.  Under this arrangement, WaMu would theoretically not be able to

10   improperly influence the appraiser or the ultimate value placed on a property.

11        34.   Both EA and LSI tout themselves as unbiased appraisers who abide by

12   USPAP requirements.  As reported on its website, EA assures consumers that it uses

13   "only the services of appraisers licensed or certified by the state in which a subject

14   property is located" and "customers can be assured that Uniform Standards of

15   Professional Appraisal Practice and Financial Institutions Reform Recovery and

16   Enforcement Act ("FIRREA") guidelines are followed and that each appraisal is

17   audited for compliance."  Likewise, LSI assures consumers that its appraisals

18   "conform to USPAP requirements."

19        35.   In or about June 2006, WaMu retained EA and LSI to administer

20   WaMu's appraisal program.  Since this time, EA and LSI have performed nearly all

21   of WaMu's appraisals.  WaMu borrowers quickly became both EA's and LSI's

22   largest source of revenue.  Since June 2006, EA alone has received over $50 million

23   in fees from borrowers who received loans through WaMu.

24        36.   Prior to being retained by WaMu, EA and LSI used a combination of

25   internal staff and third party appraisers to service Wamu borrowers.  Although the

26   independence of the appraiser is critical to the appraisal process, soon after retaining

27   EA and LSI to administer the WaMu appraisal program, WaMu identified certain

28   appraisers ("Preferred Appraisers") that WaMu requested conduct residential

13

FIRST AMENDED COMPLAINT

1  property appraisals for its loans.  At first these preferred appraisers were simply

2  added to the list of possible appraisers to conduct appraisals for WaMu loans, but

3  eventually WaMu demanded that all of its appraisals be done by the Preferred

4  Appraisers.  Despite USPAP and FIRREA requirements that appraisers be

5  independent, EA and LSI acquiesced to WaMu's demand to staff appraisals with

6  Preferred Appraisers.

7       37.    Additionally, WaMu encouraged EA and LSI to hire former WaMu

8  employees as staff appraisers and appraisal business managers, the latter of which

9  had authority to override and/or revise the values reached by third party appraisers.

10  Both LSI and EA agreed to WaMu's request and took on new employees who

11  formerly worked for WaMu as its appraisers and regional managers.

12       38.    Moreover, pursuant to contractual agreements between WaMu and the

13  AMCs, WaMu had the right to challenge an appraiser's conclusions by requesting a

14  "reconsideration of value" (also known as a "ROV" or "rebuttal") when WaMu did

15  not like the appraised value of a home.  This rebuttal system gave WaMu a direct way

16  to request that EA or LSI reconsider an appraiser's report and to raise the value

17  assigned to a given home.  WaMu frequently used this "reconsideration of value"

18  technique to get EA and LSI to provide higher appraisal values on homes to enable

19  its loan origination staff to close the loans.

20       39.    In addition to WaMu's contractual ability to request a re-appraisal of

21  property valuation, the AMCs' Appraisal Business Managers, hired at the request of

22  WaMu, were given unfettered authority to override the values prescribed by third

23  party appraisers.  According to a complaint filed by the New York Attorney General

24  ("NYAG") against EA, a WaMu executive defined the role of EA's Appraisal

25  Business Managers in terms of value disputes in the following way:

26       ... the four appraisers/reviewers would be directly involved in

27       escalations dealing with: ROVs, Valuation issues where the purchase

28       price and appraised value differ with no reconciliations/justifications by

14

**FIRST AMENDED COMPLAINT**

1     the appraiser, Value cuts which we continue to receive from your third

2     party reviewers (Wholesale), **proactively making a decision to**

3     **override and correct the third party appraiser's value or reviewer's**

4     **value cut**, when considered appropriate and supported...

5     Through these Appraisal Business Managers, WaMu sought to, and did, ensure that

6     home valuations would be sufficient to support the loan WaMu wanted to provide.

7

8               **Guaranteed High Appraisals Were Facilitated Through**

9                  **Instituting WaMu's Preferred Appraiser List**

10        40.    Soon after entering its arrangement with EA and LSI, WaMu's loan

11    origination staff began complaining about the appraisals performed by these AMCs

12    having property values too low for the proposed loans.  WaMu's loan origination

13    staff received commissions based on the value and volume of loans generated.  Their

14    dissatisfaction was based on desire to close loans at amounts higher than the

15    appraisals justified.

16        41.    For example, according to the NYAG's complaint, as early as August 9,

17    2006, WaMu's internal staff admonished EA for not providing appraisals at the

18    values they wanted.  In response to this acknowledged, improper pressure coming

19    from WaMu's loan origination staff who desired the higher appraisals, EA's

20    Executive Vice President capitulated to WaMu's demands by giving its Appraisal

21    Business Managers discretion to raise the value of homes up to $50,000.

22        42.    In order to guarantee WaMu would get the high appraisals it wanted,

23    without having to go through the delay of the rebuttal system, by the winter of 2007,

24    WaMu insisted that EA and LSI use WaMu's "Preferred Appraisers" for all of

25    WaMu's home loan appraisals.  These appraisers were individuals whom WaMu was

26    confident would appraise properties at a high inflated value to ensure WaMu could

27    quickly close the loan at a desired amount, and get as much value from the

28    transaction as possible.

15

1    43.    According to the NYAG's complaint, both EA and LSI were complicit

2    with WaMu's demands to exclusively use Preferred Appraisers. In an email dated

3    February 22, 2007, EA's President explained to senior executives at EA's parent

4    corporation, First American, that:

5        We had a joint call with Wamu and LSI today. The attached document

6        outlines the new appraiser assigning process. In short, we will now

7        assign all WaMu's work to WaMu's "Proven Appraisers" ... We will pay

8        their appraisers whatever they demand. **Performance ratings to retain**

9        **position as a Wamu Proven Appraiser will be based on how many**

10       **come in on value, negating a need for an ROV.** (Emphasis added).

11

12   **WaMu's "Preferred Appraiser List" Included Only Appraisers**

13       **Selected and Controlled by WaMu's Loan Origination Staff**

14   44.    The individuals on the "Preferred Appraiser List" were hand selected by

15   WaMu's loan origination staff. Requests sent to WaMu's AMCs for the addition of

16   specific appraisers to the approved list were often sent by WaMu's loan origination

17   staff themselves. WaMu's Vice President of "Appraisal Oversight" – the division of

18   WaMu that is supposed to be responsible for ensuring that no undue influence is

19   exerted by WaMu's loan origination staff on appraisers – stated in an email to EA

20   regarding one ROV for a "low value," that "[t]his is an example of the issue that has

21   caused sales pushing for a 'proven appraiser' process."

22   45.    In an email dated March 5, 2007, WaMu confirmed the role of its loan

23   origination staff in choosing specific appraisers for WaMu's "Proven Appraiser

24   List:"

25       Proven Appraiser List is being created. This will replace the WaMu

26       preferred list. **The initial list of names will be provided by lending**

27       **with a minimum of two appraisers per area/county.** The list will then be

28       reviewed and approved by the Appraisal Business Oversight Team and

16

**FIRST AMENDED COMPLAINT**

1  will be checked against our most recent ineligible list. Final list will be

2  provided to VMC's [vendor management companies]. Majority of work

3  must be assigned to the appraisers on the Proven Appraiser List on a

4  Priority Basis. (Emphasis added).

5      46.    Any review and approval by WaMu's Appraisal Business Oversight

6  Team was a facade. If an AMC went to WaMu's Appraisal Business Oversight team

7  to discuss the pressure being put on it by WaMu's loan origination staff to provide

8  higher home appraisal values, WaMu responded by telling the AMC to work the

9  issue out directly with the lending staff. WaMu insisted that its loan origination staff

10 have direct contact with appraisers so they could get the appraisals at the value they

11 wanted. Both EA and LSI permitted this direct involvement to occur.

12     47.    Appraisers were also aware that the Proven Appraisers were being

13 selected by WaMu's loan origination staff, and that the only way for an appraiser to

14 get onto the list was by giving WaMu's origination staff the appraisals they sought.

15 According to the NYAG's complaint, in an email sent on April 17, 2007 to EA's staff

16 appraisers to explain why staff appraisers were removed from WaMu's Proven

17 Appraiser List, EA's manager acknowledged WaMu's loan origination staff's

18 involvement in the selection of appraisers to perform WaMu's appraisals:

19     I thought I [sic] pass on my thoughts regarding the recent message that

20     we all received for [sic] Peter last weekend. I will be glad to tell you

21     what I know. I have been told that the lending folks at Wamu and [sic]

22     were unhappy with the AMC's and felt they were not receiving a good

23     level of appraisal work. They therefore decided to construct their own

24     appraisal panel, now known as the wamu proven panel, and instructed

25     the AMC's to utilize appraisers from this panel whenever possible. The

26     end result is that if you are not on this proven panel it is very unlikely

27     you will receive wamu work.

28     48.    The involvement of WaMu's loan origination staff in selecting

17

**FIRST AMENDED COMPLAINT**

1  appraisers to perform WaMu's home loan appraisals was readily apparent to all

2  parties involved and evidenced by emails sent by WaMu's origination staff to EA and

3  LSI requesting the addition of specific appraisers to the Proven Appraiser List. In an

4  email identified in the NYAG's complaint, EA's Executive Vice President informed

5  EA's President that "currently WAMU is controlling the appraisal panel. They are

6  selecting appraisers and calling them 'proven' appraisers. These appraisers are being

7  chosen by their sales force. First American eAppraiseIT (FA eAppraiseIT) is

8  obligated to use these appraisers." The stated reason WaMu insisted on only using

9  its 'proven' appraisers was because EA's appraisers provided WaMu with "low

10 values."

11      49.    In addition to selecting which appraisers were on the Proven Appraiser

12 List, WaMu's loan origination staff was responsible for removing appraisers from the

13 list who did not comply with staff expectations or requests for high appraisals, or

14 who performed desk evaluations of other appraisals and reduced another appraiser's

15 valuation of one of WaMu's customer's properties.

16                  **WaMu's Proven Appraiser List is Illegal**

17      50.    The Code of Federal Regulations provides that for independent

18 contractors or "fee" appraisers, the appraiser shall "have no direct or indirect interest,

19 financial or otherwise, in the property or the transaction." 12 C.F.R. 34.45. In

20 addition, the Uniform Standards of Professional Appraisal Practice ("USPAP") are

21 incorporated into federal law, *see* 12 C.F.R. § 34.44, are incorporated into many, if

22 not all, states' laws, including California, and are expressly incorporated as part of

23 the Uniform Residential Appraisal Report used as the standard form for the appraisal

24 reports for the WaMu loans that are the subject of this Complaint. USPAP requires

25 appraisers and appraisal reviewers to provide and ensure "credible" appraisals by

26 complying with USPAP and other applicable legal and professional requirements,

27 which include, among other things, the requirement that appraisals and appraisal

28 reviews be conducted independently and without bias: "An appraiser must perform

18

**FIRST AMENDED COMPLAINT**

1 assignments with impartiality, objectivity, and independence, and without
2 accommodation of personal interests.  In appraisal practice, an appraiser must not
3 perform as an advocate for any party or issue."  USPAP Ethics Rules (Conduct).
4      51.    Despite the requirement that appraisers be unbiased, independent, and
5 have no direct or indirect interest in the home mortgage transaction, the agreements
6 between WaMu and EA and LSI establishing WaMu's Proven Appraiser List put in
7 place an appraisal system that was anything but unbiased and independent.  Those
8 appraisers willing to provide WaMu with its desired high appraisals for home
9 mortgage transactions were paid an additional 20% WaMu preferred appraisal fee for
10 each appraisal.  Those appraisers unwilling to bend to WaMu's, EA's and LSI's
11 desire to provide WaMu with high appraisals were removed from the Proven
12 Appraiser List by WaMu's loan origination staff, and were thereafter prohibited from
13 providing appraisals for WaMu by EA or LSI.  Appraisers, therefore, had a stake in
14 each and every appraisal they performed for WaMu.  They were rewarded financially
15 for providing high home appraisal values through the 20% premium for each WaMu
16 appraisal performed, and were rewarded by staying on WaMu's "Proven Appraiser
17 List" for future WaMu appraisals.
18      52.    EA and LSI likewise had a financial incentive to provide WaMu with the
19 specific appraisers WaMu wanted.  If either EA or LSI did not agree to provide
20 WaMu with appraisers from WaMu's Proven Appraiser List, they faced losing
21 millions of dollars of business on WaMu's loans.
22      53.    EA recognized that WaMu's Proven Appraiser List was unlawful, but
23 chose to go along with WaMu and continued providing illegal appraisal services in
24 order to reap millions of dollars from unsuspecting borrowers.  According to the
25 NYAG's complaint, in an email from EA's president to senior executives of First
26 American dated April 17, 2007, EA described the relationship with WaMu as
27 follows: "In short, the issuers are using their designated appraisers as mandated by
28 the WaMu production force at 20% gross margin and bypassing our panel.  We view

**FIRST AMENDED COMPLAINT**

1  this as a violation of the OCC, OTS, FDIC and USPAP influencing regulation."
2  (Emphasis added). In support of EA's conclusion that its agreement with WaMu was
3  illegal, EA's Executive Vice President prepared a summary of the guidelines
4  regarding appraiser independence and, compared to WaMu's Proven Appraiser List,
5  concluded the following:

6      Based on our conversations we have had with the WAMU oversight as
7      well as the questions and answers initiated by our competitor LSI, it is
8      our interpretation that the loan production staff has a great deal to
9      do with selecting appraisers. The PAL [Proven Appraiser List] has
10     been selected by the loan production staff and the continued use of
11     these appraisers is being monitored by the loan production staff.
12     For example, on the LSI question #1 "Does WAMU want to be updated
13     transactionally on every order we can not assign to a PAL?", WAMU's
14     answer is "Yes, we need a short sentence in the message log so that we
15     can monitor, – AND most important – lending can see why you didn't
16     assign to a PAL service provider. Not using a PAL appraiser will be an
17     issue so we need to ensure we've covered our bases as to why they're
18     not utilized." This appears to be directly in contradiction to the
19     interagency guidelines unless you have a different interpretation.
20     (Emphasis added).

21     54.    Both EA and LSI knew that what WaMu was doing, by having its loan
22  origination staff personally select appraisers, was illegal, and that by agreeing to
23  provide WaMu with its "Proven Appraisers" EA and LSI were acting as co-
24  conspirators. According to the NYAG's complaint, in an email dated April 17, 2007,
25  EA's Executive Vice President wrote to EA's President and Chief Operating Officer
26  regarding EA's liability on this:

27     OTS and OCC only control lenders. However, there is the legal concern
28     about collusion. For example, let's say it is discovered that a lender

1  (loan officer at a lender) is being collusive with an appraiser that is on

2  OUR (WAMU) panel. That is, our reps and warrants apply. Then we

3  are liable I would say because we have gone along with it.... In addition,

4  I think it will tarnish our reputation in the appraisal community because

5  we are allowing WAMU to pick appraisers based on their loan officers.

6  It makes us look complicit. So [it] may not be actionable

7  legally but would hurt our reputation. So those are two bad things

8  off the cuff. There may be more if we think about it and use

9  creative paranoia.

10      55.    Despite increasing regulatory scrutiny, rather than abandon the Proven

11  Appraiser List, WaMu sought to obfuscate its misfeasance by changing the name of

12  its Proven Appraiser List to the "WaMu Select" panel. WaMu stated that the, "Name

13  change from 'proven appraiser' and/or use of the moniker "PAL" list is discontinued,

14  under direction of the WaMu legal department. We are utilizing a more generic term

15  acceptable w/in regulatory guidelines and industry standards."

16      56.    As a result of WaMu's, EA's and LSI's arrangement, conspiracy and

17  scheme, thousands of WaMu borrowers who collectively paid millions of dollars for

18  "independent, unbiased, and credible" appraisals, failed to receive what they paid for

19  and were damaged thereby.

20                    **PLAINTIFF SIDNEY SCHOLL**

21      57.    Plaintiff, Sidney Scholl, is an individual who is a citizen of the State of

22  California, residing in Sonoma County, California.

23      58.    In October, 2006, Ms. Scholl entered a mortgage loan through WaMu's

24  offices in Sonoma, California to purchase a property located at 194 Terrace, Edmond,

25  Oklahoma. See Exhibit 1 (Settlement Statement).

26      59.    In connection with this loan, WaMu procured for itself and Ms. Scholl

27  an appraisal on the subject property from EA and/or LSI. See Exhibit 2 (appraisal

28  report). The appraisal report, utilizing the Uniform Residential Appraisal form,

21

**FIRST AMENDED COMPLAINT**

1   certifies that it was completed in compliance with the USPAP standards, including

2   being performed in an independent, objective and unbiased manner. *Id.* It also

3   acknowledges that the appraisal was performed for WaMu and EA and provided to

4   them and LSI, and was contemplated to be disclosed to and could be relied upon by

5   the borrower, Ms. Scholl, in her mortgage loan transaction with WaMu. *Id.* Ms.

6   Scholl was charged $255.00 for this appraisal.

7       60.   Ms. Scholl understood she was purchasing a credible, lawful appraisal

8   and had no reason to doubt the certification in the appraisal report and therefore

9   believed that the appraisal done on her property was performed independently,

10  objectively, without undue influence or bias to affect the value of the home, and was

11  otherwise a credible, lawful appraisal done in compliance with applicable law. It was

12  upon this appraisal that Ms. Scholl and WaMu entered her loan.

13      61.   Contrary to Ms. Scholl's belief and unbeknownst to her until shortly

14  before filing this Complaint, the appraisal for the property that was the subject of her

15  WaMu loan was created pursuant to the scheme described in this Complaint and

16  therefore Ms. Scholl did not receive the independent, objective, unbiased and

17  credible appraisal done in compliance with applicable law for which she paid, since

18  no such appraisal was performed by WaMu, EA, LSI or their agents. Ms. Scholl has

19  been damaged thereby.

20                  **PLAINTIFF FELTON A. SPEARS JR.**

21      62.   Plaintiff, Felton A. Spears, Jr., is an individual who is a citizen of the

22  State of California, residing in San Jose, California.

23      63.   In March, 2007, Mr. Spears entered a mortgage loan with WaMu on a

24  property located in San Jose, California. See Exhibit 3 (Closing Statement).

25      64.   In connection with this loan, WaMu procured for itself and Mr. Spears

26  an appraisal on the subject property from EA and/or LSI. It is believed that the

27  appraisal report, utilizing the Uniform Residential Appraisal form, certifies that it

28  was completed in compliance with the USPAP standards, including being performed

**FIRST AMENDED COMPLAINT**

1   in an independent, objective and unbiased manner. *Id.* It is also believed that the

2   appraisal report acknowledges that the appraisal was performed for WaMu and EA

3   and provided to them and LSI, and was contemplated to be disclosed to and could be

4   relied upon by the borrower, Mr. Spears, in his mortgage loan transaction with

5   WaMu. *Id.* Mr. Spears was charged approximately $361.00 for this appraisal.

6        65.    Mr. Spears understood he was purchasing a credible, lawful appraisal

7   and had no reason to doubt the certification in the appraisal report and therefore

8   believed that the appraisal done on his property was performed independently,

9   objectively, without undue influence or bias to affect the value of the home, and was

10   otherwise a credible, lawful appraisal done in compliance with applicable law.

11        66.    Contrary to Mr. Spears' belief and unbeknownst to him until shortly

12   before filing this Complaint, the appraisal for the property that was the subject of his

13   WaMu loan was created pursuant to the scheme described in this Complaint and

14   therefore Mr. Spears did not receive the independent, objective, unbiased and

15   credible appraisal done in compliance with applicable law for which he paid, since no

16   such appraisal was performed by WaMu, EA, LSI or their agents.  Mr. Spears has

17   been damaged thereby.

18               **DEFENDANTS' CONCEALMENT OF ITS SCHEME**

19        67.    WaMu's, EA's and LSI's scheme to conduct and charge Plaintiffs and

20   the Class for appraisals for WaMu home loans that were neither independent,

21   objective, impartial, unbiased, credible or in compliance with USPAP and applicable

22   law was never disclosed to Plaintiffs or any Class member by Defendants.

