Joseph N. Kravec, Jr. *(Admitted Pro Hac Vice)*
SPECTER SPECTER EVANS
  & MANOGUE, P.C.
The 26th Floor Koppers Building
Pittsburgh, Pennsylvania 15219
Tel:    (412) 642-2300
Fax:    (412) 642-2309
E-mail: jnk@ssem.com

Michael D. Braun (167416)
BRAUN LAW GROUP, P.C.
12304 Santa Monica Blvd., Suite 109
Los Angeles, CA 90025
Tel:    (310) 442-7755
Fax:    (310) 442-7756
E-mail: service@braunlawgroup.com

Ira Spiro (67641)
J. Mark Moore (180473)
SPIRO MOSS BARNESS, LLP
11377 West Olympic Blvd., Fifth Floor
Los Angeles, CA 90064-1683
Tel:    (310) 235-2468
Fax:    (310) 235-2456
E-mail: ira@spiromoss.com
        mark@spiromoss.com

Janet Lindner Spielberg (221926)
LAW OFFICES OF JANET
LINDNER SPIELBERG
12400 Wilshire Blvd., Suite 400
Los Angeles, CA 90025
Tel:    (310) 392-8801
Fax:    (310) 278-5938
E-mail: jlspielberg@jlslp.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| FELTON A. SPEARS, JR. and SIDNEY SCHOLL, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> WASHINGTON MUTUAL, INC., a Washington corporation; WASHINGTON MUTUAL BANK, FA (aka WASHINGTON MUTUAL BANK); FIRST AMERICAN EAPPRAISEIT, a Delaware corporation; and LENDER'S SERVICE, INC., <br><br> Defendants. | **CASE NO.: 5:08-CV-00868 (RMW)** <br><br> **CLASS ACTION** <br><br> **AFFIDAVIT OF JOSEPH N. KRAVEC, JR. IN SUPPORT OF PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |

1    JOSEPH N. KRAVEC, JR., of full age, upon his affidavit, hereby certifies as follows:

2    1.    I am an attorney at law of the Commonwealth of Pennsylvania, and have been admitted

3    *pro hac vice* to the referenced action.  I am a partner with the law firm Specter Specter Evans &

4    Manogue, P.C., attorneys for Plaintiffs in the above-captioned matter.  As such, I have personal

5    knowledge of the facts contained herein.

6    2.    I make this affidavit in support of Plaintiffs Responses in Opposition to Defendants'

7    Washington Mutual Bank's and First American eAppraiseIT's Motions to Dismiss, and Lender's

8    Services, Inc.'s Motion to Dismiss.

9    3.    Attached hereto as Exhibit 1 is a true and correct copy of Plaintiff Sidney Scholl's

10   Settlement Statement which was attached as Exhibit 1 action to Plaintiffs' original Class Action

11   Complaint filed in this action, and which is specifically identified in Plaintiffs' First Amended

12   Complaint at paragraph 58.

13   4.    Attached hereto as Exhibit 2 is a true and correct copy of Plaintiff Sidney Scholl's

14   "Appraisal of Real Property" which was attached as Exhibit 2 to Plaintiffs' original Class Action

15   Complaint filed in this action, and which is specifically identified in Plaintiffs' First Amended

16   Complaint at paragraph 59 and identified as Plaintiff Scholl's "appraisal report."

17   5.    Attached hereto as Exhibit 3 is a true and correct copy of Plaintiff Felton A. Spears'

18   Closing Statement which was attached as Exhibit 3 to Plaintiffs' original Class Action Complaint filed

19   in this action, and which is specifically identified in Plaintiffs' First Amended Complaint at paragraph

20   63.

21   6.    Attached hereto as Exhibit 4 is a true and correct copy of the Court's decision in

22   *Chamberlan v. Ford Motor Company*, No. C 03-2628 CW (N.D. Cal., August 3, 2003)(Wilken, D.J.)

23

24                                                    Joseph N. Kravec, Jr.(Pa. ID 68992)

25

26   SWORN TO AND SUBSCRIBED BEFORE
     ME THIS 25th DAY OF JUNE, 2008.
                                                     COMMONWEALTH OF PENNSYLVANIA
                                                     Notarial Seal
27                                                   Anita M. Terry, Notary Public
                                                     City Of Pittsburgh, Allegheny County
                                                     My Commission Expires Oct. 24, 2009
28   _____                     Member, Pennsylvania Association Of Notaries
              Notary Public

                                          1

**PROOF OF SERVICE**

STATE OF PENNSYLVANIA )
                                              ) ss.:
COUNTY OF ALLEGHENY )

I am employed in the County of Allegheny, State of Pennsylvania. I am over the age of 18 and not a party to the within action. My business address is The 26th Floor Koppers Building, Pittsburgh, Pennsylvania 15219.

On June 25, 2008, using the Northern District of California's Electronic Case Filing System, with the ECF ID registered to Joseph N. Kravec, Jr., I filed and served the document(s) described as:

**AFFIDAVIT OF JOSEPH N. KRAVEC, JR. IN SUPPORT
OF PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS**

The ECF System is designed to automatically generate an e-mail message to all parties in the case, which constitutes service. According to the ECF/PACER system, for this case, the parties are served as follows:

| | |
|---|---|
| Janet Lindner Spielberg, Esquire | jlspielberg@jlslp.com |
| Ira Spiro, Esquire | ira@spiromoss.com |
| Robert Ira Spiro, Esquire | ira@spiromoss.com |
| J. Mark Moore, Esquire | mark@spiromoss.com |
| Michael D. Braun, Esquire | service@braunlawgroup.com |

**Attorneys for Plaintiffs**

| | |
|---|---|
| Robert J. Pfister, Esquire | rpfister@stblaw.com |
| Martin L. Fineman, Esquire | martinfineman@dwt.com |
| Stephen Michael Rummage, Esquire | steverummage@dwt.com |
| Sam N. Dawood, Esquire | samdawood@dwt.com |
| Jonathan M. Lloyd, Esquire | jonathanlloyd@dwt.com |

**Attorneys for Defendant Washington Mutual, Inc.**

| | |
|---|---|
| Laura Jean Fowler, Esquire | lfowler@mhalaw.com |

**Attorneys for Defendant eAppraiseIT**

| | |
|---|---|
| Margaret Anne Keane, Esquire | mkeane@dl.com |
| Kris Hue Chau Man, Esquire | kman@dl.com |
| Angela M. Papalaskaris, Esquire | apapalas@dl.com |

| | | |
|---|---|---|
| 1 | Christopher J. Clark, Esquire | cjclark@dl.com |
| 2 | Kevin C. Wallace, Esquire | kwallace@dl.com |
| 3 | Jeffrey D. Rotenberg, Esquire | jrotenberg@tpw.com |
| 4 | Richard F. Hans, Esquire | rhans@tpw.com |

5 **Attorneys for Defendant LSI Appraisal, LLC**

6     On June 25, 2008, I served the document(s) described as:

7     **AFFIDAVIT OF JOSEPH N. KRAVEC, JR. IN SUPPORT OF PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

8

9 by placing a true copy(ies) thereof enclosed in a sealed envelope(s) addressed as follows:

10

11 Kerry Ford Cunningham, Esquire
Patrick J. Smith, Esquire
Thacher Proffitt & Wood LLP
12 Two World Financial Center
New York, New York 10281

13

**Attorneys for eAppraiseIT**

14

15 Kris H. Man, Esquire
Dewey and LeBoeuf LLP
One Embarcadero Center
16 Suite 400
San Francisco, CA 94111-3619

17

18 **Attorneys for LSI Appraisal, LLC**

19 I served the above document(s) as follows:

20     **BY MAIL.** I am familiar with the firm's practice of collection and processing correspondence by mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Pittsburgh, Pennsylvania
21 in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than
22 one day after date of deposit for mailing in an affidavit.

23     I am employed in the office of an attorney who is admitted *pro hac vice* in this action at whose direction the service was made.

24

25     I declare under penalty of perjury under the laws of the United States that the above is true and correct.

26     Executed on June 25, 2008, at Pittsburgh, Pennsylvania.

27                                          _S/MARCIA Z. CARNEY_
                                         Marcia Z. Carney

28

| A. U.S. Department of Housing and Urban Development | | B. Type of Loan | | |
|---|---|---|---|---|
| | | 1. [ ] FHA | 2. [ ] FMHA | 3. [ ] Conv. Unins. |
| | | 4. [ ] VA | 5. [X] Conv. Ins. | |
| **FINAL** | | 6. File Number 6090335 | 7. Loan Number 0047468970 | |
| **Settlement Statement** | | 8. Mortgage Ins. Case No. | | |

OMB No. 2502-0265

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked ("POC") were paid outside the closing; they are shown here for information purposes and are not included in the totals.

