Joseph N. Kravec, Jr. *(Admitted Pro Hac Vice)*
SPECTER SPECTER EVANS
& MANOGUE, P.C.
The 26th Floor Koppers Building
Pittsburgh, Pennsylvania 15219
Tel: (412) 642-2300
Fax: (412) 642-2309
E-mail: jnk@ssem.com

Michael D. Braun (167416)
BRAUN LAW GROUP, P.C.
12304 Santa Monica Blvd., Suite 109
Los Angeles, CA 90025
Tel: (310) 442-7755
Fax: (310) 442-7756
E-mail: service@braunlawgroup.com

Ira Spiro (67641)
J. Mark Moore (180473)
SPIRO MOSS BARNESS, LLP
11377 West Olympic Blvd., Fifth Floor
Los Angeles, CA 90064-1683
Tel: (310) 235-2468
Fax: (310) 235-2456
E-mail: ira@spiromoss.com

Janet Lindner Spielberg (221926)
LAW OFFICES OF JANET
LINDNER SPIELBERG
12400 Wilshire Blvd., Suite 400
Los Angeles, CA 90025
Tel: (310) 392-8801
Fax: (310) 278-5938
E-mail: jlspielberg@jlslp.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

FELTON A. SPEARS, JR. and SIDNEY SCHOLL, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

WASHINGTON MUTUAL, INC., a Washington corporation; WASHINGTON MUTUAL BANK, FA (a/k/a WASHINGTON MUTUAL BANK); FIRST AMERICAN EAPPRAISEIT, a Delaware corporation; and LENDER'S SERVICE, INC.,

Defendants.

**CASE NO.: 5:08-CV-00868 (RMW)**

**CLASS ACTION**

**PLAINTIFFS' COMBINED MEMORANDUM IN OPPOSITION TO DEFENDANTS WASHINGTON MUTUAL BANK'S AND FIRST AMERICAN EAPPRAISEIT'S MOTIONS TO DISMISS FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS


PAGE

INTRODUCTION . . . . . . . . . . 1

STANDARD OF REVIEW . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . 3

I. PLAINTIFFS' HAVE STATED COGNIZABLE RESPA CLAIMS UNDER SECTION 8(A) AND (B). . . . . . . . . . . 3

A. Plaintiffs Properly Alleged a Violation of Section 8(a) Claim . . . . . . . . . . 4

1. Plaintiffs allege EA and LSI provided WMB with "a thing of value" in the form of counterfeit appraisals and that WMB provided EA and LSI with "a thing of value" in the form of WMB's appraisal business. . . . . . . . . . . 4

2. Plaintiffs' properly allege that WMB referred its appraisal business to EA and LSI in exchange for the counterfeit, sham appraisals6

B. Plaintiffs Have Sufficiently Alleged a Section 8(b) Claim. . . . . . . . . . . 7

1. Plaintiffs allege they were charged for services that were not provided. . . . . . . . . . . 8

2. Plaintiffs are not required to allege that charges were split between Settlement service providers. . . . . . . . . . . 9

C. Plaintiffs' 1 Year Statute of Limitations was Tolled Until the New York Attorney General's Revelation of the Conspiracy was Made Public . . . . . . . . . . 11

II. PLAINTIFFS' CLAIMS ARE NOT PREEMPTED UNDER THE HOME OWNERS' LOAN ACT ("HOLA") . . . . . . . . . . 12

A. The Regulatory Framework of HOLA Does Not Support Preemption in This Case . . . . . . . . . . 13

B. The UCL and CLRA are Laws of General Applicability Not Subject to Preemption Under HOLA . . . . . . . . . . 15

1. Plaintiffs' UCL and CLRA Claims do not impose requirements regarding the processing or origination of mortgages . . . . . . . . . . 18

2. Plaintiffs' UCL and CLRA Claims do not impose requirements regarding loan related fee . . . . . . . . . . 18

3. Plaintiffs' UCL and CLRA Claims do not impose requirements regarding disclosures and advertising . . . . . . . . . . 19

C. Plaintiffs' UCL and CLRA Claim fits squarely within the parameters of §560.2(c) . . . . . . . . . . 20

III. PLAINTIFFS HAVE STATED COGNIZABLE BREACH OF CONTRACT CLAIMS AGAINST WMB AND EA. .......... 21

A. Plaintiffs Had A Contractual Relationship With WMB And EA For Their Appraisals .......... 21

B. Plaintiffs Adequately Allege That They Had An Agreement With WMB To Procure An Agreement With EA to Prepare A Credible Appraisal In Compliance With All Legal Requirements And That As A Result Of Defendants' Conspiracy Plaintiffs Received And Paid For A False, Sham Appraisal. .......... 24

IV. DEFENDANTS PROVIDE NO GOOD GROUNDS FOR DISMISSING PLAINTIFFS' UCL AND CLRA CLAIMS .......... 26

A WMB's Argument That Plaintiffs Lack Standing To Sue For UCL Violations Fails .......... 26

B. Plaintiffs' CLRA Claim Is Properly Pleaded .......... 29

1. WMB's "Goods" or "Services" Argument Is Without Merit .......... 29

C. Plaintiffs Allege Both Misrepresentations and Omissions .......... 35

D. Plaintiffs Have Alleged Damages Resulting From Defendants' Misconduct .......... 37

V. PLAINTIFFS' QUASI-CONTRACT/UNJUST ENRICHMENT CLAIM IS PROPERLY PLEADED .......... 37

CONCLUSION .......... 40

Prosser & Keeton, Torts (5th ed. 1984) § 130 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**TABLE OF AUTHORITIES**

**CASES:** **PAGE NOS.**

*American Builder's Association v. Au-Yang*, 226 Cal. App. 3d 170 (1990) . . . . . . . . . . . . . . . . . 24

*Augustine v. FIA Credit Servs.*, N.A., 485 F. Supp. 2d 1172 (E.D. Cal. 2007) . . . . . . . . . . . . . . . 34

*Berry v. American Express Publishing, Inc.*, 147 Cal. App. 4th 224 (2007) . . . . . . . . . . . . . . . 33, 34

*Binetti v. Wash. Mut. Bank*, 446 F.Supp.2d 217 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . 17

*Bloom v. Universal City Studios, Inc.*, 1990 U.S. Dist. LEXIS 9955 (C.D. Cal. 1990) . . . . . . . . . 22

*Briley v. State of Cal.*, 564 F.2d 849 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

*Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare*, 94 Cal. App. 4th 151 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Carias v. Lenox Financial Mortg. Corp.*, 2008 WL 397339 (N.D.Cal.2008) . . . . . . . . . . . . . . . . . 5

*Chamberlan v. Ford Motor Company*, N. C 03-2628 CW (N.D. Cal., Aug. 6, 2003) . . . . . . . . . . 15

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Cohen v. JP Morgan Chase & Co., et al.*, 498 F.3d 111 (2nd Cir. 2007) . . . . . . . . . . . . . . . . . 10, 11

*Colwell Company v. Hubert*, 248 Cal.App.2d 567 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Cuevas v. Atlas Realty/Financial Servs.*, 2008 U.S. Dist. LEXIS 9614 (N.D. Cal. 2008) . . . . . . 16

*Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951 (1997) . . . . . . . . . . . . . . . . . . . . . . 27

*Enreach Tech., Inc. v. Embedded Internet Solutions, Inc.*, 403 F. Supp.2d 968 (N.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Erwin v. City of Angels Camp, City Council & Planning Commission*, 1992 U.S. App. LEXIS 33810 (9th Cir., Dec. 14, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Ewert v. eBay, Inc.*, 2008 WL 906162 (N.D. Cal. March 31, 2008) . . . . . . . . . . . . . . . . . . . . . . . 39

*Falk v. General Motors Corp.*, 496 F.Supp.2d 1088 (N.D. Cal. 2007) . . . . . . . . . . . . . . . . . . 38, 39

*Fenning v. Glenfed, Inc.*, 40 Cal. App. 4th 1285, 47 Cal. Rptr. 2d 715 (1995) . . . . . . . . . . . . . . . 16

*Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 102 S. Ct. 3014, 73 L.Ed.2d 664 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*First Nationwide Savings v. Perry*, 11 Cal. App. 4th 1657 (1992) . . . . . . . . . . . . . . . . . . . . . . . . 39

*Flanagan v. Germania, F.A.*, 872 F.2d 231 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Fun-Damental Too, Ltd. v. Universal Music Group, Inc.*, 1997 U.S. Dist. LEXIS 9597 (E.D. Pa. 1997) . . . . . . . . . . 22

*Garlock Sealing Technologies, Inc. v. NAK Sealing Technologies Corp.*, 148 Cal. App. 4th 937 (2007) . . . . . . . . . . 23

*Geraci v. Homestreet Bank*, 347 F.3d 749 (9th Cir. 2003) . . . . . . . . . . 11

*Ghirardo v. Antonioli*, 14 Cal. 4th 39 (1996) . . . . . . . . . . 39

*Gibson v. U.S.*, 781 F.2d 1334 (9th Cir. 1986) . . . . . . . . . . 12

*Gibson v. World Savings & Loan Assn.*, 103 Cal. App. 4th 1291 . . . . . . . . . . 13, 14, 16

*Graddon v. Knight*, 138 Cal.App.2d 577 (1956) . . . . . . . . . . 23

*Haehl v. Wash. Mut. Bank, F.A.*, 277 F. Supp. 2d 933 (S.D. Ind. 2003) . . . . . . . . . . 19

*Heimmerman v. First Union Mortgage Corporation*, 305 F.3d 1257 (11th Cir. 2002) . . . . . . . . . . 11

*Helus v. Equitable Life Assurance Society of the United States*, 309 F. Supp. 2d 1170 (N.D. Cal. 2004) . . . . . . . . . . 25

*Hernandez v. Hilltop Financial Mortgage, Inc.*, 2007 WL 3101250, (N.D. Cal Oct. 22, 2007) . . . 33

*Hillsborough County, FL v. Automated Medical Laboratories, Inc.*, 471 U.S. 707(1985) . . . . . . . 18

*Hirsch v. Bank of America*, 107 Cal. App. 4th 708 (2003) . . . . . . . . . . 39

*Hitz v. First Interstate Bank*, 38 Cal. App. 4th 274 (1995) . . . . . . . . . . 32

*Holmberg v. Armbrecht*, 327 U.S. 392, 394-396 (1946) . . . . . . . . . . 12

*In re Ameriquest Mortgage Co.*, 2007 WL 1202544 (N.D. Ill. April 23, 2007) . . . . . . . . . . 33, 34

*In re Ocwen Loan Servicing, LLC*, 491 F.3d 638 (7th Cir. 2007) . . . . . . . . . . 15

*In Re: Merscorp Inc.*, 2008 U.S. Dist. LEXIS 40473 *41 (S.D. Tex., May. 16, 2008) . . . . . . . 10, 11

*Jefferson v. Chase Home Fin.*, 2007 U.S. Dist. LEXIS 94652 (N.D. Cal. 2007) . . . . . . 15-17, 32-34

*Jiang v. Lee's Happy House*, 2008 WL 706529 (N.D. Ca., Mar. 14, 2008) . . . . . . . . . . 4

*Kahrer v. Ameriquest Mortg. Co.*, 418 F.Supp.2d 748 (W.D.Pa. 2006) . . . . . . . . . . 5

*Kajitani v. Downey Sav. and Loan Assn, F.A.*, 2008 WL 2164660 (D.Hawaii 2008) . . . . . . . . . . 17

*Knox v. Ameriquest Mortgage Co.*, 2005 WL 1910927 (N.D. Cal. Aug. 10, 2005) . . . . . . . . . . 33

*Konynenbelt v. Flagstar Bank, F.S.B.*, 242 Mich. App. 21, 617 N.W.2d 706 . . . . . . . . . . 15

*Lambros v. Metropolitan Life Insurance Company*, 111 Cal. App. 4th 43 (2003) . . . . . . . . . . 25

*Lane v. Residential Funding Corporation*, 323 F.3d 739 (9th Cir. 2003) . . . . . . . . . . 11

*Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723 (2000) . . . . . . . . . . 39

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) . . . . . . . . . . 7, 29

*LiMandri v. Judkins*, 52 Cal. App. 4th 326 (1997) . . . . . . . . . . 38

*Lowes v. Hill & Co. Real Estate*, 2006 WL 463517 (N.D. Cal. 2006) . . . . . . . . . . 13

*Marks v. Ocwen Loan Servicing*, 2008 WL 344210 (N.D. Cal. Feb. 6, 2008) . . . . . . . . . . 36

*Mazur v. eBay Inc.*, 2008 WL 618988 (N.D. Cal. 2008) . . . . . . . . . . 31, 32

*McBride v. Boughton,* 123 Cal.App.4th 379 (2004) . . . . . . . . . . 39

*McKell v. Washington Mutual, Inc.*, 142 Cal. App. 4th 1457 (2006) . . . . . . . . . . 17, 20, 32, 35

*Melchior v. New Line Productions, Inc.*, 106 Cal.App.4th 779 (2003) . . . . . . . . . . 39

*Mendoza v. Rast Produce Co., Inc.*, 140 Cal.App.4th 1395 (2006) . . . . . . . . . . 7, 27

*Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells*, 86 Cal. App. 4th 303 (2000) . . . . . . . . . . 13

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) . . . . . . . . . . 4

*Nymark v. Heart Fed. Sav. & Loan Ass'n*, 231 Cal. App. 3d 1089 (1991) . . . . . . . . . . 13, 35, 36

*People ex rel. Sepulveda v. Highland Fed. Savings & Loan*, 14 Cal.App.4th 1692 (1993) . . . 17, 18

*Perrin v. United States,* 444 U.S. 37 (1979) . . . . . . . . . . 10

*Rookard v. Mexicoach*, 680 F.2d 1257 (9th Cir. 1982) . . . . . . . . . . 17

*Schuetz v. Banc One Mortgage Corp.*, 292 F.3d 1004 (9th Cir. 2002) . . . . . . . . . . 11

*Siegel v. American Savings & Loan Assn.*, 210 Cal. App. 3d 953, 258 Cal.Rptr. 746 (1989) . . . . . . . . . . 15, 17

*Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001 (9th Cir. 2008) . . . . . . . . . . 14, 16, 20, 21

