1  Stephen M. Rummage, *pro hac vice*
2  Jonathan M. Lloyd, *pro hac vice*
   Sam N. Dawood (Cal. Bar No. 178862)
3  DAVIS WRIGHT TREMAINE LLP
   505 Montgomery Street, Suite 800
4  San Francisco, California 94111-6533
   Telephone: (415) 276-6500
5  Facsimile:  (415) 276-6599
   Email:  steverummage@dwt.com
6          samdawood@dwt.com

7  Attorneys for Defendant Washington Mutual Bank

8

9              IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
10                        SAN JOSE

11 SIDNEY SCHOLL and FELTON A. SPEARS,    )
12 JR., on behalf of themselves and all others  )  Case No. 5:08-cv-00868 (RMW)
   similarly situated,                     )
13                                         )  CLASS ACTION
                  Plaintiffs,              )
14                                         )  **DEFENDANT WASHINGTON MUTUAL**
        v.                                 )  **BANK'S REQUEST FOR JUDICIAL**
15                                         )  **NOTICE IN SUPPORT OF REPLY IN**
   WASHINGTON MUTUAL, INC., a Washington   )  **SUPPORT OF MOTION TO DISMISS**
16 corporation; WASHINGTON MUTUAL BANK,    )  **PLAINTIFFS' FIRST AMENDED**
   FA (aka WASHINGTON MUTUAL BANK);        )  **COMPLAINT**
17 FIRST AMERICAN EAPPRAISEIT, a Delaware  )
   corporation; and LENDER'S SERVICE, INC.,)  Date:  Friday, September 19, 2008
18                                         )  Time: 9:00 a.m.
                  Defendants.              )  Department: SJ, Courtroom 6, 4th Floor
19                                         )
20                                         )
                                           )
21 _____)

22        Defendant Washington Mutual Bank ("WMB") hereby requests that this Court take

23 judicial notice of the following facts and documents pursuant to Federal Rule of Evidence 201:

24        1.       On January 15, 2008, the United States District Court for the District of

25 Massachusetts issued a Memorandum and Order of Dismissal in *Yeomalakis v. Wash. Mut. Bank*,

26 No. 07-CV-11365-NG, dismissing plaintiff's claims against WMB on the grounds that HOLA and

27 its implementing regulations preempted those claims.  Attached hereto as **Exhibit A** is a true and

28 correct copy of the Memorandum and Order of Dismissal.

DAVIS WRIGHT TREMAINE LLP

2.      The Financial Institutions Reform, Recovery and Enforcement Act of 1989 and its implementing regulations recognize the Appraisal Foundation's Uniform Standards for Professional Appraisal Practice ("USPAP") as the generally accepted appraisal standards applicable to appraisals that federal savings associations obtain in connection with federally related transactions.  The Appraisal Foundation's website contains the full text of the 2008-2009 USPAP at http://commerce.appraisalfoundation.org/html/USPAP2008/index.htm.  Attached hereto as **Exhibit B** is a true and correct copy of Statement on Appraisal Standards No. 9, a part of USPAP.

Respectfully submitted this 1st day of August, 2008.

DAVIS WRIGHT TREMAINE LLP


By /s/ *Stephen M. Rummage*
     Stephen M. Rummage, *pro hac vice*
     Jonathan M. Lloyd, *pro hac vice*
     Sam N. Dawood (Cal. Bar No. 178862)

Attorneys for Defendant Washington Mutual Bank

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

1

2

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Robert Ira Spiro - Ira@SpiroMoss.com
Janet Lindner Spielberg - jlspielberg@jlslp.com
Joseph N. Kravec, Jr. - jnk@ssem.com
Michael David Braun - service@braunlawgroup.com
James Mark Moore - mark@spiromoss.com
Jeffrey D. Rotenberg - jrotenberg@tpw.com
Laura Jean Fowler - lfowler@mhalaw.com
Patrick J. Smith - psmith@tpw.com
Richard F. Hans - rhans@tpw.com
Christopher J Clark - cjclark@dl.com
Kevin C Wallace - kwallace@dl.com
Kris Hue Chau Man - kman@dl.com
Margaret Anne Keane - mkeane@dl.com
Angela M. Papalaskaris - apapalas@dl.com

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

Kerry Ford Cunningham
THACHER PROFFITT & WOOD LLP
Two World Financial Center
New York, NY 10281

DATED this 1st day of August, 2008.

