1   MARGARET A. KEANE (State Bar No. 255378)
    KRIS H. MAN (State Bar No. 246008)
2   DEWEY & LEBOEUF LLP
    One Embarcadero Center, Suite 400
3   San Francisco, CA  94111
    Telephone:   (415) 951-1100
4   Facsimile:    (415) 951-1180
    E-mail:       mkeane@dl.com
5
    *Attorneys for Defendant LSI Appraisal, LLC*
6

7

8                   UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11  FELTON A. SPEARS, JR. and SIDNEY      )   Case No.:  5:08-cv-00868 (RMW)
    SCHOLL, on behalf of themselves and all )
12  others similarly situated,            )   **CLASS ACTION**
                                          )
13                    Plaintiffs,         )
                                          )   **DECLARATION OF KRIS H. MAN IN**
14        v.                              )   **SUPPORT OF DEFENDANT LSI APPRAISAL,**
                                          )   **LLC'S REPLY MEMORANDUM OF LAW IN**
15  WASHINGTON MUTUAL BANK, FA (aka       )   **SUPPORT OF ITS MOTION TO DISMISS**
    WASHINGTON MUTUAL BANK); FIRST        )
16  AMERICAN EAPPRAISEIT, a Delaware      )
    corporation; and LENDER'S SERVICE, INC., )
17                                        )
                      Defendants.         )
18  _____ )

19        I, KRIS H. MAN, declare as follows:

20        1.      I am an attorney duly licensed to practice in the State of California and an associate with

21  Dewey & LeBoeuf LLP, counsel of record for defendant LSI Appraisal, LLC ("LSI") in this action.

22  I make this declaration in support of LSI's Reply Memorandum of Law in Support Of Its Motion to

23  Dismiss.  I have personal knowledge of the matters stated in this declaration and could competently

24  testify to them if called as a witness.

25        2.      Attached hereto as Exhibit A is a true and correct copy of the New York Attorney

26  General's Complaint against First American Corporation and eAppraiseIT filed on November 1, 2007 in

27

28

1   the Supreme Court of the State of New York, County of New York and described as the "NYAG

2   Complaint" in LSI's Reply Memorandum of Law in Support Of Its Motion to Dismiss.

3         I declare under penalty of perjury that the foregoing is true and correct.

4         Executed this 1st day of August, 2008 at San Francisco, California.

5                       /s/ *Kris H. Man*

6                          Kris H. Man

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Man Declaration In Support of Defendant LSI Appraisal, LLC's
Reply Memorandum In Support of Its Motion to Dismiss

# EXHIBIT A

NEW YORK
COUNTY CLERK'S OFFICE

NOV - 1 2007

NOT COMPARED
WITH COPY FILE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------x
                                  :

THE PEOPLE OF THE STATE OF NEW YORK  :
by ANDREW M. CUOMO, Attorney General of  :
the State of New York,  :
                                    :

                    Plaintiff,  :    **COMPLAINT**
                                    :

           -against-  :    Index No.  07/406796

                                    :

FIRST AMERICAN CORPORATION and  :
FIRST AMERICAN EAPPRAISEIT,  :
                                    :

                  Defendants.  :
------------------------------------------------------------x

1.    This action is brought by Plaintiff, the People of the State of New York, by

Andrew M. Cuomo, Attorney General of the State of New York ("Attorney General"), based

upon the Attorney General's authority under Article 22-A of the General Business Law, Section

63(12) of the Executive Law, and the common law of the State of New York.

2.    Plaintiff, complaining of the above-named defendants, alleges upon information

and belief as follows.

## THE RELEVANT ENTITIES

3.    First American Corporation ("First American") is, according to its 2006 annual

report, "America's largest provider of business information." It earned $8.5 billion in revenues

in 2006. First American operates in five primary business sectors: Title Insurance and Services,

Specialty Insurance, Mortgage Information (including real estate appraisal services), Property

Information, and Risk Mitigation and Business Services. It does business in New York both

directly and through its subsidiaries.

4.    First American provides real estate appraisal services to savings and loans, banks, and other lending professionals through its wholly owned subsidiary, First American eAppraiseIT ("eAppraiseIT"), an appraisal management company headquartered in California and Massachusetts. eAppraiseIT conducts business and appraises real estate in the state of New York.

5.    Washington Mutual, Inc. ("WaMu") is the country's largest savings and loan, with assets totaling $346 billion. In the first three quarters of 2007, WaMu originated $116 billion in residential mortgage loans. WaMu is eAppraiseIT's largest client.

## PRELIMINARY STATEMENT

6.    In this era of widespread mortgage loan defaults and home foreclosures, the independence and integrity of the real estate appraisers who determine the value of home loan collateral is of enormous importance. Real estate appraisals are intended to provide borrowers and lenders with an independent and accurate assessment of the value of a home. This ensures that a mortgage or home equity loan is not under-collateralized, which in turn protects borrowers from being over-extended financially and lenders and investors from loss of value in a foreclosure proceeding.

7.    First American recognizes and touts the central role it plays, through its appraisal management company eAppraiseIT, in protecting homeowners, business customers, and the entire financial market. As First American explains in its 2006 Annual Report:

> Appraisals are used to establish a property's market value; therefore, inaccurate or fraudulent appraisals damage the entire market and have negative economic effects that are far reaching. First American's third-party, unbiased valuations – including insured valuations – are a resource real estate and lending professionals can turn to for accuracy

that benefits not only the homeowner and lender, but our nation's economy.

*Value to Consumers*:  Homeowners, who place a large investment in their property, can be particularly victimized by appraisal fraud. First American's warranted valuations, which are supported by our third-party perspective and backed by more than a century of integrity, virtually eliminate risk from this type of fraud.

*Value to our Business Customers*:  Inaccurately appraised properties that make their way into lender portfolios increase the opportunity for foreclosures. Our national services provide our mortgage lender customers with a welcomed resource for unbiased appraisals that satisfy increased regulatory concerns, help to accurately determine value, and mitigate default risk.

8.    Despite these representations, First American and eAppraiseIT have abdicated their role in providing "third-party, unbiased valuations" for eAppraiseIT's largest client, WaMu. Instead, eAppraiseIT improperly allows WaMu's loan production staff to hand-pick appraisers who bring in appraisal values high enough to permit WaMu's loans to close, and improperly permits WaMu to pressure eAppraiseIT appraisers to change appraisal values that are too low to permit loans to close.  eAppraiseIT compromises its independence even while publicly touting that independence, and despite myriad warnings from its senior management team about the illegal collusion inherent in the compromises it is making.  Instead of preserving its independence, which would have protected consumers and business customers alike, eAppraiseIT chose to protect only itself.  And senior executives at First American, though warned by eAppraiseIT's senior management of its compromised independence, nonetheless directed eAppraiseIT to continue its wrongful conduct.

