1  McDONOUGH HOLLAND & ALLEN PC
   Attorneys at Law
2  MICHAEL T. FOGARTY (#065809)
   LAURA J. FOWLER (#186097)
3  555 Capitol Mall, 9th Floor
   Sacramento, CA 95814
4  Phone: 916.444.3900
   Fax:    916.444.3249
5
   DLA PIPER LLP (US)
6  RICHARD F. HANS (*Pro Hac Vice*, SBN 2593200NY)
   PATRICK J. SMITH (*Pro Hac Vice*, SBN 2402394NY)
7  JEFFREY D. ROTENBERG (*Pro Hac Vice* SBN 3984994NY)
   1251 Avenue of the Americas
8  New York, NY 10020
   Phone: 212.335.4556
9  Fax: 917.778.8556

10 Attorneys for Defendant eAppraiseIT, LLC

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13                    SAN JOSE DIVISION

14 FELTON A. SPEARS, JR. and SIDNEY          )   Case No. C 08 00868 RMW
   SCHOLL, JUAN BENCOSME and CARMEN          )
15 BENCOSME, on behalf of themselves and all )   CLASS ACTION
   others similarly situated,                )
16                                           )   NOTICE OF MOTION; MOTION TO
                        Plaintiffs,          )   DISMISS; MEMORANDUM OF
17                                           )   POINTS AND AUTHORITIES IN
              v.                             )   SUPPORT OF MOTION TO DISMISS
18                                           )
   FIRST AMERICAN EAPPRAISEIT (a/k/a         )
19 eAppraiseIT, LLC), a Delaware limited liability )  Date:    June 5, 2009
   company; and LENDERS SERVICES, INC.       )   Time:    9:00 a.m.
20 (a/k/a LSI Appraisal, LLC), a Delaware limited )  Place:   Courtroom 6, 4th Floor
   liability company,                        )            280 South 1st Street
21                                           )            San Jose, CA 95113
                        Defendants.          )
22 _____  )   **Honorable Ronald M. Whyte**

23

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

# TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................................................................... iii

NOTICE OF MOTION AND MOTION TO ALL INTERESTED PARTIES AND THEIR
    ATTORNEYS OF RECORD ............................................................................. 1

I.     STATEMENT OF RELIEF SOUGHT ............................................................. 1

II.    BACKGROUND AND SUMMARY ................................................................ 1

III.   STATEMENT OF ISSUES ............................................................................... 3

IV.   STANDARD OF REVIEW ............................................................................... 3

V.    DISCUSSION .................................................................................................... 4

    A.    Plaintiffs' Claim under RESPA is Subject to Dismissal for Lack of Subject
         Matter Jurisdiction and for Failure to State a Claim upon Which Relief can be
         Granted ...................................................................................................... 4

         1.    This Court lacks Subject Matter Jurisdiction over the RESPA claim
              Because Plaintiffs Fail to Satisfy Statutory and Constitutional Standing
              Requirements ................................................................................. 5

         2.    Plaintiffs Fail to Allege "Referrals" under RESPA ......................... 9

         3.    Plaintiffs Fail to Allege EA's Payment of a "Thing of Value" to WaMu ........ 11

         4.    The Safe Harbor Mandates Dismissal of Plaintiffs' RESPA Claim ............... 12

    B.    Plaintiffs' Contract Claim Against EA Should Be Dismissed ................................... 14

         1.    Plaintiffs' Contract Claim is Preempted by Federal Law .............................. 14

              a.    The Scope of Preemption under HOLA ............................................. 14

              b.    Determining the Scope of Preemption ............................................... 16

              c.    Plaintiffs' Contract Claim is Preempted ........................................... 17

              d.    Plaintiffs' Contract Claim Has More than an Incidental Effect
                  on Lending ........................................................................................ 19

              e.    This Case is Similar to Others Where Preemption Was Found .......... 19



C.     Plaintiffs Have Failed to Adequately Allege Their State Law Claims ...................... 21

    1.     Plaintiffs' Breach of Contract Claim is Subject to Dismissal ........................ 21

        a.     Plaintiffs Do Not Allege the Existence of a Contract with EA .......... 22

        b.     Plaintiffs Do Not Allege the Nature or Terms of their Contracts with EA ...................................................................................... 23

        c.     Plaintiffs Do Not Allege Damages .................................................. 24

VI.     CONCLUSION ........................................................................................................... 24

MHA
cDonough Holland & Allen PC
Attorneys at Law

NOTICE OF MOTION; MEMO OF P'S & A'S IN SUPPORT OF MOTION TO DISMISS          1185252v1 36887/0002

1

# TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Alston v. Countrywide Financial Corp.*
   No. 07-3508, 2008 WL 4444243 (E.D.Pa. Sept. 29, 2008) ........................................7

5

6

*Arikat v. JP Morgan Chase & Co.*
   430 F. Supp. 2d 1013 (N.D.Cal. 2006) ................................................................21

7

*Balistreri v. Pacifica Police Dep't*
   901 F. 2d 696 (9th Cir. 1988) ............................................................................4

8

9

*Bell Atlantic Corp. v. Twombly*
   550 U.S. 544, 127 S. Ct. 1955 (2007) ..................................................................4

10

*Boulware v. Crossland Mortgage Corp.*
   291 F. 3d 261 (4th Cir. 2002) .........................................................................4, 7

11

12

*Carter v. Welles Realty Co.*
   553 F.3d 979 (6th Cir. 2009) ..........................................................................6, 7

13

*Cedeno v. Indy Mac Bancorp, Inc., et al.*
   No. 06 Civ. 6438, 2008 WL 3992304 (S.D.N.Y. Aug. 26, 2008) ............................passim

14

15

*Cetacean Cmty. v. Bush*
   386 F. 3d 1169 (9th Cir. 2004) ..........................................................................5

16

*Clegg v. Cult Awareness Network*
   18 F. 3d 752 (9th Cir. 1994) ............................................................................4

17

18

*Contawe v. Crescent Heights of America, Inc.*
   No. Civ.A. 04-2304, 2004 WL 2244538 (E.D. Pa. Oct. 1 2004) .................................7

19

*Dorian v. Harich Tahoe Development*
   Nos. C-94-3387 (DLJ), 1996 WL 925859, at *6 (N.D.Cal. Jan. 16, 1996)....................24

20

21

*Durr v. Intercounty Title Co. of Ill.*
   826 F. Supp. 259 (N.D. Ill. 1993), *aff'd*, 14 F. 3d 1183 (7th Cir. 1994)........................7

22

*Fidelity Fed. Sav. and Loan Ass'n v. de la Cuesta*
   458 U.S. 141 (1982)......................................................................................14

23

24

*First Commercial Mortgage Co. v. Reece*
   89 Cal. App. 4th 731 (2001).............................................................................22

25

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*
   528 U.S. 167 (2000)........................................................................................5

26

27

*Glendale Fed. Sav. & Loan Ass'n v. Fox*
   459 F. Supp. 903 (C.D. Cal. 1978) ....................................................................15

28

**MHA**
cDonough Holland & Allen PC
Attorneys at Law

iii

*Lane v. Residential Funding Corp.*
323 F. 3d 739 (9th Cir. 2003) ............................................................................... 11

*Lopez v. World Sav. & Loan Ass'n*
105 Cal. App. 4th 729 (2003) ............................................................................... 16

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992) .............................................................................................. 5

*Minter v. Wells Fargo Bank, N.A.*
593 F. Supp. 2d 788 (D.Md. 2009) ....................................................................... 8

*Moore v. Radian Group, Inc.*
233 F. Supp. 2d 819 (E.D. Tex. 2002), *aff'd*, 69 F. App'x 659 (5th Cir. 2002) .......................... 7, 8

*Morales v. Fidelity Nat'l Title Ins.*
983 F. Supp. 1418 (S.D. Fla. 1997) ................................................................ 7, 8, 9

*Mullinax v. Radian Guar., Inc.*
311 F. Supp. 2d 474 (M.D.N.C. 2004) ............................................................ 7, 8, 9

*Papasan v. Allain*
478 U.S. 265 (1986) .............................................................................................. 3

*Paulsen v. CNF Inc.*
Nos. 07-15142, 2009 WL 723996, at *7 (9th Cir. March 20, 2009) ....................... 5

*Rosenberg v. Washington Mutual Bank*
849 A.2d 572 (2004) ..................................................................................... 20, 21

*Sanders v. Kennedy*
794 F. 2d 478 (9th Cir. 1986) .............................................................................. 4

*Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*
40 F.3d 247 (7th Cir. 1994) .................................................................................. 3

*Schuetz v. Banc One Mortgage Corp.*
292 F. 3d 1004 (9th Cir. 2002) ................................................................ 4, 11, 13

*Silvas v. E\*Trade Mortgage Corp.*
514 F. 3d 1001 (9th Cir. 2008) ..................................................................... 16, 17

