1
2
3
4
5
6
7

**E-FILED on**  4/25/2012

8        IN THE UNITED STATES DISTRICT COURT

9      FOR THE NORTHERN DISTRICT OF CALIFORNIA

10             SAN JOSE DIVISION

11

12  FELTON A. SPEARS, JR., SIDNEY          No. C-08-00868 RMW
    SCHOLL, on behalf of themselves and all
13  others similarly situated,

14                Plaintiffs,               ORDER GRANTING MOTION FOR CLASS
                                            CERTIFICATION AND SETTING CASE
15         v.                               MANAGEMENT CONFERENCE

16  FIRST AMERICAN EAPPRAISEIT (a/k/a       **[Re Docket No. 217]**
    eAprraiseIT, LLC), a Delaware limited liability
17  company,

18                Defendant.

19

20         Plaintiffs renew their motion for class certification.  For the reasons set forth below, the court

21  grants the motion.

22                          **I. BACKGROUND**

23         Home purchases in the United States have traditionally been financed through a third-party

24  lender who retains a security interest in the property until the loan is repaid.  Second Amended

25  Complaint ("SAC") ¶ 2.  In order to ensure that the secured lender will recoup the value of the loan

26  if the borrower defaults before the loan is repaid, the lender generally requires that the property be

27  professionally appraised.  *Id.*  In recent years, however, rather than hold mortgage loans until repaid,

28  banks have frequently sold the loans to other financial institutions.  *Id.* ¶ 23.  This shift created an

United States District Court
For the Northern District of California

incentive for banks to seek higher appraisals for the properties underlying their mortgage loans. *Id.* ¶ 24.

Plaintiffs allege that beginning in June of 2006, Washington Mutual Bank ("WMB") conspired with First American eAppraiseIT ("EA") and Lender's Service, Inc. ("LSI") to inflate the appraised value of property underlying their mortgage loans so that WMB could sell the aggregated security interests in these properties at inflated prices. *Id.* ¶ 6. Around June 2006, WMB retained EA and LSI to administer its appraisal program. *Id.* ¶ 36. EA and LSI have since performed almost all of WMB's appraisals, and WMB's borrowers have become EA and LSI's largest source of business. *Id.* Plaintiffs allege that defendants engaged in the following conduct as part of the conspiracy to inflate appraisals: (1) EA and LSI complied with WMB's demand that all of its appraisals be performed by appraisers on its "Proven Appraiser List," which contained appraisers selected by WMB's loan origination staff; (2) WMB maintained the contractual right to challenge appraisals by requesting a reconsideration of value ("ROV") and used ROV requests to get EA and LSI to increase appraisal values; (3) WMB requested that EA and LSI hire former WMB employees as appraisal business managers, who had the authority to override the values determined by third-party appraisers; and (4) EA and LSI altered appraisal reports to reflect higher property values, remove negative references, and make other changes so that the final appraisal reports complied with WMB's wishes. *Id.* ¶¶ 6, 37-40, 43-45.

On February 8, 2008, plaintiffs filed suit against WMB, EA, and LSI, alleging breach of contract, unjust enrichment, and violations of the Real Estate Settlement Procedures Act ("RESPA"), the Unfair Competition Law, and the Consumers Legal Remedies Act. The only claim remaining is plaintiffs Felton A. Spears and Sidney Scholl's claim against EA for violation of Section 8(a) of RESPA, 12 U.S.C. § 2607(a). The court dismissed all other claims against EA in orders issued on March 9, 2009 and August 30, 2009. In its August 30, 2009 order, the court also denied the motion to permit Juan and Carmen Bencosme to intervene and dismissed LSI from this case.

Spears and Scholl moved for class certification on May 25, 2010. On July 2, 2010, the court denied class certification and held that, while the class was ascertainable and the prerequisites of Federal Rule of Civil Procedure 23(a) had been satisfied, plaintiffs had not satisfied the requirements

1   of Rule 23(b)(3).[1]  To give the parties an opportunity to address the question of whether the inflation

2   of appraisal values in the aggregate could be established by common proof, the court denied the

3   motion for class certification without prejudice.

