John C. Hueston (164921)
jhueston@irell.com
A. Matthew Ashley (198235)
mashley@irell.com
Justin N. Owens (254733)
jowens@irell.com
840 Newport Center Drive, Suite 400
Newport Beach, California 92660-6324
Telephone:   (949) 760-0991
Facsimile:   (949) 760-5200

Attorneys for Defendant
eAppraiseIT, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FELTON A. SPEARS, JR. and SIDNEY SCHOLL, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>FIRST AMERICAN EAPPRAISEIT (a/k/a eAppraiseIT, LLC), a Delaware limited liability company,<br><br>    Defendant. | Case No. 5:08-CV-00868 (RMW)<br><br><u>CLASS ACTION</u><br><br>**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION IN LIMINE NO. 2 TO EXCLUDE EXPERT OPINIONS OF DR. MARSHA COURCHANE AND DR. GARY FRENCH**<br><br>[Filed concurrently with Declaration of Allison L. Libeu; and [Proposed] Order]<br><br>Date: October 16, 2014<br>Time: 2:00 p.m.<br>Judge: Hon. Ronald M. Whyte<br>Place: Courtroom 6, 4th Floor<br>    280 South 1st Street<br>    San Jose, CA 95113 |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

DEFENDANT'S MOTION IN LIMINE NO. 2 TO
EXCLUDE OPINIONS OF COURCHANE AND FRENCH
Case No. 5:08-CV-00868 (RMW)

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

I.    LEGAL STANDARD ........................................................................................ 2

II.   COURCHANE'S AND FRENCH'S OPINIONS ARE IRRELEVANT ........................... 3

III.  DR. COURCHANE'S OPINION IS BASED ON INSUFFICIENT FACTS
      AND DATA AND AN INAPPROPRIATE METHODOLOGY ..................................... 7

      A.    Dr. Courchane's "Upward Bias" Opinion Is Unfounded And
            Misleading ........................................................................................ 7

            1.    The Median Price Methodology ................................................. 8

            2.    The AVM Methodology ........................................................... 10

            3.    The "Estimated Value" Methodology ...................................... 13

      B.    Dr. Courchane Should Be Precluded From Opining At Trial
            Regarding The Control Group Analysis Performed By Dr. Chris
            James ............................................................................................... 14

IV.   DR.FRENCH'S OPINION IS BASED ON A TAINTED DATA SET AND
      EMPLOYS AN INAPPROPRIATE METHODOLOGY ............................................ 15

      A.    Dr. French Did Not Exercise Sufficient Control Over The Dataset ...................... 15

      B.    French's Sample Set Is Not Representative, And Is Skewed By A
            Single Outlier Appraiser ................................................................. 18

            1.    Dr. French's Sample Set Is Skewed Upward By the Results
                  From Southern California, and from Appraiser Steve Smith ................. 18

            2.    Dr. French's Sample Is Skewed By His Unjustified Focus On
                  Urban Areas ........................................................................... 20

      C.    Dr. French's "Inflation" Framework Is Unworkable And Not
            Objectively Applied ......................................................................... 20

      D.    Dr. French's Opinion Fails to Link "Inflation" To The EA-WaMu
            Relationship, And Does Not Provide Sufficient Guidance To The
            Finder Of Fact ................................................................................. 23

V.    FRENCH AND COURCHANE OFFER CONTRADICTORY AND
      CONFUSING OPINIONS, AND BOTH SHOULD BE EXCLUDED ........................... 24

VI.   CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allison v. McGhan Med. Corp.*,
   184 F.3d 1300 (11th Cir. 1999)................................................................ 3

*Bickerstaff v. Vassar Coll.*,
   196 F.3d 435 (2d Cir. 1999)........................................................... 3, 6

*Black v. Food Lion, Inc.*,
   171 F.3d 308 (5th Cir. 1999)........................................................... 4

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ........................................................... 9

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ................................................... 1, 2, 3, 13

*Daubert v. Merrell Dow Pharms.*,
   43 F.3d 1311 (9th Cir. 1995)........................................................... 10

*Davis v. Carroll*,
   937 F. Supp. 2d 390 (S.D.N.Y. 2013) ........................................... 20

*E.E.O.C. v. Rockwell Int'l Corp.*,
   60 F. Supp.2d 791 (N.D. Ill. 1999) ........................................... 17

*EEOC v. O&G Spring & Wire Forms Specialty Co.*,
   38 F.3d 872 (7th Cir. 1994)........................................................... 11

*Estate of Henry Barabin v. AstenJohnson, Inc.*,
   740 F.3d. 457 (9th Cir. 2014)........................................................... 3

*Gateway Equip.Corp. v. United States*,
   247 F. Supp. 2d 299 (W.D.N.Y. 2003) ........................................... 13

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ........................................................... 9, 13

*Geowey v. United States*,
   886 F. Supp. 1268 (D.S.C. 1995) ........................................... 25

*Guidroz-Brault v. Missouri Pac. R.R. Co.*,
   254 F.3d 825 (9th Cir. 2001)........................................................... 19

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   2008 WL 73681 (N.D. Cal. Jan. 5, 2008) ........................................... 10

*In re Ingan*,
   No. 9:10-bk-10138, 2012 WL 3930328 (Bankr. C.D. Cal. Sept. 10, 2012) .................... 15

*In re REMEC Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010) ........................................... 6

**Page(s)**

*In re TMI Litig.*,
   193 F.3d 613 (3rd Cir. 1999)..................................................................4, 17

*Jinro Am. Inc. v. Secure Invs., Inc.*,
   266 F.3d 993 (9th Cir. 2001)........................................................................8

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ..........................................................................3, 18, 23

*Lentell v. Merrill Lynch*,
   396 F.3d 161 (2d Cir. 2005) .........................................................................6

*Lyman v. St. Jude Medical S.C., Inc.*,
   580 F. Supp. 2d 719 (E.D. Wis. 2008) .......................................................17

*Nathenson v. Zonagen, Inc.*,
   322 F. Supp. 2d 764 (S.D. Tex. 2003) .........................................................4

*Polski v. Quigley Corp.*,
   538 F.3d 836 (8th Cir. 2008).......................................................................10

*Rogers v. Raymark Industries Inc.*,
   922 F.2d 1426 (9th Cir. 1991)......................................................................8

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
   No. 98 CIV, 8272 (RPP), 2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003) .....................17

*Salas v. Carpenter*,
   980 F.2d 299 (5th Cir. 1992)........................................................................7

*Shatkin v. McDonnell Douglas Corp.*,
   727 F.2d 202 (2d Cir. 1984) .......................................................................11

*United States v. Hermanek*,
   289 F.3d 1076 (9th Cir. 2002)....................................................................25

**Other Authorities**

4 J. McLauglin, *Weinstein's Federal Evid.*
   § 702.05(1) (2d ed. 1998)...........................................................................24

Leonard Nakamura, *How Much Is That Home Really Worth? Appraisal Bias and
   House-Price Uncertainty*, Bus. Rev. (Q1 2010) .........................................5, 12

Man Cho and Isaac F. Megbolugbe, *An Empirical Analysis of Property Appraisal
   and Mortgage Redlining*, J. of Real Estate Fin. and Econ. at 45 (1996)...........5, 12, 13, 20

Robert E. Jones et al., RUTTER GROUP PRAC. GUIDE: FED. CIV. TRIALS & EVID., §§
   4:345, 14:180.............................................................................................7

**Page(s)**

**Rules**

Fed. R. Civ. Proc. 26 ................................................................................................ 15

Fed. R. Evid. 402 ....................................................................................................... 1

Fed. R. Evid. 403 ....................................................................................................... 1

Fed. R. Evid. 701 ....................................................................................................... 1

Fed. R. Evid. 702 ........................................................................................ 1, 2, 3, 20

**NOTICE OF MOTION AND MOTION**

**TO ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT, on October 16, 2014, at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 6, 4th Floor, of the above-entitled Court, located at 280 South 1st Street, San Jose, CA 95113, before the Honorable Ronald M. Whyte, Defendant eAppraiseIT, LLC (hereinafter, "EA") will and hereby does move the Court *in limine*, for an order excluding the expert opinions of Dr. Marsha Courchane and Dr. Gary French, experts offered by Plaintiffs.  This motion is made on the grounds that Dr. Courchane's and Dr. French's opinions are impermissible under Federal Rules of Evidence 402, 403, 701, 702, and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  This motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of Allison L. Libeu and exhibits thereto, all documents in the Court's file, any matters of which this Court may take judicial notice, and any evidence or argument presented at or prior to the hearing on this matter.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

Plaintiffs' "inflation in the aggregate" expert case consists of two economics experts who offer four different "inflation" methodologies between them.  Those methodologies are based on rote measurements against such metrics as AVMs, retrospective appraisals, and median home prices.  None of the measurements are accompanied by any opinion or analysis setting forth the minimum value differentials that constitute "inflation," nor do they make any attempt to link the measurement differentials to an agreement or conspiracy as opposed to market wide forces.  The opinions are thus irrelevant and, as demonstrated below, deficient under *Daubert.* These opinions are particularly dangerous because they are designed to have the appearance of scientific rigor when they are nothing of the sort, as demonstrated by the contradictory outcomes they reach.