23        68.    Nor did Defendants give Plaintiffs or the Class any reason to suspect

24   that there were any problems with their appraisals.  Indeed, EA and LSI were

25   recognized, experienced appraisal companies who retained certified appraisers who

26   prepared reports that on the surface appeared to have all of the earmarks of

27   legitimate, independent, objective, unbiased, credible and lawful appraisals.  The

28   appraisal reports even included the appraiser's certification that the report was done

**FIRST AMENDED COMPLAINT**

1  independently, objectively, impartially and in compliance with USPAP standards and
2  applicable law.

3       69.     Moreover, it was traditional that lenders, like WaMu, would obtain
4  appraisals of properties in connection with the home loans and would provide the
5  appraisal reports to borrowers and would charge the borrowers for the reports.  In
6  other words, without disclosure of Defendants' arrangement, Plaintiffs and the Class
7  could not have reasonably suspected that there was anything wrong with the appraisal
8  for which they were each charged.

9       70.     The first time Defendants' scheme was publically revealed was in the
10 Fall of 2007 when the New York Attorney General announced its investigation and
11 complaint against EA for conspiring with WaMu to create false appraisals for WaMu
12 home loans.  It was only upon and after the New York Attorney General's
13 announcement in the Fall of 2007 that Plaintiffs became aware of Defendants'
14 scheme, and that Class members could have become aware of Defendants' scheme.

15                    **CLASS ACTION ALLEGATIONS**

16      71.     Plaintiffs bring this action on behalf of themselves and on behalf of all
17 other members of the Class ("Class"), defined as all persons in the United States who
18 received a home loan with WaMu and received an appraisal performed by EA or LSI.
19 Excluded from the Class are WaMu's, EA's, and LSI's officers, directors and
20 managerial employees, and any of WaMu's, EA's, or LSI's subsidiary or affiliated
21 entities and any of the judges of the Court before which this case is pending.

22      72.     There are thousands of class members who are geographically dispersed
23 throughout the United States, including California.  Therefore, individual joinder of
24 all members of the Class would be impracticable.

25      73.     Common questions of law or fact exist as to all members of the Class.
26 These questions predominate over the questions affecting only individual class
27 members.  These common legal or factual questions include:

28           a.     Whether WaMu entered into an agreement with EA and/or LSI to

**FIRST AMENDED COMPLAINT**

1  procure appraisal services that were not performed by independent, unbiased

2  appraisers as required by law;

3      b.    Whether Defendants had and have policies, practices, or

4  procedures that undermine the possibility that Plaintiffs and the Class received

5  credible appraisals done in compliance with USPAP and applicable law;

6      c.    Whether WaMu, through its agreement with EA and/or LSI, was

7  able to control the appraisal process, by its loan origination personnel or otherwise,

8  by having either EA or LSI provide higher appraised values for homes than EA's or

9  LSI's appraiser had initially concluded or than was the actual fair market value of

10  the home;

11      d.    Whether EA and/or LSI agreed with WaMu to provide WaMu

12  with appraisers who were selected by WaMu to be on WaMu's Proven Appraiser List

13  (or the WaMu Select panel);

14      e.    Whether WaMu controlled and/or manipulated the pool of

15  appraisers on WaMu's Proven Appraiser List;

16      f.    Whether the agreements between WaMu, EA and LSI constitute a

17  civil conspiracy;

18      g.    Whether Defendants' actions described herein violate the Real

19  Estate Settlement Procedures Act, 12 U.S.C. §2607;

20      h.    Whether Defendants' actions described herein violate California's

21  Business and Professions Code, sections 17200 *et seq.*;

22      i.    Whether Defendants' actions violate California's Consumer Legal

23  Remedies Act, California Civil Code sections 1750 *et seq.*;

24      j.    Whether Defendants breached their contracts with Plaintiffs and

25  the Class;

26      k.    The appropriate measure of damages and/or restitution.

27      74.    Plaintiffs' claims are typical of the claims of the Class, in that Plaintiffs

28  took out home mortgage loans with Defendant WaMu and their home appraisals were

25

**FIRST AMENDED COMPLAINT**

1 procured for them by WaMu through EA and/or LSI. Plaintiffs, therefore, are no
2 different in any relevant respect from any other Class member, and the relief sought
3 is common to the Class.

4    75.   Plaintiffs are adequate representatives of the Class because their
5 interests do not conflict with the interests of the class members they seek to represent,
6 and they have retained counsel competent and experienced in conducting complex
7 class action litigation. Plaintiffs and their counsel will adequately protect the
8 interests of the Class.

9    76.   A class action is superior to other available means for the fair and
10 efficient adjudication of this dispute. The damages suffered by each individual class
11 member likely will be relatively small, especially given the burden and expense of
12 individual prosecution of the complex litigation necessitated by Defendants' conduct.
13 Thus, it would be virtually impossible for the class members individually to
14 effectively redress the wrongs done to them. Moreover, even if the class members
15 could afford individual actions, it would still not be preferable to class wide
16 litigation. Individualized actions present the potential for inconsistent or
17 contradictory judgments. By contrast, a class action presents far fewer management
18 difficulties and provides the benefits of single adjudication, economies of scale, and
19 comprehensive supervision by a single court.

20    77.   In the alternative, the Class may be certified because Defendants have
21 acted or refused to act on grounds generally applicable to the Class, thereby making
22 appropriate preliminary and final equitable relief with respect to the Class as a whole.

23             **FIRST CLAIM FOR RELIEF**
24      **(Against Defendants' for Violation of RESPA, 12 U.S.C. §2607)**
25    78.   Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint
26 and restate them as if they were fully written herein.
27    79.   Under 12 U.S.C. §2607(b) of RESPA, "[n]o person shall give and no
28 person shall accept any portion, split, or percentage of any charge made or received

26
**FIRST AMENDED COMPLAINT**

1 | for the rendering of a real estate service in connection with a transaction involving a

2 | federally related mortgage loan other than for services actually performed."

3 |       80.    Plaintiffs and the Class entered federally related mortgage loans with

4 | WaMu on or after June 1, 2006.

5 |       81.    In connection with these WaMu loans, Plaintiffs and the Class were

6 | charged for appraisals WaMu procured for them through EA and LSI that were

7 | certified in the appraisal report to be credible, independent, objective, unbiased, and

8 | performed in compliance with USPAP and applicable law. As described throughout

9 | this Complaint, no such appraisals were performed by Defendants and the appraisals

10 | for which Plaintiffs and the Class were charged by Defendants were neither

11 | independent, objective, unbiased or performed in compliance with USPAP or

12 | applicable law, in violation of 12 U.S.C. §2607(b) of RESPA. As such, the

13 | appraisals Plaintiffs and the Class received from WaMu, EA and LSI were not

14 | appraisals at all in that they could not be relied upon at all since they had not been

15 | performed in compliance with the applicable legal and professional standards. In

16 | other words, the appraisals Plaintiffs and the Class received were not worth the paper

17 | on which they were printed and were otherwise valueless.

18 |       82.    Plaintiffs and the Class never received the appraisal service for which

19 | they were charged by Defendants and have been damaged thereby.

20 |       83.    Under 12 U.S.C. §2607(a) of RESPA, "[n]o person shall give and no

21 | person shall accept any fee, kickback, or thing of value pursuant to any agreement or

22 | understanding, oral or otherwise, that business incident to or part of a real estate

23 | settlement service involving a federally related mortgage loan shall be referred to any

24 | person."

25 |       84.    As described throughout this Complaint, WaMu entered into an

26 | agreement or understanding with EA and LSI specifying that in exchange for WaMu

27 | steering to EA and LSI all, or most, of the appraisal business for WaMu residential

28 | loans, EA and LSI would cooperate with WaMu to ensure that the appraisals

27

**FIRST AMENDED COMPLAINT**

1  established property values sufficient to support the WaMu residential loan amounts

2  regardless of the true market value of the properties that were the subject of the

3  WaMu home loans.

4       85.   To facilitate WaMu's, EA's and LSI's agreement or understanding, EA

5  and LSI agreed to use (for WaMu home loans) appraisers that WaMu's loan

6  origination staff selected to be on its Proven Appraiser List based on these

7  individuals providing WaMu with sufficiently high appraisals to financially benefit

8  both WaMu and its loan origination staff. In return, WaMu demanded that EA and

9  LSI pay appraisers on its Proven Appraiser List a 20% premium over what EA's and

10  LSI's staff or third party appraisers were paid. Those appraisers who did not provide

11  WaMu with the desired high appraisal values were removed from WaMu's Proven

12  Appraiser List by WaMu's loan origination staff, and were thereafter prohibited from

13  providing appraisals for WaMu, and could not get the 20% appraisal premium.

14  Appraisers on WaMu's Proven Appraiser List have a financial interest in each and

15  every WaMu home loan mortgage transaction that they perform appraisal services

16  for, both for the immediate 20% additional fee, as well as future appraisals for WaMu

17  at the additional 20% fee.

18       86.   WaMu benefitted from this arrangement by securing more high value

19  home mortgages that it could bundle and securitize for substantial profits, and EA

20  and LSI benefitted from this arrangement by securing a steady stream of appraisal

21  work on WaMu home loans. Appraisers on WaMu's Proven Appraiser List who

22  were retained by EA and LSI to perform appraisals for WaMu home loans benefitted

23  from this arrangement by receiving a 20% premium in return for their participation in

24  this unlawful arrangement with WaMu, EA and LSI.

25       87.   Plaintiffs and the Class were damaged by Defendants' arrangement in

26  that they never received the appraisal service for which they were charged by

27  Defendants and instead unwittingly received unreliable, biased appraisals that were

28  the basis of the mortgage transactions they entered with WaMu.

**FIRST AMENDED COMPLAINT**

<u>**SECOND CLAIM FOR RELIEF**</u>

**(Against Defendants for Unfair Business Practices in Violation of
Business & Professions Code §§17200, *et seq.*)**

88.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

89.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice. Cal. Bus. & Prof. Code §17200.

90.    A business practice is "unlawful" under the Unfair Competition Law if it is forbidden by law, including state or federal laws or regulations.

91.    The Code of Federal Regulations provides that for independent contractors or "fee" appraisers, the appraiser shall "have no direct or indirect interest, financial or otherwise, in the property or the transaction." 12 C.F.R. 34.45. In addition, the Uniform Standards of Professional Appraisal Practice ("USPAP"), which are incorporated into federal law by 12 C.F.R. § 34.44, and into the state law of many, if not all states, including California (*see* California Business and Professions Code §11319) requires appraisers to perform a credible appraisal done in compliance with USPAP standards, which includes requiring that their appraisals be conducted independently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rules (Conduct).

92.    USPAP also requires that "[e]ach written real property appraisal report must contain a signed certification that is similar in content to the following form:

I certify that, to the best of my knowledge and belief:

-    the statements of fact contained in this report are true and correct.

-    the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

29

**FIRST AMENDED COMPLAINT**

1    - I have no (or the specified) present or prospective interest in the property
2    that is the subject of this report and no (or the specified) personal
      interest with respect to the parties involved.

3    - I have no bias with respect to the property that is the subject of this
4    report or to the parties involved with this assignment.

5    - my engagement in this assignment was not contingent upon developing
      or reporting predetermined results.

6    - my compensation for completing this assignment is not contingent upon
7    the development or reporting of a predetermined value or direction in
      value that favors the cause of the client, the amount of the value opinion,
      the attainment of a stipulated result, or the occurrence of a subsequent
8    event directly related to the intended use of this appraisal.

9    - my analyses, opinions, and conclusions were developed, and this report
      has been prepared, in conformity with the *Uniform Standards of*
10   *Professional Appraisal Practice.*"

11   The appraisal reports for the WaMu loans that are the subject of this Complaint

12   contained this or a materially identical certification.

13       93.    The same or similar USPAP ethics rules, standards and certifications are

14   required for appraisal reviewers (i.e., appraisers who perform a quality review of

15   another appraiser's report). Such appraisal reviews were performed by EA and LSI

16   appraisal reviewers on the appraisal reports for the WaMu loans that are the subject

17   of this Complaint.

18       94.    WaMu, EA, and LSI have and continue to violate the "unlawful" prong

19   of the UCL through the creation and use of WaMu's Proven Appraiser List because

20   appraisers on this list clearly have an interest in each WaMu home appraisal

21   transaction, and are not unbiased and independent. WaMu's loan origination staff

22   selects appraisers to be on its Proven Appraiser List based on these individuals

23   providing WaMu with sufficiently high appraisals to financially benefit both WaMu

24   and its loan origination staff. In return, WaMu demands that EA and LSI pay

25   appraisers on its Proven Appraiser List a 20% premium over what EA's and LSI's

26   staff or third party appraisers are paid. Those appraisers who do not provide WaMu

27   with the desired high appraisal values are removed from WaMu's Proven Appraiser

28   List by WaMu's loan origination staff, and are thereafter prohibited from providing

FIRST AMENDED COMPLAINT

1  appraisals for WaMu, and can not get the 20% appraisal premium.  Appraisers on

2  WaMu's Proven Appraiser List clearly have a financial interest in each and every

3  WaMu home loan mortgage transaction that they perform appraisal services for, both

4  for the immediate 20% additional fee, as well as future appraisals for WaMu at the

5  additional 20% fee.

6      95.    WaMu, EA and LSI conspired to allow WaMu's loan origination staff to

7  select individuals to be on WaMu's Proven Appraiser List even though federal and

8  state law prohibits loan producers from having a direct influence on appraisers.  *See*

9  Office of Thrift Supervision ("OTS"), published "Frequently Asked Questions on the

10  Appraisal Regulations and the Interagency Statement on Independent Appraisal and

11  Evaluation Functions."  WaMu, EA, and LSI also agreed that WaMu's loan

12  origination staff would have control over deciding which individuals would stay on

13  the list in violation of federal laws which prohibit loan producers from having a

14  direct influence on appraisers.

15      96.    Through these agreements, the appraisers on WaMu's Proven Appraiser

16  List retained by EA and LSI for WaMu home loans are not acting independently,

17  objectively and in compliance with USPAP standards as federal and state law

18  mandates.  Rather, WaMu, EA and LSI permit and have agreed to permit WaMu's

19  loan origination staff direct contact with appraisers to influence their ultimate

20  appraisal decision, instead of allowing them to act in an unbiased, independent

21  fashion.  Moreover, the appraisal reports that these appraisers create for WaMu home

22  loans, which are approved by EA and LSI in their review process, are not

23  independent, objective, unbiased, credible or performed in compliance with USPAP

24  standards as required by federal and state law.

25      97.    Additionally, as the violation of any law may serve as the predicate for a

26  violation of the unlawful prong of the Unfair Competition Law, Plaintiffs further

27  allege that Defendants, in violating the Real Estate Settlement Procedures Act, the

28  Consumers Legal Remedies Act, and the common law of contract, violated the Unfair

**FIRST AMENDED COMPLAINT**

1 | Competition Law.

2 |     98.    Because of Defendants' unlawful acts and practices, Defendants injured

3 | Plaintiffs and members of the Class and obtained, and continue to unfairly obtain,

4 | money and property from Plaintiffs and members of the Class. Thus, Plaintiffs

5 | request that this Court cause Defendants to restore this money to Plaintiffs and all

6 | Class members, and to enjoin Defendants from continuing to violate the Unfair

7 | Competition Law as discussed herein. Otherwise, the Class may be irreparably

8 | harmed and/or denied an effective and complete remedy if such an order is not

9 | granted.

10 | **THIRD CLAIM FOR RELIEF**

11 | **(Against Defendants for Unfair Business Practices in Violation of**

12 | **Business & Professions Code §§17200, et seq.)**

13 |     99.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint

14 | and restate them as if they were fully written herein.

15 |     100.   The UCL defines unfair business competition to include any "unlawful,

16 | unfair or fraudulent" act or practice. Cal. Bus. & Prof. Code §17200.

17 |     101.   A business act or practice is "unfair" under the Unfair Competition Law

18 | if the reasons, justifications and motives of the alleged wrongdoer are outweighed by

19 | the gravity of the harm to the alleged victims.

20 |     102.   Defendants have violated, and continue to violate, the "unfair" prong of

21 | the UCL in the following ways:

22 |     a.    Agreeing to allow and allowing WaMu to create its Proven

23 | Appraiser List which is constituted of appraisers WaMu hand selected as being ones

24 | that would provide WaMu with high home appraisal values;

25 |     b.    Agreeing to allow and allowing WaMu to limit its Proven

26 | Appraiser List to only those appraisers WaMu knew would provide it with high home

27 | appraisal values;

28 |     c.    Agreeing to allow and allowing all of WaMu's home appraisals to

32

**FIRST AMENDED COMPLAINT**

1  be performed by only appraisers on WaMu's Proven Appraiser List;

2          d.      Agreeing to allow and allowing WaMu control over the Proven

3  Appraiser List by allowing WaMu, or members of WaMu's loan origination staff, to

4  choose appraisers to be added to the list, or to choose appraiser to be taken off the

5  list;

6          e.      Agreeing to allow and allowing WaMu to dictate a financial

7  incentive for appraisers on WaMu's Proven Appraiser List to inflate appraisals;

8          f.      Agreeing to provide and providing appraisers on WaMu's Proven

9  Appraiser List a financial interest in each appraisal performed for WaMu;

10          g.      Agreeing to provide and providing appraisers on WaMu's Proven

11  Appraiser List a financial interest in remaining on WaMu's Proven Appraiser List by

12  paying these appraisers a higher per-appraisal fee, and by informing them that if they

13  did not provide appraisals at a high enough value for WaMu, they would be removed

14  from the Proven Appraiser List;

15          h.      Agreeing to allow and allowing WaMu the ability to overrule

16  home appraisal values WaMu believed to be too low through the "rebuttal" or

17  "Reconsideration of Value" system;

18          i.      Agreeing to allow and allowing WaMu's loan origination staff to

19  have direct contact with LSI, EA, and their appraisers, with regard to appraisals

20  performed for home loans for WaMu; and,

21          j.      Failing to provide home loan borrowers with unbiased,

22  independent and credible home appraisals performed in compliance with USPAP

23  standards.

24      103.  The gravity of the harm to members of the Class resulting from such

25  unfair acts and practices outweighs any conceivable reasons, justifications and/or

26  motives of Defendants for engaging in such deceptive acts and practices.  By

27  committing the acts and practices alleged above, Defendants have engaged, and

28  continue to be engaged, in unfair business practices within the meaning of California

1  Business and Professions Code §§17200 *et seq.*

2      104.  Through their unfair acts and practices, Defendants have obtained, and

3  continue to unfairly obtain, money from members of the Class.  As such, Plaintiffs

4  request that this Court cause Defendants to restore this money to Plaintiffs and all

5  Class members, and to enjoin Defendants from continuing to violate the Unfair

6  Competition Law as discussed herein.  Otherwise, the Class may be irreparably

7  harmed and/or denied an effective and complete remedy if such an order is not

8  granted.

9                          **FOURTH CLAIM FOR RELIEF**

10        **(Against Defendants for Unfair Business Practices in Violation of**
                  **Business & Professions Code §§17200, *et seq.*)**
11

12      105.  Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint

13  and restate them as if they were fully written herein.

14      106.  The UCL defines unfair business competition to include any "unlawful,

15  unfair or fraudulent" act or practice.  Cal. Bus. & Prof. Code §17200.