**D. Name of Borrower:** Sidney Scholl

**E. Name of Seller:** Savannah Builders LLC                                    TIN:

**F. Name of Lender:** Washington Mutual Bank, F.A., 3050 Highland Parkway, 6th Floor, Downers Grove, IL 60515

**G. Property Location:** Lot 2, Block 3, STONEBRIAR 1

817 Northwest 194 Terrace, Edmond, OK 73003

**H. Settlement Agent:** Stewart Abstract & Title of Oklahoma (405) 232-8764

**Place of Settlement:** 4401 W. Memorial Road, Suite #106, Oklahoma City, OK 73134                 TIN: 73-1093494

**I. Settlement Date:** 10/4/2006                    Proration Date: 10/4/2006

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross amount due from borrower:** | | **400. Gross amount due to seller:** | |
| 101. Contract sales price | 289,000.00 | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 6,132.18 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance:** | | **Adjustments for items paid by seller in advance:** | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross amount due from borrower:** | 295,132.18 | **420. Gross amount due to seller:** | |
| **200. Amounts paid by or in behalf of the borrower:** | | **500. Reduction in amount due to seller:** | |
| 201. Deposit or earnest money | 5,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 231,200.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan Kirkpatrick Bank | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. Deposit or earnest money | |
| 207. Seller paid closing cost for buyer | 2,312.00 | 507. Seller paid closing cost for buyer | |
| 208. | | 508. Federal Express | |
| 209. | | 509. Release | |
| **Adjustments for items unpaid by seller:** | | **Adjustments for items unpaid by seller:** | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. 2006 HOA Dues  10/4/2006 to 1/1/2007 | |
| 215. October Rent  10/4/2006 to 10/31/2006 | 1,841.56 | 515. October Rent  10/4/2006 to 10/31/2006 | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total paid by/for borrower:** | 240,353.56 | **520. Total reduction in amount due seller:** | |
| **300. Cash at settlement from/to borrower:** | | **600. Cash at settlement to/from seller:** | |
| 301. Gross amount due from borrower (line 120) | 295,132.18 | 601. Gross amount due to seller (line 420) | |
| 302. Less amount paid by/for borrower (line 220) | 240,353.56 | 602. Less total reduction in amount due seller(line 520) | |
| **303. CASH (X)FROM ( )TO BORROWER** | 54,778.62 | **603. CASH ( )FROM (X)TO SELLER** | |

SUBSTITUTE FORM 1099 SELLER STATEMENT - The information contained in Blocks E, G, H and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

SELLER INSTRUCTION - If this real estate was your principle residence, file form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide Stewart Abstract & Title of Oklahoma (405) 232-8764 with your correct taxpayer identification number. If you do not provide Stewart Abstract & Title of Oklahoma (405) 232-8764 with your correct taxpayer identification number, you may be subject to civil or criminal penalties.

_signature_

Savannah Builders LLC

| | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|
| | sales/broker commission based on : = $16,092.00 | | |
| | Division of commission (line 700) as follows: | | |
| .2. | $16,092.00 to ReMax Associates, Realtors | | |
| .03. | Commission paid at settlement $16,092.00 | | |
| 704. | | | |
| 705. | Transaction/Closing Coordinator Fee | | |
| 706. | Transaction/Closing Coordinator Fee | | |
| 800. | Items payable in connection with loan | | |
| 801. | Loan origination fee to Washington Mutual Bank, F. ( 1%) | | |
| 802. | Loan discount to Washington Mutual Bank, F. | 2,312.00 | |
| 803. | Appraisal fee to Washington Mutual Bank, F.A. | 1,098.20 | |
| 804. | Credit report | 255.00 | |
| 805. | Lender's inspection fee | | |
| 806. | Mortgage insurance application fee | | |
| 807. | Assumption fee | | |
| 808. | Underwriting Fee | | |
| 809. | Tax Service Fee | | |
| 810. | Flood Certification Fee to LERETA Corp | | |
| 811. | Document Preparation Fee | 8.00 | |
| 812. | Tax ResearchFee to Washington Mutual Bank, F.A. | | |
| 813. | Tax Procurement Fee to LERETA Corp | 31.00 | |
| 814. | Yield Spread Premium | 50.00 | |
| 815. | Loan Review Fee to Washington Mutual Bank, F.A. | | |
| 816. | | 360.00 | |
| 900. | Items required by lender to be paid in advance | | |
| 901. | Interest from 10/4/2008 to 11/1/2008 at $41.0100/day for 28 days. | | |
| 902. | Mortgage insurance premium for | 1,148.28 | |
| 903. | Hazard insurance premium for 1 yrs. to State Farm | | |
| 904. | | | |
| 905. | | | |
| 1000. | Reserves deposited with lender | | |
| 1001. | Hazard insurance | | |
| 1002. | Mortgage insurance | | |
| 1003. | City property taxes | | |
| 1004. | County property taxes | | |
| 1005. | Annual assessments (maint.) | | |
| 1006. | | | |
| 1007. | | | |
| 1008. | | | |
| 1009. | Aggregate Adjustment | | |
| 1100. | Title charges | | |
| 1101. | Settlement or closing fee to Stewart Abstract & Title of Oklahoma | | |
| 1102. | Abstract or title search | 37.50 | |
| 1103. | Title examination Waived | | |
| 1104. | Title insurance binder | | |
| 1105. | Document preparation | | |
| 1106. | Notary fees | | |
| 1107. | Attorney's fees to | | |
| | includes above items no.: | | |
| 1108. | Title insurance to Stewart Abstract & Title of Oklahoma | | |
| | includes above items no.: Discounted | 380.00 | |
| 1109. | Lender's coverage $231,200.00 $50.00 | | |
| 1110. | Owner's coverage $289,000.00 $710.00 | | |
| 1111. | Interim Title Report to Stewart Abstract & Title of Oklahoma | | |
| 1112. | Courier Fee to Stewart Abstract & Title of Oklahoma | 50.00 | |
| 1113. | File Quit Claim Deed to Oklahoma County Clerk | 35.00 | |
| 1114. | | | |
| 1115. | | | |
| 1116. | | | |
| 1200. | Government recording and transfer charges | | |
| 1201. | Recording fees: Deed $21.00 Mortgage $55.00 | | |
| 1202. | City/county tax/stamps: | 76.00 | |
| 1203. | State tax/stamps: Deed $433.50 | | |
| 1204. | Mortgage Tax Mortgage $231.20 | | |
| 1205. | Mortgage Certification to County Treasurer | 231.20 | |
| 1206. | Assignment | 5.00 | |
| 1300. | Additional settlement charges | | |
| 1301. | Survey 0608226 to Miller Survey | | |
| 1302. | Pest Inspection Pretreat/Soil Cert | 55.00 | |
| 1303. | Home Inspection Fee | | |
| 1304. | Repairs | | |
| 1305. | Hme Warr. to be done @ end of Lease | | |
| 1306. | HOA Verification Fee to Neighborhood Services | | |
| 1307. | | | |
| 1400. | Total settlement charges (entered on lines 103, section J and 502, section K) | 6,132.18 | |

CERTIFICATION: I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipt and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

_____     _____
Sidney Scholl     Savannah Builders LLC

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____     _____   10/6/06
Stewart Abstract & Title of Oklahoma     Date

SELLER'S AND/OR PURCHASER'S STATEMENT Seller's and Purchaser's signature hereon acknowledges his/their approval of tax prorations and signifies their understanding that prorations were based on taxes for the preceding year, or estimates for the current year, and in the event of any change for the current year, all necessary adjustments must be made between Seller and Purchaser; likewise any default in delinquent taxes will be reimbursed to Title Company by the Seller.

Title Company, in its capacity as Escrow Agent, is and has been authorized to deposit all funds it receives in this transaction in any financial institution, whether affiliated or not. Such financial institution may provide Title Company computer accounting and audit services directly or through a separate entity which, if affiliated with Title Company, may charge the financial institution reasonable and proper compensation therefore and retain any profits therefrom. Any escrow fees paid by any party involved in this transaction shall only be for checkwriting and input to the computers, but not for aforesaid accounting and audit services. Title Company shall not be liable for any interest or other charges on the earnest money and shall be under no duty to invest or reinvest funds held by it at any time. Sellers and Purchasers hereby acknowledge and consent to the deposit of the escrow money in financial institutions with which Title Company has or may have other banking relationships and further consent to the retention by Title Company and/or its affiliates of any and all benefits (including advantageous interest rates on loans) Title Company and/or its affiliates may receive from such financial institutions by reason of their maintenance of said escrow accounts.

The parties have read the above sentences, recognize that the recitations herein are material, agree to same, and recognize Title Company is relying on the same.

Purchasers/Borrowers     Sellers

_____     _____
Sidney Scholl     Savannah Builders LLC

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18: U.S. Code Section 1001 and Section 1010.