*Slaughter v. Van Cleve,* 2007 U.S. Dist. LEXIS 90947 (C.D. Cal. 2007) . . . . . . . . . . 21

*Smiley v. Citibank*, 517 U.S. 735 (1996) . . . . . . . . . . 11

*Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App. 4th 1463 (2005) . . . . . . . . . . 15

*Sunset Milling & Grain Co. v. Anderson*, 39 Cal. 2d 773 (1952) . . . . . . . . . . 24

*The Missing Link v. EBAY, Inc.*, 2008 WL 1994886 (N.D. Cal. May 5, 2008) . . . . . . . . . . 29

*Van de Kamp v. Bank of America*, 204 Cal. App. 3d 819 (1988) . . . . . . . . . . 27

*Van Slyke v. Capital One Bank*, 503 F. Supp. 2d 1353 (N.D. Cal. 2007) . . . . . . . . . . 34

*Welch v. Centex Home Equity Co.*, 323 F.Supp. 2d 1087 (D.Kan. 2004) . . . . . . . . . . 5

**INTRODUCTION**

Plaintiffs' First Amended Complaint[1] alleges in essence that Plaintiffs and other borrowers (the "Class") paid Defendants for and Defendants agreed to provide Plaintiffs with lawful, independent and credible appraisal reports in connection with their home loans from Defendant Washington Mutual Bank, FA ("WMB"), but Plaintiffs and the Class never actually received them. FAC ¶¶ 7, 25, 29, 33, 56, 81-82. Instead, WMB conspired with two Appraisal Management Companies ("AMCs"), *i.e.*, Defendants First American eAppraiseIT ("EA") and Lender's Service, Inc. ("LSI"), to provide Plaintiffs with appraisal reports on WMB loans that appeared to Plaintiffs and the Class to be credible, *independent* appraisal reports done in compliance with the Uniform Standards of Professional Appraisal Practice ("USPAP") as required by state and federal law, but in reality were covertly crafted by Defendants to be false, counterfeit or sham appraisals that were unlawful and had no value. FAC, ¶¶ 6-8, 33-56. Specifically, WMB had EA and LSI falsify appraisal reports by artificially inflating home values and/or eliminating negative references in appraisal reports so that WMB could support making higher value loans which WMB could then profit from by selling them on the securities market and to third parties. FAC, ¶¶ 6, 38-39, 42-43, 51-52. By so doing, the EA and LSI appraisals, unbeknownst to Plaintiffs and the Class, violated USPAP, were rendered not credible or independent, and were simply false, sham appraisals of no real value. FAC, ¶¶ 81-82, 96.

The allegations of Plaintiffs' FAC are well supported. Indeed, Plaintiffs' quote in their FAC from several of EA's e-mails obtained by the New York Attorney General's investigation, which evidence Defendants' false appraisal conspiracy. FAC ¶¶ 39, 41-43, 45, 47, 53-55. Moreover, Plaintiffs' FAC references their own appraisal reports and Settlement Statements (HUD-1) which show Defendants' involvement with Plaintiffs' appraisals and that Plaintiffs were charged for Defendants' purported appraisal services, which were never actually provided to Plaintiffs. FAC, ¶¶ 59, 64. Indeed, Plaintiffs' FAC alleges that Defendants' conspiracy and the truth about their appraisals being false, counterfeit, sham appraisals was unknown to Plaintiffs and concealed by Defendants until November

---

[1] This refers to Plaintiffs' First Amended Complaint for Damages, Equitable Declaratory and Injunctive Relief, filed March 28, 2008 (Docket No. 14) (hereinafter "FAC").

1, 2007 when the New York Attorney General made his investigation of Defendants' false appraisal conspiracy public. FAC ¶ 70.

Plaintiffs assert claims arising from Defendants' misconduct and conspiracy under Section 8 of the Real Estate Settlement Practices Act ("RESPA"), the California Consumer Legal Remedies Act ("CLRA"), the California Unfair Competition Law ("UCL"), and for breach of contract and quasi-contract. FAC, ¶¶ 9, 78-127. WMB and EA seek to dismiss all of Plaintiffs' individual claims, and assert various grounds for dismissal. None of these proffered grounds, however, justify dismissal of Plaintiffs claims at this preliminary stage of the proceedings.

First, Plaintiffs have alleged a cognizable RESPA, Section 8(b) claim against WMB and EA because Plaintiffs allege Defendants failed to provide any service for the money Plaintiffs paid as a part of their settlement services for an appraisal. FAC, ¶¶ 81-82. Likewise, Plaintiffs have alleged a cognizable RESPA, Section 8(a) claim against Defendants because Plaintiffs allege WMB provided EA and LSI with appraisal referrals in exchange for a "thing of value" to WMB (not Plaintiffs), *i.e.*, the provision of false, counterfeit, sham appraisals. FAC, ¶¶ 84-87. That WMB and EA wish to dispute whether they provided a service to Plaintiffs or a thing of value to WMB for referrals to EA is irrelevant on a motion to dismiss as the Court must accept as true Plaintiffs' well-pled allegations which support their REPA claims.

Second, Defendants improperly attempt to couch Plaintiffs' claims as a negligent appraisal case for which no liability exists under California law. However, Plaintiffs' claims are actually based solely on Defendants' misrepresentations and fraudulent conduct in connection with their appraisal reports for which Defendants are liable under California law.

Third, Defendants assert Plaintiffs' claims are preempted by the Home Owners Loan Act ("HOLA"). But, HOLA does not preempt another federal statute such as RESPA, nor does it preempt Plaintiffs' state contract law claims, nor does it preempt state consumer fraud claims under the CLRA or UCL since they are laws generally applicable to all businesses and do not impinge on any lending activity covered by HOLA. Indeed, Plaintiffs do not complain about Defendants' right to charge a fee for an appraisal or the reasonableness of any such fee. Rather, Plaintiffs simply complain that they paid for a lawful, credible appraisal that they never received. This claim under the CLRA or UCL would be

no different whether the good or service paid for and not provided was an appraisal or something else. Hence, nothing about Plaintiffs' claims impinge on specific lending activities controlled by HOLA and thus there is no preemption.

Fourth, Defendants claim they had no contract with Plaintiffs for an appraisal, that there is no breach of any appraisal contract with Plaintiffs and Plaintiffs suffered no damages. Of course, paragraph 120 of the FAC expressly alleges that WMB agreed to procure a lawful, credible appraisal for Plaintiffs, WMB as Plaintiffs' agent contracted on their behalf with EA to provide that appraisal, EA prepared what purported to be an appraisal report and WMB delivered it to Plaintiffs and charged them for it. FAC, ¶ 120. The appraisal reports and the HUD-1s for Plaintiffs confirm these allegations. Plaintiffs further allege that, unbeknownst to them, the appraisal reports Defendants prepared were false, sham reports that had no value. FAC, ¶ 122. That WMB and EA would prefer to deny its contractual obligations to Plaintiffs, its conduct breaching those contracts and Plaintiffs' damages therefrom is again irrelevant on a motion to dismiss since Plaintiffs' well-pled allegations that must be taken as true establish all of the elements of their breach of contract claim.

Fifth, WMB's contention that Plaintiffs do not have UCL standing because they purportedly did not allege damages is belied by Plaintiffs' numerous allegations that they paid for a lawful, credible appraisal that they never received. FAC, ¶¶ 7, 56, 61, 66. That federal law may have required WMB to obtain an appraisal is unavailing since federal law does not require WMB to charge for the appraisal and certainly does not require WMB to obtain or charge for the false, sham appraisals actually provided to Plaintiffs.

Sixth, EA is incorrect as a matter of law when it claims appraisal services are not a "good or service" under the CLRA. Moreover, courts have expressly found that such services provided or obtained by a lender in connection with the overall loan transaction are financial services covered by the CLRA. Thus, WMB's contention that appraisal services are really an extension of credit not covered by the CLRA is also wrong. Defendants' additional contentions that Plaintiffs do not allege a misrepresentation or omission or damages for their CLRA claims are meritless. Plaintiffs plainly allege that Defendants charged them for appraisal reports that were purportedly credible, lawful

appraisals, when in fact they were false, sham appraisals that have no value at all. FAC, ¶¶ 1, 7, 56, 59, 61, 64, 66.

For these reasons and as further described in the Argument below, WMB's and EA's motions to dismiss Plaintiffs' FAC rest on improper and incorrect assertions of fact and law and therefore should be denied in their entirety.

## STANDARD OF REVIEW

As this Court has succinctly stated, "[o]n a motion to dismiss under Rule 12(b)(6) the issue is not what plaintiff has or will be able to prove, but whether the allegations, which are presumed true, are sufficient" to state a cognizable claim. *Jiang v. Lee's Happy House*, 2008 WL 706529, *1 (N.D. Ca., Mar. 14, 2008)(Seeborg, m.j.)(citation omitted). Here, Plaintiffs' FAC not only sufficiently alleges each of their causes of action, but those allegations are also supported by the appraisal reports and other documents incorporated by reference in their FAC. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 925 n.2 (9th Cir. 2003)(a court may consider on a motion to dismiss documents incorporated by reference in plaintiff's complaint).

## ARGUMENT

### I. PLAINTIFFS' HAVE STATED COGNIZABLE RESPA CLAIMS UNDER SECTION 8(A) AND (B).

WMB and EA argue that Plaintiffs cannot assert a claim under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.* based upon the mistaken idea that what they actually provided to Plaintiffs and other borrowers were appraisals. However, what they provided to Plaintiffs and other borrowers were, at best, counterfeit, sham appraisals. As detailed below, WMB, EA and LSI fraudulently conspired to render appraisals that would reflect WMB's desired loan amount, instead of the true market value of the property. Plaintiffs were charged and paid for legitimate appraisals as part of their real estate settlement. As a result of Defendants' conspiratorial conduct, Plaintiffs never received what they paid for. Defendants violated RESPA Section 8 (a) by engineering a quid pro quo in which WMB referred its business to EA and LSI and, in exchange for doing so, EA and LSI provided WMB with counterfeit, sham appraisals which WMB delivered to and charged

Plaintiffs. Defendants violated RESPA Section 8 (b) by failing to provide Plaintiffs with a settlement service for which Plaintiffs were charged.

**A. Plaintiffs Properly Alleged a Violation of Section 8(a) Claim**

**1. Plaintiffs allege EA and LSI provided WMB with "a thing of value" in the form of counterfeit appraisals and that WMB provided EA and LSI with "a thing of value" in the form of WMB's appraisal business.**

RESPA Section 8(a) provides:

> (a) Business referrals. No person shall give and no person shall accept any fee, kickback, ***or*** thing of value pursuant to an agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person. (Emphasis added).

WMB and EA try to escape liability for Plaintiffs' Section 8(a) claim based on their erroneous assertions that: (1) WMB received no *"thing of value" for referring business to EA and LSI (WMB Br., pp. 6-7)*, and (2) Plaintiffs did not claim a kickback was involved. WMB Br., 6-7; EA Br., p. 5.[2] Neither of these arguments withstand scrutiny.

The term "thing of value" is broadly defined and "includes, without limitation, monies, things, discounts, ... the opportunity to participate in a money-making program, ... services of all types at special or free rates." 24 C.F.R. 3500.14(d). "The term 'payment' is used throughout [the regulations] as synonymous with the giving or receiving any 'thing of value' and does not require transfer of money." *Kahrer v. Ameriquest Mortg. Co.,* 418 F.Supp.2d 748, 755 n. 9 (W.D.Pa. 2006)(quoting 24 C.F.R. § 3500.14(d)). "An agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a practice, pattern, or course of conduct." *Carias v. Lenox Financial Mortg. Corp.*, 2008 WL 397339, *3 (N.D.Cal.2008)(slip copy)(quoting 24 C.F.R. § 3500.14(e)). "When a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence

---

[2] EA fails to cite a single case supporting its argument. Moreover, EA's reliance on *Welch v. Centex Home Equity Co.*, 323 F.Supp. 2d 1087, 1097-1098 (D.Kan. 2004) for the proposition that a Section 8(b) claim cannot be made for charges made for services not performed faithfully or accurately, is misplaced. Plaintiffs do not base either their 8(a) or 8(b) claims on this particular premise, and EA fails to cite any other authority why this Court should dismiss Plaintiffs' RESPA claims against it. EA's Brief, pp. 4-6.

that it is made pursuant to an agreement or understanding for the referral of business." *Id.* The fact that the transfer of the thing of value does not result in an increase in any charge made by the person giving the thing of value is irrelevant in determining whether the act is prohibited." 24 C.F.R. § 3500.14(g)(2).

Here, Plaintiffs allege the exchange of a "thing of value" in connection with the counterfeit appraisal service. Specifically, WMB entered into a conspiratorial agreement with EA and LSI for them to provide WMB with counterfeit, sham appraisals in exchange for WMB referring all or most of its appraisal business to them. FAC, ¶¶ 6, 33, 35, 84. Consequently, EA and LSI have been paid millions of dollars directly from WMB's borrowers for providing counterfeit, sham appraisals. *Id.*, ¶ 7. Additionally, Plaintiffs allege WMB demanded that EA and LSI pay those appraisers who provided the counterfeit, sham appraisals a 20% incentive fee for doing so. *Id.*, ¶¶ 85, 94. WMB, received a "thing of value" – i.e. counterfeit, sham appraisals – in exchange for referring more appraisal business to EA and LSI. *See* 24 C.F.R. 3500.14(d)(defining "thing of value" to be any "thing" which would include a counterfeit, sham appraisal). Thus, WMB's agreements with EA and LSI to give them all of WMB's appraisal services business in exchange for EA and LSI providing sham appraisals is precisely what Section 8(a) of RESPA prohibits. 24 C.F.R. § 3500.14(b), subsection (e) (explaining "When a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business").

**2. Plaintiffs' properly allege that WMB referred its appraisal business to EA and LSI in exchange for the counterfeit, sham appraisals.**

WMB argues that Plaintiffs fail to allege that referrals were made and therefore they cannot maintain a violation of Section 8(a). WMB claims that: (1) there cannot be a referral between settlement service providers because appraisals are not settlement services; (2) there cannot be a referral because borrowers have no freedom to select the appraisers; (3) there cannot be a referral because the appraisers are acting as agents for WMB. WMB's Brief, p. 7, pp. 7-8, p. 8 n. 3.