Davis Wright Tremaine LLP
Attorneys for Def. Washington Mutual Bank

By */s/ Stephen M. Rummage*
    Stephen M. Rummage, *pro hac vice*
    WSBA #11168
    1201 Third Avenue, Suite 2200
    Seattle, Washington 98101-3045
    Telephone: (206) 757-8136
    Fax: (206) 757-7700
    E-mail: steverummage@dwt.com

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAMES YEOMALAKIS, on behalf of himself and all others similarly situated, Plaintiff, v. WASHINGTON MUTUAL BANK, Defendant. | ) ) ) ) ) ) Civ. Action No. 07cv11365-NG ) ) ) ) |

GERTNER, D.J.:

MEMORANDUM AND ORDER OF DISMISSAL
January 15, 2008

I.    INTRODUCTION

Plaintiff James Yeomalakis, on behalf of himself and other similarly-situated Massachusetts residents, brings this diversity action against defendant Washington Mutual Bank, alleging 1) that certain contractual provisions controlling interest rate increases for credit cards issued by defendant are void and unenforceable under Massachusetts law because they constitute illegal penalties, and 2) that defendant's actions constitute unfair and deceptive acts and practices in violation of M.G.L. c. 93A, § 2.  Plaintiff takes issue with what he alleges are retroactive increases to the default annual percentage rate ("APR") inappropriately applied to outstanding balances on credit cards issued by defendant. Defendant now moves this Court to dismiss the Complaint on the grounds that the Home Owners Loan Act ("HOLA"), 12 U.S.C. §§ 1461 et seq., and related regulations promulgated by the Office of Thrift Supervision ("OTS") preempt plaintiff's state law claims.

For the reasons set forth below, I conclude that plaintiff's claims are preempted by federal law and regulations. As such, Defendant's Motion to Dismiss (document # 5) is **GRANTED**.

II.    **FACTS AND PROCEDURAL HISTORY**

Defendant is a Nevada-based federally chartered savings association governed by HOLA. Pursuant to federal law and regulations, the Bank may extend "loans made through credit card accounts." 12 U.S.C. § 1464(c)(1)(T); 12 C.F.R. § 560.30. Plaintiff, a Massachusetts resident, is one of defendant's credit card customers. Plaintiff filed his original Complaint on June 21, 2007, in Middlesex Superior Court. Defendant removed the case to this Court on July 25, 2007, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

Plaintiff claims that it is defendant's practice to review its credit card accounts at the end of each account's billing cycle, select certain cardholders according to particular "secret" criteria, and to backdate increases in the APR for outstanding balances. The result, plaintiff alleges, is that "many Washington Mutual customers who reasonably believed, throughout a billing cycle, that they were being charged at the agreed upon rate shown on their previous billing statement, found themselves billed at a higher rate and assessed more finance charges than they expected after the end of the billing cycle." (Compl. ¶ 6 (Exh. A to document #1).) Plaintiff alleges that defendant imposed an

illegal penalty and violated M.G.L. c. 93A by failing to notify him and other similarly-situated customers of increases in the APR before the effective date of the change.[1]

The Account Agreement between plaintiff and defendant lays out defendant's method for calculating and applying the APR for outstanding credit card balances. It states:

> Each time [the cardholder] default[s] under any Washington Mutual Account Agreement because [the cardholder] fail[s] to make at least the Minimum Payment by the Payment Due Date, exceed[s his or her] Credit Line, or make[s] a payment to [Washington Mutual] that is not honored by [the cardholder's] bank, the APRs [Annual Percentage Rate] (including any introductory rates) for new and existing balances in any Balance Category may increase up to the Prime Rate plus 23.74% (the 'Default APR'). Using the Prime Rate in effect for billing cycles beginning in July 2006 as an estimate, the Default APR calculated using this formula would be 31.99% (0.0876% corresponding daily periodic rate).