9.    This wrongful conduct constitutes a deceptive, fraudulent, and illegal business practice.  It violates New York law as well as federal law and regulations.

### JURISDICTION

10.     The State of New York has an interest in the economic health and well-being of those who reside or transact business within its borders.  The State also has an interest in assuring the presence of an honest marketplace in which economic activity is conducted in a competitive manner, without fraud, deception, or collusion, for the benefit of marketplace participants.  The State also has an interest in upholding the rule of law generally.  The conduct of First American and eAppraiseIT injured these interests.

11.     Thus, the State of New York sues in its sovereign and quasi-sovereign capacities, as *parens patriae*, and pursuant to Executive Law § 63(12), General Business Law §§ 349 *et seq.* and New York common law.  The State sues to redress injury to the State, and to its general economy and residents, as well as on behalf of:  (1) persons who obtained mortgages, home equity loans, or refinanced their homes with WaMu and as to whose homes eAppraiseIT conducted the real estate appraisal; and (2) persons who bought WaMu loans secured by mortgages that were improperly appraised by defendants.  The State seeks disgorgement, restitution, damages including costs, and equitable relief with respect to defendants' fraudulent, deceptive, and otherwise unlawful conduct.

### FACTUAL ALLEGATIONS

### I.     The Real Estate Mortgage Industry

#### A.     Background

12.     Most people interested in purchasing or refinancing a home ("borrowers") seek a financial institution (a "lender") to lend them money on the most favorable repayment terms available.  Traditionally the lender, as part of agreeing to loan the funds, wanted to ensure that

the borrower was able to repay the loan and that the loan was adequately collateralized in case the borrower defaulted. The borrower and the lender had a common interest in accurately valuing the underlying collateral because both wanted to be sure the borrower was not paying too much for the property and would be able to meet the repayment terms, or that – in the event of default and foreclosure – the property value could support the loan.

13.    Today, the landscape of the mortgage industry is quite different from this traditional model. Rather than holding the mortgage loans, lenders now regularly sell these mortgages in the financial markets, either directly or to investment banks or Government Sponsored Enterprises ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The loans are then pooled together, securitized, and sold to the general public as mortgage backed securities. The money that the lender receives for the sale of the mortgage loans or bonds is then used to finance new mortgages, increasing the lender's profits and aiding its stock price. Today, the vast majority of mortgage loans are sold to investment banks or GSEs, leaving the original lender holding far fewer mortgages in its portfolio.

14.    This reconfiguration of the way that mortgages are held has transformed the incentives in the industry. Specifically, it has the effect of making the lender less vigilant against risky loans since any risk is quickly transferred to the purchasers of the loans. Moreover, as the lender does not hold many of its loans in its portfolio, the lender's interest in ensuring the accuracy of the appraisal backing the loan is severely diminished. Even worse, because lenders' profits are determined by the quantity of loans they successfully close, and not the quality of those loans, there is an incentive for a lender to pressure appraisers to reach values that will allow

the loan to close, whether or not the appraisal accurately reflects the home value.

15.    Further jeopardizing the process, mortgage brokers and the lenders' loan production staff (also known as "loan origination staff") are almost always paid on commission. Thus, the income of these individuals depends on whether a loan closes and on the size of the loan. Accordingly, brokers and loan production staff have strong personal incentives to pressure appraisers to value a home at the maximum possible amount, so that loans will close and generate maximum commissions. For these reasons, mortgage brokers and lenders frequently subject real estate appraisers to intense pressure to change values in appraisal reports.

16.    The investment banks and GSEs also have an interest in inflating (or at least in not questioning) the value of the pooled loans. The values of these loans serve as a basis for the value of their securities. As such, the higher the value of the loans closed, the greater the value for which the securities are sold on the secondary market.

17.    Thus, the only parties under the current system who want an accurate appraisal are the borrowers and the investors in the asset-backed securities market. Neither of these parties, however, has any contact with, or control over, the appraisal process.

**B.    Federal and State Laws Require Appraisal Independence**

18.    Because of the importance of appraisals in the home lending market, state and federal statutes and regulations require that appraisals be accurate and independent. The Uniform Standards of Professional Appraisal Practice ("USPAP") are incorporated into federal and New York law. See 12 C.F.R. § 34.44; 19 NYCRR § 1106.1. USPAP requires appraisers to conduct their appraisals independently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal

practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rule (Conduct).

19.     Federal law sets independence standards for appraisers involved in federally-regulated transactions. See 12 U.S.C. §§ 3331 *et seq.* The Code of Federal Regulations provides that an in-house or "staff" appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45. For appraisers who are independent contractors or "fee" appraisers, the regulation states that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property transaction." 12 C.F.R. § 34.45.

20.     In 2005, federal regulators including the OTS [Office of Thrift Supervision] published "Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions." With regard to appraisal independence, the document provides:

> 3.     *Who should be considered the loan production staff for purposes of achieving appraiser independence? Could loan production staff select an appraiser?*
>
> *Answer:*     The loan production staff consists of those responsible for generating loan volume or approving loans, as well as their subordinates. This would include any employee whose compensation is based on loan volume. Employees responsible for the credit administration function or credit risk management are not considered loan production staff. **Loan production staff should not select appraisers.**

* * *

5.     *When selecting residential appraisers, may loan production*
       *staff use a revolving pre-approved appraiser list, provided the*
       *list is not under their control?*

*Answer*:     Yes, loan production staff may use a revolving, board-
             approved list to select a residential appraiser, provided
             the development and maintenance of the list is not
             under their control. **Staff responsible for the**
             **development and maintenance of the list should be**
             **independent of the loan production process. . . .**
             **Further, there should be periodic internal review of**
             **the appraiser selection process to ensure that**
             **appropriate procedures are being followed and that**
             **controls exist to ensure independence**. (Emphasis
             added).