*Tayag v. National City Bank*
No. 09-667, 2009 WL 943897, at * 3 (N.D.Cal. April 7, 2009) ............................. 7

*Transamerica Mortgage Advisors, Inc. v. Lewis*
444 U.S. 11 (1979) ............................................................................................... 8

*Warth v. Seldin*
422 U.S. 490 (1975) .............................................................................................. 5

*Whitmore v. Arkansas*
495 U.S. 149 (1996) .............................................................................................. 5

MHA
cDonough Holland & Allen PC
Attorneys at Law

iv

**Constitutional Provisions**

U.S.C.A. Const. Art. 3, Section 2, CI. Article III.............................................................5

**Statutes**

12 C.F.R.
§ 34.41(b) ............................................................................................................16
§ 34.43 ..................................................................................................................18
§ 560.2 ............................................................................16, 17, 19, 20, 21
§ 564.1 et seq ....................................................................9, 10, 14, 15

24 C.F.R.
§ 3500.14 ....................................................................................4, 5, 9, 10, 11
§ 3500.2 ...............................................................................................................10

12 U.S.C.
§ 1461 *et seq*.....................................................................................14, 15
§ 2601(a) ...............................................................................................................7
§ 2602(3) .............................................................................................................11
§ 2607.....................................................................................................7, 8, 12

61 Fed. Reg. 50951, 50966-50967 (Sept. 30, 1996)............................................17

Federal Rules of Civil Procedure
12(b)(1) .................................................................................................................1
12(b)(6) ..........................................................................................1, 3, 4

**Secondary Authorities**

5 C. Wright & A. Miller, Federal Practice and Procedure
§ 1216, pp. 235-236 (3d ed.2004)........................................................................4

McDonough Holland & Allen PC
Attorneys at Law

**NOTICE OF MOTION AND MOTION TO ALL INTERESTED PARTIES AND THEIR
ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on June 5, 2009, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 6, 4th Floor, of the above-entitled Court, located at 280 South 1st Street, San Jose, CA 95113, before the Honorable Ronald M. Whyte, Defendant eAppraiseIT, LLC (erroneously sued herein as First American eAppraiseIT) will and hereby does move the Court, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss all claims for relief in the Second Amended Class Action Complaint filed by Plaintiffs in this action. This Motion is based upon this Notice of Motion, the Memorandum of Points and Authorities in Support of the Motion to Dismiss, all documents in the Court's file, matters of which this Court can take judicial notice, and any evidence presented at or prior to the hearing on this matter.

**I.      STATEMENT OF RELIEF SOUGHT**

Defendant eAppraiseIT, LLC ("EA") seeks an Order from this Court dismissing Plaintiffs' Second Amended Complaint in its entirety with prejudice.

**II.     BACKGROUND AND SUMMARY**

Plaintiffs separately applied for loans from Washington Mutual ("WaMu") to purchase or refinance their residential properties.   WaMu, in turn, contracted with defendants EA and LSI Appraisal, LLC ("LSI") for appraisal services in connection with the loans.   Plaintiffs allege that WaMu conspired with EA and LSI to generate inflated appraisals.

On that premise, Plaintiffs – who purport to represent a class of consumers who also obtained mortgage loans from WaMu since January 1, 2006 – originally filed this action against WaMu, EA, and LSI.   Defendants separately moved to dismiss the First Amended Complaint.   Before the hearing on these motions, Plaintiffs voluntarily dismissed WaMu.   On March 9, 2009, the Court issued its order, granting in part and denying in part EA's motion and providing Plaintiffs with leave to file a Second Amended Complaint.   On March 30, 2009, Plaintiffs filed a Second Amended Complaint ("SAC"), alleging two claims for relief:  a claim under section 8(a) of RESPA and a state law breach of contract claim.

/ / /

McDonough Holland & Allen PC
Attorneys at Law

1   The SAC should be dismissed with prejudice as against EA.  To summarize, this Court lacks

2   subject matter jurisdiction over the RESPA claim because Plaintiffs lack standing.  This argument,

3   which none of the defendants raised in connection with their motions to dismiss the First Amended

4   Complaint, cannot be waived and mandates dismissal.  It is undisputed that Plaintiffs sought and

5   received financing in the amounts they had requested.   Plaintiffs do not allege that they paid

6   excessive fees to WaMu or either of the Defendants, paid more for their properties or assumed more

7   debt than they had originally intended by virtue of the appraisals, or that the putative scheme has

8   otherwise harmed them in any manner.

9   Independently, Plaintiffs still allege no actionable conduct under Section 8(a) of RESPA,

10  which was enacted to eliminate increased borrower costs resulting from kickbacks and improper

11  referral fees in the real estate industry.  Even assuming Plaintiffs satisfied their Section 8(a) pleading

12  burden, the safe harbor shields EA from liability in this case.  While Defendants presented these

13  arguments in their prior motions to dismiss, EA submits there are a number of reasons why this

14  Court should review the issues once again to avoid manifest injustice and the introduction of legally

15  incorrect RESPA precedent.[1]

16  In the wake of the financial crisis and heightened scrutiny of practices in the home loan

17  industry, the number of private causes of action under RESPA appears to be increasing manifold.  It

18  is therefore imperative as case law proliferates that courts apply the statute in a manner consistent

19  with its plain meaning, congressional intent, and the governing regulations promulgated by the

20  Department of Housing and Urban Development.  EA respectfully submits this Court's interpretation

21  of   Section   8(a)   and   the   safe   harbor   as   applied   to   Plaintiffs'   allegations   was

22  / / /

23

24  ---

[1]  A number of intervening factors militate in favor of this Court further scrutinizing the Section 8(a) claim.  The decision in *Cedeno v. Indy Mac Bancorp, Inc., et al.*, No. 06 Civ. 6438, 2008 WL 3992304 (S.D.N.Y. Aug. 26, 2008), was issued subsequent to the close of briefing.  While Defendants did bring this opinion to the Court's attention, they did not have an opportunity to explain to this Court its clear and correct application of Section 8(a) and the safe harbor.  In addition, WaMu, whose RESPA arguments EA relied on and incorporated in connection with its motion, was voluntarily dismissed by Plaintiffs shortly before oral argument.  WaMu therefore did not participate in oral argument and EA maintains that its absence, having been the primary author of a number of significant arguments relating to this claim, contributed to this Court's ruling.

28

MHA
cDonough Holland & Allen PC
Attorneys at Law

1   erroneous.  The ramifications of the Court's earlier decision are significant both for purposes of this
2   litigation and future cases in this and other districts asserting claims under this section.

3       Plaintiffs' state law claim for breach of contract is preempted by the extensive federal
4   regulatory regime governing EA's relevant appraisal practices.  The contract claim also fails on the
5   merits.  Plaintiffs' amended allegations cannot overcome the fact that there was no contract between
6   them and EA.  In any event, Plaintiffs do not and cannot allege any damages attributable to EA's
7   supposed breach.[2]

8   **III.   STATEMENT OF ISSUES**

9       A.   Whether this Court has subject matter jurisdiction over Plaintiffs' RESPA claim
10  where Plaintiffs fail to allege actual harm or redressability?

11      B.   Whether Plaintiffs have stated a viable claim under RESPA Section 8(a) where they
12  fail to allege a "referral" within the meaning of RESPA, or EA's payment of a "Thing of Value" to
13  WaMu in exchange for the referral of appraisal business?

14      C.   Whether the Safe Harbor mandates dismissal of plaintiffs' RESPA claim even
15  assuming appraisals can qualify as "referrals" and "Things of Value" under RESPA?

16      D.   Whether federal law preempts Plaintiffs' breach of contract claim?

17      E.   Assuming no preemption, whether Plaintiffs have alleged a breach of contract claim
18  given that the SAC does not allege the existence of any contract between Plaintiffs and EA (or
19  breach thereof)?

20  **IV.   STANDARD OF REVIEW**

21      A motion to dismiss is proper under Rule 12(b)(6) when the pleadings fail to state a claim
22  upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  As the Supreme Court explained:

23      While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need
        detailed factual allegations, [*Conley v. Gibson*, 355 U.S. 41, 47 (1957)]; *Sanjuan v.*
24      *American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994), a
        plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires
25      more than labels and conclusions, and a formulaic recitation of the elements of a
        cause of action will not do, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986) (on a
26      motion to dismiss, courts "are not bound to accept as true a legal conclusion couched

27  _____
    [2] EA does not concede the propriety of treating this as a class action.  EA reserves all appropriate challenges to this issue
28  and will raise those challenges if and when Plaintiffs overcome this motion and move to certify the class.