### II. ANALYSIS

5   Rule 23(b)(3) requires that "questions of law or fact common to class members predominate

6   over any questions affecting only individual members, and that a class action is superior to other

7   available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### A.   Predominance

9   The predominance inquiry "tests whether proposed classes are sufficiently cohesive to

10  warrant adjudication by representation." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir.

11  1998) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).  The mere existence of

12  common issues of fact or law is insufficient, as such commonality is already required by Rule

13  23(a)(2).  Predominance is met where common questions, which can be resolved for all members on

14  a class-wide basis, are such a significant aspect of the case that they present "a clear justification for

15  handling the dispute on a representative rather than on an individual basis." *Id.*

16  Section 8(a) of RESPA provides that "[n]o person shall give and no person shall accept any

17  fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that

18  business incident to or part of a real estate settlement service involving a federally related mortgage

19  loan shall be referred to any person." 12 U.S.C. § 2607(a).  Plaintiffs' theory of liability is that,

20  pursuant to an agreement, EA gave and WMB accepted inflated appraisals in exchange for WMB's

21  referring appraisal business to EA.  This court previously held that an individual has standing to

22  bring a RESPA claim if his appraisal was part of a volume of appraisal business that was referred to

23  EA in exchange for inflated appraisals. Dkt. No. 209 at 8.  Thus, plaintiffs need not prove that each

24  or any particular member of the class received an inflated appraisal. *Id.* at 7-9.  However, plaintiffs

25  must still make some showing that WMB obtained a "thing of value" as a result of its agreement

26  with EA. *Id.* at 9.  The court found the mere fact that EA made changes in the way the appraisal

27

28  [1]  The proposed class must satisfy at least one of the three requirements listed in Rule 23(b).
    Plaintiffs rely on Rule 23(b)(3).

United States District Court
For the Northern District of California

1  function was accomplished (such as selecting appraisers from a Proven Appraiser List) did not

2  establish that WMB received a "thing of value" without evidence that those changes actually

3  resulted in inflated appraisals. *Id.* Thus, plaintiffs must establish that WMB received appraisal

4  values that were inflated in the aggregate. *Id.* at 7-8.

5        At the class certification stage, the court is not to render a decision on the merits of plaintiffs'

6  claim. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974). However, some preliminary

7  inquiry into the merits may be necessary where those issues overlap with the requirements of Rule

8  23. Schwarzer, Tashima & Wagstaffe, *California Practice Guide: Federal Civil Procedure Before*

9  *Trial* § 10:578 (2011); *see Coopers & Lybrand v. Lindsey*, 437 U.S. 463, 469 (1978) ("[T]he class

10 determination generally involves considerations that are enmeshed in the factual and legal issues

11 comprising the plaintiff's cause of action." (internal quotation omitted)). Here, in order to satisfy the

12 predominance requirement, plaintiffs must show that their key contentions – that the alleged

13 agreement existed and was carried out, and that WMB received appraisals that were inflated in the

14 aggregate – are subject to common proof.

15                    **1.    Evidence of a Conspiracy to Inflate Appraisal Values**

16       In their papers, plaintiffs provide a survey of common evidence they argue will help in

17 showing an agreement between EA and WMB. Plaintiffs identify various practices and changes in

18 procedure by EA that allegedly were designed to ensure WMB received appraisals that supported

19 the loan amount requested by the borrower, even if that required inflating the appraised value.

20 Plaintiffs argue that the central inquiry regarding the existence and implementation of a conspiracy

21 focuses on defendant's conduct and therefore will not require any individualized inquiry. Relying

22 mostly on price-fixing antitrust cases, plaintiffs argue that cases alleging an overarching conspiracy

23 are routinely certified. *See, e.g.*, *In re Static Random Access Memory Antitrust Litig.*, 264 F.R.D.

24 603, 611 (N.D. Cal. 2009) ("In price-fixing cases, courts repeatedly have held that the existence of

25 the conspiracy is the predominant issue and warrants certification even where significant individual

26 issues are present." (citation omitted)).