Plaintiffs' first "inflation" expert, Dr. Marsha Courchane, claims to measure "upward bias" by comparing the value opinions in original appraisals to three different reference point measurements: (i) median home price values, (ii) AVMs, and (iii) owner's estimates/contract prices.  Ex. 39 (Courchane Report) at ¶ 14.  Without even attempting to determine why appraisal

1    values might trend lower or higher than AVMs and/or median home prices, Dr. Courchane deems

2    every instance in which an appraisal is higher than an AVM or median home price to be evidence

3    of "bias" or "inflation."  She then calls it a day, with not an iota of further analysis, including

4    whether the perceived differences in measurements – which are wildly different for the AVM

5    approach as opposed to the median home price approach – measure anything other than the fact

6    that appraisals are different than AVMs and median home prices.  And when original appraisal

7    values equal contract prices or owners' estimates of value, Dr. Courchane finds this "surprising"

8    and suspicious (though she cites no data or support indicating that it is abnormal).  Dr. Courchane

9    also does not attempt to square her findings with extensive data and academic literature that

10   wholly undercuts the conclusions she draws from the perceived measurement differences.  This is

11   not science, it is not the rigor of Ph.D. economics outside of the courtroom, and it is thus not

12   admissible under *Daubert*.

13          Plaintiffs' second "inflation" expert, Dr. Gary French, is actually just a human calculator.

14   He purports to take a "random" sample of retrospective appraisal reviews (requisitioned and

15   collected by Plaintiffs' counsel), measure the difference between the original EA appraisal and

16   Plaintiffs' retrospective review, and then extrapolate those results to all appraisal services

17   performed by EA for WaMu.  Ex. 36 (French 1/31 Report) at 7-12.  However, Dr. French's

18   approach is marred by his blind reliance on data developed by Plaintiffs' counsel, his failure to

19   monitor the objectivity of the appraisal methods that are fundamental to his analysis, and his use

20   of a dataset that is dominated by a single outlier appraiser from Southern California who

21   performed his "retrospective" appraisals using a definition of market value that flatly contradicts

22   what he was required to employ.

23          Plaintiffs' proffered "inflation in the aggregate" experts should be excluded.

24   **I.     LEGAL STANDARD**

25          Expert testimony must "help the trier of fact to understand the evidence or to determine a

26   fact in issue," must be "based on sufficient facts or data," and must be "the product of reliable

27   principles and methods," which "the expert has reliably applied . . . to the facts of the case."  Fed.

28   R. Evid. 702.  As the Ninth Circuit has recently pronounced: "[t]he duty falls squarely upon the

1   district court to act as a gatekeeper to exclude junk science that does not meet Federal Rule of

2   Evidence 702's reliability standards." *Estate of Henry Barabin v. AstenJohnson, Inc*., 740 F.3d.

3   457, 463 (9th Cir. 2014) (en banc).  "[R]eliability and relevancy" are required of expert testimony,

4   and an important test for deciding whether to preclude expert testimony under Rule 702 is whether

5   the expert "employs in the courtroom the same level of intellectual rigor that characterizes the

6   practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152

7   (1999).

8          The burden of persuading the judge to allow the expert to testify is on the party tendering

9   the expert, and is by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

10  **II.      COURCHANE'S AND FRENCH'S OPINIONS ARE IRRELEVANT**

11         The "appraisal inflation" opinions offered by Drs. Courchane and French make no attempt

12  to establish a causal link between the alleged appraisal inflation and the EA-WaMu relationship at

13  issue in this case.  These opinions thus fail the basic test for relevance: they do not make it more or

14  less likely that EA violated RESPA. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999)

15  (excluding expert's "statistical evidence [that] does not make it more or less likely" that defendant

16  was liable); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1320 (11th Cir. 1999) (rejecting

17  expert testimony that "would not assist the trier of fact under Rule 702 because his degree of

18  certainty would not be sufficient to establish probable cause and would thus be irrelevant").

19         The inflation-related opinions of Drs. Courchane and French are Plaintiffs' attempt to show

20  not only that "EA made some changes in the way that the appraisal function was accomplished

21  (such as selecting appraisers from a Proven Appraiser List),"but that these changes actually

22  resulted in inflated appraisals."  Order Denying Mtn. for Class Cert. (Dkt. 209) at 9:19-22; *see

23  also* MSJ Order (Dkt. No. 438) at 30:7-8 (describing the "fundamental liability issue" as "whether

24  there was inflation of appraisals in the aggregate caused by an agreement between WMB and EA

25  to inflate appraisals in exchange for referrals of business.").  Despite the Court's clear admonitions

26  to Plaintiffs that their expert methodology should "eliminate other potential causes" of the

27

28

1   inflation it purports to measure, Dr. Courchane and Dr. French did not even attempt to do so.[1]  Ex.

2   67 (June 24, 2011 Hearing on Renewed Class Cert.) at 3:20-4.  In fact, Dr. Courchane and Dr.

3   French concede that their opinions are limited to identifying the existence of purported inflation in

4   appraised values, and that they are "giving no opinion as to why they're inflated."  Ex. 49 (French

5   Dep.) at 121:1-11; Ex. 46 (Courchane Dep.) at 35:10-12 ("I'm not opining on causation, if that's

6   what you're asking"), and at 189:20-190:10 (same).

7       The failure by Dr. Courchane and Dr. French to address the cause of the appraisal

8   "inflation" they purport to observe is highlighted by their own acknowledgments that forces

9   outside the EA-WaMu relationship may have caused that "inflation."  This in and of itself warrants

10  exclusion.  *In re TMI Litig.*, 193 F.3d 613, 710-11 (3rd Cir. 1999) (excluding expert on "fit"

11  grounds who conceded that the data reflected other additional factors besides plaintiffs' proffered

12  causation narrative:  "Wing's admission that his study was a mortality study only, and not an

13  analysis of an association between dose and mortality, combined with his admission that he was

14  unable to conclude that the elevated mortality was due to radiation exposure clearly demonstrates

15  a lack of 'fit.'"); *Black v. Food Lion, Inc.*, 171 F.3d 308, 313 (5th Cir. 1999) (excluding testimony

16  where expert concede that she did nothing to identify the "cause" of the harm she studied).

17      In her expert report, Dr. Courchane discussed the market-wide forces that were pushing

18  appraisal values upward in 2006-2007:  "A slow response to the falling house prices *across the*

19  *nation* means that house price appraisals continued to come in higher than true market values as

20  prices declined steadily."  Ex. 39 (Courchane Report) at ¶ 34 (emphasis added).  Dr. Courchane

21  testified that the inflationary tendencies described in her report were market-wide phenomena, and

22

23      [1] This is not the first time Dr. French has been criticized for failing to address other
    potential causes of the harm he claims to observe.  In *Nathenson v. Zonagen, Inc.*, 322 F. Supp. 2d
24  764 (S.D. Tex. 2003), Dr. French was the plaintiffs' expert on loss causation.  In ruling on
    defendant's motion for summary judgment on the issue of loss causation, the court found that
25  because Dr. French made insufficient "efforts to eliminate the possibility that other factors" were
    the cause of the harm he was studying, "French has assumed the very fact he is being proffered to
26  prove, *i.e.*," that defendant's conduct caused the alleged harm.  *Id.* at 782 ("Nor did French
    undertake an independent analysis to determine whether and how much any other event might
27  have increased or decreased Zonagen's stock price.").  Finding that "French's expert opinion puts
    Plaintiffs in no better a position than had they simply made legal arguments based upon the court's
28  prior opinions." the *Nathenson* court granted summary judgment in defendant's favor.  *Id.* at 782-
    83.

1   were not unique to the EA-WaMu relationship. Ex. 46 (Courchane Dep.) at 73:2-74:10.

2         Dr. French has similarly opined that he would expect to see wide-spread appraisal inflation

3   occurring in the 2006-2007 period due to "myriad shenanigans" that he claims were pervasive in

4   the mortgage industry. Ex. 38 (July 21, 2014 French Affidavit) at ¶¶ 18-20. Dr. French has even

5   acknowledged the contagious nature of inflated appraisals, as the appraisal values developed by

6   one appraiser are incorporated as comparable property sales by other appraisers when developing

7   their own value opinions. Ex. 49 (French Dep.) at 220:7-13 ("There was all kinds of shenanigans

8   going on. And not only that. If some of them had inflated conspiracies, *they're creating*

9   *comparables in their appraisals related to them for other people to use who aren't even part of the*

10   *conspiracy, so it leaks out to the ones that aren't.*") (emphasis added).