16      107.  A business act or practice is "fraudulent" under the Unfair Competition

17  Law if it actually deceives or is likely to deceive members of the consuming public.

18      108.  Defendants' acts and practices as described herein have deceived and/or

19  are likely to deceive members of the consuming public, including Plaintiffs and the

20  Class.  Specifically, Defendants offered to provide Plaintiffs and members of the

21  Class with independent, unbiased and credible home appraisals performed in

22  compliance with USPAP standards, and, in fact, certified such in the appraisal reports

23  prepared for and disseminated to Plaintiffs and the Class by Defendants.  Yet, despite

24  this offer and promise, Defendants' failed to provide independent, unbiased and

25  credible home appraisals in the following ways:

26          a.      Agreeing to allow and allowing WaMu to create its Proven

27  Appraiser List which is constituted of appraisers WaMu hand selected as being ones

28  that would provide WaMu with high home appraisal values;

                                    34

                          **FIRST AMENDED COMPLAINT**

1          b.    Agreeing to allow and allowing WaMu to limit its Proven

2 Appraiser List to only those appraisers WaMu knew would provide it with high home

3 appraisal values;

4          c.    Agreeing to allow and allowing all of WaMu's home appraisals to

5 be performed by only appraisers on WaMu's Proven Appraiser List;

6          d.    Agreeing to allow and allowing WaMu control over the Proven

7 Appraiser List by allowing WaMu, or members of WaMu's loan origination staff, to

8 choose appraisers to be added to the list, or to choose appraiser to be taken off of the

9 list;

10          e.    Agreeing to allow and allowing WaMu to dictate a financial

11 incentive for appraisers on WaMu's Proven Appraiser List;

12          f.    Agreeing to provide and providing appraisers on WaMu's Proven

13 Appraiser List a financial interest in each appraisal performed for WaMu;

14          g.    Agreeing to provide and providing appraisers on WaMu's Proven

15 Appraiser List a financial interest in remaining on WaMu's Proven Appraiser List by

16 paying these appraisers a higher per-appraisal fee, and by informing them that if they

17 did not provide appraisals at a high enough value for WaMu, they would be removed

18 from the Proven Appraiser List;

19          h.    Agreeing to allow and allowing WaMu the ability to overrule

20 home appraisal values WaMu believed to be too low through the "rebuttal" or

21 "Reconsideration of Value" system;

22          i.    Agreeing to allow and allowing WaMu's loan origination staff to

23 have direct contact with LSI, EA, and/or their appraisers, regarding appraisals

24 performed for WaMu home loans; and,

25          j.    Failing to provide home loan borrowers with unbiased,

26 independent and credible home appraisals performed in compliance with USPAP

27 standards.

28        109.    As a result of the conduct described above, Defendants have been, and

**FIRST AMENDED COMPLAINT**

1  will continue to be, unjustly enriched at the expense of Plaintiffs and members of the

2  proposed Class.  Specifically, Defendants have been unjustly enriched by the profits

3  and revenue it has obtained from Plaintiffs and the Class from the home appraisals

4  charged to them when taking out WaMu loans.

5     110.  Because of Defendants' unlawful acts and practices, Defendants injured

6  Plaintiffs and members of the class and obtained, and continue to unfairly obtain,

7  money and property from Plaintiffs and  members of the Class.  Thus, Plaintiffs

8  request that this Court cause Defendants to restore this money to Plaintiffs and all

9  Class members, and to enjoin Defendants from continuing to violate the Unfair

10  Competition Law as discussed herein.  Otherwise, the Class may be irreparably

11  harmed and/or denied an effective and complete remedy if such an order is not

12  granted.

13                        **FIFTH CLAIM FOR RELIEF**

14     **(Against Defendants for Violation of the Consumers Legal Remedies Act,**
                              **California Civil Code §1750, *et seq.*)**
15

16     111.  Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint

17  and restate them as if they were fully written herein.

18     112.  This claim for relief is brought pursuant to the Consumers Legal

19  Remedies Act, California Civil Code §1750, *et seq.* (the "CLRA").

20     113.  Plaintiffs and each member of the proposed Class who took out WaMu

21  home loans, and had appraisals performed by EA and/or LSI are "consumers" within

22  the meaning of *Civil Code* §1761(d).

23     114.  The home appraisals sold by Defendants to Plaintiffs and Class members

24  are "services" within the meaning of *Civil Code* §1761(b).

25     115.  Defendants have violated, and continue to violate, the CLRA in at least

26  the following respects:

27         a.     in violation of *Civil Code* §1770(a)(7), Defendants represented

28  their home appraisal services to be of a particular standard or quality, (i.e., being

                                  36
                        **FIRST AMENDED COMPLAINT**

1  credible, independent, unbiased and performed in compliance with USPAP
2  standards), which they were not.

3      116.  Plaintiffs and the members of the Class request that this Court enjoin
4  Defendants from continuing to engage in the unlawful and deceptive methods, acts
5  and practices alleged above, pursuant to *California Civil Code* §1780(a)(2).  Unless
6  Defendants are permanently enjoined from continuing to engage in such violations of
7  the CLRA, future consumers taking out WaMu home loans will be damaged by their
8  acts and practices in the same way as have Plaintiffs and the members of the
9  proposed Class.

10     117.  Pursuant to *Civil Code* §1782, Plaintiffs notified Defendants in writing
11  of the particular violations of *Civil Code* §1770 and demanded that Defendants
12  rectify the problems associated with its illegal behavior detailed above, which actions
13  are in violation of *Civil Code* §1770.

14     118.  Defendants failed within 30 days of receipt of Plaintiffs notice of
15  demand to give, or agree to give within a reasonable time to the Class, including
16  Plaintiffs, the requested remedies.  Pursuant to *Civil Code* §1782(b) and (d), Plaintiffs
17  file this Amended Complaint and seek the following damages as provided for in *Civil*
18  *Code* §1780:

19          a.     actual damages in excess of the jurisdictional limits of this Court;
20          b.     an order enjoining methods, acts and/or practices, as outlined
21                 above, which are in violation of *Civil Code* §1770;
22          c.     punitive damages;
23          d.     any other relief which the Court deems proper, and;
24          e.     court costs and attorneys' fees.

25                 **SIXTH CLAIM FOR RELIEF**
26                 **(Against Defendants for Breach of Contract)**

27     119.  Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint
28  and restate them as if they were fully written herein.

**FIRST AMENDED COMPLAINT**

1    120.   Plaintiffs and the other Class members on or after June 1, 2006 took out

2  a WaMu home loan with WaMu.  In connection with these WaMu home loans,

3  WaMu, on behalf of and for Plaintiffs and the Class, undertook and agreed to procure

4  and did procure appraisals from EA and/or LSI for the homes that were the subject of

5  Plaintiffs' and Class members' WaMu loans.  EA and/or LSI undertook and agreed to

6  provide and provided Plaintiffs and the Class with these appraisals directly and/or by

7  delivery to them through WaMu.  Plaintiffs and Class members were charged for

8  these appraisals as reflected in their Settlement Statements (HUD-1) or other loan

9  documents.

10    121.   As evidenced by the loan documents that accompanied the home loan

11  transaction, the contracts between Plaintiffs and the Class and Defendants show that

12  the Defendants were to provide a home appraisal which, pursuant to applicable laws

13  and standards as certified in the appraisal reports, would be performed by an

14  independent, objective and unbiased appraiser, and the appraisal reports would be

15  credible, objective, unbiased and independent home appraisal done in compliance

16  with USPAP standards.  Moreover, the appraisal reports Plaintiffs and the Class

17  received from Defendants specifically acknowledge that borrowers (i.e., Plaintiffs

18  and the Class) would receive the appraisal report and may rely upon them in their

19  mortgage financing transaction with the lender (i.e., WaMu).

20    122.   Plaintiffs and the Class performed all conditions of the contracts to be

21  performed by them, except to the extent they were lawfully excused from such

22  performance.  Defendants breached these contracts with Plaintiffs and each Class

23  member by not providing a home appraisal which was performed by an independent,

24  objective and unbiased appraiser, and by not providing appraisal reports that were

25  credible, objective, unbiased, independent, and done in compliance with USPAP

26  standards and applicable law.  In other words, Plaintiffs and the Class were charged

27  for a lawful appraisal which was never performed by Defendants.

28    123.   As a direct and proximate result of the foregoing conduct, Plaintiffs and

**FIRST AMENDED COMPLAINT**

1  the Class members have suffered damages, including economic losses, warranting

2  compensatory damages as well as injunctive relief, declaratory relief and other

3  equitable relief deemed just and proper by the Court.

### SEVENTH CLAIM FOR RELIEF

### (Against Defendants for Quasi-Contract/Unjust Enrichment)

6      124.  Plaintiffs hereby incorporate by reference each and every allegation

7  contained in the preceding paragraphs of this Complaint as if fully rewritten herein.

8  Plaintiffs plead this Count in the alternative.

9      125.  Defendants' engaged in unlawful conduct by representing to Plaintiffs

10  and the members of the Class that their home appraisals provided for the purpose of

11  obtaining a home loan would be performed by an independent and unbiased appraiser

12  and that the appraisal report would be credible, objective and done in compliance

13  with USPAP standards, but actually providing home appraisals performed by a

14  biased, non-independent appraiser and providing appraisal reports that were not

15  credible, objective or done in compliance with USPAP standards as described

16  throughout this Complaint, is unlawful

17      126.  Defendants took monies from Plaintiffs and Class members in exchange

18  for what were supposed to be independent, objective, unbiased, credible appraisals

19  and appraisal reports done in compliance with USPAP standards, but did not provide

20  such appraisals and appraisal reports.  Defendants have been unjustly enriched at the

21  expense of Plaintiffs and the Class members as a result of their unlawful conduct

22  alleged herein, thereby creating a quasi-contractual obligation on Defendants to

23  restore these ill-gotten gains to Plaintiffs and the Class.

24      127.  As a direct and proximate result of Defendants' unjust enrichment,

25  Plaintiffs and Class members are entitled to restitution in an amount to be proved at

26  trial.

27  ///

28  ///

**FIRST AMENDED COMPLAINT**

## PRAYER

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the other members of the Class, request an award and relief as follows:

A.    An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiffs be appointed Class Representative and Plaintiffs' counsel be appointed Class Counsel.

B.    Compensatory damages, except as to Counts Two, Three, Four.

C.    Treble damages as to Count One.

D.    Punitive damages as to Count Five.

E.    Restitution in such amount that Plaintiffs and all Class members paid for their home appraisals, or the profits, charges and fees Defendants obtained from them.

F.    An order enjoining Defendants from maintaining and utilizing WaMu's Proven Appraiser List, or any other mechanism by which WaMu has control over the appraiser selected to perform WaMu's home appraisals or value the appraiser sets for the subject property.

G.    An order awarding Plaintiffs their costs of suit, including pre and post-judgment interest.

H.    An order awarding Plaintiffs' counsel's attorneys' fees.

I.    An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Defendants as a result of the unfair, fraudulent and unlawful conduct alleged herein.

J.    Such other and further relief as may be deemed necessary or appropriate.

///
///
///
///
///

**FIRST AMENDED COMPLAINT**

1                            **DEMAND FOR JURY TRIAL**

2        Plaintiffs hereby demand a trial by jury on all causes of action and issues so

3 triable.

4

5 Dated: March 28, 2008                  LAW OFFICES OF JANET LINDNER
                                         SPIELBERG

6

7                                   By:     /s/

8                                         Janet Lindner Spielberg
                                        12400 Wilshire Boulevard, #400

9                                         Los Angeles, California 90025
                                        Tel.: (310) 392-8801

10                                         Fax: (310) 278-5938

11                                     Joseph N. Kravec, Jr.

12                                     SPECTER SPECTER EVANS
                                          & MANOGUE, P.C.

13                                     The 26th Floor Koppers Building
                                    Pittsburgh, Pennsylvania 15219

14                                     Tel: (412) 642-2300
                                    Fax: (412) 642-2309

15                                     Ira Spiro
                                    SPIRO MOSS BARNESS LLP

16                                     11377 West Olympic Blvd., Fifth Floor
                                    Los Angeles, CA 90064-1683

17                                     Tel: (310) 235-2468
                                    Fax: (310) 235-2456

18

19                                     Michael D. Braun
                                    BRAUN LAW GROUP, P.C.

20                                     12304 Santa Monica Blvd., Suite 109
                                    Los Angeles, CA 90025

21                                     Tel: (310) 442-7755
                                    Fax: (310) 442-7756

22

23                                     *Attorneys for Plaintiffs*

24

25

26

27

28

                                    41

# EXHIBIT 3

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

|  |  |  |
|---|---|---|
| IN RE WASHINGTON MUTUAL, INC.<br>SECURITIES, DERIVATIVE AND<br>"ERISA" LITIGATION | )<br>)<br>)<br>)<br>) | **MDL Docket No.  1919** |

## NOTICE OF TAG-ALONG ACTION

1.      Pursuant to 28 U.S.C. § 1407 and Rules 7.2, 7.4 and 7.5 of the Rules of

Procedure of the Judicial Panel on Multidistrict Litigation (the "MDL Rules"), Defendant

Washington Mutual, Inc. ("WaMu") hereby notifies the Judicial Panel on Multidistrict Litigation

(the "Panel") of the pendency of the following tag-along action to the above-captioned matter:

| | |
|---|---|
| **Plaintiffs:** | Felton A. Spears, Jr. and Sidney Scholl, on behalf of themselves and all others similarly situated. |
| **Defendants:** | Washington Mutual, Inc.; First American eAppraiseIT; and Lender's Services, Inc. |
| **District:** | Northern District of California |
| **Case No.:** | 08-cv-00868-HRL |
| **Judge:** | Judge Howard R. Lloyd, U.S. Magistrate Judge |

2.      On November 28, 2007, WaMu moved this Panel, pursuant to 28 U.S.C.

§ 1407 and Rule 7.2 of the MDL Rules, for an Order transferring seven similar actions, listed in

the Schedule of Actions, to the Honorable Marsha J. Pechman, United States District Judge for

the Western District of Washington, for coordinated or consolidated pretrial proceedings (the "Motion"). Oral argument with respect to WaMu's Motion was held before the Panel in Phoenix, Arizona during the January 30, 2008 Hearing Session.

3.    By Notice of Tag-Along Action dated December 5, 2007, WaMu promptly notified the Panel of the following tag-along action: *Alexander v. Washington Mutual, Inc., et al.*, No. C07-1906 RSM (W.D. Wash., filed November 29, 2007).

4.    By Notice of Tag-Along Action dated December 12, 2007, WaMu promptly notified the Panel of the following tag-along action: *Mitchell v. Washington Mutual, Inc., et al.*, No. C07-1938 MJP (W.D. Wash., filed December 5, 2007).

5.    By Notice of Tag-Along Action dated December 21, 2007, WaMu promptly notified the Panel of the following tag-along action: *Ware v. Washington Mutual, Inc., et al.*, No. C07-1997 RAJ (W.D. Wash., filed December 13, 2007).

6.    By Notice of Tag-Along Action dated January 3, 2008, WaMu promptly notified the Panel of the following tag-along action: *Rosenblatt v. Washington Mutual, Inc., et al.*, No. C07-2025 RSM (W.D. Wash., filed December 18, 2007).

7.    By Notice of Tag-Along Action dated January 3, 2008, WaMu promptly notified the Panel of the following tag-along action: *Garber v. Washington Mutual, Inc., et al.*, No. 07 Civ. 11422 (S.D.N.Y., filed December 20, 2007).

8.    By Notice of Tag-Along Action dated January 3, 2008, WaMu promptly notified the Panel of the following tag-along action: *McDonald v. Washington Mutual, Inc., et al.*, No. C07-2055 MJP (W.D. Wash., filed December 21, 2007).

9.     By Notice of Tag-Along Action dated January 3, 2008, WaMu promptly notified the Panel of the following tag-along action: *Marra v. Washington Mutual, Inc., et al.,* No. C07-2076 MJP (W.D. Wash., filed December 27, 2007).

10.     By Notice of Tag-Along Action dated January 9, 2008, WaMu promptly notified the Panel of the following tag-along action: *Slater v. Washington Mutual, Inc., et al.,* No. C08-0005 RAJ (W.D. Wash., filed January 4, 2008).

11.     By Notice of Tag-Along Action dated January 25, 2008, WaMu promptly notified the Panel of the following tag-along action: *Procida v. Killinger, et al.,* No. 08 CV 00565 (S.D.N.Y., filed January 23, 2008).

12.     By Notice of Tag-Along Action dated January 25, 2008, WaMu promptly notified the Panel of the following tag-along action: *Ryan v. Killinger, et al.,* No. C08-0095 TSZ (W.D. Wash., filed January 18, 2008).

13.     By Notice of Tag-Along Action dated February 8, 2008, WaMu promptly notified the Panel of the following tag-along action: *Wertz v. Washington Mutual Bank, et al.,* No. 2:08-cv-00317-GEB-KJM (E.D. Cal., filed February 8, 2008).[1]

14.     Plaintiffs Felton A. Spears, Jr. and Sidney Scholl filed a complaint, suing on behalf of themselves and all others similarly situated, on or about February 8, 2008 in the United States District Court for the Northern District of California (the "Spears Action"). A courtesy copy of the complaint in this action is included with this Notice of Tag-Along Action.

---

[1]     Although the *Wertz* action was originally filed in the Superior Court of California, Sacramento County, on January 9, 2008, Defendants timely removed the *Wertz* action to the United States District Court for the Eastern District of California on February 8, 2008.

15.    Like the other eighteen actions pending in federal district court, the Spears Action asserts claims arising from an alleged conspiracy to inflate appraisal valuations on loans WaMu originated.

16.    The complaint in the Spears Action relies on a complaint filed on November 1, 2007 by the New York Attorney General against First American Corporation and First American eAppraiseIT, which alleges that those two companies conspired to inflate appraisal values of property for which WaMu originated mortgage loans.  Sixteen of the eighteen other actions subject to WaMu's motion also explicitly premise their complaints on the allegations in the New York Attorney General's complaint,[2] and all of the complaints in the eighteen actions were filed after the filing of the New York Attorney General's complaint and pertain to the quality of WaMu's mortgage portfolio.

17.    The allegations in the Spears Action, along with the eighteen other actions currently the subject of WaMu's Motion pending before the Panel, raise similar claims and will involve similar complex and disputed issues of law and fact.

18.    For the reasons more fully discussed in WaMu's pending Motion, its supporting Brief, and its Reply Brief, the transfer and coordination or consolidation of these actions, including the Spears Action, to the Western District of Washington would conserve valuable judicial resources, prevent the risk of potentially conflicting or inconsistent judicial decisions, and serve the convenience of the parties, the witnesses, the judiciary and counsel in accordance with 28 U.S.C. § 1407.  Absent pretrial coordination or consolidation, there would be duplicative and unnecessary pretrial proceedings and discovery that would burden the parties, the witnesses, the judiciary and counsel.

---

[2]    The complaints in the *Mitchell* and *Rosenblatt* actions focus instead on WaMu's allegedly risky mortgage portfolio, and WaMu's allegedly "blind focus" on building loan volume.

19.    Accordingly, WaMu respectfully requests that the Panel transfer the Spears Action, along with the eighteen other actions currently the subject of WaMu's Motion and any other tag-along actions that may be filed, to the Honorable Marsha J. Pechman, United States District Judge for the Western District of Washington, for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.

Dated: February 15, 2008

Respectfully submitted,

SIMPSON THACHER & BARTLETT LLP

By: _____
      Barry R. Ostrager
      Mary Kay Vyskocil
      David J. Woll
425 Lexington Avenue
New York, NY  10017
(212) 455-2000
(212) 455-2502 (facsimile)
bostrager@stblaw.com

**Counsel for Defendants Washington Mutual, Inc., Washington Mutual Bank, and Susan Richter; and for the limited purpose of participating in proceedings before the Panel, Defendants Kerry K. Killinger; David C. Schneider; Thomas W. Casey; Stephen J. Rotella; John F. Woods; James B. Corcoran; and Daryl D. David.**

# EXHIBIT 4

### BEFORE THE JUDICIAL PANEL
### ON MULTIDISTRICT LITIGATION

|   |   |
|---|---|
| IN RE WASHINGTON MUTUAL, INC.<br>SECURITIES, DERIVATIVE AND<br>"ERISA" LITIGATION | )<br>)<br>)<br>)<br>) |

MDL Docket No. _____

### MOTION OF WASHINGTON MUTUAL FOR TRANSFER OF ACTIONS TO THE WESTERN DISTRICT OF WASHINGTON PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS

Defendant Washington Mutual, Inc. ("WaMu") respectfully moves this Panel, pursuant to 28 U.S.C. § 1407 and Rule 7.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, for an Order transferring seven similar actions, listed in the attached Schedule of Actions, to the Honorable Marsha J. Pechman, United States District Judge for the Western District of Washington, for coordinated or consolidated pretrial proceedings.