# APPRAISAL OF REAL PROPERTY

## LOCATED AT:
817 NW 194th Ter
Lot 2 Block 3 Stonebriar Sec 1
Edmond, OK 73003

## FOR:
Washington Mutual/eAppraiseIt
75 N Fairway Dr
Vernon Hills, Il 60061

## AS OF:
09/17/06

## BY:
Elizabeth J Angelo

Angelo Appraisal Service, Inc.    (405) 340-1556

File No. 2968756 Page #3

**Summary Appraisal Report**

## Exterior-Only Inspection Residential Appraisal Report
03-2783-004746897-0
File # 2968756

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | |
|---|---|
| Property Address 817 NW 194th Ter | City Edmond    State OK    Zip Code 73003 |
| Borrower Sidney Scholl    Owner of Public Record OKGeoBuilders LLC | County Oklahoma |
| Legal Description Lot 2 Block 3 Stonebriar Sec 1 | |
| Assessor's Parcel # 20-637-1460 | Tax Year 2006    R.E. Taxes $ 0 |
| Neighborhood Name Stonebriar | Map Reference 36420    Census Tract 40109-1082.12 |

Occupant ☐ Owner ☐ Tenant ☒ Vacant    Special Assessments $ None    ☐ PUD    HOA $ N/A    ☐ per year ☐ per month
Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)
Assignment Type ☒ Purchase Transaction ☐ Refinance Transaction ☐ Other (describe)
Lender/Client Washington Mutual/eAppraiselt    Address 75 N Fairway Dr, Vernon Hills, Il 60061
Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?    ☐ Yes ☒ No
Report data source(s) used, offering price(s), and date(s). Oklahoma City MLS Listing Service

I ☐ did ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. No contract was provided. Sales price was provided by lender.
Appraiser was unable to verify property owner without a contract.
Contract Price $ 289,000    Date of Contract Unknown    Is the property seller the owner of public record? ☒ Yes ☐ No  Data Source(s) Per Lender
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower?    ☐ Yes ☒ No
If Yes, report the total dollar amount and describe the items to be paid. Unknown    To appraisers knowledge there are no financing concessions.

**Note: Race and the racial composition of the neighborhood are not appraisal factors.**

| Neighborhood Characteristics | | | | |
|---|---|---|---|---|
| Location ☒ Urban ☐ Suburban ☐ Rural | Property Values ☒ Increasing ☒ Stable ☐ Declining | PRICE | AGE | One-Unit 90 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | $ (000) | (yrs) | 2-4 Unit % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | 122 Low new | Multi-Family % |
| Neighborhood Boundaries Bounded Covell Rd on the north Santa Fe Ave on the east Danforth Rd on the | | 460 High 10 | Commercial % |
| south and Western Ave on the west. | | 200 Pred. 3 | Other 10 % |

Neighborhood Description There are no apparent adverse factors which should affect the subject's marketability. Appeal to the market is average. The improvements conform well with the surrounding area. The subject has access to necessary supporting facilities including schools, shopping, recreation and employment.
Market Conditions (including support for the above conclusions) Property values in the subject area are considered to be stable with demand and supply being in balance. Primary financing in this market is Conventional, FHA and VA with little seller participation. 1 to 3 point typical.

Dimensions 70 x 120    Area 8,400 Sq.Ft. +/-    Shape Rectangular    View Avg/Interior
Specific Zoning Classification A Single Family    Zoning Description Single Family Residence
Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)
Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements - Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Concrete | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley | ☒ | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No    FEMA Flood Zone X    FEMA Map # 40109C0066G    FEMA Map Date 7/2/2002
Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No  If No, describe
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No  If Yes, describe

Source(s) Used for Physical Characteristics of Property ☐ Appraisal Files ☐ MLS ☒ Assessment and Tax Records ☐ Prior Inspection ☐ Property Owner
☒ Other (describe) MDC Appraisal Source, Assessor    Data Source for Gross Living Area MDC Appraisal Source

| | | | | | |
|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☐ Concrete Slab ☐ Crawl Space | ☒ FWA ☐ HWBB | ☒ Fireplace(s) # 1 | ☐ None | |
| # of Stories 1 | ☐ Full Basement ☐ Finished | ☐ Radiant | ☐ Woodstove(s) # | ☒ Driveway  # of Cars 3 | |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | ☐ Partial Basement ☐ Finished | ☐ Other | ☒ Patio/Deck | Driveway Surface | |
| ☒ Existing ☐ Proposed ☐ Under Const. | Exterior Walls Brick | Fuel gas | ☒ Porch Cov | ☒ Garage  # of Cars 3 | |
| Design (Style) Traditional | Roof Surface Composition | ☒ Central Air Conditioning | ☐ Pool | ☐ Carport  # of Cars | |
| Year Built 2006 | Gutters & Downspouts Galvanized | ☐ Individual | ☐ Fence | ☐ Attached ☐ Detached | |
| Effective Age (Yrs) N/A | Window Type Thermal | ☐ Other | ☐ Other | ☐ Built-In | |
| Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☐ Washer/Dryer ☐ Other (describe) | | | | | |

Finished area above grade contains:    8 Rooms    4 Bedrooms    3 Bath(s)    2,546 Square Feet of Gross Living Area Above Grade
Additional features (special energy efficient items, etc.) Three bedrooms and a study for two bedrooms.
Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.) Overall condition is good and no repairs are required. Good quality construction and functional utility. Subject is in an area of similar new construction homes.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No
If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No  If No, describe

Freddie Mac Form 2055 March 2005    Page 1 of 6    Fannie Mae Form 2055 March 2005

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.

03-2783-004746897-0

## Exterior-Only Inspection Residential Appraisal Report   File # 2968756

| | | | |
|---|---|---|---|
| There are | 24 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 179,900 | to $ 454,000 |
| There are | 51 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 122,500 | to $ 298,000 |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 817 NW 194th Ter Edmond, OK 73003 | 821 NW 194th Edmond, OK 73003 | | 19417 Crest Ridge Drive Edmond, OK 73003 | | 1609 Redland Edmond, OK 73003 | |
| Proximity to Subject | | 0.05 miles E | | 0.06 miles E | | 2.43 miles NE | |
| Sale Price | $ 289,000 | $ 283,000 | | $ 282,321 | | $ 296,000 | |
| Sale Price/Gross Liv. Area | $ 113.51 sq.ft. | $ 114.11 sq.ft. | | $ 116.71 sq.ft. | | $ 104.59 sq.ft. | |
| Data Source(s) | | Assessor | | Assessor | | Assessor | |
| Verification Source(s) | | MLS #243754 | | MLS #251725 | | MLS #237324 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | Con/Fix None | | Con/Fix None | | Con/Fix None | |
| Date of Sale/Time | | 06/06/2006 | | 07/10/2006 | | 05/12/2006 | |
| Location | Stonebriar | Stonebriar | | Stonebriar | | CheyenneCross | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 8,400 SF.Ft. +/- | 11,500 SF +/- | | 12000 SF +/- | | 16000 SF +/- | |
| View | Avg/Interior | Avg/Interior | | Avg/Interior | | Avg/Interior | |
| Design (Style) | Traditional | Traditional | | Traditional | | Traditional | |
| Quality of Construction | 1.5 Brk Comp/A | 1 Brk Comp/A | | 1 Brk Comp/A | | 1.5 Brk Comp/A | |
| Actual Age | New | New | | New | | New | |
| Condition | VeryGood | VeryGood | | VeryGood | | VeryGood | |
| Above Grade | Total | Bdrms. | Baths | Total | Bdrms. | Baths | Total | Bdrms. | Baths | Total | Bdrms. | Baths |
| Room Count | 8 | 4 | 3 | 8 | 3 | 2 | +2,000 | 7 | 3 | 1.2 | 0 | 9 | 4 | 3.1 | -1,000 |
| Gross Living Area | 2,546 sq.ft. | 2,480 sq.ft. | +3,630 | 2,419 sq.ft. | +6,985 | 2,830 sq.ft. | -15,620 |
| Basement & Finished | N/A | N/A | | N/A | | N/A | |
| Rooms Below Grade | N/A | N/A | | N/A | | N/A | |
| Functional Utility | Good | Good | | Good | | Good | |
| Heating/Cooling | Central/Central | Central/Central | | Central/Central | | Central/Central | |
| Energy Efficient Items | Therm Winds | Therm Winds | | Therm Winds | | Therm Winds | |
| Garage/Carport | 3 Car Attached | 3 Car Attached | | 3 Car Attached | | 3 Car Attached | |
| Porch/Patio/Deck | Cov Por | Cov Por | | Cov Por | | Cov Por | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☒ + ☐ - | $ 5,630 | ☒ + ☐ - | $ 6,985 | ☐ + ☒ - | $ -16,620 |
| Adjusted Sale Price of Comparables | | Net 2.0 % Gross 2.0 % | $ 288,630 | Net 2.5 % Gross 2.5 % | $ 289,306 | Net 5.6 % Gross 5.6 % | $ 279,380 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)   Oklahoma County Assessor
My research ☒ did ☐ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)   Oklahoma County Assessor
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 11/30/2005 | 12/12/2005 | 11/30/2005 | 07/07/2005 |
| Price of Prior Sale/Transfer | 36,000 | 36,000 | 35,000 | 64,000 |
| Data Source(s) | OK County Assessor | OK County Assessor | OK County Assessor | OK County Assessor |
| Effective Date of Data Source(s) | Approx 30 days | Approx 30 days | Approx 30 days | Approx 30 days |

Analysis of prior sale or transfer history of the subject property and comparable sales     All previous sales were land sales. Subject and comparables are all new construction.