Contrary to WMB's assertion, however, appraisal services are considered typical settlement services subject to RESPA. *See* 12 U.S.C. § 3500.2 (specifically providing that a Settlement service includes the "rendering of credit reports and appraisals")

That borrowers are not free to select the appraisers themselves - is simply irrelevant. *Id.*, pp. 7-8. Again, the unambiguous language in RESPA belies the falsity of Defendants' proposition: "a referral also occurs whenever a person paying for a settlement service or business incident thereto is required to use (see § 3500.2, "required use") a particular provider of a settlement service or business incident thereto." 24 C.F.R. § 3500.14(f). A "required use" is "a situation in which a person must use a particular provider of a settlement service in order to have access to some distinct service or property, and the person will pay for the settlement service of the particular provider or will pay a charge attributable, in whole or in part, to the settlement service." 24 C.F.R. § 3500.2. Here, Plaintiffs were required to use the appraisers of WMB's choosing, *i.e.* EA or LSI, and Plaintiffs paid for that "service." FAC, ¶¶ 6, 33, 35, 59, 64; *see also* Affidavit of Joseph N. Kravec, Jr. in Support of Plaintiffs' Memorandum in Opposition to Defendants' Motions to Dismiss, ("Kravec Aff."), Exh. 1 ("Scholl HUD"), p. 2, Line 803; Declaration of Stephen M. Rummage in Support of Defendant Washington Mutual Bank's Motion to Dismiss Plaintiffs' First Amended Complaint ("Rummage Dec."), Exh. F ("Spears HUD"), p. 2., Line 803.

Last, WMB attempts to evade the obvious Section 8(a) referral violation by simply making the false assertion that "the appraisers provided their services to WMB, not to borrowers." WMB's Brief, p. 8 n. 3. WMB's assertion is plainly wrong by the face of Plaintiffs' appraisal reports and the facts as alleged in the FAC.[3]

---

[3] WMB has attempted to insert facts into their Rule 12(b)(6) motion by asserting LSI and EA are acting as its agents in the appraisal process. WMB's Brief, p. 9. This is a fact not in Plaintiffs' FAC and cannot be considered by the court without converting WMB's motion into one for summary judgment. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)(*citing* Rule 12(B)(6)). Accordingly, should this Court believe WMB's agency argument has any relevance to Plaintiffs' RESPA or other claims, Plaintiffs are entitled to take discovery to determine whether or not the relationship between WMB and EA and LSI is, truly, a fiduciary relationship. If it is, Plaintiffs believe EA and LSI then owe Plaintiffs and other borrowers the same fiduciary obligations it owes WMB by virtue of WMB acting as Plaintiffs' agent for these appraisal transactions. *See* Argument § III, *infra.; see also Mendoza v. Rast Produce Co., Inc.*, 140 Cal.App.4th 1395, 1404-05 (Cal.App. 2006)("If an agent is authorized by the principal to employ a subagent, the subagent owes the same duties to the principal as does the agent"). Thus, if LSI and EA are indeed WMB's agents, by virtue of being sub-agents of Plaintiffs' agent, they owe the same fiduciary obligations to Plaintiffs as they do to any other principle, and Plaintiffs will amend their complaint to reflect these facts.

Plaintiffs allege they hired WMB to act as their agent to procure appraisals. FAC, ¶¶ 3, 59, 64. *See also* § III, *infra*. Plaintiffs paid WMB to procure appraisals for both WMB's and Plaintiffs' benefit. FAC, ¶¶ 59, 64; Scholl HUD, p. 2, Line 803; Spears HUD, p. 2, Line 803. WMB, acting as Plaintiffs' agent, hired EA and LSI to procure appraisals both for Plaintiffs' and WMB's benefit. FAC, ¶¶ 6, 35, 59, 64. Consistent with Plaintiffs' allegations, both WMB and Plaintiffs are identified in Plaintiffs' appraisal reports as the appraiser's clients for whom the reports were prepared. Kravec Aff., Exh. 2 ("Scholl Report"), pp.7-9; Rummage Dec, Exh. G ("Spears Report"), pp. 8-17. Moreover, each of Plaintiffs' appraisal reports state that both Plaintiffs and WMB may rely on the appraisals in the home mortgage transactions. FAC, ¶ 25; Scholl Report, p. 7, ¶ 23; Spears Report, p.7, ¶ 23. Plaintiffs' appraisals were purchased by Plaintiffs through their agent WMB for Plaintiffs' benefit, and not simply for WMB's benefit. Moreover, WMB cites no regulatory or any case authority for its lofty proposition that a minimum of three parties are required in order to make out a RESPA Section 8(a) referral violation. To the contrary, Section 24 C.F.R. 3500.14(g) (1) provides: "A business entity (whether or not in an affiliate relationship) may not pay any other business entity or the employees of any other business entity for the referral of settlement service business."

Plaintiffs here alleged EA and LSI provided WMB with a "thing of value" - the counterfeit, sham appraisal reports - and in exchange WMB provided EA and LSI with thousands of appraisal referrals. FAC, ¶¶ 6-9, 33, 35. Plaintiffs' complaint is squarely premised upon this illegal referral arrangement between WMB and EA and LSI. *Id.*, ¶¶ 6, 84. Based on these well-supported allegations of the FAC, there are no legitimate grounds - legal or logical - for Defendants' contention that Plaintiffs' RESPA Section 8(a) claim should be dismissed.

**B. <u>Plaintiffs Have Sufficiently Alleged a Section 8(b) Claim</u>.**

WMB and EA also assert that Plaintiffs failed to make out a claim under Section 8(b). Specifically, EA's defense lies on the faulty premise that Plaintiffs fail to allege they were charged an "unearned fee"(EA's Brief, p. 5), while WMB's defense lies in the equally faulty premise that even if Plaintiffs allege they paid an "unearned fee," they cannot bring a Section 8(b) claim unless it is an "undivided, unearned fee." WMB's Brief, pp. 12. Both of these assertions are specious.

Section 8(b) of RESPA provides:

> Splitting Charges: No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan **other than for services actually performed.**

12 U.S.C. § 2607(b) (Emphasis added). Under RESPA, "Payments that are unearned fees occur in, but are not limited to, cases where:.. (3) one settlement service provider charges the consumer a fee where no, nominal, or duplicative work is done." RESPA Policy 2001-1: Clarification of Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 Fed.Reg. 53052, 53053 (Oct. 18, 2001)(codified at 24 C.F.R. § 3500).

**1. Plaintiffs allege they were charged for services that were not provided.**

Defendants attempt to obfuscate the issues by suggesting this case is about overcharges while ignoring the plain language of the complaint which alleges that "***Plaintiffs*** and the Class ***never received the appraisal service for which they were charged*** by Defendants and have been damaged thereby." FAC, ¶ 82 (emphasis added). Indeed, Plaintiffs paid to have an appraisal report prepared in connection with their loans. *Id.*, ¶¶ 59, 64. WMB hired EA and/or LSI to provide the appraisals Plaintiffs paid for. *Id.*, ¶¶ 6, 33, 35. EA or LSI, in furtherance of their conspiracy with WMB, provided a counterfeit, sham appraisal that is of no value at all. *Id.*, ¶¶ 38-39. Indeed, a counterfeit, sham appraisal is no more the equivalent of a true, credible appraisal (which Plaintiffs paid to receive) as counterfeit money is the equivalent of true greenbacks. Thus, accepting Plaintiffs' allegations as true, Plaintiffs have adequately stated a RESPA Section 8(b) violation based on their allegations that they paid hundreds of dollars for genuine, credible appraisals as part of their settlement services, which they did not actually receive. *Id.*, ¶82.[4]

---

[4] Defendants' cited cases are inapposite since they relate to the reasonableness of the fees charged and/or possible overcharges. These cases implicate a different type of RESPA Section 8(b) violation than alleged by Plaintiffs - requiring a different analysis than the analysis required for the type of RESPA Section 8(b) violation pled here. *See Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1324 (11th Cir. 2008) (stating Section 8(b) "allows for *two* types of violations: first, where a settlement service provider charges the consumer a fee where no, nominal, or duplicative work is done, 2001 SOP, 66 Fed. Reg. at 53057; and second, where the fee charged is in excess of the reasonable value of goods or facilities provided or the services actually performed."). *Busby,* the most recent Circuit Court decision which includes a comprehensive analysis of the current state of the law regarding the various possible RESPA Section 8(b) violations, was not cited by Defendants.

**2. Plaintiffs are not required to allege that charges were split between settlement service providers.**

In advocating on behalf of its position that Plaintiffs cannot sustain a Section 8(b) claim - a claim alleging that Plaintiffs were charged for services they did not receive - WMB cites a number of 7th and 8th Circuit cases standing for the proposition that Plaintiffs must allege the fee was "split" or "shared" to be actionable under Section 8(b). WMB's Brief, pp. 9-10. ("The text of Section 8(b), aptly entitled 'Splitting charges,' unambiguously prohibits a person ***only*** from giving or receiving 'any portion, split, or percentage' of fees charged in connection with the settlement of certain mortgage-related transactions 'other than for services actually performed")(emphasis in original). Significantly, what is completely absent from WMB's analysis is any references to the 2001-1 Statement of Policy by HUD addressing this particular component of a Section 8(b) claim. WMB's interpretation is not only belied by HUD's policy statement, but also by the most recent cases interpreting RESPA, including WMB's own authority. *See Cohen v. JP Morgan Chase & CO., et al.*, 498 F.3d 111, 125 (2d Cir. 2007)(holding a Section 8(b) claim does not require a split in fees to be actionable).

The basic language of the statute used in the alternative must be construed to give each term meaning. *Perrin v. United States,* 444 U.S. 37, 42 (1979)(words in statute are interpreted as taking the ordinary, contemporary, common meaning). Indeed, RESPA Section 8(b) says "any portion...or percentage of any charge made or received." All or 100% of a charge is certainly included within the ambit of "any portion or percentage." If Congress intended the requirement of a "split," it would not have used the terms "any portion or percentage" in addition to the word "split" because then the statute would simply be redundant. *Id.* Very recently, the Second Circuit addressed this exact question, concluding that there was no requirement that fees be split amongst settlement service providers. *Cohen*, 498 F.3d at 124-25 (finding the statute ambiguous and, for that reason, deferring to the agency interpretation expressed in HUD's 2001 Statement of Policy, holding "We now hold that HUD's Policy Statement reasonably interprets §8(b) comprehensively to prohibit unearned fees, whether reflected in a charge divided among multiple parties or an undivided charge from a single lender, as in this case"); *see also In Re: Merscorp Inc.,* 2008 U.S. Dist. LEXIS 40473 *41 (S.D. Tex., May. 16, 2008)(Court concludes that Section 8(b)'s language applies to undivided charges).

Although the Ninth Circuit has yet to address the issue of whether Section 8(b) claims for no or nominal services also require allegations that the charges were split between service providers, the Ninth Circuit has acknowledged that the RESPA Statement of Policy 2001-1 by HUD is entitled to substantial deference. *Schuetz v. Banc One Mortgage Corp.*, 292 F.3d 1004, 1006, 1009 (9th Cir. 2002); *Lane v. Residential Funding Corporation*, 323 F.3d 739, 742-743, 744 N6 (9th Cir. 2003); *Geraci v. Homestreet Bank*, 347 F.3d 749, 751 (9th Cir. 2003). Moreover, the Supreme Court of the United States mandates that agency interpretations are to be accorded deference. *Smiley v. Citibank*, 517 U.S. 735, 739 (1996) ("It is our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering"). This 2001 Statement of Policy should be afforded the full force of law. *Heimmerman v. First Union Mortgage Corporation*, 305 F.3d 1257, 1261 (11th Cir. 2002)("Because the power to issue interpretations is expressly delegated in RESPA, the 2001 SOP carries the full force of law. As a result, we give deference to the 2001 SOP").

The question as to whether RESPA requires the splitting of charges for unearned fee claims is squarely addressed in HUD's 2001 Statement of Policy:

> Since RESPA was enacted, HUD has interpreted Section 8(b) as prohibiting any person from giving or accepting any unearned fees, i.e., charges or payments for real estate settlement services other than for goods or facilities provided or services performed. **Payments that are unearned for settlement services occur in, but are not limited to, cases where: ... ; or (3) one settlement service provider charges a consumer a fee where no, nominal, or duplicative work is done**, or the fee is in excess of the reasonable value of goods or facilities provided or the services actually performed.

2001 Statement of Policy, 53057. (Emphasis added). There is no requirement that the settlement service providers split their fees in order to allege a claim for a Section 8(b) violation when Plaintiffs have alleged that the service provider charged a fee for a service that was not provided. Accordingly, Plaintiffs need not allege WMB split fees with the other Defendants to bring a section 8(b) claim. *See Busby*, 513 F.3d at 1325-26 (providing an in-depth analysis of what constitutes unearned fees under Section 8(b) of RESPA); *Cohen*, 498 F.3d 111 at 124-125 (holding "that HUD's Policy Statement reasonably interprets §8(b) comprehensively to prohibit unearned fees, whether reflected in a charge divided among multiple parties or an undivided charge from a single lender, as in this case"); *In Re: Merscorp Inc.*, 2008 U.S. Dist. LEXIS 40473, *41 (S.D. Tex. 2008)(concluding that Section 8(b)'s language applies to undivided charges).

Plaintiffs have alleged they were charged for a service that was not provided - a proper claim under Section 8(b). Although there is conflicting authority regarding whether or not a fee has to be split between settlement service providers, there is authority demonstrating that the 9th Circuit repeatedly defers to HUD's 2001 Statement of Policy - the same Statement of Policy in which HUD unequivocally states there is no fee-splitting requirement. Plaintiffs claim of a violation of Section 8 (b) should be sustained.