---

[1] Plaintiff asserts that he paid approximately $138.00 in additional finance charges as a result of defendant's practices. (Compl. ¶ 15.) Additionally, in his Response to Defendant's Motion to Dismiss, plaintiff seems to suggest that defendant's practices may also constitute a breach of contract. Because this claim does not appear in the Complaint, it is not considered here.

(Exh. A to Gorman Aff. 15 (document # 7).)[2]  Similarly, monthly statements sent to plaintiff confirm that "period rates and APRs may vary . . . as provided in your Account Agreement in the event of certain Account defaults, for example, if your payments are late."  (Exh. B to Gorman Aff.  2, 4, 6, 8, 10.)

Defendant filed this Motion to Dismiss on August 24, 2007. Defendant argues that plaintiff's claims are preempted by federal law and regulations that govern credit card lending practices, namely HOLA and various regulations promulgated by OTS.

III. **STANDARD OF REVIEW**

Dismissal is appropriate under Rule 12(b)(6) where the complaint fails to state a claim upon which relief can be granted. See Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006).  In evaluating a motion under Rule 12(b)(6) the Court must assume "the truth of all well-pleaded facts contained in the operative version of the complaint and indulging all reasonable inferences in the plaintiff's favor."  Id. (citing McCloskey v. Mueller, 446 F.3d 262, 266 (1st Cir. 2006)).  A complaint must allege "a plausible

---

[2] Plaintiff did not attach a copy of the Account Agreement, but did reference it in his Complaint.  (Compl. ¶ 6.)  The Agreement enters the record by way of Defendant's Motion to Dismiss.  (Exh. A to Gorman Aff. 15.) "[A]lthough ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment, under First Circuit precedent, when a complaint's factual allegations are expressly linked to-and admittedly dependant upon-a document (the authenticity of which is not challenged), then the court can review it upon a motion to dismiss." Diva's Inc. v. City of Bangor, 411 F.3d 30, 38 (1st Cir. 2005) ( internal citations and quotations omitted); see also Penner v. Chase Bank USA, N.A., 2006 WL 2192435, at *1 n.2 (W.D. Wash. Aug. 1, 2006).

entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc.,
490 F.3d 92, 95 (1st Cir. 2007) (citing Bell Atl. Corp. v.
Twombly, 127 S. Ct. 1955, 1967 (2007)).

IV.    **DISCUSSION**

    A.    **Preemption**

       Federal preemption of state law is grounded in the Supremacy
Clause of the federal Constitution, which provides that "the Laws
of the United States . . . shall be the supreme Law of the Land;
and the Judges in every State shall be bound thereby, any thing in
the Constitution or Laws of any State to the Contrary
notwithstanding." U.S. Const. art. VI, cl. 2. Federal statutes
and the regulations adopted pursuant to those statutes have equal
preemptive effect. SPGGC, LLC v. Ayotte, 488 F.3d 525, 530 (1st
Cir. 2007). A federal statute or regulation may preempt state law
in three relevant ways. First, Congress can expressly preempt
state law through explicit statutory language. Id. (citing
Barnett Bank v. Nelson, 517 U.S. 25, 31 (1996)). The second form
of preemption falls under the term "field preemption," whereby
Congress can enact a regulatory scheme "so pervasive as to make
reasonable the inference that Congress left no room for the States
to supplement it." Barnett Bank, 517 U.S. at 31 (quoting Rice v.
Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). "In such
cases, state regulation will be invalid even if it does not
directly conflict with federal laws or regulations." Ayotte, 488

F.3d at 530 (citation omitted).  Finally, state law may be preempted when "compliance with both state and federal statutes and regulations is a physical impossibility, or when compliance with the state statute would frustrate the purposes of the federal scheme."  Id. at 531 (citation omitted).