21.     New York law incorporates USPAP and requires that a State-certified or State-

licensed appraiser may not accept a fee for an appraisal assignment "that is contingent upon the

appraiser reporting a predetermined estimate, analysis, or opinion or is contingent upon the

opinion, conclusion or valuation reached, or upon the consequences resulting from the appraisal

assignment." N.Y. Exec. Law § 160-y; 19 NYCRR § 1106.1.

## II.     Appraisal Management Companies Create
the Appearance of Appraiser Independence

22.     In response to these rules and the threat of stricter federal enforcement, in Spring

2006, WaMu attempted to insulate itself by hiring two Appraisal Management Companies

("AMCs") – eAppraiseIT and its top competitor Lender's Service, Inc. ("LSI") – to oversee the

appraisal process. These companies provide the appearance of a structural buffer between the

banks and the appraisers that eliminates potential pressure or conflicts of interest. In theory, an

AMC selects appraisers independently, serves as the appraisers' sole contact, and communicates

the unbiased results to the lending institution. In this way, structurally, a lending institution

would be much less able to improperly influence an appraisal.

23.    eAppraiseIT publicly claims on its website that it provides just such a firewall between lenders and appraisers, and that "customers can be assured that Uniform Standards of Professional Appraisal Practice (USPAP) and Financial Institutions Reform Recovery and Enforcement Act (FIRREA) guidelines are followed and that each appraisal is audited for compliance."

## III.    First American and eAppraiseIT Violate Appraiser Independence Requirements by Permitting WaMu's Loan Origination Staff To Select Appraisers Who Provide Higher Appraised Values

24.    Despite their claims of independence from their lender clients, First American and eAppraiseIT violate federal and state independence requirements with regard to appraisals performed for WaMu, and in doing so deceive borrowers and investors who rely on their proclaimed independence.

25.    WaMu retained eAppraiseIT in Spring 2006, after WaMu decided to close its internal appraisal office and terminate its staff appraisers. WaMu quickly became eAppraiseIT's largest client, providing nearly 30 percent of its business in New York. Over the course of the business relationship, eAppraiseIT conducted more than 260,000 appraisals for WaMu, receiving over $50 million from WaMu.

26.    Initially, eAppraiseIT employed a combination of in-house staff and third-party fee appraisers, including some "preferred appraisers" identified by WaMu, to conduct appraisals of residential property for WaMu. eAppraiseIT also hired approximately 50 former WaMu employees as staff appraisers and Appraisal Business Managers ("ABMs") and – at WaMu's request – gave the ABMs the authority to override and revise the values reached by third-party

appraisers. One-third of eAppraiseIT's staff appraisers are former WaMu employees, and all of

the ABMs are former WaMu employees. eAppraiseIT's President advised the leadership of First

American that "we have hired and on boarded many of Wamu's regional mangers and appraisers

last week. They will be instrumental in our relational and operational success with the sales

force."

27.    Under contractual arrangements between WaMu and eAppraiseIT, WaMu can

challenge an appraiser's conclusions by requesting a "reconsideration of value" ("ROV") when

WaMu disagrees with an appraised home value set forth in an appraisal report. Practically

speaking, this permits WaMu to ask eAppraiseIT to reconsider and raise the value assigned to a

home. Throughout the business relationship, WaMu has frequently ordered ROVs from

eAppraiseIT.

28.    By email dated September 29, 2006, a WaMu executive wrote to eAppraiseIT's

senior executives to define the responsibilities of eAppraiseIT's ABMs as to ROVs and value

disputes:

> . . . the four appraisers/reviewers would be directly involved in
> escalations dealing with: ROVs, Valuation issues where the purchase
> price and appraised value differ with no reconciliations/justifications
> by the appraiser, Value cuts which we continue to receive from your
> third party reviewers (Wholesale), **proactively making a decision to
> override and correct the third party appraiser's value or
> reviewer's value cut**, when considered appropriate and supported . . . .

In this way, from the outset, WaMu sought to use eAppraiseIT to ensure that appraisals did not

come in lower than WaMu wanted.

A.    **Summer - Fall 2006: WaMu is Dissatisfied with the Values
      Provided by eAppraiseIT's Independent Appraisers;
      First American and eAppraiseIT Try to Satisfy WaMu's Concerns**

29.    Almost immediately after WaMu retained eAppraiseIT to provide appraisals in

early Summer 2006, WaMu's loan production staff began complaining that the appraisal values

provided by eAppraiseIT's appraisers were too low. It was clear, and eAppraiseIT well

understood, that WaMu's dissatisfaction was largely due to the fact that eAppraiseIT's staff and

fee appraisers were not "hitting value," that is, were appraising homes at a value too low to

permit loans to close.

30.    For example, on August 9, 2006, eAppraiseIT's President told WaMu executives

that "We need to address the ROV issue . . . . Many lenders in today's environment . . . have no

ROV issue. The value is the value. I don't know if WAMU production will go for that . . . . The

Wamu internal staff we are speaking with admonish us to be certain we solve the ROV issue

quickly or we will all be in for some pretty rough seas."

31.    A week later, on August 15, 2006, eAppraiseIT's Executive Vice President

advised eAppraiseIT's President that WaMu's loan officers would often pressure WaMu's

internal appraisal field managers for an "extra few thousand," or "tell[] them specifically what

they needed," or would "ask for several ROVs on the same property." eAppraiseIT's Executive

Vice President explained that "[h]aving loan officers ask for a few thousand dollars because it is

within the range is something we do not currently do for any client. . . . It is also direct pressure

on the appraiser for a higher value without any additional information."

32.    Yet only a month later, on September 14, 2006, eAppraiseIT's Executive Vice

President proposed a solution that appeared to capitulate to these demands for an "extra few

thousand": he wrote "it looks like our potential 'raise the value' policy by [an eAppraiseIT manager's] group might help a lot on the small value changes. . . . [W]e are studying allowing [the manager's] group a little flexibility to raise the value 5% with a cap of $50k if it is fully justified."

33.     Complaints and pressure from WaMu's loan origination staff were not empty threats. On October 5, 2006, in response to "complaints from the WaMu production team – particularly in Northern California," eAppraiseIT prepared a "WaMu Improvement Implementation Plan." The plan was unsuccessful, however. By December 2006, WaMu had reassigned all of its Northern California appraisal work to LSI.