McDonough Holland & Allen PC
Attorneys at Law

3

1   as a factual allegation"). Factual allegations must be enough to raise a right to relief
    above the speculative level, *see* 5 C. Wright & A. Miller, Federal Practice and
2   Procedure § 1216, pp. 235-236 (3d ed. 2004) ("[T]he pleading must contain
    something more ... than ... a statement of facts that merely creates a suspicion [of] a
3   legally cognizable right of action"), on the assumption that all the allegations in the
    complaint are true (even if doubtful in fact).
4

5   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007) (footnote omitted).

6       A court may dismiss a complaint under Rule 12(b)(6) based on the "lack of a cognizable

7   legal theory" or based upon the "absence of sufficient facts alleged under a cognizable legal theory."

8   *Balistreri v. Pacifica Police Dep't*, 901 F. 2d 696, 699 (9th Cir. 1988).  The complaint is construed in

9   the light most favorable to the non-moving party, and all nonspeculative material allegations in the

10  complaint are taken to be true.  *Sanders v. Kennedy*, 794 F. 2d 478, 481 (9th Cir. 1986). A court,

11  however, is not required to accept legal conclusions cast in the form of factual allegations, if those

12  conclusions cannot reasonably be drawn from the facts alleged.  *Clegg v. Cult Awareness Network*,

13  18 F. 3d 752, 754-55 (9th Cir. 1994).

14  **V.    DISCUSSION**

15      **A.    Plaintiffs' Claim under RESPA is Subject to Dismissal for Lack of Subject
             Matter Jurisdiction and for Failure to State a Claim upon Which Relief can be
16           Granted.**

17      In Count I of the SAC, Plaintiffs allege that EA violated Section 8(a) of RESPA by providing

18  inflated appraisals to WaMu in exchange for a continued stream of appraisal business.  For each of

19  the independent reasons set forth below, this claim should be dismissed.

20      RESPA Section 8(a) provides that:

21      No person shall give and no person shall accept any fee, kickback, or thing of value
        pursuant to any agreement or understanding, oral or otherwise, that business incident
22      to or a part of a real estate settlement service involving a federally related mortgage
        loan shall be referred to any person.
23

24      Simply put, this section "prohibits fees for referrals" in order to protect home purchasers

25  from increased costs attributable to "kickbacks" exchanged for business "referrals." *Schuetz v. Banc*

26  *One Mortgage Corp.*, 292 F. 3d 1004, 1009 (9th Cir. 2002); *see also* 24 C.F.R. § 3500.14(d);

27  *Boulware v. Crossland Mortgage Corp.*, 291 F. 3d 261, 266 (4th Cir. 2002) (describing Section 8(a)

28  as "seek[ing] to eliminate kickbacks or referral fees paid to a third party ... [by] prohibit[ing] the

**MHA**
cDonough Holland & Allen PC
*Attorneys at Law*

payment of formal kickbacks or fees for the referral of business").  The essential components of any Section 8(a) claim are the (1) payment or receipt of a thing of value; (2) the referral of settlement business in exchange for that thing of value; and (3) an understanding or agreement between the parties involved in this exchange concerning the referral.  *See* 24 C.F.R. § 3500.14.

The alleged improprieties raised in this litigation surrounding EA's provision of appraisal services to WaMu are clearly beyond RESPA's scope.  As an initial matter, the Court need not reach the merits of this claim because Plaintiffs lack standing to bring this lawsuit, in that they have incurred no actual, redressable harm.  Even assuming Plaintiffs have standing, they have not alleged any "referral" of business by WaMu.  In addition, Plaintiffs fail to identify a proper "thing of value" given or received by EA in exchange for any supposed referral.  Finally, RESPA's safe harbor provision precludes liability in cases such as this, where the claim is predicated on payment for services actually performed.

### 1. This Court lacks Subject Matter Jurisdiction over the RESPA claim Because Plaintiffs Fail to Satisfy Statutory and Constitutional Standing Requirements.

To establish standing under Article III, Plaintiffs "must show … (1) … an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent …; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Cetacean Cmty. v. Bush*, 386 F. 3d 1169, 1174 (9th Cir. 2004) (*quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *See* U.S.C.A. Const. Art. 3, Section 2, Cl. Article III; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Paulsen v. CNF Inc.*, Nos. 07-15142, 2009 WL 723996, at *7 (9th Cir. March 20, 2009).  Even where plaintiffs purely seek to remedy alleged violations of statutory rights, they must satisfy the Article III standing requirements.  *See Warth v. Seldin*, 422 U.S. 490, 501 (1975).  Here, Plaintiffs do not "clearly and specifically set forth facts to satisfy Article III standing requirements" in the SAC.  *Whitmore v. Arkansas*, 495 U.S. 149, 155-56 (1996).  This failure to plead sufficient facts to meet Article III standing requirements mandates dismissal of this claim.  *Warth*, 422 U.S., at 501-502 (1975).

/ / /

1    Plaintiffs assert that WaMu borrowers as a whole have been damaged because they did not

2    receive "independent, objective, unbiased and credible appraisal[s] done in compliance with

3    applicable law" for which they paid "and instead unwittingly received unreliable, biased appraisals

4    that were the basis of the mortgage transactions they entered with WaMu." *See, e.g.,* SAC ¶¶ 7, 57,

5    62, 67 and 93.   Notably, Plaintiffs do not specifically allege that the appraisals of their <u>own</u>

6    properties were inflated; they merely surmise that the appraisals of their properties were "created

7    pursuant to the scheme" purportedly hatched between WaMu and the appraisal management

8    companies.   SAC ¶¶ 62, 67.[3]   Even indulging the speculation that the appraisals of Plaintiffs'

9    properties were inflated, Plaintiffs do not (and cannot) allege that WaMu overcharged them for the

10   appraisals, nor do they allege that the alleged illicit arrangement between EA and WaMu in any way

11   impacted the loans provided to them by WaMu.   Plaintiffs do not allege the loans should not have

12   been made, that they borrowed more than the equity in their homes, or even that they borrowed more

13   than they first asked WaMu to lend them.   Based on the foregoing, it is clear that Plaintiffs have not

14   suffered any actual injury or harm.   For that reason, in order to establish the requisite standing,

15   Plaintiffs must establish that a *per se* violation of Section 8(a) somehow gives them standing to sue

16   under RESPA.   As discussed below, Plaintiffs cannot prevail on this basis.

17   There is a split of authority among federal courts about how to determine standing under

18   RESPA.   While all courts considering RESPA standing center their analysis on the damages

19   provisions of Section 8(d), the analysis differs from there.   Some courts find that, to have standing,

20   aggrieved plaintiffs must have simply paid for the challenged settlement service, while others find

21   that, to have standing, aggrieved plaintiffs must have been charged a fee overage.[4]   For reasons

22   outlined below, the cases requiring payment of a fee overage are well-reasoned, are consistent with

23   Congressional intent and the language of the statute, and effectuate the underlying purposes of

---

[3]   EA incorporates by this reference codefendant LSI's argument in Section VI of its brief regarding Plaintiffs' failure to specifically allege that the appraisals of their properties were inflated, or were directly impacted by the purported scheme.

[4]   In *Carter v. Welles Realty Co.*, 553 F.3d 979 (6th Cir. 2009), the Sixth Circuit recently overturned a district court decision dismissing the plaintiffs' RESPA claim for lack of standing where there were no allegations of actual harm.  EA maintains that the district court was correct and that for reasons set forth in this brief the Court of Appeals erred in reversing that decision.

McDonough Holland & Allen PC
Attorneys at Law

1    RESPA.   *See Alston v. Countrywide Financial Corp.*, No. 07-3508, 2008 WL 4444243, at *5

2    (E.D.Pa. Sept. 29, 2008) (finding Plaintiffs had not been overcharged and had not suffered an injury

3    in fact); *see also Durr v. Intercounty Title Co. of Ill.*, 826 F. Supp. 259, 263 (N.D. Ill. 1993), *aff'd*, 14

4    F. 3d 1183 (7th Cir. 1994) (requiring plaintiff to have incurred increased expense due to challenged

5    arrangement to establish standing); *Moore v. Radian Group, Inc.*, 233 F. Supp. 2d 819, 823-26 (E.D.

6    Tex. 2002), *aff'd*, 69 F. App'x 659 (5th Cir. 2002) (rejecting notion of per se violation of RESPA;

7    without an allegation of overcharges, plaintiffs lack standing to bring RESPA claim); *Contawe v.

8    Crescent Heights of America, Inc.*, No. Civ.A. 04-2304, 2004 WL 2244538 (E.D. Pa. Oct. 1 2004)

9    (requiring plaintiffs to establish that a portion of their settlement charge was excessive and caused by

10   the alleged referral arrangement); *Mullinax v. Radian Guar., Inc.*, 311 F. Supp. 2d 474, 483

11   (M.D.N.C. 2004) (limiting standing to plaintiffs alleging overcharges); *Morales v. Fidelity Nat'l

12   Title Ins.*, 983 F. Supp. 1418, 1429 (S.D. Fla. 1997) (rejecting RESPA claim on standing grounds in

13   absence of an overcharge).