27       Defendant argues that plaintiffs' evidence fails to show a conspiracy existed and in fact

28 "demonstrates that the EA-WaMu relationship was complex and evolving from beginning to end."

ORDER GRANTING MOTION FOR CLASS CERTIFICATION AND SETTING CASE MANAGEMENT CONFERENCE —No.
C-08-00868 RMW
LJP                                                                  4

1  Defendant characterizes the evidence as showing that EA resisted WMB's efforts to improperly

2  influence the appraisal process and even lost business from WMB in its efforts to maintain

3  independence and comply with the Uniform Standards of Professional Appraisal Practice

4  ("USPAP").  Because the relationship continued to change, defendant argues, individualized inquiry

5  is necessary to determine what the parties' agreement was at the time that a specific appraisal was

6  performed.

7  Much of defendant's argument appears directed at the merits of plaintiffs' claim, which the

8  court cannot adjudicate at the class certification stage.  For now, it suffices that plaintiffs have

9  alleged a single, overriding agreement and shown that some amount of common evidence exists

10  from which a conspiracy could be inferred.  Defendant's attempt to recharacterize plaintiffs'

11  evidence as reflecting a changing situation and no agreement cannot defeat certification.  *See In re*

12  *TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 607 (N.D. Cal. 2010) (rejecting defendants'

13  argument that there were actually multiple conspiracies, holding "defendants may not recast

14  plaintiffs' allegations, and plaintiffs have consistently alleged a single, overriding conspiracy

15  spanning the entire class period").  In addition, the mere fact that the relationship between EA and

16  WMB was contentious does not demonstrate that they did not conspire to inflate appraisal values,

17  and even if EA implemented policies designed to inflate appraisal values only in response to

18  pressure from WMB, that may still constitute an agreement or understanding in violation of RESPA.

19  Defendant does fairly present the concern that different practices were in place at different

20  times, such that the timing of individual appraisals may matter.  However, the overarching inquiry

21  still relates to the course of conduct between EA and WMB.  A factfinder will likely have to

22  determine not only whether there was a conspiracy but, if so, the scope of that conspiracy.  But these

23  are still common questions, with a single answer that pertains to the entire class, to be determined

24  from common proof.  Once the scope of the conspiracy – in time or as to other parameters – is

25  determined, the individual question of whether an appraisal falls within that scope will likely be easy

26  to answer.  Moreover, even if plaintiffs' claims were tried on an individual basis, the entirety of EA's

27  relationship with WMB would still be relevant to whether an agreement existed at a particular point

28

ORDER GRANTING MOTION FOR CLASS CERTIFICATION AND SETTING CASE MANAGEMENT CONFERENCE —No.
C-08-00868 RMW
LJP                                                                 5

**United States District Court**
For the Northern District of California

1   in time.  Thus, to prove only their own claims, plaintiffs could and might still introduce a large

2   portion of the evidence that would be needed to try the case as a class action.

3        The court has not found authority for the proposition that a common question, and its

4   common answer, must apply identically to all of the class members' claims.  To the extent the impact

5   is not uniform, that may affect a plaintiff's typicality or the adequacy of representation, but those

6   requirements appear to be met here.  The court is persuaded at this stage that plaintiffs would

7   vigorously attempt to prove a conspiracy across the entire class period, rather than focus on when

8   their individual appraisals were conducted.  In addition, the nature of the question in this case –

9   when exactly did a conspiracy exist and which appraisals did it cover – makes it impossible to draw

10  lines ahead of the ultimate determination, so subclasses are not an available mechanism.  If it later

11  appears that only a subset of the class, potentially not including plaintiffs, can prove an agreement

12  that covered their appraisals, the court can modify the class certification order at that time.  *See* Fed.

13  R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended

14  before final judgment.").

15       Other cases are in accord with the court's approach.  For example, in *Mejdrech v. Met-Coil*

16  *Systems Corp.*, 319 F.3d 910 (7th Cir. 2003), the court affirmed certification of a class to determine

17  liability for a chemical leak that contaminated the soil and groundwater beneath class members'

18  homes.  The court found the common questions were whether the defendant leaked the chemical in

19  violation of the law and whether the chemical reached the class members' properties.  *Id.* at 911.