11         Dr. Courchane's and Dr. French's accounts of market-wide inflationary pressures on

12   appraisal values are consistent with academic literature published beginning a decade before the

13   2006-2007 period at issue in this case, and finding that appraised values universally have a

14   persistent upward bias. A study published by economists from Fannie Mae's Office of Housing

15   Research, analyzing appraisal trends in a sample of more than 600,000 observations of "borrower,

16   loan, and property characteristics (including both transaction and appraisal values of each

17   property)," identified strong appraisal bias relative to the actual transaction price:

18            In our data analysis, 80 percent of the cases were appraised at values between 0 and
19            5 percent above the transaction price, only 5 percent of the appraisals were lower
              than the transaction price, and in 30 percent of the cases the appraisal and
20            transaction prices were identical.

21   Ex. 97 (Man Cho and Isaac F. Megbolugbe, *An Empirical Analysis of Property Appraisal and*

22   *Mortgage Redlining*, J. of Real Estate Fin. and Econ. at 45, 48-49 (1996)). A subsequent article

23   by Leonard Nakamura, economist and vice president of the Philadelphia Federal Reserve Bank's

24   Research Department, reviewed the data from Cho and Megbolugbe and similar studies in

25   concluding that: "House appraisals are systematically biased – empirical evidence shows that

26   appraisals have been biased upward in the U.S." Ex. 94 (Leonard Nakamura, *How Much Is That*

27   *Home Really Worth? Appraisal Bias and House-Price Uncertainty*, Bus. Rev. (Q1 2010)) at 15-16

28   (also citing a study finding that "the appraisal price is greater than or equal to the transaction price

1   more than 97 percent of the time.")

2          Because upward valuation biases were present outside the EA-WaMu relationship (as Drs.

3   Courchane and French concede), a causation analysis is indispensable to Plaintiffs' "inflation"

4   analysis. *Lentell v. Merrill Lynch*, 396 F.3d 161, 174, 177 (2d Cir. 2005) (requiring a showing

5   that defendant's conduct, as opposed to market-wide phenomenon, caused the alleged harm); *In re*

6   *REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273 (S.D. Cal. 2010) (excluding testimony of

7   expert who "ma[de] no attempt to account for other possible causes," including "industry-specific"

8   causes; "market-specific" causes; or "other measureable macroeconomic variables"); *Bickerstaff*,

9   196 F.3d at 449 (affirming district court's exclusion of report on grounds that it was "not probative

10  because it omitted the major variables" at issue).  Lacking any evidence that the allegedly inflated

11  appraisals resulted from an illicit agreement between EA and WaMu to intentionally "inflate"

12  values – as opposed to market-wide forces at play in 2006-2007 – the opinions proffered by Drs.

13  Courchane and French are thus irrelevant to the question of EA's liability under RESPA.[2]

14          Indeed, to this day, the control group analysis conducted by EA's expert, Dr. Christopher

15  James, remains the only evidence in the record regarding causation (or lack thereof) between the

16  EA-WaMu relationship and alleged appraisal inflation.  Ex. 40 (James 6/6/14 Report) at ¶¶ 33-39.

17  Controlling for the EA-WaMu relationship, Dr. James's analysis found that on average the EA-

18  WaMu appraisals at issue in this case were more conservatively valued than other appraisals from

19  the 2006-2007 period.  *Id.* at ¶¶ 37-38 (finding that the EA-WaMu relationship had a "statistically

20  significant impact, which is also negative, on the differences in value difference at the 95 percent

21  confidence level"); *id.* at p.17, n.33 (finding that **51.3** percent of appraisal values in the EA-WaMu

22  treatment group exceeded the AVM by 0.5 percent or more, while **56.1** percent of appraisal values

23  in the non-EA-WaMu control group exceed the AVM by 0.5 percent or more).

24          Plaintiffs may argue that the causal link between the EA-WaMu relationship and the

25  _____

26  [2] Drs. Courchane and French's failure to address this evidence of systemic upward
    appraisal bias not only means that they have failed to address the fundamental issue of causation,
27  it is an invitation to the jury to draw an unsupported and erroneous inference that the presence of
    "inflation" is support for the existence of an agreement between EA and WaMu to inflate
28  appraisals, which is of course illogical if one would expect to see such "inflation" even in the
    absence of such an agreement.

allegedly inflated appraisals can be supplied by a handful of emails and the argument of counsel. However, while innuendo from emails and attorney argument may supply the inference of an agreement, it cannot as a matter of law demonstrate that any such agreement *caused* EA appraisals to be "inflated" more than any other appraisals at the time.  For that showing, there must be competent scientific evidence of causation, not just rote measurements of "inflation" (which as demonstrated below, are not only rote but also inherently flawed).  *See, e.g.,* Robert E. Jones et al., RUTTER GROUP PRAC. GUIDE: FED. CIV. TRIALS & EVID., §§ 4:345, 14:180 ("It is improper for counsel to argue inferences not supported by the record"); *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) ("Stated more directly, the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument.") (citation omitted).

In sum, Drs. Courchane's and French's failure even to attempt to establish a causal link between the EA-WaMu relationship and the allegedly inflated appraisals renders irrelevant their opinions regarding appraisal "inflation" or "bias," and those opinions should be excluded.

## III. DR. COURCHANE'S OPINION IS BASED ON INSUFFICIENT FACTS AND DATA AND AN INAPPROPRIATE METHODOLOGY

### A. Dr. Courchane's "Upward Bias" Opinion Is Unfounded And Misleading

Dr. Courchane has done nothing to support her conclusion that the differences she measures between the original EA appraisals and her three reference points (median prices, AVMs, and contract prices/owners' estimates) can be interpreted as indicators of appraisal inflation.  Whereas Dr. Courchane defines appraisal "bias" as a function of the difference between the appraised value and the home's "true value," none of her three reference points actually measure the property's "true value."  Ex. 39 (Courchane Report) at ¶ 28.  A median home price does not tell you what any particular property should appraise for.  And as demonstrated below, AVMs and appraisals do not operate identically and thus would never be expected to yield the same "values" universally.

What's worse, Dr. Courchane's opinions provide the fact finder with no guidance regarding the minimum degree of difference between the EA appraisals and the reference points that would support a finding of inflation.  Ex. 46 (Courchane Dep.) at 212:23-213:23 (confirming that "the

1  minimum degree of upward bias that would otherwise support an agreement to inflate values

2  between WaMu and eAppraiseIT" is "beyond the scope of [her] report").  So, for instance,

3  Dr. Courchane never opines on what would be a normal deviation between appraisals and AVMs.

4  She never analyzes whether AVMs – because of their nature as computer algorithms – tend to

5  trend higher or lower than human-performed appraisals, even though the academic and industry

6  literature and data on AVMs demonstrates just that:  AVMs tend to retrospectively value property

7  differently than human appraisers.

8        Because Dr. Courchane does no principled analysis, her value "differentials" are wholly

9  untethered to what is at issue in this case:  inflation of appraisals in the aggregate resulting from an

10  intentional agreement to inflate.  *Jinro Am. Inc. v. Secure Invs., Inc*., 266 F.3d 993, 1006 (9th Cir.

11  2001) (excluding expert who offered only his "impressionistic generalizations" with "no empirical

12  evidence or studies to support his sweeping indictment.").  And the fact that these meaningless

13  measurements are mouthed by an "expert" holding a Ph.D. in economics renders them both

14  insufficient under *Daubert* and antithetical to a fair trial.  *Rogers v. Raymark Industries Inc.*, 922

15  F.2d 1426, 1431 (9th Cir. 1991) ("Jurors may well assume that an expert, unlike an ordinary

16  mortal, will offer an authoritative view on the issues addressed.").

17              1.       The Median Price Methodology

18        In her median price methodology, Dr. Courchane compared appraisals performed by EA

19  for WaMu with the median sales price (on a quarterly basis) for the zip code in which the

20  appraised property was located.  Ex. 39 (Courchane Report) at ¶¶ 54-56.  Dr. Courchane reported

21  that for 61 percent of the appraisals the difference between the original appraisal value and the

22  median sold prices was greater than 0.5 percent, and on this basis concluded that there is a

23  "definite upward bias" in the original EA appraisal values as compared to the median sales prices

24  values.  *Id*. at ¶ 56.