In support of the transfer and coordination or consolidation of these actions, and as more fully articulated in the accompanying supporting Brief, WaMu states:

1.     To date, seven separate actions (the "WaMu Cases") have been brought against WaMu and certain individual defendants pending in the United States District Courts for the Western District of Washington and the Southern District of New York.

2.     WaMu is a defendant in each of the WaMu Cases.

3.     Each of the individual defendants in the WaMu Cases is an officer or director of WaMu, or both.

4.     Plaintiffs in three of the WaMu Cases purport to represent nationwide classes of investors in WaMu's publicly traded securities.

5.     The three putative class action complaints each assert claims under the federal securities laws and allege that defendants knowingly or recklessly published a series of materially false and misleading statements or failed to disclose material information related to (1) an alleged conspiracy between WaMu and an appraisal vendor, eAppraiseIT, related to appraisal valuations on loans originated by WaMu; (2) WaMu's exposure to loan-related losses, and its reserving and provisioning for those losses, in general and in light of that alleged conspiracy; and (3) various aspects of WaMu's performance and accounting in light of the alleged conspiracy and of changing conditions in the home lending and credit markets.

6.     Although the alleged WaMu-eAppraiseIT conspiracy is the subject of a lawsuit filed by the New York Attorney General, neither WaMu nor any of the individual defendants is named in the New York Attorney General's complaint.

7.     Plaintiffs in two of the WaMu Cases seek to sue derivatively on behalf of WaMu itself.

8.     The two derivative action complaints each assert state law claims for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment. These claims are based largely on the theory that defendants misrepresented WaMu's exposure to risk in the home loan market and also misrepresented or failed to disclose information revealed in the New York Attorney General's complaint.

9.      Plaintiffs in two of the WaMu Cases purport to represent nationwide classes of participants or beneficiaries of the WaMu Savings Plan, a defined contribution retirement plan, under the Employee Retirement Income Security Act ("ERISA").

10.     The two putative ERISA class actions each assert claims under ERISA for breach of fiduciary duty.  The claims are based largely on the theory that the investment of WaMu Savings Plan funds in WaMu stock was imprudent because WaMu was over-reliant on the subprime mortgage market and was manipulating the appraisal process, as alleged in the New York Attorney General's complaint.

11.     WaMu is incorporated under the laws of the State of Washington.

12.     WaMu's principal place of business and headquarters are located in Seattle, Washington.

13.     Seattle, Washington is located in the Western District of Washington.

14.     WaMu generally prepares and releases its Securities and Exchange Commission filings from its Seattle, Washington headquarters.

15.     WaMu generally prepares and releases its press releases from its Seattle, Washington headquarters.

16.     Defendants Kerry K. Killinger, Stephen J. Rotella, Thomas W. Casey, David C. Schneider, James B. Corcoran, John F. Woods, and Daryl D. David are executives of WaMu, work at WaMu's headquarters in Seattle and live in or near the Seattle, Washington metropolitan area.

17.     It is WaMu's belief at this early stage of litigation that virtually all of the relevant documents and most of the witnesses are located in or near the Western District of Washington.

18.    The allegations of all seven WaMu Cases raise substantially similar claims against an overlapping group of defendants, and all seven actions will involve similar complex and disputed issues of law and fact.

19.    Common issues that will need to be determined in the pending actions include, but are not limited to, whether the largely overlapping allegations in each of the seven WaMu Cases about WaMu's loan loss reserves, its disclosures, and its dealings with outside appraisal firms are true, and if true, whether these facts are material, and if material, whether defendants knowingly or recklessly misrepresented or failed to disclose these facts.

20.    The consolidation and transfer of the WaMu Cases would serve the convenience of the parties, the witnesses, the judiciary and counsel in accordance with 28 U.S.C. § 1407.

21.    Absent pretrial coordination or consolidation, the possibility of inconsistent pretrial rulings exists, especially on motions to dismiss and motions for summary judgment, as well as with regard to class certification and the proper scope and extent of discovery.

22.    Neither motion practice nor discovery has commenced in any of the WaMu Cases.

23.    Neither of the district courts in which the WaMu cases were filed has invested substantial judicial resources in these matters that would be wasted should this Panel transfer the WaMu Cases to the Western District of Washington.

24.    Five out of the seven WaMu Cases are currently pending in the Western District of Washington.

25.    An additional derivative action, *Catholic Medical Mission v. Killinger, et al.*, No 07-2-36548-6, has been filed in the Superior Court of the State of Washington, King County, making substantially similar allegations to the WaMu Cases. As result, discovery could be coordinated between the federal and state court actions in Washington, should the need arise.

26.    The Western District of Washington has a less congested docket, particularly with regard to multidistrict litigation. As of September 30, 2006, the median time between filing and trial in the Western District of Washington was six months shorter than in the Southern District of New York. In addition, as of November 6, 2007, the Southern District of New York has thirty-eight multidistrict litigation actions pending on its dockets, compared to only one multidistrict litigation in the Western District of Washington.

27.    The WaMu cases should be transferred to the Honorable Marsha J. Pechman, United States District Judge for the Western District of Washington, who is currently presiding over the first action filed in the Western District of Washington. Judge Pechman has experience presiding over complex multidistrict litigation and thus is the most logical choice.

28.    Transfer of these actions to the Western District of Washington would conserve valuable judicial resources and would prevent potentially conflicting judicial decisions.

WHEREFORE, for the reasons stated herein and in the accompanying Brief in

Support of WaMu's Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407, WaMu

respectfully requests that the Panel issue an Order transferring all seven actions listed in the

attached Schedule of Actions, as well as all subsequently filed related actions, to the Honorable

Marsha J. Pechman, United States District Judge for the Western District of Washington, for

coordinated or consolidated pretrial proceedings.


Date:    November 28, 2007            Respectfully submitted,

Barry R. Ostrager
Mary Kay Vyskocil
David J. Woll
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017-3954
(212) 455-2700
(212) 455-2502 (fax)
Counsel for Washington Mutual, Inc.

### BEFORE THE JUDICIAL PANEL
### ON MULTIDISTRICT LITIGATION

IN RE WASHINGTON MUTUAL, INC. )
SECURITIES, DERIVATIVE AND )  MDL Docket No. _____
"ERISA" LITIGATION )
 )
 )

### BRIEF IN SUPPORT OF WASHINGTON MUTUAL'S MOTION
### FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407

Pursuant to 28 U.S.C. § 1407 and Rule 7.2 of the Rules of Procedure of the

Judicial Panel on Multidistrict Litigation, defendant Washington Mutual, Inc. ("WaMu")

respectfully submits this Brief in support of its Motion to transfer those actions listed in the

Schedule of Actions (the "WaMu Cases") to the Honorable Marsha J. Pechman, United States

District Judge for the Western District of Washington, for coordinated or consolidated pretrial

proceedings. Most of the defendants, virtually all of the relevant documents and witnesses, and

five of the seven actions are located in the Western District of Washington, making it the forum

that will best promote the just and efficient centralized pretrial proceedings of the WaMu Cases.

## PRELIMINARY STATEMENT

Three of the WaMu cases assert claims under the federal securities laws and allege that defendants knowingly or recklessly published a series of materially false and misleading statements or failed to disclose material information related to (1) an alleged conspiracy between WaMu and an appraisal vendor, eAppraiseIT, related to appraisal valuations on loans originated by WaMu; (2) WaMu's exposure to loan-related losses, and its reserving and provisioning for those losses, in general and in light of that alleged conspiracy; and (3) various aspects of WaMu's performance and accounting in light of the alleged conspiracy and of changing conditions in the home lending and credit markets. Two of the WaMu Cases are derivative actions, each asserting state law claims for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment. These claims are based largely on the theory that defendants misrepresented WaMu's exposure to risk in the subprime home loan market and also misrepresented or failed to disclose information related to the alleged conspiracy. All seven WaMu Cases plainly arise out of the same set of operative facts, and coordination or consolidation for pretrial proceedings would serve the convenience of the parties and witnesses and promote the just and efficient conduct of these actions.

Coordination or consolidation of the WaMu Cases will promote the efficient administration of pretrial motions, discovery and related proceedings and, in the process, further the convenience of the judiciary, parties, witnesses and counsel. The combination of a complex core of facts involving WaMu's management of and disclosures related to potential loan losses in its home loans business and also involving the dealings between WaMu and outside appraisal firms, and claims requiring significant motion practice and possibly extensive discovery, militates strongly in favor of coordination or consolidation. Many of the WaMu Cases involve common legal questions that will be raised at the motion to dismiss stage, such as, *inter alia*,

2

whether the complaints state claims upon which relief can be granted, or whether plaintiffs in the derivative actions were excused from making a demand on WaMu's Board of Directors. Coordination or consolidation will avoid inconsistent determinations regarding these, as well as other, issues of law, and will avoid duplicative pretrial proceedings that would burden judicial resources. WaMu expects that plaintiffs in each of the pending cases will seek to depose many of the same witnesses, including WaMu's officers, directors and employees. Coordination or consolidation will help to eliminate or reduce the possibility for duplicative discovery, potentially inconsistent rulings, and the cost and inconvenience multiple actions entails.

Finally, WaMu and most individual defendants are located in Washington. WaMu is a Washington corporation with its corporate headquarters in Seattle, Washington and most of the individual defendants reside in or near the Seattle metropolitan area. Virtually all of the relevant witnesses and documents are likely to be located in Washington. In addition to the five (out of the seven) actions currently pending Western District of Washington, there is also a derivative action pending in Washington state court. Thus, discovery could be coordinated between the federal and state actions, should the need arise. Notably, the median time between filing and trial is shorter in the Western District of Washington than in the Southern District of New York, where the remaining two WaMu Cases are pending, and the Western District of Washington has fewer pending civil actions and multidistrict litigations on its docket.

Accordingly, these cases (and any tag-along or related actions) should be coordinated or consolidated before the Honorable Marsha J. Pechman in the Western District of Washington. Judge Pechman, who is currently presiding over the first action commenced in the Western District of Washington, has extensive judicial experience and is the most logical choice to coordinate pretrial proceedings. For the reasons set forth below, the WaMu Cases therefore should be transferred pursuant to 28 U.S.C. § 1407 to the United States District Court for the

3

Western District of Washington, Seattle Courthouse, and assigned to the Honorable Marsha J. Pechman.[1]

## BACKGROUND OF THE LITIGATION[2]

### INTRODUCTION:

WaMu is incorporated under the laws of the State of Washington and has its headquarters and principal place of business in Seattle, Washington, which is in the Western District of Washington. WaMu is a bank holding company that owns is the largest savings and loan in the nation, which has consumer and small business banking operations in major U.S. markets. *See* Koesterer Compl. ¶¶ 2, 13; Abrams Compl. ¶¶ 18, 25; Nelson Compl. ¶ 7; Sneva Compl. ¶¶ 1, 2; Harrison Compl. ¶¶ 1, 2.; Bushansky Compl. ¶ 16; Bussey Compl. ¶ 15.[3]

Because WaMu's corporate headquarters are in Seattle, Washington, WaMu generally prepares and releases its Securities Exchange and Commission ("SEC") filings and its press releases from Seattle. Accordingly, it would appear that many relevant documents and witnesses are likely to be found in or near the Seattle, Washington metropolitan area.

Defendants Kerry K. Killinger, Stephen J. Rotella, Thomas W. Casey, David C. Schneider, James B. Corcoran, John F. Woods, and Daryl D. David are executives of WaMu.

---

[1]    WaMu moves without prejudice to any defense to the above-captioned complaints that may be raised in a responsive pleading or otherwise.

[2]    The facts recited herein for which citation is made to the complaints are assumed to be true only for purposes of this motion, unless otherwise indicated.

[3]    "Koesterer Compl." refers to the complaint filed in *Koesterer v. Washington Mutual, Inc., et al.*, No. 07 Civ. 9801 (S.D.N.Y.); "Abrams Compl." refers to the complaint filed in *Abrams and Raffe v. Washington Mutual, Inc., et al.*, No. 07 Civ. 9806 (S.D.N.Y.); "Nelson Compl." refers to the complaint filed in *Nelson v. Woods, et al.*, No. C07-1809 (W.D. Wash); "Sneva Compl." refers to the complaint filed in *Sneva v. Killinger, et al.*, No. C07-1826 (W.D. Wash); "Harrison Compl." refers to the complaint filed in *Harrison v. Killinger, et al.*, No. C07-1827 (W.D. Wash); "Bushansky Compl." refers to the complaint filed in *Bushansky v. Washington Mutual, Inc., et al.*, No. C07-1874; "Bussey Compl." refers to the complaint filed in *Bussey v. Washington Mutual, Inc., et al.*, No. C07-1879.

4

*See* Koesterer Compl. ¶¶ 15-17; Abrams Compl. ¶¶ 19-21; Nelson Compl. ¶¶ 8-12; Sneva Compl. ¶¶ 14-18; Harrison Compl. ¶¶ 14-18; Bussey Compl. ¶ 35 . Messrs. Killinger, Rotella, Casey, Schneider, Corcoran, Woods and David work at WaMu's headquarters in Seattle, Washington. Moreover, these individual defendants also live with their families in or near the Seattle, Washington metropolitan area.

All other individual defendants are members of WaMu's board of directors. Anne V. Farrell, Mary E. Pugh, Michael K Murphy, William G. Reed, Jr., Orin C. Smith and James H. Stever are citizens of Washington. Stephen E. Frank and Phillip D. Matthews are citizens of California. Thomas C. Leppert is a citizen of Texas. Charles M. Lillis is a citizen of Colorado. Regina T. Montoya is a citizen of Washington, D.C. *See* Sneva Compl. ¶¶ 20-30; Harrison Compl. ¶¶ 20-30; Bushansky Compl. ¶ 17; Bussey Compl. ¶¶ 28-32.

## ALLEGATIONS AGAINST DEFENDANTS:

Two putative class actions alleging violations of securities laws were filed in the Southern District of New York, asserting that WaMu and the individual defendants violated the federal securities laws by allegedly making false and misleading statements and omissions concerning, among other things, the alleged conspiracy, loan-related losses, and WaMu's performance and accounting practices in light of those allegations. These actions were quickly followed by an additional putative class action complaint filed in the Western District of Washington, making the same allegations and claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and 17 C.F.R. § 240.10b-5. On November 13, two nearly identical complaints were filed in the Western District of Washington asserting derivative claims on behalf of WaMu. Those complaints allege that individual defendants' failure to disclose the risks of WaMu's mortgage lending business violated the individual defendants' fiduciary duties, wasted corporate assets, constituted gross mismanagement and abuse of control, and resulted in

5

unjust enrichment of the individual defendants. A third derivative action was filed in the

Superior Court of the State of Washington, King County,[4] asserting substantially the same facts

and the same claims as the derivative actions filed in federal district court. Finally, two putative

class actions were filed in the Western District of Washington alleging that defendants breached

fiduciary duties under the Employee Retirement Income Security Act ("ERISA") by investing

funds from the WaMu Savings Plan in WaMu stock. The complaints allege this investment was

imprudent because WaMu stock was an unduly risky investment due to WaMu's alleged

manipulation of the appraisal process. *See* Koesterer Compl. ¶¶ 3–8; Abrams Compl. ¶¶ 3–13;

Nelson Compl. ¶¶ 73–77; Sneva Compl. ¶¶ 3–9; Harrison Compl. ¶¶ 3–9; Bushansky Compl. ¶¶

4–7, 107-113; Bussey Compl. ¶¶ 5–9, 108-123.

### BRIEF SUMMARY OF WAMU CASES:

The following actions are currently pending in federal district courts:[5]

### WaMu Cases in the Western District of Washington

- *Nelson v. Woods, et al.*, No. C07-1809 (W.D. Wash): This action was filed on November 7, 2007 in federal district court in the Western District of Washington. Nelson Compl. at p. 1. Mark Nelson brought claims on behalf of a putative class of purchasers of WaMu common stock between April 18, 2006 and November 1, 2007 under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and 17 C.F.R. § 240.10b-5. *See* Nelson Compl. ¶¶ 1, 102-116. The complaint alleges that defendants knowingly or recklessly published a series of materially false and misleading statements or failed to disclose material information related to the alleged conspiracy, loan-related losses, and WaMu's performance and accounting practices in light of those allegations. *See* Nelson Compl. ¶¶ 1, 73-77. This action was assigned to Judge Marsha J. Pechman. Thus far, no answers or motions have been filed.

- *Sneva v. Killinger, et al.*, No. C07-1826 (W.D. Wash): This action was filed on November 13, 2007 in federal district court in the Western District of Washington. Sneva Compl. at p. 1. Tom Sneva brought derivative claims against several of WaMu's officers and directors alleging state law claims of breach of fiduciary duty, abuse of control, gross

---

[4]    The Seattle courthouse of the Western District of Washington is also located in King County.

[5]    It is anticipated that other similar actions may be filed against the defendants in the future.

mismanagement, waste of corporate assets and unjust enrichment. Sneva Compl. ¶¶ 107-133. The complaint alleges that defendants misrepresented WaMu's exposure to risk in the home loan market and misrepresented or failed to disclose information related to the alleged conspiracy, loan-related losses, and WaMu's performance and accounting practices in light of those allegations. *See* Sneva Compl. ¶¶ 4-9, 73-77. This action was assigned to Judge Ricardo S. Martinez. Thus far, no answers or motions have been filed.

- *Harrison v. Killinger, et al.*, No. C07-1827 (W.D. Wash): This action was filed on November 13, 2007 in federal district court in the Western District of Washington. Harrison Compl. at 1. Lynne Harrison brought derivative claims against several of WaMu's officers and directors alleging state law claims of breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment. Harrison Compl. ¶¶ 107-133. The complaint alleges that defendants misrepresented WaMu's exposure to risk in the home loan market and misrepresented or failed to disclose information related to the alleged conspiracy, loan-related losses, and WaMu's performance and accounting practices in light of those allegations. *See* Harrison Compl. ¶¶ 4-9, 73-77. This action was assigned to Judge John C. Coughenour. Thus far, no answers or motions have been filed. Notably, this complaint is virtually identical to the Sneva Complaint.

- *Bushansky v. Washington Mutual, Inc. et al.*, No. C07-1874 (W.D. Wash): This action was filed on November 20, 2007 in federal district court in the Western District of Washington. Bushansky Compl. at p. 1. Gregory Bushansky brought claims on behalf of a putative class of participants or beneficiaries in the WaMu Savings Plan, for breach of fiduciary duty under "ERISA." Bushansky Compl. ¶ 4. The complaint alleges that defendants imprudently allowed the WaMu Savings Plan to invest in WaMu common stock, as this stock was an unduly risky investment due to WaMu's over reliance on the subprime lending market and its alleged manipulation of the loan origination process. Bushansky Compl. ¶¶ 4-7, 107-113. This action was assigned to Judge Richard A. Jones. Thus far, no answers or motions have been filed.

- *Bussey v. Washington Mutual, Inc., et al.*, No. C07-1879 (W.D. Wash): This action was filed on November 21, 2007 in federal district court in the Western District of Washington. Bussey Compl. at p. 1. Vincent Bussey brought claims on behalf of a putative class of participants or beneficiaries in the WaMu Savings Plan, for breach of fiduciary duty under "ERISA." Bussey Compl. ¶ 4. The complaint alleges that defendants imprudently allowed the WaMu Savings Plan to invest in WaMu common stock, as this stock was an unduly risky investment, that defendants had a conflict of interest because their compensation was tied to WaMu's stock price, and that defendants failed to provide complete and accurate information to WaMu Savings Plan participants. Bussey Compl. ¶¶ 5-7. This action was assigned to Chief Judge Robert S. Lasnik. Thus far, no answers or motions have been filed.