Summary of Sales Comparison Approach     All sales were within net and gross adjustment guidelines. The comparable sales selected were the most recent and pertinent sales relative to the subject property. One and two story homes appear to market equally. All sales were located in the subjects' market area, but outside normal distance perimeters due to scarcity of similar sales in subjects' area. Sales are located in areas considered to possess very similar homes targeted to the same potential purchasers.

Indicated Value by Sales Comparison Approach $  289,000

Indicated Value by: Sales Comparison Approach $  289,000     Cost Approach (if developed) $  N/A     Income Approach (if developed) $  N/A
This is an exterior only. Insufficient data for the cost approach and income approach.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  No requirements. Appraisal is made for the intended user listed above.
Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $  289,000 , as of  09/17/06 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 2055 March 2005                     Page 2 of 6                     Fannie Mae Form 2055 March 2005

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT

# Exterior-Only Inspection Residential Appraisal Report

03-2783-004746897-0
File # 2968756

**ADDITIONAL COMMENTS**

***The intended user for this appraisal report is the Lender/Client, noted in this appraisal report. The inteded use is to evaluate the property that is the subject of this appraisal for a mortgage finance transaction, subject to the stated Scope of Work, purpose of the appraisal, reporting requirements of this appraisal report form, and Definition of Market Value. No additional Intended Uses or Users are identified by the appraiser.

Extraordinary Assumption: Due to the confidential nature of the comparable sales data; this report contains the extraordinary assumption that the county records are correct and accurate as reported and shown. The impact on value will be related to any significant changes determined later if it is found that the sale data is incorrect as relates to price, concessions, etc.

Hypothetical Conditions assume conditions contrary to known facts about legal, physical or economic characterics of the subject, but is considered for the purpose of the analysis.
***The Oklahoma wildfires had no affect on the subject. Subject is in marketable condition and no repairs are needed and no other detrimental conditions were found.

  Scope of Work for this assignment was typical for that of a residential assignment in which a exterior appraisal was performed. An order was received from the client. The assignment was to find an opinion of market valuation. After analyzing data via the Internet on Assessor, MLS, PV Plus & MDC, an appraisal data base, a sufficent amount of data was found to complete this assignment. All sales were arms length transactions. I did a exterior inspection of the subject property, from the street, taking exterior photos.  After gathering data and exterior inspecting the subject property, the analyzed the data further and started preparing the appraisal summary report. The Uniform Standards of Professional Appraisal Practice of July 2006 was utilized thoughout this process.

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.
Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)     Estimated land value may or may not be based on actual land sales depending on age of the area and availability of information.

| | | |
|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE .................................... =$ | 36,000 |
| Source of cost data | DWELLING          2,546  Sq.Ft. @ $ .............. =$ | |
| Quality rating from cost service          Effective date of cost data | Sq.Ft. @ $ .............. =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | .............. =$ | |
| Insufficient information available for a cost approach  with an exterior only. | Garage/Carport          Sq.Ft. @ $ .............. =$ | |
| | Total Estimate of Cost-New .............. =$ | |
| | Less          Physical          Functional          External | |
| | Depreciation .............. =$( ) | |
| | Depreciated Cost of Improvements .............. =$ | |
| | "As-is" Value of Site Improvements .............. =$ | |
| Estimated Remaining Economic Life (HUD and VA only)          60 Years | INDICATED VALUE BY COST APPROACH .............. =$ | |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

**INCOME**

| | | | |
|---|---|---|---|
| Estimated Monthly Market Rent $          N/A          X Gross Rent Multiplier          N/A          = $          N/A          Indicated Value by Income Approach | | | |

Summary of Income Approach (including support for market rent and GRM)

## PROJECT INFORMATION FOR PUDs (if applicable)

**PUD INFORMATION**

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No   Unit type(s) ☐ Detached ☐ Attached
Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.
Legal Name of Project
Total number of phases          Total number of units          Total number of units sold
Total number of units rented          Total number of units for sale          Data source(s)
Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No  If Yes, date of conversion
Does the project contain any multi-dwelling units? ☐ Yes ☐ No  Data Source(s)
Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Completed on behalf of eAppraiseIT.

**Exterior-Only Inspection Residential Appraisal Report**   03-2783-004746897-0   File # 2968756

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal assignment is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Completed on behalf of eAppraiseIT.

File No. 2968756 Page #7

## Exterior-Only Inspection Residential Appraisal Report

03-2783-004746897-0
File # 2968756

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

Completed on behalf of eAppraiseIT.

03-2783-004746897-0

## Exterior-Only Inspection Residential Appraisal Report   File # 2968756

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature *Elizabeth J Angelo* | Signature _____ |
| Name  Elizabeth J Angelo | Name _____ |
| Company Name  Angelo Appraisal Service, Inc. | Company Name _____ |
| Company Address  1217 Salem Ave, Edmond, OK 73003 | Company Address _____ |
| Telephone Number  (405) 340-1556 | Telephone Number _____ |
| Email Address  angeloappraisalservice@cox.net | Email Address _____ |
| Date of Signature and Report  09/20/2008 | Date of Signature _____ |
| Effective Date of Appraisal  09/17/06 | State Certification # _____ |
| State Certification #  11243CRA | or State License # _____ |
| or State License # | State _____ |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License _____ |
| State  OK | |
| Expiration Date of Certification or License  3/31/2009 | **SUBJECT PROPERTY** |
| ADDRESS OF PROPERTY APPRAISED | |
| 817 NW 194th Ter | ☐ Did not inspect subject property |
| Edmond, OK 73003 | ☐ Did inspect exterior of subject property from street |
| | Date of Inspection _____ |
| APPRAISED VALUE OF SUBJECT PROPERTY $  289,000 | |
| LENDER/CLIENT | **COMPARABLE SALES** |
| Name | |
| Company Name  Washington Mutual/eAppraiseIt | ☐ Did not inspect exterior of comparable sales from street |
| Company Address  75 N Fairway Dr, Vernon Hills, Il 60061 | ☐ Did inspect exterior of comparable sales from street |
| | Date of Inspection _____ |
| Email Address  lsistatus@lendersservice.com | |

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.

## Subject Photos

| Borrower/Client | Sidney Scholl | | | | |
|---|---|---|---|---|---|
| Property Address | 817 NW 194th Ter | | | | |
| City | Edmond | County Oklahoma | | State OK | Zip Code 73003 |
| Lender | Washington Mutual/eAppraiseIt | | | | |



### Subject Front

| | |
|---|---|
| 817 NW 194th Ter | |
| Sales Price | 289,000 |
| Gross Living Area | 2,546 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3 |
| Location | Stonebriar |
| View | Avg/Interior |
| Site | 8,400 Sq.Ft. +/- |
| Quality | 1.5 Brk Comp/A |
| Age | New |

### Subject Rear

### Subject Street



Form PICPIX.SR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.

File No. 2968756 Page #10

## Comparable Photos ##

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower/Client | Sidney Scholl | | | | | |
| Property Address | 817 NW 194th Ter | | | | | |
| City | Edmond | County | Oklahoma | State | OK | Zip Code 73003 |
| Lender | Washington Mutual/eAppraiseIt | | | | | |



### Comparable 1

821 NW 1994th
| | |
|---|---|
| Prox. to Subject | 0.05 miles E |
| Sales Price | 283,000 |
| Gross Living Area | 2,480 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | Stonebriar |
| View | Avg/Interior |
| Site | 11,500 SF +/- |
| Quality | 1 Brk Comp/A |
| Age | New |



### Comparable 2

19417 Crest Ridge Drive
| | |
|---|---|
| Prox. to Subject | 0.06 miles E |
| Sales Price | 282,321 |
| Gross Living Area | 2,419 |
| Total Rooms | 7 |
| Total Bedrooms | 3 |
| Total Bathrooms | 1.2 |
| Location | Stonebriar |
| View | Avg/Interior |
| Site | 12000 SF +/- |
| Quality | 1 Brk Comp/A |
| Age | New |



### Comparable 3

1609 Redland
| | |
|---|---|
| Prox. to Subject | 2.43 miles NE |
| Sales Price | 296,000 |
| Gross Living Area | 2,830 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.1 |
| Location | CheyenneCross |
| View | Avg/Interior |
| Site | 16000 SF +/- |
| Quality | 1.5 Brk Comp/A |
| Age | New |

Completed on behalf of eAppraiseIT.