**C. Plaintiffs' 1 Year Statute of Limitations was Tolled Until the New York Attorney General's Revelation of the Conspiracy was Made Public**

Defendants' RESPA statute of limitations argument is limited to Plaintiff Scholl since Plaintiff Spears clearly filed his RESPA claim within the one year RESPA statute of limitations. WMB's Brief, p. 5. Plaintiff Scholl's RESPA claims, however, were tolled until Defendants' conspiracy to falsify appraisals was first made public by the New York Attorney General in November, 2007 as Plaintiffs have alleged. FAC, ¶¶ 67-70. Taking these allegations as true as this Court must on a motion to dismiss and applying equitable tolling to Plaintiff Scholl's RESPA claims in light of Defendants' fraudulent conspiracy, the statutory time period would not begin to run until Plaintiffs either became aware of the agreement, or had reason to become aware of the agreement. *Holmberg v. Armbrecht*, 327 U.S. 392, 394-396 (1946)(unless Congress states otherwise, equitable tolling should be read into every federal statute of limitations); *Erwin v. City of Angels Camp, City Council & Planning Commission*, 1992 U.S. App. LEXIS 33810 (9th Cir., Dec. 14, 1992) ("The statute of limitations period is tolled if a plaintiff 'has been injured by fraud or concealment and remains in ignorance of it without any fault or want of diligence on...[her] part.' *Briley v. State of Cal.*, 564 F.2d 849, 855 (9th Cir. 1977). 'The statutory time period does not begin to run until discovery of the injury.' *Id.*; *accord Gibson v. U.S.*, 781 F.2d 1334, 1344-45 (9th Cir. 1986).

Plaintiff Scholl presents detailed allegations showing she and all other members of the Class were neither aware of Defendants' concealed conspiracy agreement, nor had reason to be aware of the conspiracy prior to November 1, 2007 - the date in which the New York Attorney General announced his intent to sue the appraisers for the practices forming the foundation of Plaintiffs' complaint. FAC, ¶¶ 67-70. These allegations must be accepted as true on a motion to dismiss. Accordingly, Plaintiff

Scholl's initial complaint that was filed on February 8, 2008, was well within RESPA's one year statute of limitations once equitable tolling is properly applied.

## II. PLAINTIFFS' CLAIMS ARE NOT PREEMPTED UNDER THE HOME OWNERS' LOAN ACT ("HOLA")

WMB begins its preemption argument from a false premise, *i.e.*, its erroneous assumption that under California law a lender cannot be held liable to a borrower for an appraisal the lender procures on the collateral of a loan as long as the lender "does not exceed the scope of its conventional role as a mere lender of money." WMB Br., p. 12, *citing Nymark v. Hart Fed. Sav. & Loan Ass'n*, 231 Cal. App. 3d 1089, 1096 (1991). EA makes a similar claim at page 13 of its brief. Of course, *Nymark* addresses only a claim of simple negligence in performing an appraisal. *Id.* Here, however, Plaintiffs are not alleging negligent performance, but rather that their appraisals were misrepresented and fraudulently performed by WMB and EA as part of their conspiracy. FAC ¶¶ 6-9, 51. Under California law, lenders and appraisers alike are held liable for their misrepresentations and fraud in connection with an appraisal. *See Lowes v. Hill & Co. Real Estate*, 2006 WL 463517, *8 (N.D. Cal. 2006)(finding that *Nymark's* principle that a bank does not owe a duty of care to a borrower for a negligently performed appraisal "does not extend to shield a lender or other entity from liability for making a negligent misrepresentation concerning the substance of the appraisal"); *Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells*, 86 Cal. App. 4th 303, 310 n.3 (2000)(an appraiser is liable "when the appraisal is intentionally in error to induce a buyer or lender to enter into a transaction, or because of a negligent evaluation of property that is below the industry standard of care").

Like this erroneous premise, the remainder of WMB's and EA's preemption arguments are inapplicable here.

### A. <u>The Regulatory Framework of HOLA Does Not Support Preemption in This Case</u>

Federally chartered savings associations are regulated by Home Owners' Loan Act, 12 U.S.C. §§ 1461, *et. seq.* ("HOLA") which created the Office of Thrift Supervision ("OTS") (12 U.S.C. §1462a(a)) and authorized it to issue regulations prescribing the operation of federal savings associations according to the "best practices of thrift institutions in the United States." *Gibson v. World Savings & Loan Assn.*, 103 Cal. App. 4th 1291, 1297 (Cal. Ct. App. 2002).

In 1996, the OTS issued 12 CFR §560.2 (2002) to address preemption in the context of lending operations stating that the "OTS hereby occupies the entire field of lending regulation for federal savings associations," thereby permitting federal savings associations to extend credit "without regard to state laws purporting to regulate or otherwise affect their credit activities. . . ." (§ 560.2(a)). The Section provides illustrative examples of the types of state laws that are preempted (§ 560.2(b) and those that are not. (§ 560.2(c)). *Gibson*, 103 Cal. App. 4th 1291, 1298.

The OTS also provided the following analysis by which a Court may determine whether a state law is properly preempted under HOLA.

> When analyzing the status of state laws under §560.2, the first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c).

*Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001 (9th Cir. 2008), quoting OTS, Final Rule, 61 Fed. Reg. 50951, 50966-67 (Sept. 30, 1996).

While there is no dispute that Congress delegated broad power to the OTS – it did not "permit the [OTS] to preempt the application of all state and local laws to such institutions. Nothing in the language of [the Home Owners' Loan Act] remotely suggests that Congress intended to permit the [OTS] to displace local laws ... not directly related to savings and loan practices." *Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 172, 102 S. Ct. 3014, 73 L.Ed.2d 664 (1982)(O'Connor, J., concurring).

Indeed, the OTS has specifically carved out certain types of state laws that are not subject to preemption. 12 C.F.R. § 560.2(c) provides, in pertinent part, that:

> State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section: (1) Contract and commercial law; ... (4) tort law;... and (6) any other law that OTS, upon review, finds (I) furthers a vital state interest; and (ii) either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section."

The gravamen of Plaintiffs' case is that Defendants failed to perform appraisals in an independent, objective, impartial and unbiased manner and instead delivered false, incredible and

unlawful appraisals to Plaintiffs. FAC, ¶¶ 1,7. Plaintiffs and the Class never received the appraisal service for which they were charged by Defendants and have been damaged thereby. FAC, ¶¶ 7, 56, 61, 66, 82. This case is not, as Defendants erroneously contend, about appraisal fees.

Plaintiffs allege that Defendants' conduct violates the Real Estate Settlement Procedures Act, 12 U.S.C. section 2607 ("RESPA"), the unlawful, unfair and fraudulent prongs of California's Business and Professions Code Section 17200, et seq. (the "UCL"); the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et. seq.* ("CLRA"); and is in a breach of contract or quasi contract. FAC, ¶ 9.

As a preliminary matter, three of these claims are clearly not subject to preemption. The RESPA claim is a self-standing federal claim while the contract and quasi contract claims are specifically excluded from preemption.[5] Indeed, the clear mandate of §560.2(c) to exempt contract claims from preemption is supported by the overwhelming weight of case law. *See e.g. Jefferson v. Chase Home Fin.*, 2007 U.S. Dist. LEXIS 94652, 31-31 (N.D. Cal. 2007)(It is well accepted that "a stated intent to preempt requirements or prohibitions imposed by state law does not reasonably extend to those voluntarily assumed in a contract"); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 at p. 526 (1992); *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App. 4th 1463, 1484 (2005) (NBA and an OCC regulation did not preempt a UCL cause of action "based on the predicate act of a systematic breach of its contractual disclosure obligations," because "enforcement of a contractual obligation under a state's general laws on contracts only incidentally affects, at most, a national bank's" powers); *In re Ocwen Loan Servicing, LLC*, 491 F.3d 638, 643-644 (7th Cir. 2007)(breach of contract claims squarely within exemption under §560.2(c)); *Flanagan v. Germania, F.A.*, 872 F.2d 231, 234 (8th Cir. 1989) (claim for tortuous interference with contract not preempted by HOLA); *Siegel v. American Savings & Loan Assn.*, 210 Cal. App. 3d 953, 258 Cal.Rptr. 746, 748-53 (1989) (suit based on a variety of state-law claims, including unfair competition, breach of contract, and breach of agency duty, permitted against federal lender); *Konynenbelt v. Flagstar Bank, F.S.B.*, 242 Mich. App. 21, 617 N.W.2d 706, 712-14 (Mich. App. 2000) (HOLA does not preempt common-law tort and contract claims). Defendants' remaining preemption argument is predicated on a flawed premise – that Plaintiffs seek "to use California law to regulate the

---

[5] "State laws that are not preempted.... (1) contract ...law" 12 CFR §560.2(c)(1).

manner in which WMB obtained real estate appraisals and the fees that it passed on to borrowers for those appraisals." WMB Br., p. 15. Defendants purposefully mischaracterize the gravamen of the FAC in a vein attempt to bring it under the auspices of §560.2(b). Their effort to fit a square peg into a round hole, however, is unsupported by law or logic and should be rejected.

**B. The UCL and CLRA are Laws of General Applicability Not Subject to Preemption Under HOLA**

Section 560.2(a) preempts state laws 'purporting to regulate or otherwise affect credit activities of federal savings associations. As laws of general applicability, neither the UCL nor the CLRA regulate or otherwise affect credit activities.[6] It is black letter law that laws of general applicability should not be preempted. *Silvas v. E*trade Mortg. Corporation*, 421 F. Supp. 2d 1315, 1320 (S.D. Cal. 2006). Meaning that HOLA does not preempt UCL or CLRA claims where the "predicated acts were violations of the general legal duties with which every business must comply." *Id.*, citing *Gibson v. World Savings & Loan Assn.*, 103 Cal. App. 4th 1291, (Cal. Ct. App. 2002). Only claims that are specific to a defendant's lending activities, as distinguished from legal duties applicable to all businesses, are preempted by HOLA. *Fenning v. Glenfed, Inc.*, 40 Cal. App. 4th 1285, 47 Cal. Rptr. 2d 715 (1995) (fraud claim not preempted because the fraudulent deception had nothing to do with the thrift's lending practices); *Cuevas v. Atlas Realty/Financial Servs.*, 2008 U.S. Dist. LEXIS 9614, 7-8 (N.D. Cal. 2008)(claims directed to legal requirements that are applicable to all businesses, such as truthfully memorializing in writing what is agreed to orally by contracting parties are not subject to preemption); *Jefferson v. Chase Home Fin.*, 2007 U.S. Dist. LEXIS 94652, 28-29 (N.D. Cal. 2007)("laws of general application, which merely require all businesses (including banks) to refrain from misrepresentations and abide by contracts and representations to customers do not impair a bank's ability to exercise its

---

[6] The underlying purpose of the CLRA is "to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." Civ. Code §1760. Similarly the purpose of the UCL is to "safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented." Bus. & Prof. Code §17000. Within the context of the UCL, "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice."*Id.*

lending powers. They only "incidentally affect" the exercise of a Bank's powers ... and are therefore not preempted").

Here, Defendants undertook to obtain an independent, credible apprisal, which they failed to do despite representing to Plaintiffs and the Class that they had. FAC, ¶¶ 7, 59-61, 64-66. The duty to refrain from misrepresentation is a general responsibility imposed on all business. *Rookard v. Mexicoach*, 680 F.2d 1257, 1263 (9th Cir. 1982)(no special relationship need be proven to establish a duty to refrain from making a misrepresentation). It does not specifically target lenders, and to the extent it has any effect on lending activities, it is at most incidental. *See, e.g., Kajitani v. Downey Sav. And Loan Assn, F.A.*, 2008 WL 2164660, *10 (D.Hawaii 2008)(slip copy)(finding federal HOLA preemption does not apply to misrepresentations by lenders). In fact, WMB has not articulated any way that enforcing state laws prohibiting misrepresentation to consumers would interfere with its nationwide operation or "obstruct, impair or condition" its ability to engage in real estate lending any more than those laws impair the operation of any business. *Jefferson v. Chase Home Fin.*, 2007 U.S. Dist. LEXIS 94652 (D. Cal. 2007); *People ex rel. Sepulveda v. Highland Fed. Savings & Loan*, 14 Cal.App.4th 1692, 1708, 1711 (1993) (neither the HOLA nor the OTS's regulations expressly preempted the actions under either the state common law or the statutory action for unfair business practices. Nor were they impliedly preempted, because their effect on the operations of the savings association was incidental rather than direct); *Siegel v. American Savings & Loan Assn.*, 210 Cal. App. 3d 953, 958-964 (1989) (rejecting both express and implied preemption of UCL and numerous common law claims); *Binetti v. Wash. Mut. Bank*, 446 F.Supp.2d 217, 218-19 (S.D.N.Y. 2006)(rejecting HOLA preemption of breach of contract, unjust enrichment, and state consumer protection statutes claims on bank's practice of charging of post-closing interest payments, holding the "impact on lending operations is incidental to *the statute's* primary purpose); *McKell v. Washington Mutual, Inc.*, 142 Cal. App. 4th 1457, 1485-87 (2006)( refused to find HOLA preemption finding that plaintiffs were using the UCL "to enforce generally duties imposed on all businesses operating in California, *i.e.,* the duties to refrain from fraudulent and unfair business practices.")

Consistent with these holdings, the Ninth Circuit confirmed that preemption is inappropriate when state laws are merely used to enforce general legal duties with which every business must comply.

*Silvas*, 514 F.3d at 1006. "To infer preemption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence." *People v. Highland Fed. Sav. & Loan*, 14 Cal. App. 4th 1692, 1710-1711 (Cal. Ct. App. 1993), citing *Hillsborough County v. Automated Medical Laboratoriess, Inc.*, 471 U.S. 707, 717(1985).

Recognizing, as they must, that the CLRA and UCL are laws of general applicability, Defendants, instead, argue that Plaintiffs *are using* the UCL and CLRA as a means by which to impose requirements on Defendants, that are otherwise specifically covered by HOLA. WMB Br., p. 15; EA Br., p. 10. Specifically, Defendants contend that the FAC's allegations seek to impose requirements on WMA regarding: (1) the processing or originating mortgages; (2) loan related fees; and (3) advertising and disclosures.

In each instance, Defendants attempt to fit the allegations of the FAC into one of the illustrative examples of state laws that are preempted under §560.2(b). A plain and fair reading of the FAC, however, demonstrates that Plaintiffs' central allegation – the credibility of the appraisal – does not impinge on any of the lending activities described under §560.2(b).