In the case at bar, defendant argues that plaintiff's claims are preempted by HOLA, a statute originally adopted in the early 1930s "to restore public confidence in savings and loan associations and to respond to dissatisfaction with the inadequate system of state regulation."  Silvas v. E*Trade Mortgage Corp, 421 F. Supp. 2d 1315, 1318 (S.D. Cal. 2006) (citing Bank of Am. v. City & County of San Francisco, 309 F.3d 551, 559 (9th Cir. 2002)).  HOLA gives OTS "broad plenary authority" to promulgate regulations governing "the powers and operations of every Federal savings and loan association from its cradle to its corporate grave."  Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 145, 160 (1982) (quotation omitted).  As the Supreme Court noted in de la Cuesta, "[i]t would have been difficult for Congress to give [OTS] a broader mandate."  458 U.S. at 161 (quotation omitted).

Federal statutes and regulations, however, will not preempt a state law action so long as it "does not prevent or significantly interfere with the national bank's exercise of its powers."  Barnett Bank v. Nelson, 517 U.S. 25, 33 (1996).  "Thus, states

retain some power to regulate national banks in areas such as

contracts, debt collection, acquisition and transfer of property,

and taxation, zoning, criminal, and tort law." Bank of Am., 309

F.3d at 559. "Nevertheless, because there has been a history of

significant federal presence in national banking, the presumption

against preemption of state law is inapplicable." Id. (citations

omitted).

OTS has made its occupation of the entire field of lending

regulation for federal savings associations explicit:

> OTS hereby occupies the entire field of
> lending regulation for federal savings
> associations. OTS intends to give federal
> savings associations maximum flexibility to
> exercise their lending powers in accordance
> with a uniform federal scheme of regulation.
> Accordingly, federal savings associations may
> extend credit as authorized under federal law,
> including this part, without regard to state
> laws purporting to regulate or otherwise
> affect their credit activities.

12 C.F.R. § 560.2(a).

Examples of the types of state laws preempted by § 560.2(a)

include: the terms of credit, including adjustments to the

interest rates; loan related fees; disclosure and advertising,

including "laws requiring specific statements, information, or

other content to be included in credit application forms, credit

solicitations, billing statements, credit contracts, or other

credit-related documents"; and usury and interest rate ceilings.

§ 560.2(b). Section 560.2(c), however, states that state laws are

-7-

not preempted "to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes" of the regulation.   The list of examples includes: contract and commercial law; tort law; criminal law; and laws determined by OTS to further a vital state interest without having more than in incidental effect on lending operations.   <u>Id.</u>

     The challenge currently before the Court, then, is to determine "which claims fall on the regulatory side of the ledger," and are therefore preempted, "and which, for want of a better term, fall on the common law side" coexisting with federal laws and regulations.   <u>In re: Ocwen Loan Serv., LLC Mortgage Serv. Litigation</u>, 491 F.3d 638, 644 (7th Cir. 2007).

       **B.**   **Count I**

     In Count I, plaintiff asserts that the contractual provisions governing the relationship between plaintiff and defendant that purport to authorize retroactive rate increases are void and unenforceable because they constitute illegal penalties rather than valid liquidated damages provisions.   Count I takes issue with the very fact and nature of the interest rates charged by defendant; as such, it is clearly preempted.

     Under the heading "Preemption of State Usury Laws," 12 U.S.C. § 1463(g)(1) reads:

             Notwithstanding any State law, a savings
             association may charge interest on any

                              -8-

> extension of credit at a rate of not more than
> 1 percent in excess of the discount rate on
> 90-day commercial paper in effect at the
> Federal Reserve bank in the Federal Reserve
> district in which such savings association is
> located or at the rate allowed by the laws of
> the State in which such savings association is
> located, whichever is greater.

Under 12 C.F.R. § 560.110(a), the term "interest" as used in § 1463(g)(1) applies to rates charged for any default or breach by a borrower and includes "numerical periodic rates, late fees, not sufficient funds (NSF) fees, [and] overlimit fees."