34.     During this period, First American was seeking additional business from WaMu in other areas. But WaMu expressly conditioned giving any future business to First American on success with eAppraiseIT. By email dated September 27, 2006, a First American senior executive advised other senior executives at First American and eAppraiseIT about a conversation he had with the President of WaMu Mortgage about long-term business prospects. The First American executive explained that:

> [WaMu] and I discussed our long-term relationship including the
> money we have on deposit there and our other current business
> relationships. I told him we would like to expand those relationships.
> And in exact terms, we would like one half of their flood business,
> which they currently give 100% to [Corporation A] and their tax
> business is divided 3 ways among [3 corporations] and that we would
> like to take [Corporation A's] tax business.

According to the First American executive, WaMu responded as follows:

> He said that if the appraisal issues are resolved and things are working
> well he would welcome conversations about expanding our
> relationship including tax and flood.

Thus, First American knew that WaMu would provide it with new business only if the "appraisal issues" – including WaMu's complaints that eAppraiseIT's appraisers did not provide high enough values – were "resolved."

35.    By December 2, 2006, eAppraiseIT noted internally that ". . . we know [WaMu is] going to complain about the excessive number of low values because the majority of orders are not going to [WaMu's] preferred appraisers."

36.    On December 18, 2006, one eAppraiseIT executive told others that WaMu had advised him that its criticism was based on the fact that "values are coming in lower with EA [eAppraiseIT]" than with LSI, the competitor appraisal management company that WaMu had also retained to provide appraisals. According to this executive, WaMu maintained that "They also see more Wamu preferred appraisers doing work for LSI and they think that is why they aren't having as many value issues with them. . . . The [WaMu] managers indicated that if the loan consultants had a choice they would prefer to use LSI over eAppraiseIT because they feel they will have less problem with the values."

**B.    Winter 2007:  First American and eAppraiseIT Agree to "Roll Over and Just Do It" and Accept WaMu's Corrupt Proven Appraiser List**

37.    In February 2007, WaMu directed eAppraiseIT to stop using its usual panels of staff and fee appraisers to perform WaMu appraisals. Instead, WaMu's loan origination staff demanded that eAppraiseIT use a Proven Panel of appraisers selected by the loan origination staff, who were chosen because they provided high values.

38.    By email dated February 22, 2007, eAppraiseIT's President explained to senior executives at First American WaMu's motives for demanding the Proven Panel:

We had a joint call with Wamu and LSI today. The attached document outlines the new appraiser assigning process. In short, we will now assign all Wamu's work to Wamu's "Proven Appraisers" . . . . We will pay their appraisers whatever they demand. **Performance ratings to retain position as a Wamu Proven Appraiser will be based on how many come in on value, negating a need for an ROV.** (Emphasis added).

39.    eAppraiseIT's senior management was well aware of the threats to appraiser independence inherent in allowing WaMu's loan production staff to select the appraisers on the Proven Panel based on whether the appraiser "came in on value," and raised these concerns with First American's senior management. eAppraiseIT executives warned of their "concern regarding the proven list" and "concerns about over-valued properties."

40.    These concerns were warranted. eAppraiseIT knew that WaMu's Proven Appraiser List would be composed of appraisers who had been hand-picked by the loan origination staff because they brought in high appraisal values. Indeed, when eAppraiseIT received email requests to add particular appraisers to the panel, the email chains often showed that the requests came directly from WaMu's loan origination staff. Further, a WaMu Vice President in the Appraisal Oversight group explained, in an email to eAppraiseIT about an ROV for a "low value," that "This is an example of the issue that has caused sales pushing for a 'proven appraiser' process."

41.    In February 2007, eAppraiseIT simply capitulated to WaMu's demands. In an email on February 22, 2007, eAppraiseIT's President told senior executives at First American "we have agreed to roll over and just do it." He explained that "we were willing to live with the change if they would back us up with the appraisers and tell them that simply because they are rated as Gold Preferred does not mean that they can grab all the fees. They agreed." In other

words, for the right price in fees, eAppraiseIT was willing to go along with the Proven Panel.

Indeed, eAppraiseIT's President suggested to WaMu

> that if this the case we should have Wamu write the introduction letters
> to their appraisers, set the stage and let us do our magic . . . . I assured
> her the noise from retail will stop . . . . She brought up the fact that
> Wamu knows this means little money to no money for EA and LSI and
> they will fix that in the near future. But for now they need to stop the
> noise or none of us will be around. I believe her.

42.    eAppraiseIT agreed to the Proven Panel with full knowledge that WaMu's loan

production staff was selecting appraisers that would "hit value" and provide higher appraisals. In

an email dated March 1, 2007, eAppraiseIT's President told WaMu executives:

> Recently, we have been notified that Lending would like us to use
> more of their "Proven Appraisers" versus appraisers off our pre-
> selected appraiser panel. It seems the amount of Reconsideration of
> Value (ROV) requests associated with our appraisers far exceeds those
> initiated when a WaMu proven appraiser completes a file. Said
> differently, **Wamu proven appraisers bring the value in a greater
> majority of the time** with minimal involvement of the vendor, sales
> and Appraisal Oversight. **I am fine with that, of course, and will
> happily assign Wamu orders to Wamu proven appraisers instead
> of eAppraiseIT's approved panel appraiser whenever possible.**
> (Emphasis added).

With this email, eAppraiseIT's President "happily" agreed to compromise the company's

independence and violate the laws governing appraiser independence.

43.    On March 5, 2007, WaMu confirmed the primary role of its loan origination staff

in picking appraisers in a follow-up email, in which it explained that the

> Proven Appraiser List is being created. This will replace the WaMu
> preferred list. **The initial list of names will be provided by lending**
> with a minimum of two appraisers per area/county. The list will then
> be reviewed and approved by the Appraisal Business Oversight Team
> and will be checked against our most recent ineligible list. Final list
> will be provided to VMC's [vendor management companies].

> Majority of work must be assigned to the appraisers on the Proven
> Appraiser List on a Priority Basis. (Emphasis added).

44.     eAppraiseIT knew that the "review and approval" role of WaMu's Appraisal

Oversight team described above was a fig leaf, because WaMu's Appraisal Oversight team

deferred to WaMu's loan production staff. For example, in March 2007, upon learning that

WaMu's loan production officers were pressuring eAppraiseIT to reach a predetermined value

for a particular appraisal, the Appraisal Oversight Vendor Relations Manager told eAppraiseIT to

"stop coming to me for approval" and to work the issue out with the lending staff. In other

words, WaMu's Appraisal Oversight group provided no oversight at all.