14          In passing RESPA, Congress sought to provide consumers "with greater and more timely

15   information on the nature and costs of the settlement process" and to protect consumers "from

16   unnecessarily high settlement charges caused by certain abusive practices that have developed in

17   some areas of the country."  *Tayag v. National City Bank*,  No. 09-667, 2009 WL 943897, at * 3

18   (N.D.Cal. April 7, 2009) (*quoting* 12 U.S.C. § 2601(a)).  There is no indication – either in the statute

19   or in the legislative history preceding it – that Congress sought to grant a private right of action

20   under Section 8(a) to borrowers to recover windfall damages where the borrowers have not suffered

21   any harm.[5]   Doing so would not advance the articulated purposes behind RESPA and would

22   "radically, and wrongly, expand the class of cases to which" this section applies.  *See, e.g.,*

23   *Boulware,* 291 F.3d at 266.

---

24   [5]   In 1983, Congress amended the statutory damages language applicable to Section 8(a), changing it from the amount of

25   the "thing of value" exchanged for the referral to "any charge paid" for "the settlement service involved in the [RESPA]
     violation."  12 U.S.C. § 2607 (d).  When viewed in the context of Section 8 as a whole, the statutory intent and the 1983

26   amendments, this linguistic adjustment does not indicate an intent to expand Section 8(a) standing to all home loan
     borrowers, regardless of whether they were individually harmed.  Rather, this change resulted from the consolidation of

27   the damages provisions for Sections 8(a) and 8(b).  *See generally Carter v. Welles Realty Co.*, 493 F. Supp. 2d. 921
     (N.D. Ohio 2007), *rev'd by* 553 F. 3d 979 (6th Cir. 2009).  Because Section 8(b) does not involve transfers of "things of

28   value" it was necessary to draft alternative language applicable to both provisions.  *Id.*



In drafting RESPA, Congress contemplated primarily public enforcement of Section 8. In Section 8(d), Congress grants only HUD, states attorney general, and state insurance commissioners the right to bring actions to enjoin violations. 12 U.S.C. § 2607(d)(4); *See Moore v. Radian Group, Inc.*, 233 F. Supp. 2d 819, 823-24 (E.D.Tex. 2002) (noting "a distinction between HUD's oversight and investigations into mortgage lending practices and RESPA's private enforcement provision," particularly when there is "no actual injury to consumers."). Congress' deliberate decision to limit the right to pursue injunctive relief to certain government entities and state officials reflects intent to restrict private plaintiff enforcement to instances where actual harm resulted from statutory violations. It also reflects a deliberate decision <u>not</u> to grant general Section 8 enforcement rights to all borrowers irrespective of whether they suffered related injuries. *See, e.g., Minter v. Wells Fargo Bank, N.A.*, 593 F. Supp. 2d 788, 796, n.11 (D.Md. 2009) (observing that 12 U.S.C. § 2607 vests "three different types of rights in different parties"); *Mullinax,* 199 F. Supp. 2d at 334. Where there is a RESPA violation but no private injury, HUD and other governmental authorities are charged with enforcing the statute and punishing wrongdoers -- not individual borrowers.

Congress sought to deter RESPA violations by permitting plaintiffs to recover treble damages for violations of Section 8. *See* 12 U.S.C. § 2607(d)(2). A plain and logical interpretation of the statute suggests that damages under this section consist of three times the <u>excessive charge</u> imposed. *See Morales*, 983 F. Supp. 1418, 1427-28. This result requires the wrongdoer to disgorge the undue (i.e., the "excessive") portion of the charge and then pay an additional amount equal to two times the excessive charge to the borrower. The statute simply does not support an interpretation that damages are calculated on the full amount of the fee. Nor should the statutory language be stretched to provide for such damages without specific Congressional intent to do so. *See Minter,* 593 F. Supp. 2d at 796, n.11 (stating that "when … a statute 'expressly provides' a specific set of remedies, the Supreme Court has cautioned that courts must 'be chary of reading others into it.'") (*quoting Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979)). The contrast between Section 2607(d) and Section 2608(b) in which Congress explicitly allows recovery for "an amount equal to three times *all charges* made" evidences an essential distinction

/ / /

MHA

McDonough Holland & Allen PC
Attorneys at Law

between when Congress intends to permit recovery of the full fee paid for the relevant service and the more limited recovery granted for violations of Section 8(a). *See Morales*, 983 F. Supp. at 1427.

Finally, this case demonstrates the absurdity of a per se civil liability and "damages" rule. Here, under this theory, even had WaMu obtained bulk rate discounts from EA as part of the alleged referral arrangement and saved Plaintiffs money, WaMu and EA would nonetheless be liable to Plaintiffs for three times the entire discounted fee. This result cannot be — and is not — what Congress intended.

Separately, Plaintiffs cannot satisfy the redressability prong of the standing inquiry because Plaintiffs' putative injury cannot be redressed by a favorable judgment in this action. *See Mullinax*, 311 F. Supp. 2d at 486. Plaintiffs sought to obtain home mortgage loans from WaMu and did, in fact, receive such loans. Again, Plaintiffs do not allege an overcharge for EA's appraisal services. They do not (and cannot) allege that their appraisals were inaccurate in any respect. Rather, Plaintiffs' RESPA claim is based on the alleged metaphysical taint imparted on their appraisals by the alleged illicit arrangement between EA and WaMu. Awarding Plaintiffs damages in the amount of three times the appraisal fee will do nothing to remove any such alleged taint.

For these reasons, Plaintiffs lack standing to sue, and this Court lacks subject matter jurisdiction over Plaintiffs' RESPA claim.

## 2. Plaintiffs Fail to Allege "Referrals" under RESPA.[6]

Under RESPA, "referrals" occur when a third party has the power to influence the borrower's selection of a settlement service provider or when "a person must use a particular [service] provider ... to have access to some distinct service or property." 24 C.F.R. § 3500.14(f); 12 C.F.R. § 564.1 et seq; Interagency Statement, Interagency Appraisal & Evaluation Functions, at 2. RESPA Section 8(a) thus only protects borrowers where the borrowers themselves have the power to select the settlement service provider or where they are required to use a designated provider. This makes sense because Congress enacted Section 8(a) to preserve the borrowers' ability to choose service

---

[6]   WaMu made this argument in connection with its motion to dismiss the First Amended Complaint and EA incorporated it by reference. Based on this Court's opinion, it does not appear the Court considered this argument in ruling on the defendants' motion. Because this point is dispositive of Plaintiffs' sole remaining federal claim, EA is including it in this brief in modified form for the Court's ease of reference.



1  providers free of improper influences.  *See* 12 C.F.R. § 564.1 et seq.  Where borrowers are not

2  making any such decisions, Section 8(a) should be generally inapplicable.

3      A lender such as WaMu is required, as a condition of providing a mortgage loan, to either

4  conduct an appraisal itself or directly engage an appraiser to do so.  *See* 12 C.F.R. § 564.5(b)(1).

5  The Office of Thrift Supervision ("OTS"), which oversaw WaMu, expressly prohibits borrower

6  participation in the appraiser selection process to preserve appraisal independence.  The October 28,

7  2003 Interagency Statement on Independent Appraisal and Evaluation Functions provides that:

8      [i]ndependence is compromised when an institution uses an appraiser who is
        recommended by the borrower or allows the borrower to select the appraiser from the

9      institution's list of approved appraisers.  Institutions may not use an appraisal
        prepared by an individual who was selected or engaged by a borrower.  An

10     institution's use of a borrower-ordered appraisal violates the agencies' appraisal
       regulations.

11

12  *See also* Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on

13  Independent Appraisal and Evaluation Functions ("Interagency FAQs"), Question 14 (Mar. 22,

14  2005) ("the borrower may not recommend an appraiser to the institution or select the appraiser").  As

15  a result, the lender selects the appraisal provider, and the borrower plays no role whatsoever in that

16  selection process.  Because the borrower is not and cannot be involved in the appraiser's selection,

17  no service is "referred" under 24 C.F.R. § 3500.14(f)(1) in connection with home loan appraisals

18  regulated by OTS.

19     Even if the absence of a "referral" did not act as a complete bar (which it does), Plaintiffs'

20  RESPA claim still fails.  WaMu did not "require" Plaintiffs to "use" appraisers obtained through

21  EA.[7]  WaMu "used" the EA appraisers in order to satisfy WaMu's own legal obligations.  *See*

22  12 C.F.R. § 564.5(b)(1).  In addition, because obtaining appraisals was a step in the loan origination

23  process that federal law required WaMu to undertake, the appraisals do not constitute "distinct

24  service[s]" sufficient to satisfy HUD's "required use" definition.  If Plaintiffs wanted their properties

25  appraised for purposes unrelated to the evaluation of the loan collateral, they were at all times free to

26

27  [7] "'Required use' means a situation in which a person must use a particular provider of a settlement service in order to
    have access to some distinct service or property, and the person will pay for the settlement service of the particular

28  provider or will pay a charge attributable, in whole or in part, to the settlement service."  24 C.F.R. § 3500.2.