20  The court explained:

21       The first question is particularly straightforward, but the second only slightly less so.
         The class members' homes occupy a contiguous area the boundaries of which are
22       known precisely. The question is whether this area *or some part of it* overlaps the
         area of contamination. Supposing all or part of it does, the next question is the
23       particular harm suffered by particular class members whose homes are in the area of
         contamination.
24
25  *Id.* (emphasis added).  The court thus contemplated that the common question could yield an answer

    that resulted in liability to some class members but not to others.  Determining the scope of the
26
    agreement in this case is analogous to determining the area of contamination.  Supposing an
27

28

1   unlawful agreement is found to exist, EA will be liable to class members whose appraisals are within

2   the scope of that agreement.

3            In securities class actions, courts have adopted longer class periods when there is a factual

4   question as to when a liability-determinative event occurred.  Specifically, courts have deferred

5   ruling on whether or when a purported corrective disclosure completely cured the alleged

6   misrepresentation and instead allowed the larger class to proceed, subject to later narrowing.  *See,*

7   *e.g.*, *In re NTL, Inc., Sec. Litig.*, 2006 WL 330113 at *14 (S.D.N.Y. 2006) ("This Court accepts at

8   this time, subject to later modification, the Class Period as set forth by Lead Plaintiffs, in preference

9   to the shorter class period suggested by defendants, which would require this Court to adjudicate in

10  advance of trial when the market had digested fully NTL's corretive disclosure."), *adopted by*, 2006

11  WL 568225 (S.D.N.Y. 2006); *In re Interpublic Sec. Litig.*, 2003 WL 22509414 at *5 (S.D.N.Y.

12  2003) ("Class certification of a broader class period is appropriate when questions of fact remain as

13  to whether a purportedly curative press release effected a complete cure of the market or was itself

14  fraudulent.").  Similarly here, it seems better to treat the entire class uniformly until and unless it

15  becomes clear on the merits that only a subset of the class can have valid claims.

16                   **2.      Methodology to Determine Inflation in the Aggregate**

17           The court previously denied plaintiffs' motion for class certification because "neither party

18  addressed the question of whether the inflation of appraisal values in the aggregate can be

19  established by common proof."  Dkt. No. 209 at 9.  In support of their renewed motion, plaintiffs

20  submitted three expert reports and outlined a proposal to use statistical sampling in addition to direct

21  evidence of WMB and EA's practices.  First, plaintiffs' experts opine that it is possible for an

22  appraiser to review a previously made appraisal report and determine whether the original appraisal

23  was USPAP-compliant and whether it was too high or too low.  Defendant does not dispute that this

24  is possible.  Opp. at 14 n.75.  Plaintiffs' third expert, Dr. French, proposes to use this retrospective

25  review process on a statistical sample of the over 300,000 appraisals performed by EA for WMB in

26  order to obtain information about inflation in the aggregate.

27           Dr. French's analysis shows that approximately one-third of all of the subject appraisals were

28  from four Metropolitan Statistical Areas ("MSAs"), New York, Miami, Chicago, and Los Angeles.

United States District Court
For the Northern District of California

For each of these MSAs, Dr. French proposes to take a random sample of appraisals and determine the proportion that are inflated and the average percentage by which they are inflated. The results from the statistical samples provide an unbiased estimate of the proportion and mean percent inflation for all of the appraisals in each MSA. Dkt. No. 222 (Expert Report of Gary L. French) ¶ 15. Dr. French explains that if such information is desired for more than the 33% of appraisals that were from the top four MSAs, the top ten MSAs can be used to reflect 50% of EA's appraisals, or one large random sample could be drawn from the universe of all appraisals done by EA. *Id.* ¶ 18. But if it is necessary only to show that the appraisals were inflated on average to some extent, Dr. French explains, then it is sufficient to look at the samples from the top four MSAs. If the average inflation in those areas is positive, then assuming the inflation in all other areas was non-negative, the nationwide average inflation must also be positive, even if the inflation in other areas was zero. In addition, the proportion of appraisals that were inflated in the top four MSAs can be extrapolated to yield a minimum nationwide proportion.