25        To reach this conclusion of "definite upward bias," Dr. Courchane makes the critical but

26  flawed assumption that "*[i]f* the eappraiseIT appraisals are distributed similarly to values for all

27  other lenders, *then* the appraised values should also follow a similar pattern, with half the values

28  falling above the median and half below."  *Id*. at ¶ 54 (emphasis added). Dr. Courchane's

assumption that the EA-WaMu appraisals "are distributed similarly to values for all other lenders" is flatly contradicted by the evidence in the record, including data from her own report.  Instead, the data indicate that in 2006-2007 WaMu was more heavily engaged in lending on high-value, i.e., "jumbo" mortgages than were other lenders.  **First**, Dr. Courchane has herself compiled HMDA data regarding average and median loan sizes for WaMu, and for all other lenders, in 2006-2007.  Ex. 39 (Courchane Report) at Table 4.  The HMDA data compiled by Dr. Courchane shows that WaMu's average and median loan size was significantly larger than loan sizes for other "OTS-Regulated Lenders" and for "All Lenders" within each of the 5 MSAs she studied.[3]  **Second**, WaMu's emphasis on high-value lending is further confirmed by contemporaneous data from Inside Mortgage Finance,[4] identifying WaMu as the nation's second largest originator of "jumbo" loans and as maintaining a market share in the jumbo market that was more than double its share of the mortgage market generally.  Ex. 99 (Inside Mortgage Finance originator rankings from 2006 and 2007).  Dr. Christopher James succinctly explains why the validity of Dr. Courchane's median price methodology is dependent on her flawed assumption of a similar value distribution:  "All else equal, I would expect that a lender making the larger loans in a geographical area to have appraisals for the corresponding properties that are greater than the median sales price in same geographical area."  Ex. 40 (James 6/6/14 Report) at ¶ 45.

"[W]hen indisputable record facts contradict or otherwise render the opinion unreasonable," the expert opinion is inadmissible.  *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144

---

[3] A comparison of the average and median loan sizes for the EA-WaMu appraisals on the one hand, and for "All Lenders" on the other hand reveals the following: (1) in the Chicago MSA WaMu's average loan size was 36 percent higher and its median loan size 23 percent higher than those for "All Lenders"; (2) in the Los Angeles MSA 'WaMu's average loan size was 52 percent higher and its median loan size 20 percent higher than those for "All Lenders; (3) in the Miami MSA 'WaMu's average loan size was 53 percent higher and its median loan size 22 percent higher than those for "All Lenders"; (4) in the New York MSA WaMu's average loan size was 46 percent higher and its median loan size 20 percent higher than that for "All Lenders"; and (5) in the Riverside MSA 'WaMu's average loan size was 31 percent higher and its median loan size 15 percent than that for "All Lenders."  Ex. 39 (Courchane Report) at Table 4; Ex. 40 (James 6/6/14 Report) at ¶ 50.

[4] During her deposition Dr. Courchane endorsed the reliability of data provided by Inside Mortgage Finance, testifying that, "I use Inside Mortgage Finance in my research and other things, so I'm familiar with what they contain in these tables."  Ex. 46 (Courchane Dep.) at 149:10-22.

1   (1997) (the evidence must be excluded if the court finds "that there is simply too great an

2   analytical gap between the data and the opinion preferred"); *see also Hynix Semiconductor Inc. v.*

3   *Rambus Inc.*, 2008 WL 73681, at *5 (N.D. Cal. Jan. 5, 2008) ("A reasonable jury cannot credit

4   [expert] testimony that fails to reflect reality.") (Whyte, J.).  Dr. Courchane's required assumption

5   of a "similar" distribution between EA-WaMu appraisals and the values for all other lenders is not

6   only unsupported, it is flatly contradicted by the undisputed evidence of WaMu's emphasis on

7   high-value lending.  Dr. Courchane should be precluded from presenting her median price

8   methodology at trial.

9             2.    <u>The AVM Methodology</u>

10        In her "AVM" methodology, Dr. Courchane compares the EA appraisals to a second

11   reference point: automated valuation models ("AVMs").  As described by Dr. Courchane, an

12   AVM is "a statistical program [that] evaluates the property based on particular characteristics of

13   the house, the neighborhood, and other economic factors at the order date of the appraisal.  The

14   value is not based on an in-person site appraisal."[5]  Ex. 39 (Courchane Report) at ¶ 60.  Using a

15   threshold of just .5% for measuring a difference between the EA appraisals and the AVMs, Dr.

16   Courchane determined that 52.9% of the EA appraisals exceeded the AVM, with an average value

17   difference of 2%.[6]  *Id*. at ¶ 63, Table 9.  In other words, Dr. Courchane found that the distribution

18   of original appraisals above and below AVMs was hardly different than 50/50.  Notably, one of

19   the five MSAs studied by Dr. Courchane actually exhibited downward "bias": in Miami only 44%

20   of appraisals exceeded the AVM value while 50.3% of appraisals were below.  *Id.*

21        Dr. Courchane's AVM methodology should be excluded because it is an untested and

22   unreliable means of testing for appraisal "inflation."  *See, e.g., Polski v. Quigley Corp.*, 538 F.3d

23   836, 840 (8th Cir. 2008) (affirming exclusion of "causation theory [that] relied on an unproven and

24   indeed untested premise"); *Daubert v. Merrell Dow Pharms. ("Daubert II"),* 43 F.3d 1311, 1319

25    

26          [5] Dr. Courchane did not develop the AVM model herself, but ordered "retrospective" AVM values for the properties in the five MSAs from Collateral Analytics, a third-party vendor. Ex. 39 (Courchane Report) at ¶¶ 52-53.

27          [6] Dr. Courchane's "inflation" conclusions from her median comparison results are radically

28   different than her AVM comparison results, calling her entire methodology into question.  Ex. 40 (James 6/6/14 Report) ¶ 51 (comparing Courchane Report Table 6 with Table 9).

(9th Cir. 1995) (holding that at the very least, it must be shown that the expert's methods are accepted by "a recognized minority" of experts in the relevant field).  While Dr. Courchane concedes that AVMs are not appraisals, and are instead estimated property values generated from a "statistical program" that does not involve an in-person inspection, she nonetheless trumpets her direct comparison of AVMs to appraised values as evidence of purported "upward bias" in EA's appraisals.  Ex. 39 (Courchane Report) at ¶¶ 69-70.  The testimony from Plaintiffs' own appraisal practices expert rejects this approach.[7]  Dawn Molitor-Gennrich, who describes herself as an expert with "over 28 years of experience in real property analysis and appraisal," testified as follows regarding the use of AVMs as a comparison point for actual appraisals:

> Ms. Molitor-Gennrich:  So to use information that appears to be taken from the use of automated valuation models that provide an estimate of pricing and compare it to an opinion of value is ***apples and oranges***.

> Counsel: Do you think it's apples and oranges to compare AVMs to appraisals?

> Ms. Molitor-Gennrich: It's a response to -- in looking at this information, my response is, as said earlier, they're not the same thing. So would you compare something that's not the same thing? I wouldn't.

Ex. 57 (Molitor-Gennrich Dep.) at 312:6-21.

Tracking the language used by Plaintiffs' own appraisal practices expert to describe Courchane's methodology, circuit courts have held that an "***apples and oranges*** comparison simply cannot withstand scrutiny."  *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984) (affirming exclusion of expert testimony) (emphasis added); *EEOC v. O&G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 891 (7th Cir. 1994) (expert's statistical model that lower court deemed "was like comparing ***'apples to oranges'***" held not scientifically valid) (emphasis added).  The fact that Plaintiffs' own appraisal practices expert dismisses the comparison of AVMs and appraisal values as "apples and oranges" further highlights Dr. Courchane's failure to use a control group to isolate the cause of the differences she observes.  *See supra*, Section IV.  Without a control group, it is impossible to know whether the higher appraisal values relative to AVMs are

---

[7] Dr. Courchane acknowledges that she is not an appraisal practices expert.  Ex. 46 (Courchane Dep.) at 78:20-22.

1    attributable to the EA-WaMu relationship, to market-wide phenomenon unrelated to the EA-

2    WaMu relationship, *or simply to the inherent differences between AVMs and appraisals.*

3          Indeed, when compared to academic literature on the "systematic" upward bias that has

4    been measured in appraisals dating back to the 1990s, Dr. Courchane's AVM analysis indicates

5    that the EA-WaMu appraisal values are conservative: only 52.8% of EA-WaMu appraisals exceed

6    AVMs, compared to 65% of nationwide appraisals that exceed purchase price.  Ex. 97 (Cho and

7    Megbolugbe (1996)) at 48-49.  And when EA's expert applied a control group methodology to the

8    AVM-to-appraisal comparison employed by Dr. Courchane, he found that the control group

9    appraisals (*i.e.*, those not performed by EA for WaMu) exceeded the AVM more frequently than

10   did the EA-WaMu appraisals.  Ex. 40 (James 6/6/14 Report) at ¶¶ 33-39.  In other words, by

11   controlling for the variable of the EA-WaMu relationship, Dr. James was able to eliminate that

12   relationship as a potential cause of the "bias" observed by Dr. Courchane.