## WaMu Cases in the Southern District of New York

- *Koestarer v. Washington Mutual, Inc., et al.*, No. 07 Civ. 9801 (S.D.N.Y.): This action was filed on November 5, 2007 in federal district court in the Southern District of New York.

7

Koesterer Compl. at 1. Dennis Koesterer brought claims on behalf of a putative class of purchasers of WaMu common stock between July 19, 2006 and October 31, 2007 under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and 17 C.F.R. § 240.10b-5. *See* Koesterer Compl. ¶¶ 1, 81-98. The complaint alleges that defendants knowingly or recklessly published a series of materially false and misleading statements or failed to disclose material information related to the alleged conspiracy, loan-related losses, and WaMu's performance and accounting practices in light of those allegations. *See* Koesterer Compl. ¶¶ 3-8. This action was assigned to Judge Colleen McMahon. Thus far, no answers or motions have been filed.

- *Abrams and Roffe v. Washington Mutual, Inc., et al.*, No. 07 Civ. 9806 (S.D.N.Y.): This action was filed on November 5, 2007 in federal district court in the Southern District of New York. Abrams Compl. at 1. Joel Abrams and Brian Roffe brought claims on behalf of a putative class of purchasers of WaMu common stock between October 18, 2006 and November 1, 2007 under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and 17 C.F.R. § 240.10b-5. *See* Abrams Compl. ¶¶ 1, 42-47. The complaint alleges that defendants knowingly or recklessly published a series of materially false and misleading statements or failed to disclose material information related to the strength of WaMu's mortgage loan portfolio. *See* Abrams Compl. ¶¶ 3-9. The complaint further alleges that these misleading statements or material omissions were related to the alleged conspiracy, loan-related losses, and WaMu's performance and accounting practices in light of those allegations. *See* Abrams Compl. ¶¶ 10-13. This action was assigned to Judge Alvin K. Hellerstein. Thus far, no answers or motions have been filed.

## ARGUMENT

The WaMu Cases are patently appropriate actions for transfer and coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407, and the Western District of Washington is unquestionably the forum most convenient to the parties and witnesses. It is the forum where nearly all the defendants are located and, accordingly, where virtually all of the relevant witnesses and documents are likely to be found. In short, transfer to the Western District of Washington will best promote the just and efficient pretrial proceedings of the WaMu Cases.

**I.    TRANSFER AND COORDINATION OR CONSOLIDATION OF THESE ACTIONS IS APPROPRIATE AND NECESSARY**

The Judicial Panel on Multidistrict Litigation (the "Panel") may transfer and coordinate or consolidate two or more civil cases involving "one or more common questions of

8

fact" for coordinated or consolidated pretrial proceedings upon a determination that the transfers would "be for the convenience of the parties and witnesses" and would "promote the just and efficient conduct of such actions." 28 U.S.C. §1407(a).  By providing for the centralized management of pretrial proceedings, Section 1407 seeks "to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts." *Manual for Complex Litigation, Fourth,* § 20.131 (2004) (citing *In re Plumbing Fixture Cases*, 298 F. Supp. 484 (J.P.M.L. 1968)).  A straightforward application of the criteria set forth in Section 1407 compels the conclusion that all seven of the WaMu Cases should be coordinated or consolidated for pretrial proceedings.

### A.    The WaMu Cases Present Common Questions of Law and Fact

Although arising from complex factual allegations, at bottom, each complaint alleges, *inter alia*, that defendants misrepresented WaMu's exposure to risk in the subprime home loan market and misrepresented or failed to disclose information related to the alleged conspiracy, loan-related losses, and WaMu's performance and accounting practices in light of those allegations.  The Panel has routinely transferred and centralized putative securities and ERISA class actions and shareholder derivative suits stemming from "a significant number of common events, defendants, and/or witnesses." *In re Pfizer, Inc. Sec., Derivative and "ERISA" Litig.*, 374 F. Supp. 2d 1348, 1349 (J.P.M.L. 2005); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 196 F. Supp. 2d 1375, 1376 (J.P.M.L. 2002).

Although there are slight variations in the way each plaintiff phrases its allegations, the obvious factual similarities of these actions are illustrated by a simple comparison of the common questions of fact asserted in the WaMu Cases.  First, the securities class action complaints allege false and misleading statements and omissions concerning:

9

- WaMu's exposure to home loan defaults and related losses. *See* Koesterer Compl. ¶¶ 30, 42, 46, 55, 59, 63, 67; Abrams Compl. ¶¶ 3, 12, 36; Nelson Compl. ¶¶ 32, 39, 45, 53, 60, 67.

- WaMu's reported loan loss reserves and provisioning. *See* Koesterer Compl. ¶¶ 34, 42, 46, 55, 59, 63, 67; Abrams Compl. ¶¶ 6, 12, 36; Nelson Compl. ¶¶ 32, 39, 45, 53, 60, 67.

- The adequacy of WaMu's systems of internal operational or financial controls. *See* Koesterer Compl. ¶ 55; Nelson Compl. ¶¶ 32, 39, 45, 53, 60, 67.

- The conspiracy to inflate appraisal values on residential-secured loans with the goal of artificially increasing loan-to-value ratios, artificially increasing loan origination volumes, under-reporting WaMu's true costs, and taking inadequate reserves. *See* Koesterer Compl. ¶¶ 22, 42, 46, 55, 59, 63, 67, 70, 71; Abrams Compl. ¶¶ 10, 12, 34, 36; Nelson Compl. ¶¶ 32, 39, 45, 53, 60, 67.

- The level of risk inherent in the residential real-estate secured loans that WaMu made in light of its allegedly improper appraisal practices. *See* Koesterer Compl. ¶¶ 42, 46, 55, 59, 63, 67; Abrams Compl. ¶ 12, 36; Nelson Compl. ¶¶ 32, 39, 45, 53, 60, 67.

- WaMu's reported income and asset valuations, in light of its allegedly improper appraisal practices. *See* Koesterer Compl. ¶¶ 42, 46, 55, 59, 63, 67; Abrams Compl. ¶ 12; Nelson Compl. ¶¶ 32, 39, 45, 53, 60, 67.

- WaMu's profitability in light of its failure to take sufficient reserves and its failure to account properly for the results of its operations. *See* Koesterer Compl. ¶¶ 42, 46, 55, 59, 63, 67; Abrams Compl. ¶ 12; Nelson Compl. ¶¶ 32, 39, 45, 53, 60, 67.

Next, the two derivative lawsuits, which are virtually identical, repeat allegations similar to those pleaded in the securities complaints. *See* Sneva Compl. ¶¶ 53, 62, 71, 76, 81, 85; Harrison Compl. ¶¶ 53, 62, 71, 76, 81, 85. The complaints further assert that the defendant officers and directors violated their fiduciary duties to WaMu in light of the misrepresentations and omissions alleged in the securities complaints. *See, e.g.*, Sneva Compl. ¶¶ 100, 115; Harrison Compl. ¶¶ 100, 115. More particularly, the derivative claims assert that the underlying violations of the securities laws and the related misrepresentations and omissions have harmed WaMu in the following ways:

10

057471-0024-11475-NY012591133.6

- WaMu has been and will continue to be forced to incur substantial costs of investigation and defense related to governmental investigations and the securities class actions. *See* Sneva Compl. ¶ 92; Harrison Compl. ¶ 92.

- WaMu's image, reputation and market capitalization have been severely damaged as a result of the defendants' fiduciary breaches. *See* Sneva Compl. ¶ 92; Harrison Compl. ¶ 92.

- Certain of the defendants sold WaMu stock with knowledge of true facts that were not generally disclosed to the investing public and thus misappropriated confidential WaMu information. *See* Sneva Compl. ¶¶ 101, 109; Harrison Compl. ¶¶ 101, 109.

- As a result of the defendants' conduct, WaMu has wasted corporate assets by paying unjustified incentive bonuses. *See* Sneva Compl. ¶ 129; Harrison Compl. ¶ 129.

The two putative ERISA class actions were also precipitated by the alleged conspiracy, and many of the allegations in the ERISA complaints repeat those above. Specifically, the putative ERISA class actions allege that WaMu stock was a risky investment because:

- WaMu's mortgage origination practices were highly risky and inappropriate. *See* Bushansky Compl. ¶ 64; Bussey Compl. ¶ 108-114.

- WaMu's financial condition, particularly with respect to subprime mortgages, was being misrepresented. *See* Bushansky Compl. ¶ 65; Bussey Compl. ¶ 94.

- WaMu disregarded the risk of loans collateralized by inflated appraisals because WaMu was primarily focused on increasing the volume of mortgage originations. *See* Bushansky Compl. ¶ 109; Bussey Compl. ¶¶ 117.

- WaMu held insufficient reserves, given the added risks of mortgages backed by inflated appraisals. *See* Bushansky Compl. ¶ 113.

The legal issues in the purported securities class actions are identical. The putative class would need to prove the facts above and show, in part, that defendants' statements misrepresented material facts about WaMu's financial condition, to what extent the members of the class sustained damages, and the proper measure of damages. *See* Koesterer Compl. ¶ 76; Abrams Compl. ¶ 36; Nelson Compl. ¶ 24. Likewise, plaintiffs in the derivative actions would

11

need to demonstrate, in part, that these nondisclosures damaged WaMu.  *See* Sneva Compl. ¶¶
92, 101, 108, 109, 129; Harrison Compl. ¶¶ 92, 101, 108, 109, 129.  Finally, plaintiffs in the
ERISA class actions seek to prove, *inter alia*, that WaMu's stock was an imprudent investment
based, in part, on defendants' alleged misrepresentation of WaMu's true financial condition.
Bushansky Compl. ¶ 65; Bussey Compl. ¶ 94.

> **B.    The Questions of Law and Fact Are Sufficiently Complex To Require
> Consolidation under Section 1407**

Consolidation will ensure that many of the complex and difficult issues raised by
these cases — for example, through motions to dismiss, motions for summary judgment, and
discovery disputes — are handled in a consistent manner that will protect both plaintiffs and
defendants from conflicting judgments by different district courts.  This Panel has long held that
the possibility of duplicative pretrial proceedings and inconsistent pretrial rulings is a central
factor in determining whether cases should be consolidated pursuant to Section 1407.  *See, e.g.,*
*In re Enron Corp. Sec., Derivative & "ERISA" Litig.,* 196 F. Supp. 2d at 1376; *In re Food Fair*
*Sec. Litig.,* 465 F. Supp. at 1304; *In re First Nat'l Bank, Heavener, Okla. Sec. Litig.,* 451 F.
Supp. 995, 997 (J.P.M.L. 1978).

A review of the allegations and claims for relief in the actions summarized above
shows that these similar actions will involve complex legal and factual pretrial issues.  Questions
of the nature and scope of appropriate discovery, as well as privilege, will have to be resolved for
each case.  Most significantly, a court will need to resolve questions relating to whether each of
the five putative securities and ERISA class actions can properly be maintained as class actions.
*See* discussion section I.C, *infra.*  Because the WaMu Cases are so similar, there exists a very
real danger of conflicting or inconsistent pretrial rulings if these cases proceed separately.

12

**C.    Consolidation Will Avoid Conflicting and Duplicative Class Certification Rulings**

Consolidation is appropriate where the actions purport to be brought on behalf of similar classes. This Panel has acknowledged that "[i]t is in the field of class action determinations in related multidistrict civil actions that the potential for conflicting, disorderly, chaotic judicial action is the greatest." *In re Plumbing Fixture Cases*, 298 F. Supp. at 493. In fact, this Panel has continually recognized that prevention of inconsistent rulings by separate district courts with respect to class certification issues is a primary purpose of Section 1407. *See In re Isolagen, Inc. Sec. & Derivative Litig.*, 416 F. Supp. 2d 1366, 1367 (J.P.M.L. 2006); *In re Res. Exploration, Inc., Sec. Litig.*, 483 F. Supp. 817, 821 (J.P.M.L. 1980).

Consequently, consolidation is clearly appropriate here, where several of the actions purport to be brought on behalf of similar putative classes during overlapping class periods.[6] Consolidation will ensure consistency in the adjudication of class certification issues arising in these actions.

**D.    Consolidation Will Avoid Duplicative Discovery and Would Be for the Convenience of the Witnesses and All Parties**

Consolidation also will prevent duplicative discovery and save the parties, witnesses and courts time and effort. As the Panel has recognized, consolidation "ensures that pretrial proceedings will be conducted in a streamlined manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties." *In re General Motors Corp. Sec. & Derivative Litig.*, 429 F. Supp. 2d 1368, 1370 (J.P.M.L. 2006); *see also In re Enron*

---

[6]    It bears noting that the barely different class periods asserted in the purported class actions are no bar to centralization. *See In re Food Fair Sec. Litig.*, 465 F. Supp. 1301, 1304 (J.P.M.L. 1979) (ordering transfer even though the class period asserted was different in the putative securities class actions); *In re Commonwealth Oil/Tesoro Petroleum Sec. Litig.*, 458 F. Supp. 225, 229 (J.P.M.L. 1978) (same). In any event, the periods differ only by a matter of months.

13

*Corp. Sec., Derivative & "ERISA" Litig.*, 196 F. Supp. 2d at 1376 ("Centralization under Section 1407 is necessary in order to eliminate duplicative discovery . . . and conserve the resources of the parties, their counsel and the judiciary."); *In re Food Fair Sec. Litig.*, 465 F. Supp. at 1305 ("While voluntary cooperation among parties and their counsel is always commendable, transfer under Section 1407 and the assignment of all actions to a single judge will ensure the streamlining of discovery and all other pretrial proceedings as well."). Given the similar factual and legal allegations in these actions, *see* section I.C, *supra*, plaintiffs undoubtedly will seek largely duplicative discovery. Coordinated or consolidated discovery would avoid such duplication of effort by the parties, reduce litigation costs and minimize inconvenience to witnesses.

Counsel for plaintiffs also benefit from coordinated or consolidated pretrial proceedings by combining and streamlining their individual efforts. *See In re Baldwin-United Corp. Litig.*, 581 F. Supp. 739, 741 (J.P.M.L. 1984) ("prudent counsel will combine their forces and apportion the workload in order to streamline the efforts of the parties and witnesses, their counsel and the judiciary, thereby effectuating an overall savings of cost and a minimum of inconvenience to all concerned"); *see also In re Sunshine Min. Co. Sec. Litig.*, 444 F. Supp. 223, 226 (J.P.M.L 1978) (stating that streamlining efforts of the parties and their counsel is "one of the purposes of coordinated or consolidated pretrial proceedings"). This streamlining of efforts further supports consolidation of these actions.

Moreover, parties and witnesses may be further convenienced because the Panel often transfers actions to a location where the relevant documents and witnesses are located in order to promote the just and efficient conduct of the litigation. *See, e.g., In re Sterling Fin. Corp. Sec. Litig.*, MDL No. 1879, 2007 WL 3236468, at *1 (J.P.M.L. 2007); *In re SFBC Int'l, Inc., Sec. & Derivative Litig.*, 435 F. Supp. 2d at 1356. As discussed in section II, *infra*, many of

14

the individual defendants in the WaMu cases reside in Washington, and WaMu itself is headquartered in Seattle. Accordingly, virtually all relevant documents and witnesses are likely to be found in the Western District of Washington.

## II. THE ACTIONS SHOULD BE TRANSFERRED TO THE WESTERN DISTRICT OF WASHINGTON WHICH IS BY FAR THE MOST APPROPRIATE FORUM

The Western District of Washington is clearly the preferable transferee district for the WaMu Cases. Accordingly, and for the reasons discussed below, the WaMu Cases should be transferred to the Western District of Washington, Seattle Courthouse, and assigned to the Honorable Marsha J. Pechman, to whom the first of the WaMu Cases filed in the Western District of Washington was assigned.

As a threshold matter, neither motion practice nor discovery has commenced in any of the federal district courts in which the WaMu Cases have been filed. Accordingly, it does not appear that any judicial resources would be wasted should this Panel transfer the WaMu Cases to the Western District of Washington. On the contrary, judicial resources will be conserved by transfer to the Western District of Washington at this early stage of the litigation.

### A. The Location of the Defendants, the Relevant Documents and Witnesses Strongly Supports Transfer to the Western District of Washington

It is well settled that the Panel routinely transfers securities, ERISA and derivative actions to a district where the defendant has its corporate headquarters and where many of the individual defendants reside because "[that] district is where many relevant documents and witnesses are likely to be found." *In re General Motors Corp. Sec. & Derivative Litig.*, 429 F. Supp. 2d at 1370; *see also In re Pfizer Ins. Sec., Derivative & "ERISA" Litig.*, 374 F. Supp. 2d 1348, 1350 (J.P.M.L. 2005) (ordering transfer to the district where the defendant "has its headquarters and many individual defendants reside, and therefore relevant witnesses and

15

documents will likely be found there"); *In re Unumprovident Corp. Sec., Derivative & "ERISA" Litig.*, 280 F. Supp. 2d 1377, 1380 (J.P.M.L. 2003) (same).

Here, too, the Panel should transfer the WaMu Cases to the Western District of Washington since WaMu is a Washington corporation with its corporate headquarters in Seattle, Washington and many of the individual defendants reside in or near the Seattle metropolitan area. As a result, the Western District of Washington — over any other district — is the most appropriate transferee district for centralized pretrial proceedings, as most of the relevant witnesses and documents are likely to be found in or near Seattle, Washington. Notably, the public disclosures forming the basis of plaintiffs' claims in each of the WaMu Cases were drafted in and issued from WaMu's headquarters in Seattle, Washington, and decisions regarding the contents of those disclosures were largely made by individuals living and working in Washington. Standing alone, these facts are sufficient to demonstrate that the Western District of Washington is the center of gravity of the WaMu Cases and the forum that would best promote the convenience of the parties and witnesses. *See, e.g., In re Washington Pub. Power Supply Sys. Sec. Litig.*, 568 F. Supp. 1250, 1251-52 (J.P.M.L. 1983) ("[W]e are persuaded that the Pacific Northwest, and particularly the State of Washington, is the center of gravity of this litigation and the focal point for discovery.").

Balanced against this is — nothing. The named plaintiffs in the WaMu Cases are dispersed throughout the country and, with respect to the securities and ERISA actions, purport to represent putative nationwide plaintiff classes. Consequently, there is nothing in the geographical location of the named plaintiff and the putative plaintiff classes that can overcome the overwhelming connection of the WaMu Cases to the Western District of Washington.[7]

---

[7]    Neither WaMu nor any of the individual defendants in the WaMu Cases is a party to the action the New York Attorney General filed against eAppraiseIT. Indeed, WaMu cannot be

16

**B.     The Largest Number of Cases Are Pending in the Western District of Washington**

An examination of the WaMu Cases reveals that five of the seven actions are currently pending in the Western District of Washington. This further bolsters the evidence that the Western District of Washington is the most logical transferee district. *See, e.g., In re Burlington N. & Santa Fe Ry. Co. Employee Settlement Agreements Litig.*, 162 F. Supp. 2d 699, 700 (J.P.M.L 2001) (noting as a factor supporting transfer that three of the five actions were already pending in the Western District of Washington). *See also In re Doral Fin. Corp. Sec. Litig.*, 398 F. Supp. 2d 1369, 1370 (J.P.M.L. 2005) (noting as a factor supporting transfer that "nearly all" of the actions were already pending in the transferee district).

Moreover, since a related shareholder derivative action is currently pending in Washington state court "centralization in the [Western District of Washington] carries the added benefit of fostering coordinated discovery between the federal and state proceedings, should such a need arise." *In re General Motors Corp. Sec. & Derivative Litig.*, 429 F. Supp. 2d at 1370 (noting as a factor supporting transfer that a related shareholder derivative action was pending in state court within the transferee district); *In re Delphi Corp. Sec., Derivative and "ERISA" Litig.*, 403 F. Supp. 2d 1358, 1360 (J.P.M.L. 2005) (same).