State of Oklahoma

Oklahoma Real Estate Appraiser Board

This is to certify that:

**Elizabeth J. Angelo**

has complied with the provisions of the Oklahoma Real Estate Appraisers Act to transact business as a Certified Residential Real Estate Appraiser in the State of Oklahoma.

In Witness Whereof, I have hereunto set my hand and caused the seal of my office to be affixed at the City of Oklahoma City, State of Oklahoma, this 1st day of March A.D. 2000.

Date: March 11, 2000                    11243CRA

Form SCA — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Completed on behalf of eAppraiseIT.

File No. 2966756  Page #12

# ELIZABETH J. ANGELO
1217 Salem Ave
Edmond, OK  73003
(405) 340-1555  Fax (405) 340-7388
AngeloAppraisalService.a.vv.net

**EDUCATION:**  BBA Finance
University of Central Oklahoma, OK   1992
AAS Banking, Real Estate & Insurance
Hudson Valley Community College, NY  1978
Charles Barnes School of RE Appraisal, OK  1992

**1990-1992**  Real Estate Law
Real Estate Principles
Real Estate Practices

**1996-1999**  FHA Appraisals
Technology & Modern Appraiser
New Construction
Home Inspection-Common Defects
Introduction to Income Property

**2000-2002**  Residential Analysis for Small Income Property
Financial Analysis of Income Property
Dissection of a Residential Appraisal Report
Computing GLA using Anci Standards
Is a Comparable A Comparable?
Documenting & Supporting Appraisal Reports
Mobile & Manufacturing Homes

**2003-2005**  Market Abstraction
Reviewing Residential Appraisals
Narrative Report Writing
Building Material Characteristics
New Fannie Mae Forms Review
USPAP Update

**EXPERIENCE:**  Full Time Residential Appraiser, October 1994- Present
Seven Years experience in a RE Construction & Mgmt Office

**CREDENTIALS:**  OK Certified Residential Appraisal License   #11245CRA
FHA Approval          Chums          #4237

**PROFESSIONAL
MEMBERSHIPS:**  Oklahoma Metropolitan Board of Realtors
National Association of Independent Fee Appraisers

Completed on behalf of eAppraiseIT.

File No. 2968758  Page #13

## Location Map

| Borrower/Client | Sidney Scholl | | | | |
|---|---|---|---|---|---|
| Property Address | 817 NW 194th Ter | | | | |
| City | Edmond | County Oklahoma | | State OK | Zip Code 73003 |
| Lender | Washington Mutual/eAppraiseIt | | | | |



Completed on behalf of eAppraiseIT.

FROM :ALFONSO TONI SPEARS""""        FAX NO. :              Feb. 05 2008 08:04PM P2



# ALLIANCE TITLE COMPANY

901 Campisi Way, Suite 100, Campbell, CA 95008
Phone: (408) 559-3424    Fax: (408) 377-0284

## BUYERS/BORROWERS CLOSING STATEMENT
### Estimated

| | |
|---|---|
| Buyer/Borrower: **Felton A. Spears** | Escrow No:    11517558-001 JLT |
| **Toni Spears** | Close Date: |
| | Proration Date: |
| | Date Prepared:    03/03/2007 |

Property:    10161 Roehampton Avenue
San Jose, CA 95127

| Description | Debit | Credit |
|---|---|---|
| **NEW AND EXISTING ENCUMBRANCES:** | | |
| Refinance from Washington Mutual Bank | | $178,000.00 |
| **NEW LOAN CHARGES:** | | |
| Appraisal Fee to Washington Mutual Bank | 361.00 | |
| Tax Service to Washington Mutual Bank | 81.00 | |
| Flood Determination to LandAmerica Tax & Flood | 8.00 | |
| Funding & Review Fee to Washington Mutual Bank | 480.00 | |
| Wire Transfer Fee to Washington Mutual Bank | 35.00 | |
| Payment Processing to Washington Mutual Bank | 200.00 | |
| Credit-Customer Retent to Washington Mutual Bank | (980.00) | |
| Prepaid Interest to Washington Mutual Bank | 621.80 | |
| @ $31.09 per day        From 03/12/07 To 04/01/07 | | |
| Hazard Insurance to Washington Mutual Bank | 222.00 | |
| 3 mos. @ $74.00/month | | |
| County Property Taxes to Washington Mutual Bank | 499.47 | |
| 3 mos. @ $166.49/month | | |
| **RECORDING FEES:** | | |
| Recording Fees to Alliance Title Company | 73.00 | |
| Record Release to Alliance Title Company | 18.00 | |
| **ADDITIONAL CHARGES:** | | |
| Homeowners Insurance Premium to Please Advise (If Needed) | 600.00 | |
| **PAYOFFS:** | | |
| Payoff to World Savings | $155,423.11 | |
| $154,165.58    Principal Balance | | |
| $561.75    Interest From 03/01/2007 to 03/16/2007 | | |
| $561.78    Interest 2/15/07-3/01/07 | | |
| $54.00    Reconveyance Fee | | |
| $80.00    Statement Fee | | |

| | | |
|---|---:|---:|
| Lenders Policy $178,000.00 to Alliance Title Company | 584.00 | |
| Delivery/Courier Deliveries to Alliance Title Company | 63.00 | |
| Escrow Fee to Alliance Title Company | 250.00 | |
| Notary Fee to Alliance Title Company | 75.00 | |
| | | |
| Sub Totals | 158,616.38 | 178,000.00 |
| Refund Due Buyer/Borrower | 19,383.62 | |
| Totals | $178,000.00 | $178,000.00 |

Felton A. Spears

Toni Spears

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSAN CHAMBERLAN, BRIAN CHAMPINE, and HENRY FOK, on behalf of themselves and all others similarly situated, and on behalf of the general public, | No. C 03-2628 CW |
| | ORDER GRANTING IN PART DEFENDANT's MOTION TO DISMISS AND DENYING IT IN PART |
| Plaintiffs, | |
| v. | |
| FORD MOTOR COMPANY, and DOES 1 through 100, inclusive, | |
| Defendants. | |
| _____/ | |

Plaintiffs Susan Chamberlan, Brian Champine, and Henry Fok (Plaintiffs) are suing Defendant Ford Motor Company (Defendant) for violations of the California Consumers Legal Remedies Act (CLRA), Cal. Civ. Code § 1750 et seq., and the Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200 et seq. Defendant moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiffs' complaint for failure to state a claim and files a request for judicial notice. Plaintiffs oppose the motion and the request for judicial notice. The matter was heard on August 1, 2003. Having

considered oral argument on the motion and all of the papers

filed by the parties, the Court GRANTS Defendant's motion to

dismiss in part and DENIES it in part and GRANTS Defendant's

request for judicial notice.  The Court also GRANTS Plaintiffs

leave to amend their complaint.

BACKGROUND

Plaintiffs bring this action on behalf of themselves and

all similarly situated persons residing in California who

purchased certain automobiles (Subject Automobiles)[1] manufactured

by Defendant.  In relevant part, the complaint alleges that

beginning in 1996, Defendant manufactured, sold, and distributed

Subject Automobiles containing defective intake manifolds.

Compl. at ¶ 2.  Plaintiffs allege that no later than January 1,

1997, and possibly earlier, Defendant became aware that a large

number of intake manifolds in the Subject Automobiles were

cracking prematurely, exposing drivers and their passengers to

serious risk of injury.  Id. at ¶ 4.  Plaintiffs allege that

Defendant's testing and records showed that the intake manifolds

failed at a "much higher rate than was to be expected from a

properly functioning manifold, and was occurring much more

quickly than the expected life of the part."  Id. at ¶ 5.

Starting in January, 1998, Defendant began to offer several

extended warranty protection, or "recall," programs for free

replacement or repair of the defective intake manifolds for some

---

[1] Subject Automobiles include Mercury Grand Marquis (1996-2001), Ford Mustang (1996-2001), Ford Explorer (2002), Ford Crown Victoria (1996-2001), Lincoln Town Car (1996-2001), Mercury Cougar (1996-1997), and Ford Thunderbird (1996-1997).

**United States District Court**
For the Northern District of California

of the Subject Automobiles.  <u>Id.</u> at ¶ 6.  Plaintiffs allege, however, that Defendant extended this offer almost exclusively to fleet purchasers of Subject Automobiles such as taxi cab companies, limousine companies, and police forces.  <u>Id.</u> Plaintiffs allege that by failing to send the recall letter or offer the recall program to the vast majority of consumer purchasers of Subject Automobiles, Defendant "concealed from and/or failed to disclose to Plaintiffs and the Class the defective nature of the intake manifolds contained in the Subject Automobiles."  <u>Id.</u> at ¶ 7.  As a result of these defective intake manifolds, the Subject Automobiles purchased by Plaintiffs and the Class "did not perform in accordance with the reasonable expectations of Plaintiffs and the Class–namely, that the automobiles were suitable for normal use as a passenger vehicle."  <u>Id.</u> at ¶ 8.