**1. Plaintiffs' UCL and CLRA Claims do not impose requirements regarding the processing or origination of mortgages**

Defendants contend that the process of obtaining appraisals is an integral part of 'processing or originating mortgages' and therefore covered by §560.2(b). While there are a number of events that involve the processing and origination of a mortgage, a third party independent appraisal, in which the lender should have no involvement, is not one of them. *See Wertz v. Washington Mut. Bank*, 2008 WL 1882843, *5 (E.D.Cal. 2008)(slip copy)(remanding to state court state common law claims against WMB and EA for Defendants' appraisal practices despite the defendants argument that HOLA controls the field of lenders appraisal practices giving federal court jurisdiction). Indeed, Defendants fail to cite

a single case in which the appraisal process has been adjudicated to fit within the parameters of §560.2(b).[7]

**2. Plaintiffs' UCL and CLRA Claims do not impose requirements regarding loan related fee**

While appraisal *fees* may indeed be considered loan related fees under §560.2(b)(5), this case does not seek to impinge on any right WMB has to charge such fees. Indeed, Plaintiffs take no issue with the fee, how it was levied, or how much was charged. This case is about the credibility of the underlying appraisal not how much was charged for it. The OTS made it clear that the UCL would be preempted only "to the extent that it is being used to regulate the imposition of loan-related fees that are part of the Associations' lending programs. . ." OTS No. P-99-3 (March 10, 1999) at p. 16. The OTS' rationale was equally clear – that lawsuits based on "charging loan-related fees, could subject the Associations to different standards within California as well as in other states.... As such, it violates the objective of allowing federal savings associations to conduct their lending operations in accordance with uniform standards of operation." OTS No. P-99-3 (March 10, 1999) at p. 17. Here, the FAC does not implicate any loan related charges. Moreover, a primary objective of Plaintiffs' suit is remuneration for failure to perform a credible appraisal. FAC, Prayer. Nothing in what Plaintiffs seek to achieve would create different standards among associations, nor any disparity in their obligations based on the states in which they operate.[8] By failing to perform an independent appraisal, it is tantamount to not doing one at all. FAC ¶ 82. Representing that an independent appraisal was performed, when it was not is a classic

---

[7] Defendants' reliance on *Haehl v. Wash. Mut. Bank, F.A.*, 277 F. Supp. 2d 933, 940 (S.D. Ind. 2003) is misplaced. There, the Court held in favor of preemption, concluding that plaintiffs' tort law claims sought to regulate the fees that the Defendant Bank could charge its customers. *Haehl* at 277 F Supp 2d 940, 942. The FAC does not contest the Appraisal fee, nor WMB's right to charge the fee. Rather, the FAC alleges the underlying appraisal was not performed lawfully and therefore not credible (*i.e.* never performed). FAC, ¶ 82.

[8] Defendants' reliance on *Haehl* is misplaced. There, the Court preempted a state law holding that "by charging a reconveyance fee that allegedly was neither bona fide nor reasonable, plaintiffs seek to impose requirements of Indiana state law on the types of loan-related fees that a federal savings association may charge." *Haehl* at 942. In the case at bar, however, Plaintiffs are not contesting the appraisal fee, nor WMA's right to charge the fee. The sole issue is the credibility of the appraisal itself.

case of misrepresentation which is a law of general application. *See e.g. McKell v. Washington Mutual, Inc.*, 142 Cal. App. 4th 1457, 1485-87 (2006)(refused to find HOLA preemption where bank was leading borrowers to believe that it was charging them for the actual cost of underwriting, tax services, and wire transfer fees in conjunction with home loans when it was actually charging them substantially in excess of these costs because "plaintiffs here are using the UCL to enforce generally duties imposed on all businesses operating in California, *i.e.,* the duties to refrain from fraudulent and unfair business practices").

**3. Plaintiffs' UCL and CLRA Claims do not impose requirements regarding disclosures and advertising**

Defendants' final attempt to fit Plaintiffs' FAC under the auspices of §560.2(b) is the most incredulous. Defendants do not even attempt to identify what in the FAC could possibly be construed as an advertisement or disclosure. WMB Br., p. 15. Rather, they only opaquely state that, "[t]o the extent these claims seek to impose disclosure requirements or liability for disclosure (or omissions) relating to appraisals..." they are preempted under §560.2(b)(9). *Id.*, pp. 16-17. Indeed, on its face there is nothing in the FAC that relates to disclosures or advertising. This is a classic red herring.

Ultimately, Plaintiffs' UCL and CLRA allegations are not based on a regulatory state law, nor do they purport to regulate or otherwise affect the credit or deposit activities or operations of federally chartered savings associations. In this case, Plaintiffs' state law claims are based on WMA's failure to perform a credible appraisal, which by contract it had obligated itself to do. See § III, *infra*. WMA's failure has nothing to do with its role as a lender, but falls squarely within a legal mandate that obligates

every business to refrain from unfair practices.[9] As such, preemption is inappropriate. *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001 (2008).

**C. Plaintiffs' UCL and CLRA Claim fits squarely within the parameters of §560.2(c)**

Not only are Plaintiffs' UCL and CLRA claims laws of general application that at most incidentally impinge on lending activities, they are also properly excluded from preemption under §560.2(c). The OTS expressly acknowledged that, "[t]he UC[L] may also be viewed as a form of contract and commercial law under §560.2(c)" and "emphasize[d] the extremely limited nature of [their] [] preemption determination []". OTS No. P-99-3 (March 10, 1999) at p. 13. "Our finding of preemption is only based on how the UC[L] has been used by private and governmental plaintiffs to set standards in the three specific areas of a thrift's lending operations discussed herein, areas that have traditionally been governed by federal law. We do not preempt the entire UC[L] or its general application to federal savings associations in a manner that only incidentally affects lending and is consistent with the objective of allowing federal savings associations to operate in accordance with uniform standards." OTS No. P-99-3 (March 10, 1999) *Id.* at p. 18. Numerous courts have also ruled that the UCL sounds in tort, another area of state law specifically excluded under §520.6(c)(4). *Slaughter v. Van Cleve*, 2007 U.S. Dist. LEXIS 90947, 20-21 (C.D. Cal. 2007) (violation of California

---

[9] Defendants' reliance on *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001 (9th Cir. 2008) is misplaced. In *Silvas*, Plaintiffs alleged that defendant charged a non-refundable $400.00 fee to lock in an interest rate. Plaintiffs subsequently rescinded the mortgage but the defendant bank refused to refund the fee. Plaintiffs brought a claim nearly four years after the event alleging that the failure to refund the fee was illegal under the UCL and California's Business and Professions Code §17500 (the "False Advertising Act" or "FAA"). Although both, the UCL and FAA, claims were predicated exclusively on a violation of the federal Truth In Lending Act ("TILA"), Plaintiffs did not assert a TILA violation because the applicable statute of limitations had expired. The *Silvas* Court preempted the claims, holding that the FAA claim runs afoul of §560.2(b)(9) which preempts any "disclosure and advertising [] laws requiring specific statements... or content..." and the UCL claim which contends the lock in fee is 'unlawful' violates §560.2(b)(6) which preempts attempts to regulate loan related fees. Notwithstanding the fact that *Silvas*, unlike the case at bar, pertains directly to the legality of a loan related fee, notably, the Court did not break with long standing legal precedent in this Circuit that laws of general applicability will only be preempted when used to regulate areas expressly preempted by federal law. Rather, as the facts of *Silvas* demonstrate, it is merely improper to use a law of general applicability as a surrogate for a federal claim that could not be alleged because its statute of limitation has lapsed.

Business and Professions Code § 17200 sound in tort.); *Xerox Corp. v. Apple Computer, Inc.*, 734 F. Supp. 1542, 1550 (C.D. Cal. 1990)(Cal. Bus. & Prof. Code §17200 codifies the tort of "passing off"); *Fun-Damental Too, Ltd. v. Universal Music Group, Inc.*, 1997 U.S. Dist. LEXIS 9597 (E.D. Pa. 1997); *Bloom v. Universal City Studios, Inc.*, 1990 U.S. Dist. LEXIS 9955 (C.D. Cal. 1990) ("In essence, §17200 is a statutory tort the contours of which are similar to the common law tort of unfair competition"). "Unfair competition is now a generic name for a number of related torts involving improper interference with business prospects. ... Unfair competition thus does not describe a single course of conduct or a tort with a specific number of elements; it instead describes a general category into which a number of new torts may be placed when recognized by the courts. The category is open-ended, and nameless forms of unfair competition may be recognized at any time for the protection of commercial values." Prosser & Keeton, Torts (5th ed. 1984) § 130, pp. 1013, 1015, fns. omitted.

Defendants have failed to present any legitimate basis on which to preempt Plaintiffs' claims. Accordingly, their preemption arguments should be rejected.

## III. PLAINTIFFS HAVE STATED COGNIZABLE BREACH OF CONTRACT CLAIMS AGAINST WMB AND EA.

WMB and EA contend in essence that Plaintiffs' breach of contract claims with respect to their appraisals are not adequately pled purportedly because they fail to allege a contractual relationship with Defendants, fail to allege the terms of any said contracts that were breached, and fail to allege damages. WMB Br., pp. 23-24, EA Br., pp. 15-17. In making these contentions, WMB and EA twist their arguments so they point to the other for culpability. None of Defendants' contentions have merit.

### A. Plaintiffs Had A Contractual Relationship With WMB And EA For Their Appraisals.

Plaintiffs allege in their FAC that:

> In connection with these WMB home loans, WMB, on behalf of and for Plaintiffs and the Class, undertook and agreed to procure and did procure appraisals from EA and/or LSI for the homes that were the subject of Plaintiffs' and Class members' WMB loans. EA and/or LSI undertook and agreed to provide and provided Plaintiffs and the Class with these appraisals directly and/or by delivery to them through WMB. Plaintiffs and Class members were charged for these appraisals as reflected in their Settlement Statements (HUD-1) or other loan documents.

FAC, ¶ 120. EA quotes this very paragraph of Plaintiffs' FAC and concedes that based upon these allegations "Plaintiffs plainly allege the existence of a contract with WMB and a business relationship between WMB and eAppraiseIT." EA Br., p. 15. EA also concedes, just as Plaintiffs allege, that the appraisal report "was procured by WMB through the auspices of eAppraiseIT." *Id.*, p. 16. EA contends, however, that Plaintiffs have no contract with EA. *Id.* On the other hand, WMB contends that it had no contract with Plaintiffs for the appraisals, and that any contract claim Plaintiffs might have would be against the appraiser. WMB Br., p. 24. This is a classic case of finger-pointing. In fact, Plaintiffs' FAC more than adequately states a contractual relationship for the appraisal with both WMB and EA.

It has long been held that when a lender undertakes to procure an item for the borrower in connection with a loan, the lender is acting as the agent of the borrower in procuring the item. *Graddon v. Knight*, 138 Cal.App.2d 577, 581-83 (1956)(evidence that the lender agreed to procure fire insurance for borrower is sufficient to establish an agency agreement for that purpose between lender and borrower) (numerous citations omitted). *See also Colwell Company v. Hubert*, 248 Cal.App.2d 567, 575 (1967)(evidence that broker agreed to procure lease in shopping center for lessor established agreement for that purpose between lessor and broker).

Here, as EA seems to recognize, Plaintiffs have plainly alleged that WMB undertook to procure and did procure an appraisal report for Plaintiffs. FAC, ¶ 120. This allegation is further supported by Plaintiffs' appraisal reports themselves, each of which list Plaintiffs and WMB as the "Clients," state that the appraisal reports were prepared for the "Clients," and states that both the borrower and the lender "may rely on the appraisal reports in entering their mortgage financing transaction." Scholl Report, pp. 7-9; Spears Report, pp. 7-17. The documents further show that WMB delivered the appraisal reports to Plaintiffs and then charged Plaintiffs for them. Scholl HUD, p. 2, Line 803; Spears HUD, p. 2, Line 803. That WMB may wish to deny these well-plead facts supporting WMB's agency agreement with Plaintiffs to procure an appraisal report for them demonstrates only that there is a factual dispute over the existence of the agency agreement. Such factual disputes over the existence of an agency agreement must be resolved by the trier of fact, not on a preliminary motion to dismiss. *Garlock Sealing Technologies, Inc. v. NAK Sealing Technologies Corp.*, 148 Cal. App. 4th 937, 965 (2007) ("The existence of an agency relationship is a factual question for the trier of fact").

As for EA, Plaintiffs' appraisal reports list them as the "Clients" and state they were made "on behalf of eAppraiseIT" for the "Clients." Scholl Report, generally (stating on each page it was "Completed on behalf of eAppraiseIT"); Spears Report, pp. 7-17 (identifying Plaintiff Spears as the "borrower/client"). This certainly establishes a direct contractual relationship between EA and Plaintiffs.

Moreover, Plaintiffs also have a direct contractual relationship with EA by virtue of the fact that WMB contracted with EA to procure the appraisal reports on behalf of Plaintiffs. Indeed, it is well-established that:

> Unless excluded by the terms of the agreement made by the agent, an undisclosed principal may claim the benefits of the contract and may sue or be sued in his or her own name.

*American Builder's Association v. Au-Yang*, 226 Cal. App. 3d 170, 176 (1990) (numerous citations omitted). Cf. *Sunset Milling & Grain Co.*, 39 Cal. 2d 773, 778 (1952) (applying rule to disclosed principals).

Here, EA concedes that it had a "business relationship" with WMB and that the appraisal reports were "procured by WMB through the auspices of eAppraiseIT." EA Br., pp. 15-16. This is consistent with the allegations of Plaintiffs at paragraph 120 of their FAC. It is also consistent with the appraisal report and other documents referenced by the FAC which identify WMB ***and*** Plaintiffs as the "Clients," state the appraisal report was prepared "on behalf of eAppraiseIT" for the "Clients" to rely on in their mortgage financing transaction, and show that Plaintiffs paid EA's fee for the appraisal report. Scholl Report, p. 7 at ¶ 23, pp. 7-9; Spears Report, p. 7 at ¶ 23, pp. 7-17; Scholl HUD, p. 2, Line 803; Spears HUD, p. 2, Line 803. Accordingly, whether Plaintiffs are a direct contracting party as a result of being a named "Client" in the appraisal report, or are a contracting party by virtue of the agreement for the appraisal report WMB made with EA as Plaintiffs' agent, Plaintiffs have adequately stated a contractual relationship between themselves and EA for the appraisal report.