Plaintiff may not avoid the implications of federal law simply by labeling the interest rates charged by defendant "illegal penalties." Interpreting a nearly identical provision in the National Bank Act, the Supreme Court in <u>Smiley v. Citibank (South Dakota), N.A.</u>, 517 U.S. 735 (1996), held that the plaintiff's claim that the certain fees charged by a credit card company were "unconscionable" was preempted by federal law.[3] <u>Id.</u> at 738, 744; <u>see also</u> <u>Bank of Am.</u>, 309 F.3d at 559 (HOLA and OTS regulations preempt city ordinance pertaining to ATM fees). As § 560.110(a) makes clear, § 1463(g)(1) applies to the types of charges and fees complained of here. The interest rate charged by a savings association as a fee or as the result of a breach or default need not be related to the costs actually incurred; it need only fall within the limits set by federal statute. §

---

[3] It should be noted that plaintiff also asserts that defendant's calculation of the APR is "unconscionable." <u>See</u> Compl. ¶ 26(a).

1463(g)(1); see also Forness v. Cross Country Bank, Inc., 2006 WL 240535, at *3 (S.D. Ill. Jan. 13, 2006) (claim that credit card fees were improper because they bore no relationship to bank's actual cost preempted by federal regulations). Here, plaintiff does not allege that defendant has exceeded these limits. Count I is aimed at a lending practice subject only to the control of federal law and regulations and is therefore preempted.

### C.    **Count II**

Plaintiff's second claim is also preempted, though for reasons that require a bit more explanation. Count II of the Complaint alleges that defendant engages in unfair and deceptive acts and practices in violation of M.G.L. c. 93A, §2. In particular, plaintiff alleges that defendant "backdates" interest rates for certain customers without notice, resulting in "unconscionable" "instantaneous lump sum finance charges."

Plaintiff faces an uphill battle. A number of courts around the country have considered claims similar to the one currently before the Court, each finding against the plaintiff. See, e.g., Augustine v. FIA Card Servs., N.A., 485 F. Supp. 2d 1172, 1175-76 (E.D. Cal. 2007); Penner v. Chase Bank USA, N.A., 2006 WL 2192435, at *4-5 (W.D. Wash. Aug. 1, 2006); Evans v. Chase Manhattan Bank USA, N.A., 2006 WL 213740, at *5-6 (N.D. Cal. Jan. 27, 2006).[4] For example, in Augustine, a case involving claims under

---

[4] It also appears that plaintiff's counsel was involved in a number of these cases.

California consumer protections laws virtually identical to the
claims in this case, found that the plaintiff "had not alleged
facts sufficient to show her claim is not preempted since it seeks
to change Defendant's terms of credit provided in Defendant's
Cardholder Agreement."  485 F. Supp. 2d at 1175-76 (claim
preempted by 12 C.F.R. § 7.4008(d)(2)(iv), a regulation mirroring
12 C.F.R. § 560.2(b)).  (Compl. ¶ 26(c).)

Federal regulations, however, do not preempt all claims
alleging deceptive acts and practices against savings
associations.  As explained in an Opinion by OTS's Chief Counsel
addressing Indiana's deceptive acts and practices statute, OTS
"does not intend to preempt state laws that establish the basic
norms that undergird commercial transactions." Ocwen, 491 F.3d at
644 (quoting Opinion of OTS Chief Counsel, Dec. 24, 1996, 1996 WL
767462).  Thus, state laws prohibiting deceptive acts, such as
Chapter 93A, are not preempted where "the impact on lending
appears to be only incidental to the primary purpose of the
statute." Id.  As defendant notes, a consumer would be able to
bring a Chapter 93A claim if a savings association participated in
a scheme to deceive customers as to the relationship between the
bank, whose investment products were federally insured, and a
brokerage firm, which sold uninsured and highly risky investments.
(Def.'s Mem. 17 (citing Fenning v. Glenfed, Inc., 40 Cal. App. 4th
1285 (1995).)  It is only when Chapter 93A is invoked against a

-11-

lending practice over which Congress has expressed an intent to be the sole regulator that federal law preempts.