### C.    Spring 2007: First American and eAppraiseIT Knew That The Proven Appraiser List Was Illegal

45.     As it became increasingly apparent to eAppraiseIT that WaMu's loan production

staff was hand-picking the appraisers that eAppraiseIT was required to use based on the values

the appraisers provided, eAppraiseIT began to consider the legal implications of this

arrangement. eAppraiseIT's Executive Vice President analyzed the federal guidelines and

regulations on appraiser independence and selection of appraisers by loan production staff, and

advised eAppraiseIT's President that "Based on this, I think WAMU's new initiative is way over

the line. It is even possible that the current arrangement crosses the line." In response,

eAppraiseIT's President wrote: "Bingo!" and explained that since the federal government

enforced appraiser independence rules variably in different regions of the United States, and that

"it boils down to who has juice with whom at the regulatory level." In response, the Executive

Vice President warned "it may be that the OTS [federal Office of Thrift Supervision] is OK with

WAMU's current way (maybe) but the new way seems to be quite a stretch."

46.     On April 4, 2007, eAppraiseIT's Executive Vice President wrote an email to

senior eAppraiseIT executives regarding eAppraiseIT's legal liability for using WaMu's Proven

List.  He explained that appraiser independence is initially

> the lender's responsibility since the OCC [Office of the Comptroller of
> the Currency]/OTS only pertain to lenders.  **However, we as an AMC
> need to retain our independence from the lender or it will look like
> collusion.  Imagine a simple mortgage broker saying he will give us
> the work if we use his "proven" appraiser.  We say no.  This is
> very similar to that except they are very big. . . .**
>
> So the push back to WAMU needs to be (assuming we want to do this
> some day), eAppraiseIT needs to choose the appraisers, not WAMU.
> Where it gets really clear that eAppraiseIT is NOT choosing is the
> proven idea because they always go first and MUST be selected unless
> there is a specific reason why not.  **eAppraiseIT is clearly being
> directed who to select.  The reasoning that there are fewer ROVs is
> bogus for many reasons including the most obvious – the proven
> appraisers bring in the values.**
>
> Fun, eh??  (Emphasis added).

47.     Yet, despite this clear articulation of what eAppraiseIT should do, by one of the

company's most senior executives, eAppraiseIT did not "push back."  It agreed to use the WaMu

Proven Appraiser Panel, acceding to WaMu's demands for complete control over the Proven

Panel and the reconsideration of value process.

48.     On April 17, 2007, eAppraiseIT's President wrote to senior executives at First

American, describing the issues with WaMu as follows:

> In short, the issues are using their designated appraisers as mandated
> by the WaMu production force at 20% gross margin and bypassing our
> panel.  **We view this as a violation of the OCC, OTS, FDIC and
> USPAP influencing regulation.**  (Emphasis added).

49.     In support of his conclusion that using the WaMu panel violated federal

regulations and USPAP, eAppraiseIT's President attached to his email a memorandum to WaMu

that was prepared by eAppraiseIT's Executive Vice President. At the outset of the memorandum,

eAppraiseIT summarized the guidelines regarding appraiser independence, stating:

> The various regulatory boards including OTS, OCC, FDIC and others
> prepared a list of frequently asked questions on Independent Appraisal
> and Evaluation Functions on March 21, 2005. These FAQs should be
> reviewed in conjunction with prior guidelines published in 1994 and
> 2003. I have included the 2005 FAQs at the end of this document. We
> assume that you are very familiar with these documents.
>
> We want to focus on appraiser independence. All three documents
> address and re-address this issue. In the section titled Independence of
> the Appraisal and Evaluation Function, the 1994 and 2003 document
> states, "Because the appraisal and evaluation process is an integral
> component of the credit underwriting process, it should be isolated
> from influence by the institutions's loan production process." This is
> reinforced in the Selecting Individuals to Perform Appraisals or
> Evaluations section from the 2003 document. It states that it is
> important to ensure that the program is safeguarded from internal
> influence and interference from an institution's loan production staff.
> Individuals independent from the loan production area should oversee
> the selection of appraisers and individuals providing evaluation
> services.

50.    eAppraiseIT's memorandum then applied the appraiser independence guidelines

to the WaMu Proven Panel and concluded that:

> Based on our conversations we have had with the WAMU oversight as
> well as the questions and answers initiated by our competitor LSI, **it is
> our interpretation that the loan production staff has a great deal
> to do with selecting appraisers. The PAL [Proven Appraiser List]
> has been selected by the loan production staff and the continued
> use of these appraisers is being monitored by the loan production
> staff.** For example, on the LSI question #1 "Does WAMU want to be
> updated transactionally on every order we can not assign to a PAL?",
> WAMU's answer is "Yes, we need a short sentence in the message log
> so that we can monitor, – AND most important - lending can see why
> you didn't assign to a PAL service provider. Not using a PAL
> appraiser will be an issue so we need to ensure we've covered our

bases as to why they're not utilized." **This appears to be directly in contradiction to the interagency guidelines unless you have a different interpretation.**

* * *

This produces the following challenge – eAppraiseIT is operating under what appears to be a mandate from WAMU in utilizing PAL selected appraisers (and this selection is coming from the loan production staff). We are then asked to rep and warrant this work. We are concerned about this arrangement from a risk perspective . . . ." (Emphasis added).

51.     As demonstrated by this memorandum, First American and eAppraiseIT knew that complying with the WaMu Proven Panel violated appraiser independence regulations. However, eAppraiseIT did not stop conducting appraisals for WaMu using the tainted Proven Panel. To the contrary, First American's Chief Operating Officer, who sits on First American's Compliance Committee, testified under oath that his reaction to the April 17 email and the attached memorandum was that "I don't recall anything unique about this email."

52.     Again, on April 17, 2007, eAppraiseIT's Executive Vice President wrote to eAppraiseIT's President and Chief Operating Officer regarding eAppraiseIT's legal liability:

OTS and OCC only control lenders. However, there is the legal concern about collusion. For example, let's say it is discovered that a lender (loan officer at a lender) is being collusive with an appraiser that is on OUR (WAMU) panel. That is, our reps and warrants apply. Then we are liable I would say because we have gone along with it. . . .

In addition, I think it will tarnish our reputation in the appraisal community because we are allowing WAMU to pick appraisers based on their loan officers. It makes us look complicit. So [it] may not be actionable legally but would hurt our reputation. So those are two bad things off the cuff. There may be more if we think about it and use creative paranoia.