10

commission their own appraisals by a company or individual appraiser of their choice.  The fact they chose not to do so does not mean they were "required" to "use" the appraisals obtained by WaMu to comply with its own federal lending requirements.

In sum, because (1) as a federally regulated lender, WaMu must select the appraiser it uses for the loans it originates and borrowers such as Plaintiffs are prohibited from playing any role in this appraisal selection process, and (2) Plaintiffs were not "required" to "use" EA's appraisals, Plaintiffs have failed to allege a "referral" under RESPA.  24 C.F.R. § 3500.14(f).

### 3. Plaintiffs Fail to Allege EA's Payment of a "Thing of Value" to WaMu.

Plaintiffs' RESPA claim is predicated on the unworkable theory that the "thing of value" requirement of Section 8(a) is satisfied through allegations that WaMu provided EA with continued business in exchange for inflated appraisals.  This novel attempt to shoehorn settlement services into the "thing of value" category turns Section 8(a) on its head and cannot withstand serious scrutiny.

In RESPA's implementing regulation, HUD defines a "thing of value" to include:

> without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity, special bank deposits or accounts, special or unusual banking terms, services of all types at special or free rates, sales or rentals at special prices or rates, lease or rental payments based in whole or in part on the amount of business referred, trips and payment of another's expenses, or reduction in credit against an existing obligation.

24 C.F.R. § 3500.14(d).  Not one of the over twenty examples of "things of value" identified by RESPA and its regulator is a settlement service such as appraisals.  Compare 24 C.F.R. § 3500.14(d) with 12 U.S.C. § 2602(3) (listing settlement services).  To the contrary, each example of a "thing of value" identifies a vehicle for a service provider to give something valuable to a referral source - a gift, gratuity, service, or opportunity other than the settlement service itself - without getting compensation in return.  Thus, the plain language of the RESPA statute and its implementing regulations demonstrate that appraisals are not "things of value" under Section 8(a).

The Ninth Circuit recognizes that to state a claim under Section 8(a), plaintiffs must allege the exchange of a "thing of value" separate and apart from any settlement service.  *Lane v. Residential Funding Corp.*, 323 F. 3d 739, 744 (9th Cir. 2003) (quoting *Schuetz,* 292 F. at 1013).

M|H|A
cDonough Holland & Allen PC
Attorneys at Law

1   Specifically, this section only prohibits payments "for nothing else (other) than the referral of

2   business" in return.  *Id.*  Thus, where the alleged "thing of value" is provided for purposes other than

3   solely to induce the referral of business, liability under Section 8(a) does not arise.  As Plaintiffs

4   acknowledge, EA provided the appraisals to receive a fee from WaMu for those very appraisals it

5   was retained to provide.  *See, e.g.,* SAC ¶ 36.  It is therefore undisputed that EA, at least in part,

6   provided the appraisals at issue to WaMu to receive its service fee and not solely for the referral of

7   business.  Under these circumstances, the law of this circuit mandates dismissal, as the appraisals

8   cannot constitute a "thing of value."

9       Logically, the "thing of value" exchanged for the referral cannot be the same "real estate

10   settlement service" that is being referred.  Yet, Plaintiffs' circular allegations identify inflated

11   appraisals themselves as the "thing of value" that WaMu received in exchange for the supposed

12   referral of these very appraisal services to EA, LSI, and various "Proven Appraisers."  But this

13   cannot be.  The appraisals are the settlement service; they cannot simultaneously be both the

14   purchased settlement service <u>and</u> an illicit kickback.  If providing settlement services can give rise to

15   Section 8(a) liability where, as a result of these services, their recipient referred additional business

16   to the provider, liability would be endless.  This absurd result is not what Congress intended.

17       **4.    The Safe Harbor Mandates Dismissal of Plaintiffs' RESPA Claim.**

18       Even assuming Plaintiffs' allegations satisfy the elements of Section 8(a), RESPA's safe

19   harbor shields EA from liability.  The safe harbor provides that "[n]othing in this section shall be

20   construed as prohibiting … the payment to any person of a bona fide salary or compensation or other

21   payment for goods or facilities actually furnished or for services actually performed."  12 U.S.C.

22   § 2607(c).  This provision makes clear that RESPA permits payment of fees for the appraisal

23   services actually performed by EA.  As Plaintiffs admit and as this Court recognized in ruling on the

24   defendants' motions to dismiss the FAC, EA did provide appraisal services for an unchallenged fee

25   pursuant to which WaMu made the loans that enabled Plaintiffs to purchase or refinance their

26   properties.  *See* Opinion at 6:18-21 ("[p]laintiffs do not contend that the appraisals were so defective

27   as to make them useless in supporting the borrowers' loan applications" and "plaintiffs' position that

28   the appraisal were so defective as to be useless and of no value is belied by the complaint (as) [t]he

1    appraisals were, in fact, successfully used to obtain mortgages"). These undisputed facts fit squarely

2    within the safe harbor and mandate dismissal of this claim.

3         The decision in *Cedeno v. Indy Mac Bancorp, Inc., et al.*, No. 06 Civ. 6438, 2008 WL

4    3992304 (S.D.N.Y., Aug. 26, 2008), is directly on point and supports dismissal. There, the Court

5    ruled that "[e]ven assuming that IndyMac (the lender) received a 'thing of value' in the form of

6    inflated appraisals, and that IndyMac promised and provided business in return" to the appraiser, the

7    'safe harbor' precludes RESPA liability." *Id.* at *3.

8         In *Cedeno*, the plaintiff alleged that appraisers provided the lender with artificially high

9    appraisals in exchange for the opportunity to perform further appraisals for that lender. *Id.* at *3.

10   Plaintiffs make the identical allegations in this case, asserting that WaMu provided EA and LSI with

11   appraisal referrals in exchange for inflated appraisals. SAC ¶ 6. Plaintiffs in *Cedeno* alleged that the

12   lenders sought and used these artificially high appraisals to increase profits through the issuance of

13   higher mortgage loans. Our plaintiffs make the same allegation. *Id.* ¶ 6.

14        The Court in *Cedeno* rejected the plaintiffs' argument that the safe harbor did not apply

15   because the appraisal was "faulty and inaccurate." The fact that there could be no "dispute that the

16   appraisal was performed and paid for" was dispositive. The lynchpin in the Court's analysis was the

17   absence of authority permitting inquiry into "the quality and price of the services actually"

18   performed when applying the safe harbor provision. *Id.* at *4 ("the plain meaning of the safe harbor

19   precludes an analysis of the quality and price of the services actually performed").

20        EA respectfully submits that the Court in *Cedeno* got it right. Failing to apply the safe harbor

21   here would eviscerate its intended application. Indeed, continuing business arrangements stand to

22   violate RESPA whenever a plaintiff alleges that the recipient of a settlement service referred

23   business back to the service provider. The safe harbor was created to avoid such a predicament and

24   to allow settlement service providers to perform regular business functions and maintain continuing

25   business relationships without the constant specter of RESPA liability. Courts have been mindful of

26   interpreting RESPA so as to avoid a course which "effectively writes Section 8(c)" out of the Act

27   and this Court should do likewise here. *See Schuetz*, 292 F. 3d at 1013 n. 6 (internal citations

28   omitted).

MHA
cDonough Holland & Allen PC
Attorneys at Law

1    This Court's application of the safe harbor provision mistakenly turned on the quality (rather

2    than the fact) of the services EA performed.  If this Court does not give weight to Plaintiffs' attacks

3    on the quality of EA's appraisals, then the safe harbor must apply, as all that remains is an appraisal,

4    a fee, and an ongoing business relationship between WaMu and EA.  Otherwise, Plaintiffs would be

5    free to circumvent the safe harbor simply by attacking the <u>quality</u> of the service and not directly

6    challenging the fee.  This result – clearly unintended by the statute — elevates semantics and artful

7    pleading over RESPA's purpose.  The safe harbor must be applied here, regardless of Plaintiffs'

8    efforts to outflank its purpose in a manner recognized and rejected in *Cedeno*.  To hold otherwise

9    would paralyze settlement service providers rather than advance a home purchaser's interests, as

10   RESPA intended.  In fact, such a regime stands to increase costs to settlement service providers,

11   which in turn would increase home purchaser costs - a result antithetical to RESPA's purposes.