Defendant disputes that Dr. French's methodology can be used to show inflation in the aggregate. Defendant's expert, Dr. Edelstein, opines that Dr. French makes improper assumptions about the uniformity of the appraisals in each MSA and fails to account for differences between specific markets within a MSA, changes in the market and the economy over time, and differences in the processes employed by WMB and EA in preparing a particular appraisal. To account for these differences, the appraisals would need to be further stratified, i.e., subdivided, within each MSA. Dr. Edelstein further opines that Dr. French's methodology does not account for the fact that appraisers may honestly differ to some extent on the appraised value for a property, so that a lower appraisal on retrospective review does not necessarily mean inflation in the original appraisal.

In his rebuttal expert report, Dr. French opines that additional stratification is not necessary to account for differences within the MSAs unless one is interested in the average inflation for each stratum. Dkt. No. 240 ¶ 13. Dr. French also explains that his methodology does not make assumptions about market dynamics and Dr. Edelstein's concerns are nullified because the retrospective appraisal will view a property at the same point in time as the original appraisal. *Id.* ¶¶ 17-18. Plaintiffs' expert Dr. Wiley, an experienced appraiser, acknowledges that differences in

professional opinion can result in small percentage differences in original and retrospective appraisal values. Dkt. No. 239 (Rebuttal Report of Danny Wiley) at 4-5. Dr. Wiley opines that differences of less than 5% require a closer look to determine if there has been inflation or simply a difference of opinion; for non-complex properties, a value difference of 5% to 10% indicates a strong probability of inflation, and a difference of greater than 10% indicates virtually certain inflation; for complex properties, a difference of 10% to 15% indicates a strong probability of inflation, and a difference of greater than 15% indicates virtually certain inflation. *Id.* at 5. Using those values, Dr. French proposes taking a "conservative" approach by normalizing the estimated differences in appraised values by 10% for non-complex properties and 15% for complex properties. Dkt. No. 240 ¶ 16.

For the purposes of class certification, the court finds plaintiffs have shown that aggregate inflation is subject to common proof. At this stage, plaintiffs need not set out the exact methodology they will follow, nor must the court bless it. Rather, "[p]laintiffs need only show that their proposed method is realistic." *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 353 (N.D. Cal. 2005). Notably, Dr. Edelstein does not appear to dispute the basic premise that statistical sampling can be used to ascertain aggregate characteristics about the universe of appraisals done by EA. Some of Dr. Edelstein's criticisms could be addressed, if necessary, by further stratification and/or evaluation of samples from additional MSAs, for example. Plaintiffs could also avoid certain criticisms by their choice of which statistics to present. For example, a minimum proportion of appraisals meeting Dr. Wiley's threshold for "virtually certain" inflation might be subject to fewer attacks than an average or minimum average percent inflation. Thus, plaintiffs have demonstrated the possibility of proving aggregate inflation by common proof. *See In re Apple & ATTM Antitrust Litig.*, 2010 WL 3521965 at *11 (N.D. Cal. 2010) (finding plaintiffs had met their burden at the class certification stage where both sides agree plaintiffs' expert employed the proper general methodology but disputed the precise scope of his analysis).

The court need not decide at this stage what degree of evidence plaintiffs must present with regard to aggregate inflation. It seems clear that plaintiffs need not determine with absolute precision the proportion of inflated appraisals or the average percent inflation. By way of analogy, a plaintiff trying to prove that kickbacks were paid over time would not necessarily need to prove

ORDER GRANTING MOTION FOR CLASS CERTIFICATION AND SETTING CASE MANAGEMENT CONFERENCE —No. C-08-00868 RMW
LJP

every single payment nor the exact total amount.  As a general matter, plaintiffs must prove a sufficient degree of inflation – whether expressed as a minimum or an estimate with an error range – that allows a factfinder to conclude that WMB received a thing of value and that, in combination with plaintiffs' other evidence, allows the fact finder to conclude that this thing of value was given pursuant to an agreement that WMB would refer appraisal business to EA.  Plaintiffs' proposed methodology has the potential to yield that sort of proof.