13         In its September 16 Order addressing EA's summary judgment motion, the Court noted

14   that a "control group argument is not necessarily valid" when applied to Plaintiffs' comparison of

15   EA appraisals to "a new retrospective appraisal from the standpoint of a person at the time of the

16   original appraisal," because the retrospective appraisal may itself account for the impact of

17   market-wide inflation.  Dkt. No. 438 at 17:22-18:2.  Even assuming this is true,[8] this does not cure

18   the defects in Courchane's *AVM methodology* because Dr. Courchane has provided no indication

19   that AVMs are *ever* an appropriate comparison point for measuring inflation in original appraisals.

20   For example, the academic literature discussed above concludes that actual human appraisers

21   exhibit a persistent upward bias and exceed the property's transaction price "more than 97 percent

22   of the time."  Ex. 94 (Nakamura, *How Much Is That Home Really Worth?)* at 15.  But Dr.

23   Courchane has done nothing to show that the computer algorithms generating AVMs exhibit a

24   similar bias.  She therefore cannot rely on a mechanically measured "difference" between AVM

25   values and appraisal values to conclude that appraisals were "biased."

26   _____

27        [8] As shown in EA's concurrently filed Motion to Exclude Testimony of Steven Smith (the "Smith Motion"), the pervasive "hindsight bias" that infected Plaintiffs' retrospective appraisal reviews, and Smith's deviation from the very definition of market value used by the original

28   appraisers, indicates that these reviews were not in fact performed "from the standpoint of a person at the time of the original appraisal."

1       In sum, there is no basis whatsoever to conclude that the differences Dr. Courchane

2 observes between AVMs and appraisal values are indicative of "inflation" caused by the EA-

3 WaMu relationship, and not from fundamental differences between the two methods of

4 measurement, as well as market-wide phenomena.

5                3.      The "Estimated Value" Methodology

6       Dr. Courchane's "estimated value" methodology is the classic example of an opinion

7 founded on nothing more than the expert's own *ipse dixit*. The premise of this approach is simple

8 enough: Dr. Courchane looks at how frequently appraisal values are equal to (13.7%), above

9 (23.3%), or below (63.0%) the value as negotiated by the buyer and seller (in a purchase) or as

10 estimated by the buyer (in a refinance). Ex. 39 (Courchane Report) at ¶ 67, Table 13; Ex. 46

11 (Courchane Dep.) at 203:10-25. And from this data Dr. Courchane opines that she "would be

12 surprised that 14 percent of the time the appraiser hit exactly the value that the buyer and seller

13 agreed to." Ex. 49 (Courchane Report) at ¶ 75; Ex. 46 (Courchane Dep.) at 205:25- 206:16.

14 However, Dr. Courchane does not cite any data in support of her "surprise" opinion, nor does she

15 cite any academic literature in support of it. It is simply her say-so. *Gen. Elec. Co. v. Joiner,* 522

16 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a

17 district court to admit opinion evidence which is connected to existing data only by the *ipse dixit*

18 of the expert."); *Gateway Equip.Corp. v. United States*, 247 F. Supp. 2d 299, 309 (W.D.N.Y.

19 2003) (excluding report where expert "provided *ipse dixit* conclusions which do not take into

20 account relevant information," that were "utterly unhelpful").

21       Empirical research on nationwide appraisal data show that in a sample of more than

22 600,000 observations of home purchase loans, "for more than 30 percent of our sample, the

23 appraisal and transaction values are identical." Ex. 97 (Cho and Megbolugbe (1996)) at 48-49. In

24 other words, the 13.7% match rate Dr. Courchane observes between EA-WaMu appraisals and the

25 owner's estimate or negotiated contract price is "surprising" only because it is so low. Thus, far

26 from tending to show or support an inference of intentionally "inflated" appraisals, it shows that

27 EA's appraisals matched the contract price/owner's estimate even less often than the industry

28 average. Indeed, Dr. Courchane never explains why an appraiser – who is *required* to reference

1   the contract price in developing an opinion of fair market value – would not be expected to reach a

2   similar conclusion roughly 14% of the time.  Because it lacks any scientific basis or support and

3   reaches a conclusion flatly contradicted by the empirical evidence, Dr. Courchane's "estimated

4   value" opinion should be excluded.

5       B.      Dr. Courchane Should Be Precluded From Opining At Trial Regarding The Control

6               Group Analysis Performed By Dr. Chris James

7       Plaintiffs' counsel made a strategic decision not to permit Dr. Courchane to review Dr.

8   James's control group methodology before her deposition, thereby depriving EA of the ability to

9   explore any such opinions before trial.  Consequently, Dr. Courchane should be precluded from

10  providing such testimony at trial.

11      Given the importance of Dr. James's control group to the parties' expert cases, EA spent

12  considerable time during the Courchane deposition exploring her responses to Dr. James's report

13  and methodologies.  Indeed, at one point during her deposition Dr. Courchane quipped, "I don't

14  think I've ever had a deposition where all of the focus is on someone else's expert report."  Ex. 46

15  (Courchane Dep.) at 146:24-147:2.  Yet when asked about the James control group methodology,

16  Dr. Courchane repeatedly claimed that she could not assess the validity of that methodology

17  because she had not reviewed the underlying data.

18      Dr. Courchane did not review the data necessary to her analysis of Dr. James's control

19  group because Plaintiffs' counsel did not provide it to her.  EA produced the data underlying Dr.

20  James's control group methodology on June 20, 2014, nearly six weeks before Dr. Courchane's

21  deposition,[9] yet Dr. Courchane's testimony makes clear that she was never given the opportunity

22  to review that data.  For example, in explaining why she was not prepared to opine on the control

23  group methodology, Dr. Courchane testified: "I'd want to do to actually see whether this made

24  sense is to have all of the 750,000 properties so I can see the biases that might be inherently

25  present in his choice of the control group…. I don't have the data to do that.  I don't have the

26  750,000 properties."  Ex. 46 (Courchane Depo.) at 140:13-141:14.  In fact, this data – including

27

28      [9] See Ex. 106 (June 20, 2014 email from EA counsel to Plaintiffs' counsel, transmitting
    EA's expert document production).

the "750,000 properties" referenced by Dr. Courchane (764,483 to be exact) – was provided to Plaintiffs' counsel as part of EA's June 20, 2014 expert document production.  But because Plaintiffs' counsel never provided Dr. Courchane with the data she needed to assess the control group topic before her deposition, EA was deprived of the opportunity to explore the bases for Dr. Courchane's opinion in advance of trial.  *In re Ingan*, No. 9:10-bk-10138, 2012 WL 3930328, at *4 (Bankr. C.D. Cal. Sept. 10, 2012) (affirming expert exclusion and noting that Rule 26(a)(2) of the FRCP "prevents experts from 'lying in wait' to express new opinions at the last minute, thereby denying the opposing party the opportunity to depose the expert on the new information or closely examine the expert's new testimony.") (quotations omitted).  Dr. Courchane should be precluded from offering any testimony at trial regarding the use of a control group to test causation between inflated appraisals and the EA-WaMu relationship.

## IV.    DR. FRENCH'S OPINION IS BASED ON A TAINTED DATA SET AND EMPLOYS AN INAPPROPRIATE METHODOLOGY

Dr. French does no real analysis of his own.  Instead, he performs simple mathematical calculations with data supplied to him by Plaintiffs' counsel and their retained retrospective appraisal review experts.  Even the set of 450 sample loans used in Dr. French's calculations were not selected by him, but were picked by Plaintiffs' counsel who reviewed individual files to determine whether they should be included in the sample or "skipped."  Even worse, Dr. French's calculations result from unprincipled and subjective methodologies, and a blind reliance on the data provided to him by others.  The data relied upon by Dr. French is fatally flawed, a fact which Dr. French has done nothing to address.