---

a *defendant* to that action as it is regulated by a federal agency, namely the Department of the Treasury's Office of Thrift Supervision. Accordingly, the pendency of the New York Attorney General's complaint in the Southern District of New York does not militate against transfer to the Western District of Washington. *See In re Res. Exploration, Inc., Sec. Litig.*, 483 F. Supp. at 822 (transferring actions to a district, other than the district in which a proceeding by the SEC was pending, because, *inter alia*, the transferee district would have "a substantial quantity of documents [that] may be anticipated as part of the discovery process").

17

C.    **The Western District of Washington Is Also the Most Convenient Forum for Non-Party Witnesses**

It is also significant here that many of the relevant non-party witnesses — such as former WaMu executives and employees — are found either in or near Seattle, Washington. Accordingly, the Western District of Washington is the most convenient forum for many of the relevant non-party witnesses. Moreover, if the WaMu Cases were transferred to another federal district court, it appears that many of the relevant non-party witnesses would be outside the respective district court's subpoena power. As a result, transfer to the Western District of Washington advances the parties' ability to conduct discovery and take depositions of relevant non-party witnesses as these witnesses can be compelled to appear and produce documents.

D.    **Judge Pechman Has Experience Managing Multidistrict Litigation and Relative Docket Congestion Strongly Favors Transfer to the Western District of Washington**

The Honorable Marsha J. Pechman — to whom the first of the WaMu Cases filed in the Western District of Washington was assigned — is the most logical choice to coordinate pretrial proceeding in the WaMu Cases. Judge Pechman is no stranger to multidistrict litigation and, in turn, has developed expertise in the pretrial conduct of multidistrict litigation matters. *See In re Burlington N. & Santa Fe Ry. Co. Employee Settlement Agreements Litig.*, 162 F. Supp. 2d at 700 (assigning a multidistrict litigation matter to the Honorable Marsha Pechman for coordinated or consolidated pretrial proceedings). It also does not appear that Judge Pechman has any multidistrict litigation matters currently on her docket.[8]

---

[8]    *See* Judicial Panel on Multidistrict Litigation, *Distribution of Pending MDL Dockets* (as of Nov. 6, 2007), at p. 9, http://www.jpml.uscourts.gov/MDL_Information/PendingMDL-November-07.pdf.

18

To the extent that Washington state law issues arise during the course of the WaMu Cases, for example, in connection with the derivative actions, it would appear that Judge Pechman — who was a Washington state superior court judge for eleven years prior to her appointment to the federal bench — would be more familiar with Washington law than a judge sitting elsewhere. Although the presence of foreign state law in multidistrict litigation is not dispositive, see In re A. H. Robins Co., Inc. "Dalkon Shield" IUD Products Liability Litig., 438 F. Supp. 942, 943 (J.P.M.L 1977), this is yet another example of how the scales tip decidedly in favor of transfer to the Western District of Washington and assignment to Judge Pechman.

Furthermore, the current levels of docket congestion in the two districts where the WaMu Cases are pending strongly favor transfer of the WaMu Cases to the Western District of Washington. As of September 30, 2006, the median time between a civil filing and trial was six months longer in the Southern District of New York than in the Western District of Washington.[9] Also, as of that date, the Southern District of New York had over six times more civil cases pending on its docket than the Western District of Washington.[10] Notably, the Southern District of New York has thirty-eight MDL dockets pending as of November 6, 2007, while the Western District of Washington has only one, which is not assigned to Judge Pechman.[11] The Panel has routinely favored one district court over another "because that district has a significantly lighter

---

[9]    The median time between a civil filing and trial is 19 months in the Western District of Washington versus 25.7 months in the Southern District of New York. See James C. Duff, 2006 Judicial Business of the United States Courts: Annual Report of the Director, Table C-10, at pp. 208-10, available at http://www.uscourts.gov/judbus2006/contents.html.

[10]    There are 2,779 civil cases pending in the Western District of Washington versus 16,852 civil cases pending in the Southern District of New York. Id. at Table C-1, at pp. 159-61.

[11]    See Judicial Panel on Multidistrict Litigation, Distribution of Pending MDL Dockets (as of Nov. 6, 2007), at pp. 7-9, http://www.jpml.uscourts.gov/MDL_Information/PendingMDL-November-07.pdf.

19

civil action docket than the [other district] and, therefore, is in the best position to expeditiously process this particular litigation." *In re Eastern Airlines, Inc. Flight Attendant Weight Program Litig.*, 391 F. Supp. 763, 764-65 (J.P.M.L.1975); *see also In re Air Crash Disaster at Taipei Int'l Airport on July 31, 1975*, 433 F. Supp. 1120, 1122 (J.P.M.L. 1977) (same); *In re Transit Co. Tire Antitrust Litig.*, 350 F. Supp. 1165, 1166 n.2 (J.P.M.L. 1972).

In sum, transfer of the WaMu Cases to the Honorable Marsha J. Pechman of the Western District of Washington is the best choice to efficiently and effectively conduct pretrial proceedings of the WaMu Cases.

### CONCLUSION

For the foregoing reasons, WaMu respectfully requests that the Panel transfer the WaMu Cases, listed in the Schedule of Actions, to the Honorable Marsha J. Pechman, United States District Judge for the Western District of Washington, for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.

Dated: November 28, 2007                    Respectfully submitted,

                                            Barry R. Ostrager
                                            Mary Kay Vyskocil
                                            David J. Woll
                                            SIMPSON THACHER & BARTLETT LLP
                                            425 Lexington Avenue
                                            New York, New York 10017-3954
                                            (212) 455-2000
                                            (212) 455-2502 (fax)
                                            Counsel for Defendant Washington Mutual, Inc.

# EXHIBIT 5



The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE WASHINGTON MUTUAL, INC. SECURITIES, DERIVATIVE & ERISA LITIGATION | No.  2:08-md-1919 MJP |
| | **JOINT PRELIMINARY REPORT** |
| IN RE WASHINGTON MUTUAL, INC. SECURITIES LITIGATION<br><br>This Document Relates to:  ALL CASES | Lead Case No. C08-0387 MJP |
| IN RE WASHINGTON MUTUAL, INC. DERIVATIVE LITIGATION<br><br>This Document Relates to:<br>ALL DEMAND FUTILE ACTIONS | Lead Case No. C07-1826 MJP |
| IN RE WASHINGTON MUTUAL, INC. DERIVATIVE LITIGATION<br><br>This Document Relates to:<br>ALL DEMAND MADE ACTIONS | Lead Case No. C08-0566 MJP |
| IN RE WASHINGTON MUTUAL, INC. ERISA LITIGATION<br><br>This Document Relates to:  ALL CASES | Lead Case No. C07-1874 MJP |

JOINT PRELIMINARY REPORT
(No. 2:08-md-01919 MJP)

1           Washington Mutual, Inc. ("WaMu" or the "Company"); Ontario Teachers' Pension

2    Plan Board ("Lead Securities Plaintiff"); Faruqi & Faruqi, LLP and Krislov & Associates, Ltd.

3    (collectively, "Lead Demand Futile Derivative Counsel"); the Law Offices Bernard M. Gross, P.C.

4    ("Lead Demand Made Derivative Counsel"); Hagens Berman Sobol Shapiro LLP and Keller

5    Rohrback LLP (collectively, "Lead ERISA Counsel"); First American Corporation; eAppraiseIT;

6    and the Individual Defendants[1] jointly submit this Preliminary Report pursuant to the Court's

7    April 18, 2008 Order Scheduling Initial Conference.

8         **1.**    **Nature and Complexity of the Case**

9           <u>Securities Litigation</u>:  The consolidated securities class action (the "Securities

10    Case") is brought on behalf of WaMu investors against the Company, certain of its current and

11    former officers and directors, and (subject to further analysis and investigation by Lead Securities

12    Plaintiff) may also be brought against WaMu's auditor Deloitte & Touche LLP, and the

13    investment banks that underwrote WaMu's public offerings during the relevant time period,

14    among others.  Lead Securities Plaintiff anticipates that its consolidated complaint (the

15    "Consolidated Securities Complaint"), which will be filed no later than August 5, 2008, pursuant

16    to the Court's May 7, 2008 Order, will assert at least two distinct sets of claims:

17           First, Lead Securities Plaintiff anticipates that the Consolidated Securities

18    Complaint will assert fraud-based claims under the Securities Exchange Act of 1934 (the

19    "Exchange Act") against those defendants who are alleged to have made materially false and

20    misleading statements regarding, among other things, WaMu's financial results, accounting

21    practices and home-mortgage lending business, including the Company's underwriting and

22    appraisal practices for these mortgages, during the class period.  Lead Securities Plaintiff also

23    anticipates that the Consolidated Securities Complaint will assert "control person" claims under

24    Section 20(a) of the Exchange Act against various principals of WaMu, including certain of the

25    

26    [1]    For purposes of this response, Thomas W. Casey, James B. Corcoran, Daryl D. David, Anne V.
Farrell, Stephen E. Frank, Kerry K. Killinger, Thomas C. Leppert, Charles M. Lillis, Phillip D. Matthews,

27    Regina T. Montoya, Michael K. Murphy, Deanna W. Oppenheimer, Margaret Osmer-McQuade, Mary E.
Pugh, William G. Reed, Jr., Stephen Rotella, David C. Schneider, Orin C. Smith, James H. Stever, Willis

28    B. Wood, Jr., and John F. Woods are collectively referred to as the "Individual Defendants."

JOINT PRELIMINARY REPORT
(No. 2:08-md-01919 MJP) – 1

1  Individual Defendants, who were allegedly in a position to control those defendants who made the

2  allegedly false and misleading statements to the market. Second, Lead Securities Plaintiff

3  anticipates that the Consolidated Securities Complaint will assert strict liability and negligence-

4  based claims under the Securities Act of 1933 (the "Securities Act") against those defendants who

5  are alleged to be statutorily responsible under Sections 11 and 12(a)(2) of the Securities Act for

6  the alleged materially untrue statements and omissions that were allegedly made in connection

7  with WaMu's public offerings during the relevant time period.

8          Derivative Litigation:  The shareholder derivative claims against the Company

9  (collectively, the "Derivative Case") have been consolidated into two separate tracks, consisting of

10  those plaintiffs who contend that making a demand on the Company's board of directors (the

11  "Board") prior to filing suit would have been futile (the "Demand Futile Plaintiffs") and those who

12  made a pre-suit demand (the "Demand Made Plaintiffs").  Both sets of derivative plaintiffs purport

13  to bring claims on behalf of WaMu against certain of its officers and directors for breach of

14  fiduciary duty (and, in certain instances, against defendant First American/eAppraiseIT for

15  allegedly aiding and abetting breaches of fiduciary duty) relating to alleged inflation of the

16  Company's mortgage underwriting and loan origination volume, reserving practices, appraisal

17  practices, and SEC filings.

18          WaMu and the Demand Futile Plaintiffs submit that the necessity of a pre-suit

19  demand on the Board is a threshold question that must be resolved prior to the merits of the

20  Derivative Case.  Demand Made Plaintiffs disagree with that position, asserting that they tendered

21  proper shareholder demands, the Board rejected those demands, and that the Demand Made

22  Plaintiffs should proceed without any stay or abatement.  WaMu and the Individual Defendants

23  deny that demand was "refused," and submit that the Court should first determine whether demand

24  was required.

25          ERISA Litigation:  The consolidated ERISA class action (the "ERISA Case")

26  alleges breaches of fiduciary duty under the Employee Retirement Income Security Act of 1974

27  ("ERISA") against the Company and certain defendants alleged to be fiduciaries of the WaMu

28  Savings Plan (the "Plan"), an ERISA-regulated defined contribution plan.  The ERISA Case arises

JOINT PRELIMINARY REPORT
(No. 2:08-md-01919 MJP) – 2

1  out of the alleged failure of the ERISA defendants to manage the Plan's investment in WaMu

2  stock prudently and loyally during the proposed class period. Specifically, plaintiffs allege that

3  the ERISA defendants continued to offer WaMu stock as a Plan investment option, and invest

4  Plan assets in WaMu stock when it no longer was prudent to do so because of serious

5  mismanagement, and dire financial circumstances affecting the Company. The ERISA Case is

6  brought as a class action on behalf of the Plan under, *inter alia*, ERISA § 502(a)(2), for losses to

7  the Plan, and the Plan's participants and beneficiaries.

8              <u>Defendants' Position:</u> WaMu and the Individual Defendants named in the

9  Securities, Derivative and ERISA Cases deny the material allegations in the complaints previously

10  on file with the Court, and they expect to move to dismiss any consolidated complaints making the

11  same or similar allegations. Defendants submit that efficiency will be enhanced by sequencing

12  motion practice, such that the Court addresses the sufficiency of the Consolidated Securities

13  Complaint before turning to the pleadings in the other cases. Defendants submit that the Court's

14  ruling on the legal sufficiency of the factual allegations in the Consolidated Securities Complaint

15  will provide guidance to the parties and will allow for streamlined motion practice in the

16  remaining cases.

17        2.    **ADR Method**

18              The parties' preferred ADR method is mediation (at the appropriate time, as

19  discussed below).

20        3.    **ADR Timing**

21              The parties for each of these respective actions believe that the appropriate time for

22  mediation likely will be at some point after the consolidated complaints have been filed, and

23  possibly after the parties have had sufficient discovery to evaluate fully the strength and

24  weaknesses of their respective cases.

25        4.    **Deadline for Joining Additional Parties**

26              Lead Securities Plaintiff, the Demand Futile Plaintiffs and the Demand Made

27  Plaintiffs propose that the deadline for joining additional parties in their respective cases be sixty

28  (60) days prior to the close of discovery. Lead ERISA Counsel propose that the deadline for

1  joining additional parties in the ERISA Case be the close of discovery. WaMu and the Individual

2  Defendants propose that the deadline for joining additional parties in all cases be coincident with

3  the deadlines for filing consolidated complaints.

4       5.    **Deadline for Amending Pleadings**

5       Pursuant to the Court's May 7, 2008 Order in the Securities Case, Lead Securities

6  Plaintiff will file its Consolidated Securities Complaint on or before August 5, 2008. Lead

7  Securities Plaintiff proposes that the deadline for the amendment of the pleadings in the Securities

8  Case should be no later than thirty (30) days after the close of discovery.

9       Demand Futile Plaintiffs propose to undertake discovery on demand futility prior to

10  filing a consolidated complaint. Defendants contend that such discovery is not appropriate, but

11  they and Demand Futile Plaintiffs agree that the issue of *Demand Futile Plaintiffs' entitlement to*

12  *discovery regarding demand futility* should be resolved prior to the filing of their consolidated

13  complaint. Defendants and Demand Futile Plaintiffs agree to meet and confer, and Demand Futile

14  Plaintiffs propose to file a motion regarding this issue—if at all—by August 1, 2008, and will file

15  a consolidated complaint by the later of: (a) thirty (30) days after the close of any Court-ordered

16  discovery regarding demand futility; (b) thirty (30) days after the Court's denial of discovery

17  regarding demand futility; or (c) September 5, 2008.

18       Demand Made Plaintiffs propose to file a consolidated complaint on July 18, 2008.

19  Demand Made Plaintiffs take the position that neither the Private Securities Litigation Reform

20  Act, 15 U.S.C. § 78u-4(b)(3)(B) ("PSLRA"), nor FRCP 9(b) applies to the Derivative Case, and

21  that the breach of fiduciary duty claims are separate and distinct from the claims asserted in the

22  Securities and ERISA Cases. Accordingly, Demand Made Plaintiffs believe that their action

23  should proceed without regard to the status of the motions to dismiss any other case.

24       Lead ERISA Counsel propose that no later than July 5, 2008, defendants shall

25  produce core ERISA documents and information that will enable plaintiffs to identify accurately

26  the specific persons who serve as Plan fiduciaries during the class period, or otherwise inform

27

28

1  plaintiffs of the identity of such persons[2]; and that plaintiffs will file a consolidated complaint on

2  August 5, 2008, or within 30 days of the receipt of the documents identified above, whichever is

3  later. Lead ERISA Counsel further propose that the deadline for amending the pleadings in the

4  ERISA case should be the close of discovery. Lead ERISA Counsel further propose that the

5  ERISA Case should proceed without regard to the status of motions to dismiss in the Securities

6  and Derivative Cases as the ERISA Case asserts fiduciary breach claims under ERISA that Lead

7  ERISA Counsel submit are not governed by the PSLRA or FRCP 9(b).

8          Defendants submit that motion practice should be sequenced such that the Court

9  addresses the sufficiency of the Consolidated Securities Complaint before turning to the pleadings

10 in the other cases, and that the deadline by which consolidated pleadings should be filed in the

11 Derivative and ERISA Cases should be set accordingly. Regardless of the schedule, defendants

12 submit that the consolidated pleading filed in the Derivative Case should be filed by the Demand

13 Futile Plaintiffs (rather than the Demand Made Plaintiffs), and that defendants' motion to dismiss

14 for failure to make a pre-suit demand on the Board be ruled upon first. Once the Court has ruled

15 on the question of whether a pre-suit demand was required, one set of plaintiffs can prosecute any

16 claims that remain.

17      6.    **Timeline for Class Certification**

18          Lead Securities Plaintiff proposes that its motion for class certification should be

19 due after the close of discovery, consistent with precedent concluding that evidence developed

20 through fact discovery can be important to class certification issues.[3] Class certification is not

---

21 [2]      These documents are as follows: (1) documents that identify the persons who from January 1, 2006

22 through the present serve or served on (a) the Human Resources Committee of the Board of Directors of
   WaMu, (b) the Plan Administrative Committee for the WaMu Savings Plan, and (c) the Plan Investment

23 Committee for the WaMu Savings Plan (collectively, "the Committees"); (2) and minutes and/or
   resolutions of the Committees and/or subcommittees thereof that pertain to the WaMu Savings Plan and

24 show the appointment or removal of Plan fiduciaries or otherwise demonstrate the fiduciary function of any
   of the Committees.

25 [3]      *See* FRCP 23 (2003 amendments), Advisory Committee's note ("The 'as soon as practicable'

26 exaction [of the old Rule 23] neither reflects prevailing practice nor captures the many valid reasons that
   may justify deferring the initial certification decision . . . . Time may be needed to gather information

27 necessary to make the certification decision"); *see also, e.g., Hurley v. U.S. Healthworks Medical Group of
   Wash.*, 2006 WL 1788994, at *4-5 (E.D. Wash. Jun. 27, 2006) (finding plaintiffs' motion for class

28 certification, which was filed after the close of discovery, timely under Rule 23).

JOINT PRELIMINARY REPORT
(No. 2:08-md-01919 MJP) – 5

1  applicable in the Derivative Case.  Lead ERISA Counsel propose that they will file their motion

2  for class certification by January 9, 2009, or ninety (90) days after the Court rules on ERISA

3  motions to dismiss, if any, whichever is later.  Defendants propose to meet and confer with respect

4  to the process for discovery on and briefing of class certification issues upon the Court's

5  resolution of defendants' motions to dismiss.

6         7.    **Discovery Plan**

7              A.    Dates for FRCP Conference/Disclosures:  Pursuant to the PSLRA,

8  discovery in the Securities Case will "be stayed during the pendency of any motion to dismiss,

9  unless the court finds upon the motion of any party that particularized discovery is necessary to

10 preserve evidence or to prevent undue prejudice to that party."  Lead Securities Plaintiff proposes

11 that, absent a ruling by the Court, discovery in the Securities Case commence immediately after

12 the Court has ruled on any motions to dismiss the Consolidated Securities Complaint.  Lead

13 Securities Plaintiff further proposes that, consistent with the Court's May 7, 2008 Order, the initial

14 FRCP 26(f) conference and the initial FRCP 26(a) disclosures in the Securities Case should occur

15 within thirty (30) days after the Court's decision on any motions to dismiss the Consolidated

16 Securities Complaint.

17        Demand Futile Plaintiffs propose to move this Court by August 1, 2008 regarding

18 their entitlement to discovery on the narrow issue of demand futility and otherwise propose that

19 FRCP 26(a) initial disclosures should occur within thirty (30) days after the Court's resolution of

20 the motion to dismiss the Derivative Case.  Demand Made Plaintiffs propose that the FRCP 26(f)

21 conference and FRCP 26(a) initial disclosures should occur within thirty (30) days after the filing

22 of their consolidated complaint.  Demand Made Plaintiffs further propose that they will serve

23 document requests upon defendants with the filing of their consolidated complaint, and that

24 defendants shall respond in accordance with the Federal Rules and shall place documents in a

25 depository to which all cases will have access at the appropriate time.  Demand Made Plaintiffs

26 submit that they will not commence depositions of witnesses until resolution of defendants'

27 motion to dismiss.