The complaint alleges that Plaintiff Brian Champine bought a 1996 Ford Thunderbird on September 13, 2000 and the intake manifold cracked on March 28, 2002 at about 88,000 miles.  <u>Id.</u> at ¶ 12.  Plaintiff Susan Chamberlan bought a used 1997 Mercury Grand Marquis.  In June, 2002, the intake manifold in her car cracked at about 60,000 miles.  <u>Id.</u> at ¶ 13.  Plaintiff Henry Fok bought a used 1998 Mustang GT convertible, and in March, 2003, the car's intake manifold cracked at 70,000 miles.  <u>Id.</u> at ¶ 14.  Plaintiffs allege that Defendant, "through its own efforts and through its network of authorized dealerships acting as its agents . . . warranted, advertised, distributed, and sold its automobiles throughout the state of California."  <u>Id.</u> at ¶

3

**United States District Court**
For the Northern District of California

1    16.

2        Plaintiffs' CLRA claim alleges that Defendant engaged in

3    "unfair competition or unfair or deceptive practices in

4    violation of Civil Code sections 1770(a)(5) and (7) when they

5    failed to disclose that the Subject Automobiles contain

6    defective intake manifolds."  <u>Id.</u> at ¶ 29.

7        Plaintiffs' UCL claim alleges that Defendant engaged in

8    "unfair competition or unlawful, unfair or fraudulent business

9    practices in violation of the Unfair Business Practices Act when

10   they omitted to disclose that the Subject Automobiles have

11   defective intake manifolds."  <u>Id.</u> at ¶ 34.  Plaintiffs request

12   damages, restitution, and attorneys' fees.

13                        LEGAL STANDARD

14       A motion to dismiss for failure to state a claim will be

15   denied unless it appears that the plaintiff can prove no set of

16   facts which would entitle it to relief.  <u>Conley v. Gibson</u>, 355

17   U.S. 41, 45-46 (1957); <u>Fidelity Financial Corp. v. Federal Home</u>

18   <u>Loan Bank</u>, 792 F.2d 1432, 1435 (9th Cir. 1986), <u>cert. denied</u>,

19   497 U.S. 1064 (1987).  Dismissal of a complaint can be based on

20   either the lack of a cognizable legal theory or the lack of

21   sufficient facts alleged under a cognizable legal theory.

22   <u>Balistreri v. Pacifica Police Dept.</u>, 901 F.2d 696, 699 (9th Cir.

23   1990).

24       All material allegations in the complaint will be taken as

25   true and construed in the light most favorable to the plaintiff.

26   <u>NL Indus., Inc. v. Kaplan</u>, 792 F.2d 896, 898 (9th Cir. 1986).

27   However, "conclusory allegations without more are insufficient

28                              4

to defeat a motion to dismiss." <u>McGlinchy v. Shell Chemical</u>
<u>Co.</u>, 845 F.2d 802, 810 (9th Cir. 1988); <u>Smilecare Dental Group</u>
<u>v. Delta Dental Plan</u>, 88 F.3d 780, 785 n.6 (9th Cir.), <u>cert.</u>
<u>denied</u>, 519 U.S. 1028 (1996).

DISCUSSION

I.    The CLRA and the UCL

The CLRA makes illegal "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."  Cal. Civ. Code § 1770(a).  Among the proscribed activities are

> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have.

> (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

Cal. Civ. Code § 1770 (a)(5), (7).  The CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."  Cal. Civ. Code § 1760.

The UCL prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act

1    prohibited by Chapter 1[2] (commencing with Section 17500) of Part

2    3 of Division 7 of the Business and Professions Code."  Cal.

3    Bus. & Prof. Code   § 17200.

4     The UCL provides for monetary relief in the form of

5    restitution:  "Any person who engages, has engaged, or proposes

6    to engage in unfair competition may be enjoined in any court of

7    competent jurisdiction.  The court may make such orders or

8    judgments, including the appointment of a receiver, as may be

9    necessary to prevent the use or employment by any person of any

10   practice which constitutes unfair competition, as defined in

11   this chapter, or as may be necessary to restore to any person in

12   interest any money or property, real or personal, which may have

13   been acquired by means of such unfair competition."  Cal. Bus. &

14   Prof. Code § 17203.

15   II.  Defendant's Request for Judicial Notice

16    Defendant requests that the Court take judicial notice of

17   Assembly Bill No. 292, which documents some of the legislative

18   history of the CLRA, and of the warranties for Plaintiffs'

19   

20   vehicles.

21    Although generally a court may not consider material beyond

22   the pleadings in ruling on a Rule 12(b)(6) motion, "documents

23   whose contents are alleged in a complaint and whose authenticity

24   no party questions, but which are not physically attached to the

25   

26   _____

27    [2]  Chapter 1 prohibits false advertising for a variety of
     businesses.

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

pleading, may be considered." <u>Branch v. Tunnell</u>, 14 F.3d 449, 454 (9th Cir. 1994).  A court may also consider documents which are not expressly incorporated into the complaint, but "upon which the plaintiff's complaint necessarily relies." <u>Parrino v. FHP, Inc.</u>, 146 F.3d 699, 706 (9th Cir. 1998).  Federal Rule of Evidence 201(b) permits courts to take judicial notice of adjudicative facts when they are capable of accurate and ready determination by sources whose accuracy cannot reasonably be questioned.

Defendant has submitted Assembly Bill No. 292 as it was introduced to the California Legislature on January 21, 1970 and as amended on May 22, 1970.  The Assembly Bill is a public record whose accuracy cannot be reasonably questioned. Defendant has also submitted copies of the warranties for Plaintiffs' vehicles.  Because Defendant's motion must be denied in relevant part even if the Court considers the warranties, the Court will judicially notice them for purposes of this motion.

III.    Defendant's Motion to Dismiss

    A.   Warranty

Defendant contends that Plaintiffs fail to state a claim under the CLRA or the UCL because Plaintiffs cannot use these statutes retroactively to convert their vehicles' warranties into lifetime guarantees.  Plaintiffs respond that their claims

7

are not warranty claims and that the CLRA and the UCL provide relief to consumers, regardless of the warranty involved, if the defendant engages in unfair, unlawful or fraudulent business activities.

Defendant relies on several cases to argue that because the intake manifolds failed after the warranty had expired, Plaintiffs cannot bring claims under the CLRA or the UCL. See e.g., Seely v. White Motor Co., 63 Cal. 2d. 9, 16 (1965) (manufacturer's failure to comply with its obligation under warranty entitled purchaser to recover damages resulting from such breach of warranty); Standard Platforms. Ltd. v. Document Imaging Sys. Corp., 1995 WL 691868 at *1 (N.D. Cal.) (granting Rule 12(b)(6) motion to dismiss fraud claim that defendants knew but failed to disclose specific defects in the products because plaintiff impermissibly attempted to "tortify" contract law); Greentree Software, Inc. v. Delrina Tech., Inc., 1996 WL 183041 at *3 (N.D. Cal.) (granting Rule 12(b)(6) motion to dismiss claim for negligent misrepresentation of product quality where claim, sounding in tort, was based on false statement made during the performance of a commercial sales contract); Abraham v. Volkswagen of Am., 795 F.2d 238, 249-50 (2d. Cir. 1986) (warranty does not cover defects manifested after warranty's expiration).

United States District Court
For the Northern District of California

None of the cases relied on by Defendant holds that a defect manifested after the expiration of a warranty precludes a plaintiff from bringing claims under the CLRA or the UCL.  The effect of warranty expiration is not included in the plain language of the relevant sections of the CLRA and the UCL.  To state a claim under these statutes, a plaintiff must only allege that the defendant engaged in unfair business practices.  For these reasons, Plaintiffs' complaint cannot be dismissed on this ground.

B.   Duty of Disclosure

Defendant argues that Plaintiffs' complaint must be dismissed because Plaintiffs have not alleged and cannot establish that Defendant had a duty to disclose information about the allegedly defective intake manifolds.

The plain language of the relevant sections of the CLRA and the UCL does not require a plaintiff to allege that the defendant has a duty of disclosure.  Although Defendant argues that a manufacturer or a seller has no duty to make disclosures to the buyer, it has cited no case law to show that such a duty must be alleged in order to state a claim under the CLRA or the UCL.