**B. Plaintiffs Adequately Allege That They Had An Agreement With WMB To Procure An Agreement With EA to Prepare A Credible Appraisal In Compliance With All Legal Requirements And That As A Result Of Defendants' Conspiracy Plaintiffs Received And Paid For A False, Sham Appraisal.**

It is well-established that courts should imply as a term of a contract that it be performed in compliance with applicable law. *Lambros v. Metropolitan Life Insurance Company*, 111 Cal. App. 4th 43, 53 (2003), *quoting* Civ. Code §1656 (Mosk, J., dissenting). *See also Helus v. Equitable Life Assurance Society of the United States*, 309 F. Supp. 2d 1170, 1176-77 (N.D. Cal. 2004)(insurer that violates unfair insurance practices prohibited by California statute also violates an implied covenant of good faith and fair dealing). Both federal and California law expressly require that every appraisal report be done in compliance with the standards set forth in the Uniform Standards of Professional Appraisal Practice ("USPAP"). FAC, ¶ 25, *citing* 12 C.F.R. §34.44 and California Business and Professions Code §11319. As detailed in the FAC, these regulations require an appraiser and an appraisal reviewer to prepare a "credible appraisal" by acting independently, without bias to any party and without setting any predetermined value for the property, and then to present the appraisal report in an honest manner that is neither misleading nor fraudulent. FAC, ¶¶ 26-32.

Besides being an implied term, Plaintiffs' appraisal reports expressly certify that they "compl[y] with the Uniform Standards of Professional Practice." Scholl Report, p. 6 at ¶ 3; Spears Report, p. 6 at ¶ 3. WMB conveniently ignores this express provision of Plaintiffs' appraisal reports when it implies in its brief that USPAP is not part of Plaintiffs' appraisal contracts. WMB Br., p. 24. Thus, the appraisal reports WMB agreed to procure for and the appraisal report EA agreed to provide to Plaintiffs have a legally and contractually imposed requirement that they be credible appraisals done in compliance with USPAP.

Plaintiffs' FAC alleges that "Defendants breached these contracts with Plaintiffs and each Class member by not providing a home appraisal which was performed by an independent, objective and unbiased appraiser, and by not providing appraisal reports that were credible, objective, unbiased, independent, and done in compliance with USPAP standards and applicable law. In other words, Plaintiffs and the Class were charged for a lawful appraisal which was never performed by Defendants." FAC, ¶122. Plaintiffs further allege that these breaches were the result of Defendants' conspiracy to

artificially inflate the appraised value of properties and to eliminate negative descriptions of the property so that WMB could make higher value loans that it could sell for more profit in the securities market or to third parties. FAC, ¶¶ 6-8, 22-24. Plaintiffs' FAC cites numerous e-mails from EA officers that were obtained by the New York Attorney General which supports these allegations of a conspiracy between WMB, EA and LSI to provide false, sham appraisal reports and to charge Plaintiffs (and all WMB borrowers) for them without disclosing to them that they were in fact false, sham appraisal reports.[10] FAC, ¶¶ 39, 43, 45, 47, 53-54.

Defendants' concealment of its conspiracy to provide and charge Plaintiffs for false, sham appraisals is manifest here. Indeed, the appraisal reports prepared by EA and delivered to Plaintiffs by WMB appear to be genuine appraisal reports and even recite that they are done in compliance with USPAP, when, unbeknownst to Plaintiffs, they were not. In other words, Defendants' appraisal reports were like good counterfeit money, it might look real, but in fact it is not real and has no value. Plaintiffs paid for Defendants' false, sham appraisal reports and have clearly suffered damage at the hands of Defendants' conduct in conspiring to and in breaching their contracts to procure and provide Plaintiffs with a genuine, credible appraisal reports. FAC, ¶¶ 120-123; Scholl HUD, p. 2; Spears HUD, p. 2.

WMB and EA also breached their duties of good faith to Plaintiffs to procure and provide them with credible appraisal reports done in compliance with USPAP as they agreed to do, and to disclose to Plaintiffs that their appraisal reports were false, sham reports. Indeed, it is well-established that:

> Every contract requires one party to repose an element of trust and confidence in the other to perform. For this reason, every contract contains an implied covenant of good faith and fair dealing, obligating the contracting parties to refrain from 'doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. . .'

*Wolf v. Superior Court,* 107 Cal. App. 4th 25, 31 (2003) (citations omitted). When a party to a contract breaches the implied covenant of good faith and fair dealing, "it affords [a] basis for redress for breach of contract." *Id.*

---

[10] WMB contends in its brief that Plaintiffs never pled that WMB "provided" them with the appraisal reports prepared by EA. WMB Br., p. 24. This contention is belied by Plaintiffs' FAC in which it specifically alleges that WMB delivered these appraisal reports to Plaintiffs. FAC, ¶120.

Moreover, as demonstrated in the prior section, WMB was acting as Plaintiffs' agent under a agency agreement to procure the appraisal reports for Plaintiffs. "An agency relationship is a fiduciary one, obligating the agent to act in the interest of the principal." *Engalla v. Permanentc Medical Group, Inc.*, 15 Cal. 4th 951, 977 (1997). "The agent owes the principal the duty of fullest disclosure of material facts concerning a transaction which might affect the principal's decision thereon. The agent must disclose whether it is acting on its own account or as an adverse party to the principal. The duty extends to all facts likely to affect the principal's judgment." *Van de Kamp v. Bank of America National Trust & Savings Association*, 204 Cal. App. 3d 819, 857 (1988) (citations omitted).

WMB also argues that EA was its agent in procuring appraisal reports. WMB Br., p. 9. This would mean that EA was a subagent of WMB who was Plaintiffs' agent for the purpose of procuring an appraisal report. Under California law, "the subagent owes the same duties to the principal as does the agent." *Mendoza v. Rast Produce Co., Inc.*, 140 Cal. App. 4th 1395, 1404 (2006) (citations omitted).

Accordingly, under either the contractual duty of good faith and fair dealing and/or fiduciary duties arising from the agency agreement to procure and prepare appraisal reports for Plaintiffs, WMB and EA had to deal honestly with Plaintiffs and disclose material facts about the transactions to item. WMB and EA breached these contractual duties of good faith by conspiring to create and creating false, sham appraisal reports, and delivering those reports to Plaintiffs without disclosing their true nature and under the guise that they were genuine, credible appraisal reports. Plaintiffs were damaged by paying for these false, sham appraisal reports since they had no value at all.

Plaintiffs have adequately stated all necessary elements of their breach of contract claims against WMB and EA. That WMB and EA contend that the facts are different than alleged or should be viewed in a manner more favorable to Defendants is contrary to the standards for reviewing a motion to dismiss and is not proper grounds for granting a motion to dismiss.

## IV. DEFENDANTS PROVIDE NO GOOD GROUNDS FOR DISMISSING PLAINTIFFS' UCL AND CLRA CLAIMS

### A. WMB's Argument That Plaintiffs Lack Standing To Sue For UCL Violations Fails

WMB asserts that Plaintiffs' claims for UCL violations (Second, Third and Fourth Claims for Relief) should be dismissed because Plaintiffs lack standing to bring such a claim. WMB Br., pp. 18-20.

This is so, WMB argues, because Plaintiffs have not alleged and cannot allege that they suffered damages as a result of the alleged UCL violations. *Id.*, p. 18. More specifically, WMB asserts that because Plaintiffs obtained the home loans they sought to obtain, their claims that they were duped into paying hundreds of dollars in appraisal fees for sham appraisals as part of the lending process cannot stand. *Id.*, p. 19. That is, because federal law requires that appraisals be obtained, Plaintiffs did not lose money because of WMB's alleged illegal, unfair conduct but rather, apparently, because federal law required appraisals for which the borrowers must pay. *Id.*

The argument is meritless, and requires WMB to ignore and/or misconstrue Plaintiffs' allegations. Setting aside that federal law does *not* require that banks *charge their borrowers* for appraisals (banks can cover those costs themselves)(15 U.S.C. § 1691(e)), the alleged UCL violation here is not merely the charging of an appraisal fee, as WMB suggests. ***It is the charging of an appraisal fee for a sham appraisal while failing to disclose that the appraisal is a sham.*** Plaintiffs allege that the appraisals at issue were sham appraisals intended only to serve WMB's interests (i.e., its interests in maximizing the volume and value of loans generated, as opposed to any interest in accurately valuing the homes to protect collateral). FAC, ¶¶ 6-9. However, borrowers, in agreeing to pay the appraisal fees, believed those fees were being demanded for real appraisals, particularly since the appraisal reports expressly stated that borrowers could rely on them and that they were performed in compliance with USPAP. Scholl Report, pp. 6-7; Spears Report, pp. 6-7. WMB's suggestion that federal law required it to charge Plaintiffs standard appraisal fees for such sham appraisals (while passing the appraisals off as real, credible appraisals), and that accordingly, Plaintiffs' payment of such fees was simply a result of federal law, is specious. Had Plaintiffs known the truth, which WMB and its co-conspirators failed to disclose, Plaintiffs would not have agreed to pay the fees requested as payment for purportedly real appraisals. FAC, ¶¶ 67-70. Defendants ignore Plaintiffs' express allegations that they were damaged "in that they never received the appraisal service for which they were charged by Defendants and instead unwittingly received unreliable, biased appraisals . . ." *Id.*, ¶ 87.

Relying on purported facts outside the allegations and the scope of any judicially noticeable matters (which this Court therefore should disregard at this stage), WMB argues at pages 19-20 of its brief that because Plaintiffs ultimately obtained the loans they wanted, they have no damages related to

the sham appraisals for which they paid. WMB is wrong. Over and above the loans themselves, Plaintiffs, like any borrower, also wanted to receive all the ancillary services for which they were paying in connection with the loan transactions. Borrowers plainly do not want to pay fees allegedly representing real appraisals when, in fact, sham appraisals have been performed.[11] WMB's suggestion - which contradicts Plaintiffs' allegations - that borrowers do not care about the fees they pay, or the services for which such fees are charged, so long as they ultimately obtain the loans they are seeking is unsupportable and inconsistent with common sense and economic reality (not to mention an impermissible attempt to interject on a motion to dismiss purported facts contrary the allegations of the FAC). *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). While the ultimate, primary goal of a would-be borrower may be to secure the financing for the desired home purchase, no one can seriously dispute that borrowers prefer to pay as little as possible, and to pay only for real loan-related services, when they close a loan transaction. In WMB's view, it could charge fees for *any* services - regardless whether the services were sham or non-existent - when providing loans to unwitting customers, and so long as the customers ultimately closed their loan transactions, they would have no damages, notwithstanding their having paid WMB for sham or non-existent services. The notion is specious.

As a result of Defendants' illegal conspiracy relating to the provision of sham appraisals, and their failure to disclose that conspiracy to borrowers, Plaintiffs paid the full price for a credible appraisal and instead received a sham appraisal. Accordingly, they suffered both injury in fact and the loss of money as a result of Defendants' alleged UCL violations. *See, e.g., The Missing Link v. EBAY, Inc.*, 2008 WL 1994886, *8 (N.D. Cal. May 5, 2008) (this Court rejecting defendant's argument that plaintiff

---

[11] Defendant's argument is no better than the argument of a licensed smog check station that passes off a fake smog test as a real one, while charging the vehicle owner for a real one. Regardless whether after the test the station operator transmits a passing grade to the DMV which allows the vehicle owner to obtain a smog certificate, the vehicle owner paid for a real test, and has the right to rely on the assumption that, in fact, in paying for a real test, a real test was performed that confirms his vehicle is not emitting illegal amounts of smog. The fact that the test is required by law (as WMB argues here with respect to appraisals), or that the vehicle owner obtained a smog certificate (as WMB argues here by claiming Plaintiffs obtained the loans they sought), does not change the fact that the station operator has illegally and unfairly charged its customer for a service which it did not truly provide.

lacked standing to bring UCL claim where it paid money for an EBAY listing of a particular duration and that duration was not provided, thereby decreasing the value of the listing for which it paid).

Contrary to WMB's arguments, Plaintiffs have adequately alleged that they suffered damages as a result of the conduct which they claim constituted violations of the UCL. In the event the Court somehow concludes otherwise, Plaintiffs respectfully request leave to amend.

**B. Plaintiffs' CLRA Claim Is Properly Pleaded**

WMB asserts that Plaintiffs' CLRA claim must be dismissed because: (1) Plaintiffs' loan transactions did not involve "goods or services"; (2) Plaintiffs have not properly alleged an actionable representation or omission; and (3) Plaintiffs have not alleged damages resulting from any such representation or omission. WMB Br., pp. 20-23. All three arguments are baseless.

**1. WMB's "Goods" or "Services" Argument Is Without Merit**

As WMB notes, the CLRA prohibits certain unlawful acts and practices "undertaken . . . in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). The term "services" means "work, labor, and services for other than a commercial or business use . . ." Cal. Civ. Code § 1761(b).[12]

WMB claims that its transaction with Plaintiffs involved simply the extension of credit, and that extensions of credit are neither goods nor services and thus are outside the purview of the CLRA. WMB Br., p. 20. WMB is incorrect. Certainly, the transactions involved the extension of credit. However, they *also* involved the payment by Plaintiffs for separate tangential services, including appraisals. Scholl HUD, p. 2, Line 803; Spears HUD, p. 2, Line 803. Indeed, WMB argues that appraisals were required - by federal law - as part of those transactions. Unquestionably, appraisals are "services" – a fact WMB concedes. WMB Br., p. 21:13. Just as unquestionably, WMB required Plaintiffs to pay for those appraisals. FAC, ¶¶ 59, 64; Scholl HUD, p. 2, Line 803; Spears HUD, p. 2, Line 803. In doing so, WMB indisputably engaged in transactions intended to result, and which resulted, in the sale to Plaintiffs of (sham) appraisals.

---

[12] Relatedly, the term "transaction" means "an agreement between a consumer and any other person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement." Cal. Civ. Code § 1761(e).