The Seventh Circuit's recent decision in In re: Ocwen Loan Serv., LLC Mortgage Serv. Litigation, 491 F.3d 638 (7th Cir. 2007), provides guidance as to how courts should draw this distinction.  In Ocwen, the court read 12 C.F.R. § 560.2(c) "to mean that OTS's assertion of plenary regulatory authority does not deprive persons harmed by the wrongful acts of savings and loan associations of their basic state common-law-type remedies."  491 F.3d at 643.  As examples of the types of actions that escape OTS's preemptive reach, the court cited cases in which a bank agrees to charge a specified rate on a mortgage and then charges a higher rate or in which a bank represents that it will forgive a default but nonetheless forecloses.  Id. at 643-44.  The court contrasted these claims with others that would work to "substitute for the federal regulatory scheme," like those that fall within the ambit of 12 C.F.R. § 560.2(b).  Id. at 644.  The court then applied this distinction to practices and conduct alleged to violate a California statute similar to the Massachusetts statute at issue here, holding that claims targeting some of the practices would be preempted insofar as "prohibiting them could interfere with federal regulation of disclosure, fees, and credit terms."  Id. at 646.

-12-

Though couched in the terms of Massachusetts consumer protection law, Count II of the Complaint is unavoidably a challenge to the way in which defendant calculates and applies the default interest rate it charges its customers. This is particularly true since the Account Agreement expressly allows for the instantaneous increase of the APR upon any default or breach by the customer. (Exh. A to Gorman Aff. 15 (document # 7).) As such, it is preempted by federal law.

Plaintiff argues that his claims are simply aimed at preventing defendant's unfair and deceptive acts, and that a decision in his favor "would not restrict or limit Washington Mutual's chosen default rate, or the basis chosen by Washington Mutual on which to implement such rate. Nor would it impose any additional disclosure requirements on Washington Mutual." (Pl.'s Opp. 5 (document # 11).) It is difficult to see how this could be true. What action could defendant take to remedy the alleged wrong here that would not implicate the setting of the default rate, its implementation, or the way in which it is disclosed to consumers? To the extent that plaintiff's claim takes issue with the interest rate itself or its calculation, the claim is preempted for the same reasons as Count I. See also § 560.2(b)(2) (OTS regulations preempt state laws affecting "adjustments to the interest rate"); SPGGC, LLC, 488 F.3d at 536 (HOLA and OTS regulations preempt state law regarding the sale and marketing of

-13-

stored value gift cards by third parties).  To the extent that the claim takes issue with the notice provided to plaintiff in billing statements, the claim is preempted by § 560.2(b)(9), which preempts state laws relating to "disclosure and advertising."  See also Am. Bankers Ass'n v. Lockyer, 239 F. Supp. 2d 1000, 1012 (E.D. Cal. 2002) (HOLA preempts California law requiring certain disclosures in billing statements).  Tellingly, plaintiff does not allege that defendant breached a contractual term.  Nor does plaintiff bring an action under the federal Truth in Lending Act.

An artfully drafted complaint may not avoid the fact that --- despite plaintiff's protestations to the contrary -- plaintiff's claims go directly to the nature and implementation of the interest rate charged by defendant to its customers -- practices falling within the federal regulatory scheme's broad sweep. Plaintiff may not launch a collateral attack by employing state consumer protection laws.

**V.**    **CONCLUSION**

For the foregoing reasons, I find that both Counts asserted in Plaintiff's Complaint are preempted by federal law and regulations.  Thus, Defendant's Motion to Dismiss (document # 5) is **GRANTED**.  This case is **DISMISSED**.

**SO ORDERED.**

Date:  **January 15, 2008**        /s/ Nancy Gertner
                            **NANCY GERTNER, U.S.D.C.**

-14-

# EXHIBIT B

# USPAP 2008–2009

## THE ISSUE (SMT-9)

An appraiser must identify and consider the intended use and intended users of the appraiser's reported opinions and conclusions in order to identify the problem to be solved and to understand his or her development and reporting responsibilities in an appraisal, appraisal review, or appraisal consulting assignment. An appraiser must state the intended use and intended users of the opinions and conclusions in a report.

What kind of information must an appraiser identify and consider regarding the intended use and intended users in the course of accepting and completing an assignment, and how much of that information must an appraiser include in the report?