53.     On April 17, 2007, eAppraiseIT emailed its staff appraisers to explain why the staff appraisers had been removed from the WaMu Proven List. In these messages,

eAppraiseIT's ABMs acknowledged that WaMu loan origination staff were now choosing the

appraisers for their loans:

> I thought I [sic] pass on my thoughts regards the recent message that
> we all received for [sic] Peter last weekend. I will be glad to tell you
> what I know. I have been told that the lending folks at Wamu and [sic]
> were unhappy with the AMC's and felt they were not receiving a good
> level of appraisal work. They therefore decided to construct their own
> appraisal panel, now known as the wamu proven panel, and instructed
> the AMC's to utilize appraisers from this panel whenever possible.
> The end result is that if you are not on this proven panel it is very
> unlikely you will receive wamu work.

No independent appraiser could misread this message: if you want to do work for WaMu, you

will have to satisfy the "lending folks at Wamu."

54.    Even beyond picking the Proven Panel, WaMu's loan officers at times also

directly selected specific individual appraisers on the panel to conduct their appraisals. On April

19, 2007, eAppraiseIT's Chief Operating Officer wrote in an email to eAppraiseIT's President

and Executive Vice President:

> Evidently, we do get calls/emails from the WaMu Oversight Group to
> select a specific appraiser for an order. Now, normally, this would not
> be a concern since the group is separate from [WaMu] lending.
> However, Vicky [at eAppraiseIT] is also receiving a copy of an email
> from the LC [WaMu Loan Consultants] to Oversight requesting the
> appraiser selection – then the subsequent email from Oversight
> directing the assignment change."

55.    By April 2007, WaMu had complete control over eAppraiseIT's appraiser panel.

On April 26, 2007, eAppraiseIT's President wrote an email to senior management at First

American regarding WaMu. In the email, eAppraiseIT's President discussed the Proven Panel

and eAppraiseIT's reputational risk:

> Sales is the driving force behind the Proven Appraiser List (PAL)

which is questionable from regulatory perspective. We are required to use these appraisers at 80/20% fee splits. This is dilutive to our P&L. Even with the implementation of such, we are still finding that we are being questioned surrounding what appraiser was assigned the order. **We feel our reputation in the industry is being tarnished by the implementation of the Proven List since Production selects the appraiser.** (Emphasis Added).

56.    Yet First American and eAppraiseIT continued to comply with WaMu's demands and agreed to use the Proven Panel selected by WaMu loan production staff.

57.    On May 11, 2007, eAppraiseIT's Executive Vice President wrote to eAppraiseIT's President that "currently WAMU is controlling the appraiser panel. They are selecting the appraisers and calling them 'proven' appraisers. These appraisers are being chosen by their sales force. First American eAppraiseIT (FA eAppraiseIT) is obligated to use these appraisers." According to eAppraiseIT's Executive Vice President, WaMu was using a Proven Panel because of the "low values" from eAppraiseIT's appraisers.

**D.     Spring 2007: First American and eAppraiseIT Attempt to Stop Warranting WaMu's Appraisals Because They Know They Have Illegally Compromised Appraiser Independence**

58.    On April 26, 2007, eAppraiseIT informed WaMu that effective May 1, 2007, it would no longer "be warranting appraisals as performed by the Wamu selected Proven Appraiser List (PAL) appraiser on originations. . . . The new, verbal requirements to utilize Wamu's panelists falls outside the spirit and letter of our agreement as it relates to Warranties. . . ."

59.    This was a dramatic departure from eAppraiseIT's regular practices. On its website, eAppraiseIT claims that: "All of First American eAppraiseIT's traditional appraisal products come standard with one of the industry's strongest warranties. Our warranty coverage includes foreclosure loss incurred due to fraud or gross negligence. First American

eAppraiseIT's commitment to appraisal quality means our customers don't need to go through the lengthy and difficult process of filing a claim against our Errors and Omissions policy, in the event they suffer a loss due to appraisal error. Of course, the policy is there for that purpose, but our warranty presents a much simpler way to recover losses due to appraisal fraud or gross negligence."

     60.     eAppraiseIT threatened to stop warranting WaMu appraisals because eAppraiseIT's management knew that it had compromised its appraiser independence by using the WaMu Proven Appraiser List. eAppraiseIT's Chief Appraiser has testified that the threat to stop warranting was based on the risks inherent with WaMu's choice of such a "limited" panel.

     61.     eAppraiseIT's senior managers acknowledged these risks internally to one another. As eAppraiseIT's Executive Vice President explained in an email to other members of senior management while discussing a particular reconsideration of value: "The original appraiser was a WAMU proven appraiser coming in $750,000 higher than the eAppraiseIT review appraiser. This is a good example of why we currently have stopped rep and warrants and our concerns about over-valued properties."

     62.     In response to the above email, eAppraiseIT's Chief Operating Officer wrote that "In addition to this example, we are also seeing what appears to be a higher incidence of Threshold Reviews [mandated for properties worth over $1 million] coming in with a lower value than the original appraisal. I think this supports our concern regarding the proven list."

     63.     On April 30, 3007, eAppraiseIT's President wrote to his Chief Operating Officer, regarding the warranting of appraisals from WaMu's Proven Panel:

          I have given serious thought to your suggestion on Friday regarding an

addendum to section B of the contract striking our quality control efforts and warranty coverage on appraisals performed by an appraiser off the Wamu Proven Appraiser List (PAL). Would you draft something that stipulates this? Again, this new requirement violates the spirit of our agreement where we agreed to aggressively QC and warrant appraisals as performed by our own panel. **Using Loan Officer's favorite appraiser is obviously something we will not stand behind from a quality and risk perspective.** (Emphasis added).

64.    Nevertheless, eAppraiseIT continued to perform appraisals for WaMu, and continued to tout its independence.

65.    The New York Attorney General issued a subpoena to First American on May 5, 2007.

66.    On May 15, 2007, eAppraiseIT's Chief Operating Officer in an email wrote to eAppraiseIT's President regarding WaMu's Appraisal Oversight group: "I think this proves the point that . . . Oversight continues to buckle when confronted with direct and unrelenting pressure from lending."

67.    Although eAppraiseIT repeatedly told First American that WaMu's loan origination staff illegally selected and controlled its Proven Appraiser List and that, in some instances, loan officers were directly selecting specific appraisers, First American instructed eAppraiseIT to continue the business relationship with WaMu. By email dated May 17, 2007, First American's Chief Operating Officer instructed eAppraiseIT's President and Executive Vice President to continue the relationship with WaMu and to "design a model that predominantly leverages their panel but doesn't violate our independence **which is probably easier said than done but there should be a way to figure it out**." (Emphasis added).