12       **B.    Plaintiffs' Contract Claim Against EA Should Be Dismissed.**

13       In the Sixth Claim for Relief, Plaintiffs attempt to reformulate their "breach of contract"

14   theory against EA, but the premise remains unchanged: EA did not comply with applicable federal

15   standards in providing its appraisal services to WaMu.  As shown below, Plaintiffs' reformulated

16   contract claim is clearly preempted by federal law.  The additional allegations also make clear that

17   Plaintiffs have no contractual rights to enforce as against EA.  Even if preemption were not an

18   absolute bar (which it is), Plaintiffs' reformulated breach of contract claim fails on substantive

19   grounds.

20       **1.    Plaintiffs' Contract Claim is Preempted by Federal Law.**

21       As argued in EA's original motion to dismiss, Congress has created a comprehensive scheme

22   of federal law and regulations that exclusively governs the operations of federal savings and loan

23   associations.  *See* Home Owners' Loan Act ("HOLA") 12 U.S.C. § 1461 *et seq*.; 12 C.F.R. Part 564.

24       **a.    The Scope of Preemption under HOLA.**

25       In passing HOLA, Congress established a "significant federal presence," regulating all

26   aspects of the operation of federal savings associations.  *Fidelity Fed. Sav. and Loan Ass'n v. de la*

27   *Cuesta*, 458 U.S. 141, 144 (1982).  In so doing, Congress authorized the Office of Thrift Supervision

28   to issue sweeping preemptive regulations establishing the exclusivity of federal control.  As the

**MHA**
cDonough Holland & Allen PC
Attorneys at Law

1  United States Supreme Court explained, Congress made this federal power <u>exclusive</u>:

2  Congress plainly envisioned that federal savings and loans would be governed by
3  what the [OTS] – not any particular State – deemed to be the "best practices." …
   Thus, the statutory language suggests that Congress expressly contemplated, and
4  approved, the [OTS]'s promulgation of regulations superseding state law.

5  *de la Cuesta*, 458 U.S. at 161-162 (citation omitted).  Congress also made the OTS's exclusive

6  power <u>expansive</u>.  "The broad language of [HOLA] expresses no limits on the [OTS]'s authority to

7  regulate the lending practices of federal savings and loans.  As one court put it, '[i]t would have been

8  difficult for Congress to give the [OTS] a broader mandate.'"  *Id*. at 161 (emphasis added) (quoting

9  *Glendale Fed. Sav. & Loan Ass'n v. Fox*, 459 F. Supp. 903, 910 (C.D. Cal. 1978).  The end result is

10 that HOLA provides OTS with principal responsibility for regulating federally chartered savings

11 associations (such as WaMu) and institution-affiliated parties (such as EA).  12 U.S.C. §§ 1462a,

12 1463(a), and 1464.

13      The authority of OTS clearly extends not only to mortgage loans, but also to appraisal

14 services.  Any doubt as to whether appraisal services are an integral component of the loan

15 origination process exclusively regulated by OTS was eliminated by the enactment of FIRREA in

16 1989, which amended HOLA to expand federal oversight over federal savings and loan associations

17 to encompass their "appraisal policies and practices."  *See* 12 C.F.R. § 564.1 et seq.  In response to

18 FIRREA, OTS promulgated specific regulations governing federal savings associations' usage of

19 appraisals in connection with their lending activities.   See 12 C.F.R. § 564.1 et seq.[8]  These

20 expansive new regulations which, among other things, prescribe minimum standards for the

21 performance of loan appraisals, including compliance with the Uniform Standards of Professional

22 Appraisal Practice ("USPAP"), set competency standards for appraisers, and require appraiser

23 "independence."  12 C.F.R. § 564.1. 564.4, 564.5.  Significantly, these regulations extend not only to

24 federal savings and loan associations, but also to institution-affiliated parties including appraisal

25 management companies such as EA.  12 C.F.R. § 564.7.  The regulations further provide that federal

26

---

27 [8]  For example, OTS regulations identify which real estate-related financial transactions require the services of an
   appraiser; prescribe which categories of federally related transactions shall be appraised by a state certified appraiser or a
28 state licensed appraiser; and impose minimum standards for the performance of real estate appraisals in connection with
   federally related transactions under its jurisdiction.  *See* 12 C.F.R. §§ 564.2(i)(1)-(3), 564.3 and 564.4



1   savings and loan associations and institution-affiliated parties who violate these requirements are

2   subject to cease and desist orders and monetary fines. *Id.* In addition, USPAP is incorporated into

3   federal regulations concerning real-estate lending. *See* 12 C.F.R. § 34.41(b).

4        Because of this expansive and exclusive federal control, when a plaintiff challenges a federal

5   savings association's lending practices under state law, federal law preempts the claim. This is true

6   regardless of whether the plaintiff purports to state a claim under a state regulation, statute, or

7   common law. As recognized by one California court, "the federal regulation is intended to preempt

8   all state laws purporting to regulate any aspect of the lending operations of a federally chartered

9   savings association, whether or not OTS has adopted a regulation governing the precise subject of

10  the state provision." *Lopez v. World Sav. & Loan Ass'n*, 105 Cal. App. 4th 729, 738 (2003). The

11  Ninth Circuit recently described the regulatory scope of HOLA and these implementing regulations

12  as "so pervasive as to leave no room for state regulatory control." *Silvas v. E*Trade Mortgage*

13  *Corp.*, 514 F. 3d 1001, 1004 (9th Cir. 2008).

              **b.**     **Determining the Scope of Preemption.**

14

15       OTS federal regulations – codified at 12 C.F.R. § 560.2 – contain an analytical framework

16  for addressing whether particular claims are preempted. Section 560.2(a) sets forth the general

17  "field preemption rule" and provides:

18       To enhance safety and soundness and to enable [FSAs] to conduct their operations in
     accordance with best practices (by efficiently delivering low-cost credit to the public

19       free from undue regulatory duplication and burden), <u>OTS hereby occupies the entire
     field of lending regulation for [FSAs]</u>. OTS intends to give [FSAs] maximum

20       flexibility to exercise their lending powers in accordance with a uniform federal
     scheme of regulation.

21

22  12 C.F.R. § 560.2(a) (emphasis added). Section 560.2(b) proceeds to enumerate ("without

23  limitation") thirteen particular types of state laws that are explicitly preempted. Most relevant here,

24  the list includes:

25       • state laws purporting to impose requirements regarding loan related fees (12 C.F.R.

26          § 560.2(b)(5)) and

27       • state laws purporting to regulate the processing, origination, servicing, sale or

28          purchase of, or investment or participation in, mortgages (12 C.F.R. § 560.2(b)(10)).


**McDonough Holland & Allen PC**
**Attorneys at Law**

NOTICE OF MOTION; MEMO OF P'S & A'S IN SUPPORT OF MOTION TO DISMISS      1185252v1 36887/0002

Section 560.2(c) then identifies state laws (such as state contract, tort, and commercial law) that are not preempted <u>if</u> "they only incidentally affect the lending operations of Federal savings associations…" 12 C.F.R. § 560.2(c).

In applying these various preemption rules, OTS has indicated that a court should first inquire whether a particular state law falls within the scope of § 560.2(b). *Silvas*, 514 F. 3d 1001, 1005 (9th Cir. 2008). If it does, then the law is preempted. *Id.* If the particular state law does not fall within the scope of 560.2(b), then the question becomes whether the law "affects lending." If it does, then the law is preempted <u>unless</u> the law can clearly be shown to fall within the scope of section 560.2(c) because it has only an incidental effect on lending operations. In determining whether a particular law has an "incidental effect," section 560.2(c) should be interpreted narrowly, with any doubt being resolved in favor of preemption.[9]

### c.    Plaintiffs' Contract Claim is Preempted.

Applying these rules here leads to the inevitable conclusion that Plaintiffs' contract claim is preempted. Despite characterizing WaMu's alleged failure to obtain independent appraisals as "a breach of Plaintiff's express contract," Plaintiffs' contract theory boils down to one simple assertion: EA failed to "provide [Plaintiffs] with a properly certified appraisal report in violation of USPAP." SAC at ¶ 136. Notably, the only additional details regarding terms of the supposed contracts emanates from the body of federal law that preempts the contract claim. For example, the SAC alleges as follows:

/ / /

/ / /

/ / /

/ / /

---

[9]   Commentary accompanying regulations enacted in 1996 provides the following insight: "[T]he first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. this presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph 9(c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption." 61 Fed. Reg. 50951, 50966-50967 (Sept. 30, 1996).


**MHA**
cDonough Holland & Allen PC
Attorneys at Law

NOTICE OF MOTION; MEMO OF P'S & A'S IN SUPPORT OF MOTION TO DISMISS          1185252v1 36887/0002

Under these appraisal contracts, EA undertook and agreed: a) to perform these appraisals for Plaintiffs and the Class credibly, independently, impartially, objectively, and without bias or predetermined results in compliance with USPAP standards; and b) to provide Plaintiffs and the Class with appraisal reports comporting with these standards directly and/or by delivery to them through WaMu so that Plaintiffs and the Class could rely upon them in entering their loans with WaMu.