Even if plaintiffs' methodology has flaws, it appears that inflation in the aggregate must be demonstrated by common proof or not at all, so the class certification concerns about individualized inquiry are not implicated.  Plaintiffs' allegation of inflation in the aggregate is analogous to the allegation in *Edwards v. First Am. Corp.*, 610 F.3d 514 (9th Cir. 2010), that the defendant paid $2 million to a title company in exchange for a minority share of the company and an agreement that the title company refer all future title insurance business to the defendant.  In a nonprecedential decision, the Ninth Circuit reversed the denial of class certification, finding that "there is a single, overwhelming common question of fact: whether the arrangement between Tower City and First American violated [RESPA]."  *Edwards v. First Am. Corp.*, 385 Fed. Appx. 629, 631 (9th Cir. 2010).  Although the alleged benefit received by WMB is more distributed and less direct than the $2 million payment in *Edwards*, that does not change the fact that proving this benefit is part of establishing a RESPA violation that taints every appraisal that was referred as part of the agreement.

Although the need to analyze so many individual appraisals feels like the typical situation in which a need for individualized inquiries defeats class certification, that is not the case.  Here, the analysis of each appraisal affects the class as a whole.  Each appraisal plaintiffs can demonstrate was inflated will bolster every class member's claim that WMB received a thing of value – like piling grains of sand on the scale.  Once plaintiffs demonstrate a factually sufficient amount of inflation, they will have established this element on behalf of the class, assuming they also tie WMB's benefit to a comprehensive agreement with EA.  Thus, while the "thing of value" alleged here may be, and almost certainly is, much more difficult to prove than a monetary payment or overcharge of consumers, it is still an issue subject to common proof.  The court is not enthusiastic about the prospect of plaintiffs introducing evidence about hundreds or thousands of appraisals, each

potentially subject to conflicting expert opinions and fact-specific defenses.  However, the volume and complexity of evidence required appears to be a product of plaintiffs' claim being difficult to prove, not a problem introduced by proceeding as a class action.  Thus, the court finds that common questions, subject to common proof, predominate.

**B.     Superiority**

Rule 23(b)(3) lists four non-exclusive factors pertinent to whether a class action is superior to other methods of adjudication, including any other litigation already filed, the desirability of concentrating litigation in this forum, and manageability.  Plaintiffs argue that the Rule 23(b)(3) factors favor certification, emphasizing that they seek to vindicate relatively small claims that would be impracticable to litigate individually and that such individual lawsuits would be a greater burden on the judicial system and far less manageable than a class action.  Defendant argues that the need for individualized inquiry makes a class action unmanageable, that RESPA provides other enforcement mechanisms, and that litigation should not be concentrated in this district.

It appears that certifying a class in this case would confer the usual benefits of a class action: allowing issues to be resolved once and applied to the entire class, and preventing a multiplicity of similar lawsuits.  As discussed above, although the necessary evidence may make this case difficult to manage, it not a problem of individualized inquiries and thus certifying a class does not particularly make management *more* difficult.  Indeed, the benefits of a class action seem greater where the common issues are complex and require extensive evidence.  Similarly, defendant's argument against concentrating litigation in this forum is that witnesses are scattered across the country, but a class action would efficiently resolve a large number of claims without the need to present the same evidence or witnesses in multiple actions.  Notably, this is not a case that requires application of multiple states' laws; at issue is a single, federal cause of action.  In addition, defendant has not shown that the testimony of many geographically distributed appraisers will be required.