### A.    Dr. French Did Not Exercise Sufficient Control Over The Dataset

The starting point for Dr. French's methodology is his sample set of 450 loans, which he claims were randomly selected from the following Metropolitan Statistical Areas, or "MSAs": Los Angeles, Riverside, Chicago, New York, Miami.  Ex. 36 (French 1/31 Report) at ¶¶ 13-15.  Despite the importance of this 450-loan dataset to his analysis, Dr. French exercised virtually no control or supervision over its development.  In fact, the 450-loan set was developed by attorneys from the Plaintiffs' law firm sifting through individual loan files and making judgment calls as to

1   whether a loan should be included in the sample set or not – *and it was not until Plaintiffs' counsel*

2   *had reviewed nearly 1,000 loans that they decided upon the sample set of 450 provided to Dr.*

3   *French.*  Ex. 37 (French Supp. Report) at Table 2 (see line 3, identifying 994 as the "[n]umber of

4   EA appraisals examined to achieve sample of 450.").

5          As part of expert discovery, Dr. French produced a spreadsheet containing "column H,"

6   identifying the reasons developed by Plaintiffs' counsel – and not Dr. French or his team – as to

7   why they did or did not include a particular loan in the 450 sample.  Ex. 70 (PLAINTIFF001175);

8   Ex. 49 (French Dep.) at 76:3-6 ("[B]ut we didn't provide the information in column H ourselves.

9   We just used it to – to - to include or not include the various random number properties in the

10  sample.").  But the reasons provided by Plaintiffs' counsel for excluding a loan were never

11  independently examined by Dr. French.  These reasons included:

12        • "SKIP: Per reviewer, no credible review can be done of the EA appraisal
            because of significant discrepancies between the appraisal report and public

13          records" (Ex. 70 at H-293)

14        • "SKIP: cannot review due to long term lease control and no lease data" (Ex.
            70 at H-437)

15
          • "SKIP: Reviewer says absence of MLS data is a unique circumstance [stet]

16          preventing him from doing quality review…" (Ex. 70 at H-805)[10]

17         When asked about the reasons given by Plaintiffs' counsel for excluding loan files from the

18  450 loan sample set, Dr. French admitted that he not only lacked the expertise to determine

19  whether these were legitimate reasons for exclusion, but that he wasn't even sure if the "reviewer"

20  making these determinations was Plaintiffs' counsel or one of the retrospective appraisal

21  reviewers.  Ex. 49 (French Dep.) at 75:8-23 ("Frankly, I'm not certain if that means the person

22  reviewing the files or the reviewer who's the person doing the review appraisal.").  And outside the

23  ten loan files out of 994 that Dr. French reviewed as part of his "spot check," he did nothing to

24  confirm the accuracy of the reasons provided by Plaintiffs' counsel for "skipping" loans and

25

26        [10] This "skip" in particular suggests bias in the selection of the sample. The availability of
    nearby and similar comparable data was supposed to be a measuring stick for whether the original
27  appraisal was "complex" under Plaintiffs' appraisal review framework – which would lead to a
    higher threshold before Plaintiffs would find "inflation" – not a basis to avoid a property
28  altogether.  Ex. 33 (Wiley Rebuttal Report) at 3-5.

1    excluding them from the sample set.  *Id*. at 77:1-12.

2          Federal courts require that the testifying expert exhibit a sufficient degree of control and

3    supervision over development of the dataset to be studied, and Dr. French has fallen woefully

4    short in this regard.  For example, in *In re TMI Litig.*, 193 F.3d 613 (3rd Cir. 1999), the Third

5    Circuit excluded expert testimony due to the expert's failure to exercise proper control and

6    supervision over the data included in his analysis, finding that the expert "had absolutely no part in

7    the selection of the participants he studied," but merely performed "the statistical calculations

8    regarding the data [] provided" to him by non-testifying litigation consultants.  *In re TMI Litig.*,

9    193 F.3d at 708 & n.148.  Apropos here, the Third Circuit held that:

10              Trial Plaintiffs have not referred us to anything in the record from which we could
                determine that the [consultants] are qualified to select the participants and the data
11              for a cohort study.  Consequently, the data upon which [the expert] relied are
                woefully lacking in Rule 703 reliability. . . . ***There is no way to insure that***
12              ***participants were not selected or excluded in a manner that would bias the study.***
                *Id.* at 708

13

14         Dr. French's blind reliance on data compiled by others is even more egregious than the

15   facts at issue in *TMI Litigation*, because Dr. French received his data not from litigation

16   consultants but directly from Plaintiffs' counsel.  *See, e.g., Rowe Entm't, Inc. v. William Morris*

17   *Agency, Inc*., No. 98 CIV, 8272 (RPP), 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003)

18   ("[A]ny expert should be aware that a party and counsel in a litigation have an interest in the

19   outcome and that an expert study should not be dependent on the information they supply.");

20   *E.E.O.C. v. Rockwell Int'l Corp.*, 60 F. Supp.2d 791, 797 (N.D. Ill. 1999) (striking report of

21   plaintiffs' expert as unreliable where the expert "relied on materials, reports and summaries given

22   to him by counsel, and failed to verify the information from reliable, independent sources.");

23   *Lyman v. St. Jude Medical S.C., Inc*., 580 F. Supp. 2d 719, 726-27 (E.D. Wis. 2008) (same).

24   Tellingly, Dr. French admitted that analysis for the 450-loan sample set could have been

25   performed by research analysts under his direct supervision at Nathan Associates, but that *it was*

26   *decided by Plaintiffs' counsel* that attorneys – and not an independent analyst – should review the

27   loan files.  Ex. 49 (French Dep.) at 90:9-91:16.  Dr. French's total lack of control over the dataset

28   used in his calculations not only renders that data unreliable, it confirms that Dr. French did not

1  approach this assignment with "the same level of intellectual rigor that characterizes the practice

2  of an expert in the relevant field."  *Kumho Tire*, 526 U.S. at 152.

3       B.    French's Sample Set Is Not Representative, And Is Skewed By A Single Outlier

4             Appraiser

5       In addition to his failure to adequately oversee the development of the 450-loan sample set,

6  the composition of Dr. French's dataset suffers from further flaws: First, by requiring that 55

7  percent of the sample come from two contiguous MSAs in Southern California (Los Angeles and

8  Riverside), Dr. French created a dataset that is dramatically skewed by the outlier results obtained

9  from the lone appraiser retained by Plaintiffs in that region; Second, by weighting the sample

10  towards large metropolitan regions Dr. French has adversely selected regions most likely to

11  exhibit "inflation," and has created a sample that is not representative of the population as a whole.

12       1.    Dr. French's Sample Set Is Skewed Upward By the Results From Southern

13             California, and from Appraiser Steve Smith

14       Dr. French has radically over-weighted his sample set towards a single appraiser in a single

15  geographic region: Steven Smith in Southern California.[11]  Dr. French's own tables show that the

16  Los Angeles and Riverside MSAs account for just 21.4 percent of EA appraisals nationwide, yet

17  these two MSAs comprise a whopping 56 percent of the sample set (254 out of 450 loans).  Ex. 36

18  (French 1/31 Report) at Tables 3, 4.  Dr. French's decision to over-emphasize Southern California

19  in his sample is exacerbated by the anomalous methods used, and results reached, by Mr. Smith.

20       As discussed at length in the concurrently filed Smith Motion, Mr. Smith is an outlier

21  among all other appraisers in this case, and has completely ignored the accepted definition of

22  market value in employing methodologies that drastically decrease his appraised values (and thus

23  create large "differences" between his values and those of the original EA appraisals he is

24  reviewing).  One glaring example of Mr. Smith's biased methodology is his use of "financing

25

26  **[11]** Dr. French claims not to know why Plaintiffs' counsel opted to use a single appraisal
   reviewer for both Los Angeles and Riverside counties (over half of the sample), when they used a
27  total of six different appraisers to cover the other three MSAs in the other half of the sample:  **Q**: Do
   you have any idea why there was only one review appraiser used in the LA and Riverside MSAs?
28  **A**: No.  Ex. 49 (French Dep.) at 180:14-20.  This not only demonstrates the bias in Dr. French's
   sample, but further evidences his lack of control over the data inputs in his analysis.

adjustments" based on what he calls "low equity" property sales. Specifically, when the financing of a comparable property includes a down payment of 10 percent or less, Mr. Smith assumes that the market price is not the actual market value. Instead, Mr. Smith assumes that the real market value – which he redefines – was 5-10 percent lower than the agreed upon sales price between willing buyer and willing seller. Smith Motion at 8-14. According to Mr. Smith, borrowers who put 10 percent or less down on their homes universally overpay by precisely 5-10 percent because such buyers "are not concerned about value or price."[12] *Id*. at 8.

Mr. Smith's biases are far from harmless. In fact, he single-handedly drives the "inflation" results reached by Dr. French. Although Plaintiffs commissioned reviews in five different Metropolitan Statistical Areas ("MSAs") and by seven different appraisers, Mr. Smith completed a majority of Plaintiffs' reports—219 retrospective desk reviews on properties located in the Los Angeles and Riverside MSAs. *Id*. at 6. Even taking into account the proportion of Plaintiffs' review reports that he completed, Mr. Smith has an outsized impact on French's inflation conclusions: Three-quarters of the appraisals identified by Dr. French as showing a "strong probability" of inflation, and eighty percent of those that Dr. French deems "virtually certain" to be inflated, were reviewed by Mr. Smith. Indeed, Mr. Smith concluded that *91 percent* of the EA appraisals he reviewed overstated the value by more than five percent (as compared to 37 percent for the Plaintiffs' other six retrospective reviewers). *Id*.