28

JOINT PRELIMINARY REPORT
(No. 2:08-md-01919 MJP) -- 6

1    Lead Demand Made Derivative Counsel propose that the FRCP 26(f) initial

2  conference and FRCP 26(a) initial disclosures should occur within thirty (30) days after the filing

3  of their consolidated complaint.  They will serve document requests upon defendants with the

4  filing of their consolidated complaint and defendants shall respond in accordance with the Federal

5  Rules.  Documents to be produced shall be placed in a depository to which all cases will have

6  access at the appropriate time.  If defendants move to dismiss the Demand Made Derivative

7  Claims, Lead Demand Made Derivative Counsel will not commence depositions of witnesses until

8  resolution of the motion.

9    Lead ERISA Counsel state that the PSLRA does not apply to the ERISA action,

10  which asserts ERISA claims that are separate and distinct from the claims asserted in the securities

11  and derivative actions.  Accordingly, Lead ERISA Counsel propose to proceed with discovery

12  upon resolution of ERISA motions to dismiss, if any, in the phased manner discussed below.  Lead

13  ERISA Counsel propose that the initial FRCP 26(f) conference and FRCP 26(a) disclosures should

14  occur within thirty (30) days after the Court's resolution of ERISA motions to dismiss, if any.

15    WaMu and the Individual Defendants believe that the most efficient, simplified and

16  logical course is for the Court to assess first the legal sufficiency of the consolidated complaints in

17  each of the cases in turn, with discovery commencing uniformly on the date the last motion to

18  dismiss has been decided.  WaMu and the Individual Defendants reserve the right to oppose

19  initiation of discovery in the ERISA and Derivative Cases before a ruling on the motions to

20  dismiss the Securities Case, and to take discovery on all claims and defenses at issue.

21    B.    Discovery Topics/Phasing:  Lead Securities Plaintiff believes that discovery

22  will be needed on all subjects relevant to the allegations in its anticipated Consolidated Securities

23  Complaint, including, but not limited to the following topics: the underwriting of WaMu's loans;

24  the securitization of WaMu's loans; the appraisal of the properties underlying WaMu's loans; the

25  various types of loans originated by WaMu and the procedures related to the origination of those

26  loans; the accounting for WaMu's home-mortgage loans, including how WaMu established its

27  reserves, valued the loans reported on its financial statements, and reported its assets and liabilities

28  associated with those loans; WaMu's internal controls over financial reporting; WaMu's financial

1  reporting; each defendant's involvement in the aforementioned activities, if any; class certification

2  issues; and damages.

3          Demand Futile Plaintiffs submit that additional topics for discovery include the

4  independence and good faith of the Board, and the actions of defendants First American and

5  eAppraiseIT. Defendants object to discovery on the question of whether a pre-suit demand was

6  required, but they and the Demand Futile Plaintiffs agree that the question of whether Demand

7  Futile Plaintiffs are entitled to discovery on the question of demand futility is a matter that should

8  be resolved prior to the filing of a consolidated complaint. Demand Futile Plaintiffs recognize the

9  need to coordinate overlapping discovery and cooperate with the other parties to the extent

10  possible.

11         Demand Made Plaintiffs submit that additional discovery will be needed

12  concerning the Board's actions and knowledge with respect to the allegations of wrongdoing.

13  Demand Made Plaintiffs believe that the issues of the Board's independence and good faith arise

14  only in connection with the Board's alleged rejection of the demand made upon them and the issue

15  of defendants' liability for the alleged wrongdoing. Recognizing the need to coordinate

16  overlapping discovery, Demand Made Plaintiffs submit that they will first depose non-overlapping

17  witnesses and then will coordinate depositions of witnesses who are relevant to the Securities and

18  ERISA Cases to avoid duplicative depositions.

19         Lead ERISA Counsel note that the ERISA plaintiffs will take discovery on

20  defendants' status as Plan fiduciaries; alleged breach of their fiduciary duties, factors bearing on

21  the alleged imprudence of WaMu stock (including many of the factual areas germane to the

22  Securities and Derivative Cases as noted above); losses to the Plan allegedly caused by breaches

23  of fiduciary duties; and related fact and expert discovery. Lead ERISA Counsel recognize the

24  need to coordinate overlapping discovery in the ERISA, Securities, and Derivative. To facilitate

25  this coordination, Lead ERISA Counsel propose that during the pendency of the PSLRA stay that

26  is applicable to the Securities Case, they will first serve written discovery in all relevant areas,

27  followed by depositions of witnesses that are specific to the ERISA Case. No depositions will be

28  noticed on issues germane to the Securities and Derivative Cases until the Court resolves the

1   securities motion to dismiss; depositions will be coordinated to avoid duplication.  Lead ERISA

2   Counsel note that this same approach to discovery has been followed successfully in several other

3   litigations with parallel ERISA, securities, and derivative cases.

4          Counsel for all parties agree that expert discovery will be necessary in several

5   areas.  The parties will have more insight into the nature and extent of the necessary discovery

6   after the filing of consolidated complaints in each of the cases and after the Court has decided

7   defendants' respective motions to dismiss.

8          C.   Discovery Limitations:  Given the complexity of this litigation and its

9   anticipated scope, all plaintiffs believe that certain discovery in excess of the limits established in

10  certain of the Federal and Local Civil Rules is necessary.  While WaMu and the Individual

11  Defendants do not believe that discovery in excess of the established limits is necessary, all parties

12  agree to discuss these matters in connection with the FRCP 26(f) conference, after the

13  consolidated complaint has been filed.  The parties propose advising the Court of any suggested

14  modifications as appropriate.

15         D.   Minimization of Discovery Expenses:  The parties will work together in

16  good faith to manage and limit all discovery burdens and costs to the extent possible, including

17  coordinating document production and depositions when possible.  The parties will hold meet and

18  confer conferences on a prompt basis after service of any party's objections to discovery requests,

19  and will work together in good faith to resolve any disputes.

20         E.   Other Orders:  At this time, the parties do not contemplate any additional

21  orders that should be entered by the Court pursuant to FRCP 26(c) or Local Rule CR 16(b) and

22  (c).

23      8.   Discovery Deadline

24         Considering, *inter alia*, the anticipated complexity and scope of the allegations at

25  issue, the substantial volume of documents anticipated to be produced (including from third

26  parties), the number of defendants, and the number of anticipated issues requiring expert

27  discovery, the parties propose the following schedule for the completion of discovery:

28

JOINT PRELIMINARY REPORT
(No. 2:08-md-01919 MJP) – 9

1       A.    Lead Securities Plaintiff proposes that discovery in the Securities Case

2 commence immediately after the Court's decision on any motions to dismiss the Consolidated

3 Securities Complaint. Lead ERISA Counsel propose that discovery in the ERISA Case commence

4 immediately after the Court's decision on any motions to dismiss the consolidated ERISA

5 complaint, and be completed one hundred twenty (120) days prior to the trial date. WaMu and the

6 Individual Defendants propose that discovery should commence immediately after the Court's

7 ruling on the sufficiency of the pleadings in the Securities, ERISA and Derivative Cases, and

8 should be closely coordinated to prevent duplication and unnecessary expense.

9       B.    Lead Securities Plaintiff proposes that parties in the Securities Case will

10 substantially complete the production of their documents in response to initial discovery requests

11 one hundred twenty (120) days after the Court's decision on any motions to dismiss the

12 Consolidated Securities Complaint. Demand Futile Plaintiffs propose that they will substantially

13 complete the production of their documents in response to initial discovery requests one hundred

14 twenty (120) days after the Court's decision on any motions to dismiss their claims. WaMu and

15 the Individual Defendants propose that the parties will substantially complete the production of

16 their documents in response to initial discovery requests one hundred twenty (120) days after the

17 Court's decision on the final motion to dismiss.

18       C.    The deadline for completion of fact discovery should be nine (9) months

19 after the deadline for the substantial completion of the production of documents. The deadline for

20 completion of expert discovery should be sixty (60) days after the completion of fact discovery.

21     **9.**    **Pending Motions**

22       There are no motions currently pending before the Court.

23     **10.**   **Bifurcation**

24       At this time, the parties do not anticipate that bifurcation of the liability and

25 damages issues will be necessary or useful.

26

27

28

11.    **Pretrial Statements and Pretrial Order**

At this time, the parties do not believe that the pretrial statements and pretrial order called for by Local Rules CR 16(e), (h), (i), and (l), and 16.1 should be dispensed of, in whole or in part.

12.    **Date Case(s) Will Be Trial Ready**

The parties are not in a position at this time to identify the specific date that these actions will be ready for trial, as the trial dates will depend, in large part, on the deadlines for filing summary judgment motions, the amount of time necessary to address pre-trial issues, including *Daubert* and *in limine* motions, and the nature of the issues in dispute. The parties propose that the Court reconvene a status conference after disposition of motions for class certification and summary judgment to discuss trial dates for the three cases.

13.    **Jury or Bench Trial**

Lead Securities Plaintiff elects trial by jury. Demand Futile Plaintiffs and Demand Made Plaintiffs elect trial by jury. Lead ERISA Counsel elect a bench trial.

14. :    **Number of Trial Days Required**

The parties anticipate multi-week trials in each of the Securities, Derivative and ERISA Cases.

15.    **Return to Original Districts for Trial**

The parties anticipate that each of the Securities, Derivative and ERISA Cases will be tried in this District.

16.    **Further Suggestions for Simplification**

The parties will work together at all times to make this litigation as efficient and streamlined as possible.

17.    **Trial Counsel**

*See* Appendix A.

18.    **Companies Affiliated with the Parties and All Associated Counsel**

*See* Appendix B.

1    19.    **Related Cases**

2        There are four shareholder derivative cases pending in Washington State Superior

3    Court, King County related to the above-captioned cases:  *Catholic Medical Mission v. Killinger,*

4    *et al.,* Case No. 07-2-36548-6, *Breene v. Killinger, et al.,* Case No. 07-2-41042-2, *Gibb v.*

5    *Killinger, et al.,* Case No. 07-2-41044-9, and *Brody v. First American Corp., et al.,* Case No. 08-2-

6    13425-3.  The first three cases have been consolidated, *In re Washington Mutual, Inc. King*

7    *County Derivative Litigation,* Lead Case No. 07-2-36548-6, and all proceedings have been stayed

8    pending this Court's ruling on defendants' motions to dismiss the Securities Case.  The parties are

9    in the process of negotiating a stipulation to add the *Brody* action to the consolidated state court

10   docket and bring it within the purview of the stay.

11

12   /    /    /

13

14   /    /    /

15

16   /    /    /

17

18   /    /    /

19

20   /    /    /

21

22   /    /    /

23

24   /    /    /

25

26   /    /    /

27

28   /    /    /

JOINT PRELIMINARY REPORT
(No. 2:08-md-01919 MJP) — 12

1  Dated this 27th day of May 2008.

2  SIMPSON THACHER & BARTLETT LLP    DAVIS WRIGHT TREMAINE LLP

3

4  By:   /s/ Barry R. Ostrager          By:   /s/ Steven P. Caplow
      Barry R. Ostrager (*pro hac vice*)        Stephen M. Rummage, WSBA #11168
5      Mary Kay Vyskocil (*pro hac vice*)        Steven P. Caplow, WSBA #19843
      425 Lexington Avenue                    1201 Third Avenue, Suite 2200
6      New York, New York 10017              Seattle, Washington 98101-3045
      Tel.:      (212) 455-2700             Tel.:     (206) 757-8108
7      Fax:       (212) 455-2502             Fax:      (206) 757-7136
      Email:     bostrager@stblaw.com       E-mail:   stevenrummage@dwt.com
8                mvyskocil@stblaw.com                  stevencaplow@dwt.com

9      -and-                                *Counsel for Defendant Washington Mutual,*
                                            *Inc., and for the limited purpose of filing this*
      Robert J. Pfister (*pro hac vice*)        *Joint Preliminary Report, Kerry K. Killinger,*
10     Gabriel D. Miller (*pro hac vice*)       *Stephen Rotella, James B. Corcoran, David C.*
      1999 Avenue of the Stars, 29th Floor  *Schneider, John F. Woods, Daryl D. David,*
11     Los Angeles, California 90067        *Deanna W. Oppenheimer, the WaMu Human*
      Tel.:      (310) 407-7500            *Resources Committee, the WaMu Plan*
12     Fax:       (310) 407-7502            *Administration Committee, the WaMu Plan*
      Email:     rpfister@stblaw.com        *Investment Committee, the Plan*
13               gdmiller@stblaw.com         *Administration Committee for the WaMu*
                                            *Savings Plan, and the Plan Investment*
14                                          *Committee for the WaMu Savings Plan*

15

16                                          PERKINS COIE LLP

17                                          By:   /s/Ronald L. Berenstain
                                               Ronald L. Berenstain, WSBA #7573
18                                             David F. Taylor, WSBA #25689
                                               1201 Third Avenue, Suite 4800
19                                             Seattle, Washington 98101-3099
                                               Tel.:     (206) 359-8477
20                                             Fax:      (206) 359-9477
                                               E-mail:   rberenstain@perkinscoie.com
21                                                       dftaylor@perkinscoie.com

22                                          *Counsel for Defendants Anne V. Farrell,*
                                            *Stephen E. Frank, Thomas C. Leppert, Charles*
23                                          *M. Lillis, Phillip D. Matthews, Regina T.*
                                            *Montoya, Michael K. Murphy, Mary E. Pugh,*
24                                          *William G. Reed, Jr., Orin C. Smith, Thomas*
                                            *Casey, James H. Stever, and Willis J. Wood,*
25                                          *Jr.*

26

27

28

JOINT PRELIMINARY REPORT
(No. 2:08-md-01919 MJP) -- 13

| | | |
|---|---|---|

THACHER PROFFITT & WOOD LLP

By: /s/ Richard F. Hans
   Richard F. Hans (pro hac vice)
   Patrick J. Smith (pro hac vice)
   Darius P. Chafizadeh (pro hac vice)
   Two World Financial Center
   New York, New York 10281
   Tel.:  (212) 912-7400
   Fax:  (212) 912-7751
   Email: rhans@tpw.com
   psmith@tpw.com
   dchafizadeh@tpw.com

*Counsel for First American Corporation
and eAppraiseIT, LLC*

BISHOP WHITE & MARSHALL

By: /s/ William Bishop
   Ann T. Marshall
   William Bishop, Jr.
   720 Olive Way, Suite 1301
   Seattle, Washington 98101
   Tel.:  (206) 622-5306
   Fax:  (206) 622-0354
   Email: amarshall@bwmlegal.com
   bbishop@bwmlegal.com

*Counsel for First American Corporation
and eAppraiseIT, LLC*

BERNSTEIN LITOWITZ
  BERGER & GROSSMANN LLP

By: /s/ Chad Johnson
   Chad Johnson (pro hac vice)
   Hannah Ross (pro hac vice)
   1285 Ave. of the Americas, 38th Floor
   New York, New York 10019
   Tel.:  (212) 554-1400
   Fax:  (212) 554-1444
   Email: chad@blbglaw.com
   hannah@blbglaw.com

*Counsel for Ontario Teachers' Pension Plan
Board and Lead Counsel for the Class*

BYRNES & KELLER LLP

By: /s/ Bradley Keller
   Bradley S. Keller, WSBA# 10665
   Jofrey M. McWilliam, WSBA#28441
   1000 Second Avenue, Suite 3800
   Seattle, Washington 98104
   Tel.:  (206) 622-2000
   Fax:  (206) 622-2522
   Email: bkeller@byrneskeller.com
   jmcwilliam@byrneskeller.com

*Liaison Counsel for the Class*

KRISLOV & ASSOCIATES, LTD.

By: /s/ Clinton A. Krislov
   Clinton A. Krislov (pro hac vice)
   Jeffrey M. Salas (pro hac vice)
   20 North Wacker Drive, Suite 1350
   Chicago, Illinois 60606
   Tel.:  (312) 606-0500
   Fax:  (312) 606-0207
   Email: clint@krislovlaw.com
   jeff@krislovlaw.com

*Interim Co-Lead Counsel in Derivative
Demand Futile Action*

BRESKIN JOHNSON & TOWNSEND PLLC

By: /s/ Roger M. Townsend
   Roger M. Townsend
   999 Third Avenue, Suite 4400
   Seattle, Washington 98104-4088
   Tel.:  (206) 652-8660
   Fax:  (206) 652-4088
   Email: rtownsend@bjtlegal.com

*Interim Liaison Counsel in Derivative
Demand Futile Action*

JOINT PRELIMINARY REPORT
(No. 2:08-md-01919 MJP) – 14

1  FARUQI & FARUQI, LLP

2

3  By:  /s/ David H. Leventhal
         David H. Leventhal (*pro hac vice*)
4       369 Lexington Avenue, Tenth Floor
         New York, New York 10017-6531
         Tel.:     (212) 983-9330
5       Fax:     (212) 983-9331
         Email:   dleventhal@faruqilaw.com
6
       -and-
7
       Vahn Alexander (*pro hac vice*)
8       1901 Avenue of the Stars, Second Floor
         Los Angeles, California 90067
         Tel.:     (310) 461-1426
9       Fax:     (310) 461-1427
         Email:   valexander@faruqilaw.com
10

11  *Interim Co-Lead Counsel in Derivative Demand Futile Action*

12  LAW OFFICES               ZWERLING, SCHACHTER &
      BERNARD M. GROSS, P.C.        ZWERLING, LLP
13

14  By:  /s/ Deborah R. Gross          By:  /s/ Dan Drachler
       Deborah R. Gross               Dan Drachler (WSBA #27728)
15      Robert P. Frutkin              1904 Third Avenue, Suite 1030
       100 Penn Square East, Suite 450     Seattle, Washington 98101-1170
16     Philadelphia, Pennsylvania 19107     Tel.:     (206) 223-2053
       Tel.:     (215) 561-3600         Fax:     (206) 343-9636
17     Fax:     (215) 561-3000         Email:   ddrachler@zsz.com
       Email:   debbie@bernardmgross.com
18

19  *Interim Lead Counsel in the*          *Interim Lead Counsel in the*
      *Demand Made Derivative Action*     *Demand Made Derivative Action*

20  HAGENS BERMAN SOBOL       KELLER ROHRBACK L.L.P.
      SHAPIRO LLP
21

22  By:  /s/ Andrew M. Volk         By:  /s/ Derek W. Loeser
       Steve W. Berman, WSBA #12536      Lynn L. Sarko, WSBA #16569
23     Andrew M. Volk, WSBA #27639       Derek W. Loeser, WSBA # 24274
       Tyler Weaver, WSBA #29413         Erin M. Riley, WSBA # 30401
24     Genessa Stout, WSBA #38410         1201 Third Avenue, Suite 3200
       1301 Fifth Avenue, Suite 2900       Seattle, Washington 98101-3052
25     Seattle, Washington 98101          Tel.:     (206) 623-1900
       Tel.:     (206) 623-7292         Fax:     (206) 623-3384
26     Fax:     (206) 623-0594         Email:   lsarko@kellerrohrback.com
       Email:   steve@hbsslaw.com               dloeser@kellerrohrback.com
27            andrew@hbsslaw.com
            tyler@hbsslaw.com
28  *Interim Co-Lead ERISA Counsel*     *Interim Co-Lead ERISA Counsel*

JOINT PRELIMINARY REPORT
(No. 2:08-md-01919 MJP) – 15

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| )<br>IN RE WASHINGTON MUTUAL, INC. )<br>SECURITIES, DERIVATIVE AND      )<br>"ERISA" LITIGATION                      )<br>) | MDL Docket No. 1919 |

**BRIEF IN SUPPORT OF MOTION FOR
TRANSFER OF TAG-ALONG ACTION TO MDL NO. 1919**

**I.      INTRODUCTION**

Felton A. Spears, Jr. and Sidney Scholl ("Movants"), seek transfer pursuant to 28 U.S.C. §

1407 to the United States District Court for the Western District of Washington for coordinated

pretrial proceedings with the other similar actions already centralized pursuant to the Panels's MDL

1919 Transfer Order.  Exhibit 1.  Similar to the actions centralized in MDL 1919, Movants'

complaint alleges Washington Mutual, Inc. ("WaMu") conspired with two appraisal management

companies to obtain fraudulently inflated home appraisal values for the purpose of inflating the value

of its home loan portfolio which WaMu bundled and sold in the financial markets.