Defendant also contends that Plaintiffs' complaint is

9

insufficient as a matter of law under Rule 9(b).  Defendant

relies on <u>Vess v. Ciba-Geigy Corp.</u>, which held that, although

fraud is not a necessary element of a CLRA claim, if a plaintiff

chooses to allege in the complaint that a defendant has engaged

in fraudulent conduct, the pleading of that claim must satisfy

the particularity requirement of Rule 9(b) of the Federal Rules

of Civil Procedure.  317 F.3d 1097, 1103-04 (9th Cir. 2003).

Defendant claims that Plaintiffs have plead fraud but have not

specified when failure of the intake manifolds is so premature

and so frequent that Defendant has an obligation to disclose it

or what Plaintiffs' "expectations" were regarding the durability

of the manifolds.

In the complaint, Plaintiffs allege that no later than

January, 1997, Defendant became aware that the defective intake

manifolds were failing at a "much higher rate" than the

"expected life of the part," and that beginning in January,

1998, Defendant concealed the defects when it sold the

automobiles while advertising that they were of sufficient

quality for normal use and when it offered an extended warranty

program to fleet purchasers of Subject Automobiles but not to

the vast majority of consumers.  Compl. at ¶¶ 4-7.  Plaintiffs

also allege that because of the defective intake manifolds,

their Subject Automobiles did not perform in accordance with

10

their reasonable expectation that the cars would be "suitable for normal use as a passenger vehicle." Id. at ¶ 8. Thus, Plaintiffs have alleged when Defendant became aware of the defect, what the defect was, when it concealed the defect, and what the Plaintiffs' expectations were regarding their vehicles. Therefore, to the extent that Plaintiffs' claims sound in fraud, they have alleged facts with sufficient particularity to satisfy Rule 9(b).

For these reasons, Plaintiffs' complaint cannot be dismissed on the ground that it did not allege a duty of disclosure or that it did not allege fraud with particularity.

C.   Concealment

Defendant argues that Plaintiffs fail to state a CLRA claim because they do not allege any affirmative misrepresentations by Defendant.

Citing Outboard Marine Corp. v. Superior Court, 52 Cal. App. 3d 30, 36. (1975), Plaintiffs argue that concealment of design defects is prohibited by the CLRA.  In Outboard Marine, the plaintiff brought a class action alleging that the defendant, a manufacturer, fraudulently concealed a design defect in its vehicles.  Id. at 34.  The plaintiff also brought a second cause of action, alleging that the defendant made fraudulent misrepresentations about certain specifications of

11

United States District Court
For the Northern District of California

the vehicle in violation of the CLRA.  Id.  The defendant moved

to dismiss the first cause of action on the ground that it was

covered by the CLRA.  Id.[3]  The trial court denied the motion.

The court of appeal held that the motion to dismiss should have

been granted because the CLRA provided the exclusive remedy for

conduct encompassed by the act and the first cause of action was

based on the same conduct as that alleged in the second cause of

action.  The court concluded that because "an active concealment

has the same force and effect as a representation," the CLRA

includes a proscription against "a concealment of the

characteristics, use, benefit, or quality of the goods contrary

to that represented."  Id. at 37.

Defendant seeks to distinguish Outboard Marine by noting

that the plaintiff, unlike Plaintiffs in this case, alleged that

the defendant made positive misrepresentations in addition to

concealing facts.  Defendant argues that Plaintiffs have not

alleged that Defendant made any misrepresentations about the

durability of its intake manifolds.  Defendant also argues that

by using the word "representing" in § 1770(a)(5) and (7), the

legislature meant affirmative misrepresentations and not

concealment.  Defendant further supports this interpretation by

---

[3] At the time this case was decided, the CLRA provided the exclusive remedy for conduct encompassed by the act.  Section 1752 now provides that the CLRA is not an exclusive remedy.

12

noting that § 1770(a)(21)[4] provides that the failure to disclose certain characteristics of "grey market goods" is a violation of the CLRA.  Defendant argues that because the legislature included concealment in one provision of the CLRA and did not do so in another related one, the legislature intended to make concealment actionable only in the case of "grey market goods."

Defendant's arguments are unpersuasive.  First, although Defendant is correct that the plaintiff in <u>Outboard Marine</u>, unlike Plaintiffs in this case, alleged that the defendant made positive misrepresentations, this distinction does not affect the court's determination that concealment of product defects is equivalent to misrepresentation for the purpose of analyzing claims brought under CLRA.

Second, Defendant's attempt to infer legislative intent from Chapter 4 of Title 1.7 (Consumer Warranties) is

_____

[4] Section 1770(a)(21) prohibits the "[s]elling or leasing goods in violation of Chapter 4 (commencing with Section 1797.8) of Title 1.7."

Section 1797.81 provides that "[e]very retail seller who offers grey market goods for sale shall post a conspicuous sign at the product's point of display and affix to the product or its package a conspicuous ticket, label, or tag disclosing" certain characteristics about the product (e.g., the item is not covered by manufacturer's express written warranty).

"Grey market goods" means "consumer goods bearing a trademark and normally accompanied by an express written warranty valid in the United States of America which are imported into the United States through channels other than the manufacturer's authorized United States distributor and which are not accompanied by the manufacturer's express written warranty valid in the United States."  Cal. Civ. Code § 1797.8(a).

United States District Court

For the Northern District of California

unpersuasive.  Title 1.7 is not part of the CLRA, and it does not contain the word "conceal" or "concealment."  The CLRA merely incorporates Chapter 4 of Title 1.7 to prohibit certain acts and practices in the sale of grey market goods.  The relationship between the CLRA and Chapter 4 is too attenuated to infer the legislative intent of the terms in the CLRA from language in Chapter 4.

Nothing in the CLRA indicates that concealment is not the legal equivalent of misrepresentation.  Rather, the statute specifically provides that it shall be "liberally construed" to promote its underlying purposes, which include protection of consumers against unfair and deceptive business practices.  Cal. Civ. Code § 1760.  Liberally construed, the CLRA's proscription against unfair and deceptive business practices encompasses Defendant's alleged concealment of product defects.

Even if concealment were not actionable under the CLRA, Plaintiffs' complaint has alleged sufficient facts to show that Defendant represented that its vehicles would be of a particular quality that they are not.  In the complaint, Plaintiffs allege that Defendant "warranted, advertised, distributed, and sold" its automobiles.  In this way, Defendant represented that its cars would be of sufficient quality for normal use, and Plaintiffs bought the cars with the expectation that the cars

14

would be suitable for normal use.  Plaintiffs allege that the intake manifolds in the Subject Automobiles "did not perform in accordance with the reasonable expectations of Plaintiffs and the Class--namely, that the automobiles were suitable for normal use as a passenger vehicle."  Compl. at ¶ 8.  Therefore, Defendant allegedly represented that its vehicles would be of a quality suitable for normal use even though they were not.

Cases cited by Defendant to support the proposition that concealment is not actionable under CLRA are inapt.  In <u>Vess v. Ciba-Geigy Corp.</u>, a plaintiff sued the maker of Ritalin and two non-profit organizations for conspiring to increase sales of the drug in violation of the CLRA.  2001 WL 290333 at *2 (S.D. Cal., Mar. 9, 2001), <u>aff'd in relevant part</u>, 317 F.3d 1097 (9th Cir. 2003).  The court found that the non-profit organizations did not market or sell the product, there was no transaction between them and the plaintiff, and there was no allegation that the plaintiff saw or relied on the organizations' advertisements or that they made misrepresentations.  <u>Id.</u> at 12, 16.  For these reasons, the court granted the non-profit organizations' Rule 12(b)(6) motion to dismiss the CLRA claim.  The court did not hold that concealment is not actionable under the CLRA.

In <u>Bescoes v. Bank of America</u>, a plaintiff who leased a vehicle brought an action against the automobile dealer and the

15

**United States District Court**
For the Northern District of California

1   bank that financed the lease.  105 Cal. App. 4th 378, 382

2   (2003).  The plaintiff claimed that the bank was liable under

3   the CLRA for failing to include a certain notice in its lease

4   agreement as required by federal law.  Id. at 385.  The court

5   rejected the plaintiff's CLRA claim because the federal law did

6   not apply to his case and the bank therefore did not engage in a

7   deceptive practice by not including the notice.  Id. at 395.

8   The court did not hold that concealment is not actionable under

9   the CLRA.

10  the CLRA.

11      Therefore, the CLRA claim cannot be dismissed on this

12  basis.

13      D.   Transaction

14      Defendant contends that because Plaintiffs bought used

15  vehicles and did not buy them from Defendant, they fail to state

16  a CLRA claim in that they have not alleged that they entered

17  into a transaction with Defendant.