Whether the overall transactions at issue were "extensions of credit," as WMB argues (p. 21:7-8) does not mean that those transactions did not *also* result in the sale of services. The transaction need not *be* a sale of goods or services for the CLRA to apply – it need only be intended to result in, or actually result in, a sale of goods or services. Similarly, whether Plaintiffs "came to WMB looking for loans, not appraisals" (WMB Motion at 21:9-10) does not change the fact that the loan transactions resulted in the sale to Plaintiffs not only of credit but also of appraisals. (Had WMB not made Plaintiffs pay for the sham appraisals that were provided, the conclusion would be different.) Likewise, whether WMB itself performed the appraisals it sold to Plaintiffs is irrelevant. Liability under the CLRA does not require that the party transacting business with a consumer itself perform the services which are sold in the transaction. *See, e.g., Mazur v. eBay Inc.*, 2008 WL 618988, *13 (N.D. Cal. 2008)(holding both the seller of a product and the company who facilitated the sale could be liable under the CLRA). Parties can and frequently do sell services performed by others.

Nevertheless, WMB attempts to confuse matters by arguing that the appraisal reports the Plaintiffs paid for expressly provide that "[t]he intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of the appraisal for a mortgage finance transaction." WMB Br., p. 21. The appropriate response is "so what?" The appraisal reports also expressly state that borrowers are "clients" too, that borrowers may rely on those reports for their mortgage transaction with the lender and, as alleged, borrowers do rely on them, as contemplated by Defendants. FAC, ¶ 25; Scholl Report, p. 7, ¶ 23; Spears Report, p. 7, ¶ 23. Relatedly, the fact that the appraisal reports contain language regarding their "intended use" in no sense deflects from the fact that Plaintiffs were required to pay WMB for them. FAC, ¶¶ 59, 64. While quoting the "intended use" language, WMB completely fails to explain its legal *significance* to the CLRA question, let alone demonstrate that such language somehow establishes as a matter of law that appraisals were not sold to Plaintiffs when Plaintiffs paid for them as part of the lending transactions. Whether they were first sold

to WMB and then resold to Plaintiffs (WMB admits it "passed on the costs") during the loan transaction is immaterial.[13] *See, e.g. Mazur*, 2008 WL 618988 at *13.

WMB relies heavily on *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457 (2006), suggesting it is dispositive and mandates dismissal of Plaintiffs' CLRA claim. Not so. First, as Judge Thelton Henderson of this Court recently recognized in rejecting a defendant's similar attempted reliance on *McKell* in the context of a CLRA claim, *McKell* is not binding if this Court concludes the California Supreme Court would rule otherwise. *Jefferson v. Chase Home Finance LLC*, 2007 WL 1302984, *2 (N.D. May 3, 2007) (discussing facts of, and limited analysis in, *McKell* and finding it unpersuasive in concluding that misrepresentations in connection with the sale of financial services related to mortgage loans are covered by the CLRA).

As Judge Henderson correctly observed, "the court in *McKell* provided no analysis before reaching its decision that the CLRA did not apply." *Id.* Here, in contrast (and as in *Jefferson*), Plaintiffs contend that WMB engaged in misrepresentations and omissions in connection with the sale to Plaintiffs of financial services – appraisals - related to the underlying mortgages. WMB here, like the defendant in *Jefferson*, has provided "no written argument" as to why the *appraisals* Plaintiffs paid for do not fall within the category of "services" as defined by the CLRA. *Id.*, at *3. Rather, tellingly, WMB simply argues that the *extension of credit* is not a service. WMB Br., p. 20. While Plaintiffs dispute that the CLRA does not cover mortgage loans, that dispute is irrelevant, since Plaintiffs are not alleging that their *loans* constitute services, but rather that the *appraisals* which they paid WMB for are services which were sold as part of the overall loan transactions. FAC, ¶ 114. Like the courts in *Jefferson, supra* and *Hitz v. First Interstate Bank*, 38 Cal. App. 4th 274 (1995), a case discussed in *Jefferson*, this Court should

---

[13] Indeed, a Northern District court has previously held that used car purchasers have standing to sue the manufacturer of the vehicles despite having never entered into a *transaction* with the manufacturer, since the manufacturer engaged in transactions with auto distributors which later resulted in the resales of the vehicles to the plaintiffs, and the transactions in which the manufacturer engaged were intended to result in the ultimate sale of the vehicles to consumers. *See* Kravec Aff., Exh. 4, *Chamberlan v. Ford Motor Company*, N. C 03-2628 CW (N.D. Cal., Aug. 6, 2003)("Among the sales of goods to consumers, that resulted from the transactions in which Defendant engaged, were the subsequent resales of [automobiles] to Plaintiffs").

conclude that the transactions between Plaintiffs and WMB "involved more than the provision of a loan; they also include financial services." *Id.*, at *3.[14]

Decisions from other courts in this District also support the viability Plaintiffs' CLRA claim. In *Hernandez v. Hilltop Financial Mortgage, Inc.*, 2007 WL 3101250, (N.D. Cal Oct. 22, 2007), the plaintiffs received loans from Ameriquest. After refinancing with Ameriquest, they refinanced again, with defendant Hilltop, and, in doing so, had discussions with Hilltop's agent about affordable payments in which alleged misrepresentations about their loan payments and what those payments would cover were made. *Hernandez* at *1-2. Ultimately, they sued. The defendants moved to dismiss their CLRA claim on the ground that "the CLRA does not apply to a mortgage loan because the loan is not a 'service" as defined by the Act." *Id.*, at 5. The Northern District court disagreed. Noting that the CLRA is to be liberally construed, the court observed that the California Supreme Court has not addressed "whether a mortgage loan, and the activities involved in receiving and maintaining one, falls within the CLRA's definition of a 'good' or 'service.'" *Id.*, at *5. After considering other cases involving financial transactions in which the California Supreme Court and other courts had allowed CLRA claims to proceed, the *Hernandez* court concluded that the CLRA covered the transactions and the alleged misrepresentations about loan payments at issue, which were made in connection with refinancing. In doing so, the court rejected the defendants' reliance on *McKell* and *Berry v. American Express Publishing, Inc.*, 147 Cal. App. 4th 224 (2007) (also cited by WMB here), stating that it found those authorities unpersuasive. *Id.*, at 6.

Relying on *Jefferson, supra*, as well as Judge Conti's opinion in *Knox v. Ameriquest Mortgage Co.*, 2005 WL 1910927, *4 (N.D. Cal. Aug. 10, 2005)[15] and the decision in *In re Ameriquest Mortgage*

---

[14] The *Jefferson* Court also rejected the defendant's argument that the CLRA should not apply to real estate lending because it is heavily regulated. The Court noted that the CLRA must be "liberally construed" (Cal. Civ. Code § 1760) and that it would not conclude that the California Supreme Court would expand the CLRA's specified exclusions or read into it exclusions not present on the face of the statute. *Id.*, at 3.

[15] Judge Conti observed that he had "reviewed the limited case law on this issue and finds that California courts generally find financial transactions to be subject to the CLRA." *Knox, supra* at *4. He concluded that "the CLRA covers the mortgages at issue in the instant case" and denied the defendant's motion to dismiss the CLRA claim. *Id.*

*Co.*, 2007 WL 1202544 (N.D. Ill. April 23, 2007), Judge Illston concluded that the California Supreme Court "would find that the CLRA does apply to the mortgage loans in the present case." *Id.*, at *6.[16]

In sum, this Court's colleagues correctly rejected arguments similar to WMB's when they were faced with motions by banks seeking dismissal of CLRA claims arising out of residential lending transactions. The cases discussed above are plainly more analogous to the present case than the distinguishable ones cited with little discussion by WMB.[17] Here, Plaintiffs have not alleged merely that Defendants violated the CLRA by making them loans - let alone by issuing them credit cards, as in several of the cases cited by WMB. Rather, Plaintiffs allege they were misled in violation of the CLRA in transactions which involved both the extension of credit and the separate provision of tangential financial services, namely, appraisals. As such, the CLRA applies.

Finally, little discussion is needed to dispose of EA's unsupported argument – which WMB does not advance - that appraisals are not "services" under the CLRA. Assuming, as Defendants contend, that appraisals occurred, such appraisals undoubtedly constitute "work, labor, and services . . ." Regardless

---

[16] Like Judge Henderson in *Jefferson*, Judge Illston observed that the *McKell* court "provided little analysis on the broader question regarding applicability of the CLRA to financial transactions, and instead relied largely on the fact that the plaintiffs cited no authority and made no argument explaining how the defendants' actions fell under the CLRA." *Id.*, at *6. The same can't be said of Plaintiffs here.

[17] *Berry, supra*, involved only the question whether the *issuance of a credit card* was a "a transaction intended to result or which results in the sale or lease of goods or services to [a] consumer...." *Berry, supra* at 228. Terming it a matter of first impression (despite the existence of *McKell*), the Court found the CLRA did not apply. *Id.* Notably, in doing so, the Court focused on the fact that at issue was *only* the issuance of a credit card, holding that "[w]e conclude neither the express text of CLRA nor its legislative history supports the notion that credit transactions separate and apart from any sale or lease of goods or services are covered under the act." *Id.*, at 233. Here, Plaintiffs did not pay only for a credit card, or for credit, and but also paid separately for an appraisal, which is unquestionably a service. FAC, ¶ 114; see also 12 U.S.C. 2601, 3500.2 (RESPA identifies an appraisal as a service). *Berry* does not speak to the question whether unlawful acts in connection with the provision of appraisals are actionable under the CLRA. WMB also cites the Court to *Van Slyke v. Capital One Bank*, 503 F. Supp. 2d 1353 (N.D. Cal. 2007), another case involving credit cards, but tellingly provides no discussion of the case or its facts. Similarly, *Augustine v. FIA Credit Servs.*, N.A., 485 F. Supp. 2d 1172 (E.D. Cal. 2007), without any discussion. That case involved claims that the defendant's increased credit card rates, made without warning, violated the CLRA and other statutes. With respect to the "goods" or "services" question, the Court's analysis was limited to citing *Berry* and stating "California law provides that the CLRA does not apply to credit card transactions." *Augustine, supra* at 1175. It is not surprising WMB does not discuss the case.

whether a mortgage loan is a service, physically inspecting a home and engaging in a process of comparing it to comparable sales and assessing its value in accordance with uniform standards plainly qualifies as "work," "labor" and/or "services." Despite EA's reliance on it, *McKell* does not hold otherwise, as it did not involve claims relating to the sale of appraisals. The fact that the appraisals at issue here occurred in connection with transactions resulting in the sale of real property is irrelevant.[18] Nothing in the CLRA suggests that sales of goods or services occurring in connection with the sale of real property are somehow outside the purview of the CLRA simply because they occur in connection with a real property sale, and to the extent *McKell* could somehow be interpreted as including such a holding, this Court, like its colleagues, should reject it as unpersuasive.

EA also tries to latch onto the statutory definition's exclusion of services "for commercial or business use." EA Br., p. 13. Pointing to the appraisal report's stated "intended use," EA claims that because the appraisals are for *WMB*'s commercial/business use, they are not "services" when sold to *Plaintiffs*. The argument is absurd. Whatever their use by *WMB* – here, allegedly to inflate property values in an effort to maximize profits from the sale of mortgage-backed securities, and *not* to protect collateral – the fact is that the appraisals are sold *to borrowers* for use in non-commercial home purchase transactions which the appraisal reports themselves expressly state. FAC, ¶ 25; Scholl Report, p. 7; Spears Report, p. 7. Thus, insofar as Plaintiffs and the class are concerned, the appraisals sold to them were "work, labor, and services for other than a commercial or business use." If *WMB* were suing EA for CLRA violations, EA's argument might have merit. (Indeed, WMB also would not qualify as a "consumer" under the CLRA.) But that is not the case here.[19]

---

[18] EA suggests that because the appraisal is "incident" to a home loan transaction it is not a "service." (EA brief at 13:10-11.) Of course, it cites no authority for this notion, which is not consistent with the statutory definition of "service."

[19] EA's reliance on *Nymark v. Heart Federal Savings & Loan Ass'n*, 231 Cal. App. 3d 1089 (1991) is also misplaced. First, *Nymark* was a summary judgment decision, not a pleading decision, and the court's conclusions were thus based on the evidence presented. *Id.* At 1094. The language EA purports to be quoting while conveniently substituting words it prefers (EA brief at 13:15-16) was actually the court's conclusion based on the evidence presented to it in connection with the summary judgment motion. *Id.* at 1096. Second, Plaintiffs in this case allege that the appraisals at issue were not performed to protect WMB's security interest, as in *Nymark*, but rather to inflate values and facilitate

### C. Plaintiffs Allege Both Misrepresentations and Omissions

Plaintiffs allege that Defendants engaged in a conspiracy to provide borrowers with sham, illegal appraisals, while charging Plaintiffs and borrowers for real appraisals, and that Defendants intentionally concealed their scheme from Plaintiffs and other borrowers. FAC, ¶¶ 67-69. Defendants contemplated that Plaintiffs and borrowers could and would rely on the appraisal reports, which, as previously discussed, included language expressly stating that borrowers could rely on the reports. Id., ¶ 25. The reports falsely stated that they were prepared in compliance with USPAP, when, in fact, they were illegally prepared as part of Defendant's conspiracy. In addition to charging Plaintiffs for these sham appraisals, WMB actually provided them to Plaintiffs and borrowers. *See, e.g.*, FAC, ¶¶ 60, 65, 69.