## TABLE OF CONTENTS

USPAP 2008–2009 Edition
©The Appraisal Foundation

## USPAP 2008–2009

### THE STATEMENT (SMT-9)
**Relevant USPAP References**

The term "Client" is defined in the DEFINITIONS section of USPAP as

> *the party or parties who engage an appraiser (by employment or contract) in a specific assignment.*

The term "Intended Use" is defined as

> *the use or uses of an appraiser's reported appraisal, appraisal review, or appraisal consulting assignment opinions and conclusions, as identified by the appraiser based on communication with the client at the time of the assignment.*

The term "Intended User" is defined as

> *the client and any other party as identified, by name or type, as users of the appraisal, appraisal review, or appraisal consulting report by the appraiser on the basis of communication with the client at the time of the assignment.*

**General**

The SCOPE OF WORK RULE requires an appraiser to identify the intended use and intended users as part of problem identification. Identifying the intended use and intended users is required to determine the scope of work necessary to develop credible assignment results. The credibility of assignment results is always measured in the context of their intended use.

STANDARDS 1, 3, 4, 6, 7, and 9 require an appraiser to identify the intended use and intended users in the course of developing his or her opinions and conclusions in the assignment. In the context of a real property appraisal, Standards Rules 1-2(a) and (b) (for example) state:

> *In developing a real property appraisal, an appraiser must:*
>
> *(a) identify the client and other intended users;*
>
> *(b) identify the intended use of the appraiser's opinions and conclusions…*

STANDARDS 2, 3, 5, 6, 8, and 10 require an appraiser to state the intended use in the report. In the context of a written real property appraisal report, Standards Rule 2-2(a) (for example) states, *The content of a Self-Contained Appraisal Report must be consistent with the **intended use** of the appraisal…* (bold added for emphasis).

In the context of a real property appraisal report (for example), Standards Rules 2-2(a)(i) and (ii) require the appraiser to:

> *(i)  state the identity of the client and any intended users, by name or type;*
>
> *(ii) state the intended use of the appraisal…*

An appraiser identifies the intended use by communicating with the client before accepting an appraisal, appraisal review, or appraisal consulting assignment. The intended use may encompass requirements of intended users other than the client. An appraiser cannot reasonably identify the intended use without having identified the client and communicating with the client or the client's agent.

Although an appraiser must identify and consider the intended use of the appraiser's opinions and conclusions, an appraiser must not allow the objectives of the client or other intended users of the report to affect the appraiser's independence and objectivity. An appraiser must not allow the objectives of a client or other intended users to cause the analysis or report to be biased.

### Identification of the Client and Other Intended Users in an Assignment

In order to properly define the problem under study and to understand his or her responsibilities in an assignment, an appraiser must identify the client and other intended users. This is accomplished by communication with the client prior to accepting the assignment.

An appraiser should use care when identifying the client to avoid violations of the Confidentiality section of the ETHICS RULE. The client may be identified as a person or entity, or as an agent of an intended user. In instances where the client wishes to remain anonymous, the appraiser must still document the identity of the client in the workfile but may omit the client's identity in the appraisal, appraisal review, or appraisal consulting report.

Neither the client nor the appraiser is obligated to identify an intended user by name. If identification by name is not appropriate or practical, an appraiser's client and the appraiser may identify an intended user by type.

An appraiser's obligations to the client are established in the course of considering and accepting an assignment. If an appraiser becomes aware of a change in the intended use of the report, the appraiser must consider whether the extent of the development process and type of report initially identified are still appropriate. If they are not, the appraiser must communicate with the client to establish an appropriate basis upon which to proceed.

If the appraiser is contacted regarding an assignment or report by a party other than the appraiser's client, before responding the appraiser must review his or her obligations to that client. An appraiser may need to review the Confidentiality section of the ETHICS RULE and Advisory Opinions 25, 26, and 27 for guidance.

An appraiser's obligations to other intended users may impose additional development and reporting requirements in the assignment. It is essential that an appraiser establish with the client a clear and mutual understanding of the needs of all intended users prior to accepting an assignment. An appraiser's obligation to intended users other than the client is limited to addressing their requirements as identified by the appraiser at the time the appraiser accepts the assignment.