68.    On May 29, 2007, eAppraiseIT's Executive Vice President summarized the

problems in the eAppraiseIT/WaMu business relationship in a letter to a senior executive at

WaMu as follows:

> In the first quarter of 2007, the sales group of WAMU began to insist
> they choose the appraisers mostly due to their concerns about 'low
> values.' eAppraiseIT encouraged WAMU to resist these pressures if
> possible. However, WAMU decided to go with what came to be called
> the "proven" list of appraisers recommended by sales. . . .
>
> The use of the "proven panel is challenging for eAppraiseIT in two
> ways: A. Financially – The proven panel is paid a minimal of 20%
> more than the eAppraiseIT panel. B. Risk Management – the
> possibility of collusion between the loan officers and appraisers is
> increased when eAppraiseIT does not control the selection. In
> addition, eAppraiseIT is concerned with any possible lender pressure
> or perception of lender pressure when the only way to get on the
> WAMU "proven" panel is through the loan officer.

69.    Despite this articulation of the "possibility of collusion," nothing changed

between the parties, except cosmetically, and they continued in this corrupt business relationship.

On June 7, 2007, a WaMu executive directed eAppraiseIT to change the name of the Proven List

for the following reasons: "Name change from "proven appraiser" and/or use of the moniker

"PAL" list is discontinued, under direction of the WaMu legal department. We are utilizing a

more generic term acceptable w/in regulatory guidelines and industry standards." The Proven

Appraiser Panel was renamed the "WaMu Select" panel, and eAppraiseIT accepted the name

change while doing nothing to solve the regulatory violations.

## IV.    First American and eAppraiseIT Permit WaMu's Loan Origination Staff to Remove Appraisers From the Proven Appraiser Panel and to Improperly Communicate Directly With eAppraiseIT Appraisal Business Managers

70.    As discussed above, First American and eAppraiseIT permitted WaMu's loan

origination staff to select a Proven Appraiser List of appraisers and to control the Proven Panel.

In addition, First American and eAppraiseIT permitted WaMu's loan origination staff to remove appraisers from the Proven Panel on the grounds that such appraisers consistently valued properties lower than WaMu's desired target amount, had a high rate of reconsideration of value requests, or performed desk reviews that reduced another appraiser's value for a given property.

71.    In one specific example, in or about December 2006, a particular appraiser ("Appraiser A") was approved to be an appraiser on the Proven Panel. From January 25, 2007 through May 7, 2007, Appraiser A conducted five appraisals for eAppraiseIT with respect to WaMu properties. For each appraisal, WaMu requested a reconsideration of value. In each instance, Appraiser A refused to increase the value.

72.    Shortly thereafter, Appraiser A was removed from the Proven List and placed on the WaMu inactive list. He was then told by a WaMu sales assistant that he was removed from the panel because he did not increase values in response to these reconsiderations of value. This same WaMu sales assistant told Appraiser A that many appraisers who had previously been removed from WaMu's list of active appraisers for conducting fraudulent appraisals were being reinstated on WaMu's Proven List in order to help ensure that appraisals would come in at sufficiently high value to permit the loans to close.

73.    On May 30, 2007, Appraiser A wrote to eAppraiseIT regarding the WaMu Proven Panel. In the email, Appraiser A wrote that: "We continued to provide this high level of service when eAppraiseIT took over as appraisal management. With no explanation or warning, I was removed from the assignment rotation in mid April of this year. I respectfully ask to be re-instated as an active preferred appraiser."

74.    Following receipt of Appraiser A's email, on May 30, 2007, an eAppraiseIT

Appraisal Specialist wrote to eAppraiseIT's Executive Vice President, Chief Operating Officer

and Chief Appraiser:

> I was working with two good, solid long-time wonderful appraisers in
> NY and CT until right after the WaMu Proven Panel was formed.
> They were both removed very soon after for no apparent reason. **We
> were having value issues, however, I felt their work was very
> defendable and supportable, and kept copious notes on our
> dealings.** They have continued to keep in touch with me, in order to
> find out why they were removed from the panel. (Emphasis added).

75. On May 31, 2007, eAppraiseIT's Chief Appraiser replied:

> First he was on the Master List so put on WAMU Proven and then as
> the list went around he was REMOVED. The probability that a loan
> officer requested him to be removed is pretty high I think because that
> is what they did with the Master List; they sent it out to Lending to
> choose.

76. To date, Appraiser A remains off the Proven Panel.

77. Another appraiser ("Appraiser B") conducted hundreds of appraisals for WaMu

loans through eAppraiseIT from January 2007 through April 2007. During this period, Appraiser

B received 102 Reconsideration of Value requests.

78. On April 3, 2007, in an email Appraiser B wrote to eAppraiseIT the following:

> I WAS JUST MADE AWARE FROM ONE OF YOUR
> COMPETITORS (LSI) THAT I MAY BE ON A BLOCKED LIST
> FROM WAMU. THIS MAY HAVE SOMETHING TO DO WITH
> THIS APPRAISAL IN QUESTION FOR WHICH I THOUGHT WAS
> BEING TAKEN CARE OF AND IN PROCESS OF BEING
> RESOLVED. CAN SOMEONE HELP ME OUT HERE AS THIS IS
> IMPORTANT TO US TO KEEP THE RELATIONSHIP WITH
> WAMU THROUGH EAPPRAISEIT. WHAT IS GOING ON AND
> WHAT CAN I DO TO CLEAR THIS FILE UP????? (Capitals in
> original).

79. A senior appraiser employed by Appraiser B argued to eAppraiseIT that he was

removed because WaMu did not like it when he reduced appraisal values after desk reviews. He wrote: "After reviewing appraisals over the past few months, many of which are fraudulent, with inflated unsupported values, it is disturbing that WaMu's focus and concern is misplaced with the review process."