SAC at ¶ 127.

This Court previously concluded that Plaintiffs' claims under California's Unfair Competition Law ("UCL") and the Consumer Legal Remedies Act ("CLRA") were preempted because they were based on EA's "allegedly unlawful conduct in contravention of the Uniform Standards of Professional Appraisal Practice." Order at 8:4-7. Indeed, the language of the Court's prior order is particularly instructive here:

Each of these claims relate directly to the processing and origination of mortgages. Appraisals are required for many real-estate transactions. 12 C.F.R. 34.43 (requiring a certified or licensed appraisal for all real-estate financial transactions except those falling within enumerated exceptions). And those appraisals must be performed according to certain standards in order to protect the public and federal financial interests. 12 C.F.R. 34.41(b). Indeed, plaintiffs' theory of the case, that lenders and appraisers conspired to inflate appraisals in order to increase mortgage resale prices, demonstrates the importance and interrelationship of impartial appraisals to mortgage origination and servicing. The court therefore finds that plaintiffs' UCL and CLRA claims, as applied, relate to the processing and origination of, and participation in, mortgages, and are thus preempted under 560.2(b)(10).

Court's Order at 8:15-25. This language applies with equal force to Plaintiffs' contract claim and shows, without a doubt, that it is also preempted. Indeed, Plaintiffs cite to USPAP no less than nine times in their contract claim alone. The allegations in paragraph 134 summarize the gist of Plaintiffs' "express contract" theory:

EA breached these contracts with Plaintiffs and each Class member by not providing a home appraisal which was performed by an impartial, independent, objective and unbiased appraiser, and by not providing appraisal reports that were credible, objective, unbiased, impartial, independent, without predetermined values and done in compliance with USPAP standards. In other words, Plaintiffs and the Class contracted with EA for and were charged for impartial, USPAP compliant appraisals which were never performed by EA or delivered to Plaintiffs and the Class.

SAC at 134. The remaining allegations in Plaintiffs' sixth claim for relief make abundantly clear that WaMu's and/or EA's failure to abide by USPAP standards is the basis of their contract action. *See, e.g.*, SAC at ¶¶ 127, 129, 130, 131, 134, 135, 136, 137, 138. Plaintiffs' own allegations make clear that they are attempting to use California contract law to regulate "the processing, origination,

MHA
cDonough Holland & Allen PC
Attorneys at Law

servicing, sale or purchase of, or investment or participation in, mortgages." (12 C.F.R. § 560.2(b)(10)). As such, Plaintiffs' contract claim falls within the scope of section 560.2(b) and is preempted.

### d. Plaintiffs' Contract Claim Has More than an Incidental Effect on Lending.

Because Plaintiffs' contract claim easily falls within the scope of section 560.2(b), there is no need to determine whether it has "more than an incidental effect" on lending. Even if that step of the analysis did apply, preemption still exists. The crux of Plaintiffs' contract claim is that the means by which WaMu hired EA to obtain appraisals on its behalf destroyed the independence and impartiality of those appraisals. Because this entire process of obtaining appraisals occurred as an integral part of WaMu's "processing [or] origination" of mortgages, the effect on lending is much more than "incidental." Indeed, because appraisals are required as a condition of providing many types of loans (*see, e.g.*, 12 C.F.R. 34.43) and because HOLA prescribes the manner in which appraisals can be conducted, there is no way to extricate appraisals from the scope of exclusive federal regulation.

The nature of Plaintiffs' requested remedy further illustrates how the impact on lending would be more than just incidental. In their breach of contract claim, Plaintiffs seek compensatory damages and injunctive relief. SAC at ¶ 139. Further, their prayer for relief seeks "[a]n order enjoining Defendants from maintaining and utilizing WaMu's Proven Appraiser List, or any other mechanism by which WaMu has control over the appraiser selected to perform WaMu's home appraisals or value the appraiser sets for the subject property." SAC, Prayer for Relief at F. In no uncertain terms, Plaintiffs purport to regulate the manner in which WaMu obtains and EA provides real estate appraisals in connection with mortgage loans. To adjudicate Plaintiffs' contract action and grant Plaintiffs the relief they request, this Court would be prescribing standards that would have more than just an "incidental effect" on lending.

### e. This Case is Similar to Others Where Preemption Was Found.

The holdings in other cases show why preemption is the only appropriate conclusion here. For example, in *Cedeno*, the plaintiff (on behalf of herself and all similarly situated residential home

mortgage borrowers) included a breach of contract claim in her suit, based on the theory that IndyMac provided appraisal services that were materially inaccurate, inflated, and improperly influenced by interested parties. The *Cedeno* court found that this contract claim was preempted. Specifically, the Court concluded as follows:

> This claim, like the claims under the California and New York deceptive practices statutes, is preempted because it relies on state law purporting to impose a requirement on the processing and origination of the mortgage, which is preempted under 12 C.F.R. § 560.2(b)(10). *See Rosenberg*, 849 A.2d at 572 (state contract claim was preempted under 12 C.F.R. § 560.2(b)(9) because the plaintiffs sought to insert a form of state regulation by compelling a different type of billing statement disclosures).

> Because the state law breach of contract claim in this case is foreclosed by 12 C.F.R. § 560.2(b)(10), it is unnecessary to determine whether enforcement of the contract claim would "only incidentally affect the lending operations of Federal savings associations," under 12 C.F.R. § 560.2(c). However, for the reasons explained above, the regulation that the plaintiff seeks would in fact more than incidentally affect the lending operations of IndyMac and similarly situated federally chartered savings banks. The contract claim is simply another means to attempt to regulate the method used by IndyMac to assess the value of collateral in securing its loans. Granting the plaintiff the relief she seeks would have the same effect as a direct regulation of appraisal practices – causing IndyMac to alter the methods it uses to evaluate loans and more than incidentally affecting lending operations of federally chartered savings associations.

*Cedeno*, 2008 WL 3992304, at *10.

The same analysis and conclusion are appropriate here. Like *Cedeno*, Plaintiffs here are challenging the appraisal services provided in connection with their home mortgage loans. Like *Cedeno*, Plaintiffs here contend that the appraisals were inflated in order to gain an economic advantage. And, like *Cedeno*, the "contract claim" here is an ill-conceived attempt to obtain state regulation over lending practices, in general, and appraisal practices, in particular. Whether stated as a "breach of contract" or otherwise, this claim is foreclosed by 12 C.F.R. § 560.2(b)(10) as an attempt to regulate the method used by WaMu and EA to assess the value of collateral in securing mortgage loans.

*Rosenberg v. Washington Mutual Bank*, 849 A.2d 572 (2004) provides another example of a case in which a contract claim was preempted. In that case, Jeffrey and Joni Rosenberg obtained a 30-year mortgage loan from Washington Mutual Bank ("WaMu"). They agreed to an adjustable rate mortgage, were provided with several different types of payment options, and received monthly

billing statements.  The Rosenbergs eventually stopped making payments on their loan and then filed

a state court action against WaMu for consumer fraud and breach of contract.  The crux of both

claims was that the monthly billing statements the Rosenbergs received were deceptive.  WaMu

moved to dismiss on the ground that all claims alleged in the complaint were preempted by HOLA.

After discussing the broad preemptive scope of HOLA and its implementing regulations, the Court

agreed and dismissed all claims.  The Court specifically concluded:

> Here, plaintiffs' state law claims clearly fall within 12 C.F.R. § 560.2(b)(9) as they assert that WMBFA's billing statements fail to convey, i.e., disclose, to the debtor that the "total amount due" figure is something other than what one normally would think of as a "total amount due."  By way of either injunctive relief or monetary damages, plaintiffs seek to insert a form of state regulation by compelling a different type of billing statement disclosure.

*Rosenberg*, 849 A.2d at 572.

Based on the principles set forth in *Rosenberg*, preemption also exists here.  The Rosenbergs

were not just disputing the terms of their contract with WaMu.  Instead, they were attempting to alter

the nature of the disclosures required with monthly billing statements – a topic that falls within the

scope of federal preemption (under section 560.2(b)).  While the nature of Plaintiffs' challenge varies

here (in that Plaintiffs do not appear to challenge any disclosure-related issues), they are nonetheless

attempting to fundamentally impact the nature of the appraisal practices adhered to by WaMu and

EA.  This clearly goes beyond any "contractual dispute" and falls either within the scope of section

560.2(b) or more than incidentally affects lending.

### C.  Plaintiffs Have Failed to Adequately Allege Their State Law Claims.

Even if Plaintiffs can somehow overcome the preemption argument, the Court should

nevertheless dismiss that claim due to Plaintiffs' failure to adequately plead a breach of contract

against EA.