Finally, the court does not find that RESPA's provision of attorney's fees, treble damages, and government enforcement mechanisms renders a class action inferior in this case.  Courts outside this circuit are split regarding whether RESPA's fee-shifting and treble recovery provisions render

ORDER GRANTING MOTION FOR CLASS CERTIFICATION AND SETTING CASE MANAGEMENT CONFERENCE —No. C-08-00868 RMW
LJP

1   RESPA claims inappropriate for class actions. *Compare Minter v. Wells Fargo Bank, N.A.*, 274

2   F.R.D. 525, 550 (D. Md. 2011) (certifying class) *with Toldy v. Fifth Third Mtg. Co.*, 2011 WL

3   4634154 at *2-3 (N.D. Ohio 2011) ("The Courts in this Circuit have uniformly found that the

4   RESPA statute's financial provisions bar a finding of superiority under Rule 23(b)(3)."). Comparing

5   the barriers to individual litigation presented in a complex case such as this with the incentives

6   provided by RESPA, the court finds that a class action is superior to individual suits. *See White v.*

7   *E-Loan, Inc.*, 2006 WL 2411420 at *9 (N.D. Cal. 2006) (finding class action superior

8   notwithstanding defendant's argument that the FCRA provides for individual statutory damages and

9   attorney's fees); *Johnson v. General Mills, Inc.*, 275 F.R.D. 282, 289 (C.D. Cal. 2011) (finding class

10  action superior, noting "the great expense that would fall on individual class members if each class

11  member had to provide scientific evidence and expert testimony in separate cases"). In addition,

12  although the New York attorney general has brought an action based on the same conducted alleged

13  here, that action appears limited to New York residents. The hypothetical possibility of further

14  government enforcement should not displace a class action brought by private plaintiffs. *See also*

15  *White v. E-Loan, Inc.*, 2006 WL 2411420 at *9 (finding from the FCRA's authorization of statutory

16  damages and attorney's fees that "FTC enforcement is not designed to be the sole mechanism for

17  protecting consumers' rights created by the FCRA"). Thus, the court finds that a class action is

18  superior to other available methods for adjudicating this controversy and a class should be certified.

19                                       **III. ORDER**

20      For the foregoing reasons, the court:

21  (1) grants certification of a class defined as:

22          All consumers in California and throughout the United States who, on or after June 1,
            2006, received home loans from Washington Mutual Bank, FA in connection with
23          appraisals that were obtained through eAppraiseIT.

24  (2) finds that plaintiffs Felton Spears[2] and Sidney Scholl will fairly and adequately represent the

25  class and hereby appoints them as representatives of the class.

26  _____

27  [2] The court left open in its July 2, 2010 Order the question of whether Spears is an adequate lead
    plaintiff in view of his limited knowledge about the case. The court concludes on balance that he is
28  an adequate lead plaintiff. This determination may be re-visited should Scholl cease acting as a lead
    plaintiff for some reason and if Spears does not maintain some basic understanding of the case.

(3) appoints Stember Feinstein Doyle Payne & Cordes, LLC as interim lead counsel on behalf of the class pending a proposal from plaintiffs as to who should act as lead counsel.

The Braun Law Group, P.C.; the Law Offices of Janet Lindner Spielberg; Stember Feinstein Doyle Payne & Cordes, LLC; and Spiro Moore LLP (formerly Spiro Moss LLP) all have sought appointment as co-counsel for the class.  All have the requisite qualifications and experience to serve as lead counsel.  The briefing filed, however, does not address which, among the four firms, should be selected lead counsel, or, if more than one firm is appointed, how tasks are to be efficiently divided.  The court and defendant also need to know who will act as the contact for the class and can be relied upon as having binding authority. The court generally limits the appointment of lead counsel to no more than two firms.  Appointment of more than two firms seems inconsistent with the reasons for having lead counsel.

The parties shall file by May 11, 2012 a joint proposed form of class notice and joint plan for dissemination of that notice.  If they cannot agree on particular aspects of the notice or the plan for dissemination, they are to include their respective proposals.

A case management conference is hereby set for May 25, 2012 at 10:30 a.m. or a date and time otherwise agreed to by all parties and cleared with the court's courtroom deputy, Jackie Garcia, who can be reached at 408/535-5375.  The parties are to file a joint case management conference statement at least one week before the conference and include in it an efficient plan for completing discovery.  The court anticipates that the parties can formulate a plan that involves far less discovery than that discussed by defendant in its opposition to plaintiffs' renewed class certification motion.

DATED:   April 25, 2012

*Ronald M. Whyte*

RONALD M. WHYTE
United States District Judge

United States District Court
For the Northern District of California