The outsized impact of Southern California appraisals performed by Mr. Smith not only demonstrates the bias in Dr. French's sample, but further evidences his lack of control over the data inputs used in his analysis. Dr. French's blind reliance upon appraisal values provided by Mr. Smith – a retrospective appraisal reviewer whose flawed methodologies make him an outlier among the hundreds of appraisers at issue in this case – so thoroughly taints the outcome of the "inflation in the aggregate" analysis that exclusion is the only remedy. *See, e.g., Guidroz-Brault v.*

---

[12] Because "low equity" financing was a normal part of the lending market in 2006-07, *none* of Plaintiffs other six retrospective experts employed financing adjustments for low equity loans, *none* of the 265 professional appraisers whose work was reviewed by Plaintiffs' experts in this case employed such financing adjustments, and *none* of EA's four rebuttal retrospective appraisal experts employed such financing adjustments.

1   *Missouri Pac. R.R. Co.*, 254 F.3d 825, 831-32 (9th Cir. 2001) (ruling expert testimony

2   inadmissible:  "In the case at bar, our study of the record does not reveal the existence of

3   underlying facts which could support the opinions"); *Davis v. Carroll*, 937 F. Supp. 2d 390, 415

4   (S.D.N.Y. 2013) (excluding appraiser who deviated from typical appraisal methods and noting

5   that "when presented with a novel methodology—or a novel application of a familiar

6   methodology—courts must conduct with particular care their Rule 702 inquiry into reliability").

7              2.      Dr. French's Sample Is Skewed By His Unjustified Focus On Urban Areas

8              Even putting aside his unwarranted emphasis on Mr. Smith's Southern California

9   retrospective appraisal reviews, Dr. French concedes that the five MSAs used in his sample set are

10  not representative of the full population of EA appraisals at issue in this case.  According to Dr.

11  French, he selected the five MSAs on the basis of one criteria: they are big.  Ex. 49 (French Dep.)

12  at 46:3-13.  Dr. French acknowledged at his deposition that the sample set consists solely of loans

13  from "from urban regions," and that non-urban regions are underrepresented in his sample.  *Id*. at

14  50.  When asked whether he did anything to test the representative nature of these five MSAs to

15  the entire population of EA appraisals, Dr. French responded that there was "[n]o need to, so I

16  didn't, no."  *Id*. at 50:19-51:2.

17             In fact, appraisals from urban and non-urban regions <u>do</u> exhibit significant differences in

18  their valuation patterns, and thus Dr. French did "need to" assess whether his five MSAs were

19  representative of the full population (which they were not).  As reported in the academic literature,

20  "properties in nonmetropolitan areas are most likely to exhibit negative appraisal bias"; in other

21  words, appraisals on properties outside the large urban areas that Dr. French focuses are more

22  likely to come in "low" than appraisals in urban regions.  *See* Ex. 97 (Cho and Megbolugbe

23  (1996)) at 49.  Dr. French's failure to select a sample that includes both urban and non-urban

24  regions means that his results do not reflect a representative measurement of the  population at

25  issue.

26       C.      Dr. French's "Inflation" Framework Is Unworkable And Not Objectively Applied

27             Under the framework employed by Dr. French, when the original appraisal was "non-

28  complex" and the review value differed from the original value by 5-10 percent, Plaintiffs claim

1  there is a "strong probability" that the original appraisal was "inflated," and when the difference is

2  greater than 10 percent Plaintiffs claim inflation is "virtually certain."  Ex. 36 (French 1/31

3  Report) at ¶¶ 18-19.  When the difference is greater than 10 percent, inflation – according to

4  Plaintiffs – is "virtually certain."  *Id.*  But for complex assignments there is a higher threshold for

5  finding "inflation."  Borrowing from the appraisal experts, Dr. French finds that value inflation is a

6  "strong probability" or a "virtual certainty" at differences of 10-15 percent and greater than 15

7  percent, respectively.[13]  *Id.*  The reliability of Dr. French's "inflation" calculations are thus

8  dependent on the objectivity of the reviewers' threshold complexity conclusions.  Dr. French stated

9  in his report that defining complexity by reference to the objective guidelines established by

10  Fannie Mae and Freddie Mac would avoid uncertainty:

11        Mr. Wiley defines a "non-complex" assignment as one "for which the available
          comparables fit within the accepted guidelines of Fannie Mae and Freddie Mac (i.e.
12        the comparables sold within the last 6 months, are located within one mile, require
          gross adjustments less than 25%, etc.)" and a complex assignment as one "for
13        which such data does not exist."

14  Ex. 36 (French 1/31 Report) at 9, n.14.  Plaintiffs' retrospective reviewers were thus instructed to

15  follow this complexity framework in completing their reviews.  Ex. 29 (Gregoire Report) at 14.

16        Dr. French made no effort to confirm that the appraisers feeding him the inputs for his

17  inflation calculations were following the complex/non-complex distinction.  Ex. 49 (French Dep.)

18  at 83:13-23 ("Did I confirm that?  No, I didn't.").  In fact, as discussed at length in Defendant's

19  concurrently-filed motion to exclude the testimony of Mr. Gregoire, all seven of Plaintiffs'

20  retrospective reviewers ignored the complexity definition.  *See, e.g.*, Ex. 59 (Simmons Dep.) at

21  253:8-25, 254:4-12, 255:5-10; Ex. 62 (Sweeney Dep.) at 142:17 21; Ex. 56 (Miller Dep.) at 228:7

22  18; Ex. 107 (Rascati Dep.) at 167:6 168:17, 200:7 201:14; Ex. 21 (Caruso Dep. Ex. 359) at

23  NEWYORK00696, NEWYORK00701.  For example, Mr. Gargano designated a property non-

24  complex although his own report states that the subject is "atypical" and that data conforming with

25  the Fannie Mae guidelines was not available to the original appraiser.  *See* Ex. 50 (Gargano Dep.

26

27    _____
      [13] Defendant's position is that this framework is contrary to industry practice and
      understanding regarding the margin of error inherent in appraisal practice and that, moreover, it is
28    inappropriately employed in Plaintiffs' case since Plaintiffs have withdrawn its proponent, Wiley,
      as a testifying expert.

Ex. 310) at CHICAGO00394.  Mr. Smith's flaunting of the complex/non-complex distinction was especially egregious; Mr. Smith cannot say he even compared his data to the Fannie Mae guidelines.  Ex. 60 (Smith Dep.) at 214:7-11 ("Q. And when you in fact were deciding for any particular assignment whether that assignment was complex or noncomplex, did you compare the sales you used to these guidelines?  A. No.").  Indeed, Mr. Smith repeatedly characterized appraisal assignments as "non-complex," thereby permitting a finding of "inflation" at far lower thresholds than for "complex" properties, despite using comparables that *by definition* would mean the appraisal assignment was complex under the framework proffered by Gregoire and Wiley.  *See* Ex. 35 (Chandler Report) at ¶¶ 23-24.

In response to the obvious subjectivity injected into Dr. French's analysis by the retrospective reviewers' disregard for the complex/non-complex distinction, Plaintiffs' appraisal experts now claim that they never really meant that an appraisal was complex just because the comparables did not fit within the Fannie Mae guidelines, but that this is a "judgment" call.  Ex. 51 (Gregoire Dep.) at 170:7-178:1.  However, this new spin on the complex/non-complex distinction is contradicted by Mr. French's own written expert report, which unambiguously states that a "non-complex" property is one for which "the available comparable sales fit within the accepted guidelines of Fannie Mae and/or Freddie Mac."  Ex. 36 (French 1/31 Report) at 9, n.14.  Indeed, according to Danny Wiley – Plaintiffs' now withdrawn expert who originally developed the framework used by Dr. French – the entire point of using an objective standard was to alleviate any "difficulty in classifying an assignment as complex or non-complex."  Ex. 33 (Wiley Rebuttal Report) at 4.  This makes good sense in light of Dr. French's approach:  how could the "inflation in the aggregate" results from the five MSAs be extrapolated to a nationwide population of appraisals if every retrospective appraiser was subjectively determining "complexity" in his or her own unique way?  Yet this appears to be precisely what has happened, such that the "inflation" assumptions that follow are purely subjective and thus impossible to test.

Once again, Dr. French's failure to monitor and control the data he relies upon undermines the reliability of his entire methodology.