This Motion presents the situation for which Section 1407 was designed. Movants' action is a putative class action with identical underlying factual claims to those at issue in most, if not all, of the actions already centralized in MDL 1919. No discovery has taken place in either Movants' action or in MDL 1919, and no substantive rulings have been made. Transfer of Movants' action to the Western District of Washington for coordinated pretrial proceedings is necessary to avoid duplicative, burdensome and unnecessary discovery, and also to avoid inconsistent pretrial decisions regarding the legal implications of the alleged unlawful conspiracy for the cases already filed and that might be filed later, especially with regards to class certification issues.

## II.    FACTUAL BACKGROUND

On November 1, 2007, the New York Attorney General ("NYAG") filed a complaint against First American eAppraiseIT ("EA"), an appraisal management company ("AMC"), for its role in participating in a conspiracy with WaMu to provide artificially high home appraisal values. The NYAG's complaint also alleges a third company, Lenders Services, Inc. (now known as LSI Appraisal, LLC)(hereafter "LSI"), also participated in the conspiracy with WaMu and EA to also provide fraudulent appraisals.

Soon after the NYAG filed its complaint, multiple individual and class actions were filed against WaMu alleging a variety of causes of action including securities fraud, derivative actions, and ERISA claims, each premised specifically on the NYAG's allegations of the WaMu-EA conspiracy. Exhibit 4, WaMu's Motion for Transfer, ¶¶ 5 (securities actions), 7 (derivative actions), 10 (ERISA actions). On November 28, 2007, WaMu Moved the Panel to centralize all of the actions and transfer them to the United States District Court for the Western District of Washington. *See*

Exhibit 4, WaMu's Motion to Transfer. WaMu argued transfer of the actions for coordinated pretrial proceedings was appropriate because nearly all of the complaints had the same underlying factual allegations regarding WaMu's alleged conspiracy with its AMCs. Exhibit 4, WaMu's Brief, pp. 1, 6-8, 10.

On February 8, 2008, Movants filed their action in the United States District Court for the Northern District of California, on behalf of themselves and a class of WaMu borrowers nationwide alleging the conspiracy among WaMu, EA and LSI as the basis for their consumer claims. Exhibit 2, Movants' First Amended Complaint. As with the securities, derivative and ERISA actions, Movants' allegations stem directly from the NYAG's complaint. *Id.*, ¶¶ 39, 41-49, 53-55. Also like the securities, derivative, and ERISA actions, Movants' claims stem directly from the allegations that WaMu entered into a conspiracy with EA and LSI, and allege the reason for the conspiracy was to bundle home mortgage loans, securitize them, and sell them in the financial markets. Id., ¶¶ 6-9, 22-24, 33-56.

As Movants' action shares identical factual bases to their legal claims as the securities, derivative, and ERISA actions filed against WaMu, WaMu noticed Movants' action as a tag-along action pursuant to 28 U.S.C. § 1407 on February 15, 2008. Exhibit 3, Notice of Tag-along Action. WaMu's Notice of Tag-along Action states that Movants' action is based on the same alleged conspiracy as eighteen other filed actions as of that date. *Id.*, ¶ 15. In its Notice, WaMu noted that Movants' premised their complaint on the NYAG's complaint as did sixteen other actions. *Id.*, ¶ 16. WaMu also identified Movants' action as a tag-along because it involves similar claims and similar issues of law and fact as all the other actions filed against WaMu regarding its appraisal practices, but did not explain why. *Id.*, ¶ 17.

On February 21, 2008, less than one week after WaMu noticed Movants' action as a tag-along to the derivative, securities and ERISA actions, the Panel issued a Transfer Order centralizing most of the actions then pending against WaMu, transferring them to the United States District Court for the Western District of Washington before the Honorable Marsh J. Pechman. Exhibit 1. The Panel neither mentioned nor considered Movants' action in its Transfer Order for MDL 1919 despite its factual similarities to the other actions transferred. *Id.* Instead, Movants were notified by the Clerk of the Panel that WaMu's Notice of Tag-along Action was administratively denied as being "not related" to MDL 1919 by indicating "No Action Taken" on the Panel's Case Listing Report. The Clerk did not specify a reason why Movants' action was deemed "not related."

Despite the Panel's Clerk's administrative determination that Movants' action was "not related," Movants believe as WaMu does that the factual claims underlying their action are identical to the other actions already centralized in MDL 1919, making transfer of their action pursuant to Rule 1407 appropriate.

## III.    MOVANTS' ACTION SHARES COMMON QUESTIONS OF FACT MAKING TRANSFER APPROPRIATE

Transfer for coordinated pretrial proceedings is authorized if the Panel determines that "transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). Factors the Panel looks to in effectuating this purpose include whether centralization "will eliminate duplicative discovery; prevent inconsistent pretrial rulings, especially with respect to class certification; and conserve the resources of the parties, their counsel and the judiciary." *In re: Washington Mutual, Inc., Securities, Derivative & "ERISA" Litigation,* 536 F.Supp.2d 1377, 1378 (Jud.Pan.Mult.Lit. 2008)(centralizing

cases based on identical underlying fact as Movants' action to the Western District of Washington in *MDL 1919*). Based on these considerations, over twenty actions against WaMu have already been centralized in the Western District of Washington for coordinated pretrial proceedings because, "these actions share factual questions arising from alleged misrepresentations or omissions concerning WaMu's financial condition with respect to its subprime home loan portfolio." *In re: Washington Mutual*, 536 F.Supp.2d at 1378.

**A.    The Need for Identical Discovery Between Movants' Action and MDL 1919 Makes Transfer Appropriate.**

One of the main purposes for centralization of actions under Section 1407 for pretrial proceedings is to avoid duplicative discovery. *In re: Washington Mutual*, 536 F.Supp.2d at 1378; *see also In re Neurontin Marketing, Sales Practices, and Products Liability Litigation*, 245 F.R.D. 55, 57 (D.Mass. 2007) ("The purpose of a multidistrict litigation consolidation is to avoid duplicative discovery, prevent inconsistent pretrial rulings and conserve judicial resources")(internal quotation and citation omitted). One of the primary factual allegations for nearly all of the actions centralized in MDL 1919 is WaMu's appraisal practices and the alleged conspiracy between WaMu and its AMCs. *See* Exhibit 4, WaMu's Brief, p. 1 (WaMu stating that the claims against it stem from "an alleged conspiracy between [WaMu] and an appraisal vendor, [EA], related to appraisal valuations on loans originated by [WaMu]"); pp. 6-8 (summarizing five complaints with allegations that WaMu published materially false and misleading statements "related to the alleged conspiracy" with its AMCs); p. 10 (citing multiple complaints of actions coordinated in MDL No. 1919 as being based on "[t]he conspiracy to inflate appraisal values on residential-secured loans with the goal of artificially increasing loan-to-value ratios"); *see also* Exhibit 5, MDL 1919 Joint Preliminary Report,

§ 1 (under "Nature and Complexity of the Case, the "Securities Litigation" cases state they anticipate asserting claims for WaMu's appraisal practices for their mortgages, and the "Derivative Litigation" cases state they anticipate asserting claims for WaMu's alleged inflation of its loan origination volume and apprisal practices).

These allegations against WaMu for its appraisal practices and the alleged conspiracy with EA and LSI are the exact same claims Movants allege harmed them. Exhibit 2, ¶¶ 6-9, 35-49. Accordingly, Movants will require essentially the same extensive document and deposition discovery to support their allegations that WaMu injured consumers by virtue of its unlawful conspiracy with EA and LSI as the actions already centralized in MDL 1919 will need to prove their securities, derivative and ERISA claims. *See* Exhibit 5, § 7.B (identifying the "Discovery Topics" to include, "the actions of defendants First American and eAppraiesIT," "the appraisal of the properties underlying WaMu's loans," and "each defendant's involvement in the aforementioned activities").

Additionally, many of the actions centralized in MDL 1919 allege harm caused by WaMu's securitization of its home loans. Exhibit 5, § 1. Likewise, Movants allege that the underlying reason why WaMu entered into its conspiracy to inflate appraisal values with EA and LSI is because WaMu wanted to raise the value of its loan portfolio, securitize the loans and sell them on the financial market. Exhibit 2, ¶¶ 6, 22-24. Although scienter is not an element of any of Movants' claims, Movants will need to show WaMu's motive for their punitive damage claims. *Id.*, ¶¶ 17, 118, and Prayer at D. Thus, Movants will need to take essentially the same discovery as the centralized actions regarding WaMu's mortgage securitization practices as illustrated in MDL 1919's Joint

Status Report. Exhibit 5, § 7.B (identifying the "Discovery Topics" to include not only WaMu's appraisal practices, but also "the securitization of WaMu's loans").

The Panel has already concluded that based on the exact same factual allegations in Movants' complaint, centralization was appropriate for over twenty similar actions against WaMu for coordinated pretrial proceedings. Exhibit 1. It is WaMu's appraisal practices, the alleged conspiracy between it and its AMCs, and the purpose behind the conspiracy – *i.e.*, to inflate home values to increase profits by bundling the properties and securitizing them on the financial markets – that give rise to the already centralized actions' claims for the "alleged misrepresentations or omissions concerning WaMu's financial condition with respect to its subprime home loan portfolio." *Id.*

As Movants' action shares the exact same common questions of fact regarding WaMu's appraisal practices and its securitization of its home mortgage loans as the actions already centralized in MDL 1919, transfer of Movants' action to the Western District of Washington for coordinated pretrial proceedings is appropriate to avoid duplicative discovery. *See In re: Washington Mutual*, 536 F.Supp.2d at 1378; *see also In re: Avendia Marketing, Sales Practices and Products Liability Litigation*, 543 F.Supp.2d 1376, 1378 (Jud.Pan.Mult.Lit. 2008)("Section 1407, however, does not require a complete identity or even a majority of common factual and legal issues as a prerequisite to centralization); *In re: Aircraft Accident at Barrow Alaska, on October 13, 1978*, 474 F.Supp. 996, 999 (Jud.Pan.Mult.Lit. 1979)("The presence of different legal theories in some of the actions with regard to the alleged liability of each defendant does not negate the existence of common questions of fact regarding the cause or causes of the crash and attendant circumstances" that require centralization "to avoid duplicative discovery ..., prevent inconsistent pretrial rulings, conserve judicial resources and ensure the cooperation of all parties and counsel").

**B.**     **The Danger of Inconsistent Determinations Regarding Class Related Issues And Pretrial Rulings Favors Section 1407 Transfer of Movants' Action to the Western District of Washington.**

In addition to avoiding duplicative discovery, the Panel centralized the actions against WaMu in MDL 1919 to "prevent inconsistent pretrial rulings, especially with respect to class certification." *In re: Washington Mutual*, 536 F.Supp.2d at 1378; *see also Southeastern Milk Antitrust Litigation*, 530 F.Supp.2d 1359, 1360 (Jud.Pan.Mult.Lit. 2008)("Centralization under Section 1407 will eliminate duplicative discovery; prevent inconsistent pretrial rulings, especially with respect to class certification; and conserve the resources of the parties, their counsel and the judiciary"); *In re Korean Air Lines Co., Ltd. Antitrust Litigation*, 528 F.Supp.2d 1372, 1373 (Jud.Pan.Mult.Lit. 2007)(same); *In re Plumbing Fixture Cases*, 298 F.Supp. 484, 493 (Jud.Pan.Mult.Lit. 1968)("It is in the field of class action determinations in related multidistrict civil actions that the potential for conflicting, disorderly, chaotic judicial action is the greatest"). Indeed, many of the actions centralized in MDL 1919 are brought as purported class actions. *See* Exhibit 4, WaMu's Motion for Transfer, ¶¶ 5, 10; Exhibit 5, § 6 (indicating class certification is an issue for all of the securities and ERISA actions). Similarly, Movants are purporting to represent a class of consumers similarly harmed by WaMu's conduct. Exhibit 2, ¶¶ 1, 71-77.

As WaMu asserted in its original Motion for Transfer, transfer of Movants' action to the Western District of Washington "will ensure consistency in the adjudication of class certification issues arising" among Movant's action and those already transferred to MDL 1919. Exhibit 4, WaMu's Brief, p. 13. As centralization for pretrial proceedings is particularly important to prevent inconsistent pretrial rulings with respect to class certification, transfer of Movants' action to the

-8-

Western District of Washington for coordinated pretrial proceedings with MDL 1919 is appropriate.

*In re: Washington Mutual*, 536 F.Supp.2d at 1378.

## IV.    CONCLUSION

For the foregoing reasons, Movants respectfully request that the Panel transfer their action

to the Honorable Marsha J. Pechman, United States District Judge for the Western District of

Washington, for coordinated pretrial proceedings in MDL 1919 pursuant to 28 U.S.C. § 1407.

Dated: June 19, 2008

SPECTER SPECTER EVANS
  & MANOGUE, P.C.

By:  _Joseph M. Krave Jr._
        Joseph N. Kravec, Jr.

The 26th Floor Koppers Building
Pittsburgh, Pennsylvania  15219
Telephone:  (412) 642-2300
Facsimile:  (412) 642-2309

Michael D. Braun
BRAUN LAW GROUP, P.C.
12304 Santa Monica Blvd., Suite 109
Los Angeles, CA 90025
Telephone:  (310) 442-7755
Facsimile:  (310) 442-7756

Ira Spiro
SPIRO MOSS BARNESS, LLP
11377 West Olympic Blvd., Fifth Floor
Los Angeles, CA 90064-1683
Telephone:  (310) 235-2468
Facsimile:  (310) 235-2456

Janet Lindner Spielberg
LAW OFFICES OF JANET LINDNER
   SPIELBERG
12400 Wilshire Blvd., Suite 400
Los Angeles, CA 90025
Telephone:  (310) 392-8801
Facsimile:  (310) 278-5938

*Attorneys for Plaintiffs in the Spears Action*

-10-

## PROOF OF SERVICE

The undersigned, Joseph N. Kravec, Jr., Esquire, hereby certifies that he served a true and correct copy of the **BRIEF IN SUPPORT OF MOTION FOR TRANSFER OF TAG-ALONG ACTION TO MDL NO. 1919** on counsel for Defendant by U.S. First Class Mail, on the 19th day of June, 2008 as follows:

Robert J. Pfister, Esquire
SIMPSON THACHER & BARTLETT LLP
1999 Avenue of the Stars, 29th Floor
Los Angeles, CA 90067

Stephen M. Rummage, Esquire
Jonathan M. Lloyd, Esquire
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045

Martin L. Fineman, Esquire
Sam N. Dawood, Esquire
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111

Laura J. Fowler, Esquire
MCDONOUGH HOLLAND
& ALLEN PC
555 Capitol Mall, 9th Floor
Sacramento, CA 95814

Margaret Anne Keane, Esquire
Kris H. Man, Esquire
DEWEY AND LEBOEUF LLP
One Embarcadero Center
Suite 400
San Francisco, CA 94111-3619

Angela M. Papalaskaris, Esquire
Christopher J. Clark, Esquire
Kevin C. Wallace, Esquire
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019-6092

Richard F. Hans, Esquire
Kerry Ford Cunningham, Esquire
Jeffrey D. Rotenberg, Esquire
Patrick J. Smith, Esquire
THACHER PROFITT & WOOD LLP
Two World Financial Center
New York, New York 10281

**MDL NO. 1919 LIAISON COUNSEL:**

Dan Drachler, Esquire
ZWERLING SCHACHTER & ZWERLING LLP
1904 Third Avenue
Suite 1030
Seattle, WA 98101-1170

Roger M. Townsend, Esquire
BRESKIN JOHNSON & TOWNSEND PPLC
999 Third Avenue
Suite 4400
Seattle, WA 98104-4088

_____

Joseph N. Kravec, Jr., Esquire

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

|  |  |
|---|---|
| IN RE WASHINGTON MUTUAL, INC. SECURITIES, DERIVATIVE AND "ERISA" LITIGATION | ) ) ) ) ) MDL Docket No. 1919 |

**SCHEDULE OF ACTIONS**

| Case Captions | Date Filed | Civil Action No. | Judge | District Court |
|---|---|---|---|---|
| Spears, et al. v. Washington Mutual, Inc., et al. | 02/08/2008 | 5:08-CV-00868 (RMW) | Honorable Ronald M. Whyte | Northern District of California (San Jose) |

Dated: June 19, 2008

SPECTER SPECTER EVANS
  & MANOGUE, P.C.

By: _____
      Joseph N. Kravec, Jr.

The 26th Floor Koppers Building
Pittsburgh, Pennsylvania 15219
Telephone: (412) 642-2300
Facsimile: (412) 642-2309

Michael D. Braun
BRAUN LAW GROUP, P.C.
12304 Santa Monica Blvd., Suite 109
Los Angeles, CA 90025
Telephone: (310) 442-7755
Facsimile: (310) 442-7756

Ira Spiro
SPIRO MOSS BARNESS, LLP
11377 West Olympic Blvd., Fifth Floor
Los Angeles, CA 90064-1683
Telephone: (310) 235-2468
Facsimile: (310) 235-2456

Janet Lindner Spielberg
LAW OFFICES OF JANET LINDNER
  SPIELBERG
12400 Wilshire Blvd., Suite 400
Los Angeles, CA 90025
Telephone: (310) 392-8801
Facsimile: (310) 278-5938

*Attorneys for Plaintiffs in the Spears Action*

## PROOF OF SERVICE

The undersigned, Joseph N. Kravec, Jr., Esquire, hereby certifies that he served a true and

correct copy of the **SCHEDULE OF ACTIONS** on counsel for Defendant by U.S. First Class Mail,

on the 19th day of June, 2008 as follows:

Robert J. Pfister, Esquire
SIMPSON THACHER & BARTLETT LLP
1999 Avenue of the Stars, 29th Floor
Los Angeles, CA 90067

Stephen M. Rummage, Esquire
Jonathan M. Lloyd, Esquire
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045

Martin L. Fineman, Esquire
Sam N. Dawood, Esquire
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111

Laura J. Fowler, Esquire
MCDONOUGH HOLLAND
& ALLEN PC
555 Capitol Mall, 9th Floor
Sacramento, CA 95814

Margaret Anne Keane, Esquire
Kris H. Man, Esquire
DEWEY AND LEBOEUF LLP
One Embarcadero Center
Suite 400
San Francisco, CA 94111-3619

Angela M. Papalaskaris, Esquire
Christopher J. Clark, Esquire
Kevin C. Wallace, Esquire
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019-6092

Richard F. Hans, Esquire
Kerry Ford Cunningham, Esquire
Jeffrey D. Rotenberg, Esquire
Patrick J. Smith, Esquire
THACHER PROFITT & WOOD LLP
Two World Financial Center
New York, New York 10281

**MDL NO. 1919 LIAISON COUNSEL:**

Dan Drachler, Esquire
ZWERLING SCHACHTER & ZWERLING LLP
1904 Third Avenue
Suite 1030
Seattle, WA 98101-1170

Roger M. Townsend, Esquire
BRESKIN JOHNSON & TOWNSEND PPLC
999 Third Avenue
Suite 4400
Seattle, WA 98104-4088

Joseph N. Kravec, Jr., Esquire