18      As stated above, the CLRA prohibits "unfair methods of

19  competition and unfair or deceptive acts or practices undertaken

20  by any person in a transaction intended to result or which

21  results in the sale or lease of goods or services to any

22  consumer."  Cal. Civ. Code § 1770(a).  The CLRA defines

23  "transaction" to mean "an agreement between a consumer and any

24  other person, whether or not the agreement is a contract

28                              16

United States District Court

For the Northern District of California

1  enforceable by action, and includes the making of, and the

2  performance pursuant to, that agreement."  Cal. Civ. Code §

3  1761(e).

4

5      Defendant argues that the California Legislature intended

6  the CLRA to apply only to a defendant's alleged unlawful action

7  in the context of a transaction between the plaintiff and the

8  defendant.  As originally introduced in the legislature, the

9  language of § 1770 proscribed "unfair methods of competition and

10  unfair or deceptive practices undertaken by any person in the

11  conduct of any trade or commerce . . . ."  Assembly Bill 292,

12  Regular Session (Cal. Jan. 21, 1970) (emphasis added).  An

13  amended version of the bill replaced "conduct of any trade or

14  commerce" with "sale or lease of goods to any consumer."

15  Amended Assembly Bill 292, Regular Session (Cal. May 22, 1970).

16  Defendant argues that this change demonstrates that the

17  legislature intended to restrict the CLRA's ambit to unlawful

18  practices of a seller in a transaction with a buyer.

19

20      However, before the bill was passed, the legislature also

21  inserted another phrase: "a transaction intended to result or

22  which results in."  Thus, the legislature expanded the range of

23  illegal acts and practices to include those "undertaken by any

24  person in a transaction intended to result or which results in

25  the sale or lease of goods or services to any consumer."

26

27

28                              17

United States District Court
For the Northern District of California

1  Nothing in the language of the CLRA states that only a defendant

2  who directly engaged in a completed transaction with a plaintiff

3  may be liable to that plaintiff.  Viewed in light of the

4  provision to construe the statute liberally, the broad language

5  of the statute suggests that the legislature intended the CLRA

6  to cover a wide range of business activities.

7

8      In support of its argument, Defendant relies on <u>Vess</u>, 2001

9  WL 290333 at *2, and <u>Boyd v. Keyboard Network Magazine</u>, 2000 WL

10 274204 at *3 (N.D. Cal.), <u>aff'd</u>, 246 F.3d 672 (9th Cir. 2000).

11 In <u>Vess</u>, the CLRA claim against the non-profit organizations was

12 dismissed partly because they were not engaged in any business

13 transactions with the plaintiff.  In <u>Boyd</u>, the plaintiff, who

14 was wronged by a company that made a false advertisement, sued

15 the publisher of that advertisement.  2000 WL 274204 at *3.  The

16 court dismissed the CLRA claim for failing to allege a

17 transaction because the publisher never intended to sell goods

18 or services to the plaintiff.  <u>Id.</u>

19

20     The present case is distinguishable from <u>Vess</u> and <u>Boyd</u>.

21 Neither the non-profit organizations in <u>Vess</u> nor the publisher

22 in <u>Boyd</u> manufactured goods for sale, provided services, or

23 intended to sell goods or provide services to any consumers.  In

24 contrast, here Defendant is a manufacturer of automobiles which

25 it intends to and does sell to consumers.  Plaintiffs' complaint

26

27

28                              18

**United States District Court**

For the Northern District of California

alleges that they bought a 1996, a 1997, and a 1998 model of the Subject Automobiles, that Defendant knew of the defective intake manifolds "no later than January 1, 1997, and possibly earlier," and that Defendant, "through its own efforts and through its network of authorized dealerships acting as its agents," "warranted, advertised, distributed, and sold its automobiles throughout the state of California." Compl. at ¶¶ 4, 12, 13, 14, 16. Therefore, Defendant allegedly knew of and concealed the defects in its Subject Automobiles at the time it engaged in transactions that were "intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). Among the sales of goods to consumers, that resulted from the transactions in which Defendant engaged, were the subsequent resales of Subject Automobiles to Plaintiffs.

For these reasons, Defendant's alleged concealment of product defects from Plaintiffs constitutes a transaction actionable under the CLRA and the complaint cannot be dismissed on this ground.

E.   Restitution

Defendant argues that because Plaintiffs are not entitled to restitution or damages under the UCL, that claim should be dismissed. Plaintiffs contend that they properly requested

19

1    restitution under the UCL.

2        In <u>Kraus v. Trinity Mgmt. Servs.</u>, the court found that the

3    California Legislature has not expressly authorized monetary

4    relief other than restitution in UCL actions.  23 Cal. 4th 116,

5    138 (2000).  The court defined an order for restitution as one

6    "compelling a UCL defendant to return money obtained through

7    unfair business practice to those persons in interest from whom

8    the property was taken, that is, to persons who had an ownership

9    interest in the property or those claiming through that person."

10   <u>Id.</u> at 126-127.  The court concluded that although disgorgement

11   into a fluid recovery fund[5] is not an available remedy under the

12   UCL for representative actions, the legislature has "authorized

13   disgorgement into a fluid recovery fund in class actions."  <u>Id.</u>

14   at 138.

15       In <u>Korea Supply Co. v. Lockheed Martin Corp.</u>, 29 Cal. 4th

16   1134 (2003), the Republic of Korea solicited bids from several

17   manufacturers of military equipment.  The plaintiff represented

---

[5]  "Fluid recovery" refers to "the application of the
equitable doctrine of cy près in the context of a modern class
action.  The implementation of fluid recovery involves three
steps.  First, the defendant's total damage liability is paid
over to a class fund.  Second, individual class members are
afforded an opportunity to collect their individual shares by
proving their particular damages, usually according to a lowered
standard of proof.  Third, any residue remaining after
individual claims have been paid is distributed by one of
several practical procedures that have been developed by the
courts."  <u>Kraus</u>, 23 Cal. 4th at 127 (citations and quotation
marks omitted).

a company that lost the bid.  <u>Id.</u> at 1140.  The plaintiff, who would have received a commission had the company it represented won the bid, sued the defendant under the UCL because it allegedly won the bid by bribing Korean officials.  <u>Id.</u>  One issue before the court was "whether disgorgement of profits allegedly obtained by means of an unfair business practice is an authorized remedy under the UCL where these profits are neither money taken from a plaintiff nor funds in which the plaintiff has an ownership interest."  <u>Id.</u>  The court concluded that the plaintiff was not seeking return of money or property that was once in its possession but was seeking return of the profit the defendant received from the Republic of Korea, and that "disgorgement of such profits is not an authorized remedy in an individual action under the UCL."  <u>Id.</u> at 1140, 1149.  However, direct victims of unfair competition may obtain restitution. <u>Id.</u> at 1152.

Relying on <u>Kraus</u>, Plaintiffs argue that <u>Korea Supply</u> limited only direct victims in representative actions to a restitution remedy.  Plaintiffs suggest that in class actions, disgorgement into a fluid recovery fund is an available remedy under the UCL, even for indirect victims.  Plaintiffs are incorrect.  The <u>Kraus</u> court noted that disgorgement into a fluid recovery fund is an available remedy for class actions, but the

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  court also concluded that restitution is the only monetary

2  remedy available under the UCL.   23 Cal. 4th at 138.   Thus,

3  although a court may order disgorgement into a fluid recovery

4  fund under the UCL for a class action, a plaintiff may recover

5

6  money from this fund only to the extent that the recovery is

7  restitutionary.

8      In the present case, Plaintiffs, as used car purchasers,

9  have not alleged that they paid any money to Defendant.

10  Plaintiffs are not direct victims who seek the return of money

11  that was taken from them by Defendant.   Therefore, the remedy

12  that Plaintiffs seek is not restitutionary and their claim for

13  restitution under the UCL is dismissed.

14

15      In their prayer for relief, Plaintiffs request any other

16  relief that may be appropriate.   Under the UCL, Plaintiffs may

17  seek injunctive relief.   Therefore, Plaintiffs are given leave

18  to amend to make a UCL claim for injunctive relief if they wish

19  to do so.

20

21                    CONCLUSION

22      For the foregoing reasons, Defendant's motion to dismiss

23  (Docket #7) is GRANTED IN PART.   Plaintiffs' UCL claim is

24  dismissed with leave to amend in accordance with this order.

25  Defendant's motion to dismiss Plaintiffs' CLRA claim is DENIED.

26  Plaintiffs may file their amended complaint within ten days from

27

28                       22

United States District Court

For the Northern District of California

1  the date of this order.  Defendant shall respond to Plaintiffs'

2  complaint within twenty days thereafter.  If Defendant files a

3  motion to dismiss Plaintiffs' amended complaint, Defendant shall

4  notice it for October 3, 2003 at 10 a.m.  In that event, the

5  Case Management Conference scheduled for October 3, 2003 will

6  also be held at

7  10 a.m.

8       IT IS SO ORDERED.

Dated: _8/6/03_                    /s/ CLAUDIA WILKEN____
                                   CLAUDIA WILKEN
                                   United States District Judge