Yet, WMB now actually argues that Plaintiffs have alleged neither misrepresentations or omissions.[20] WMB Br., p. 22. In fact, Plaintiffs expressly allege that, in violation of Civ. Code Section 1770(a)(7), Defendants represented the appraisal services to be of a particular standard and quality (i.e., credible, independence, unbiased and performed in compliance with USPAP standards), which they were not. FAC ¶ 115. Despite this allegation against it, WMB seeks to contest the allegation by suggesting that any such representation was the representation of its alleged captive appraiser, not *its* representation, claiming in a footnote that Plaintiffs have improperly "lumped together" the different defendants without making allegations against each of them. However, WMB again ignores Plaintiffs' incorporated allegations of a *conspiracy*, which, if true, would render WMB responsible for the co-conspirators' acts in furtherance of the conspiracy, including such false representations. *See, e.g., Marks v. Ocwen Loan*

---

sales of mortgage-backed securities. FAC ¶ 6. Third, *Nymark* involved a negligence claim, not a CLRA claim. *Nymark* at 1096. The question at issue in *Nymark* court was considering was "whether a lender has a duty of care to a borrower in appraising the borrower's collateral to determine if it is adequate security for a loan." *Id.* at 1095-96. Plaintiffs are not making such a claim. To the contrary, Plaintiffs allege that the appraisals at issue were sham appraisals that, unbeknownst to Plaintiffs, were *not* performed to determine whether their property was adequate security for the loans, despite the appraisals' express statements that borrowers could rely on them for the mortgage transaction. FAC. ¶¶ 6, 25. As shown at page 13 *supra.*, appraisers and lenders alike are liable to borrowers for their misrepresentation and fraudulent performance of an appraisal. *Nymark* is therefore inapposite for all these reasons.

[20] EA has not made this argument, to its credit.

*Servicing*, 2008 WL 344210 (N.D. Cal. Feb. 6, 2008) (denying motion to dismiss misrepresentation claims and noting that "Plaintiff may be able to show, for instance, that defendants were so closely connected to New Century and Home 123 that they should be liable for the false statements of the loan originators.") Indeed, as discussed above, WMB admits at page 9 of its brief that EA acts as its agent in the appraisal scheme challenged by Plaintiffs. By knowingly and intentionally passing along written misrepresentations in appraisal reports to Plaintiffs and borrowers, while knowing that Plaintiffs and borrowers could rely on them (as expressly stated in the reports), WMB effectively made such misrepresentations itself. *Id.* (WMB's co-conspirator liability). *See also* Argument III. B. *supra.* (discussing WMB's agency and contractual duties). The fact that the misrepresentations initially were made by WMB's agents and/or co-conspirators did not give WMB free license to knowingly convey them to its borrowers and then, upon being sued, assert that the misrepresentations originated with others.

Likewise, Plaintiffs have clearly alleged omissions, in alleging that Defendants conspired to conceal that the appraisals paid for by Plaintiffs were in fact sham appraisals rather than credible appraisals prepared by authorized appraisers in accordance with USPAP and federal law.[21] WMB's real complaint appears to be not that no omissions are alleged but that Plaintiffs have not alleged materiality or a duty to disclose. Plainly, however, Plaintiffs and borrowers would have resisted paying the requested appraisal fees had they known they were being provided sham, illegal appraisals. As such, the omission is material, notwithstanding WMB's misplaced suggestion that Plaintiffs are required to allege that they would "not have gone forward with their loans" had they known the truth about the appraisals and the conspiracy. To the extent the Court believes Plaintiffs have not adequately pleaded that they would have refused to pay the appraisal fees had they known the true facts, Plaintiffs request leave to amend.

WMB unquestionably also had a duty to disclose the true facts to Plaintiffs, since it was charging them for appraisals represented to be credible and in compliance with USPAP while concealing its

---

[21] Indeed, WMB effectively concedes that Plaintiffs have pleaded an omission in its very next argument, at page 23, lines 3-7.

knowledge - unknown and unavailable to Plaintiffs - that the appraisals were, in fact, counterfeit, sham appraisals. *See LiMandri v. Judkins,* 52 Cal. App. 4th 326, 337 (1997); *Falk v. General Motors Corp.*, 496 F.Supp.2d 1088, 1097 (N.D. Cal. 2007) (citing *LiMandri*). As alleged, WMB owed Plaintiff a duty of disclosure both because it actively concealed material facts, because it had exclusive knowledge of material facts not known to Plaintiffs and because of its agency and contractual duties of good faith.

**D. Plaintiffs Have Alleged Damages Resulting From Defendants' Misconduct**

Both WMB and EA argue that Plaintiffs have not alleged that they suffered harm as a result of their alleged wrongdoing. Defendants are incorrect. Plaintiffs respectfully direct the Court to their previous discussion of the damages issue *supra*. Plaintiffs were sold appraisals which asserted that they were credible and prepared in compliance with USPAP, when in fact they weren't. Defendants knew this, and Plaintiffs didn't. FAC, ¶¶ 60, 65, 69. Plaintiffs were damaged "in that they never received the appraisal service for which they were charged by Defendants and instead unwittingly received unreliable, biased appraisals . . ." FAC, ¶ 87.

The proposition – which Defendants seem to be advocating – that Plaintiffs would have agreed to pay the full appraisal fees for such sham appraisals had Plaintiffs known they were receiving sham appraisals prepared not to obtain accurate values but rather as part of a conspiracy to inflate values, is not only inconsistent with Plaintiffs' allegations but absurd. Whether Plaintiffs have alleged that the appraisals actually "inflated the values of their properties" or that they "would not have gone forward" with the *loan* transactions, as Defendants seek to focus attention on, is irrelevant. As alleged, Plaintiffs paid for something – a lawful, credible, independent appraisal – which, despite the deceptive appearance form of the documents provided, Plaintiffs did not receive. FAC, ¶ 82. The hundreds of dollars that Plaintiffs paid for the counterfeit appraisals are their damages. Despite Defendant's wishful thinking, Plaintiffs would not have willingly paid hundreds of dollars in appraisal fees charged by WMB had they known the true facts - i.e., that the lawful, credible appraisals they were paying for had not, in fact, been performed. As such, Plaintiffs have been damaged by Defendants' illegal scheme.

**V. PLAINTIFFS' QUASI-CONTRACT/UNJUST ENRICHMENT CLAIM IS PROPERLY PLEADED**

Defendants also assert that there is no such thing as an independent cause of action for unjust enrichment in California, and that this requires dismissal of Plaintiffs' claim for quasi-contract/unjust enrichment. In fact, contrary to Defendants' suggestion, the Northern District has recognized that "California courts appear to be split on whether unjust enrichment can be an independent claim or merely an equitable remedy." *Falk v. General Motors Corp.*, 496 F. Supp. 2d 1088, 1099 (N.D. Cal. 2007) (comparing cases).

Despite the language of the intermediate court in the *Melchior v. New Line Productions, Inc.*, 106 Cal.App.4th 779 (2003) decision (and the subsequent *McBride v. Boughton,* 123 Cal.App.4th 379 (2004) decision, citing *Melchior*, which EA cites), the *California Supreme Court* has suggested that independent claims for unjust enrichment are proper. *See Ghirardo v. Antonioli*, 14 Cal. 4th 39, 52-53 (1996) (discussing unjust enrichment cause of action). Numerous other California cases - ignored by Defendants - are consistent. *See, e.g., First Nationwide Savings v. Perry*, 11 Cal. App. 4th 1657, 1664-1665 (1992) (discussing availability of cause of action for unjust enrichment); *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000) ("Evidence also supported the conclusion that Lectrodryer **satisfied the elements of a claim of unjust enrichment: receipt of a benefit and unjust retention of the benefit at the expense of another**" (citing *First Nationwide Savings, supra.*); *Hirsch v. Bank of America*, 107 Cal. App. 4th 708, 721-722 (2003), *Rev. Denied* July 23, 2003 ("Appellants have **stated a valid cause of action for unjust enrichment based on Banks' unjustified charging and retention of excessive fees** which the title companies passed through to them . . . . We conclude that appellants' unjust enrichment cause with respect to the alleged overcharges survives demurrer . . . .").[22] *See also Ewert*

---

[22] In the Northern District case cited by EA, *Enreach Tech., Inc. v. Embedded Internet Solutions, Inc.*, 403 F. Supp.2d 968, 976 (N.D. Cal. 2005), the court, in dismissing the claim for unjust enrichment, noted that the plaintiff "cites no case law holding that a party may plead a cause of action for unjust enrichment." Whatever the plaintiff did or didn't do in that case, Plaintiffs in *this* case have cited numerous authorities showing that valid causes of action for unjust enrichment can be pleaded under California law, at least in the view of some California courts. A split in authority is not a basis to dismiss a claim.

*v. eBay, Inc.*, 2008 WL 906162 (N.D. Cal. March 31, 2008) (this very Court observing that the plaintiff's first amended complaint "sets forth a claim for unjust enrichment").[23]

Whatever the views of two divisions of California's intermediate courts, the California Supreme Court's multiple references to an unjust enrichment cause of action in *Ghirardo* rebut any notion that the Supreme Court - the only court whose views are binding on this Court in matters of California law - would hold that a separate cause of action for unjust enrichment cannot be pleaded under state law. As such, and in light of the split in authority at the intermediate court level, Defendants' suggestion that this claim must be dismissed as a matter of law, at the pleading stage, should be rejected.

**CONCLUSION**

For the foregoing reasons, WMB's and EA's motions to dismiss should be denied in their entirety.

Dated: June 25, 2008

**SPECTER SPECTER EVANS & MANOGUE, P.C.**

By: s/Joseph N. Kravec, Jr.
Joseph N. Kravec, Jr.

The 26th Floor Koppers Building
Pittsburgh, Pennsylvania 15219
Tel: (412) 642-2300
Fax: (412) 642-2309
E-mail: jnk@ssem.com

---

[23] Defendant WMB's footnote argument that the quasi-contract/unjust enrichment claim also should be dismissed because Plaintiffs have express contracts against WMB also fails. Plaintiffs ***are entitled to plead in the alternative*** and, moreover, ***WMB itself argues that the contracts impose no obligations on it relating to appraisals.*** As such, WMB can hardly claim that the its contracts with Plaintiffs "define the rights" of the parties relating to the issues raised in this case. The present case is thus entirely distinguishable from the authority cited by WMB, *Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare*, 94 Cal. App. 4th 151 (2001), where the issue of physician compensation raised in the physician plaintiffs' "quasi-contract" claim was expressly governed by express contracts between the parties. *Id.* At 173. According to WMB, Plaintiffs' contracts contain no terms relating to appraisals, and do not even mention appraisals. Its proffered authority is therefore inapposite.

Michael D. Braun, Esquire
**BRAUN LAW GROUP, P.C.**
12304 Santa Monica Blvd., Suite 109
Los Angeles, CA 90025
Tel: (310) 442-7755
Fax: (310) 442-7756
E-mail: service@braunlawgroup.com

Ira Spiro (67641)
J. Mark Moore (180473)
**SPIRO MOSS BARNESS, LLP**
11377 West Olympic Blvd., Fifth Floor
Los Angeles, CA 90064-1683
Tel: (310) 235-2468
Fax: (310) 235-2456
E-mail: ira@spiromoss.com
mark@spiromoss.com

Janet Lindner Spielberg (221926)
**LAW OFFICES OF JANET LINDNER SPIELBERG**
12400 Wilshire Blvd., Suite 400
Los Angeles, CA 90025
Tel: (310)3928801
Fax: (310)278-5938
E-mail: jlspielberg@jlslp.com

***Attorneys for Plaintiffs***

# PROOF OF SERVICE

STATE OF PENNSYLVANIA )
) ss.:
COUNTY OF ALLEGHENY )

I am employed in the County of Allegheny, State of Pennsylvania. I am over the age of 18 and not a party to the within action. My business address is The 26th Floor Koppers Building, Pittsburgh, Pennsylvania 15219.

On June 25, 2008, using the Northern District of California's Electronic Case Filing System, with the ECF ID registered to Joseph N. Kravec, Jr., I filed and served the document(s) described as:

**PLAINTIFFS' COMBINED MEMORANDUM IN OPPOSITION TO DEFENDANTS WASHINGTON MUTUAL BANK'S AND FIRST AMERICAN EAPPRAISEIT'S MOTIONS TO DISMISS FIRST AMENDED COMPLAINT**

The ECF System is designed to automatically generate an e-mail message to all parties in the case, which constitutes service. According to the ECF/PACER system, for this case, the parties are served as follows:

Janet Lindner Spielberg, Esquire jlspielberg@jlslp.com
Ira Spiro, Esquire ira@spiromoss.com
Robert Ira Spiro, Esquire ira@spiromoss.com
J. Mark Moore, Esquire mark@spiromoss.com
Michael D. Braun, Esquire service@braunlawgroup.com

**Attorneys for Plaintiffs**

Robert J. Pfister, Esquire rpfister@stblaw.com
Martin L. Fineman, Esquire martinfineman@dwt.com
Stephen Michael Rummage, Esquire steverummage@dwt.com
Sam N. Dawood, Esquire samdawood@dwt.com
Jonathan M. Lloyd, Esquire jonathanlloyd@dwt.com

**Attorneys for Defendant Washington Mutual, Inc.**

Laura Jean Fowler, Esquire lfowler@mhalaw.com

**Attorneys for Defendant eAppraiseIT**

Margaret Anne Keane, Esquire mkeane@dl.com
Kris Hue Chau Man, Esquire kman@dl.com
Angela M. Papalaskaris, Esquire apapalas@dl.com

Christopher J. Clark, Esquire cjclark@dl.com
Kevin C. Wallace, Esquire kwallace@dl.com
Jeffrey D. Rotenberg, Esquire jrotenberg@tpw.com
Richard F. Hans, Esquire rhans@tpw.com

**Attorneys for Defendant LSI Appraisal, LLC**

On June 25, 2008, I served the document(s) described as:

**PLAINTIFFS' COMBINED MEMORANDUM IN OPPOSITION TO DEFENDANTS WASHINGTON MUTUAL BANK'S AND FIRST AMERICAN EAPPRAISEIT'S MOTIONS TO DISMISS FIRST AMENDED COMPLAINT**

by placing a true copy(ies) thereof enclosed in a sealed envelope(s) addressed as follows:

Kerry Ford Cunningham, Esquire
Patrick J. Smith, Esquire
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, New York 10281

**Attorneys for eAppraiseIT**

Kris H. Man, Esquire
Dewey and LeBoeuf LLP
One Embarcadero Center
Suite 400
San Francisco, CA 94111-3619

**Attorneys for LSI Appraisal, LLC**

I served the above document(s) as follows:

BY MAIL. I am familiar with the firm's practice of collection and processing correspondence by mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Pittsburgh, Pennsylvania in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in an affidavit.

I am employed in the office of an attorney who is admitted *pro hac vice* in this action at whose direction the service was made.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on June 25, 2008, at Pittsburgh, Pennsylvania.

S/MARCIA Z. CARNEY
Marcia Z. Carney