A party receiving a report copy from the client does not, as a consequence, become a party to the appraiser-client relationship.

Parties who receive a copy of an appraisal, appraisal review, or appraisal consulting report as a consequence of disclosure requirements applicable to an appraiser's client do not become intended users of the report unless they were specifically identified by the appraiser at the time of the assignment.

### Disclosure of Client and Other Intended User(s) in an Appraisal, Appraisal Review, or Appraisal Consulting Report

Except when specifically requested not to do so as part of the agreement with the client, an appraiser must disclose the identity of the client and any other intended users in an appraisal, appraisal review, or appraisal consulting report. The purpose of this reporting requirement is to (1) ensure that the client and any other intended users can recognize their relationship to the assignment and report, and (2) ensure that unintended users will not be misled by notifying them that they are neither the client nor an intended user. For example, a statement similar to the following may be appropriate:

This report is intended for use only by (identify the client) and (identify any other intended users by name

or type). Use of this report by others is not intended by the appraiser.

If the client's identity is omitted from an appraisal report, the appraiser must (1) identify the client in the workfile, and (2) provide a notice in the appraisal report that the identity of the client has been omitted in accordance with the client's request and that the report is intended for use only by the client and any other intended users.

**Identification of the Intended Use in an Appraisal, Appraisal Review, or Appraisal Consulting Assignment**

Identification of the intended use is one of the assignment elements necessary to properly identify the appraisal, appraisal review, or appraisal consulting problem. Identification of the intended use helps the appraiser and the client make two important decisions about the assignment:

- the appropriate scope of work for the appraisal, appraisal review, or appraisal consulting development process; and
- the level of detail to provide in the appraisal, appraisal review, or appraisal consulting report.

**Disclosure of the Intended Use in an Appraisal, Appraisal Review, or Appraisal Consulting Report**

An appraiser can avoid misleading parties in possession of an appraisal, appraisal review, or appraisal consulting report by clearly identifying the intended use in the report and stating that other uses are not intended. For example, a statement similar to the following may be appropriate:

This report is intended only for use in (describe the use). This report is not intended for any other use.

The intended use description provided in the statement must be specific to the assignment.

TABLE OF CONTENTS

USPAP 2008–2009 Edition
©The Appraisal Foundation

# USPAP 2008–2009

## CONCLUSIONS (SMT-9)

- An appraiser must identify the client and other intended users as part of the process of identifying the client's intended use of an appraisal, appraisal review, or appraisal consulting report, by communication with the client prior to accepting the assignment.
- Identification of the intended use and intended users are necessary steps in determining the appropriate scope of work.
- Whether or not assignment results are credible is measured in the context of the intended use of the opinions and conclusions.
- An appraiser should use care when identifying the client to ensure a clear understanding and to avoid violations of the Confidentiality section of the ETHICS RULE.
- The appraiser's obligations to the client are established in the course of considering and accepting an assignment.
- The appraiser's obligation to intended users other than the client is limited to addressing their requirements as identified by the appraiser at the time the appraiser accepts the assignment.
- Identification of the intended use and intended users of the report is one of the essential steps in order to identify the problem to be solved.
- An appraiser identifies the intended use and any intended users of an appraisal, appraisal review, or appraisal consulting report by communicating with the client before accepting an assignment.
- Appraisers can avoid misleading parties in possession of a report by clearly identifying the intended use and any intended users in the report and stating that other uses and/or users are not intended by the appraiser.
- Except when specifically requested not to do so as part of the agreement with the client, an appraiser must disclose the identity of the client and any other intended users of an appraisal report in the report.
- If the client's identity is omitted from an appraisal report, the appraiser must (1) document the identity of the client in the workfile, and (2) provide a notice in the appraisal report that the identity of the client has been omitted in accordance with the client's request and that the report is intended for use only by the client and any other intended users.

TABLE OF CONTENTS

USPAP 2008–2009 Edition
©The Appraisal Foundation