80.    To date, Appraiser B is still on the WaMu removed list.

81.    Similarly, on April 17, 2007, a third appraiser ("Appraiser C") wrote to eAppraiseIT that:

> This is the second Wamu Appraisal quality assurance issue I have received from Wamu in the past 2 months. Both as a result of an appraisal I completed that did not come in to their predetermined value for a "valued" Wamu client. **I was pressured for 2 weeks to change both my value and the conditions of my appraisal report . . . both of which were violations of USPAP, FANNIE MAE and the Supplemental Standards I am required to observe and am bound by my license to complete.** Since that time, I have been singled out by WaMu and have been pressured on every appraisal I have completed that did not reach a pre-determined value. I feel that Wamu is in process of "blacklisting" me as an approved Wamu appraiser by going after each appraisal I complete and looking for violations." (Emphasis added).

82.    Appraiser C wrote this email after having been pressured and harassed to increase values on two appraisals, after WaMu had requested ROVs and she had declined to increase the values. Shortly after her refusal to increase these values, she received two "Unacceptable Appraisal Notifications" from WaMu. After having been harassed and targeted with "unacceptable" strikes, she withdrew from WaMu's panel in order to avoid being removed against her will.

83.    Senior executives at eAppraiseIT acknowledged that WaMu was targeting their appraisers. On May 23, 2007, eAppraiseIT's Chief Operating Officer wrote to eAppraiseIT's

Executive Vice President that " It was disturbing to find out from [WaMu] that we receive three times the number of strike letters as LSI – and we're getting less volume. This indicates to me that they have targeted our "non-proven" appraisers – and are somewhat biased against EA in their work."

84.    Further, eAppraiseIT permitted loan officers at WaMu to communicate directly with eAppraiseIT's ABMs and Appraisal Specialists by telephone and email, to discuss appraisal values. Indeed, eAppraiseIT permitted loan officers at WaMu to pressure eAppraiseIT ABMs and Appraisal Specialists about appraisal values even after an initial appraiser has considered a value reconsideration request and refused to change the value.

85.    eAppraiseIT permitted these improper practices because WaMu is a large client that demanded the right to have these contacts. And eAppraiseIT's ABMs had the authority to change a final appraisal value only because WaMu had demanded, in September, 2006, that ABMs be permitted to "proactively mak[e] a decision to override and correct the third party appraiser's value or reviewer's value cut."

86.    Further, email exchanges between WaMu and eAppraiseIT show that WaMu repeatedly pushed eAppraiseIT's ABMs to increase appraised values so that loans could close. For example, in one exchange with an eAppraiseIT review appraiser, a WaMu loan officer wrote that "Basically, if we don't get at least the appraised value of $3,650,000 . . . we lose the deal." (Ellipses in original).   Earlier that day, this loan officer told eAppraiseIT that "if we don't have a definitive $$ appraised value then the borrower will go to another lender with a higher appraised value of $4mm. Please . . . at least . . . keep this value at the original appraised value of $3,650,000." (Ellipses in original).

Page 28 of 31

87.    On May 23, 2007, eAppraiseIT's Chief Appraiser described these comments as "a clear picture of Lender Pressure on behalf of WaMu."

88.    eAppraiseIT received other communications from WaMu in which WaMu attempted to influence the appraised values of specific properties. For example, on May 24, 2007, eAppraiseIT's Chief Operating Officer wrote to eAppraiseIT's President that: "We have received in the past, and now most recently with the Sag Harbor event (which incidentally just happens to be a New York property), communications where it could be viewed that EA did experience some level of influence to increase a value beyond that which we concluded in our own analysis was not supported."

89.    eAppraiseIT's internal appraisal log entries indicate that its Review Appraisers and ABMs increased property values on appraisal reports after being told by WaMu loan origination staff that such increases would help loans to close. For the period of November 2006 to May 2007, there were 8 desk reviews performed by ABMs and 1 desk review performed by the Appraisal Specialist relating to properties in New York, all of which were for WaMu. The appraised values were increased in each of the 9 desk reviews completed, as follows: from $825,000 to $850,000, $230,000 to $240,000, $415,000 to $420,000, $1,550,000 to $2,270,000, $720,000 to $730,000, $535,000 to $556,000, $580,000 to $587,000, $500,000 to $525,000.

90.    This level of contact between WaMu's loan production staff and eAppraiseIT's ABMs is prohibited by USPAP's independence requirements and by state and federal law.

## FIRST CAUSE OF ACTION
(Fraudulent or Illegal Business Practices – Executive Law § 63(12))

91.    The acts and practices alleged herein constitute conduct proscribed by § 63(12) of

the Executive Law, in that defendants engaged in repeated fraudulent or illegal acts or otherwise

demonstrated persistent fraud or illegality in the carrying on, conducting on transaction or a

business.

## SECOND CAUSE OF ACTION
(Deceptive Acts or Practices – General Business Law § 349)

92.    The acts and practices alleged herein constitute conduct proscribed by § 349 of the

General Business Law, in that defendants engaged in repeated deceptive acts or practices in the

conduct of its business.

## THIRD CAUSE OF ACTION
(Unjust Enrichment)

93.    By engaging in the acts and conduct described above, defendants unjustly

enriched themselves by receiving payment for independent, accurate, and legal appraisals, but

failing to provide such appraisals.


WHEREFORE, plaintiff demands judgment against the defendants as follows:

A.    Enjoining and restraining First American and eAppraiseIT, their affiliates,

assignees, subsidiaries, successors and transferees, their officers, directors, partners, agents and

employees, and all other persons acting or claiming to act on their behalf or in concert with them,

from engaging in any conduct, conspiracy, contract, agreement, arrangement or combination, and

from adopting or following any practice, plan, program, scheme, artifice or device similar to, or

having a purpose and effect similar to, the conduct complained of above.

      B.      Directing that First American and eAppraiseIT, pursuant to Article 22-A of the

General Business Law, § 63(12) of the Executive Law and the common law of the State of New

York, disgorge all profits obtained, including fees collected, and pay all restitution, and damages

caused, directly or indirectly by the fraudulent and deceptive acts complained of herein;

      C.      Directing that First American and eAppraiseIT pay plaintiff's costs, including

attorneys' fees as provided by law;

      D.      Directing such other equitable relief as may be necessary to redress First

American and eAppraiseIT's violations of New York law; and

      E.      Granting such other and further relief as may be just and proper.


Dated:      New York, New York
              November 1, 2007


                            ANDREW M. CUOMO
                            Attorney General of the State of New York
                            *Attorney for Plaintiff*
                            120 Broadway, 25th Floor
                            New York, New York 10271
                            (212) 416-6053

              By:                   
                            Nicole Gueron
                            Deputy Chief Trial Counsel

Of Counsel:
Christopher Mulvihill
Assistant Attorney General