### 1.  Plaintiffs' Breach of Contract Claim is Subject to Dismissal.

To state a cause of action for breach of contract, the plaintiff must allege each of the

following elements:  (1) existence of the contract; (2) performance by the plaintiff or excuse for

nonperformance; (3) breach by the defendant; and (4) damages.  *Arikat v. JP Morgan Chase & Co.*,

430 F. Supp. 2d 1013, 1021 (N.D.Cal. 2006), *citing First Commercial Mortgage Co. v. Reece*, 89

1    Cal. App. 4th 731, 745 (2001).  Plaintiffs have not satisfied their pleading burden and their contract

2    claim therefore fails.

3                        **a.       Plaintiffs Do Not Allege the Existence of a Contract with EA.**

4              As argued in EA's original motion to dismiss, Plaintiffs have no enforceable contract with

5    EA.  To the contrary, the only contractual relationship that exists regarding the provision of appraisal

6    services is between WaMu and EA.  Plaintiffs do not (and cannot) allege that they contracted

7    directly with EA for any services.  As reflected in the SAC, Plaintiffs' only contracts are with

8    WaMu, and EA was indisputably not a party to those agreements.  Any alleged deficiencies in EA's

9    performance with respect to its own business relationship with WaMu do not give rise to the breach

10   of contract claim Plaintiffs assert.

11             In a futile attempt to save their contract theory, Plaintiffs now allege that WaMu entered into

12   these contracts as Plaintiffs' "agent."  SAC at ¶¶ 126-127.  This contention is, at best, disingenuous.

13   It is completely unsupported by any of the SAC's factual allegations and entirely incongruous with

14   the regulatory regime by which lenders procure appraisals in connection with home mortgage loans.

15   As explained above, and as this Court has previously recognized, WaMu contracted for the

16   appraisals to comply with its own obligations under federal law regarding the valuation of the loan

17   collateral.

18             To support their contract-by-agent theory, Plaintiffs rely on isolated references to Scholl and

19   Spears as the "Borrower/Client" in the addenda to the appraisal reports.  SAC at ¶ 128.  These

20   references do not begin to support the conclusion that WaMu acted as Plaintiffs' agent in procuring

21   the appraisals, nor does it mean that EA has incurred any contractual obligations with respect to

22   either Spears, Scholl, or any other putative member of the class.  The body of each appraisal report

23   explicitly and unambiguously states on line one of page one: "The **purpose** of this summary report is

24   to provide the **lender/client** with an accurate, and adequately supported, opinion of the market value

25   of the subject property."  SAC Exhibit 2 at "page 1 of 6;" Exhibit 4 at "page 1 of 6."  A few lines

26   below, the reports identify the "lender/client" as WaMu and EA.  Each report goes on to explicitly

27   state at page 4 that the "**intended user** of this appraisal report is the **lender/client**," and that "the

28   **intended use** of this appraisal report is for the **lender/client** to evaluate the property that is the

1  subject of this appraisal for a mortgage finance transaction." These unambiguous provisions negate

2  any inference that WaMu ordered the appraisals on behalf of Plaintiffs or as their "agents."

3      Plaintiffs' next contention – that the Residential Appraisal Reports "specifically acknowledge

4  that borrowers (i.e., Plaintiffs and the Class) would receive the appraisal report[s] and may rely upon

5  them in their mortgage financing transaction with the lender (i.e., WaMu)" – is equally unavailing.

6  SAC at ¶ 128.  Preliminarily, the reports do <u>not</u> state that Plaintiffs would be direct recipients or

7  beneficiaries of the reports.  Rather, they state that "the lender/client <u>may</u> disclose or distribute this

8  appraisal report to: the borrower," thus reinforcing that the reports were prepared for the use and

9  benefit of the lender/client, who may disclose or distribute them as the lender/client sees fit to certain

10  potentially interested parties that include not only the borrower, but also other lenders, mortgage

11  insurers, mortgage assignees, various governmental entities and government sponsored enterprises,

12  data reporting services, professional appraisal organizations, and more. SAC, Ex. 2 and Ex. 4 at ¶21,

13  p. 6.  Nor do these statements establish a contractual relationship between EA and the borrowers.

14  The fact that the borrowers may be able to rely on the appraised value of their properties in obtaining

15  a mortgage loan does not mean that they have a contract with the appraisal company, that they can

16  sue the appraisal company for breach of contract, that their mortgage lender was acting as their

17  agent, or that they have any contractual rights to enforce.  To reiterate, the reports explicitly provide

18  that the only "intended user" is the lender/client (defined as WaMu and EA) and that the intended

19  use is for the lender/client to evaluate the loan collateral. SAC ¶ 128 and exhibits 2 and 4 thereto at

20  page 4.

21      **b.**    **Plaintiffs Do Not Allege the Nature or Terms of their Contracts**

22               **with EA.**

23      Even if Plaintiffs' novel agency theory had any merit, the contract claim is still defective.  In

24  their prior complaints, Plaintiffs were exceedingly vague regarding the nature of their alleged

25  contracts with EA.  The SAC now points to the "Residential Appraisal Reports" prepared for WaMu

26  and the HUD Settlement Statements provided by the title company as the basis for their contract

27  claim.  *See* SAC ¶ 128 (alleging that the "contracts for appraisals between Plaintiffs and the Class

28  and EA are evidenced by standard form documents entitled "Residential Appraisal Report") and

MHA
cDonough Holland & Allen PC
Attorneys at Law

SAC ¶ 132 (alleging that "[t]hese contracts for appraisals between Plaintiffs and the Class and EA are also evidenced by the Settlement Statements (HUD-1) for each of Plaintiffs' and Class members' WaMu home loans.")

Neither of those documents, however, qualifies as a "contract" between Plaintiffs and EA.  If anything, these documents confirm the absence of any contract relationship between EA and any of the Plaintiffs.  For example, the HUD Settlement Statements (Exhibits 1 and 3) do not even identify EA much less set forth any contractual obligations owing to Plaintiffs.  Likewise, the Residential Appraisal Reports (Exhibits 2 and 4) do not reveal any contractual relationship between Plaintiffs and EA nor identify any obligations owing to Plaintiffs; their only avowed purpose is to enable the lender/client to evaluate the loan collateral.  At bottom, the failure to properly allege the terms of the contract subjects this claim to dismissal.

### c.      Plaintiffs Do Not Allege Damages.

Plaintiffs assert that they "suffered damages, including economic losses" as a result of Defendants' breach of contract.  Once again, however, taking the SAC's allegations as a whole, it is entirely unclear how Plaintiffs have been damaged in any way.  The SAC is devoid of any suggestion of a nexus between the alleged wrongdoing leading to the inflated appraisals and actual harm to Plaintiffs, who received loans from WaMu in the amounts they had seen fit to request before the appraisals were even commissioned.  This deficiency presents an independent basis for dismissal of Plaintiffs' breach of contract claim.  *See Dorian v. Harich Tahoe Development,* Nos. C-94-3387 (DLJ), 1996 WL 925859, at *6 (N.D.Cal. Jan. 16, 1996) ("conclusory assertion that [plaintiffs] incurred $700,000,000 worth of damages '[b]y reason of defendants' breach of contract'" insufficient" to allege damages).

## VI.     CONCLUSION

In conclusion, EA requests that the Court dismiss the SAC in its entirety with prejudice.  Plaintiffs allege no actionable conduct under RESPA, which was enacted to prohibit kickbacks and improper referral fees in the real estate industry.  In this case, Plaintiffs do not and cannot allege any such practices occurred, even assuming the truth of their allegations that the arrangement between WaMu and the appraisal management companies led to inflated appraisals.  Plaintiffs' state law

McDonough Holland & Allen PC
Attorneys at Law

1    breach of contract claim against EA is preempted by a comprehensive scheme of federal law and

2    regulation which exclusively governs the operations of savings and loan associations and institution-

3    affiliated parties such as EA.  The breach of contract claim independently fails for the simple reason

4    that there was no contract between Plaintiffs and EA.  Plaintiffs' allegations fail to identify any

5    contractual obligations enforceable against EA.  For all those reasons, the RESPA and contract claim

6    in the Second Amended Complaint should be dismissed against EA with prejudice.

7    DATED:  April 21, 2009.

8                                                    DLA PIPER LLP (US)
                                                     RICHARD F. HANS
9                                                    PATRICK J. SMITH
                                                     JEFFREY D. ROTENBERG
10

11                                                   McDONOUGH HOLLAND & ALLEN PC
                                                     Attorneys at Law
12

13

14                                                   By: _____ /s/ Laura J. Fowler _____
                                                              LAURA J. FOWLER

15                                                   *Attorneys for Defendant eAppraiseIT, LLC*

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION; MEMO OF P'S & A'S IN SUPPORT OF MOTION TO DISMISS          1185252v1 36887/0002

**MHA**
cDonough Holland & Allen PC
Attorneys at Law