D.     <u>Dr. French's Opinion Fails to Link "Inflation" To The EA-WaMu Relationship,</u>
<u>And Does Not Provide Sufficient Guidance To The Finder Of Fact</u>

In the final step of his analysis, Dr. French calculates the purportedly "inflated" appraisals in his 450-loan sample as a percentage of the entire sample, and then extrapolates those results to the nationwide population. Ex. 36 (French 1/31 Report) at ¶¶ 21-23. Dr. French concludes that 14.6% of appraisals nationwide are inflated with "virtually certain" probability. Ex. 37 (French Supp. Report) at Table 1. Despite this thin margin of "inflation," Dr. French makes no attempt to identify the minimum extent of inflation necessary to support Plaintiffs' claim of an illicit agreement between EA and WaMu. Ex. 49 (French Dep.) at 165:3-14 ("No one's asked me to answer that question, so I don't know."). And as discussed above, Dr. French has further disclaimed any attempt to link the EA-WaMu relationship at issue in this case to the "inflation" he purports to measure, either in the sample or nationwide. *See supra*, Section IV; Ex. 49 (French Dep.) at 121:1-11 ("Q: So you're giving no opinion as to why they're inflated. Is that an accurate statement? A: Yes, that's an accurate statement.").

Dr. French's complete failure to address causation means that he is incapable of "eliminat[ing] other potential causes" of the inflation his analysis purports to measure. *See supra*, Section II. This flaw is magnified by Plaintiffs' use of retrospective *desk reviews of the existing EA appraisal,* instead of conducting full retrospective appraisals of the properties. By requiring the retrospective reviewers to analyze the existing appraisal in reaching their own opinion of value, Plaintiffs' framework dramatically heightens the risk of hindsight bias by focusing the reviewers' attention on perceived flaws in the original reports. Ex. 35 (Chandler Report) at ¶¶ 36-42. Plaintiffs could have asked their experts to perform "blind" full retrospective appraisals, and provided them with the property address and effective date of the original appraisal; there was no need to bias their opinions by also requiring a review of the original EA appraisal report. *Id.*

It would be improper to ask a jury to determine whether Dr. French's observations support a finding that EA agreed to inflate appraisal values, when Dr. French himself (or any other expert retained by Plaintiffs) did not do so. *See, e.g., Kumho Tire Co.,* 526 U.S. at 156 (trial court must decide whether expert opinion will "assist the jurors 'in deciding the particular issues in this

1 case.'") (*quoting* 4 J. McLauglin, *Weinstein's Federal Evid.* § 702.05(1) (2d ed. 1998)).

2 **V.   FRENCH AND COURCHANE OFFER CONTRADICTORY AND CONFUSING**

3 **OPINIONS, AND BOTH SHOULD BE EXCLUDED**

4 Plaintiffs' two "inflation" experts proffer opinions and conclusions that cannot be

5 reconciled with each other.  This is an independent basis for exclusion of both experts' opinions.

6 ***Conflict Between The "Inflation" Findings of Courchane and French***:  The "inflation"

7 findings of Drs. Courchane and French are frequently in direct contradiction.[14]  For example:

8 • Whereas Dr. French finds Miami to be the third-most "inflated" of his five MSAs
   (surpassed only by the regions appraised by Steve Smith), Dr. Courchane found the

9 Miami MSA to be *deflated* as a whole, with more original appraisals coming in below
   the AVM value (50.3%) than above (44.0%). *Compare* Ex. 71 (PLAINTIFF001175),

10 *with* Ex. 39 (Courchane Report) at 33 (Table 9).

11 • Under Dr. Courchane's AVM methodology, Los Angeles's "inflation" is lower than
   both New York and Chicago.  Ex. 39 (Courchane Report) at 33 (Table 9).  Yet the

12 retrospective appraisal reviews provided by Mr. Smith find "inflation" in 72.4% of
   appraisals in the Los Angeles MSA, nearly three times greater than the findings of the

13 retrospective reviewers in New York (26.7%) and Chicago (26.5%).  Ex. 71
   (PLAINTIFF001175).

14

15 • Dr. Courchane's Median Price methodology ranks New York as the second most
   "inflated" MSA (62.3% above median) and Chicago as third (61.6% above median).

16 Ex. 39 (Courchane Report) at 27 (Table 6).  But the retrospective reviews provided to
   Dr. French show New York and Chicago as having far and away the least "inflation."

   Ex. 71 (PLAINTIFF001175).

17

18 • While Riverside is the second-least "inflated" MSA under Dr. Courchane's median
   price methodology, the retrospective reviews provided by Mr. Smith indicate that

   Riverside is easily the most "inflated" of the five MSAs.  *Compare* Ex. 39 (Courchane

19 Report) at 27 (Table 6), *with* Ex. 71 (PLAINTIFF001175).

20 Dr. Courchane's report hypothesizes that variation in "inflation" across the five MSAs "is

21 not surprising…as house price changes and the speed of the house price declines was not uniform

22 in every MSA."  Ex. 39 (Courchane Report) at ¶ 63.  But even if this is true, the various methods

23 used by Plaintiffs' experts should still be consistently measuring these differences, *e.g.*, each

24 methodology should measure Los Angeles as exhibiting more (or less) "inflation" than the other

25 regions.  Instead, Plaintiffs' methodologies exhibit complete randomness as to which regions are

26

27 ────────────────

[14] Any sampling of appraisal values will necessarily include some that are above
anticipated values (what Plaintiffs describe as "inflation") and some that are below anticipated
28 values ("deflation").  Accordingly, the mere fact that both of Plaintiffs' experts found some degree
of "inflation" is meaningless, and certainly does not establish consistency in their outcomes.

rated as the most and least "inflated."  The disparate results reached by these experts' various methodologies highlight the unreliable nature of each of them.  *United States v. Hermanek*, 289 F.3d 1076, 1097 (9th Cir. 2002) ("Inconsistent results may be an indicator of unreliability); *Geowey v. United States*, 886 F. Supp. 1268, 1282 (D.S.C. 1995) (Where "significant inconsistencies appear among Plaintiffs' experts' testimony . . . the court must conclude that Plaintiffs are merely speculating.").

*Courchane's AVM Values Reveal Bias By The Retrospective Appraisers*: It is self-evident that Plaintiffs' retrospective appraisal values are relevant to establishing appraisal "inflation" only if the retrospective values are themselves the result of a neutral and objective valuation process.  Yet when Plaintiffs' retrospective desk review values are compared to Dr. Courchane's AVM valuations, a dramatic bias is revealed: 86.1% of Plaintiffs' retrospective appraisal values are lower than the AVM value for the same property, by an average of 10.6%. This is a far greater bias than that which Dr. Courchane observed in the original EA appraisals (52.9% of EA appraisals above AVM, with average difference of 9.2%), except the bias exhibited by Plaintiffs' appraisers goes down instead of up.  Ex. 41 (James August 1, 2014 Decl.) at ¶¶ 7-8.

The obvious consequence of this downward bias in Plaintiffs' retrospective appraisal reviews is to increase the apparent inflation in the original EA appraisals. And with lower retrospective values to use as a comparison point, Plaintiffs will of course measure more "inflation" in the EA appraisals.  Plaintiffs cannot have it both ways: either (i) the AVMs used by Dr. Courchane are not a legitimate comparison point for human appraisal values and should be excluded as unreliable, or (ii) the AVMs are a valid comparison point, and these AVMs thus demonstrate that Plaintiffs' retrospective appraisal review experts have massively and systematically undervalued their reviews, thereby creating a false appearance of "inflation" in the original EA appraisals.  To avoid jury confusion and prejudice to EA, both of Plaintiffs' "inflation" experts must be excluded.

## VI.   **CONCLUSION**

For all the reasons described herein, the "inflation"-related opinions of Drs. Courchane and French should be excluded.

1   Dated: October 2, 2014                    Respectfully submitted,

2                                             IRELL & MANELLA LLP
                                              John C. Hueston
3                                             A. Matthew Ashley
                                              Justin N. Owens
4

5                                             By:   /s/ Justin N. Owens
                                                    Justin N. Owens
6                                                   Attorneys for Defendant
                                                    eAppraiseIT, LLC
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**ECF ATTESTATION**

2      I, Jeff Wilkerson, am the ECF user whose ID and password are being used to file

3  **DEFENDANT'S NOTICE OF MOTION AND MOTION IN LIMINE NO. 2 TO EXCLUDE**

4  **THE OPINIONS OF DR. MARSHA COURCHANE AND DR. GARY FRENCH**.  I hereby

5  attest that I have on file all holographic signatures corresponding to any signatures indicated by a

6  conformed signature (/s/) within this e-filed document.

7

8

9                                                    /s/ Jeff Wilkerson

10                                                   Jeff Wilkerson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28